# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>TOUSA, INC., *et al*.,<br><br>          Debtors. | Chapter 11 Cases<br><br>Case No. 08-10928-JKO<br><br>Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TOUSA, INC., *ET AL.*,<br><br>          Plaintiff<br><br>      vs.<br><br>CITICORP NORTH AMERICA, INC.; WELLS FARGO BANK, N.A.; DOE NEW LENDERS NOS. 1-100; DOE NEW SUBORDINATED NOTES SUCCESSOR TRUSTEE; DOE NEW SUBORDINATED NOTEHOLDERS NOS. 101-200; THE CIT GROUP/BUSINESS CREDIT, INC; DISTRESSED HIGH YIELD TRADING OPS. FUND LTD; 3V CAPITAL MASTER FUND LTD.; DEUTSCHE BANK TRUST COMPANY AMERICAS; SILVER OAK CAPITAL, LLC; BEAR STEARNS INVESTMENT PRODUCTS INC.; BANK OF AMERICA, N.A.; BLACK DIAMOND CLO 2005-1; FALL CREEK CLO, LTD.; EATON VANCE SENIOR DEBT PORTFOLIO; EATON VANCE SENIOR INCOME TRUST; EATON VANCE GRAYSON & CO.; EATON VANCE VT FLOATING-RATE INCOME FUND; EATON VANCE LIMITED DURATION INCOME FUND; EATON VANCE SENIOR FLOATING-RATE TRUST; EATON VANCE FLOATING-RATE INCOME TRUST; EATON VANCE CREDIT OPPORTUNITIES FUND; FARALLON CAPITAL INSTITUTIONAL PARTNERS, L.P.; FARALLON CAPITAL INSTITUTIONAL PARTNERS II, L.P.; TINICUM PARTNERS, L.P.; | Adv. Pro. No. [_____] |

FARALLON CAPITAL OFFSHORE
INVESTORS, INC.; FARALLON CAPITAL
OFFSHORE INVESTORS II, L.P.; FARALLON
CAPITAL PARTNERS, L.P.; FARALLON
CAPITAL INSTITUTIONAL PARTNERS III,
L.P.; AURUM CLO 2002-1 LTD.; FLAGSHIP
CLO III; FLAGSHIP CLO IV; FLAGSHIP CLO
V; GOLDMAN SACHS CREDIT PARTNER,
L.P.; GRAND CENTRAL ASSET TRUST, CED
SERIES; HARTFORD MUTUAL FUNDS, INC.
ON BEHALF OF THE HARTFORD FLOATING
RATE FUND BY HARTFORD INVESTMENT
MANAGEMENT COMPANY, ITS SUB-
ADVISOR; STEDMAN CBNA LOAN
FUNDING LLC; ATASCOSA INVESTMENTS,
LLC; GLENEAGLES CLO LTD; GRAND
CENTRAL ASSET TRUST, HLD SERIES;
GRAND CENTRAL ASSET TRUST, SOH
SERIES; JASPER CLO, LTD.; LIBERTY CLO,
LTD.; BURNET PARTNERS, LLC; ROCKWALL
CDO, LTD.; HIGHLAND CDO OPPORTUNITY
FUND, LTD.; HIGHLAND FLOATING RATE
LLC; HIGHLAND LEGACY LIMITED; LOAN
FUNDING VII, LLC; HIGHLAND OFFSHORE
PARTNERS, L.P.; HIGHLAND CREDIT
OPPORTUNITIES CDO LTD.; HIGHLAND
FLOATING RATE ADVANTAGE FUND;
JPMORGANCHASE BANK, N.A.; LL BLUE
MARLIN FUNDING LLC; MERRIL LYNCH
CREDIT PRODUCTS, LLC; OCEAN BANK;
QUADRANGLE MASTER FUNDING LTD.;
CENTURION CDO 10, LTD.; CENTURION
CDO XI, LTD.; CENTURION CDO 8, LIMITED;
CENTURION CDO 9, LTD.; CENTURION CDO
II, LTD.; CENTURION CDO VI, LTD.;
SEQUILS-CENTURION V, LTD.; CENTURION
CDO VII, LTD.; RIVERSOURCE FLOATING
RATE FUND; VAN KAMPEN SENIOR LOAN
FUND; VAN KAMPEN DYNAMIC CREDIT
OPPORTUNITIES FUND; VAN KAMPEN
SENIOR INCOME TRUST; and THE
FOOTHILLS GROUP, INC.,

Defendants.

## ADVERSARY COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") of TOUSA, Inc., *et al*. ("Debtors"), by and through its undersigned counsel, on behalf of and as the representative of the bankruptcy estates of the Debtors, based upon information and belief and as a result of its investigation to date, alleges as follows:

## PRELIMINARY STATEMENT

1.      The Committee seeks in this adversary proceeding to avoid certain prepetition fraudulent and preferential transfers of up to $800 million that grow out of certain secured debt obligations that were incurred by certain Debtors. TOUSA, Inc. ("TOUSA") forced certain of its subsidiaries, now among the Debtors, to take on hundreds of millions of dollars of debt on or about July 31, 2007 so that TOUSA could repay a debt for which those subsidiaries were not liable. At the time of the transaction, the subsidiaries either already were insolvent or thereby became insolvent. The Committee also seeks to recover payments already made on those debt obligations. The Debtors used the proceeds of those debt obligations to satisfy antecedent debts owed by only two of the Debtors; the Committee seeks in the alternative to recover the proceeds of those loans. The Committee also seeks to set aside as a preferential transfer a tax refund of more than $200 Million, and objects to certain claims lodged against Debtors.

2.      During the summer of 2005, Debtor TOUSA Homes LP ("Homes LP") and Falcone/Ritchie LLC formed TE/TOUSA LLC (the "Transeastern JV") to acquire substantially all of the homebuilding assets of Transeastern Properties, Inc. (the "Transeastern Acquisition"). TOUSA and Homes LP gave certain guaranties as part of the transaction, and the parties formed several subsidiaries of the Transeastern JV. In order to fund the Transeastern Acquisition, Homes LP, TOUSA, and the Transeastern JV Subsidiaries (as defined below) entered into three

credit agreements with the Transeastern Lenders totaling $675 million (the "<u>Transeastern Debt</u>"). TOUSA and Homes LP were the only Debtors that were liable for the Transeastern Debt.

3.      The Transeastern JV floundered within months. By November 2006, the Administrative Agent for the Transeastern Lenders began litigation against TOUSA and Homes LP seeking recovery under their guarantees. After months of negotiations, the Debtors consummated a "global settlement" of the litigation and of the remaining obligations among participants in the Transeastern JV (the "<u>Transeastern Settlement</u>"). As part of the Transeastern Settlement, TOUSA and Homes LP forced certain of their direct and indirect subsidiaries (the "Conveying Subsidiaries"), on or about July 31, 2007, to become co-borrowers and guarantors under certain secured credit facilities of approximately $800 million with the New Lenders (as defined below). TOUSA and Homes LLP used the proceeds of those credit facilities, among other things, to satisfy the Transeastern Debt, and to incur certain other liabilities – even though the Conveying Subsidiaries were not obligated for the Transeastern Debt.

4.      As they were not liable on the Transeastern Debt, the Conveying Subsidiaries did not receive reasonably equivalent value (a) from the New Lenders in exchange for incurring secured debt obligations in an amount potentially in excess of $800 million (the "<u>New Lender Claim and Lien Transfers</u>"), or (b)(i) from CIT and the Transeastern Lenders (defined below) in exchange for the transfer of over $422 million in satisfaction of the Transeastern Debt (the "<u>CIT Transfer</u>") and (ii) from the Doe Successor Trustee (as defined below) in exchange for incurring obligations on the "<u>New Subordinated Notes</u>,"[1] $20 million of new paid-in-kind notes in the

_____

[1] These were $20 million of new 14.75% senior subordinated paid-in-kind notes due July 1, 2015, The New Subordinated Notes were issued pursuant to that certain Indenture, dated as of July 31, 2007, among TOUSA (as issuer), all or substantially all of the Conveying Subsidiaries (as guarantors), and Wells Fargo (as indenture trustee.) Wells Fargo subsequently resigned as indenture trustee and was replaced by HSBC. Upon information and belief, on or about May 13, 2008, HSBC resigned as indenture trustee and has not been replaced.

"New Subordinated Notes Transfers." (The CIT Transfer and the New Subordinated Notes Transfers together are the "Transeastern Transfers" and, together with the New Lender Claim and Lien Transfers, are the "Fraudulent Transfers.")

5.      On July 31, 2007, the Conveying Subsidiaries were (i) either insolvent or rendered insolvent by the Fraudulent Transfers, (ii) left with unreasonably small capital, or (iii) unable to pay their debts as they were to come due. Thus, the Committee seeks to avoid and, as applicable, recover, the foregoing transfers and payments made in connection therewith, on behalf of and for the benefit of the Conveying Subsidiaries' estates, as constructively fraudulent conveyances under applicable bankruptcy and non-bankruptcy law.

6.      In addition, the Committee seeks to avoid as a preferential transfer any security interest allegedly granted by any of the Debtors to the New Lenders in respect of a tax refund in the approximate amount of $210 million (the "Tax Refund") that the Debtors received in or around June 2008. The Debtors' entitlement to the Tax Refund arose as a result of significant losses incurred during fiscal year 2007, which the Debtors were able to carry back to fiscal years 2005 and 2006. As a matter of law, (a) the Tax Refund is deemed earned as of the last day of the fiscal year for which the refund is claimed (in this case, December 31, 2007) and, thus, (b) any interest that the New Lenders allegedly obtained in the Tax Refund could not have arisen until December 31, 2007. As the New Lenders' alleged interest in the Tax Refund (a) arose during the 90-day period prior to the commencement of the Debtors' chapter 11 cases, (b) was a transfer on account of an antecedent debt owed to the New Lenders prior to the Petition Date, (c) was made while the Debtors were insolvent and (d) resulted in the New Lenders receiving more than they would in a chapter 7 case had the transfer not occurred, the Committee seeks to avoid, on behalf of and for the benefit of each of the Debtors' estates that has an interest in the Tax Refund, the

New Lenders' alleged lien on the Tax Refund as a preferential transfer under Bankruptcy Code section 547 (the "Preferential Transfer" and, together with the Fraudulent Transfers, the "Transfers").

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) because the claims asserted in this adversary proceeding arise in the above-captioned chapter 11 cases. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

8.     The Debtors and their non-Debtor affiliates (collectively, the "TOUSA Companies") design, build, and market detached single-family residences, town homes, and condominiums, and operate in various metropolitan markets in ten states, located in four major geographic regions: Florida, the Mid-Atlantic, Texas, and the West. TOUSA is a publicly traded company and the TOUSA Companies were collectively the nation's thirteenth largest homebuilder in 2006. On January 29, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.     Plaintiff Committee was appointed by the Office of the United States Trustee for the Southern District of Florida pursuant to Bankruptcy Code section 1102 on February 13, 2008. The Committee brings the Fraudulent Transfer claims derivatively on behalf of and for the benefit of the estates of the following Debtors: Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra

Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; and TOUSA/West Holdings, Inc. (collectively, the "Conveying Subsidiaries"). The Committee brings the Preferential Transfer claim on behalf of and for the benefit of the estates of each of the Debtors that has an interest in the Tax Refund.

10.    Defendant Citicorp North America, Inc. ("Citicorp"), the administrative agent under the New Revolving Debt and First Lien Term Loan (each, as defined below) and holder of the liens conveyed pursuant thereto, is a corporation organized under the laws of the State of Delaware. Citicorp is an initial transferee of the New Lender Claim and Lien Transfers within the meaning of section 550(a) of the Bankruptcy Code.

11.    Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), the successor administrative agent under the Second Lien Term Loan (as defined below) and holder of the liens conveyed pursuant thereto, is a corporation organized under the laws of the United States of America. Wells Fargo is an initial transferee of the New Lender Claim and Lien Transfers within the meaning of section 550(a) of the Bankruptcy Code.

12.     Defendants Doe New Lenders Nos. 1-100 are the original lenders under the New Loans and signatories thereunder, their successors, assigns, and participants (collectively with Citicorp and Wells Fargo, the "New Lenders"). The New Lenders are initial, immediate and/or mediate transferees of the New Lender Claim and Lien Transfers within the meaning of section 550(a) of the Bankruptcy Code.

13.     Defendant Doe New Subordinated Notes Successor Trustee ("Doe Successor Trustee") is the successor indenture trustee on the New Subordinated Notes. Doe Successor Trustee is an initial transferee of the New Subordinated Notes Transfers within the meaning of section 550(a) of the Bankruptcy Code.

14.     Defendants Doe New Subordinated Noteholders 101-200 are the original lenders under the New Subordinated Notes, their successors, assigns and participants. The Doe New Subordinated Noteholders are immediate and/or mediate transferees of the New Subordinated Notes Transfers within the meaning of section 550(a) of the Bankruptcy Code.

15.     Defendant The CIT Group/Business Credit, Inc. ("CIT"), the administrative agent in connection with the Transeastern Debt on the Transfer Date (as defined below), is a corporation organized under the laws of the state of New York. CIT is an initial, immediate, or mediate transferee of the Transeastern Transfers within the meaning of section 550(a) of the Bankruptcy Code.

16.     The remaining defendants[2] are lenders under the Senior Credit Agreement and signatories to the CIT Settlement Agreement (both defined below) (collectively, the

_____

[2] The remaining defendants are 3V Capital Master Fund Ltd.; Atascosa Investments, LLC; Aurum CLO 2002-1 Ltd.; Bank of America, N.A.; Bear Stearns Investment Products Inc.; Black Diamond CLO 2005-1; Burnet Partners, LLC; Centurion CDO 10, Ltd.; Centurion CDO 8, Limited; Centurion CDO 9, Ltd.; Centurion CDO II, Ltd.; Centurion CDO VI, Ltd.; Centurion CDO VII, Ltd.; Centurion CDO XI, Ltd.; Deutsche Bank Trust Company Americas; Distressed High Yield Trading Ops. Fund Ltd; Eaton Vance Credit Opportunities Fund; Eaton Vance Floating-Rate

"Transeastern Lenders" and, together with CIT, HSBC and Doe Successor Trustee and the Doe New Subordinated Noteholders 101-200, the "Transeastern Transferees"). The Transeastern Lenders are initial, immediate, or mediate transferees of the Transeastern Transfers within the meaning of section 550(a) of the Bankruptcy Code.

17.    All defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure, made applicable by Rule 7020 of the Federal Rules of Bankruptcy Procedure, because the right to relief asserted against all defendants arises out of the same transaction, occurrence, or series of transactions and occurrences, and questions of law and fact common to all defendants and/or certain categories or classes of defendants will arise in this action.

## BACKGROUND

### A.    The Transeastern Acquisition

18.    On June 6, 2005, the Transeastern JV was formed to enter into the Transeastern Acquisition. Prior to the consummation of the Transeastern Acquisition, Arthur J. Falcone and Edward W. Falcone were the majority owners of Transeastern Properties, Inc.

---

Income Trust; Eaton Vance Grayson & Co.; Eaton Vance Limited Duration Income Fund; Eaton Vance Senior Debt Portfolio; Eaton Vance Senior Floating-Rate Trust; Eaton Vance Senior Income Trust; Eaton Vance VT Floating-Rate Income Fund; Fall Creek CLO, Ltd.; Farallon Capital Institutional Partners II, L.P.; Farallon Capital Institutional Partners III, L.P.; Farallon Capital Institutional Partners, L.P.; Farallon Capital Offshore Investors II, L.P.; Farallon Capital Offshore Investors, Inc.; Farallon Capital Partners, L.P.; Flagship CLO III; Flagship CLO IV; Flagship CLO V; Gleneagles CLO Ltd; Goldman Sachs Credit Partner, L.P.; Grand Central Asset Trust, CED Series; Grand Central Asset Trust, HLD Series; Grand Central Asset Trust, SOH Series; Hartford Mutual Funds, Inc. on behalf of The Hartford Floating Rate Fund by Hartford Investment Management Company, its Sub-Advisor; Highland CDO Opportunity Fund, Ltd.; Highland Credit Opportunities CDO Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate LLC; Highland Legacy Limited; Highland Offshore Partners, L.P.; Jasper CLO, Ltd.; JPMorganChase Bank, N.A.; Liberty CLO, Ltd.; LL Blue Marlin Funding LLC; Loan Funding VII, LLC; Merril Lynch Credit Products, LLC; Ocean Bank; Quadrangle Master Funding Ltd.; Riversource Floating Rate Fund; Rockwall CDO, Ltd.; Sequils-Centurion V, Ltd.; Silver Oak Capital, LLC; Stedman CBNA Loan Funding LLC; The Foothills Group, Inc.; Tinicum Partners, L.P.; Van Kampen Dynamic Credit Opportunities Fund; Van Kampen Senior Income Trust; and Van Kampen Senior Loan Fund.

19.     To fund the Transeastern Acquisition, the Transeastern JV created a series of "tiered" special purpose subsidiaries (the "Transeastern JV Subsidiaries") : a) EHT, the primary operating subsidiary of the Transeastern JV; b) TE/TOUSA Senior, LLC ("TOUSA Senior"), managing member and sole owner of EHT; c) TE/TOUSA Mezzanine LLC ("TOUSA Mezz"), which owned all of the membership interests in TOUSA Senior; and d) TE/TOUSA Mezzanine Two LLC ("TOUSA Mezz II"), which owned all of the membership interests in TOUSA Mezz. The Transeastern Subsidiaries entered into credit agreements with separate groups of lenders, each dated August 1, 2005 (collectively, the "Transeastern Credit Agreements"),[3] totaling $675 million, as follows:

(i)     a $450,000,000 Credit Agreement (the "Senior Credit Agreement")[4] entered into by EHT with TOUSA Senior, LLC as co-borrower;

(ii)    a $137,500,000 Senior Mezzanine Credit Agreement (the "Senior Mezzanine Credit Agreement")[5] with TOUSA Mezz as borrower; and

(iii)   an $87,500,000 Junior Mezzanine Credit Agreement (the "Junior Mezzanine Credit Agreement") with TOUSA Mezz II as borrower.

20.     Thus, (a) EHT and TOUSA Senior were the only primary obligors under the Senior Credit Agreement, (b) TOUSA Mezz was the only primary obligor under the Senior Mezzanine Credit Agreement, and (c) TOUSA Mezz II was the only primary obligor under the Junior Mezzanine Credit Agreement. In addition, TOUSA and Homes LP (the "TOUSA Guarantors") both executed three unsecured completion guaranties and three unsecured carve-

---

[3] Deutsche Bank Trust Company Americas ("DB Trust") was the original administrative agent under the Transeastern Credit Agreements, and Deutsche Bank Securities Inc. ("DB Securities") was the sole lead arranger and sole book running manager thereunder. On March 13, 2007, CIT replaced DB Trust and DB Securities as administrative agent, lead arranger, and book running manager for the Transeastern Credit Agreements.

[4] The Senior Credit Agreement was secured by first priority liens on substantially all of the assets of EH/Transeastern, LLC ("EHT") including, without limitation, real estate and options contracts.

[5] The Senior Mezzanine Credit Agreement and the Junior Mezzanine Credit Agreement were secured by liens on ownership interests in certain of the Transeastern JV Subsidiaries.

out guaranties (the six guaranties together are the "TOUSA Guaranties") in respect of the Transeastern Credit Agreements. Upon information and belief, carve-out guaranties were also executed by Falcone/Ritchie LLC and certain of its affiliates.

21.    Although the Debtors' corporate structure includes many entities, only TOUSA and Homes LP had any obligations in connection with the Transeastern Debt. None of the Conveying Subsidiaries were obligors under the Transeastern Credit Agreements.

**B.    The Prepetition Transeastern Litigation**

22.    On October 31, 2006, and November 1, 2006, the TOUSA Guarantors received demand letters from DB Trust requiring payment under the TOUSA Guaranties. The demand letters alleged that potential defaults and events of default had occurred under the Transeastern Credit Agreements triggering the TOUSA Guarantors' obligations. On November 28, 2006, the TOUSA Guarantors filed a declaratory action in Florida state court against DB Trust seeking a declaration that the TOUSA Guarantors' obligations under the TOUSA Guaranties had not been triggered and/or that their exposure under the TOUSA Guaranties differed from what DB Trust alleged in the demand letters (the "Florida Action").[6] On November 29, 2006, DB Trust filed suit in New York against the TOUSA Guarantors asserting claims allegedly arising out of DB Trust's rights under the TOUSA Guaranties (the "New York Action").

23.    DB Trust was the Administrative Agent under the Transeastern Credit Agreements from the inception of the agreements through March 13, 2007. In addition, DB Securities acted as financial advisor to certain of the TOUSA Guarantors and Transeastern JV

---

[6] On April 27, 2007, the Florida Action was dismissed without prejudice by stipulation of the parties.

Subsidiaries in connection with the Transeastern Acquisition, pursuant to a letter agreement (the "DB Letter Agreement"). On March 26, 2007, DB Securities commenced an action in New York for claims allegedly arising out of the DB Letter Agreement (the "DB Securities Action" and, together with the Florida Action and the New York Action, the "Prepetition Transeastern Litigation").

24.     As the Conveying Subsidiaries were not liable for any of the Transeastern Debt, they were not parties in the Prepetition Transeastern Litigation.

**C.      The Transeastern Settlement**

25.     During the months of May, June, and July 2007, parties to the Prepetition Transeastern Litigation and others entered into the following agreements in connection with the Transeastern Settlement:

(i)      a Settlement and Release Agreement dated as of May 30, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, and certain of the Falcone Entities[7] as set forth in Schedule 1 to the agreement (the "Land Bank Settlement Agreement");

(ii)     a Settlement and Release Agreement dated as of July 31, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, CIT, and the lenders under the Senior Credit Agreement (the "CIT Settlement Agreement");

(iii)    a Settlement and Release Agreement, dated as of June 29, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, and the lenders under the Senior Mezzanine Credit Agreement (the "Senior Mezzanine Settlement Agreement"); and

(iv)     a Settlement and Release Agreement, dated as of June 29, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, and the lenders under the Junior Mezzanine Agreement (the "Junior Mezzanine Settlement Agreement" and, together with the Land Bank Settlement Agreement, the CIT Settlement Agreement, and the Senior Mezzanine Settlement Agreement, the "Transeastern Settlement Agreements").

---

[7] The "Falcone Entities" consist of Arthur Falcone, Edward Falcone, Falcone/Ritchie LLC, and other affiliated entities.

26.     Pursuant to the Land Bank Settlement Agreement, among other things, the Falcone Entities obtained releases from any and all claims or issues arising in connection with the Transeastern JV and the Transeastern Acquisition with the exception of certain retained obligations set forth in the Land Bank Settlement Agreement. Upon information and belief, the Land Bank Settlement Agreement also provided for the payment of over $49 million by EHT to the Falcone Entities in exchange for the takedown of certain properties. Also upon information and belief, EHT, TOUSA Senior, TOUSA Mezz, and TOUSA Mezz II were merged into TOUSA Homes Florida, L.P., one of the Debtors, upon consummation of the Transeastern Settlement.

27.     Pursuant to the CIT Settlement Agreement and in accordance with a pay-off letter attached thereto, among other things, EHT and TOUSA Senior agreed to pay $421,522,193.46 to CIT on July 31, 2007, with an additional penalty of approximately $140,000 per day for any late payments.

28.     Pursuant to the Senior Mezzanine Settlement Agreement, among other things, TOUSA agreed to issue and deliver (i) the New Subordinated Notes, and (ii) $117.5 million (at $1,000 per share) of 8% Series A Convertible Pay-in-Kind Preferred Stock in TOUSA to the lenders under the Senior Mezzanine Settlement Agreement in satisfaction and discharge of the debt incurred thereunder.

29.     Pursuant to the Junior Mezzanine Settlement Agreement, among other things, TOUSA agreed to issue and deliver $16.25 million of warrants to acquire shares of TOUSA common stock to the Junior Mezzanine Credit Agreement lenders in satisfaction and discharge of the debt incurred thereunder.

30.     The Transeastern Settlement closed on July 31, 2007 (the "Transfer Date"). The

Transeastern Settlement released all claims by the Transeastern Transferrees against the TOUSA

Guarantors and the Transeastern JV Subsidiaries arising out of the Transeastern Acquisition and

the Transeastern Debt.

**D.      The New Credit Agreements**

31.     In order to fund, among other things, the settlement payments to, among others,

CIT under the Transeastern Settlement, TOUSA, as borrower, together with Homes LP and the

Conveying Subsidiaries, as both co-borrowers and guarantors, entered into the following secured

credit facilities on the Transfer Date:

(i)     Second Amended and Restated Revolving Credit Agreement (the "Amended Revolver Agreement") with Citicorp, as Administrative Agent, and certain other lending institutions (the "Revolving Debt");[8]

(ii)    $200 million first lien term loan facility (the "First Lien Term Credit Agreement") with Citicorp, as Administrative Agent, and certain other lending institutions (the "First Lien Term Loan");[9] and

(iii)   $300 million second lien term loan facility (the "Second Lien Term Credit Agreement," and together with the Amended Revolver Agreement and the First Lien Term Loan Agreement, the "New Credit Agreements") with Citicorp, as Administrative Agent, [10] and certain other lending institutions (the "Second Lien Term Loan" [11] and, together with the First Lien Term Loan and the Revolving Debt, the "New Debt" or "New Loans").

---

[8] As of the Petition Date, approximately $316.5 million was outstanding under the Amended Revolver Agreement in respect of revolving loans and letters of credit.

[9] As of the Petition Date, approximately $199 million was outstanding under the First Lien Term Loan.

[10] On or about January 28, 2008, Citicorp resigned as administrative agent under the Second Lien Term Loan and was replaced by Wells Fargo.

[11] As of the Petition Date, approximately $317 million was outstanding under the Second Lien Term Loan.

32.    The obligations under the Revolving Debt and First Lien Term Loan (together, the "First Lien Indebtedness") are allegedly secured by first priority liens on, among other things, the property and assets of all of the Debtors, whether real or personal, tangible or intangible, and wherever located (the "Prepetition Collateral"). The obligations under the Second Lien Term Loan are allegedly secured by a second priority lien on the Prepetition Collateral. An intercreditor agreement, dated as of July 31, 2007, governs the respective rights of the lenders under the First Lien Indebtedness and the lenders under the Second Lien Term Loan.

33.    Even though the Conveying Subsidiaries did not receive fair consideration or reasonably equivalent value in connection with the transaction, they were forced to be co-borrowers and guarantors on the New Loans and, thus, made jointly and severally liable on a secured basis for all amounts owed and subsequently borrowed thereunder (including interest, fees, and other amounts). Moreover, rather than being used for the benefit of the Conveying Subsidiaries (whose assets were pledged to support the New Loans), all or substantially all of which were already liable on at least approximately $1.1 billion in debt obligations, the New Debt credit agreements expressly required that proceeds from the New Loans would be used to satisfy the obligations of the TOUSA Guarantors, the Transeastern JV Subsidiaries, and the Falcone Entities under the Transeastern Credit Agreements. Indeed, the New Loans were conditioned upon finalizing the Transeastern Settlement and extinguishing the Transeastern Debt.[12] On the Transfer Date, no less than $422.8 million of the proceeds from the New Debt

---

[12] The conditions to the New Loans, included, but were not limited to, "[t]he Settlement Documents . . . [being] in full force and effect", "[t]he refinancing and exchange of Indebtedness under the Transeastern JV Credit Agreements . . . [being] consummated in full to the satisfaction of the Lenders with all Liens in favor of the existing lenders being terminated and discharged", and "the Administrative Agent [of the Transeastern Debt] . . . [receiving] a 'pay-off' letter." First Lien Term Loan at Section 3.1(c)(i) and (iii); Second Lien Term Loan at Section 3.1(c)(i) and (iii); Amended Revolver Agreement at Section 3.1(c)(i) and (iii).

plus other consideration was paid to CIT and other parties in satisfaction of the Transeastern Debt.

34.    The Transeastern Transferees (i) knew that the Conveying Subsidiaries were not defendants in the Prepetition Transeastern Litigation, (ii) knew that the Conveying Subsidiaries were not obligated on the Transeastern Debt that was released in connection with the Transeastern Settlement resolving the litigation, (iii) knew that the Conveying Subsidiaries did not otherwise benefit from the Transeastern Settlement, and (iv) knew that the Conveying Subsidiaries were nevertheless forced to take on crippling obligations in order to fund the Transeastern Settlement. In short, the Transeastern Transferees knew or should have known that the Conveying Subsidiaries did not receive fair or reasonably equivalent value in exchange for incurring the New Debt that was used to fund the Transeastern Settlement.

35.    The Transeastern Settlement was negotiated extensively among sophisticated parties represented by sophisticated counsel, and resulted in certain of the Transeastern Transferees receiving, among other consideration, equity interests in TOUSA and unsecured notes from TOUSA and the Conveying Subsidiaries. On information and belief, the sophisticated Transeastern Transferees and their agents and counsel must have conducted extensive due diligence, including examination of the capital structure of TOUSA and the Conveying Subsidiaries, before agreeing to accept that consideration. Such due diligence would have revealed, among other things, that all or substantially all of the Conveying Subsidiaries already were guarantors of more than $1 billion in unsecured bond obligations, and that any property held by the Conveying Subsidiaries was far less than the obligations of those entities, before and certainly after consummation of the Transeastern Settlement. For these reasons and others, the Transeastern Transferees knew, should have known, or upon reasonable inquiry

would have learned, that the Conveying Subsidiaries were insolvent at the time of, or became insolvent as a result of, the Transeastern Settlement.

**E.**     **The Tax Refund**

36.     Upon information and belief, on or about March 14, 2008, the Debtors filed with the Internal Revenue Service a consolidated 2007 federal tax return in which the Debtors claimed the Tax Refund. Upon information and belief, the Debtors received the Tax Refund in or around June 2008. The Debtors' entitlement to the Tax Refund arose as a result of significant losses incurred during fiscal year 2007 resulting from the sale, disposition, and returning of assets to various lenders, which losses the Debtors were able to carry back to fiscal years 2005 and 2006. As a matter of law, the Tax Refund is deemed earned as of the last day of the fiscal year for which the refund is claimed, or in this case December 31, 2007.

## COUNT I

### FRAUDULENT TRANSFER AGAINST NEW LENDERS (SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

37.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

38.     None of the Conveying Subsidiaries received reasonably equivalent value in exchange for New Lender Claim and Lien Transfers.

39.     At the time the New Lender Claim and Lien Transfers were made, each of the Conveying Subsidiaries: (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due; and/or (b) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

40.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

41.     The New Lender Claim and Lien Transfers should be avoided pursuant to sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code section 544(b).

42.     Any payments made in connection with the New Lender Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550 of the Bankruptcy Code.

## COUNT II

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS (SECTIONS (726.106 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

43.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

44.     None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the New Lender Claim and Lien Transfers.

45.     Each of the Conveying Subsidiaries either already was insolvent at the time of the New Lender Claim and Lien Transfers or became insolvent as a result of the New Lender Claim and Lien Transfers.

46.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

18

47.    The New Lender Claim and Lien Transfers should be avoided pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code section 544(b).

48.    Any payments made in connection with the New Lender Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550.

## COUNT III

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

49.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

50.    None of the Conveying Subsidiaries received fair consideration in exchange for the New Lender Claim and Lien Transfers.

51.    Each of the Conveying Subsidiaries either already was insolvent at the time of the New Lender Claim and Lien Transfers or became insolvent as a result of the New Lender Claim and Lien Transfers.

52.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

53.    The New Lender Claim and Lien Transfers should be avoided pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

54.    Any payments made in connection with the New Lender Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

## COUNT IV

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS
### (SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

55.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

56.    None of the Conveying Subsidiaries received fair consideration in exchange for the New Lender Claim and Lien Transfers.

57.    The capital remaining in the hands of each of the Conveying Subsidiaries after the New Lender Claim and Lien Transfers was unreasonably small.

58.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

59.    The New Lender Claim and Lien Transfers should be avoided pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

60.    Any payments made in connection with the New Lender Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or

subsequent to the Petition Date) should be avoided and recovered pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

## COUNT V

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS
### (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW
### AND 11 U.S.C. §§ 544(b)AND 550)

61.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

62.    None of the Conveying Subsidiaries received fair consideration in exchange for the New Lender Claim and Lien Transfers.

63.    At the time of the New Lender Claim and Lien Transfers, each of the Conveying Subsidiaries intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

64.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

65.    The New Lender Claim and Lien Transfers should be avoided pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

66.    Any payments made in connection with the New Lender Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

## COUNT VI

### FRAUDULENT TRANSFER AGAINST
### THE NEW LENDERS (11 U.S.C. §§ 548, 550)

67.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

68.     The New Lender Claim and Lien Transfers were made within two years of the Petition Date.

69.     Each of the Conveying Subsidiaries received less than reasonably equivalent value in exchange for the New Lender Claim and Lien Transfers.

70.     At the time of the New Lender Claim and Lien Transfers, each of the Conveying Subsidiaries (i) was insolvent or became insolvent as a result of the New Lender Claim and Lien Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with such Conveying Subsidiary was unreasonably small; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

71.     The New Lender Claim and Lien Transfers should be avoided pursuant to Bankruptcy Code section 548(a)(1)(b).

72.     Any payments made in connection with the New Lender Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to Bankruptcy Code sections 548 and 550.

## COUNT VII

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES
### (SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES AND
### 11 U.S.C. §§ 544(b) AND 550)

73.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

74.     None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

75.     At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due; and/or (b) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

76.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

77.     At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

78.     The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT VIII

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 726.106 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

79.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

80.     None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

81.     Each of the Conveying Subsidiaries either already was insolvent at the time of the Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

82.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

83.     At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

84.     The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT IX

## FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

85.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

86.     None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

87.     Each of the Conveying Subsidiaries either already was insolvent at the time of the Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

88.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

89.     At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

90.     The Transeastern Transfers should be avoided and/or recovered pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT X

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

91.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

92.     None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

93.     The capital remaining in the hands of each of the Conveying Subsidiaries after the Transeastern Transfers was unreasonably small.

94.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

95.     At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

96.     The Transeastern Transfers should be avoided and/or recovered pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XI

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b)AND 550)

97.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

98.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

99.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

100.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

101.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

102.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XII

### FRAUDULENT TRANSFER AGAINST
### TRANSEASTERN TRANSFEREES (11 U.S.C. §§ 548 AND 550)

103.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

104.    The Transeastern Transfers were made within two years before the Petition Date.

105.    Each of the Conveying Subsidiaries received less than reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

106.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (i) was insolvent or became insolvent as a result of the New Lender Claim and Lien Transfers and the Transeastern Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with each such Conveying Subsidiary was an unreasonably small; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

107.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

108.    The Transeastern Transfers should be avoided and/or recovered pursuant to Bankruptcy Code sections 548 and 550(a).

**COUNT XIII**

**AVOIDABLE PREFERENCE**
**AGAINST THE NEW LENDERS (11 U.S.C. §§ 547 AND 550)**

109.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

110.    The granting of a security interest in the Tax Refund, to the extent valid, was for the benefit of the New Lenders.

111.    The granting of a security interest in the Tax Refund, to the extent valid, was on account of an antecedent debt owed to the New Lenders prior to the Petition Date.

112.    The granting of a security interest in the Tax Refund, to the extent valid, was made to the New Lenders while the Debtors were insolvent.

113.    The granting of a security interest in the Tax Refund, to the extent valid, occurred within 90 days of the Petition Date.

114.    The granting of a security interest in the Tax Refund, to the extent valid, will result in the New Lenders receiving more than they would in a chapter 7 case had the granting of the security interest not occurred.

115.    The granting of the security interest in the Tax Refund to the New Lenders, to the extent valid, should be avoided and/or recovered pursuant to Bankruptcy Code sections 547 and 550.

**COUNT XIV**

**OBJECTION TO ALLOWANCE OF CLAIM**
**(11 U.S.C. §§ 105, 502, 544, 548, 550 AND FRBP 3007, 7001)**

116.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

117.    The New Lenders filed proofs of claims seeking allowance of the full amount of the New Loans (the "Claims"). The Committee hereby objects to the Claims pursuant to section 502 of the Bankruptcy Code.

118.    The Conveying Subsidiaries received less than reasonably equivalent value in exchange for incurring the New Loans and pledging the Pre-Petition Collateral, and either were insolvent at the time of the New Lender Claim and Lien Transfers, or were rendered insolvent by those Transfers. As such, the New Lender Claim and Lien Transfers are avoidable under sections 544 and 548 of the Code, and the Claims of the New Lenders – which are based exclusively on the alleged validity of the New Lender Claim and Lien Transfers – must be disallowed under section 502 of the Code.

119.    In connection with the New Credit Agreements, the Conveying Subsidiaries were required to execute Guaranty agreements each dated July 31, 2007 (the "New Loan Guaranties"). Section 2 of the New Loan Guaranties contains language that purports, under certain circumstances, to limit the Debtors' obligations arising from the Debtors' guaranty of the obligations created in the New Credit Agreements and New Loan Guaranties (the "New Loan Savings Clause"). Section 2 of the Amended Revolver Agreement has a guaranty with an identical putative Savings Clause (the Revolver Savings Clause" and together with the New Loan Savings Clauses, the "Guaranty Savings Clauses"). Section 10 of each of the New Credit Agreements also contains language, albeit different language from the Guaranty Savings Clauses, that also purports, under certain circumstances, to limit the liability and liens attributable to the Conveying Subsidiaries. ("The Loan Agreement Savings Clauses," and together with the Guaranty Savings Clauses, the "Savings Clauses.").

120.    The Savings Clauses by their terms purport to reduce the amount of the New Loan obligations incurred in connection with the New Credit Agreements and in the New Loan Guaranties below the amount at which the Conveying Subsidiaries would be rendered insolvent. The New Lenders may argue that the Savings Clauses operate as a defense to the Committee's avoidance claims. The Committee does not concede that the Savings Clauses are enforceable or that the clauses actually serve as a defense to an avoidance claim.

121.    Even if the Savings Clauses were to be enforced so as to reduce the Conveying Subsidiaries' liabilities, the Claims still have to be disallowed in their entirety or reduced under section 502 of the Bankruptcy Code.

122.    Thus, pursuant to sections 105, 502, 544 and 548 of the Code, and Bankruptcy Rules 3007 and 7001, the Claims should be disallowed in their entirety or reduced.

## RESERVATION OF RIGHTS

123.    The Committee believes that additional claims in favor of one or more of the Debtors' estates against the Defendants and/or other parties, including, without limitation, the Falcone Entities, may exist. The Committee reserves any and all rights to bring such claims to the extent authorized by the Court and/or applicable law.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an order:

(1)     avoiding the New Lender Claim and Lien Transfers;

(2)     granting recovery of all amounts paid in connection with the New Claim and Lien Transfers;

(3)     disallowing or in the alternative reducing the Claims by the New Lenders;

(4)    avoiding and/or requiring return of the Transeastern Transfers;

(5)    avoiding any security interest in the Tax Refund;

(6)    enforcing paragraph 16(d) of the *Stipulated Final Order (i) Authorizing Limited Use Of Cash Collateral Pursuant To Sections 105, 361 And 363 Of The Bankruptcy Code, And (ii) Granting Replacement Liens, Adequate Protection And Super Priority Administrative Expense Priority To Secured Lenders,* entered by this court on June 20, 2008, to modify or eliminate the Adequate Protection Liens and Adequate Protection Claims as defined in that order, and requiring disgorgement from Pre-Petition Secured Parties, as that term is defined in that Order, any payments made as Adequate Protection under that Order [D.E. 1226 in Ch. 11 No. 08-10928];

(7)    granting such other and further relief , including to the extent warranted, equitable subordination, as the Court deems just, proper and equitable, including the fees, costs, interest, and expenses of this action.

Dated: July 14, 2008

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

I hereby certify that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court order dated July 10, 2008 [D.E. 1360, 1362, 1363 in Ch. 11 No. 08-10928]

<table>
<tr><td>/s/ Patricia A. Redmond</td><td>/s/ Lawrence S. Robbins</td></tr>
</table>

PATRICIA A. REDMOND
(Florida Bar No. 303739)
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street
Miami, FL  33130
Telephone: (305) 789-3553
Facsimile: (305) 789-3395
predmond@swmwas.com

LAWRENCE S. ROBBINS        *pro hac vice*
(D.C. Bar No. 420260)
ALAN D. STRASSER            *pro hac vice*
(D.C. Bar No. 967885)
MICHAEL L. WALDMAN         *pro hac vice*
(D.C. Bar No. 414646)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street N.W., Suite 411-L
Washington, DC  20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
lrobbins@robbinsrussell.com
astrasser@robbinsrussell.com
mwaldman@robbinsrussell.com

*Local Counsel to the Fraudulent Conveyance Adversary Proceeding Counsel for the Official Committee of Unsecured Creditors of TOUSA, Inc., et al.*

*Fraudulent Conveyance Adversary Proceeding Counsel for the Official Committee of Unsecured Creditors of TOUSA, Inc., et al.*