# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>TOUSA, INC., *et al*.,<br><br>Debtors. | Chapter 11 Cases<br><br>Case No. 08-10928-JKO |
| OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF TOUSA, INC., *ET AL.*,<br><br>Plaintiff<br><br>vs.<br><br>CITICORP NORTH AMERICA, INC., *ET AL.*,<br><br>Defendants. | Jointly Administered<br><br>Adv. Pro. No. 08-1435-JKO |

## SECOND LIEN AGENT'S MOTION TO DISMISS
## (I) ALL CLAIMS AGAINST INDIVIDUAL SECOND LIEN LENDERS,
## (II) ALL CLAIMS AGAINST THE TRANSEASTERN LENDERS, AND
## (III) PRAYERS FOR EQUITABLE SUBORDINATION AND INTEREST;
## AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Wells Fargo Bank, N.A., solely in its capacity as successor administrative agent (the

"**Second Lien Agent**") under the Second Lien Term Loan Agreement dated as of July 31, 2007

(the "**Second Lien Term Loan**") and, in such capacity, as a named defendant in the adversary

complaint (the "**Complaint**") (Adv. Proc. Dkt. No. 1) filed by the Official Committee of

Unsecured Creditors of TOUSA, Inc., *et al.* (the "**Committee**"), by and through its undersigned

counsel, respectfully moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

("**FRCP 12(b)(6)**")[1] for dismissal of the Complaint in substantial part as more particularly discussed below.

## PRELIMINARY STATEMENT[2]

1.     The facts in the public record (as discussed herein) and the applicable legal standards compel the conclusion that the entire Complaint is without merit:

- The TOUSA Group were solvent at the time as opined to by AlixPartners;

- By definition, because the TOUSA Group was solvent, each Conveying Subsidiary was solvent due to its legal rights of estimation, reimbursement, contribution and subrogation against all other Conveying Subsidiaries and against TOUSA and Homes LP;

- The Conveying Subsidiaries received reasonably equivalent value due to their identity of interests with the other members of the fully integrated TOUSA Group;

- The corporate group structure of the Second Lien Term Loan and other bank financing was consistent with capital markets requirements, as evidenced by the fact that the TOUSA Group's senior and subordinated notes had exactly the same structure;

- The Conveying Subsidiaries were contingently liable as guarantors of TOUSA Group debt from the day that TOUSA was formed in 2002 and were contingently liable for $800 million in bank indebtedness more than a year before July 31, 2007, whereas they were only liable for $724 million in bank debt on the petition date, plus another $108 million in contingent exposure on undrawn letters of credit; and

- The Debtors operated on a centrally-managed, consolidated basis, to the point that individual employees and creditors contracted with the Debtors and were paid strictly on a divisional basis, not a local legal entity basis.

2.     At this stage of the litigation, however, the only tool that the Second Lien Agent is permitted to employ is a motion to dismiss, and such a motion requires factual allegations – no matter how insupportable – to be construed in a light favorable to the plaintiff.  Therefore, while the facts in the public record and the applicable legal standard warrant dismissal of the

---

[1] FRCP 12(b)(6) is made applicable in adversary proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

[2] Capitalized terms not defined in the introduction or this Preliminary Statement are defined in the Statement of Facts that follows.

Complaint in its entirety, the Second Lien Agent is focusing this motion to dismiss on those causes of action in the Complaint that the Committee will be unable to sustain even if every fact alleged in the Complaint were true.

3.     Specifically, insofar as it applies to the Second Lien Term Loan, the Complaint names as defendants both the Second Lien Agent and "Doe New Lenders Nos. 1-100" (the "**Second Lien Doe Defendants**" or "**Second Lien Lenders**").  In Counts I to VI, Count XIII and Count XIV, the Complaint essentially seeks two forms of recovery from the Second Lien Doe Defendants:  (i) avoidance of claims and liens and (ii) recovery of payments.

4.     As to avoidance of the claims of the Second Lien Doe Defendants, the Second Lien Agent on behalf of the Second Lien Lenders filed all of the relevant proofs of claim pursuant to a Stipulation among the parties, an Order of this Court, and the express acknowledgment of the Committee.  As to avoidance of the liens of the Second Lien Doe Defendants, those liens are held by the Second Lien Agent for the benefit of the Second Lien Lenders.  As a result, the Second Lien Agent is the only necessary defendant and there is no basis or reason to include any of the Second Lien Doe Defendants as additional defendants.

5.     As to the recovery of payments, the Second Lien Lenders never received any payments.  Interest on the Second Lien Term Loan is "PIK" (payment-in-kind), meaning that accruing interest is added to the principal rather than paid in cash (TOUSA had the option to pay in cash but never elected to do so).  Therefore, there is simply no "property" to be recovered from the Second Lien Lenders.

6.     Counts VII to XII of the Complaint seeking recovery of payments made to the Transeastern Lenders should also be dismissed.  The Committee has asserted these claims only on behalf of the Conveying Subsidiaries.  However, the Complaint alleges that it was only

TOUSA and Homes LP that made and received the benefit of the payments and that the Conveying Subsidiaries neither made nor benefited from such payments. *See*, *e.g.*, Compl. ¶¶ 1, 3 & 34.  Because the Conveying Subsidiaries cannot recover payments they allegedly did not make or benefit from, these Counts must also fail.

7.     Finally, although nowhere referred to in the body of the Complaint, the Committee requests equitable subordination in the Prayer for Relief.  However, the Committee has not even attempted to plead any of the three elements of the *Mobile Steel* test.  Therefore, the Committee's request for equitable subordination should also be dismissed.  The Prayer for Relief also requests recovery of interest from the Second Lien Agent and the Second Lien Lenders, but as there are no payments to be recovered on which interest could accrue, the request for interest should also be dismissed.

## STATEMENT OF FACTS[3]

8.     This proceeding arises out of the Chapter 11 cases of TOUSA, Inc. ("**TOUSA**") and certain of its subsidiaries (collectively, the "**Debtors**").  TOUSA's predecessor company was founded in Houston in 1983 as Newmark Homes Corp.  After a series of acquisitions and mergers, TOUSA (then known as Technical Olympic USA) was formed on June 25, 2002.  *See* McAden Decl. ¶ 5; *see also* 2007 10-K at 2 (summarizing history of acquisitions and mergers).

9.     TOUSA is a holding company whose principal assets include, among other things, its equity interests in the other Debtors and in various other non-debtor subsidiaries and

---

[3] The facts in this Statement of Facts are derived principally from two sources.  The first is TOUSA's "first day affidavit" – the Declaration of Tommy L. McAden, Executive Vice President and Chief Financial Officer of TOUSA, Inc., in Support of First Day Pleadings (the "**McAden Decl.**") (Dkt. No. 7).  The second source is TOUSA's public filings with the Securities and Exchange Commission over the years.  These are cited as "**200_ 10-K**", if an annual filing, "**200_ Q_ 10-Q**", if a quarterly filing, and "**__/__/200_ 8-K**" if a filing as to current developments.  As discussed in paragraph 40 below, these court and public filings are proper for consideration in connection with a motion to dismiss.  For the convenience of the Court as to a more general background concerning TOUSA, attached to this Motion to

joint ventures (the Debtors and all of the other non-debtor subsidiaries are referred to as the "**TOUSA Group**"). *See* Organizational Chart of the TOUSA Group, McAden Decl. exh. A.

10. At all times, TOUSA reported its financial position strictly on a consolidated basis and, starting in 2007, also included separate operational and financial data for its several main "segments," without regard to actual legal entity. As stated in TOUSA's 10-K filing for the year ended December 31, 2007 (filed August 12, 2008):

> Our operating segments are aggregated into reportable segments in accordance with Statement of Financial Accounting Standards No. 131…based primarily upon similar economic characteristics, product type, geographic area, and information used by the chief operating decision maker to allocate resources and assess performance. Our reportable segments consist of our four major Homebuilding geographic regions (Florida, Mid-Atlantic, Texas and the West) and our Financial Services operations.

2007 10-K at 59; *see also* 2006 10-K at 40 (indicating 2007 change from one Homebuilding reportable segment to four segments).

11. TOUSA's local homebuilding operations are managed on a divisional basis, not on a legal entity basis. 2007 10-K at 5-6. "We centralize the key risk elements of our homebuilding business through our corporate offices." *Id.* at 6. TOUSA's corporate offices also have "primary responsibility" for:

> financing; treasury and cash management; risk and litigation management; allocation of capital; issuance and monitoring of inventory investment guidelines; review and approval of all land and homesite acquisition contracts; oversight of land and construction inventory levels; environmental assessments of land and homesite acquisitions and dispositions; accounting, financial and management reporting; review and approval of division plans and budgets; internal audit; information technology systems; administration of human resources compliance, payroll and employee benefits; negotiation of national purchasing contracts; and management of major national or regional supply chain initiatives.

*Id*. at 6 (internal bullet points omitted).

---

Dismiss is TOUSA's most recent public filing – its 2007 Annual Statement on Form 10-K.

**History of Borrowings**

12.     Upon its formation, TOUSA issued various senior and senior subordinated notes (as issued and outstanding from time to time, the "**Notes**").  For the history of Note issuances from 06/25/2002 through 04/12/2006, *see* McAden Decl. ¶¶ 24-25.  At the same time, TOUSA entered into a revolving credit facility (as amended, restated and refinanced from time to time, the "**Revolver**").  *See* 07/09/2002 8-K, exh. 99.2 (copy of original Revolver).  As is typical in corporate group financings with a holding company structure, the Notes and the Revolver were all guaranteed by various of TOUSA's subsidiaries, including those Conveying Subsidiaries that were members of the TOUSA Group at the time.  *Id.*

13.     Over the years, TOUSA issued more Notes, *see* McAden Decl. at ¶¶ 24-25, and increased the size of the Revolver (discussed below).  The incremental Note and Revolver proceeds were generally used to acquire new homebuilding assets and subsidiaries (which were then added as guarantors) and to provide working capital for the entire TOUSA Group.  *See* 2007 10-K at 67.

14.     By late October 2004, the Revolver was already in the amount of $600 million, and TOUSA had the unilateral option (if not in default at the time) to increase the Revolver amount to $750 million.  *See* 10/28/2004 8-K.  The Revolver commitments were further increased to $800 million on March 9, 2006.  *See* 2005 10-K, exh. 10.30.

15.     On July 31, 2007, TOUSA entered into the Second Lien Term Loan and the First Lien Term Loan (together, the "**Term Loans**"), and reduced the Revolver.  *See* 08/02/2007 8-K; *see also* 2007 Q2 10-Q, exh. 10.49 (this exhibit is the actual Second Lien Term Loan).

16.     At all times, each Conveying Subsidiary that guaranteed any of the Notes also guaranteed the Revolver and, when incurred, both of the Term Loans (collectively, the "**New**

Loans"). *See* 2007 10-K at 69-71. (The reverse is not true, however, as the New Loans have a number of guarantees that the Notes do not, including from the Transeastern entities.[4]) Thus, by mid-March 2006, each of the Conveying Subsidiaries was already obligated with respect to $800 million of bank commitments. This fact stands in stark contrast to the cornerstone thesis of the Complaint that the Conveying Subsidiaries were only liable on Note debt prior to July 31, 2007. *See*, *e.g.*, Compl. ¶¶ 33 & 35.

17.    While the aggregate of the Term Loan borrowings and the Revolver commitments was $1.2 billion, upon information and belief the Revolver commitments have never been close to fully drawn. In fact, there was only $724 million outstanding in the aggregate under the New Loans on the petition date, together with another $108 million in contingent exposure under undrawn letters of credit. *See* McAden Decl. ¶¶ 17-19.

18.    At all times, all borrowings and guarantees under the New Loans were expressly permitted by the indentures governing all of the Notes, and all such borrowings and guarantees were publicly disclosed by TOUSA at the time they were incurred. *See*, *e.g.*, Second Lien Term Loan § 4.2(a)(iii) (TOUSA representation and warranty that Second Lien Term Loan did not violate terms of any other debt instruments).

**Central Management of the Debtors' Operations**

19.    Like many large corporations, the Debtors use an integrated, centralized cash management system in the ordinary course of business. *See* McAden Decl. ¶ 72. Under this system (the "**Cash Management System**"), funds are collected by the various subsidiaries, transferred to a main funding account and disbursed to pay operating expenses. *Id.* As part of

---

[4] It also appears probable from discovery responses that the later-issued Notes have some guarantees that the earlier-issued Notes do not, because of the formation or acquisition of new subsidiaries in the interim. For the same reason, it also appears probable that the New Loans, which were

the Cash Management System, payroll deductions for all TOUSA entities and subsidiaries are transferred from its main funding account directly to one of three standalone accounts at Wachovia Bank from which payroll checks are issued by TOUSA's payroll agent. *Id.* at 81. The three payroll accounts are named (i) "TOUSA, Inc. – payroll", (ii) "TOUSA Homes – payroll" and (iii) "Newmark Homes, LP – payroll". *See* Emergency Motion for Entry of Interim and Final Orders Authorizing, (A) the Debtors to Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Administrative Expense Priority to Postpetition Intercompany Claims and (C) Authorizing Continued Intercompany Arrangement and Historical Practices at ¶ 14.e, n.4 & exh. C Ref. ## 3, 5 & 24 (Dkt. No. 8). Payments to vendors and other suppliers follow a similar centralized structure under the Cash Management System. *Id.* ¶ 20.

20.     In other words, upon information and belief, employees and vendors do not work for, provide goods and services to or receive checks from any local operating Conveying Subsidiary. For example, an employee working on a home being built by TOUSA Homes Colorado, LLC, and a vendor providing materials for that home, receive checks with the name of one of three TOUSA funding affiliates as the payor -- the name TOUSA Homes Colorado, LLC is nowhere to be seen. *See id.*

21.     The Proposed Restructuring Term Sheet (the "**Plan Term Sheet**") that the Debtors filed with their chapter 11 petitions underscores the fact that trade and other non-funded unsecured creditors were dealt with at the group level, not the local legal entity level. In fact, the Plan Term Sheet affirmatively acknowledges that such creditors' claims "reside" at one of only three divisional members of the TOUSA Group. *See* McAden Decl., exh. B (the Plan Term

incurred 15 months after the last issuance of Notes, have some guarantees (in addition to the Transeastern

Sheet is exhibit A to exhibit B).  Specifically, the Plan Term Sheet provides that the single class consisting of "Non Essential Trade, Non Note, General Unsecured Claims" would have only three sub-classes "depending on the operating Debtor entity at which such claims reside (*i.e.*, TOUSA Homes, Inc., Engle Homes Residential Construction, L.L.C. or Newmark Homes, Inc.)."[5]

22.     As an aside, it is self-evident that the foregoing facts (and many others) present a classic case for substantive consolidation.  While substantive consolidation is beyond the scope of a motion to dismiss, it is most certainly a matter that will be taken up in due course.

23.     In sum, upon information and belief based on public documents:

- At no time did there exist any Conveying Subsidiary that guaranteed any of the Notes that did not also guarantee the Revolver and, later, the Term Loans.

- At no time did TOUSA or any Conveying Subsidiary incur any obligations under any Revolver or the Term Loans that was not contractually consented to by, and disclosed to, the holders of the Notes.

- As of late October 2004, each Conveying Subsidiary was already a guarantor of $600 million, and potentially $750 million, of bank debt.

- As of mid-March 2006, each Conveying Subsidiary was already a guarantor of $800 million of bank debt – more than the dollars actually outstanding under the New Loans on the petition date.

- The TOUSA Group has always reported on a consolidated and (more recently) segment basis.  The homebuilding operations of the TOUSA Group have always been managed as a corporate group via three main divisions – TOUSA Homes, Newmark and Engle – and never on a legal entity by legal entity basis.  It further appears highly likely that, as acknowledged by the Debtors and Senior Noteholders in their own Plan Term Sheet, no Noteholder, no employee and no other creditor relied on the standalone credit of any individual local operating subsidiary, including the local operating Conveying Subsidiaries.

---

guarantees) that none of the Notes have.

[5] The Plan Term Sheet was negotiated between TOUSA and the holders of a majority in principal amount of its Senior Notes, *see* 01/31/08 8-K at Item 1.03 – the primary creditors (together with the holders of the Subordinated Notes) who are now protesting so vehemently that each of the dozens of individual legal entities in the TOUSA Group *must* be evaluated strictly on a standalone basis.

**The Transeastern Transaction and Settlement[6]**

24.     On August 1, 2005, TOUSA Homes L.P. ("**Homes LP**"), a subsidiary of TOUSA, formed a joint venture named EH/Transeastern LLC with Falcone/Ritchie LLC to acquire the homebuilding assets of Transeastern Properties, Inc., which included over 20,000 owned or optioned lots in major Florida markets (the "**Transeastern JV**").  Homes LP was the manager of the Transeastern JV.  In order to finance the acquisition (the "**Transeastern Transaction**"), the Transeastern JV, through a series of affiliated limited liability companies, obtained $675 million in funding in three tranches, referred to in paragraph 19 of the Complaint as, respectively, the $450 million Senior Credit Agreement; the $137.5 million Senior Mezzanine Credit Agreement; and the $87.5 million Junior Mezzanine Credit Agreement (collectively, the "**Transeastern Credit Agreements**").  *See* 2006 Q3 10-Q at 10-11 & exhs. 10.2-10.4 (those exhibits are the three credit agreements).

25.     TOUSA and Homes LP each signed completion and carve-out guarantees for each of the Transeastern Credit Agreements (the "**TOUSA Guarantees**").  As "completion" and "carve-out" guarantees, the TOUSA Guarantees made TOUSA and Homes LP contingently liable not only for the $675 million owing under the Transeastern Credit Agreements, but also for the hundreds of millions or even billions more (as was later alleged) that would be necessary to complete all of the Transeastern JV's homebuilding projects in the event the Transeastern JV defaulted on its completion obligations.  *Id.* at 11-12 and exhs. 10.5 & 10.6 (those exhibits are the two TOUSA Guarantees).

26.     In late 2006, Deutsche Bank Trust Company Americas ("**DB Trust**"), as the then-administrative agent under each of the Transeastern Credit Agreements, asserted in several

---

[6] For a more detailed summary of the Transeastern Transaction and the Transeastern Settlement,

demand letters that various events had occurred that triggered the obligations of TOUSA and Homes LP under the TOUSA Guarantees, thus obligating them for the full amount outstanding under the Transeastern Credit Agreements as well as for completion obligations.  TOUSA and Homes LP denied that the Transeastern Guarantees had been triggered.  *Id*. at 12.  Shortly thereafter, litigation in Florida and New York ensued between DB Trust (on behalf of the Transeastern Lenders), TOUSA and Homes LP, with the Transeastern Lenders seeking more than $2 billion in damages for unpaid loan and completion amounts.  *See* 12/08/2006 8-K.

27.     On July 31, 2007, in order to settle the dispute with the Transeastern Lenders (the "**Transeastern Settlement**"), TOUSA and Homes LP agreed, among other things, to pay $422 million in cash and to incur $20 million in New Subordinated Notes.  In addition to receiving a release from the litigation, TOUSA and Homes LP also received the other 50% interest in the Transeastern JV – a very valuable asset in its own right.  *See* 08/02/2007 8-K (describing settlement); *see also* 2007 10-K at F-28 (indicating that TOUSA estimated at the time that the fair market value of the 50% interest was $200.9 million).

28.     In order to fund the cash portion of the Transeastern Settlement, TOUSA, Homes LP and each of the Conveying Subsidiaries entered into the Term Loans as co-borrowers.  The Conveying Subsidiaries also executed guarantees.  At the same time, TOUSA amended and restated its Revolver to reduce the commitments thereunder from $800 million to $700 million. *See* 08/02/2007 8-K.

29.     Citigroup Global Markets, Inc. and certain of its affiliates (collectively, "**CGMI**") issued a commitment letter for the entire amount of the Term Loans and CGMI committed to

---

see 2007 10-K at F-26 to F-29.

fund the Term Loans by itself without any condition as to syndication.[7]  *See* 07/02/2007 8-K.  As the housing market had started to soften by then, CGMI required TOUSA to provide a solvency opinion from a nationally-recognized firm, *see id*., in this case, AlixPartners.  Upon information and belief, TOUSA itself also obtained substantial "corporate benefit" opinions from Lehman Brothers.

30.    Neither CGMI nor any of its affiliates were agents for any of the Transeastern Credit Agreements nor were they Transeastern Lenders.  *See* Compl. ¶¶ 15-16 & n.2 (listing Transeastern Lenders).

31.    Upon information and belief, within days of its funding of the Term Loans, CGMI sought to access the capital markets in order to syndicate the Term Loans (*i.e.*, to sell a substantial portion of the Term Loans to market participants).  Both the closing and the syndication of the Term Loans occurred "shortly before the unexpected housing industry and capital markets difficulties in August 2007."  McAden Decl. ¶ 41 (emphasis added).  In fact, upon information and belief, the Term Loans were substantially oversubscribed by the markets, meaning that the sum of the loan amounts that lenders had indicated to CGMI they wanted to buy far exceeded the amount actually sought by CGMI.

32.    Upon information and belief, the Second Lien Lenders that were finally accepted by CGMI for participation in the Second Lien Term Loan were all sophisticated capital market participants, including money-center banks, insurance companies and other institutional investors.  With one or two minor exceptions, none of the Second Lien Lenders had been Transeastern Lenders.  Thus, there was no overlap between the Transeastern Lenders and the

---

[7] The 07/31/2007 Revolver was simply an amendment and restatement of the prior Revolver with CGMI and, therefore, was already funded.

Second Lien Term Loan as originally funded by CGMI, and there was very little overlap between the Transeastern Lenders and the Second Lien Lenders after syndication.

33.    All of the New Loans were secured by liens on substantially all of the co-borrowers' assets, including the assets of the Conveying Subsidiaries.  *See* 2007 Q2 10-Q at 15-16.

34.    Citigroup North America, Inc. was the administrative agent under each Term Loan and the Revolver.  On January 28, 2008, the Second Lien Agent became the successor administrative agent under the Second Lien Term Loan.

**The Bankruptcy Cases**

35.    On January 29, 2008, each of the Debtors filed chapter 11 petitions in this Court.

36.    On or about May 16, 2008, pursuant to a Stipulation approved by this Court,[8] The Second Lien Agent filed proofs of claim in connection with the Second Lien Term Loan and the security therefor (the "**Second Liens**") in each of the Debtors' jointly-administered cases (all claims represented by such proofs of claim, the "**Second Lien Claims**").  *See* TOUSA Claims Register available at www.kccllc.net/tousa.  The Committee understood and agreed that the Second Lien Agent would be the sole entity to file proofs of claim in connection with the Second Lien Claims and the Second Liens.[9]  As a result, no Second Lien Lender filed (or was required to file) an individual proof of claim with respect to the Second Lien Claims or the Second Liens and the bar date for filing any such proof of claim occurred on May 19, 2008.

37.    The Committee filed the Complaint on July 14, 2008.  (Adv. Proc. Dkt. No. 1). The Complaint is in the name of all of the Debtors but only seeks relief on behalf of the

---

[8]    *See* Stipulation Permitting Wells Fargo Bank, N.A. as Administrative Agent, to File Consolidated Proof of Claim on Behalf of the Second Lien Lenders, dated May 9, 2008. (Dkt. No. 939); Agreed Order Permitting Wells Fargo Bank, N.A., as Administrative Agent, to File Consolidated Proof of

Conveying Subsidiaries except as to Count XIII, which is on behalf of unspecified Debtors. *See* Compl. ¶ 9 ("The Committee brings the Fraudulent Transfer claims derivatively on behalf of and for the benefit of the estates of the following Debtors: [names omitted] (collectively, the "Conveying Subsidiaries"). The Committee brings the Preferential Transfer claim on behalf of and for the benefit of the estates of each of the Debtors that has an interest in the Tax Refund.").

## STANDARD FOR DISMISSAL

38.     A complaint should be dismissed for "failure to state a claim upon which relief can be granted…." FRCP 12(b)(6). In considering such a motion, although the Court should accept all the well-plead factual allegations in the complaint as true, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 (1986). Dismissal is appropriate where "it is clear the plaintiff can prove no set of facts in support of the claims in the complaint." *Powell v. United States*, 945 F.2d 374, 375-76 (11th Cir. 1991) (quoting *Wright v. Newsome*, 795 F.2d 964, 967 (11th Cir. 1986)). Therefore, a court should dismiss a complaint "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (citations omitted).

39.     While a complaint challenged by an FRCP 12(b)(6) motion to dismiss does not need detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal quotation marks omitted). Further, the plaintiff's factual allegations,

Claim on Behalf of the Second Lien Lenders. (Dkt. No. 959).
[9] *See* Transcript of May 14, 2008 hearing at 9-10 (Dkt. No. 1034).

when assumed to be true, "must be enough to raise a right to relief above the speculative level." *Id.* at 1965 (citations omitted).

40. Finally, in reviewing a motion to dismiss under FRCP 12(b)(6), a court in the Eleventh Circuit may take judicial notice of public records. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-80 (11th Cir. 1999) (taking judicial notice of public records of the Securities and Exchange Commission for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents); *see also Winget v. JP Morgan Chase Bank, N.A.*, No. 07-1657, 2008 WL 3268201, at *9 (3d Cir. Aug. 11, 2008) ("To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint."). The Eleventh Circuit has also adopted the "incorporation by reference" doctrine whereby a court may review documents attached to the complaint, without converting the motion to dismiss into one for summary judgment, if the attached documents are central to the plaintiff's claim and undisputed. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (citations omitted); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (citation omitted). "Undisputed" in this context means that the authenticity of the document is not challenged. *Horsley*, 304 F.3d at 1134.

## ARGUMENT

## I. All Claims Against the Second Lien Doe Defendants in the Complaint Should Be Dismissed Because They Are Neither Necessary Nor Proper Parties.

### A. The Second Lien Agent Filed the Only Proofs of Claim in These Proceedings and is the Holder of Legal Title to the Second Liens

41. The Second Lien Agent is the only necessary party for avoidance of the Second Lien Claims. Pursuant to the parties' agreement, the Second Lien Agent is the only entity that filed proofs of claim against each Debtor seeking recovery on the Second Lien Claims. *See*

*supra* paragraph 36 and accompanying footnotes.  The bar date for filing proofs of claim has

now passed and no individual Second Lien Lender has filed a proof of claim.  *Id*.  In the unlikely

event that the Committee prevails in its action to avoid the Second Lien Claims, it is the claims

represented by the Second Lien Agent's proofs of claim filed that will be avoided.  There is,

therefore, no basis for naming any individual Second Lien Lender for such relief.

42.    The Security Agreement in respect of the Second Lien Term Loan (the "**Security**

**Agreement**") is also clear as to the Second Liens.  The Second Lien Agent, as administrative

agent (as the successor to Citigroup North America, Inc.), holds the liens on the Debtors' assets

for the benefit of the Second Lien Lenders:

> Each Grantor hereby pledges to the Administrative Agent for its benefit and for the
> ratable benefit of the Lenders, and hereby grants to the Administrative Agent, for its
> benefit and for the ratable benefit of the Lenders, a security interest in all of such
> Grantor's right, title and interest in, to and under the following property, whether now
> existing or hereafter acquired...as collateral security for the prompt and complete
> payment and performance when due....

Security Agreement at § 2.

43.    In fact, the Complaint itself acknowledges that the Second Lien Agent, as

successor administrative agent under the Second Lien Term Loan, is the "holder of the liens

conveyed pursuant thereto."  Compl. ¶ 11.

44.    As the Second Lien Lenders do not hold any title to the Second Liens and are

represented by the Second Lien Agent as their administrative agent, they are not necessary or

proper parties.  *See Colo. & S. Ry. Co. v. Blair*, 214 N.Y. 497, 513 (1915) (noting that "the

trustee represents the bondholders, who, though their rights are directly affected, are individually

not necessary parties."); *see also Jackson v. Tallmadge*, 246 N.Y. 133, 139 (1927) ("[w]here the

complainant claims in opposition to the assignment or deed of trust, and seeks to set the same

aside on the ground that it is fraudulent and void, he is at liberty to proceed against the fraudulent

assignee or trustee, who is the holder of the legal estate of the property, without joining the *cestui que trust*.").  This is because "trustees, being invested with the legal title and the authority to represent the beneficial owners, are generally the proper and necessary parties in actions by or against strangers affecting the trust property and not involving any question between the trustee and the beneficiaries."  *Blair*, 241 N.Y. at 513 (citations omitted); s*ee also Carey v. Brown,* 92 U.S. 171 (1875) ("[W]here the suit is brought by the trustee to recover the trust-property or reduce it to possession, and in no wise affects his relation with his *cestuis que trust*, it is unnecessary to make the latter parties.").

> **B.     The Second Lien Doe Defendants Are Not Proper Parties to the Committee's Claims to Recover Payments, As It Is Undisputed that There Were No Payments to Second Lien Lenders**

45.     The Committee not only seeks to avoid the Second Lien Claims and Second Liens, but also seeks to "as applicable, recover, the foregoing transfers and payments made in connection therewith, on behalf of and for the benefit of the Conveying Subsidiaries' estates…." Compl. ¶ 5; *see also* Compl. Counts I through VI and clause (2) of the Prayer for Relief).

46.     There are no payments to "recover" from the Second Lien Lenders in connection with the Second Lien Term Loan for the obvious and undisputed reason that the Second Lien Lenders never received any payments.  No principal payments were due prepetition and all interest was PIK, not paid in cash.  *See* Second Lien Term Loan § 2.9(d).  Although the Debtors have made certain adequate protection fee and expense payments to the Second Lien Agent's professionals pursuant to the DIP and Cash Collateral Orders, *see* DIP Order (Dkt. No. 113) and Cash Collateral Order (Dkt. No. 1226), both such Orders provide the Court with the full ability to order any appropriate relief, including disgorgement, should the Court consider it proper to do so.

47.     Accordingly, the Committee's claims to recover monetary payments made to the Second Lien Doe Defendants in connection with the Second Lien Term Loan should be dismissed.

**C.     This Court Should Also Drop the Second Lien Doe Defendants as a Matter of Discretion**

48.     FRCP 19 requires the joinder of "persons needed for just adjudication." Conversely, this Court has the discretion to drop an unneeded person "at any stage of the action and on such terms as are just."  FRCP 21.  The following factors are to be considered in an analysis of whether a person is "needed for just adjudication":  (i) to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (ii) the extent to which the prejudice can be lessened or avoided by protective provisions in the judgment or other measures; (iii) whether a judgment rendered in the person's absence will be adequate; and (iv) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.  *Beritiech v. Metro. Life Ins. Co.*, 881 F. Supp. 557, 562 (S.D. Ala. 1995) (citing FRCP 19(b)).

49.     All of the foregoing factors weigh heavily in favor of dismissing the Second Lien Doe Defendants.  First, a judgment granting relief to the Committee in the Second Lien Doe Defendants' absence (avoidance of the Second Lien Claims and Second Liens) would by no means prejudice either the Second Lien Doe Defendants or any other party in this case for the reason discussed above:  such relief is available against the Second Lien Agent in its capacity as successor administrative agent.  Second, no protective provisions in the judgment would be necessary in the Second Lien Doe Defendants' absence if only the Second Lien Agent is named. On the other hand, the extent of protective measures that would be necessary to fashion a judgment against unknown "Doe" defendants would be extremely complicated and problematic.

Next, a judgment rendered in the Second Lien Doe Defendants' absence would not only be adequate, but proper. And finally, the Committee has an adequate remedy against the Second Lien Agent in its capacity as successor administrative agent.

###### D.    Fictitious Party Practice Is Not Permitted in the Eleventh Circuit

50.    Courts in the Eleventh Circuit have repeatedly held that "fictitious party practice is not permitted in federal court." *New v. Sports Rec.*, *Inc.*, 114 F.3d 1092, 1094 n.1 (11th Cir. 1997) (requiring that a court strike such fictitious parties);[10] *see also Zolin v. Caruth,* No. 3:07cv538/RV/EMT, 2008 U.S. Dist. LEXIS 7039, at *3-4 (N.D. Fla. Jan. 30, 2008) (recognizing that fictitious party practice is not permitted in federal court unless parties are sufficiently identified to make service of process possible).

51.    The Committee has not adequately described the Second Lien Doe Defendants in order to make them viable defendants in this lawsuit. Instead, the Complaint simply refers to the "original lenders under the New Loans and signatories thereunder, their successors, assigns and participants…." Compl. ¶ 12. As noted above, there was only one original lender under the Second Lien Term Loan – CGMI. In addition, as defined, the Second Lien Doe Defendants are a constantly changing group of entities in a loan trading marketplace, together with participants in such loans, many of whom never even appear on the loan register and, therefore, the Second Lien Agent has no way of identifying them. Even if the Committee were better able to define the group, aside from the administrative nightmare involved in the sheer number of members, its members might not be the same from one day to the next. This complexity is one of many reasons that an administrative agent was appointed to serve as the representative for all such

---

[10] *Cf. Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992) (applying a more relaxed standard for a pro se plaintiff in order to find plaintiff's offer of "Chief Deputy Doe" as sufficient because the person could be identified for service).

lenders.  The Committee should not be permitted to disregard applicable Eleventh Circuit law or ignore the clearly defined relationship between the parties.

52.     Accordingly, the Committee has failed to state a claim for which relief can be granted as to the Second Lien Doe Defendants.  The Second Lien Doe Defendants have not filed any proofs of claim, they do not hold legal title to the Second Liens, they have not received any payments in connection with the Second Lien Term Loan, they are not necessary parties to this action, and they have not been properly named or adequately described.  Therefore, Counts I through VI, XIII and XIV should be dismissed as to the Second Lien Doe Defendants.

## II.   Counts VII to XII of the Complaint Against the Transeastern Lenders Should Be Dismissed Pursuant to FRCP 12(b)(6) for Failure to State a Claim Upon Which Relief Can be Granted.[11]

### A.     The Second Lien Agent Has Standing to Move for Dismissal

53.     As part of the Complaint, the Committee seeks to avoid, as constructive fraudulent conveyances, certain payments and/or transfers made to the Transeastern Lenders.  According to the Complaint, these payments and transfers were made solely by and for the benefit of TOUSA and Homes LP.  *See*, *e.g.*. Compl. ¶ ¶ 1 & 3.  However, the Complaint seeks recovery of these payments and transfers solely for the benefit of the estates of the Conveying Subsidiaries and does not request any recovery for the benefit of TOUSA or Homes LP.

54.     Nothing in the Complaint seeks to avoid any of the Second Lien Claims or Second Liens held by the Second Lien Agent against TOUSA or Homes LP.  As an undisputed

---

[11] Wells Fargo understands that the Transeastern Lenders on the $450 million Senior Credit Agreement (the "**Senior Transeastern Lenders**") intend to file a motion to dismiss the claims against them on substantially similar grounds.  The Senior Transeastern Lenders' motion is expected to be filed on or before September 3, 2008.  *See* Agreed Motion to Extend Deadline to Respond to Complaint dated August 12, 2008 (Adv. Proc. Dkt. No. 9) (identifying the Senior Transeastern Lenders and requesting a consensual extension of the deadline for Senior Transeastern Lenders to respond to the Complaint).  Wells Fargo respectfully requests that oral argument concerning this Part II of the Motion to Dismiss be heard at the same time that the Court hears oral argument on the Senior Transeastern Lenders' motion to

creditor against TOUSA and Homes LP, therefore, the Second Lien Agent, as successor administrative agent for the benefit of the Second Lien Lenders, has a substantial economic interest in favor of any avoided payments being recovered by TOUSA and Homes LP and against any such payments being recovered by the Conveying Subsidiaries.  Thus, if the Conveying Subsidiaries are wrongfully permitted to pursue remedies against the Transeastern Lenders, the Second Lien Agent's claims and liens against TOUSA and Homes LP will be prejudiced.  Accordingly, the Second Lien Agent has a sufficient interest and standing to seek dismissal of Counts VII to XII.[12]

> **B.** **There are No Facts or Circumstances Which Allow the Committee, Acting Solely on Behalf of the Conveying Subsidiaries, to Recover the Payments and/or Transfers Made by TOUSA and Homes LP to the Transeastern Lenders**

55.    The Committee has failed to allege any facts in the Complaint to substantiate a claim that the Conveying Subsidiaries are entitled to any portion of the payments and/or transfers made by TOUSA and Homes LP to the Transeastern Lenders.  To the contrary, the Complaint repeatedly alleges that it is either TOUSA alone or TOUSA and Homes LP that made the payments to the Transeastern Lenders and there is no allegation that the Conveying Subsidiaries made any payments at all.  *See*, *e.g.*, Compl. ¶ 1 (TOUSA "forced" the subsidiaries to "take on" the New Loans "so that TOUSA could repay a debt") & ¶ 3 ("TOUSA and Homes LP used the proceeds of those credit facilities, among other things, to satisfy the Transeastern Debt").

---

dismiss.

[12] The normal rule is that a defendant is restricted in the assertion of the rights of a third party. *See*, *e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) ("[A] litigant must normally assert his own legal interests rather than those of third parties.") (citations omitted).  However, courts have recognized exceptions to this rule if appropriate to preserve the rights of interested litigants.  *See id.* at 805 (where the defendant itself has a distinct and personal interest in the outcome of litigation, principles of *jus tertii* will not be held to apply).  The Ninth Circuit also noted the exception in *Kamilche Co. v. United States*, 53 F.3d 1059, 1061 n.1 (9th Cir. 1995).

56.     In fact, the Second Lien Term Loan itself contradicts the foregoing allegations. The Conveying Subsidiaries were co-borrowers under the Second Lien Term Loan and the proceeds of the Second Lien Term Loan were paid out for the benefit of all of the co-borrowers, not just TOUSA and Homes LP.  However, it is solely the allegations in the Complaint that are relevant to this Motion to Dismiss, and the Complaint is quite clear in alleging that only TOUSA and Homes LP made and benefited from the payments.

57.     Section 548(a)(1)(B) of the Bankruptcy Code sets out the elements of a constructive fraudulent transfer claim.  Of note for this Motion to Dismiss is the preface:  "The trustee may avoid any transfer…of an interest of the debtor in property, or any obligation…incurred by the debtor…."  Section 544(b)(1) of the Bankruptcy Code contains similar language:   "[t]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable [state] law."[13]

58.     The statute plainly states that the transfer of "property of the debtor" is a prerequisite to any fraudulent conveyance action, and courts must apply a plain meaning approach in bankruptcy cases as elsewhere.  *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citations omitted).

59.     Courts in the Eleventh Circuit have frequently highlighted the importance of the "property of the debtor" requirement.  *See, e.g.*, *Miner v. Bay Bank & Trust, Co. (In re Miner)*, 185 B.R. 362, 365 (N.D. Fla. 1995) ("An essential element in a fraudulent transfer action is that the debtor have had an interest in the property transferred."); *In re N & D Props., Inc.*, 799 F.2d

726, 733 (11th Cir. 1986) ("Fraudulent and preferential transfers may be avoided only where property of the debtor is transferred.") (citations omitted).

60.    Courts in this Circuit have described the bankruptcy "debtor" as the party with "control" over the property at issue.  For example, in *Miner*, appellant Woodman H. Miner ("**Miner**") was the sole stockholder of the Miner Corporation.  Miner filed a voluntary Chapter 11 bankruptcy petition and was appointed as debtor in possession of the estate.  In a separate adversary proceeding, Miner sought to recover, as a constructive fraudulent transfer, property of the Miner Corporation that was sold at a pre-petition foreclosure sale.  The Court held that the property was not recoverable because Miner, the debtor, did not own or control the corporate assets even though he was the sole shareholder of the corporation.  Rather, Miner, the debtor, was viewed by the court as a separate legal person from the corporation in which he owned stock. *Miner*, 185 B.R. at 367; *see also In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1180-82 (11th Cir. 1987) (funds wire transferred through debtor's account never became an "interest of the debtor in property" in light of debtor's lack of control over them).

61.    In this case, the Committee insists that the Conveying Subsidiaries had no control over the flow of funds in the Transeastern Settlement.  In fact, it is a cornerstone of the Complaint that the Conveying Subsidiaries allegedly had no control at all.  For example, paragraphs 1, 3, 33 and 34 of the Complaint describe how the Conveying Subsidiaries were supposedly "forced" by TOUSA to be co-borrowers under the New Loans, which TOUSA and Homes LP then used to satisfy the Transeastern Debt "even though the Conveying Subsidiaries were not obligated for the Transeastern Debt."  Compl. ¶ 3.

---

[13] The applicable state law in this case is the Uniform Fraudulent Transfer Act ("**UFTA**"), which both Florida and New York have adopted as part of their statutory schema.  The corresponding section of the UFTA that is relevant to this analysis is Section 4, which reads: "[a] transfer made or obligation

62.     Accepting as true for the purposes of this Motion to Dismiss the Committee's allegations that the Conveying Subsidiaries were "forced" to incur debt for which they did not receive reasonably equivalent value (and were rendered insolvent thereby), then the proper remedy is to avoid the Conveying Subsidiaries' debt incurrence.  It is not a proper remedy to recover for the benefit of the Conveying Subsidiaries funds that the Committee insists they never received and never had control over.  If the payments really were made to the Transeastern Lenders solely by and for the benefit of TOUSA and Homes LP, then the proper remedy is to recover the payments for the benefit of TOUSA and Homes LP, not for the benefit of the Conveying Subsidiaries.[14]   The Court should therefore dismiss Counts VII to XII of the Complaint because they only seek recovery for the benefit of the Conveying Subsidiaries.

## III.    The Committee Has Not Alleged Any Facts to Support Its Prayer for Equitable Subordination or for Interest.

### A.    The Complaint Fails to Allege Any of the Three Elements of the *Mobile Steel* Test

63.     After 17 pages of factual allegations and another 14 pages of Counts, the Complaint throws in something nowhere referred to in any of the prior 31 pages – that the Court should enter an order for equitable subordination.  *See* Prayer for Relief clause (7).  The Committee not only fails to allege facts necessary to substantiate a claim for equitable subordination, but also fails to provide even a "formulaic recitation of the elements" in support of its request.  *Bell Atl.*, 127 S. Ct. at 1964-65.

---

incurred by a debtor is fraudulent as to a creditor…if the debtor made the transfer or incurred the obligation…."

[14] To be clear, there is no sustainable claim for recovery by TOUSA or Homes LP, either.  As the Complaint freely admits, $422 million was paid in order to settle litigation seeking to recover more than $2 billion from TOUSA and Homes LP and to acquire the other 50% of the valuable Transeastern JV.  A payment to settle litigation claims in a far greater amount than the settlement payment itself constitutes reasonably equivalent value.  *See, e.g., Kapila v. WLN Family Ltd. P'ship (In re Leneve)*, 341 B.R. 53, 57 (Bankr. S.D. Fla. 2006) ("in determining whether the debtor received reasonably equivalent value, the

64.     In the Eleventh Circuit, it is settled that equitable subordination is *only* appropriate where the plaintiff establishes each of the three conditions of the *Mobile Steel* test, namely that: (i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.  *In re Mobile Steel Co.,* 563 F.2d 692, 699-700 (5th Cir. 1977) (citations omitted); *see also N & D Props.*, 799 F.2d at 731 (citing *Mobile Steel*, 563 F.2d 692); *In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1556 (11th Cir. 1990) (citing *Mobile Steel*, 563 F.2d 692) (other citations omitted).  In this instance, the Committee has attempted to slip a cause of action into its Prayer for Relief without alleging any facts to support even one of the necessary three elements against the Second Lien Agent or the Second Lien Doe Defendants.

65.     With respect to the first prong of the test, the plaintiff must allege some kind of inequitable conduct.  *Mobile Steel*, 563 F.2d at 700.  The degree to which alleged misconduct must be inequitable depends on whether the claimant is an insider.  If, as here, the claimant is not an insider, the claim will not be subordinated unless the plaintiff can prove with particularity egregious misconduct tantamount to fraud, overreaching or spoliation to the detriment of others.  *N & D Props.,* 799 F.2d at 731.  Here, there can be no inquiry as to the factual sufficiency of the allegations because the Committee fails to allege any inequitable conduct at all by the Second Lien Agent or the Second Lien Doe Defendants, let alone egregious misconduct.

66.     While all the three elements of the *Mobile Steel* test must be satisfied, *see Mobile Steel*, 563 F.2d at 699-700, the failure to allege inequitable conduct is, in and of itself, fatal to the second and third elements.

---

essential examination is a comparison of 'what went out' with 'what was received'") (citation omitted).

67.    The second element dictates that "[a] claim may be subordinated only to the extent necessary to offset the harm caused by the claimant to the debtor and its creditors." *Chira v. Salkin* (*In re Chira*), 378 B.R. 698, 714 (S.D. Fla. 2007) (citing *Mobile Steel,* 563 F.2d at 701). Self-evidently, without the establishment of inequitable conduct, there can be no harm flowing from such conduct.

68.    The third element is likewise dependent on the first:   "The requirement that subordination must be consistent with bankruptcy law comes into play only after the court has concluded that the first two prongs have been satisfied." *Official Comm. of Unsecured Creditors of Toy King Distrib, Inc. v. Liberty Sav. Bank* (*In re Toy King Distribs., Inc.*), 256 B.R. 1, 202 (Bankr. M.D. Fla. 2000) (quoting *80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 841 (Bankr. S.D.N.Y. 1994) (noting that the third prong is probably superfluous)).  The third prong has been read as a reminder to the bankruptcy court that it may not adjust a legally valid claim merely because the result appears inequitable.  *United States  v. Noland,* 517 U.S. 535, 539 (1996) (citations omitted).  Again, the Committee has failed to allege facts that might satisfy the third condition – or any of the conditions – of the *Mobile Steel* test.

69.    Perhaps the Committee intends to argue that its equitable subordination "claim" is only a remedy, not a cause of action.  However, such an argument is not supported by Eleventh Circuit jurisprudence.   "Equitable subordination" is an established cause of action, treated consistently as such by courts and parties alike.  *See Mobile Steel,* 563 F.2d at 692; *N & D Props.*, 799 F.2d at 726; *Chira*, 378 B.R. at 698; and *In re Fla. Group, Inc.*, 123 B.R. 923 (Bankr. M.D. Fla. 1991).  Moreover, this Court may grant a motion to dismiss as to a remedy or cause of action stated in the plaintiff's prayer for relief.  *See*, *e.g.*, *Gonzalez v. Macy's/DSNB*, No.

06-61571-CIV, 2006 WL 5849317 at *1 (S.D. Fla. Dec. 12, 2006) (dismissing a prayer for relief in the form of injunctive relief); *Craine v. Int'l Longshoremen's Ass'n*, No. 3:07-cv-72-J-32HTS, 2007 WL 2010783 at *2 (M.D. Fla. July 6, 2007) (considering dismissal of a prayer for relief but finding that the facts might support the claim); *Carter Hill Assocs. v. Town of Clinton* (*In re Carter Hill Assocs.*), 188 B.R. 5, 8 n.4 (Bankr. D. Conn. 1995) (acknowledging that plaintiff's prayers for relief might be construed as claims for equitable subordination).

70.     The Committee must allege and ultimately prove the factual support for its claim in order for the Court to consider equitable subordination. The Committee has not done this and cannot do so. By reason of the foregoing, the Court should dismiss the Committee's request for equitable subordination against the Second Lien Agent and the Second Lien Lenders in the Prayer for Relief.

### B.     The Complaint Improperly Seeks the Recovery of Interest

71.     As discussed above, there are no payments to be recovered from the Second Lien Agent or the Second Lien Lenders. Therefore, there can be no interest payable on recovered amounts. Accordingly, the Court should also dismiss the Committee's request for an award of interest against the Second Lien Agent and the Second Lien Lenders.

### <u>CONCLUSION</u>

72.     The Second Lien Agent believes that, at trial, the facts and the law will demonstrate that the entire Complaint is without merit. In the meantime, the Second Lien Agent is focusing this Motion to Dismiss on those causes of action in the Complaint that the Committee will be unable to sustain as a matter of law even if every fact alleged in the Complaint were true.

WHEREFORE, the Second Lien Agent respectfully moves the Court for an Order:

(1)     dismissing all claims and objections asserted against the Second Lien Doe Defendants;

(2)    dismissing all claims of the Conveying Subsidiaries to avoid and recover any payments and/or transfers made to the Transeastern Lenders;

(3)    dismissing the prayers for equitable subordination and for interest asserted against the Second Lien Agent and the Second Lien Doe Defendants; and

(4)    granting such other and further relief, in law or in equity, as the Court deems just.

Dated:  August 13, 2008

Respectfully submitted,

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications in this Court set forth in Local Rule 2090-1(A)

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: __/s/ Jeffrey I. Snyder_____
      Scott L. Baena, Esq. (Florida Bar No. 186445)
      Matthew I. Kramer, Esq. (Florida Bar No. 0937231)
      Jeffrey I. Snyder, Esq. (Florida Bar No. 021281)

and

BRACEWELL & GIULIANI LLP

Evan D. Flaschen (CT Bar No. 304232)
Gregory W. Nye (CT Bar No. 300188)
Richard F. Whiteley (TX Bar No. 24013744)
Heath A. Novosad (TX Bar No. 24037199)
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, CT 06103
Telephone: (860) 947-9000
Facsimile: (860) 246-3201

*Co-Counsel for Wells Fargo Bank, N.A., as Successor Administrative Agent under the Second Lien Term Loan*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2008 a true and correct copy of the foregoing document has been sent via email and first-class, U.S. mail, postage prepaid to the following:

| **Counsel to the Debtors** | **Counsel to Citicorp North America, Inc.** |
|---|---|
| Richard M. Cieri<br>Paul M. Basta<br>M. Natasha Labovitz<br>Kirkland & Ellis LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, New York 10022<br>rcieri@kirkland.com<br>pbasta@kirkland.com<br>nlabovitz@kirkland.com<br><br>Jeffrey S. Powell<br>Kirkland & Ellis LLP<br>655 East 15th Street, N.W.<br>Washington, D.C. 20005<br>jpowell@kirkland.com<br><br>Paul Steven Singerman<br>Berger Singerman, P.A.<br>200 Biscayne Boulevard, Suite 1000<br>Miami, FL 33131<br>singerman@bergersingerman.com | Stephen D. Busey<br>Smith Hulsey & Busey<br>225 Water Street, Suite 1800<br>Jacksonville, FL 32202<br>busey@smithhulsey.com<br><br>Richard Craig Prosser<br>Strichter, Riedel, Blain & Prosser, PA<br>110 E. Madison Street, Suite 200<br>Tampa, FL 33602-4718<br>rprosser@srbp.com<br><br>Joseph H. Smolinsky<br>Seven R. Rivera<br>Thomas J. Hall<br>Chadbourne & Parke LLP<br>20 Rockefeller Plaza<br>New York, NY 10112<br>jsmolinsky@chadbourne.com<br>srivera@chadbourne.com<br>thall@chadbourne.com |
| **Counsel to the Official Committee of Unsecured Creditors**<br>Patricia A. Redmond<br>Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.<br>150 West Flagler Street<br>Miami, Florida 33130<br>predmond@swmwas.com<br><br>Michael Waldman<br>Alan Strasser<br>Robbins Russell Englert Orseck Untereiner & Sauber LLP<br>1801 K Street, NW, Suite 411<br>Washington, DC 20015<br>mwaldman@robbinsrussell.com<br>astrasser@robbinsrussell.com | **United States Trustee**<br>Office of the U.S. Trustee<br>51 S.W. 1st Avenue, Suite 1204<br>Miami, FL |
| **Counsel to Aurelius Capital Master, Ltd., Aurelius Capital Partners, LP, GSO Special Situations Fund L.P., GSO Special Situations Overseas Master Fund Ltd., GSO Credit Opportunities Fund (Helios), L.P., and Carlyle Strategic Partners (collectively, the Noteholders")**<br>David S. Rosner<br>Andrew K. Glenn<br>Jeffrey R. Gleit | **Counsel to the Transeastern Lenders**<br>Dennis F. Dunne<br>Andrew M. LeBlanc<br>Andrew Beirne<br>Dennis C. O'Donnell<br>David R. Eastlake<br>Milbank, Tweed, Hadley & McCloy, LLP<br>1 Chase Manhattan Plaza<br>New York, NY 10005 |

| | |
|---|---|
| Daniel A. Fliman<br>John Minsker<br>Kasowitz, Benson, Torres & Friedman LLP<br>1633 Broadway<br>New York, New York 10019<br>(212) 506-1700<br>drosner@kasowitz.com<br>aglenn@kasowitz.com<br>jgleit@kasowitz.com<br>dfliman@kasowitz.com<br>jminsker@kasowitz.com<br><br>John H. Genovese, Esq.<br>Paul J. Battista, Esq.<br>Heather L. Yonke, Esq<br>Genovese Joblove & Battista, P.A.<br>Bank of America Tower<br>100 SE 2nd Street, 44th Floor<br>Miami, FL 33131<br>Tel: (305) 349-2300<br>Fax: (305) 349-2310<br>jgenovese@gjb-law.com<br>pbattista@gjb-law.com<br>hyonke@gjb-law.com | (212) 530-5287<br>ddunne@milbank.com<br>abeirne@milbank.com<br>aleblanc@milbank.com<br>dodonnell@milbank.com<br>deastlake@milbank.com<br><br>Michael I. Goldberg<br>Akerman Senterfeit<br>Las Olas Centre II, Suite 1600<br>350 East Las Olas Boulevard<br>Fort Lauderdale, FL 33301-2229<br>(954) 463-2700<br>Michael.goldberg@akerman.com |

/s/ Jeffrey I. Snyder
Jeffrey I. Snyder