# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION
#### www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>TOUSA, INC., *et al.*,<br><br>        Debtors. | Chapter 11 Cases<br><br>Case No. 08-10928-JKO<br><br>Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF TOUSA, INC., *ET AL.*,<br><br>        Plaintiff<br><br>      vs.<br><br>CITICORP NORTH AMERICA, INC.; WELLS<br>FARGO BANK, N.A.; BANK OF AMERICA,<br>N.A.; JPMORGAN CHASE BANK, N.A.;<br>MORGAN STANLEY SENIOR FUNDING,<br>INC.; CASTLERIGG MASTER<br>INVESTMENTS, LTD.; CHICAGO<br>FUNDAMENTAL INVESTMENT PARTNERS,<br>LLC; CGDO, LLC; CITIBANK, N.A.;<br>COVALENT PARTNERS LLC; ESPERANCE<br>C/O SCOTIABANK (IRELAND) LIMITED;<br>REOPICYM; THE FOOTHILL GROUP, INC.;<br>FORTRESS CREDIT INVESTMENTS I LTD.;<br>FORTRESS CREDIT INVESTMENTS II LTD.;<br>GOLDMAN SACHS CREDIT PARTNERS L.P.;<br>GRAND CENTRAL ASSET TRUST, GAIA<br>SERIES; GRAND CENTRAL ASSET TRUST,<br>SIL SERIES; HBK MASTER FUND L.P.;<br>HELIOS FUNDING LLC; INVESTMENT<br>CBNA LOAN FUNDING LLC; JP MORGAN<br>WHITEFRIARS INC.; LEHMAN<br>COMMERCIAL PAPER INC.; MARATHON<br>FINANCING I. B.V.; MCDONNELL LOAN<br>OPPORTUNITY LTD.; PERRY PRINCIPALS,<br>L.L.C.; PROMETHEAN I MASTER, LTD.;<br>ROYAL BANK OF CANADA; SOF<br>INVESTMENTS, L.P.; STRLRRE; TACONIC<br>CAPITAL PARTNERS 1.5 L.P.; TACONIC | Adv. Pro. No. 08-1435-JKO |

OPPORTUNITY FUND L.P.; TENNENBAUM
MULTI-STRATEGY MASTER FUND;
TRILOGY PORTFOLIO COMPANY, LLC;
VAN KAMPEN DYNAMIC CREDIT
OPPORTUNITIES FUND; VAN KAMPEN
SENIOR INCOME TRUST; VAN KAMPEN
SENIOR LOAN FUND; WCP REAL ESTATE
STRATEGIES FUND; WESTPORT CAPITAL
PARTNERS LLC; AIG ANNUITY
INSURANCE COMPANY; ALEXANDRA
GLOBAL MASTER FUND, LTD.; AMERICAN
GENERAL LIFE INSURANCE COMPANY;
AMERICAN INTERNATIONAL GROUP,
INC.; AVENUE INVESTMENTS LP; , BANK
AG; NEW YORK BRANCH; LONGACRE
CAPITAL PARTNERS QP, LP; LONGACRE
MASTER FUND LTD; M.D. SASS
RE/ENTERPRISE PORTFOLIO COMPANY,
L.P.; MERRILL LYNCH PIERCE FENNER &
SMITH INC.; MONARCH MASTER FUNDING
LTD; Q FUNDING III, LP; QUADRANGLE
MASTER FUNDING LTD; STONEHILL
INSTITUTIONAL PARTNERS LP;
SUNAMERICA INCOME FUNDS –
SUNAMERICA HIGH YIELD BOND FUND;
SUNAMERICA SERIES TRUST – HIGH
YIELD BOND PORTFOLIO; THE MASTER
TRUST BANK OF JAPAN, LTD.; THE
VARIABLE ANNUITY LIFE INSURANCE
COMPANY; THIRD POINT LOAN LLC;
VALIC COMPANY II HIGH YIELD BOND
FUND; BANK OF THE WEST; BANK
UNITED; BRANCH BANKING AND TRUST
CO.; COMERICA BANK DB SERVICES NEW
JERSEY, INC.; COMPASS BANK; DK
ACQUISITION PARTNERS, L.P.;
GUARANTY GROUP; JEFFRIES BUCKEYE
MASTER FUND, LTD; LISPENARD;
NATIXIS; PNC BANK, N.A.; QUATTRO
GLOBAL CAPITAL, LLC; GRAND CENTRAL
ASSET TRUST, SAN SERIES; GRAND
CENTRAL ASSET TRUST, VCM SERIES;
NATIONAL CITY; RAYMOND JAMES;
SOVEREIGN BANK; TRS VENOR LLC; UBS;
US BANK; VENOR CAPITAL MASTER
FUND, LTD.; WACHOVIA BANK, N.A.;

WASHINGTON MUTUAL; THE CIT
GROUP/BUSINESS CREDIT, INC;
DISTRESSED HIGH YIELD TRADING OPS.
FUND LTD; 3V CAPITAL MASTER FUND
LTD.; DEUTSCHE BANK TRUST COMPANY
AMERICAS; SILVER OAK CAPITAL, LLC;
BEAR STEARNS INVESTMENT PRODUCTS
INC.; BLACK DIAMOND CLO 2005-1; FALL
CREEK CLO, LTD.; EATON VANCE SENIOR
DEBT PORTFOLIO; EATON VANCE SENIOR
INCOME TRUST; EATON VANCE GRAYSON
& CO.; EATON VANCE VT FLOATING-RATE
INCOME FUND; EATON VANCE LIMITED
DURATION INCOME FUND; EATON VANCE
SENIOR FLOATING-RATE TRUST; EATON
VANCE FLOATING-RATE INCOME TRUST;
EATON VANCE CREDIT OPPORTUNITIES
FUND; FARALLON CAPITAL
INSTITUTIONAL PARTNERS, L.P.;
FARALLON CAPITAL INSTITUTIONAL
PARTNERS II, L.P.; TINICUM PARTNERS,
L.P.; FARALLON CAPITAL OFFSHORE
INVESTORS, INC.; FARALLON CAPITAL
OFFSHORE INVESTORS II, L.P.; FARALLON
CAPITAL PARTNERS, L.P.; FARALLON
CAPITAL INSTITUTIONAL PARTNERS III,
L.P.; AURUM CLO 2002-1 LTD.; FLAGSHIP
CLO III; FLAGSHIP CLO IV; FLAGSHIP CLO
V; GRAND CENTRAL ASSET TRUST, CED
SERIES; HARTFORD MUTUAL FUNDS, INC.
ON BEHALF OF THE HARTFORD FLOATING
RATE FUND BY HARTFORD INVESTMENT
MANAGEMENT COMPANY, ITS SUB-
ADVISOR; STEDMAN CBNA LOAN
FUNDING LLC; ATASCOSA INVESTMENTS,
LLC; GLENEAGLES CLO LTD; GRAND
CENTRAL ASSET TRUST, HLD SERIES;
GRAND CENTRAL ASSET TRUST, SOH
SERIES; JASPER CLO, LTD.; LIBERTY CLO,
LTD.; BURNET PARTNERS, LLC; ROCKWALL
CDO, LTD.; HIGHLAND CDO OPPORTUNITY
FUND, LTD.; HIGHLAND FLOATING RATE
LLC; HIGHLAND LEGACY LIMITED; LOAN
FUNDING VII, LLC; HIGHLAND OFFSHORE
PARTNERS, L.P.; HIGHLAND CREDIT
OPPORTUNITIES CDO LTD.; HIGHLAND

FLOATING RATE ADVANTAGE FUND; LL
BLUE MARLIN FUNDING LLC; MERRIL
LYNCH CREDIT PRODUCTS, LLC; OCEAN
BANK; QUADRANGLE MASTER FUNDING
LTD.; CENTURION CDO 10, LTD.;
CENTURION CDO XI, LTD.; CENTURION
CDO 8, LIMITED; CENTURION CDO 9, LTD.;
CENTURION CDO II, LTD.; CENTURION CDO
VI, LTD.; SEQUILS-CENTURION V, LTD.;
CENTURION CDO VII, LTD.; RIVERSOURCE
FLOATING RATE FUND; AND DOE
SUCCESSOR TRUSTEE.

                Defendants.

## FIRST AMENDED ADVERSARY COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") of TOUSA,

Inc., *et al*. ("Debtors"), by and through its undersigned counsel, on behalf of and as the

representative of the bankruptcy estates of the Debtors, based upon information and belief and as

a result of its investigation to date, alleges as follows:

## PRELIMINARY STATEMENT

1.      In this adversary proceeding, the Committee seeks (in Counts I–VI) to avoid

certain prepetition fraudulent and preferential transfers of up to $800 million that grew out of

secured debt obligations incurred by certain Debtors and to recover payments already made on

those debt obligations.  On or about July 31, 2007, TOUSA, Inc. ("TOUSA") and certain of its

subsidiaries, now among the Debtors, took on $500 million of debt in term loans so that TOUSA

could repay a debt for which those subsidiaries were not liable.  Each of those subsidiaries also

took on debt pursuant to a revolving credit facility; the proceeds of the loans under the revolving

credit facility may have benefited the subsidiary that used the borrowed funds, but did not

provide reasonably equivalent value or fair consideration to other subsidiaries that were

obligated to pay the debt.  At the time of these transactions, the subsidiaries either already were insolvent or thereby became insolvent.  The Committee also seeks (in Counts VII-XVIII) to recover the proceeds of the term loans or the proceeds of liens granted by Debtors from the recipients of the payments of the proceeds.  Finally, the Committee seeks (in Count XIX) to set aside as a preferential transfer the lien on a tax refund of more than $200 Million, and objects (in Count XX) to certain claims lodged against Debtors.

2.      During the summer of 2005, Debtor TOUSA Homes LP ("Homes LP") and Falcone/Ritchie LLC formed TE/TOUSA LLC (the "Transeastern JV") to acquire substantially all of the homebuilding assets of Transeastern Properties, Inc. (the "Transeastern Acquisition"). TOUSA and Homes LP gave certain guaranties as part of the transaction, and the parties formed several subsidiaries of the Transeastern JV. In order to fund the Transeastern Acquisition, Homes LP, TOUSA, and the Transeastern JV Subsidiaries (as defined below) entered into three credit agreements with the Transeastern Lenders totaling $675 million (the "Transeastern Debt"). TOUSA and Homes LP were the only Debtors that were liable for a portion of the Transeastern Debt.

3.      The Transeastern JV foundered within months. By November 2006, the Administrative Agent for the Transeastern Lenders began litigation against TOUSA and Homes LP seeking recovery under their guaranties. After months of negotiations, the Debtors consummated a "global settlement" of the litigation and of the remaining obligations among participants in the Transeastern JV (the "Transeastern Settlement"). As part of the Transeastern Settlement, TOUSA and Homes LP forced certain of their direct and indirect subsidiaries (the "Conveying Subsidiaries"), on or about July 31, 2007, to become co-borrowers and guarantors under certain secured credit facilities (a First Lien Term Loan, a Second Lien Term Loan, and an

amended revolving credit facility (defined below as the New Loans)) of approximately $800 million with the New Lenders (as defined below). TOUSA and Homes LLP used the proceeds of the First Lien Term Loan and the Second Lien Term Loan, among other things, to satisfy the Transeastern Debt – even though the Conveying Subsidiaries were not obligated for the Transeastern Debt.

4.      The Conveying Subsidiaries did not receive reasonably equivalent value (a) from the New Lenders in exchange for incurring secured debt obligations under the Term Loans, or under the Amended Revolver Agreement (as defined below) (the "New Lender Claim and Lien Transfers"), under the October 25, 2007 Amended Revolver Agreement (as defined below) (the "October 25, 2007 Claim and Lien Transfers"), or under the December 14, 2007 Amended Revolver Agreement (as defined below) (the "December 14, 2007 Claim and Lien Transfers"), or (b)(i) from CIT and the Transeastern Lenders (defined below) in exchange for the transfer of over $422 million in satisfaction of the Transeastern Debt (the "CIT Transfer"), or (ii) from the Doe Successor Trustee (as defined below) in exchange for incurring obligations on the "New Subordinated Notes,"[1] which were $20 million of new paid-in-kind notes, in the "New Subordinated Notes Transfers." (The CIT Transfer and the New Subordinated Notes Transfers together are the "Transeastern Transfers" and, together with the New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim and Lien Transfers, are the "Fraudulent Transfers.")  The October 25, 2007 Claim and Lien Transfers and the December 14, 2007 Claim and Lien Transfers are together the "Late 2007 Avoidable Claim and Lien Transfers".

---

[1] These were $20 million of new 14.75% senior subordinated paid-in-kind notes due July 1, 2015. The New Subordinated Notes were issued pursuant to that certain Indenture, dated as of July 31, 2007, among TOUSA (as issuer), all or substantially all of the Conveying Subsidiaries (as guarantors), and Wells Fargo (as indenture trustee.) Wells Fargo subsequently resigned as indenture trustee and was replaced by HSBC. Upon information and belief, on or about May 13, 2008, HSBC resigned as indenture trustee and has not been replaced.

5.      On July 31, 2007, the Conveying Subsidiaries were (i) either insolvent or rendered insolvent by the Fraudulent Transfers, (ii) left with unreasonably small capital, or (iii) incurring debts beyond their ability to pay as the debts matured.  Thus, the Committee seeks to avoid and, as applicable, recover, the foregoing transfers and payments made in connection therewith, on behalf of and for the benefit of the Conveying Subsidiaries' estates, as constructively fraudulent conveyances under applicable bankruptcy and non-bankruptcy law.

6.      In addition, the Committee seeks to avoid as a preferential transfer any security interest allegedly granted by any of the Debtors to the New Lenders in respect of a tax refund in the approximate amount of $210 million (the "Tax Refund") that the Debtors received in or around June 2008. The Debtors' entitlement to the Tax Refund arose as a result of significant losses incurred during fiscal year 2007, which the Debtors were able to carry back to fiscal years 2005 and 2006. As a matter of law, (a) the Tax Refund is deemed earned as of the last day of the fiscal year for which the refund is claimed (in this case, December 31, 2007) and, thus, (b) any interest that the New Lenders allegedly obtained in the Tax Refund could not have arisen until December 31, 2007. As the New Lenders' alleged interest in the Tax Refund (a) arose during the 90-day period prior to the commencement of the Debtors' chapter 11 cases, (b) was a transfer on account of an antecedent debt owed to the New Lenders prior to the Petition Date, (c) was made while the Debtors were insolvent and (d) resulted in the New Lenders receiving more than they would in a chapter 7 case had the transfer not occurred, the Committee seeks to avoid, on behalf of and for the benefit of each of the Debtors' estates that has an interest in the Tax Refund, the New Lenders' alleged lien on the Tax Refund as a preferential transfer under Bankruptcy Code section 547 (the "Preferential Transfer" and, together with the Fraudulent Transfers, the "Transfers").

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b) because the claims asserted in this adversary proceeding arise in the above-captioned chapter 11 cases. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

8.      The Debtors and their non-Debtor affiliates (collectively, the "TOUSA Companies") design, build, and market detached single-family residences, town homes, and condominiums, and operate in various metropolitan markets in ten states, located in four major geographic regions: Florida, the Mid-Atlantic, Texas, and the West. TOUSA is a publicly traded company and the TOUSA Companies were collectively the nation's thirteenth largest homebuilder in 2006. On January 29, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.      Plaintiff Committee was appointed by the Office of the United States Trustee for the Southern District of Florida pursuant to Bankruptcy Code section 1102 on February 13, 2008. The Committee brings the Fraudulent Transfer claims derivatively on behalf of and for the benefit of the estates of the following Debtors: Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC;

8

TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; and TOUSA/West Holdings, Inc. (collectively, the "Conveying Subsidiaries"). The Committee brings the Preferential Transfer claim on behalf of and for the benefit of the estates of each of the Debtors that has an interest in the Tax Refund.

10.     Defendant Citicorp North America, Inc. ("Citicorp"), the administrative agent under the New Revolving Debt and First Lien Term Loan (each, as defined below) and holder of the liens conveyed pursuant thereto, is a corporation organized under the laws of the State of Delaware. Citicorp is an initial transferee of the New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim and Lien Transfers within the meaning of section 550(a) of the Bankruptcy Code.

11.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), the successor administrative agent under the Second Lien Term Loan (as defined below) and holder of the liens conveyed pursuant thereto, is a corporation organized under the laws of the United States of America. Wells Fargo is an initial transferee of the New Lender Claim and Lien Transfers within the meaning of section 550(a) of the Bankruptcy Code.

12.     The original lenders under the New Loans and signatories thereunder, their successors, assigns, and participants, are defendants herein and are identified as follows:

(i)    The First Lien Lenders include Bank of America, N.A.; JPMorgan Chase Bank, N.A.; Morgan Stanley Senior Funding, Inc.; Castlerigg Master Investments, Ltd.; Chicago Fundamental Investment Partners, LLC; CGDO, LLC; Covalent Partners LLC; Esperance C/O Scotiabank (Ireland) Limited; REOPICYM; The Foothill Group, Inc.; Fortress Credit Investments I LTD.; Fortress Credit Investments II LTD.; Goldman Sachs Credit Partners L.P.; Grand Central Asset Trust, Gaia Series; Grand Central Asset Trust, SIL Series; HBK Master Fund L.P.; Helios Funding LLC; Investment CBNA Loan Funding LLC; JP Morgan Whitefriars Inc.; Lehman Commercial Paper Inc.; Marathon Financing I., B.V.; McDonnell Loan Opportunity LTD.; Merrill Lynch Pierce, Fenner & Smith Incorporated; Monarch Master Funding LLC; Perry Principals, L.L.C.; Promethean I Master, Ltd.; Royal Bank of Canada; SOF Investments, L.P.; STRLRRE; Taconic Capital Partners 1.5 L.P.; Taconic Opportunity Fund L.P.; Tennenbaum Multi-Strategy Master Fund; Trilogy Portfolio Company, LLC; Van Kampen Dynamic Credit Opportunities Fund; Van Kampen Senior Income Trust; Van Kampen Senior Loan Fund; WCP Real Estate Strategies Fund; and Westport Capital Partners LLC.

(ii)    The Second Lien Lenders include AIG Annuity Insurance Company; Alexandra Global Master Fund, Ltd.; American General Life Insurance Company; American International Group, Inc.; Avenue Investments LP; CGDO, LLC; Citibank, NA; Citicorp North America, Inc.; Deutsche Bank AG, New York Branch; Goldman Sachs Credit Partners LP; HBK Master Fund LP; JPMorgan Chase Bank, N.A.; Longacre Capital Partners QP, LP; Longacre Master Fund LTD; M.D. Sass

Re/Enterprise Portfolio Company, L.P.; Merrill Lynch Pierce Fenner & Smith Inc.; Monarch Master Funding Ltd; Morgan Stanley Senior Funding, Inc.; Q Funding III, LP; Quadrangle Master Funding LTD; Stonehill Institutional Partners LP; SunAmerica Income funds – SunAmerica High Yield Bond Fund; SunAmerica Series Trust – High Yield Bond Portfolio; The Master Trust Bank of Japan, Ltd.; The Variable Annuity life Insurance Company; Third Point Loan LLC; Trilogy Portfolio Company LLC; and VALIC Company II High Yield Bond Fund.

(iii)     The <u>Lenders Under the Amended Revolver Agreement</u> include JPMorgan Chase Bank, N.A.; Morgan Stanley Senior Funding, Inc.; Avenue Investments LP; Bank of the West; Bank United; Branch Banking and Trust Co; Citigroup; Citibank, N.A.; Compass Bank DB Services New Jersey, Inc.; DK Acquisition Partners, L.P.; Goldman Sachs Credit Partners L.P.; Guaranty Group; Investment CBNA Loan Funding LLC; Jeffries Buckeye Master Fund, LTD; JPMorgan Chase Bank N.A.; Lehman Commercial Paper Inc.; Lispenard; Merrill Lynch Pierce, Fenner & Smith Incorporated; Monarch Master Funding LLC; Morgan Stanley Senior Funding, Inc.; National City; NATIXIS; PNC Bank, N.A.; Quattro Global Capital, LLC; Comerica Bank; Raymond James; Royal Bank of Canada; US Bank; UBS; Grand Central Asset Trust, SAN Series; SOF Investments, L.P.; Grand Central Asset Trust, VCM Series; Sovereign Bank; TRS Venor LLC; Wachovia Bank, N.A.; and Washington Mutual.  Lenders under the Amended Revolver Agreement include lenders under the October 25, 2007 Amended

Revolver Agreement and lenders under the December 14, 2007 Amended

Revolver Agreement.

The First Lien Lenders, the Second Lien Lenders, and the Lenders Under the Amended Revolver

Agreement, are, collectively with Citicorp and Wells Fargo, the "New Lenders". The New

Lenders are initial, immediate and/or mediate transferees of the New Lender Claim and Lien

Transfers within the meaning of section 550(a) of the Bankruptcy Code.

13.    Defendant Doe New Subordinated Notes Successor Trustee ("Doe Successor

Trustee") is the successor indenture trustee on the New Subordinated Notes. Doe Successor

Trustee is an initial transferee of the New Subordinated Notes Transfers within the meaning of

section 550(a) of the Bankruptcy Code.

14.    The original lenders under the New Subordinated Notes and signatories

thereunder, and their successors, assigns and participants (the New Subordinated Noteholders)

are defendants herein and include Deutsche Bank Trust Company Americas; Highland CDO

Opportunity Fund, Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate

Limited Liability Company; Highland Legacy Limited; Highland Offshore Partners, L.P.; Jasper

CLO, Ltd.; Loan FundingVII LLC; and Quadrangle Master Funding Ltd.. The New

Subordinated Noteholders are immediate and/or mediate transferees of the New Subordinated

Notes Transfers or the entities for whose benefit transfers were made within the meaning of

section 550(a) of the Bankruptcy Code.

15.    Defendant The CIT Group/Business Credit, Inc. ("CIT"), the administrative agent

in connection with the Transeastern Debt on the Transfer Date (as defined below), is a

corporation organized under the laws of the state of New York. CIT is an initial, immediate, or

mediate transferee of the Transeastern Transfers within the meaning of section 550(a) of the Bankruptcy Code.

16.    The  lenders under the Senior Credit Agreement and signatories to the CIT Settlement Agreement (both defined below), defendants herein, are: 3V Capital Master Fund Ltd.; Atascosa Investments, LLC; Aurum CLO 2002-1 Ltd.; Bank of America, N.A.; Bear Stearns Investment Products Inc.; Black Diamond CLO 2005-1; Burnet Partners, LLC; Centurion CDO 10, Ltd.; Centurion CDO 8, Limited; Centurion CDO 9, Ltd.; Centurion CDO II, Ltd.; Centurion CDO VI, Ltd.; Centurion CDO VII, Ltd.; Centurion CDO XI, Ltd.; Deutsche Bank Trust Company Americas; Distressed High Yield Trading Ops. Fund Ltd; Eaton Vance Credit Opportunities Fund; Eaton Vance Floating-Rate Income Trust; Eaton Vance Grayson & Co.; Eaton Vance Limited Duration Income Fund; Eaton Vance Senior Debt Portfolio; Eaton Vance Senior Floating-Rate Trust; Eaton Vance Senior Income Trust; Eaton Vance VT Floating-Rate Income Fund; Fall Creek CLO, Ltd.; Farallon Capital Institutional Partners II, L.P.; Farallon Capital Institutional Partners III, L.P.; Farallon Capital Institutional Partners, L.P.; Farallon Capital Offshore Investors II, L.P.; Farallon Capital Offshore Investors, Inc.; Farallon Capital Partners, L.P.; Flagship CLO III; Flagship CLO IV; Flagship CLO V; Gleneagles CLO Ltd; Goldman Sachs Credit Partner, L.P.; Grand Central Asset Trust, CED Series; Grand Central Asset Trust, HLD Series; Grand Central Asset Trust, SOH Series; Hartford Mutual Funds, Inc. on behalf of The Hartford Floating Rate Fund by Hartford Investment Management Company, its Sub-Advisor; Highland CDO Opportunity Fund, Ltd.; Highland Credit Opportunities CDO Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate LLC; Highland Legacy Limited; Highland Offshore Partners, L.P.; Jasper CLO, Ltd.; JPMorganChase Bank, N.A.; Liberty CLO, Ltd.; LL Blue Marlin Funding LLC; Loan Funding VII, LLC; Merril Lynch Credit Products, LLC;

Ocean Bank; Quadrangle Master Funding Ltd.; Riversource Floating Rate Fund; Rockwall CDO, Ltd.; Sequils-Centurion V, Ltd.; Silver Oak Capital, LLC; Stedman CBNA Loan Funding LLC; The Foothill Group, Inc.; Tinicum Partners, L.P.; Van Kampen Dynamic Credit Opportunities Fund; Van Kampen Senior Income Trust; and Van Kampen Senior Loan Fund  (collectively, the "Transeastern Lenders" and, together with CIT, HSBC and Doe Successor Trustee and the New Subordinated Noteholders, the "Transeastern Transferees").  The Transeastern Lenders are initial, immediate, or mediate transferees of the Transeastern Transfers or the entities for whose benefit transfers were made within the meaning of section 550(a) of the Bankruptcy Code.

17.     All defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure, made applicable by Rule 7020 of the Federal Rules of Bankruptcy Procedure, because the right to relief asserted against all defendants arises out of the same transaction, occurrence, or series of transactions and occurrences, and questions of law and fact common to all defendants and/or certain categories or classes of defendants will arise in this action.

## BACKGROUND

### A.     The Transeastern Acquisition

18.     On June 6, 2005, the Transeastern JV was formed to enter into the Transeastern Acquisition. Prior to the consummation of the Transeastern Acquisition, Arthur J. Falcone and Edward W. Falcone were the majority owners of Transeastern Properties, Inc.

19.     To fund the Transeastern Acquisition, the Transeastern JV created a series of "tiered" special purpose subsidiaries (the "Transeastern JV Subsidiaries") : a) EHT, the primary operating subsidiary of the Transeastern JV; b) TE/TOUSA Senior, LLC ("TOUSA Senior"), managing member and sole owner of EHT; c) TE/TOUSA Mezzanine LLC ("TOUSA Mezz"),

which owned all of the membership interests in TOUSA Senior; and d) TE/TOUSA Mezzanine

Two LLC ("TOUSA Mezz II"), which owned all of the membership interests in TOUSA Mezz.

The Transeastern JV Subsidiaries entered into credit agreements with separate groups of lenders,

each dated August 1, 2005 (collectively, the "Transeastern Credit Agreements"),[2] totaling $675

million, as follows:

> (i)     a $450,000,000 Credit Agreement (the "Senior Credit Agreement")[3] entered into
>         by EHT with TOUSA Senior, LLC as co-borrower;
>
> (ii)    a $137,500,000 Senior Mezzanine Credit Agreement (the "Senior Mezzanine
>         Credit Agreement")[4] with TOUSA Mezz as borrower; and
>
> (iii)   an $87,500,000 Junior Mezzanine Credit Agreement (the "Junior Mezzanine
>         Credit Agreement") with TOUSA Mezz II as borrower.

20.     Thus, (a) EHT and TOUSA Senior were the only primary obligors under the

Senior Credit Agreement, (b) TOUSA Mezz was the only primary obligor under the Senior

Mezzanine Credit Agreement, and (c) TOUSA Mezz II was the only primary obligor under the

Junior Mezzanine Credit Agreement. In addition, TOUSA and Homes LP (the "TOUSA

Guarantors") both executed three unsecured completion guaranties and three unsecured carve-

out guaranties (the six guaranties together are the "TOUSA Guaranties") in respect of the

Transeastern Credit Agreements. Upon information and belief, carve-out guaranties were also

executed by Falcone/Ritchie LLC and certain of its affiliates.

---

[2] Deutsche Bank Trust Company Americas ("DB Trust") was the original administrative agent under the Transeastern Credit Agreements, and Deutsche Bank Securities Inc. ("DB Securities") was the sole lead arranger and sole book running manager thereunder. On March 13, 2007, CIT replaced DB Trust and DB Securities as administrative agent, lead arranger, and book running manager for the Transeastern Credit Agreements.

[3] The Senior Credit Agreement was secured by first priority liens on substantially all of the assets of EH/Transeastern, LLC ("EHT") including, without limitation, real estate and options contracts.

[4] The Senior Mezzanine Credit Agreement and the Junior Mezzanine Credit Agreement were secured by liens on ownership interests in certain of the Transeastern JV Subsidiaries.

21.     Although the Debtors' corporate structure includes many entities, only TOUSA and Homes LP had any obligations in connection with the Transeastern Debt. None of the Conveying Subsidiaries were obligors under the Transeastern Credit Agreements.

**B.      The Prepetition Transeastern Litigation**

22.     On October 31, 2006, and November 1, 2006, the TOUSA Guarantors received demand letters from DB Trust requiring payment under the TOUSA Guaranties. The demand letters alleged that potential defaults and events of default had occurred under the Transeastern Credit Agreements triggering the TOUSA Guarantors' obligations. On November 28, 2006, the TOUSA Guarantors filed a declaratory action in Florida state court against DB Trust seeking a declaration that the TOUSA Guarantors' obligations under the TOUSA Guaranties had not been triggered and/or that their exposure under the TOUSA Guaranties differed from what DB Trust alleged in the demand letters (the "Florida Action").[5] On November 29, 2006, DB Trust filed suit in New York against the TOUSA Guarantors asserting claims allegedly arising out of DB Trust's rights under the TOUSA Guaranties (the "New York Action").

23.     DB Trust was the Administrative Agent under the Transeastern Credit Agreements from the inception of the agreements through March 13, 2007. In addition, DB Securities acted as financial advisor to certain of the TOUSA Guarantors and Transeastern JV Subsidiaries in connection with the Transeastern Acquisition, pursuant to a letter agreement (the "DB Letter Agreement"). On March 26, 2007, DB Securities commenced an action in New York for claims allegedly arising out of the DB Letter Agreement (the "DB Securities Action" and, together with the Florida Action and the New York Action, the "Prepetition Transeastern Litigation").

---

[5] On April 27, 2007, the Florida Action was dismissed without prejudice by stipulation of the parties.

24.    As the Conveying Subsidiaries were not liable for any of the Transeastern Debt,

they were not parties in the Prepetition Transeastern Litigation.

## C.    The Transeastern Settlement

25.    During the months of May, June, and July 2007, parties to the Prepetition

Transeastern Litigation and others entered into the following agreements in connection with the

Transeastern Settlement:

   (i)    a Settlement and Release Agreement dated as of May 30, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, and certain of the Falcone Entities[6] as set forth in Schedule 1 to the agreement (the "Land Bank Settlement Agreement");

   (ii)    a Settlement and Release Agreement dated as of July 31, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, CIT, and the lenders under the Senior Credit Agreement (the "CIT Settlement Agreement");

   (iii)    a Settlement and Release Agreement, dated as of June 29, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, and the lenders under the Senior Mezzanine Credit Agreement (the "Senior Mezzanine Settlement Agreement"); and

   (iv)    a Settlement and Release Agreement, dated as of June 29, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, and the lenders under the Junior Mezzanine Agreement (the "Junior Mezzanine Settlement Agreement" and, together with the Land Bank Settlement Agreement, the CIT Settlement Agreement, and the Senior Mezzanine Settlement Agreement, the "Transeastern Settlement Agreements").

26.    Pursuant to the Land Bank Settlement Agreement, among other things, the

Falcone Entities obtained releases from any and all claims or issues arising in connection with

the Transeastern JV and the Transeastern Acquisition with the exception of certain retained

obligations set forth in the Land Bank Settlement Agreement. Upon information and belief, the

Land Bank Settlement Agreement also provided for the payment of over $49 million by EHT to

the Falcone Entities in exchange for the takedown of certain properties. Also upon information and belief, EHT, TOUSA Senior, TOUSA Mezz, and TOUSA Mezz II were merged into TOUSA Homes Florida, L.P., one of the Debtors, upon consummation of the Transeastern Settlement.

27.     Pursuant to the CIT Settlement Agreement and in accordance with a pay-off letter attached thereto, among other things, EHT and TOUSA Senior agreed to pay $421,522,193.46 to CIT on July 31, 2007, with an additional penalty of approximately $140,000 per day for any late payments.

28.     Pursuant to the Senior Mezzanine Settlement Agreement, among other things, TOUSA agreed to issue and deliver (i) the New Subordinated Notes, and (ii) $117.5 million (at $1,000 per share) of 8% Series A Convertible Pay-in-Kind Preferred Stock in TOUSA to the lenders under the Senior Mezzanine Settlement Agreement in satisfaction and discharge of the debt incurred thereunder.

29.     Pursuant to the Junior Mezzanine Settlement Agreement, among other things, TOUSA agreed to issue and deliver $16.25 million of warrants to acquire shares of TOUSA common stock to the Junior Mezzanine Credit Agreement lenders in satisfaction and discharge of the debt incurred thereunder.

30.     The Transeastern Settlement closed on July 31, 2007 (the "Transfer Date"). The Transeastern Settlement released all claims by the Transeastern Transferrees against the TOUSA Guarantors and the Transeastern JV Subsidiaries arising out of the Transeastern Acquisition and the Transeastern Debt.

---

[6] The "Falcone Entities" consist of Arthur Falcone, Edward Falcone, Falcone/Ritchie LLC, and other affiliated entities.

**D.**     **The New Credit Agreements**

31.     Having agreed to settle the Transeastern litigation, TOUSA and Homes LP had to obtain the funds necessary to pay for the settlement, which they otherwise lacked.

32.     In order to fund, among other things, the settlement payments to, among others, CIT under the Transeastern Settlement, TOUSA, as borrower, together with Homes LP and the Conveying Subsidiaries, as both borrowers and guarantors, entered into the following secured credit facilities on the Transfer Date:

(i)     Second Amended and Restated Revolving Credit Agreement (the "Amended Revolver Agreement") with Citicorp, as Administrative Agent, and certain of the Lenders Under the Amended Revolver Agreement; (the "Revolving Debt");[7]

(ii)     $200 million first lien term loan facility (the "First Lien Term Credit Agreement") with Citicorp, as Administrative Agent, and certain of the First Lien Term Lenders (the "First Lien Term Loan");[8] and

(iii)     $300 million second lien term loan facility (the "Second Lien Term Credit Agreement," and together with the Amended Revolver Agreement and the First Lien Term Loan Agreement, the "New Credit Agreements") with Citicorp, as Administrative Agent,[9] and certain of the Second Lien Term Lenders (the "Second Lien Term Loan"[10] and, together with the First Lien Term Loan and the Revolving Debt, the "New Debt" or "New Loans").

The New Credit Agreements were executed as part of a single integrated transaction, and all of the Agreements choose the law of the State of New York as the law governing the agreements.

33.     The obligations under the Revolving Debt and First Lien Term Loan (together, the "First Lien Indebtedness") are allegedly secured by first priority liens on, among other things, the property and assets of all of the Debtors, whether real or personal, tangible or

---

[7] As of the Petition Date, approximately $316.5 million was outstanding under the Amended Revolver Agreement in respect of revolving loans and letters of credit.

[8] As of the Petition Date, approximately $199 million was outstanding under the First Lien Term Loan.

[9] On or about January 28, 2008, Citicorp resigned as administrative agent under the Second Lien Term Loan and was replaced by Wells Fargo.

intangible, and wherever located (the "Prepetition Collateral"). The obligations under the Second

Lien Term Loan are allegedly secured by a second priority lien on the Prepetition Collateral. An

intercreditor agreement, dated as of July 31, 2007, governs the respective rights of the lenders

under the First Lien Indebtedness and the lenders under the Second Lien Term Loan.

34.     Prior to the Transeastern Settlement, the existing First Amended and Restated

Revolving Credit Agreement, (the "January 2007 Revolver") forbade TOUSA and Homes LP

and any of its subsidiaries from creating any lien upon its properties except in limited

circumstances inapplicable to the Transeastern Settlement.  When TOUSA and Homes LP

entered into loan agreements to fund the Transeastern Settlement, thereby granting liens beyond

those permitted by the January 2007 Revolver, the lenders under the January 2007 Revolver as a

result no longer had any commitment to make any further loans to TOUSA, Homes LP or any of

the Conveying Subsidiaries.  In connection with funding the Transeastern Settlement, the lenders

under the January 2007 Revolver exercised their discretion and entered into the Amended

Revolver Agreement in order to authorize the First Lien Term Loan and Second Lien Term Loan

and to continue to make loans under the revolving facility.  The Amended Revolver Agreement

was a new loan commitment, because the lenders under the January 2007 Revolver retained the

absolute discretion to refuse to make further loans under that agreement.  Indeed, the parties

agreed that the Amended Revolver Agreement expressly "superseded" the January 2007

Revolver.  The Amended Revolver Agreement contained numerous other terms making clear

that it was a new loan agreement, including provisions that deemed prior letters of credit to be

letters of credit under the Amended Revolver Agreement, provisions granting security interests

to the Administrative Agent under the Amended Revolver Agreement, and other provisions

---

[10] As of the Petition Date, approximately $317 million was outstanding under the Second Lien Term Loan.

showing that further borrowings would be regarded as having been created under the Amended Revolver Agreement itself.

**E.**     **Knowledge of The Transeastern Transferees**

35.      Even though the Conveying Subsidiaries did not receive fair consideration or reasonably equivalent value in connection with the Transeastern Settlement, the New Loans, or the October 25, 2007 Amended Revolver Agreement and the December 14, 2007 Amended Revolver Agreement, the Conveying Subsidiaries were made jointly and severally liable on a secured basis for all amounts owed and subsequently borrowed pursuant to the New Loans, the October 25, 2007 Amended Revolver Agreement and the December 14, 2007 Amended Revolver Agreement, (including interest, fees, and other amounts). All, or substantially all, of the Conveying Subsidiaries were liable before July 31, 2007, on approximately $1.1 billion in debt obligations. Nonetheless, the New Credit Agreements expressly required that proceeds from the New Loans would be used to satisfy the obligations of the TOUSA Guarantors, the Transeastern JV Subsidiaries, and the Falcone Entities under the Transeastern Credit Agreements. Indeed, the New Loans were conditioned upon finalizing the Transeastern Settlement and extinguishing the Transeastern Debt.[11] On the Transfer Date, no less than $422.8 million of the proceeds from the New Debt plus other consideration was paid to CIT and other parties in satisfaction of the Transeastern Debt.

---

[11] The conditions to the New Loans included, but were not limited to, "[t]he Settlement Documents . . . [being] in full force and effect", "[t]he refinancing and exchange of Indebtedness under the Transeastern JV Credit Agreements . . . [being] consummated in full to the satisfaction of the Lenders with all Liens in favor of the existing lenders being terminated and discharged", and "the Administrative Agent [of the Transeastern Debt] . . . [receiving] a 'pay-off' letter." First Lien Term Loan at Section 3.1(c)(i) and (iii); Second Lien Term Loan at Section 3.1(c)(i) and (iii). The Amended Revolver Agreement required execution of the First Lien and Second Lien Term Loans. Section 3.1(c)(i) and (iii).

36.    The Transeastern Transferees (i) knew that the Conveying Subsidiaries were not defendants in the Prepetition Transeastern Litigation, (ii) knew that the Conveying Subsidiaries were not obligated on the Transeastern Debt that was released in connection with the Transeastern Settlement, (iii) knew that the Conveying Subsidiaries did not otherwise benefit from the Transeastern Settlement, and (iv) knew that the Conveying Subsidiaries were nevertheless forced to take on crippling obligations in order to fund the Transeastern Settlement. In short, the Transeastern Transferees knew or should have known that the Conveying Subsidiaries did not receive fair consideration or reasonably equivalent value in exchange for incurring the New Debt that was used to fund the Transeastern Settlement.

37.    The Transeastern Settlement was negotiated extensively among sophisticated parties represented by sophisticated counsel, and resulted in certain of the Transeastern Transferees receiving, among other consideration, equity interests in TOUSA and unsecured notes from TOUSA and the Conveying Subsidiaries. On information and belief, the sophisticated Transeastern Transferees and their agents and counsel must have conducted extensive due diligence, including examination of the capital structure of TOUSA and the Conveying Subsidiaries, before agreeing to accept that consideration. Such due diligence would have revealed, among other things, that all or substantially all of the Conveying Subsidiaries already were guarantors of more than $1 billion in unsecured bond obligations, and that the fair value of the assets of each Conveying Subsidiaries was far less than the obligations of those entities, before and certainly after consummation of the Transeastern Settlement. For these reasons and others, the Transeastern Transferees knew, should have known, or upon reasonable inquiry would have learned, that the Conveying Subsidiaries were insolvent at the time of, or became insolvent as a result of, the Transeastern Settlement.

**F.**     **Further Amendments of the Revolver**

38.     At the time that TOUSA and Homes LP entered into the New Loan agreements, there were $50 Million in draws and approximately $227 million in letters of credit outstanding under the January 2007 Revolver.

39.     Letters of credit were issued under the Amended Revolver Agreement, each time on behalf of a specific TOUSA entity. Even though these letters of credit thus benefited a specific TOUSA entity, *all* of the Conveying Subsidiaries were obligated as co-borrowers and guarantors to repay the revolver that funded the issuance of the letters of credit. As a result, those co-borrowing and guaranteeing (but not benefiting) Conveying Subsidiaries did not receive reasonably equivalent value in exchange for incurring obligations as co-borrower and guarantor.

40.     Not long after executing the Amended Revolver Agreement, the Debtors proved unable to comply with its terms and conditions. On information and belief, the Chief Financial Officer of TOUSA refused in September 2007 to certify that TOUSA was solvent. That refusal constituted an Event of Default under the Amended Revolver Agreement and authorized the Lenders Under the Amended Revolver Agreement to cease permitting further draws or Letters of Credit.

41.     Nevertheless, on October 25, 2007, the Lenders Under the Amended Revolver Agreement exercised their discretion and entered into a new revolver agreement (the "October 25, 2007 Amended Revolver Agreement") in order to make additional loans and to excuse TOUSA from having to make any representations about its solvency until December 31, 2007. The October 25, 2007 Amended Revolver Agreement was a new loan commitment because, in light of the Event of Default, the Lenders under the Amended Revolver Agreement retained the absolute discretion to refuse to make further loans under that agreement. The Lenders under the

Amended Revolver Agreement decided to make a new loan commitment to TOUSA, notwithstanding TOUSA'S inability to comply with the terms of the Amended Revolver Agreement. TOUSA's Form 10Q for the period ending September 30, 2007, stated that TOUSA had incurred a net loss for the nine months ended September 30, 2007 of $817.7 million and that "there is substantial doubt about our ability to continue as a going concern."

42.     TOUSA's financial condition continued to deteriorate. On information and belief, an Event of Default occurred under the October 25, 2007 Amended Revolver Agreement. Nevertheless, on December 14, 2007, the lenders under the October 25, 2007 Amended Revolver Agreement exercised their discretion and again decided to make a new loan commitment to TOUSA by amending the October 25, 2007 Amended Revolver Agreement to enter into a new agreement (the "December 14, 2007 Amended Revolver Agreement") in order to make additional loans under a revolving facility. The December 14, 2007 Amended Revolver Agreement was a new loan commitment because the lenders under the October 25, 2007 Amended Revolver Agreement had the absolute discretion to refuse to make further loans under that agreement. The company reported that the December 14, 2007 Amended Revolver Agreement extended "through February 1, 2008 the waiver of the financial covenants."

43.     Between July 31, 2007 and the petition date, several of the Conveying Subsidiaries were unable to perform under option or land contracts. TOUSA reported that these failures caused contract counterparties to draw on existing letters of credit. Those draws, TOUSA reported in its September 30, 2007, 10Q, "increased our outstanding borrowings." As each of those cash draws was for the benefit of only one of the subsidiaries, the cash draws did not provide reasonably equivalent value to the other Conveying Subsidiaries. On information and belief, some or all of the remaining cash draws between July 31, 2007 and the petition date

24

likewise failed to provide reasonably equivalent value to every one of the Conveying Subsidiaries.

**G.    The Tax Refund**

44.    Upon information and belief, on or about March 14, 2008, the Debtors filed with the Internal Revenue Service a consolidated 2007 federal tax return in which the Debtors claimed the Tax Refund. Upon information and belief, the Debtors received the Tax Refund in or around June 2008. The Debtors' entitlement to the Tax Refund arose as a result of significant losses incurred during fiscal year 2007 resulting from the sale, disposition, and returning of assets to various lenders, which losses the Debtors were able to carry back to fiscal years 2005 and 2006. As a matter of law, the Tax Refund is deemed earned as of the last day of the fiscal year for which the refund is claimed, i.e., December 31, 2007.

## COUNT I

**FRAUDULENT TRANSFER AGAINST NEW LENDERS (SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)**

45.    The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

46.    None of the Conveying Subsidiaries received reasonably equivalent value in exchange for New Lender Claim and Lien Transfers under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement.  Each of the Conveying Subsidiaries incurred an obligation to repay the First Lien Term Loan and Second Lien Term Loan and transferred an interest in its property on July 31, 2007 when it executed those agreements.

47.    At the time the New Lender Claim and Lien Transfers were made, each of the Conveying Subsidiaries: (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due; and/or (b) was engaged or

was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

48.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

49.     The New Lender Claim and Lien Transfers under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement should be avoided pursuant to sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code section 544(b).

50.     Any payments made in connection with the New Lender Claim and Lien Transfers under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 726.105 and 726.108 of the Florida Statutes and sections 544(b) and 550 of the Bankruptcy Code.

## COUNT II

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS (SECTIONS 726.106 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

51.     The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

52.     None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the New Lender Claim and Lien Transfers under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement.  Each of the Conveying Subsidiaries incurred an obligation to repay the First Lien Term Loan and Second Lien Term Loan and transferred an interest in its property on July 31, 2007 when it executed those agreements.

53.     Each of the Conveying Subsidiaries either already was insolvent at the time of the New Lender Claim and Lien Transfers or became insolvent as a result of the New Lender Claim and Lien Transfers.

54.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

55.     The New Lender Claim and Lien Transfers under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement should be avoided pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code section 544(b).

56.     Any payments made in connection with the New Lender Claim and Lien Transfers under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550.

## COUNT III

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS
### (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW
### AND 11 U.S.C. §§ 544(b) AND 550)

57.     The Committee repeats and realleges the allegations contained in paragraphs one through forty-four,  which are incorporated by reference as if set forth fully herein.

58.     None of the Conveying Subsidiaries received fair consideration in exchange for the New Lender Claim and Lien Transfers. Each of the Conveying Subsidiaries incurred an obligation to repay the New Loans and transferred an interest in its property on July 31, 2007

27

when it executed the New Credit Agreements, and incurred new obligations and transferred an interest in its property when it executed the October 25, 2007 Amended Revolver Agreement and again when it executed the December 14, 2007 Amended Revolver Agreement.

59.     In addition, each of the Conveying Subsidiaries transferred an interest in its property and incurred new obligations every time a letter of credit was issued or a new draw was made under the Amended Revolver Agreement, the October 25, 2007 Amended Revolver Agreement and the December 14, 2007 Amended Revolver Agreement.  Every Conveying Subsidiary, except for the one for whose benefit the letter of credit was issued or the draw made, failed to receive fair consideration for the transfer of its property interest and the incurrence of a new obligation.

60.     Each of the Conveying Subsidiaries either already was insolvent at the time of the New Lender Claim and Lien Transfers or became insolvent as a result of the New Lender Claim and Lien Transfers.

61.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

62.     The New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim and Lien Transfers should be avoided pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

63.     Any payments made in connection with the New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be

avoided and recovered pursuant to sections 273 and 278 of the New York Debtor and Creditor

Law and Bankruptcy Code sections 544(b) and 550.

## COUNT IV

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS
### (SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW
### AND 11 U.S.C. §§ 544(b) AND 550)

64.     The Committee repeats and realleges the allegations contained in   paragraphs one

through forty-four, which are incorporated by reference as if set forth fully herein.

65.     None of the Conveying Subsidiaries received fair consideration in exchange for

the New Lender Claim and Lien Transfers. Each of the Conveying Subsidiaries incurred an

obligation to repay the New Loans and transferred an interest in its property on July 31, 2007

when it executed the New Credit Agreements, and incurred new obligations, and transferred an

interest in its property when it executed the October 25, 2007 Amended Revolver Agreement

and again when it executed the December 14, 2007 Amended Revolver Agreement.

66.     In addition, each of the Conveying Subsidiaries transferred an interest in its

property and incurred new obligations every time a letter of credit was issued or a new draw was

made under the Amended Revolver Agreement, the October 25, 2007 Amended Revolver

Agreement, and the December 14, 2007 Amended Revolver Agreement.  Every Conveying

Subsidiary, except for the one for whose benefit the letter of credit was issued or the draw made,

failed to receive fair consideration for the transfer of its property interest and the incurrence of a

new obligation.

67.     The capital remaining in the hands of each of the Conveying Subsidiaries after

the New Lender Claim and Lien Transfers was unreasonably small.

68.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

69.     The New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim and Lien Transfers should be avoided pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

70.     Any payments made in connection with the New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

## COUNT V

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS
### (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW
### AND 11 U.S.C. §§ 544(b) AND 550)

71.     The Committee repeats and realleges the allegations contained in   paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

72.     None of the Conveying Subsidiaries received fair consideration in exchange for the New Lender Claim and Lien Transfers. Each of the Conveying Subsidiaries incurred an obligation to repay the New Loans and transferred an interest in its property on July 31, 2007 when it executed the New Credit Agreements, and incurred new obligations, and transferred an interest in its property when it executed the October 25, 2007 Amended Revolver Agreement and again when it executed the December 14, 2007 Amended Revolver Agreement.

73.     In addition, each of the Conveying Subsidiaries transferred an interest in its property and incurred new obligations every time a letter of credit was issued or a new draw was made under the Amended Revolver Agreement, the October 25, 2007 Amended Revolver Agreement and the December 14, 2007 Amended Revolver Agreement.  Every Conveying Subsidiary, except for the one for whose benefit the letter of credit was issued or the draw made, failed to receive fair consideration for the transfer of its property interest and the incurrence of a new obligation.

74.     At the time of the New Lender Claim and Lien Transfers, each of the Conveying Subsidiaries intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

75.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

76.     The New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim and Lien Transfers should be avoided pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

77.     Any payments made in connection with the New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

## COUNT VI

### FRAUDULENT TRANSFER AGAINST
### THE NEW LENDERS (11 U.S.C. §§ 548, 550)

78.     The Committee repeats and realleges the allegations contained in paragraphs one

through forty-four, which are incorporated by reference as if set forth fully herein.

79.     The New Lender Claim and Lien Transfers were made within two years of the

Petition Date.

80.     Each of the Conveying Subsidiaries received less than reasonably equivalent

value in exchange for the New Lender Claim and Lien Transfers.  Homes LP and the Conveying

Subsidiaries incurred a new obligation upon executing the New Credit Agreements on July 31,

2007. They also incurred a new obligation, for which they did not receive reasonably equivalent

value, when they executed  the October 25, 2007 Amended Revolver Agreement and the

December 14, 2007 Amended Revolver Agreement because each of those agreements

represented a new loan commitment.

81.     At the time of the New Lender Claim and Lien Transfers, each of the Conveying

Subsidiaries (i) was insolvent or became insolvent as a result of the New Lender Claim and Lien

Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a

transaction, for which any property remaining was unreasonably small; and/or (iii) intended to

incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts

matured.

82.     The New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim

and Lien Transfers should be avoided pursuant to Bankruptcy Code section 548(a)(1)(b).

83.     Any payments made in connection with the New Lender Claim and Lien

Transfers and the Late 2007 Avoidable Claim and Lien Transfers (including but not limited to

any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to Bankruptcy Code sections 548 and 550.

## COUNT VII

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

84.     The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

85.     None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

86.     At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due; and/or (b) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

87.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

88.     At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

33

89.     Each of the Conveying Subsidiaries transferred an interest in its property to the First Lien Lenders and the Second Lien Lenders when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

90.     As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

91.     In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

92.     The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT VIII

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 726.106 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

93.     The Committee repeats and realleges the allegations contained in  paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

94.     None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

34

95.     Each of the Conveying Subsidiaries either already was insolvent at the time of the Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

96.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

97.     At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

98.     Each of the Conveying Subsidiaries transferred an interest in its property to the First Lien Lenders and the Second Lien Lenders when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

99.     As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

100.     In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

101.     The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT IX

## FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

102.    The Committee restates and realleges the allegations contained in  paragraphs one

through forty-four, which are incorporated by reference as if set forth fully herein.

103.    None of the Conveying Subsidiaries received fair consideration in exchange for

the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the

Conveying Subsidiaries' estates.

104.    Each of the Conveying Subsidiaries either already was insolvent at the time of the

Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

105.    At all times relevant hereto, there were actual creditors of each of the Conveying

Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code

sections 502 and 544(b).

106.    At all times relevant hereto, the Transeastern Transferees had actual or

constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien

Transfers were fraudulent.

107.    Each of the Conveying Subsidiaries transferred an interest in its property when it

executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second

Lien Lenders transferred that interest in property, or the value of that interest in property, to the

lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and

others (but not by the Conveying Subsidiaries).

108.    As the New Loan Agreements expressly required that the proceeds of the First

Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the

Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

109.     In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

110.     The Transeastern Transfers should be avoided and/or recovered pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT X

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

111.     The Committee restates and realleges the allegations contained in  paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

112.     None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

113.     The capital remaining in the hands of each of the Conveying Subsidiaries after the Transeastern Transfers was unreasonably small.

114.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

115.     At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

116.    Each of the Conveying Subsidiaries transferred an interest in its property when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

117.    As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

118.    In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

119.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XI

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

120.    The Committee restates and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

121.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

122.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

123.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

124.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

125.    Each of the Conveying Subsidiaries transferred an interest in its property when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

126.    As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

127.    In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

128.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XII

### FRAUDULENT TRANSFER AGAINST
### TRANSEASTERN TRANSFEREES (11 U.S.C. §§ 548 AND 550)

129.    The Committee restates and realleges  the allegations contained in paragraphs one

through forty-four, which are incorporated by reference as if set forth fully herein.

130.    The Transeastern Transfers were made within two years before the Petition Date.

131.    Each of the Conveying Subsidiaries received less than reasonably equivalent

value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the

value of each of the Conveying Subsidiaries' estates.

132.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (i)

was insolvent or became insolvent as a result of the New Lender Claim and Lien Transfers and

the Transeastern Transfers; (ii) was engaged in business or a transaction, or was about to engage

in business or a transaction, for which any property remaining with each such Conveying

Subsidiary was an unreasonably small; and/or (iii) intended to incur, or believed that it would

incur, debts that would be beyond its ability to pay as such debts matured.

133.    At all times relevant hereto, the Transeastern Transferees had actual or

constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien

Transfers were fraudulent.

134.    Each of the Conveying Subsidiaries transferred an interest in its property when it

executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second

Lien Lenders transferred that interest in property, or the value of that interest in property, to the

lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and

others (but not by the Conveying Subsidiaries).

135.    As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

136.    In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

137.    The Transeastern Transfers should be avoided and/or recovered pursuant to Bankruptcy Code sections 548 and 550(a).

## COUNT XIII

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

138.    The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

139.    None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

140.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due; and/or (b) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

141.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

142.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

143.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan. On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan. Funds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

144.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XIV

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 726.106 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

145.    The Committee repeats and realleges the allegations contained in  paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

146.    None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

147.    Each of the Conveying Subsidiaries either already was insolvent at the time of the Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

148.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

149.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

150.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan. On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan. Funds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

151.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XV

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

152.     The Committee restates and realleges the allegations contained in  paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

153.     None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

154.     Each of the Conveying Subsidiaries either already was insolvent at the time of the Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

155.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

156.     At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

157.     The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan. On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan. Funds drawn under the First Lien Term Loan and the Second Lien Term Loan was property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

158.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XVI

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

159.    The Committee restates and realleges the allegations contained in  paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

160.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

161.    The capital remaining in the hands of each of the Conveying Subsidiaries after the Transeastern Transfers was unreasonably small.

162.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

163.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

164.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan. On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan. Funds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying

Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

165.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XVII

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

166.    The Committee restates and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

167.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

168.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

169.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

170.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

171.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan. On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan. Funds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries

172.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XVIII

### FRAUDULENT TRANSFER AGAINST
### TRANSEASTERN TRANSFEREES (11 U.S.C. §§ 548 AND 550)

173.    The Committee restates and realleges  the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

174.    The Transeastern Transfers were made within two years before the Petition Date.

175.    Each of the Conveying Subsidiaries received less than reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

176.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (i) was insolvent or became insolvent as a result of the New Lender Claim and Lien Transfers and the Transeastern Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with each such Conveying Subsidiary

47

was an unreasonably small; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

177.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

178.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan. On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan. Funds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

179.    The Transeastern Transfers should be avoided and/or recovered pursuant to Bankruptcy Code sections 548 and 550(a).

### COUNT XIX

**AVOIDABLE PREFERENCE**
**AGAINST THE NEW LENDERS (11 U.S.C. §§ 547 AND 550)**

180.    The Committee restates and realleges  the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

181.    The granting of a security interest in the Tax Refund, to the extent valid, was for the benefit of the New Lenders.

182.    The granting of a security interest in the Tax Refund, to the extent valid, was on account of an antecedent debt owed to the New Lenders prior to the Petition Date.

183.    The granting of a security interest in the Tax Refund, to the extent valid, was made to the New Lenders while the Debtors were insolvent.

184.    The granting of a security interest in the Tax Refund, to the extent valid, occurred within 90 days of the Petition Date.

185.    The granting of a security interest in the Tax Refund, to the extent valid, will result in the New Lenders receiving more than they would in a chapter 7 case had the granting of the security interest not occurred.

186.    The granting of the security interest in the Tax Refund to the New Lenders, to the extent valid, should be avoided and/or recovered pursuant to Bankruptcy Code sections 547 and 550.

## COUNT XX

### OBJECTION TO ALLOWANCE OF CLAIM
### (11 U.S.C. §§ 105, 502, 544, 548, 550 AND FRBP 3007, 7001)

187.    The Committee restates and realleges  the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

188.    The New Lenders filed proofs of claims seeking allowance of the full amount of the New Loans (the "Claims"). The Committee hereby objects to the Claims pursuant to section 502 of the Bankruptcy Code on behalf of TOUSA and the Conveying Subsidiaries.

189.    The Conveying Subsidiaries received less than reasonably equivalent value in exchange for incurring the New Loans and pledging the Pre-Petition Collateral, and either were insolvent at the time of the New Lender Claim and Lien Transfers, or were rendered insolvent by those Transfers. As such, the New Lender Claim and Lien Transfers are avoidable under sections 544 and 548 of the Code, and the Claims of the New Lenders – which are based exclusively on the alleged validity of the New Lender Claim and Lien Transfers – must be disallowed under

section 502 of the Code.  In addition, the Conveying Subsidiaries received less than reasonably

equivalent value in exchange for incurring the obligations and transferring an interest in property

under the October 25, 2007 Amended Revolver Agreement and the December 14, 2007

Amended Revolver Agreement and were insolvent when they incurred those obligations and

made transfers under those agreements. Accordingly, the claims of the New Lenders that arise

under the October 25, 2007 Amended Revolver Agreement or the December 14, 2007 Amended

Revolver Agreement are avoidable under section 502 of the Code.

190.    In connection with the New Credit Agreements, the Conveying Subsidiaries were

required to execute Guaranty agreements each dated July 31, 2007 (the "New Loan

Guaranties"). Section 2 of the New Loan Guaranties contains language that purports, under

certain circumstances, to limit the Debtors' obligations arising from the Debtors' guaranty of the

obligations created in the New Credit Agreements and New Loan Guaranties (the "New Loan

Savings Clause"). Section 2 of the Amended Revolver Agreement has a guaranty with an

identical putative Savings Clause (the "Revolver Savings Clause" and together with the New

Loan Savings Clauses, the "Guaranty Savings Clauses"). Section 10 of each of the New Credit

Agreements also contains language, albeit different from the Guaranty Savings Clauses, that also

purports, under certain circumstances, to limit the liability and liens attributable to the

Conveying Subsidiaries. ("The Loan Agreement Savings Clauses," and together with the

Guaranty Savings Clauses, the "Savings Clauses.").

191.    The Savings Clauses by their terms purport to reduce the amount of the New

Loan obligations incurred in connection with the New Credit Agreements and in the New Loan

Guaranties below the amount at which the Conveying Subsidiaries would be rendered insolvent.

The New Lenders may argue that the Savings Clauses operate as a defense to the Committee's

avoidance claims. The Committee does not concede that the Savings Clauses are enforceable or that the clauses actually serve as a defense to an avoidance claim.

192.    Even if the Savings Clauses were to be enforced so as to reduce the Conveying Subsidiaries' liabilities, the Claims still have to be disallowed in their entirety or reduced under section 502 of the Bankruptcy Code.

193.    Thus, pursuant to sections 105, 502, 544 and 548 of the Code, and Bankruptcy Rules 3007 and 7001, the Claims should be disallowed in their entirety or reduced.

## RESERVATION OF RIGHTS

194.    The Committee believes that additional claims in favor of one or more of the Debtors' estates against the Defendants and/or other parties, including, without limitation, the Falcone Entities, may exist. The Committee reserves any and all rights to bring such claims to the extent authorized by the Court and/or applicable law.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an order:

(1)    avoiding the New Lender Claim and Lien Transfers;

(2)    granting recovery of all amounts paid in connection with the New Claim and Lien Transfers;

(3)    disallowing or in the alternative reducing the Claims by the New Lenders;

(4)    avoiding and/or requiring return of the Transeastern Transfers;

(5)    avoiding any security interest in the Tax Refund;

(6)    enforcing paragraph 16(d) of the *Stipulated Final Order (i) Authorizing Limited Use Of Cash Collateral Pursuant To Sections 105, 361 And 363 Of The Bankruptcy Code, And (ii) Granting Replacement Liens, Adequate Protection And Super Priority Administrative Expense Priority To Secured Lenders,* [D.E.

1226 in Ch. 11 No. 08-10928]entered by this court on June 20, 2008, to modify or eliminate the Adequate Protection Liens and Adequate Protection Claims as defined in that order, and requiring disgorgement from Pre-Petition Secured Parties, as that term is defined in that Order, any payments made as Adequate Protection under that Order;

(7)    granting such other and further relief, including to the extent warranted, equitable subordination, as the Court deems just, proper and equitable, including the fees, costs, interest, and expenses of this action.

Dated: October 7, 2008

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications in this Court set forth in Local Rule 2090-1(A).

I hereby certify that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court order dated July 10, 2008 [D.E. 1360, 1362, 1363]

/s/ Patricia A. Redmond

PATRICIA A. REDMOND
(Florida Bar No. 303739)
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street
Miami, FL  33130
Telephone: (305) 789-3553
Facsimile: (305) 789-3395
predmond@swmwas.com

/s/ Lawrence S. Robbins

LAWRENCE S. ROBBINS        *pro hac vice*
(D.C. Bar No. 420260)
ALAN D. STRASSER        *pro hac vice*
(D.C. Bar No. 967885)
MICHAEL L. WALDMAN        *pro hac vice*
(D.C. Bar No. 414646)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street N.W., Suite 411-L
Washington, DC  20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
lrobbins@robbinsrussell.com
astrasser@robbinsrussell.com
mwaldman@robbinsrussell.com

*Local Counsel to the Fraudulent Conveyance Adversary Proceeding Counsel for the Official Committee of Unsecured Creditors of TOUSA, Inc., et al.*

*Fraudulent Conveyance Adversary Proceeding Counsel for the Official Committee of Unsecured Creditors of TOUSA, Inc., et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2008, I caused a true and correct copy of the First Amended Adversary Complaint to be served by e-mail on:


Paul Steven Singerman, Esq.                     *singerman@bergersingerman.com*
**BERGER SINGERMAN P.A.,** *Local Counsel*
200 S. Biscayne Blvd., Suite 1000
Miami, FL   33131
Telephone:  305.775.9500
Facsimile:  305.714.4340
– and –
Paul M. Basta, Esq.                             *pbasta@kirkland.com*
Richard M. Cieri, Esq.                          *rcieri@kirkland.com*
M. Natasha Labovitz, Esq.                       *nlabovitz@kirkland.com*
**KIRKLAND & ELLIS, LLP**
153 East 53 Street
New York, NY   10022
Telephone:   212.446.4800
Facsimile:  212.446.4900
– and –
Jeffrey S. Powell, Esq.                         *jpowell@kirkland.com*
**KIRKLAND & ELLIS, LLP**
655 15 Street, NW
Washington DC   20005
Telephone:   202.879.5000
Facsimile:  202.879.5200
                *Counsel for TOUSA, Inc., et al.,* **Debtors / Third Party Defendants**
                - - - - - - - - - - - - - - - - - - - - - - - - -

Patricia A. Redmond, Esq.                       *predmond@swmwas.com*
David C. Pollack, Esq.                          *dpollack@swmwas.com*
**STEARNS WEAVER MILLER WEISSLER  ALHADEFF & SITTERSON, P.A.,** *Local Counsel*
150 W. Flagler Street, Suite 2200
Miami, FL   33130
Telephone: 305.789.3200
Facsimile: 305.789.3395
– and –
Lawrence S. Robbins, Esq.                       *lrobbins@robbinsrussell.com*
Alan D. Strasser, Esq.                          *astrasser@robbinsrussell.com*
Michael L. Waldman, Esq.                        *mwaldman@robbinsrussell.com*
**ROBBINS, RUSSELL, ENGLERT, ORSECK,  UNTEREINER & SAUBER LLP,**
1801 K Street, Suite 411-L                      *Fraudulent Conveyance Adversary Proceeding*
Washington, DC 20006                            *Special Counsel*
Telephone:  202-775-4500
Facsimile:  202.775.4510
– and –
Daniel H. Golden, Esq.                          *dgolden@akingump.com*
Philip C. Dublin, Esq.                          *pdublin@akingump.com*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
590 Madison Avenue
New York, NY 10022

Telephone: (212) 872-1000
Facsimile: (212) 872-1002
     *Counsel for Official Committee of Unsecured Creditors of TOUSA, Inc., et al,* **Plaintiff**
- - - - - - - - - - - - - - - - - - - - - - - -


Allan E Wulbern, Esq.                              *awulbern@smithhulsey.com*
Stephen D. Busey, Esq.                             *busey@smithhulsey.com*
**SMITH HULSEY & BUSEY**
225 Water Street, Suite 1800
Jacksonville, FL   32202
Telephone:  904.359.7700
Facsimile:  904.359.7708
– and –
Richard Craig Prosser, Esq.                        *rproser@srbp.com*
Harley Edward Riedel, Esq.                         *hriedel@srbp.com*
Amy D. Harris, Esq.                                *aharris.ecf@srbp.com*
Edward Peterson, Esq.                              *epeterson@srbp.com*
**STICHTER, RIEDEL, BLAIN & PROSSER, P.A.**
110 East Madison Street, Suite 200
Tampa, FL  33602-4718
Telephone:  813.229.0144
Facsimile:  813.229.1811
– and –
Joseph H. Smolinsky, Esq.                          *jsmolinsky@chadbourne.com*
Thomas J. Hall, Esq.                               *thall@chadbourne.com*
Seven R. Rivera, Esq.                              *sriveera@chadbourne.com*
Thomas J. McCormack, Esq.                          *tmccormack@chadbourne.com*
**CHADBOURNE & PARKE LLP**
30 Rockefeller Plaza
New York, NY   10112
Telephone:  212.408.5100
Facsimile:  212.541.5369


*Counsel for Citicorp North America, Inc., in its capacity as Administrative Agent for the First Lien Revolver and First
Lien Term Loan Credit Agreement***, Defendant**
- - - - - - - - - - - - - - - - - - - - - - - -


Scott L. Baena, Esq.                               *sbaena@bilzin.com*
Matthew I. Kramer, Esq.                            *mkramer@bilzin.com*
Jeffrey I Snyder, Esq.                             *jsnyder@bilzin.com*
**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**, *Local Counsel*
200 S. Biscayne Blvd., Suite 2500
Miami, FL   33131
Telephone:  305.374.7580
Facsimile:  305.374.7593
– and –
Evan D. Flaschen, Esq.                             *evan.flaschen@bgllp.com*
Gregory W. Nye, Esq.                               *gregory.nye@bgllp.com*
Richard Whiteley, Esq.                             *richard.whiteley@bgllp.com*
Heath A. Novosad, Esq.                             *heath.novosad@bgllp.com*
**BRACEWELL & GIULIANI LLP**
225 Asylum Street, Suite 2600
Hartford, CT   06013
Telephone:  860.947.9000

Facsimile:  860.246.3201
*Co-Counsel to Wells Fargo, as Successor Administrative Agent under that Certain  Second Lien Term Loan Credit Agreement, and an Informal Group of Holders of Second Lien Term Loan Lenders*, **Defendants**
- - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| John H. Genovese, Esq. | *jgenovese@gjb.com* |
| Paul J. Batista, Esq. | *pbattista@gjb.com* |
| Heather L. Yonke, Esq. | *hyonke@gjb.com* |

GENOVESE JOBLOVE & BATTISTA, P.A. , *Local Counsel*
100 SE 2 Street, 44 Floor
Miami, FL  33131
Telephone:  305.349.2300
Facsimile:  305.349.2310
– and –

| | |
|---|---|
| David S. Rosner, Esq. | *drosner@kasowitz.com* |
| Andrew K. Glenn, Esq. | *aglenn@kasowitz.com* |
| Jeffrey R. Gleit, Esq. | *jgleit@kasowitz.com* |
| Daniel A. Fliman, Esq. | *dfliman@kasowitz.com* |
| John Minsker, Esq. | *jminsker@kasowitz.com* |

KASOWITZ,  BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY  10019
Telephone:  212.506.1700
*Counsel to Aurelius Named-Entities, GSO Named-Entities, and Carlyle Strategic Partners (collectively, the "Noteholders"),* **Defendants**
- - - - - - - - - - - - - - - - - - - - - - - -

Michael I Goldberg, Esq.    *michael.goldberg@akerman.com*
AKERMAN SENTERFITT, *Local Counsel*
350 East Las Olas Blvd., Suite 1600
Fort Lauderdale, FL  33301-2229
Telephone:  954.463.2700
Facsimile:  954.463.2224
– and –

| | |
|---|---|
| Dennis F. Dunne, Esq. | *ddunne@milbank.com* |
| Andrew M. LeBlanc, Esq. | *aleblanc@milbank.com* |
| Andrew Beirne, Esq. | *abeirne@milbank.com* |
| Atara Miller, Esq. | *amiller@milbank.com* |
| Dennis C. O'Donnell, Esq. | *dodonnell@milbank.com* |
| David R. Eastlake, Esq. | *deastlake@milbank.com* |

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005
Telephone:  212.530.5287
Facsimile:  212.530.5219
*Counsel for the "Senior Transeastern Lenders,"* **Defendants**
- - - - - - - - - - - - - - - - - - - - - - - -

Ileana A. Cruz,  Esq.    *icruz@whitecase.com*
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL  33131
Telephone:  305.371.2700
Facsimile:  305.995.5289
– and –

| | |
|---|---|
| Meghan McCurdy, Esq. | *mmccurdy@whitecase.com* |
| David G. Hille,  Esq. | *dhille@whitecase.com* |

WHITE & CASE LLP
1155 Avenue of the Americas

New York, NY   10036
Telephone:  212.819.8200
Facsimile:  212.354.8113
*Counsel for Deutsche Bank Trust Company Americas, Highland Named-Entities, Jasper CLO Ltd., Loan Funding VII LLC, Quadrangle Master Funding Ltd.*
- - - - - - - - - - - - - - - - - - - - - - -
Steven Schneiderman, Esq.                                             steven.d.schneiderman@usdoj.gov
**OFFICE OF THE ASSISTANT UNITED STATES TRUSTEE**
51 SW 1 Avenue, Suite 1204
Miami, FL   33130
Telephone:  305.536.7285
Facsimile:  305.536.7360

                                             /s/ Alan D. Strasser
                                             **ALAN D. STRASSER**
                                             **ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP**
                                             1801 K Street N.W., Suite 411-L
                                             Washington, DC  20006
                                             Telephone: (202) 775-4500
                                             Facsimile: (202) 775-4510