**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re:<br>TOUSA, INC., *et al.*,<br><br>　　　　　　Debtors. | Chapter 11 Cases<br><br>Case No. 08-10928-JKO<br><br>Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF TOUSA, INC., *et al.*,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>CITICORP NORTH AMERICA, INC., *et al.*,<br><br>　　　　　　Defendants. | Adv. Pro. No. 08-01435 |

**SENIOR TRANSEASTERN LENDERS' MOTION TO DISMISS**
**FIRST AMENDED ADVERSARY COMPLAINT AND**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION**

Dated: November 4, 2008

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    A.   Transeastern Transaction and Settlement ........................................................................ 2

    B.   Claims Against the Senior Transeastern Lenders ............................................................ 5

ARGUMENT ............................................................................................................................ 7

I.     Legal Standards........................................................................................................... 7

    A.   Motion To Dismiss ......................................................................................................... 7

    B.   Fraudulent Transfer Statutes ........................................................................................... 8

II.    The Committee Has Not Pled That the Conveying Subsidiaries Had an Interest in the Property transferred to the Senior Transeastern Lenders............................................. 9

    A.   The Conveying Subsidiaries Did Not Obtain an Interest in the Proceeds of the New Loans on the Basis of Being Co-Borrowers ............................................................ 12

    B.   Analogous Legal Contexts Demonstrate the Conveying Subsidiaries Have No Interest in the Proceeds of the New Loans...................................................................... 16

    C.   Finding a Property Interest in Borrowed Funds Would Render Subsidiary Guaranty Loans Useless............................................................................................... 19

    D.   The Committee's Newly Pled Theory of Liability in Counts VII Through XII Fares No Better Than the Theory Pled in the Original Complaint .................................. 20

III.   The Senior Transeastern Lenders Are Not Liable As Subsequent Transferees of an Incurred Obligation........................................................................................................ 21

IV.   The Committee Should Not Be Permitted To Bring a Second Amended Complaint....... 23

    A.   The Committee Has Not – And Cannot – Plead a Transfer of an Interest of the Debtor in Property........................................................................................................ 24

    B.   Amendment Would Be Futile Because the Senior Transeastern Lenders Have a Right of Recoupment .................................................................................................... 25

CONCLUSION........................................................................................................................ 27

ATTORNEY CERTIFICATION.............................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.W. Lawrence & Co., Inc. v. Burstein et al. (In re A.W. Lawrence & Co., Inc.),*
 346 B.R. 51 (Bankr. N.D.N.Y. 2006) ................................................................ 14

*Aalfs v. Wirum (In re Straightline Invs., Inc.),*
 525 F.3d 870 (9th Cir. 2008) ............................................................................ 15

*Ambrosia Coal & Constr. Co. v. Pages Morales,*
 482 F.3d 1309 (11th Cir. 2007) .......................................................................... 7

*Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc.*
 *(In re Ames Dep't Stores, Inc.),* 161 B.R. 87 (Bankr. S.D.N.Y. 1993)........................ 9

*Associated Builders, Inc. v. Alabama Power Co.,*
 505 F.2d 97 (5th Cir. 1974) ............................................................................. 11

*Atlanta Shipping Corp. v. Chemical Bank,*
 818 F.2d 240 (2d Cir. 1987) ............................................................................ 25

*Begier v. IRS,*
 496 U.S. 58 (1990).......................................................................................... 10

*Bell Atlantic v. Twombly,*
 127 S. Ct. 1955 (U.S. 2007).............................................................................. 7

*Bennett & Kahnweiler Associates v. Ratner (In re Ratner),*
 132 B.R. 728 (N.D. Ill. 1991) .......................................................................... 13

*Buffalo Molded Plastics, Inc. v. Omega Tool Corp. (In re Buffalo Molded Plastics, Inc.),*
 344 B.R. 394 (Bankr. W.D. Pa. 2006) ............................................................... 15

*C.H. Rider & Family v. Wyle (In re United Energy Corp.),*
 102 B.R. 757 (B.A.P. 9th Cir. 1989) ................................................................. 25

*Coral Petroleum, Inc. v. Banque Paribas-London,*
 797 F.2d 1351 (5th Cir. 1986) ......................................................................... 15

*Dzikowski v. NASD Regulation, Inc.,*
 247 B.R. 867 (S.D. Fla. 2000) ......................................................................... 14

*Ear, Nose & Throat Surgeons of Worcester, Inc. v. Guaranty Bank & Trust Co.*
 *(In re Ear, Nose & Throat Surgeons of Worcester, Inc.),*
 49 B.R. 316 (Bankr. D. Mass. 1985) ................................................................. 17

*Edgewater Med. Ctr. Edgewater Prop. Co. (In re Edgewater Med. Ctr.),*
 373 B.R. 845 (Bankr. N.D. Ill. 2007) ................................................................. 9

*Enron Corp. v. Granite Constr. Co. (In re Enron Corp.),*
 No. 01-16034, 2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006) ................... 8, 15

*Florida Power & Light Co. v. Allis Chalmers Corp.,*
 85 F.3d 1514 (11th Cir. 1996) ......................................................................... 23

*Giuliano v. United States Nursing Corp. (In re Lexington Healthcare Group, Inc.),*
   339 B.R. 570 (Bankr. D. Del. 2006) ........................................................................ 9

*Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.),*
   327 B.R. 711 (Bankr. D. Del. 2005) ........................................................................ 9

*GMC v. New A.C. Chevrolet, Inc.,*
   263 F.3d 296 (3d Cir. 2001) .................................................................................... 8

*Goldberg v. Chong,*
   No. 07-20931-CIV, 2007 WL 2028792 (S.D. Fla. July 11, 2007) ........................... 8

*Goveart v. Capital Bank (In re Miami Gen. Hosp., Inc.),*
   124 B.R. 383 (Bankr. S.D. Fla. 1991) ............................................................ 17, 19

*Hall v. United Ins. Co.,*
   367 F.3d 1255 (11th Cir. 2004) .............................................................................. 23

*Halliburton & Assocs., Inc. v. Henderson,*
   Few & Co., 774 F.2d 441 (11th Cir. 1985) ............................................................ 23

*Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries, Inc.),*
   16 F.3d 313 (9th Cir. 1994); ................................................................................... 15

*Harker v. Center Motors, Inc. (In re Gerdes),*
   246 B.R. 311 (S.D. Ohio 2000) ............................................................................. 13

*Harris v. Ivax Corp.,*
   182 F.3d 799 (11th Cir. 1999) ................................................................................. 8

*Holford v. Powers (Matter of Holford),*
   896 F.2d 176 (5th Cir. 1990) .................................................................................. 25

*Hopkins v. D.L. Evans Bank (In re Fox Bean Co.),*
   287 B.R. 270 (Bankr. D. Idaho 2002) .................................................................... 14

*Horsley v. Feldt,*
   304 F.3d 1125 (11th Cir. 2002) ............................................................................... 8

*In re Astropower Liquidating Trust,*
   335 B.R. 309 (Bankr. D. Del. 2005) ........................................................................ 9

*In re Gutpelet,*
   137 F.3d 748 (3d Cir. 1998) ................................................................................... 14

*In re Oakwood Homes Corp.,*
   325 B.R. 696 (Bankr. D. Del. 2005) ........................................................................ 9

*Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.),*
   374 B.R. 333 (Bankr. S.D. Fla. 2007) ................................................................... 14

*Kapila v. WLN Family Ltd. P'Ship (In re Leneve),*
   341 B.R. 53 (Bankr. S.D. Fla. 2006) ............................................................... 8, 25

*Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.),*
   139 F.3d 574 (7th Cir. 1998) ................................................................................. 18

*Marshall County Bd. of Educ. v. Marshall County Gas Dist.,*
    992 F.2d 1171 (11th Cir. 1993) .................................................................................... 7

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.,*
    945 F.2d 635 (3d Cir. 1991) ......................................................................................... 17

*Nordberg v. Sanchez (In re Chase &*
    *Sanborn Corp.),* 813 F.2d 1177 (11th Cir. 1987) .......................................... 14, 15, 16

*Papasan v. Allain,*
    478 U.S. 265 (1986) ........................................................................................................ 8

*Pardo v. Avanti Corporate Health Sys., Inc. (In re APF Co.),*
    274 B.R. 634 (Bankr. D. Del. 2001) .............................................................................. 8

*Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.),*
    124 B.R. 398 (Bankr. S.D. Fla. 1991) ........................................................................ 17

*Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.),*
    287 B.R. 98, 107 (Bankr. S.D.N.Y 2002) ..................................................................... 9

*Powell v. United States,*
    945 F.2d 374 (11th Cir. 1991) ...................................................................................... 7

*Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings*
    *(Cayman), Inc.),*
    216 B.R. 371 (Bankr. S.D.N.Y. 1998) ........................................................................ 14

*Rubin v. Manufacturers Hanover Trust Co.,*
    661 F.2d 979 (2d Cir. 1981) ........................................................................................ 17

*Security First Nat'l Bank v. Brunson (Matter of Coutee),*
    984 F.2d 138 (5th Cir. 1993) ...................................................................................... 15

*Sigmon v. Royal Cake Co., Inc. (In re Cybermech, Inc.),*
    13 F.3d 818 (4th Cir. 1994); ........................................................................................ 15

*Silverman v. Paul's Landmark, Inc. (In re Nirvana Rests., Inc.),*
    337 B.R. 495 (Bankr. S.D.N.Y. 2006) ........................................................................... 8

*Southmark Corp. v. Grosz (In the Matter of Southmark Corp.),*
    49 F.3d 1111 (5th Cir. 1995) ...................................................................................... 15

*Tavormina v. Capital Factors, Inc. (In re Jarax Int'l, Inc.),*
    164 B.R. 180 (Bankr. S.D. Fla. 1993) ........................................................................ 15

*TeleFest, Inc. v. VU-TV, Inc.,*
    591 F. Supp. 1368 (D.N.J. 1984) .......................................................................... 18, 19

*Tolz v. Barnett Bank of S. Fla., N.A.*
    *(In re Safe-T-Brake of S. Fla., N.A.),*
    162 B.R. 359 (Bankr. S.D. Fla. 1993) ........................................................................ 14

*Uiterwyk Corp. v. Maher Terminals, Inc. (In re Uiterwyk Corp.),*
    75 B.R. 33 (Bankr. M.D. Fla. 1987) ........................................................................... 25

iv

*Weissman v. National Ass'n of Sec. Dealers, Inc.,*
    500 F.3d 1293 (11th Cir. 2007) ............................................................................ 11

## Statutes

11 U.S.C. § 544 ........................................................................................................ 8

11 U.S.C. § 548 ..................................................................................... 8, 9, 22, 25

11 U.S.C. § 548 ........................................................................................................ 9

Florida Statute ¶ 726.105 ....................................................................................... 8

Florida Statute ¶ 726.106 ....................................................................................... 8

Florida Statute ¶ 726.108 ....................................................................................... 8

New York Debtor and Creditor Law ¶ 273 ............................................................ 8

New York Debtor and Creditor Law ¶ 274 ............................................................ 8

New York Debtor and Creditor Law ¶ 275 ............................................................ 8

New York Debtor and Creditor Law ¶ 278 ............................................................ 8

## Other Authorities

Brian E. Greer & Joel S. Moss, "Guaranties in Bankruptcy:
    A Primer," 16 J. Bankr. L. & Prac. 3 Art. 2 (2007) ....................................... 20

Jack F. Williams, "The Fallacies of Contemporary Fraudulent Transfer Models
    as Applied to Intercorporate Guaranties: Fraudulent Transfer Law as a
    Fuzzy System," 15 Cardozo L. Rev. 1403 (1994) ......................................... 17

Kenneth J. Carl, "Fraudulent Transfer Attacks on Guaranties in Bankruptcy,"
    60 Am. Bankr. L.J. 109 (1986) ................................................................ 17, 20

Michael F. Maglio, "The Promise, Part II: Corporations, Obligations and Fraudulent
    Conveyances," 14 Bus. L. Today 25 (2005) ............................................... 16, 20

## Rules

Federal Rule of Bankruptcy Procedure 7012 ......................................................... 1

Federal Rule of Civil Procedure 12(b)(6) ................................................. 1, 7, 8, 27

United States District Court for the Southern District of Florida
    Local Rule 2090-1(A) .................................................................................... 28

## Treatises

5 Lawrence P. King, Collier on Bankruptcy (15th ed. 1984) ............................... 25

Certain of the lenders on the $450,000,000 Credit Agreement dated as of August 1, 2005 (collectively, the "Senior Transeastern Lenders"),[1] by and through undersigned counsel and under Federal Rule of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12(b)(6), hereby file their Motion to Dismiss (the "Motion") the First Amended Adversary Complaint (the "Amended Complaint" (D.E. 120)[2] and Memorandum of Law in support of their Motion and state as follows:

## PRELIMINARY STATEMENT

The Committee's claims against the Senior Transeastern Lenders seek to recover funds transferred to the Senior Transeastern Lenders as part of the Transeastern Settlement.[3]  The Committee does not allege that the Conveying Subsidiaries -- the plaintiffs in this proceeding -- made any transfer to the Senior Transeastern Lenders.  Rather, the Committee argues that other parties transferred to the Senior Transeastern Lenders property in which the Conveying

---

[1] The Senior Transeastern Lenders, as named in the Complaint, are:  3V Capital Master Fund Ltd.; Atascosa Investments, LLC; Aurum CLO 2002-1 Ltd.; Bank of America, N.A.; Bear Stearns Investment Products Inc.; Black Diamond Clo 2005-1; Burnet Partners, LLC; Centurion CDO 10, Ltd.; Centurion CDO 8, Limited; Centurion CDO 9, Ltd.; Centurion CDO II, Ltd.; Centurion CDO VI, Ltd.; Centurion CDO VII, Ltd.; Centurion CDO XI, Ltd.; Deutsche Bank Trust Company Americas; Distressed High Yield Trading Ops. Fund Ltd.; Eaton Vance Credit Opportunities Fund; Eaton Vance Floating-Rate Income Trust; Eaton Vance Grayson & Co.; Eaton Vance Limited Duration Income Fund; Eaton Vance Senior Debt Portfolio; Eaton Vance Senior Floating-Rate Trust; Eaton Vance Senior Income Trust; Eaton Vance VT Floating-Rate Income Fund; Farallon Capital Institutional Partners II, L.P.; Farallon Capital Institutional Partners III L.P.; Farallon Capital Institutional Partners L.P.; Farallon Capital Offshore Investors II, L.P.; Farallon Capital Offshore Investors, Inc.; Flagship Capital Partners L.P.; Flagship CLO III; Flagship CLO IV; Flagship CLO V; Gleneagles CLO Ltd.; Goldman Sachs Credit Partners, L.P.; Grand Central Asset Trust, CED Series; Grand Central Asset Trust, HLD Series; Grand Central Asset Trust, SOH Series; Hartford Mutual Funds, Inc., on behalf of The Hartford Floating Rate Fund by Hartford Investment Management Company, its Sub-Advisor; Highland CDO Opportunity Fund, Ltd.; Highland Credit Opportunities CDO Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate LLC; Highland Legacy Limited; Highland Offshore Partners, L.P.; JPMorgan Chase Bank, N.A.; Jasper CLO, Ltd.; LL Blue Marlin Funding LLC; Liberty CLO, Ltd.; Loan Funding VII, LLC; Merrill Lynch Credit Products LLC; Ocean Bank; Quadrangle Master Funding Ltd.; Riversource Floating Rate Fund; Rockwall CDO, Ltd.; Sequils-Centurion V, Ltd.; Silver Oak Capital LLC; Stedman CBNA Loan Funding LLC; The CIT Group/Business Credit, Inc.; The Foothill[s] Group, Inc.; Van Kampen Dynamic Credit Opportunities Fund; Van Kampen Senior Income Trust; Van Kampen Senior Loan Fund; and Wells Fargo Bank, N.A.

[2] The Committee filed the Amended Complaint on October 17, 2008, amending the original complaint (the "Original Complaint" (D.E. 1)).

[3] All capitalized terms not defined herein have the meanings given to them in the Amended Complaint.

Subsidiaries had an interest.  The Committee has failed, however, to plead any facts that could support the legal contention that the Conveying Subsidiaries had an interest in the cash proceeds of the New Loans.

The Committee's claims against the Senior Transeastern Lenders are based essentially on the following two factual allegations:  (1) the Conveying Subsidiaries became obligated to repay the New Loans; and (2) the Conveying Subsidiaries pledged their assets as collateral for the New Loans.  Contrary to the conclusory contentions of the Amended Complaint, those facts, even if proved, are insufficient as a matter of law to create in the Conveying Subsidiaries a property interest in the proceeds of the New Loans.  The Committee's argument that the Conveying Subsidiaries obtained a property interest by becoming obligated and pledging assets alone is unprecedented, contrary to established case law, and would distort, if not render moot, well-established legal principles.  Moreover, if permitted to proceed, the Committee's argument would render useless subsidiary guaranty structures such as the one used in this case, which have for decades been a significant part of financial transactions.

Simply put, the Complaint does not allege that any of the property transferred to the Senior Transeastern Lenders was property of the Conveying Subsidiaries.  This is a fatal defect that infected the Original Complaint and continues to infect the Amended Complaint.  Moreover, this defect cannot be cured by amendment because it goes to the core of the Committee's theory.  The Committee's resort to an unprecedented legal argument, unsupported by any factual allegations, confirms that the Complaint should be dismissed with prejudice.

## BACKGROUND

A.      **Transeastern Transaction and Settlement**

The Committee's claims against the Senior Transeastern Lenders relate to a payment made to them on July 31, 2007 as part of a settlement of litigation (the "Transeastern

Litigation") against TOUSA and TOUSA Homes LP ("Homes LP") – two entities that are not included among the Conveying Subsidiaries. The Transeastern Litigation concerned certain credit agreements (the "Transeastern Credit Agreements") and guaranties entered into with the Transeastern Lenders[4] in connection with financing a 2005 transaction.[5] (*See* Amended Complaint ¶¶ 3, 20.) The Amended Complaint describes the transaction as follows: "TOUSA Homes LP ('Homes LP') and Falcone/Ritchie LLC formed TE/TOUSA LLC (the 'Transeastern JV') to acquire substantially all of the homebuilding assets of Transeastern Properties, Inc. (the 'Transeastern Acquisition')." (*Id.* ¶ 2.) To finance the Transeastern Acquisition, TOUSA, Homes LP, and the Transeastern JV Subsidiaries[6] had entered into the Transeastern Credit Agreements. (*Id.*) TOUSA and Homes LP "both executed three unsecured completion guaranties and three unsecured carve-out guaranties (the six guaranties together are the 'TOUSA Guaranties') in respect of the Transeastern Credit Agreements." (*Id.* ¶ 20.) TOUSA and Homes LP were the only Debtors that were liable as guarantors under the Transeastern Credit Agreements, including the Senior Credit Agreement. (*Id.* ¶ 2.)

The Transeastern JV experienced financial difficulties shortly after its formation. On October 31, 2006 and November 1, 2006, the administrative agent under the Transeastern Credit Agreements sent demand letters to TOUSA and Homes LP alleging potential defaults and

---

[4]   The Amended Complaint defines the Transeastern Lenders in Paragraph 16. (*See* Amended Complaint ¶ 16.) This definition includes the Senior Transeastern Lenders as well as the lenders with respect to certain other tranches of debt borrowed by the Transeastern JV.

[5]   The Transeastern Credit Agreements consisted of funding in an aggregate amount of $675,000,000 under three credit agreements, each with separate groups of lenders, and each dated August 1, 2005: (a) a $450,000,000 Credit Agreement (the "Senior Credit Agreement"); (b) a $137,000,000 Senior Mezzanine Credit Agreement (the "Senior Mezzanine Credit Agreement"); and (c) an $87,500,000 Junior Mezzanine Credit Agreement. (*Id.* ¶ 19.) The Senior Transeastern Lenders were the "Lenders" under the Senior Credit Agreement.

[6]   The "Transeastern JV Subsidiaries" were formed in connection with the Transeastern JV and are EH/Transeastern, LLC; TE/TOUSA Senior, LLC; TE/TOUSA Mezzanine LLC; and TE/TOUSA Mezzanine Two LLC. (*Id.* ¶ 19 & n.3.) The borrowers under the $450,000,000 Senior Credit Agreement were EH/Transeastern, LLC and TE/TOUSA Senior, LLC. (*Id.* ¶ 19.)

events of default under those loan agreements, triggering TOUSA's and Homes LP's obligations under the TOUSA Guaranties, and demanding payment thereon. (*Id.* ¶ 20.) In November 2006, the administrative agent under the Transeastern Credit Agreements, on the one hand, and TOUSA and Homes LP, on the other hand, sued one another in New York and Florida on the TOUSA Guaranties. (*Id.* ¶¶ 3, 22.) The Amended Complaint alleges that "[a]fter months of negotiations, the Debtors consummated a 'global settlement' of the litigation and of the remaining obligations among participants in the Transeastern JV (the 'Transeastern Settlement')." (*Id.* ¶ 3.) On July 31, 2007, as part of the Transeastern Settlement, the Senior Transeastern Lenders received approximately $422.8 million as payment in full of all principal and interest outstanding under the Senior Credit Agreement. (*See* ¶¶ 4, 27, 35.)

The Committee affirmatively alleges that the funds paid to the Senior Transeastern Lenders as part of the Transeastern Settlement did not come from the Conveying Subsidiaries. The Amended Complaint asserts instead that TOUSA or Homes LP (and not the Conveying Subsidiaries) made the transfer to the Senior Transeastern Lenders: "TOUSA and Homes LLP [sic] used the proceeds of . . . [new] credit facilities, among other things, to satisfy the Transeastern Debt, and to incur certain other liabilities,"[7] and "TOUSA . . . repa[id] a debt for which [the Conveying Subsidiaries] were not liable." (*Id.* ¶¶ 3, 1.) As a consequence, the Committee's claims against the Senior Transeastern Lenders are based solely on the legal assertion that the Conveying Subsidiaries had an interest in the property transferred to the Senior Transeastern Lenders. (*See id.* ¶¶ 89, 98, 107, 116, 125, 134, 143, 150, 157, 164, 171, 178.) The Committee, however, alleges no facts that support this legal conclusion.

---

[7] These new credit facilities are collectively, the "New Loans," three secured credit facilities entered into on July 31, 2007: (1) a Second Amended and Restated Revolving Credit Agreement; (2) a $200 million first lien term loan facility (the "First Lien Term Loan"); and (3) a $300 million second lien term loan facility (the "Second Lien Term Loan"). (*See id.* ¶ 32.)

**B.    Claims Against the Senior Transeastern Lenders**

The Committee alleges that the above-recounted sequence of events gives rise to, broadly speaking, two categories of fraudulent transfer claims.[8]  The first category is a series of fraudulent transfer claims against the New Lenders.  The Committee alleges that "[a]s part of the Transeastern Settlement, TOUSA and Homes LP forced" the Conveying Subsidiaries "to become co-borrowers and guarantors under certain secured credit facilities . . . of approximately $800 million with the New Lenders."[9]  (*Id.* ¶ 3.)  The Committee alleges in counts I through VI that the obligations the Conveying Subsidiaries incurred as co-borrowers and guarantors on the New Loans were either actual or constructive fraudulent transfers.  The Committee seeks relief in the form of both avoidance of the obligations and liens and recovery of any amounts paid (*i.e.*, of interest and principal) in connection with the New Loans.  (*Id.* Prayer Nos. 1, 2.)

The second category of fraudulent transfer claims is pled against the Senior Transeastern Lenders.  In counts VII through XVIII of the Amended Complaint, the Committee alleges that the payment made to the Senior Transeastern Lenders as part of the Transeastern Settlement was a fraudulent transfer.   The Committee seeks to recover on behalf of the Conveying Subsidiaries the cash proceeds of the New Loans allegedly transferred to the Senior Transeastern Lenders, even though they concededly did not come from any Conveying Subsidiary, on the theory that the Conveying Subsidiaries had some undefined property interest in those cash proceeds.  (*See id.* Prayer No. 4.)  This Motion is only concerned with this second category of fraudulent transfer claims, and only as against the Senior Transeastern Lenders.[10]

---

[8]    In addition to the fraudulent transfer claims, the Amended Complaint also alleges an avoidable preference (count XIX) and an objection to allowance of claim (count XX).  Neither of these counts is alleged against the Senior Transeastern Lenders.

[9]    The "New Lenders" are lenders involved in the New Loans. (*See id.* ¶ 12.)

[10]   Counts VII through XVIII seek avoidance or recovery of the "Transeastern Transfers," which are defined to include both the payment to the Senior Transeastern Lenders and obligations allegedly incurred by the

The Amended Complaint includes what purport to be two different legal theories of fraudulent transfer liability against the Senior Transeastern Lenders. The first is set forth in counts VII through XII. In these counts, the Committee asserts that "[e]ach of the Conveying Subsidiaries transferred an interest in its property to the First Lien Lenders and the Second Lien Lenders when it executed the [New Loans]." (*Id.* ¶¶ 89, 98, 107, 116, 125, 134.) The Committee further states that "[t]he First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries)." (*Id.*) Further, because the New Loan Agreements "expressly required" that proceeds be used to repay debts to the Senior Transeastern Lenders, the Senior Transeastern Lenders "are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made." (*Id.* ¶¶ 90, 99, 108, 117, 126, 135.) Lastly, the Senior Transeastern Lenders are alleged to be "mediate transferees" because the distribution they received in the Transeastern Settlement constituted "proceeds of the transfer of property by the Conveying Subsidiaries." (*Id.* ¶¶ 91, 100, 109, 118, 127, 136.)

The second purported legal theory is set forth in counts XIII through XVIII. Here the Committee alleges that the Conveying Subsidiaries were "borrowers" under the First Lien Term Loan and the Second Lien Term Loan and that they "provided the funds used to repay

---

Conveying Subsidiaries in connection with the issuance of $20 million of new 14.75% senior subordinated paid-in-kind notes due July 1, 2015 (the "New Subordinated Notes"). (*See id* ¶ 4 & n.1.) The New Subordinated Notes were given as consideration to Transeastern Lenders other than the Senior Transeastern Lenders, specifically to holders of other tranches of debt under the Senior Mezzanine Credit Agreement to which the Transeastern JV Entities, among others, were obligated. (*See id.* ¶¶ 19, 25, 28.) Although these six counts are pled collectively against the Senior Transeastern Lenders and holders of the New Subordinated Notes, among others, the portion of the claims with respect to any alleged transfers made or obligations incurred by the Conveying Subsidiaries with respect to the New Subordinated Notes (the "New Subordinated Notes Transfers") are not made against the Senior Transeastern Lenders in their capacity as such and are not the subject of this Motion. The alleged transferees with respect to the New Subordinated Notes Transfers are described in Paragraphs 13 and 14 of the Amended Complaint. (*See id.* ¶¶ 13, 14.) The Senior Transeastern Lenders understand that claims relating to the alleged New Subordinated Notes Transfers are the subject of a separate motion by certain holders of the New Subordinated Notes.

principal and interest on the First Lien Term Loan." (*Id.* ¶¶ 143, 150, 157, 164, 171, 178.) Although it does not allege that the proceeds of the First Lien Term Loan or any other New Loan Agreement were paid to the Conveying Subsidiaries, the Committee further asserts that "[f]unds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries," which were transferred to the Senior Transeastern Lenders as initial transferees from the Conveying Subsidiaries. (*Id.*)

## ARGUMENT

## I.   LEGAL STANDARDS

### A.   Motion To Dismiss

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of a Complaint. Rule 12(b)(6), made applicable herein by Federal Rule of Bankruptcy Procedure 7012, requires dismissal of a claim when the party has failed "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

While a motion to dismiss generally requires the court to accept the well-pled allegations of the complaint as true, *see Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007), dismissal is appropriate where "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims in the complaint that would entitle him or her to relief." *Powell v. United States*, 945 F.2d 374, 375-76 (11th Cir. 1991).[11] Although detailed factual allegations are not required to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (U.S. 2007) (quoting *Papasan v. Allain*, 478 U.S.

---

[11]   *See also Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (court should dismiss claims "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action").

265, 286 (1986) (on motion to dismiss, "courts are not bound to accept as true a legal conclusion couched as a factual allegation")); *GMC v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001) ("While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions."). *See also Pardo v. Avanti Corporate Health Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 640 (Bankr. D. Del. 2001) ("a plaintiff must do more than merely recite the statutory language to survive a motion to dismiss"); *Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*, No. 01-16034, 2006 WL 2400369, at *3 (Bankr. S.D.N.Y. May 11, 2006) (similar).[12]

## B.    Fraudulent Transfer Statutes

The Bankruptcy Code permits a trustee, under certain circumstances, to "avoid any transfer" "of an interest of the debtor in property" where the debtor "received less than a reasonably equivalent value in exchange for such transfer" and was insolvent at that time or became insolvent as a result.    11 U.S.C. § 548(a)(1)(B)(i), (a)(1)(B)(ii)(I)-(III).    Section 544(b)(1) similarly provides that a trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable [state] law." 11 U.S.C. § 544.[13]

---

[12]    In evaluating a motion to dismiss under Rule 12(b)(6), a court may review documents incorporated by reference in the complaint, where those documents are central to the plaintiff's case and are undisputed, without converting the motion to dismiss into one for summary judgment. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (citations omitted); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (citation omitted).

[13]    The Committee also brings claims under Florida Statutes ¶¶ 726.105, Florida Statutes ¶¶ 726.105(1), 726.106, 726.108, and New York Debtor and Creditor Law ¶¶ 273, 274, 275, 278. *See, e.g., Goldberg v. Chong*, No. 07-20931-CIV, 2007 WL 2028792, at *4 (S.D. Fla. July 11, 2007) (holding that the Florida Statutes and the Bankruptcy Code are analogous "in form and substance"); *Kapila v. WLN Family Ltd. P'Ship (In re Leneve)*, 341 B.R. 53, 56 n.1 (Bankr. S.D. Fla. 2006) (holding that Florida fraudulent transfer provisions are essentially identical to those in the Bankruptcy Code, with the exception of a longer statute of limitations under state law); *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rests., Inc.)*, 337 B.R. 495, 501 (Bankr. S.D.N.Y. 2006) (except for the longer statute of limitations under the state statute, the Bankruptcy Code "closely parallels" New York fraudulent conveyance law); *Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc. (In re Ames Dep't Stores, Inc.)*, 161 B.R. 87, 89 n.1 (Bankr. S.D.N.Y.

To plead a fraudulent transfer claim, a plaintiff must allege facts in sufficient detail to identify the alleged transfers and enable the defendants to understand the claims against them. Under 11 U.S.C. § 548, a plaintiff must identify: (1) the date of the transfer; (2) the amount of the transfer; (3) the transferor(s); and (4) the transferee(s). *Giuliano v. United States Nursing Corp. (In re Lexington Healthcare Group, Inc.)*, 339 B.R. 570, 575 (Bankr. D. Del. 2006). To avoid a payment as a fraudulent transfer, the plaintiff must have been the transferor of the subject property transferred because "[i]f no transfer has taken place, there is nothing to avoid or recover." *Edgewater Med. Ctr. Edgewater Prop. Co. (In re Edgewater Med. Ctr.)*, 373 B.R. 845, 852 (Bankr. N.D. Ill. 2007). In other words, the plaintiff is required to identify the payments the debtor made and that it seeks to avoid.[14]

## II.    THE COMMITTEE HAS NOT PLED THAT THE CONVEYING SUBSIDIARIES HAD AN INTEREST IN THE PROPERTY TRANSFERRED TO THE SENIOR TRANSEASTERN LENDERS

In order to state a claim to avoid a transfer, the Committee must plead as a threshold issue that there has been a transfer "of an interest of the debtor in property." 11 U.S.C. § 548(a)(1); *see also Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 287 B.R. 98, 107 (Bankr. S.D.N.Y 2002) (to recover under 11 U.S.C. § 548, trustee must demonstrate that "the debtor transferred an interest in property"). The Supreme Court has held that "property of the debtor" - which is coextensive with the language "interests of the debtor in property" on which the Committee relies - "is best understood as that property that would have been part of

---

1993) ("[t]his Court need not discuss the components of a fraudulent conveyance claim under New York state law, [because] the elements are almost identical to that of 11 U.S.C. § 548(a)(2)").

[14]    The plaintiff is also required to provide the amount of consideration the debtor received and the debtor's financial condition at the time it made the transfer. *In re Astropower Liquidating Trust*, 335 B.R. 309, 333 (Bankr. D. Del. 2005); *Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.)*, 327 B.R. 711, 718 (Bankr. D. Del. 2005); *In re Oakwood Homes Corp.*, 325 B.R. 696, 698 (Bankr. D. Del. 2005).

the estate had it not been transferred before the commencement of bankruptcy proceedings."
*Begier v. IRS*, 496 U.S. 53, 58 (1990).

As described above, the Amended Complaint, like the Original Complaint, does not allege that the Conveying Subsidiaries themselves made any transfer to the Senior Transeastern Lenders. Rather than point to a transfer by the Conveying Subsidiaries, the Committee conclusorily states that the Conveying Subsidiaries had an "interest" in the proceeds of the New Loans, approximately $422.8 million of which was transferred to the Senior Transeastern Lenders by, as the Committee readily admits, entities other than the Conveying Subsidiaries. (*See supra* at 4, 5-7.)

Its claims against the Senior Transeastern Lenders appear to be based on two purported theories, neither of which has ever been embraced by the courts and either of which would transform the law of fraudulent transfers. The first theory, in counts VII through XII, is that the transfer to the Senior Transeastern Lenders was the transfer of the value of the New Lender Claim and Lien Transfers, which the Conveying Subsidiaries granted to the New Lenders in connection with the New Loans.[15] (*See* Amended Complaint ¶¶ 89, 98, 107, 116, 125, 134.)[16] In this formulation, the Committee equates the Conveying Subsidiaries' obligations incurred and liens transferred with the loan proceeds paid and asserts that the Conveying Subsidiaries gained an interest in the latter as a necessary consequence of the former. The second theory is based on the Conveying Subsidiaries' status as co-borrowers under the First Lien Term Loan and the Second Lien Term Loan, and the allegation that they made interest and principal payments on the

---

[15] The "New Lender Claim and Lien Transfers" are defined to include certain debt obligations allegedly incurred by the Conveying Subsidiaries to the New Lenders in connection with the New Loans. (*See* Amended Complaint ¶ 4.)

[16] To the extent that the Committee suggests in the Amended Complaint that the New Lenders transferred the Conveying Subsidiaries' obligations and liens to the Senior Transeastern Lenders (*see id.* ¶¶ 89, 98, 107, 116, 125, 134), the Senior Transeastern Lenders (even if this transfer occurred) cannot be liable to the Conveying Subsidiaries as subsequent transferees of an incurred obligation. (*See infra* at 21-23.)

First Lien Term Loan. (*See id.* ¶¶ 143, 150, 157, 164, 171, 178.) The Committee asserts that the Conveying Subsidiaries obtained a property interest in the loan proceeds simply by virtue of being a co-borrower, but it does not allege that they received as a borrower the loan proceeds transferred to the Senior Transeastern Lenders. Both theories seek to establish that the Conveying Subsidiaries had an "interest" in the proceeds of the New Loans, a necessary component of every one of the Committee's claims against the Senior Transeastern Lenders.

But the conclusory allegations that the Conveying Subsidiaries had an "interest" in the $422.8 million are legal assertions and are not creditable on a motion to dismiss.[17] Rather, to survive the Motion, the Committee must plead facts that could support the legal conclusion that the Conveying Subsidiaries had an interest in the property transferred to the Senior Transeastern Lenders, and that this property would have been part of their estates but for the transfer. The Committee has not done this. It has not alleged any facts that support – and the transaction documents that are central to the Amended Complaint belie – the legal conclusion that the Conveying Subsidiaries ever had an interest in the proceeds of the New Loans.

Similarly, the Committee's claims in counts VII through XVIII rest on the premise that the payment to the Senior Transeastern Lenders diminished the value of the Conveying Subsidiaries' estates, which the Committee contends creates an interest in the property paid. This legal assertion, however, begs the question of the Conveying Subsidiaries' alleged interest: the Conveying Subsidiaries are only "poorer" by virtue of the transfer to the Senior Transeastern Lenders if the property transferred was their property in the first place. If the property transferred was not the property of the Conveying Subsidiaries, which it

---

[17] *See, e.g., Weissman v. National Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, at 1304-05 (11th Cir. 2007) ("[C]omplaints are not impregnable"; any conclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts do not prevent dismissal) (citing *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 99 (5th Cir. 1974) (same)).

unquestionably was not, then the transfer of that property by other parties to the Senior Transeastern Lenders did not affect the Conveying Subsidiaries at all.

The correct analysis is that, as pled in the Amended Complaint, the July 31, 2007 transactions impacted the Conveying Subsidiaries' estates by causing (1) the Conveying Subsidiaries to incur obligations to the New Lenders with respect to the New Loans; and (2) the Conveying Subsidiaries to transfer property interests to the New Lenders in the form of liens on their assets. Accordingly, to the extent that the Conveying Subsidiaries' estates were in any way diminished or made "poorer," this happened only because of obligations incurred and liens transferred to the New Lenders, not because of TOUSA's transfers of approximately $422.8 million of the New Loans proceeds to the Senior Transeastern Lenders. Regardless of whether these factual allegations state a claim for avoidance of the obligations against the New Lenders, they clearly do not state a claim against the Senior Transeastern Lenders for recovery of transfers.

A.    **The Conveying Subsidiaries Did Not Obtain an Interest in the Proceeds of the New Loans on the Basis of Being Co-Borrowers**

Each of the Committee's claims depends on the legal premise that the Conveying Subsidiaries had an interest in the proceeds of the New Loans, which the Committee contends the Conveying Subsidiaries had because of the incurrence of obligations and pledge of assets. The Committee's argument is unprecedented, illogical, and contrary to existing case law.[18]

In opposition to the Senior Transeastern Lenders' motion to dismiss the Original Complaint, the Committee did not cite even *a single case* to support its contention that by becoming obligated on the New Loans the Conveying Subsidiaries obtained a property interest in the proceeds thereof. In fact, the Committee's assertion that the Conveying Subsidiaries

---

[18]    The Senior Transeastern Lenders reserve the right to seek sanctions for their defense of such an attenuated and unprecedented claim.

obtained any interest in the proceeds of the New Loans by virtue of their being co-borrowers is contrary to existing case law. In *Bennett & Kahnweiler Associates v. Ratner (In re Ratner)*, the court addressed whether a debtor had an interest in loan proceeds because he was a co-borrower on a loan with his wife. 132 B.R. 728 (N.D. Ill. 1991). The debtors' wife used the loan proceeds to purchase real estate. *Id.* at 733. The plaintiffs contended that the debtor "had an interest in the loan proceeds, which he transferred to his wife so that she could acquire the Mohawk property." *Id.* The plaintiffs admitted to the court that "there is no legal authority to support their theory, but suggest[ed] that support for their position can be gleaned from case law." *Id.* The court flatly disagreed. *Id.* Noting that this was a question of law, the court concluded that "[t]here is no legal authority to support plaintiffs' position that a debtor who acts as a co-borrower while insolvent has made a transfer under § 727 of the Code, and this court would have to reach too far to make the finding plaintiffs seek." *Id.* at 734. The theory the *Ratner* court rejected as having "no legal authority to support" is exactly the theory presented by the Committee, again without any legal support.[19]

The issue of whether a debtor has an interest in property more commonly arises in cases involving whether a debtor that possessed property had an interest in that property or whether possession is enough to create an interest. Whether the debtor-plaintiff in a fraudulent transfer action has an interest in property for fraudulent transfer purposes is not determined by

---

[19] Similarly, the Committee's suggestion that alleged payment of principal and interest on the First Lien Term Loan by the Conveying Subsidiaries caused them to have an interest in the loan proceeds is without merit. *See, e.g., Harker v. Center Motors, Inc. (In re Gerdes)*, 246 B.R. 311 (S.D. Ohio 2000) (payment of third party's debt on purchase of car did not give debtor an interest in the car, and court conducted analysis of whether debtor received reasonably equivalent value in indirect benefits). The Committee's theory has an implicit temporal component, which makes it particularly tenuous in these circumstances. More specifically, the Committee's theory, if it were correct, would imply that a party may gain a property interest when it pays interest and principal, which logic suggests would be after the transfer of the loan proceeds. Apparently, the Committee would suggest that the Conveying Subsidiaries had no interest until the payment of principal and interest, and then their interest sprung to life when such payment was made. Such a result is illogical and unprecedented.

mere possession, but by whether the debtor had "control" over the property. *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181-82 (11th Cir. 1987); *Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*, 374 B.R. 333, 338 (Bankr. S.D. Fla. 2007).[20]

The two elements of "control" for purposes of this analysis are the power to designate the party that will receive the funds and the power actually to disburse the funds at issue to that party. *Tolz v. Barnett Bank of S. Fla., N.A. (In re Safe-T-Brake of S. Fla., N.A.)*, 162 B.R. 359, 365 (Bankr. S.D. Fla. 1993); *Kapila*, 374 B.R. at 338-39; *Dzikowski v. NASD Regulation, Inc.*, 247 B.R. 867, 869-70 (S.D. Fla. 2000). The court in *Kapila* held that "where the debtor's interests do not provide the impetus for the transaction, as was the case in *Sanchez/Chase & Sanborn*, 813 F.2d at 1177, courts are more likely to find that there was no fraudulent transfer of property of the debtor." *Id.* at 339. The Committee nowhere alleges that the transfer to the Senior Transeastern Lenders was for the benefit of the Conveying Subsidiaries – in fact, as discussed herein, the Committee asserts that the use of the New Loan proceeds was for the benefit of the Senior Transeastern Lenders and it vociferously argues that the Conveying Subsidiaries did not benefit. (*See supra* at 4, 5-7.)

These cases illustrate that a party's mere involvement in a transaction that included a transfer, including even possession of the property transferred, does not, as a matter of law, establish that party's interest in the property for purposes of a fraudulent transfer. A party must allege sufficient facts to establish that it had control over the property transferred. *See Chase & Sanborn*, 813 F.2d at 1182-83. The court in *Chase & Sanborn* determined that

---

[20] This "control" analysis developed in *Chase v. Sanborn* and its progeny has been followed and applied in many courts in other jurisdictions. *See, e.g., Hopkins v. D.L. Evans Bank (In re Fox Bean Co.)*, 287 B.R. 270, 278 (Bankr. D. Idaho 2002); *In re Gutpelet*, 137 F.3d 748, 751 (3d Cir. 1998); *A.W. Lawrence & Co. v. Burstein. (In re A.W. Lawrence & Co.)*, 346 B.R. 51, 56 (Bankr. N.D.N.Y. 2006); *Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 376 (Bankr. S.D.N.Y. 1998).

presuming control in the content of an alleged fraudulent transfer begs the question of whether the transfer diminished the debtor's assets and created the possibility of a windfall where funds simply passed through a debtor's possession but were not property of the debtor. *Id.* at 1181. The court concluded that "where a transfer to a noncreditor is challenged as fraudulent, more is necessary to establish the debtor's control over the funds than the simple fact that a third party placed the funds in an account of the debtor with no express restrictions on their use." *Id.*[21] Because the debtor in *Chase & Sanborn* could show no greater interest than a third party's placing funds in its account, the court therefore affirmed the dismissal of the fraudulent transfer claims. *Id.* at 1182.[22]

The Committee's allegations against the Senior Transeastern Lenders do not even come close to the standard set in *Chase & Sanborn*. The Committee does not allege that the Conveying Subsidiaries had any control over the funds transferred to the Senior Transeastern Lenders. In fact, if anything, the Amended Complaint establishes the lack of control of the Conveying Subsidiaries over the New Loans, their proceeds, and every aspect of the payment to the Senior Transeastern Lenders. (*See* Amended Complaint ¶¶ 1, 3, 4, 35, 36.) Unlike the funds considered in *Chase & Sanborn*, which had "no express restrictions on their use," the Committee affirmatively alleges that the New Loan proceeds were expressly intended for a particular use –

---

[21]     Similar tests apply in other courts, which "have generally held that for certain funds held in a bank or checking account to be considered property of the estate the debtor must have the requisite control over those funds." *Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*, Bankruptcy No. 01-16034 (AJG), 2006 WL 2400369, at *6 (Bankr. S.D.N.Y, May 11, 2006); *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1358 (5th Cir. 1986); *Security First Nat'l Bank v. Brunson (Matter of Coutee)*, 984 F.2d 138, 141 & n.3 (5th Cir. 1993); *Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries, Inc.)*, 16 F.3d 313, 316-17 (9th Cir. 1994); *Sigmon v. Royal Cake Co., Inc. (In re Cybermech, Inc.)*, 13 F.3d 818, 820-21 (4th Cir. 1994); *Southmark Corp. v. Grosz (In the Matter of Southmark Corp.)*, 49 F.3d 1111, 1117 (5th Cir. 1995); *Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870, 877 (9th Cir. 2008); *Tavormina v. Capital Factors, Inc. (In re Jarax Int'l, Inc.)*, 164 B.R. 180, 185 (Bankr. S.D. Fla. 1993); *Buffalo Molded Plastics, Inc. v. Omega Tool Corp. (In re Buffalo Molded Plastics, Inc.)*, 344 B.R. 394 (Bankr. W.D. Pa. 2006).

[22]     Courts have construed *Chase & Sanborn* as setting a pleading standard applicable on a motion to dismiss. *See, e.g., Enron Corp.*, 2006 WL 2400369, at *7.

15

to repay the antecedent debts of TOUSA, Homes LP, and the Transeastern JV Subsidiaries. (*See id.* ¶¶ 1, 3, 4, 35, 36.) The Committee cannot plead or contend otherwise because the documents relied on in the Amended Complaint expressly state this purpose. (*See infra* at 6.)    The Committee alleges no facts to support the Conveying Subsidiaries' control over the loan proceeds or any aspects of the payment to the Senior Transeastern Lenders.

In fact, the Committee seeks the sort of windfall that concerned the Court in *Chase & Sanborn,* based upon allegations that are even weaker than those the court found there to be insufficient.[23]  Thus, because the Committee has not pled facts to establish the Conveying Subsidiaries had an interest in the proceeds of the New Loans, its claims against the Senior Transeastern Lenders in Counts VII through XVIII must be dismissed.

## B.    Analogous Legal Contexts Demonstrate the Conveying Subsidiaries Have No Interest in the Proceeds of the New Loans

In addition to being unprecedented and contrary to existing law, as shown above, the Committee's legal premise – that by becoming obligated on the New Loans and pledging their assets the Conveying Subsidiaries obtained a property interest in the proceeds of the New Loans – cannot be reconciled with the substantial body of case law dealing with subsidiary

---

[23]    Whether the Conveying Subsidiaries are considered guarantors or co-borrowers under the New Loans does not change the analysis because the Committee does not allege that the Conveying Subsidiaries received the cash proceeds as borrowers. Under *Chase & Sanborn,* the label attached to a party in connection with a transaction is irrelevant because the "control" inquiry turns on "the entire circumstance of the transactions," not on titles or names. *See* 813 F.2d at 1181-82. As a result, it is not relevant to this inquiry whether the Conveying Subsidiaries are considered "guarantors" or "co-borrowers" under the New Loans. As shown above, the Committee has failed to allege any facts that support control of the proceeds of the New Loans and instead asserts that because of the Conveying Subsidiaries' incurred obligations and pledged assets, which would apply whether the Conveying Subsidiaries are considered "guarantors" or "co-borrowers," they obtained an interest in those cash proceeds. But neither the incurred obligations nor the pledged assets, whether granted as a "guarantor" or a "co-borrower," are sufficient to establish control of the proceeds of the New Loans paid to the Senior Transeastern Lenders under the standard set forth in *Chase & Sanborn.* (*See supra* at 14-16.)  *See also* Michael F. Maglio, "The Promise, Part II: Corporations, Obligations and Fraudulent Conveyances," 14 Bus. L. Today 25, 30 (2005) (explaining that from the standpoint of fraudulent transfer law, whether a subsidiary signs a promissory note or a separate guarantee agreement makes no difference if the subsidiary does not receive the loan proceeds).

guaranties.[24]  In subsidiary guaranty cases, of which there are many, courts routinely analyze fraudulent transfer claims brought against the lenders to which the subsidiary guarantors became obligated.  Those claims uniformly seek to avoid the guaranty obligation incurred by the subsidiary as a fraudulent transfer and, where applicable, avoid the pledge of liens.  As stated by one commentator in a comprehensive review of subsidiary guaranty cases, "[t]raditional intercorporate guaranties generate a viperous nest of fraudulent transfer issues.  At the epicenter of the perplexing issues posed is whether the guarantor received a reasonably equivalent value in exchange for the obligation incurred at a time the guarantor was insolvent or rendered insolvent."  Williams, "Fallacies of Contemporary Fraudulent Transfer Models," 15 Cardozo L. Rev. at 1404-05 (internal footnote omitted); *see Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991); *Goveart v. Capital Bank (In re Miami Gen. Hosp., Inc.)*, 124 B.R. 383, 394 (Bankr. S.D. Fla. 1991); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991); *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981); *Ear, Nose & Throat Surgeons of Worcester, Inc. v. Guaranty Bank & Trust Co. (In re Ear, Nose & Throat Surgeons of Worcester, Inc.)*, 49 B.R. 316 (Bankr. D. Mass. 1985).[25]  Courts engage in this analysis "because from the

---

[24]     The subsidiary guarantor incurs certain liabilities and obtains certain rights as a result of the loans, but an interest in the proceeds of the loans is not one of the rights obtained.  *See, e.g.*, Kenneth J. Carl, "Fraudulent Transfer Attacks on Guaranties in Bankruptcy," 60 Am. Bankr. L.J. 109, 110, 111-12 (1986) (describing the guarantor's rights to include the equitable rights of exoneration, reimbursement, subrogation, and contribution); Jack F. Williams, "The Fallacies of Contemporary Fraudulent Transfer Models as Applied to Intercorporate Guaranties:  Fraudulent Transfer Law as a Fuzzy System," 15 Cardozo L. Rev. 1403, 1418-19 (1994) (same).

[25]     Although the substance of the subsidiary guaranty analysis is not relevant to the claims against the Senior Transeastern Lenders, the modern view is that whether a debtor received reasonably equivalent value for an obligation incurred as part of an alleged fraudulent transfer requires examination of "all aspects of the transaction" and careful measuring of "the value of all benefits and burdens to the debtor, direct or indirect."  *Pembroke Dev. Corp.*, 124 B.R. at 400.  As this Court stated in *Goveart*, "[w]here there are indicia of a bona fide financing arrangement, not designed as a shield against other creditors, the lack of perceptible 'direct' benefit to a subsidiary guaranteeing the loan of its parent should not be viewed as tantamount to a lack of 'fair consideration.'  . . .  Indirect benefit provides the necessary 'fair

17

standpoint of the unsecured creditor, the guarantor had received no consideration for the guarantee." *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 578 (7th Cir. 1998).

The only reasonable inference that can be drawn from the analysis conducted in these cases is that the subsidiary does not obtain a property interest in the proceeds of the loans simply by becoming obligated on the guaranty or by pledging assets to support the loan. The claims asserted and analysis conducted in these cases would be totally irrelevant if the Committee's legal theory were correct. Plaintiff subsidiaries in such cases would routinely bring claims to recover the proceeds of the loans against the recipients thereof, and not simply to avoid the obligations incurred.[26] Defendant lenders in such cases would have an absolute defense to the fraudulent transfer claims against them because the subsidiaries would have an interest in the loan proceeds, even if, as is the case here, the loan proceeds were never controlled (or even possessed) by the subsidiaries.[27] Courts would not analyze the question of reasonably equivalent value because the subsidiaries received direct consideration in the form of property in which they have an interest. The prevalence of cases presenting these issues, and the absence of cases even raising the arguments that the Committee makes, speaks volumes about the legitimacy of the Committee's novel arguments. Were the Court to hold that such a claim could be supported on the allegations of the Amended Complaint and the Committee's legal theories, it would extirpate decades of jurisprudence dealing with complex subsidiary guaranty cases.

---

consideration.'" 124 B.R. at 394 (quoting with approval *TeleFest, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368 (D.N.J. 1984)).

[26] The recoveries of creditors of an insolvent debtor are always greater if a debtor recovers property than if the debtor avoids an equal amount of creditor claims.

[27] If its theory were correct, the Committee could not prevail, as a matter of law, on its claims against the New Lenders in counts I through VI.

18

### C.    Finding a Property Interest in Borrowed Funds Would Render Subsidiary Guaranty Loans Useless

Moreover, were the Court to conclude, as the Committee asks, that the Conveying Subsidiaries held a property interest in the cash proceeds of the New Loans, it would alter fundamentally the structure of common loan arrangements involving cross- and up-stream guaranties. Cross- and up-stream guaranties are common in modern loan arrangements, particularly where large sums of money are borrowed by corporate entities.[28]  The court in *Goveart* has cautioned against holdings that are "'inhibitory of contemporary financing practices, which recognize that cross-guarantees are often needed because of the unequal abilities of interrelated corporate entities to collateralize loans.'"  *Goveart*, 124 B.R. at 393 (quoting *Telefest*, 591 F.2d at 1379).  If, as the Committee suggests, subsidiaries obtained a property interest in loan proceeds by virtue of their pledge of collateral and incurrence of obligations, such financing practices would be rendered useless because virtually every such structure, and the use of proceeds therefrom, would *per se* be a fraudulent transfer.

Consider the Committee's theory applied to a simple example of a corporation borrowing $1 billion to make an acquisition where the lenders require up-stream guaranties issued by each of 10 subsidiaries.  If any of the subsidiaries has less than $1 billion in assets at the time of the transaction (which is likely if subsidiary guaranties were required), then any such subsidiary would be rendered insolvent by the loan structure.  If the Committee were correct that each of the subsidiaries obtained a property interest in the loan proceeds by virtue of its pledge of collateral and the incurrence of the repayment obligation, then any transfer of the loan proceeds by the parent would *per se* be a fraudulent transfer avoidable by each of the insolvent subsidiaries.  As discussed above, the proper legal standard applied by courts is whether the

---

[28]    *See* Williams, "Fallacies of Contemporary Fraudulent Transfer Models," 15 Cardozo L. Rev. at 1418 (noting that "[i]ntercorporate guaranties are routine in commercial transactions").

subsidiaries (or the enterprise) received reasonably equivalent value in return for the pledge of their assets, and the courts analyze whether the transaction is avoidable on those terms. *See Pembroke Dev. Corp.*, 124 B.R. at 400.

Under the Committee's argument, up-stream guaranties would cease to have any value – and in fact would create new liabilities for borrowers, lenders, and for unrelated third parties that transact with parties that borrow under such loan structures, thereby wreaking havoc in the credit markets.[29] This Court should deny the Committee's invitation to eliminate, without any meaningful exception, the utility of up-stream guaranties.

### D.     The Committee's Newly Pled Theory of Liability in Counts VII Through XII Fares No Better Than the Theory Pled in the Original Complaint

The Amended Complaint added a purportedly new legal theory to counts VII through XII, but it did not include any new factual allegations to support it. Under this theory, the Conveying Subsidiaries allegedly transferred an interest in property to the New Lenders in the form of the New Lender Claim and Lien Transfers as part of the July 31, 2007 transactions. The Committee's theory is that the value of the New Lender Claim and Lien Transfers was transformed into cash and that value was transferred to the Senior Transeastern Lenders in connection with the Transeastern Settlement. The New Lender Claim and Lien Transfers, by this theory, became transformed into the cash proceeds of the New Loans they secured and are recoverable by the Conveying Subsidiaries.

---

[29]   The academic and professional literature is rife with discussions of the risk to lenders that the guaranties may be avoidable if the elements of fraudulent transfer have been met. *See, e.g.*, Carl, "Fraudulent Transfer Attacks on Guaranties," 60 Am. Bankr. L.J. 109; Brian E. Greer & Joel S. Moss, "Guaranties in Bankruptcy: A Primer," 16 J. Bankr. L. & Prac. 3 Art. 2 (2007); Maglio, "The Promise, Part II," 14 Bus. L. Today 25; Williams, "Fallacies of Contemporary Fraudulent Transfer Models," 15 Cardozo L. Rev. 1403. The Senior Transeastern Lenders have not found any discussion of even the possibility that subsidiary obligors gain a property interest in the proceeds of the subject loans such that they could seek recovery of those proceeds from third parties that transact with the parent.

Not only is this theory absurd and equally unprecedented, it is also premised on a basic misunderstanding of the law. The New Lenders lent cash as part of the New Loans; they did not transfer to the Senior Transeastern Lenders the value of the New Lender Claim and Lien Transfers. The New Lender Claim and Lien Transfers are still held by the New Lenders and are the subject of the Committee's claims against those defendants – those obligations have not been subsequently transferred to any party. To the extent that the Committee is successful in avoiding these incurred obligations in its claims against the New Lenders, it would no longer have any obligations to the New Lenders in the form of the New Lender Claim and Lien Transfers to recover from any other transferee. The New Lender Claim and Lien Transfers did not become the cash proceeds of the loans they secured (in whole or in part) and cannot be recovered on this theory. Counts VII through XII are based on a faulty legal premise and must be dismissed.

## III.    THE SENIOR TRANSEASTERN LENDERS ARE NOT LIABLE AS SUBSEQUENT TRANSFEREES OF AN INCURRED OBLIGATION

The Committee conclusorily asserts that the Senior Transeastern Lenders had actual or constructive knowledge that the Transeastern Transfers or New Lender Claim and Lien Transfers were fraudulent and that the Senior Transeastern Lenders are liable as "mediate transferees." (*See* Amended Complaint ¶¶ 88, 91, 97, 100, 106, 109, 115, 118, 124, 127, 133, 136.) As dubious a factual premise as that is, even if true (and it is not), it does not state a claim against the Senior Transeastern Lenders. The Senior Transeastern Lenders are not subsequent transferees of any avoidable transfer, and therefore cannot be liable to the Conveying Subsidiaries under this theory.

The Amended Complaint fails to identify any initial transfer that is sought to be avoided by the Committee that could possibly give rise to subsequent transferee liability under Section 550(b)(1). The only transaction, as pled in the Amended Complaint, that involves the

Conveying Subsidiaries is the incurrence by the Conveying Subsidiaries of the New Lender Claim and Lien Transfers – obligations to the New Lenders as part of the New Loans.[30]  Such a transaction is not even alleged to be a fraudulent transfer, but rather it is alleged to be a fraudulent incurrence of an obligation by the Conveying Subsidiaries (as to the New Lenders, not the Senior Transeastern Lenders).

It is axiomatic that there is no such thing as a claim against a subsequent transferee of a fraudulently incurred obligation, although that appears to be exactly what the Committee may be alleging in the Complaint.  In addition to permitting avoidance of fraudulent transfers, Section 548 of the Bankruptcy Code, entitled "Fraudulent transfers *and obligations*," permits a trustee to avoid "any obligation . . . incurred by the debtor" if the obligation is incurred through actual or constructive fraud.  *See* 11 U.S.C. § 548(a) (emphasis added).  Section 550 of the Bankruptcy Code, entitled "Liability of transferee of *avoided transfer*," provides for a mechanism for a trustee to recover any *transfer* avoided under Section 548, and therein provides for the recovery from the initial transferee or any subsequent transferee.  *See* 11 U.S.C. § 550 (emphasis added).  Section 550 does not deal at all with claims for fraudulently incurred obligations, because the remedy of avoidance of an obligation is complete relief standing alone for a fraudulently incurred obligation.  Because the only transaction in which the Conveying Subsidiaries are involved is a transaction by which they allegedly fraudulently incurred obligations and liens to the New Lenders, those claims can only stand against – if anyone – the New Lenders, and not against the Senior Transeastern Lenders on a subsequent transferee theory of liability.

---

[30]     The portion of the Committee's claim against the New Lenders that seeks avoidance and recovery of any payments made of interest and principal to the New Lenders is not relevant to this analysis as such transfers, even if avoidable, are not alleged to have been transferred subsequently to the Senior Transeastern Lenders.

This principle is illustrated by considering the effect of any outcome on the Committee's claims against the New Lenders. If the Committee prevails on its claims against the New Lenders, then the Conveying Subsidiaries are not obligated on the New Loans. Accordingly, the Conveying Subsidiaries clearly cannot recover from the Senior Transeastern Lenders because the Conveying Subsidiaries are not victims of any unremedied fraudulent transfer. If, by contrast, the Committee does not prevail on its claims against the New Lenders, then the incurrence of the obligations by the Conveying Subsidiaries by definition was not fraudulent. In that case, the Conveying Subsidiaries would have no claim against any party as a subsequent transferee thereof, including the Senior Transeastern Lenders. It is therefore clear that whatever the result of the Conveying Subsidiaries' claims against the New Lenders, the Conveying Subsidiaries will not have any claim against the Senior Transeastern Lenders.

## IV.    THE COMMITTEE SHOULD NOT BE PERMITTED TO BRING A SECOND AMENDED COMPLAINT

The Court should not allow the Committee to amend again its claims against the Senior Transeastern Lenders because any such amendment would be futile. Leave to amend a complaint that has been dismissed should be denied where the amendment would be futile and the complaint would still be subject to dismissal. *See Hall v. United Ins. Co.*, 367 F.3d 1255, 1263 (11th Cir. 2004); *Halliburton & Assocs., Inc. v. Henderson, Few & Co.*, 774 F.2d 441, 444 (11th Cir. 1985); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520 (11th Cir. 1996).

As explained above, the Committee's claims against the Senior Transeastern Lenders are contrary to existing case law and the Committee does not allege facts to support its claims that the Conveying Subsidiaries had any interest in the property transferred to the Senior Transeastern Lenders. The Committee has once amended its claims but has not fixed any of the

fatal flaws of the Original Complaint. Furthermore, the July 31, 2007 transaction documents, on which the Committee bases its claims, preclude certain amendments to counts VII through XVIII. The Court should not permit the Committee to plead its claims for the third time because amendment would be futile.

A.    **The Committee Has Not – And Cannot – Plead a Transfer of an Interest of the Debtor in Property**

The Amended Complaint itself negates any claim that could be brought against the Senior Transeastern Lenders. The parties that the Committee admits made the alleged transfer to the Senior Transeastern Lenders are either TOUSA or EH/Transeastern, LLC. (*See* Amended Complaint ¶¶ 1 (TOUSA), 3 (TOUSA and Homes LP), 27 (EH/Transeastern, LLC "agreed to pay $421,522,193.46" in connection with the Transeastern Settlement).) While none of these parties is a Conveying Subsidiary, a second amended complaint that added any or all of them as plaintiffs would fail as a matter of law.

*First*, the Committee has admitted that it does not have a good-faith basis for asserting fraudulent transfer claims on behalf of TOUSA because, as the Committee's counsel conceded to the Court, TOUSA "most likely" received reasonably equivalent value for its transfer to the Senior Transeastern Lenders. (*See* May 22, 2008 Hearing Tr. at 155:11-22 (D.E. 1045).) TOUSA would therefore not have viable fraudulent transfer claims against the Senior Transeastern Lenders; inclusion of TOUSA as a Conveying Subsidiary would render counts VII through XVIII impossible to prove.

*Second*, if the Committee added EH/Transeastern, LLC as a plaintiff, those claims would fail as a matter of law for similar reasons. EH/Transeastern, LLC was, with TE/TOUSA Senior, LLC, one of the borrowers under the $450,000,000 Senior Credit Agreement with the Senior Transeastern Lenders. (*See supra* at 3 n.6.) As part of the Transeastern Settlement,

EH/Transeastern, LLC and TE/TOUSA Senior, LLC "propose[d] to repay in full the principal of and interest on and other amounts owing under the Senior Credit Agreement." (*See* Mutual Release and Consent Agreement, dated as of July 31, 2007, with respect to the Senior Credit Agreement, which is referred to in Paragraph 25 of the Amended Complaint as the "CIT Settlement Agreement.")[31] EH/Transeastern, LLC's payment of antecedent debt is reasonably equivalent value for any transfer it may be alleged to have made to the Senior Transeastern Lenders. *See* 11 U.S.C. § 548(d)(2)(A) ("value" includes "satisfaction or securing of a present or antecedent debt of the debtor"); *Uiterwyk Corp. v. Maher Terminals, Inc. (In re Uiterwyk Corp.)*, 75 B.R. 33, 34 (Bankr. M.D. Fla. 1987); *Kapila*, 341 B.R. at 62.[32] Such an amendment would be futile.

**B.    Amendment Would Be Futile Because the Senior Transeastern Lenders Have a Right of Recoupment**

Even if the Committee could amend to plead claims against the Senior Transeastern Lenders, that amendment would be futile because the Senior Transeastern Lenders would have a right of recoupment for the full amount of any such claim. As the Fifth Circuit has stated, "'[r]ecoupment allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff *which arose out of the same transaction* to arrive at a just and proper liability on the plaintiff's claim.'" *Holford v. Powers (Matter of Holford)*, 896 F.2d 176, 178 (5th Cir. 1990) (quoting 5 Lawrence P. King, Collier on Bankruptcy ¶ 553.03 (15th ed. 1984)) (emphasis in *Holford*).

---

[31]    TOUSA, which (along with other TOUSA-related entities) had guaranty obligations under the Senior Credit Agreement (*see supra* at 3), was also a party to the CIT Settlement Agreement. The Amended Complaint cites to and explicitly relies upon the Senior Credit Agreement and the CIT Settlement Agreement.

[32]    *See also C.H. Rider & Family v. Wyle (In re United Energy Corp.)*, 102 B.R. 757, 763 (B.A.P. 9th Cir. 1989) (payment on antecedent debt is ordinarily not recoverable as a fraudulent transfer because existing debt is deemed valid consideration for payment), *aff'd*, 944 F.2d 589 (9th Cir. 1991); *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 249 (2d Cir. 1987) ("repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor").

Under the Senior Credit Agreement, the "Borrower Parties," which included TOUSA, EH/Transeastern, LLC and TE/TOUSA Senior, LLC (among other TOUSA-related entities), broadly agreed to indemnify and hold the Senior Transeastern Lenders harmless. (*See* Senior Credit Agreement § 9.14.)[33]  On the basis of this indemnity, the Senior Transeastern Lenders would therefore have a right of recoupment, on an equal basis, against TOUSA, EH/Transeastern, LLC, or TE/TOUSA Senior, LLC for any damages arising out of the same transaction for which the Committee seeks recovery.  As such, even if the Committee could assert and prove claims on behalf of TOUSA, EH/Transeastern, LLC, or TE/TOUSA Senior, LLC as transferor, it could not recover from the Senior Transeastern Lenders because any recovery would be reduced, on an equal basis, as a result of the indemnity.  Accordingly, any amendment to these claims would be futile and the Court should not permit it.

---

[33]  In the CIT Settlement Agreement, the parties expressly agreed that the indemnification obligations of the Senior Credit Agreement survived, defining these obligations as among the "Surviving Obligations." (*See* CIT Settlement Agreement § 3.)

26

## **CONCLUSION**

For the above-stated reasons, the Senior Transeastern Lenders respectfully request that the Court enter an order dismissing with prejudice, under Federal Rule of Civil Procedure 12(b)(6), Counts VII through XVIII asserted against them because the Amended Complaint fails to state a claim upon which relief can be granted.   The Senior Transeastern Lenders also respectfully request that the Court not allow the Committee to amend again its claims against the Senior Transeastern Lenders because any such amendment would be futile, and that the Court grant the Senior Transeastern Lenders such further and additional relief as the Court deems just and equitable.

Dated:  November 4, 2008

27

## ATTORNEY CERTIFICATION

I, Michael I. Goldberg  hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that the attorneys with Milbank Tweed, Hadley & McCloy, LLP, appearing pro hac vice in this matter, were admitted pursuant to Court Order dated August 27, 2008 as to Dennis C. O'Donnell (D.E. 46); David R. Eastlake (D.E. 48); Andrew W. LeBlanc (D.E. 48); Andrew T. Bierne (D.E. 49) and dated August 28, 2008 as to Dennis F. Dunne (D.E. 53).

Respectfully submitted,

MILBANK, TWEED, HADLEY & McCLOY LLP
Dennis F. Dunne (pro hac vice)
Andrew M. Leblanc (pro hac vice)
Dennis C. O'Donnell (pro hac vice)
Andrew T. Bierne (pro hac vice)
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: 212-530-5000
Facsimile: 212-530-5219

and

AKERMAN SENTERFITT
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2229
Phone: (954) 463-2700
Fax: (954) 463-2224
Email: michael.goldberg@akerman.com


By:  /s/ Michael I. Goldberg
     Michael I. Goldberg, Esq.
     Florida Bar Number:  886602

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 4, 2008, I electronically filed the foregoing *SENIOR TRANSEASTERN LENDERS' MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT OF MOTION* with the Clerk of the Court using CM/ECF.  I also certify that notification of the filing of the foregoing document will be served on all counsel of record via CM/ECF and e-mail as indicated on the attached Service List

By:  /s/ Michael I. Goldberg
Michael I. Goldberg

{FT534939:1}

### SERVICE LIST

Patricia A. Redmond, Esq.
Stearns Weaver Miller Weissler
  Alhadeff & Sitterson, P.A.
150 W. Flagler St., Suite 2500
Miami, FL  33130
*predmond@swmwas.com*

Michael L. Waldman, Esquire
Robbins, Russell, Englert, Orseck,
Untereiner & Sauberg, LLP
1801 K. Street, N.W.
Suite 411-L
Washington, DC 20006
*mwaldman@robbinsrussell.com*

Paul Steven Singerman, Esq.
Berger Singerman, P.A.
200 S. Biscayne Blvd., Suite 1000
Miami, FL  33131
*singerman@bergersingerman.com*

Allan E. Wulbern, Esq.
Stephone D. Busey, Esq.
Smith, Hulsey & Busey
225 Water St., # 1800
Jacksonville, FL  32202
*awulbern@smithhulsey.com*

Amy D. Harris, Esq.
Strichter, Riedel, Blain & Prosser, P.A.
110 E. Madison St., #200
Tampa, FL  33602
*aharris.ecf@srbp.com*

Joseph H. Smolinsky, Esq.
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, New York 10012
*jsmolinsky@chadbourne.com*

Scott L. Baena, Esq.
Matthew I. Kramer, Esq.
Jeffrey I. Snyder, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 S. Biscayne Blvd., #2500
Miami, FL  33131
*sbaena@bilzin.com*

Gregory W. Nye, Esq.
Bracewell & Giuliani LLP
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, CT  06103
*gregory.nye@bgllp.com*

M. Natasha Labovitz, Esq.
Kirkland & Ellis, LLP
Citigroup Center
153 East 53 Street
New York, New York 10022-4611
*nlabovitz@kirkland.com*

Ileana A. Cruz, Esquire
White & Chase, LLP
Wachovia Financial Center
200 South Biscayne Blvd.
Suite 4900
Miami, Florida 33131
*icruz@whitecase.com*

Meghan McCurdy, Esquire
David O. Hille, Esquire
White & Case, LLP
1155 Avenue of the Americas
New York, New York 10036
*mmccurdy@whitecase.com*

{FT518759;1}