# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

|  |  |
|---|---|
| In re: | Chapter 11 Cases |
| TOUSA, INC., *et al.*, | Case No. 08-10928-JKO |
| Debtors. | Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TOUSA, INC., *et al.*, | Adv. Pro. No. 08-01435 |
| Plaintiff, | |
| v. | |
| CITICORP NORTH AMERICA, INC., *et al.*, | |
| Defendants. | |

**SENIOR TRANSEASTERN LENDERS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT**

November 25, 2008

{FT540134;1}

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ............................................................................................................................ 3

I.     The Committee Has Not Pled Facts To Demonstrate That the Conveying
Subsidiaries Had an Interest in the Property Transferred to the Senior
Transeastern Lenders ................................................................................................ 3

     A.     The Amended Complaint Fails To Allege That the Payment to the
Senior Transeastern Lenders Was Property of the Conveying
Subsidiaries ................................................................................................ 4

     B.     The Committee's Legal Analysis Is Flawed ............................................... 7

II.    Counts VII Through XII Fail To State Claims Against the Senior
Transeastern Lenders ................................................................................................ 13

     A.     The Committee Cannot Recover the New Loan Proceeds from the
Senior Transeastern Lenders as Entities for Whose Benefit the
Conveying Subsidiaries Granted Liens to the New Lenders ...................... 13

     B.     The New Lender Claim and Lien Transfers Were Not
Subsequently Transferred to the Senior Transeastern Lenders .................. 17

III.   Further Amendment of the Amended Complaint Would Be Futile ............................ 19

CONCLUSION ........................................................................................................................ 20

ATTORNEY CERTIFICATION ............................................................................................ 21

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

American Bank of Marin County v. Leasing Serv. Corp.
(In re Air Conditioning, Inc. of Stuart),
845 F.2d 293 (11th Cir. 1988) ................................................. 14, 15, 16, 17

Anzalone v. Dulgerian (In re Dulgerian),
388 B.R. 142 (Bankr. E.D. Pa. 2008) ................................................. 10, 11

Bash v. Suntrust Banks, Inc. (In re Ohio Business Machines, Inc.),
356 B.R. 786, 2007 WL 177941 (B.A.P. 6th Cir. Jan. 25, 2007) .......................... 10, 11

Bell Atlantic Corp. v. Twombly,
127 S. Ct. 1955 (U.S. 2007) ................................................. 19

Bennett & Kahnweiler Assocs. v. Ratner (In re Ratner),
132 B.R. 728 (N.D. Ill. 1991). ................................................. 5, 6

Bonded Fin. Servs., Inc. v. European Am. Bank,
838 F.2d 890 (7th Cir. 1988) ................................................. 14

Dzikowski v. NASD Regulation, Inc. (In re Scanlon),
239 F.3d 1195 (11th Cir. 2001) ................................................. 5

Dzikowski v. NASD Regulation, Inc. (In re Scanlon),
247 B.R. 867 (S.D. Fla. 2000) ................................................. 5

In re Smith,
966 F.2d 1527 (7th Cir. 1992) ................................................. 8, 9

Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.),
831 F.2d 586 (5th Cir. 1987) ................................................. 14, 15, 16, 17

Manchester v. First Bank & Trust Co. (In re Moses),
256 B.R. 641 (B.A.P. 10th Cir. 2000) ................................................. 8

NASD Regulation, Inc. v. Scanlon,
(In re Scanlon),
242 B.R. 533 (Bankr. S.D. Fla. 1999) ................................................. 5

Nordberg v. Sanchez (In re Chase & Sanborn Corp.),
813 F.2d 1177 (11th Cir. 1987) ................................................. 4

Ridge at Red Hawk, LLC v. Schneider,
493 F.3d 1174 (10th Cir. 2007) ................................................. 19

Tolz v. Barnett Bank of S. Fla., N.A. (In re Safe-T-Brake of S. Fla., N.A.),
162 B.R. 359 (Bankr. S.D. Fla. 1993) ................................................. 4, 5

United States v. Craft,
535 U.S. 274 (2002) ................................................. 9

## STATUTES

11 U.S.C. § 101(54) ................................................. 12

11 U.S.C. § 547 ................................................. 8, 14, 16

11 U.S.C. § 548 ................................................. 12, 18

11 U.S.C. § 550 ................................................. 14, 17, 18

## OTHER AUTHORITIES

Michael F. Maglio, "The Promise, Part II: Corporations, Obligations and Fraudulent Conveyances," 14 Bus. L. Today 25 (2005)............................................ 10

## RULES

Federal Rule of Civil Procedure 12(b)(6) ........................................................................ 21

Local Rule 2090-1(A) ....................................................................................................... 22

The Senior Transeastern Lenders,[1] by and through undersigned counsel, hereby file their reply memorandum of law in support of their Motion To Dismiss (the "Motion" (D.E. 151)), the First Amended Adversary Complaint (the "Amended Complaint" (D.E. 120)) and state as follows:

## PRELIMINARY STATEMENT

The Committee's opposition (the "Opposition" (D.E. 168)) does not dispute that the series of transactions pled in the allegations of the First Amended Complaint is a commonplace and unremarkable up-stream guaranty structure routinely used in modern financing. The Conveying Subsidiaries suffered liens on their assets and incurred obligations to the New Lenders to secure the New Loans, the proceeds of which were used by TOUSA, Inc. ("TOUSA"), the Conveying Subsidiaries' parent (and not itself a Conveying Subsidiary), in part to pay the Senior Transeastern Lenders. Although the transaction context is familiar, the claims asserted by the Committee are unprecedented and run contrary to decades of case law analyzing these transactions.

The Committee concedes that the claims against the Senior Transeastern Lenders are premised on its novel legal contention that the Conveying Subsidiaries had an interest in the proceeds of the New Loans, a portion of which TOUSA transferred to the Senior Transeastern Lenders. It is common ground between the parties that if that premise is not correct, the Committee's claims against the Senior Transeastern Lenders necessarily fail. Yet the Opposition does not – because it cannot – identify a single court, whether in the familiar context of subsidiary guaranty cases or in any other context, that has ever held

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Senior Transeastern Lenders' Motion To Dismiss First Amended Adversary Complaint or the First Amended Adversary Complaint.

that a party obtains an interest in loan proceeds that it cannot control simply by becoming obligated thereon or by pledging assets therefor. None has done so and the Committee's novel theory is unsupported in bankruptcy law. The claims against the Senior Transeastern Lenders consequently fail.

The Committee tries to salvage its claims against the Senior Transeastern Lenders by arguing in the alternative that the liens the Conveying Subsidiaries pledged to the New Lenders were indirectly or subsequently transferred to the Senior Transeastern Lenders. This theory, if true, would mean that a pledgor obtains an interest in loan proceeds simply by pledging assets – a theory as unprecedented, illogical, and contrary to analogous case law as the Committee's primary argument. The liens transferred by the Conveying Subsidiaries to the New Lenders were never indirectly or subsequently transferred to the Senior Transeasten Lenders or anyone else; such liens continue to be held exclusively by the New Lenders today. The Committee's theory in effect asks the Court to engage in proverbial alchemy to transform the transferred liens into the loan proceeds. No court has ever done that, and this Court should decline the invitation to do so here.

The Committee's resort to unprecedented and plainly incorrect legal theories to support its claims against the Senior Transeastern Lenders derives from a flawed fundamental premise that pervades the Opposition. The Committee argues that "[i]t is clear that property of the Conveying Subsidiaries was fraudulently transferred on July 31, 2007, even though it is not yet clear *which* property was fraudulently transferred to *which* transferees." (Opp. at 4 (emphasis in original).) This statement is demonstrably untrue. The Conveying Subsidiaries unquestionably incurred obligations and transferred liens to the New Lenders on July 31, 2007, but whether those transfers were *fraudulent* is the

issue presently before the Court.  The claims against the Senior Transeastern Lenders, however, fail because the legal theories on which they are based are wrong, regardless of the merit (or lack thereof) of claims against the New Lenders.

**ARGUMENT**

I.  **THE COMMITTEE HAS NOT PLED FACTS TO DEMONSTRATE THAT THE CONVEYING SUBSIDIARIES HAD AN INTEREST IN THE PROPERTY TRANSFERRED TO THE SENIOR TRANSEASTERN LENDERS**

The Committee agrees, as it must, that in order to state a claim to avoid a transfer, the Committee must plead facts demonstrating that the Conveying Subsidiaries had an interest in the property transferred.  (*See* Opp. at 5.)  It has not done this.  Instead, the Committee creates novel legal theories that are contrary to established case law.  These theories, however, do not substitute for factual allegations that the property transferred was ever the Conveying Subsidiaries' property and cannot sustain the Committee's deficient claims.[2]

The Committee's first theory, which underlies counts XIII through XVIII, relies on the premise that the Conveying Subsidiaries had an "interest" in the proceeds of the New Loans transferred to the Senior Transeastern Lenders.  The Committee bases this assertion on the following three allegations:  (1) that the Conveying Subsidiaries were co-

---

[2]    The Committee's suggestions that the Court must wait to hear the positions of the newly added defendants or for the completion of discovery before deciding whether the Conveying Subsidiaries had an interest in the New Loans proceeds are meritless delay tactics.  (*See* Opp. at 3-4.)  The "doubt" that the Committee confesses to concerning whether any such interest exists cannot be resolved by arguments that other parties may make (as the Committee is already making the argument that the Conveying Subsidiaries have an interest in the cash proceeds) or any discovery (as the loan documents on which it bases its claims direct the payment by TOUSA to the Senior Transeastern Lenders and preclude the Conveying Subsidiaries' control over those funds).  (*See infra* at 5.)  The Committee's claims against the Senior Transeastern Lenders are based only on the viability of its legal theories and are ripe for disposition on a motion to dismiss.

borrowers under the First Lien Term Loan and the Second Lien Term Loan; (2) that the Conveying Subsidiaries incurred an obligation to repay those loans and provided funds to make certain principal and interest payments on the First Lien Term Loan; and (3) that the Conveying Subsidiaries are guarantors of the New Loans and granted liens to the New Lenders. (Opp. at 5-6.) In short, the Committee contends that the Conveying Subsidiaries obtained an interest in the proceeds of the New Loans simply by becoming obligated on, and pledging assets to support, the New Loans. But identical allegations could describe any subsidiary involved in an up-stream guaranty financing, and no court has held that such allegations are sufficient to establish a subsidiary guarantor's interest in those loan proceeds. The Committee's contention is flawed.

A.    **The Amended Complaint Fails To Allege That the Payment to the Senior Transeastern Lenders Was Property of the Conveying Subsidiaries**

As detailed in the Motion, whether the plaintiff in a fraudulent transfer action can be shown to have an interest in property is determined by whether the plaintiff had "control" over the property—the determination of which turns upon the power to designate the payee and the power actually to disburse the funds. *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181-82 (11th Cir. 1987); *Tolz v. Barnett Bank of S. Fla., N.A. (In re Safe-T-Brake of S. Fla., N.A.)*, 162 B.R. 359, 365 (Bankr. S.D. Fla. 1993).[3] Nothing in the Opposition identifies allegations in the Amended Complaint

---

[3]    The Committee cites *Safe-T-Brake* for the proposition that the "earmarking" doctrine does not apply to their allegations. (Opp. at 9 n.5.) The Committee ignores the fact that *Safe-T-Brake* addresses the threshold question of whether the debtor had sufficient control over newly borrowed funds to constitute an interest in the property transferred, which is the very test the Committee contends should not apply here. *Id.* at 365. Because a condition of the new loan was that the funds be used to repay a creditor, the *Safe-T-Brake* court concluded in analyzing a preferential transfer claim that even though the new funds passed through the debtor's account, the debtor had no "realistic power to designate

sufficient to establish the requisite level of control by the Conveying Subsidiaries over the funds transferred to the Senior Transeastern Lenders. Indeed, the Opposition demonstrates the Conveying Subsidiaries' lack of control over the New Loans and every aspect of the payment to the Senior Transeastern Lenders. (*See* Mot. at 4, 5-7, 15-16.)

The Opposition makes clear that the Committee's claims against the Senior Transeastern Lenders in counts XIII through XVIII rely upon the legal premise that the Conveying Subsidiaries obtained an interest in the proceeds of the New Loans simply by virtue of their status as "co-borrowers," and their incurrence of obligations and pledge of assets. (*See* Opp. at 5-6) This theory has been specifically examined and rejected in existing case law. In *Bennett & Kahnweiler Associates v. Ratner (In re Ratner)*, the court held that there was no legal authority for the proposition that a debtor who acted as a co-borrower on a loan with his wife transferred a legal interest when his wife used the loan proceeds to purchase real estate. 132 B.R. 728, 734 (N.D. Ill. 1991). The theory rejected

_____

which party [would] receive the funds," and hence lacked sufficient control for them to be considered its property. *Id.* at 365-66 (internal quotation omitted).

The control test used in *Safe-T-Brake* to determine whether a debtor had an interest in property has been adopted and applied to fraudulent transfer actions as well. *See NASD Regulation, Inc. v. Scanlon, (In re Scanlon)*, 242 B.R. 533, 534, 537-38 (Bankr. S.D. Fla. 1999), *aff'd sub nom. Dzikowski v. NASD Regulation, Inc.*, 247 B.R. 867, 869-70 (S.D. Fla. 2000) (citing *Safe-T-Brake* and holding that debtor lacked control and hence had no property interest in borrowed funds paid into an escrow account because the transfer could only be made in accordance with a settlement agreement with the NASD). The Eleventh Circuit affirmed this holding, concluding that even if the debtor could be deemed the legal owner of the borrowed funds paid into escrow because he repaid the loan, this and the fact that the escrow funds "experienced a temporary layover in an account maintained by his counsel while *en route* to compensating others without any oversight by the Debtor hardly converts them into property of the bankruptcy estate." *Dzikowski v. NASD Regulation, Inc. (In re Scanlon)*, 239 F.3d 1195, 1199 (11th Cir. 2001) (emphasis in original).

by the court in *Ratner* is exactly the theory presented by the Committee, also without legal support.[4]

As set out in detail in the Motion, and not addressed in the Opposition, it is also impossible to reconcile the Committee's theory with the substantial body of jurisprudence dealing with fraudulent transfer claims brought in the subsidiary guaranty context. (*See* Mot. at 16-18.) The Committee does not dispute that its theory would render moot, or at least fundamentally alter, the case law dealing with subsidiary guaranties. If subsidiaries obtained a property interest in the loan proceeds merely by becoming obligated on the debt and pledging assets, then they would seek turnover of their property or assert fraudulent transfer claims against the holders of the loan proceeds; and, conversely, the defendant lenders would have an absolute defense to the fraudulent transfer claims by noting that the subsidiaries received value in the form of an interest in the loan proceeds. The Committee has not identified, and the Senior Transeastern Lenders have not found, any case among the plethora of cases dealing with this common scenario where these assertions have been made by a party or considered by a court. Given the plentitude of cases presenting these issues, the only reasonable inference is that

---

[4]    The Committee attempts to distinguish *Ratner* through a game of meaningless semantics. In *Ratner*, as is alleged here, there was no dispute that the proceeds of the subject loan were transferred to a third party. The *Ratner* plaintiffs alleged that the debtor "had an interest in the loan proceeds, which he transferred to his wife, " the other co-borrower, who then used the funds to purchase a house. *Id.* at 733. This is directly analogous to what the Committee alleges here in contending that the Conveying Subsidiaries had an interest in the loan proceeds that were transferred to TOUSA and then to the Senior Transeastern Lenders. (*See* Mot. at 4.) The *Ratner* court disagreed with the plaintiff, holding that there was no "transfer" under the Bankruptcy Code that could be avoided. Inherent in this holding is the conclusion that the co-borrower/debtor had no interest in the borrowed funds. The fact that the *Ratner* court spoke in terms of transfer, rather than interest, is a distinction without a difference. The facts pled in the two cases are indistinguishable and the legal arguments are identical; the conclusion must also be the same.

the Committee's theory, while creative, is just wrong. To conclude otherwise would extirpate decades of jurisprudence on complex subsidiary guaranties and transform the entire landscape of corporate bankruptcy proceedings.

Moreover, as set forth in the Motion, the adoption of the Committee's theory would reverberate throughout the financial markets. If the Court were to conclude that the Conveying Subsidiaries held a property interest in the cash proceeds of the New Loans, it would create chaos in the countless existing loan arrangements involving cross- and up-stream guaranties. (*See* Mot. at 19-20.) Cross- and up-stream guaranties would henceforth be rendered useless as a tool of corporate finance because the proceeds would be unusable by the parent corporation. Again, the Committee has not disputed or even responded to this inevitable outcome of the adoption of its theory.

### B.    The Committee's Legal Analysis Is Flawed

The Committee asserts that there is support for its theory, but no case it cites holds that a party that becomes obligated on a loan, either as a co-borrower or as a guarantor, obtains an interest in the loan proceeds by virtue of becoming so obligated. In each of the cases cited by the Committee, the court determined whether the debtor had an interest in the subject borrowed property by considering facts *other than* the debtor's obligation to repay the debt. If the Committee's theory were correct, the analysis in each of these cases would have ended upon the recognition that the debtor became obligated. But it never did. Faced with this reality, the Committee tries to obfuscate the holdings, resorting in at least one instance to undisclosed alterations to the quoted authority that materially change the holding of the case.

In *Manchester v. First Bank & Trust Co. (In re Moses)*, 256 B.R. 641 (B.A.P. 10th Cir. 2000), a preference case, the debtor borrowed money to repay another debt on the same day he petitioned for bankruptcy. *Id.* at 643. The court held that the debtor's repayment of one loan using funds from another was a "transfer of an interest of the debtor in property" under 11 U.S.C. § 547(b). *Id.* at 645. The Committee's description of the case reads as follows: "holding that, by virtue of being a borrower, 'the debtor had a legal and equitable interest in the Trust Loan proceeds, and the Transfer to the Bank diminished the debtor's estate. On the debtor's petition date, the Trust Loan proceeds were no longer available to pay unsecured creditors.'" (Opp. at 6-7.) Although the Committee did not indicate any alteration of the quoted portion, the *Moses* court did not end its holding at the word "creditors." In fact, the Court wrote: "On the debtor's petition date, the Trust Loan proceeds were no longer available to pay unsecured creditors ***because they had been used by the debtor for his personal needs or to pay antecedent debts of his choosing, including the Bank Loan.***" *Moses,* 256 B.R. at 645 (emphasis on omitted portion added). The court went on to note that the debtor "totally controlled the proceeds of the Trust Loan." *Id.* at 650. Rather than holding that the debtor had an interest simply "by virtue of being a borrower," the court actually held that the debtor had an interest by virtue of its demonstrated control and disposition of the property. In contrast, the Committee alleges a complete lack of control over the loan proceeds by the Conveying Subsidiaries and does not contend that they could or did use the proceeds for their needs. (*See supra* at 5.)

Nor do the Committee's other cases support its theory. *In re Smith*, 966 F.2d 1527 (7th Cir. 1992), stands for the simple proposition that borrowed funds received by

the borrower are the property of the borrower rather than of the lender. *Id.* at 1533 n.8 ("a borrower who accepts a check representing the proceeds of his loan may freely negotiate that check as his own property notwithstanding a security agreement which secures his obligation to repay") (internal quotation omitted). Moreover, the court's holding in *Smith* turns, once again, on the question of control over the funds. The court concluded that the debtor exercised control over the provisionally credited funds when the debtor converted the credit into a loan and paid a creditor with that loan. *Id.* at 1535.

Equally inapposite is *United States v. Craft*, 535 U.S. 274 (2002). The Committee asserts that the Conveying Subsidiaries as co-borrowers must have an interest in the New Loans proceeds because, quoting a snippet from *Craft*, "'if the conclusion were otherwise, the . . . property would belong to no one . . . .'" (Opp. at 7.) The Committee further argues that such a "conclusion would shield borrowed funds from creditors even if all of the co-borrowers filed a bankruptcy petition." (*Id.*) Notwithstanding the Committee's contention that the quoted language arises in an "analogous context" (*see id.*), *Craft* applies only to the distinct question of the application of the tax code to tenants by the entirety. 535 U.S. at 285. The Supreme Court concluded that, despite the state-law fiction that a tenant by the entirety has no separate interest in the entireties property, each tenant (there a husband and wife) "possesses individual rights in the estate sufficient to constitute 'property' or 'rights to property' for the purposes of the lien . . . ." *Id.* at 276. Clearly, application of the legal fiction that neither tenant had a separate interest would result in the "absurd" conclusion that "property would belong to no one . . . ." *Id.* at 285. There is no similar legal fiction that applies to co-borrowers. Rather, borrowed funds, like any other property, belong to the entity that controls them. (*See* Mot. at 12-

15.)  The "absurd" conclusion that the Supreme Court could not tolerate cannot arise here.  As noted above, the allegations of the Amended Complaint make clear that the entity that controlled the loan proceeds was TOUSA, which used them to pay the Senior Transeastern Lenders, and that the Conveying Subsidiaries did not control or have an interest in them.  (*See supra* at 5.)

The Committee next mistakenly argues that two cases support its contention that "courts that have confronted the question have held that borrowed funds are the property of the co-borrowers."[5]  (Mot. at 7 (citing an unpublished disposition in *Bash v. Suntrust Banks, Inc. (In re Ohio Business Machines, Inc.)*, 356 B.R. 786, No. 06-8005, 2007 WL 177941 (B.A.P. 6th Cir. Jan. 25, 2007) and *Anzalone v. Dulgerian (In re Dulgerian)*, 388 B.R. 142 (Bankr. E.D. Pa. 2008)).)  Neither supports the asserted conclusion.  In *Ohio Business Machines*, the court again considered the question of control and held that the subsidiary co-borrower had an interest in borrowed funds paid to a third party where the loan documents provided that (1) the loan proceeds were placed in escrow over which the

---

[5]  The Committee attempts to draw a meaningful distinction between guarantors and co-borrowers.  (*See* Opp. at 10.)  Whether the Conveying Subsidiaries are co-borrowers or guarantors under the New Loans is irrelevant.  The legal status of co-borrowers and guarantors is the same: they become obligated on the debt.  *See* Michael F. Maglio, "The Promise, Part II:  Corporations, Obligations and Fraudulent Conveyances," 14 Bus. L. Today 25, 30 (2005) (whether a subsidiary "sign[s] the promissory note or a separate guarantee agreement makes no difference for fraudulent transfer law since the potential effect of both transactions on the [subsidiary] and its creditors is the same").  No Court has held that any party that becomes obligated on a debt has an interest in the property simply by becoming obligated, regardless of the structure of the obligation.

Equally irrelevant is the allegation that the Conveying Subsidiaries paid principal and interest on the First Lien Term Loan.  (*See* Opp. at 10.)  The Committee admits that this allegation "is neither necessary nor sufficient (standing alone) to confer ownership of the borrowed funds."  (*Id.*)  No court has concluded that a property interest is created because payments were made (or were to be made) by an obligor on a debt, or that such payment demonstrates that a property interest in the loan proceeds exists.  The Committee cites no authority to the contrary.  This allegation shows no more than that the Conveying Subsidiaries were in fact obligated under the New Loans.

subsidiary had signatory authority; and (2) any funds that were not paid to the third party were to be used by the subsidiary as working capital.[6] The Committee has not alleged any such authority over the loan proceeds or residual interest by the Conveying Subsidiaries, and plainly none existed. In *Dulgerian*, the court held that a lender could not state a claim for embezzlement against the debtor/co-borrower because, having lent the funds to him to develop property, the money at issue no longer belonged to the lender, even though the debtor/co-borrower did not use the funds for the specified purpose. *Id.* at 151. In dismissing this claim by the lender, the court notes, in *dicta*, that if any party might have an embezzlement claim against the debtor, it could be his co-borrowers with whom he was to develop property with the borrowed funds. *Id.* The issue of whether the co-borrowers had an interest, and how they might have obtained such an interest, was not before the court. *Dulgerian*'s *dicta* does not support the Committee's claims.

Having failed to identify any support for its theory, the Committee sets up a straw man to jettison the critical control factor altogether and divert attention from the legal deficiency of its claims against the Senior Transeastern Lenders. The Committee contends that the Senior Transeastern Lenders' argument depends on a conclusion that "'control' is an essential element of any property interest" and that there are in fact

---

[6]   The Committee baldly states that "[t]here can be no serious doubt that if the Conveying Subsidiaries had retained the borrowed funds, rather than transferring those funds to the Senior Transeastern Lenders, those funds would have been included within the debtors' estates when the petition was filed, thereby ensuring that those funds, along with other property of the debtors, would be available to creditors." (Opp. at 6.) In contrast to the situation in *Ohio Business Machines*, there were no circumstances under the New Loans in which any of the New Loan proceeds would have gone to the Conveying Subsidiaries, so there was nothing for them to "retain." The allegations in the Amended Complaint make this clear, and the documents on which the Committee's claims are based are equally clear. (*See supra* at 5.) The only way that the proceeds of the New Loans could have come to the Conveying Subsidiaries, to later be retained by them, is if they breached the provisions of the New Loans.

"many examples of interests in property that do not encompass control of the disposition of the property." (Opp. at 8-9.) The Committee is correct that there are other examples of interests in property that do not include control, such as residual interests and tenancies by the entirety. The Committee's argument falls short, however, because no court has ever concluded that becoming obligated on a debt, without more, creates a property interest in the proceeds of the debt.

Nor is the Committee's position enhanced by either its review of the language of Sections 101(54) and 548(a)(1) of the Bankruptcy Code to state that transfers may be "direct or indirect" or "voluntary or involuntary," or the proposition that "a debtor may own property even if the debtor has no power to prevent some other party from transferring the property."[7] (Opp. at 9-10.) These conclusory statements do not apply to the Committee's factual allegations and do not provide a basis for recovery against the Senior Transeastern Lenders. The Committee cites no authority that holds that the facts as alleged state a plausible claim. That a debtor "may" own property that another party transferred does not mean that the Committee has properly alleged that the Conveying Subsidiaries did own the cash proceeds of the New Loans that, it alleges, TOUSA transferred to the Senior Transeastern Lenders. The Amended Complaint is devoid of factual allegations supporting this necessary conclusion. Indeed, as described above, the Committee alleges exactly the opposite, contending repeatedly that the Conveying

---

[7]    To illustrate, the Committee presents an example of the owner of an insolvent corporation who transferred corporate funds for his personal use. The Committee asserts that this misappropriation does not negate the corporation's interest in those funds. A premise of that example is exactly what the Committee must – but does not – allege facts to support: that the funds belonged to the corporation and that it therefore controlled them. The example does not itself demonstrate that the Conveying Subsidiaries had any interest in the New Loan proceeds.

Subsidiaries did not control the decision by TOUSA to fund the payment to the Senior

Transeastern Lenders. (*See supra* at 5.)

## II.    COUNTS VII THROUGH XII FAIL TO STATE CLAIMS AGAINST THE SENIOR TRANSEASTERN LENDERS

The Committee's alternative articulation of its theory underlies counts VII

through XII of the Amended Complaint.  In these counts, the Committee contends that

the grant of liens by the Conveying Subsidiaries to the First Lien Lenders and Second

Lien Lenders was a fraudulent transfer and that the Committee is entitled to recover the

value of those liens from the Senior Transeastern Lenders because they are either the

entities "for whose benefit such transfer was made" or because they are "mediate

transferee[s] of such initial transfer." (Opp. at 11.)  Neither of these bases supports the

Committee's recovery of the cash proceeds of the New Loans from the Senior

Transeastern Lenders.  Although the words used are different, these articulations of the

Committee's theories are no different from its primary theory that the Conveying

Subsidiaries obtained an interest in the proceeds of the New Loans by virtue of becoming

obligated to repay the New Loans.  The Committee's argument that subsidiary guarantors

obtain an interest in loan proceeds by pledging assets is likewise unprecedented, would

have the identical impact on the commercial lending landscape, and is equally wrong as a

matter of law.

### A.    The Committee Cannot Recover the New Loan Proceeds from the Senior Transeastern Lenders as Entities for Whose Benefit the Conveying Subsidiaries Granted Liens to the New Lenders

The Committee's first formulation of its alternative theory is that it may recover

from the Senior Transeastern Lenders because they were the entities on whose behalf the

New Lender Claim and Lien Transfers were made.[8]   Under this formulation, any party that pledges assets gains an interest in the proceeds of the loans supported by the pledge simply by virtue of having pledged assets.  This theory, if true, would have all of the same reverberations through the financial markets and the body of case law dealing with subsidiary guaranties as would the Committee's primary theory that the incurrence of the obligation is enough.   None of the cases cited by the Committee supports its theory, despite efforts to shoehorn it into the holdings of two isolated and fact-specific cases dealing with preferential transfers under Section 547 of the Bankruptcy Code.  (Opp. at 12-13 (citing *American Bank of Marin County v. Leasing Serv. Corp. (In re Air Conditioning, Inc. of Stuart)*, 845 F.2d 293 (11th Cir. 1988) and *Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*, 831 F.2d 586 (5th Cir. 1987)).)

*Air Conditioning* and *Compton* deal with virtually identical fact situations that bear no relation to the facts alleged in the Amended Complaint.  In both cases, the debtor effectuated a payment to a creditor on account of an antecedent debt immediately prior to the bankruptcy filing by transferring assets (cash in *Air Conditioning*, 845 F.2d at 295;

---

[8]    Whether the "for the benefit of" language even applies to the allegations against the Senior Transaction Lenders is not clear.  The Committee asserts that claims to recover from entities for whose benefit transfers were made "do not require proof that the debtors' property was transferred to the Senior Transeastern Lenders, because an entity for whose benefit a transfer is made, by definition, cannot be a transferee."  (Opp. at 12 n.7.)  It cites *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 896 (7th Cir. 1988), for the proposition that Section 550 "distinguishes transferees (those who receive the money or other property) from entities that get a benefit because someone else received the money or property."  The Senior Transeastern Lenders, as the Committee alleges, received money in the form of the proceeds of the New Loans and would therefore, under *Bonded Financial Services*, appear to be transferees. Furthermore, *Bonded Financial Services* uses the example of the borrower that pays off the loan to lender that had been guarantied by the guarantor.  In that example – which has no application to the relationship of the Conveying Subsidiaries, the New Lenders, and the Senior Transeastern Lenders – the borrower's payment to the lender is for the benefit of the guarantor because, although the guarantor did not receive the funds, it was no longer obligated on the loans.

security interests in *Compton*, 831 F.2d at 589) to a bank. The bank then issued a letter of credit for the benefit of the creditor, which the creditor drew upon on the occurrence of the filing of the bankruptcy petition. It is clear in both cases that had the debtor made the payment on the antecedent debt directly to the creditor, it would have been an avoidable preference. By instead going through a letter of credit, the debtor and the creditor apparently hoped to prevent the avoidance of the transfer as a preference.

The holdings of both cases were also identical: each court considered the transfer by the debtor to be *indirectly* a transfer to the creditor, notwithstanding the involvement of the bank issuing the letter of credit. In essence, the courts ignored the form of the transactions and looked at the substance. Among the facts that the courts cited in support of this holding were that: (1) the transfer to the bank could not be an avoidable preference because it was for new value, so the debtor would not have a preference claim if it could not pursue the claim against the creditor as an indirect transferee, *see Compton*, 831 F.2d at 591; (2) the purpose of the Bankruptcy Code to avoid preferential transfers must be carried out, *see Compton*, 831 F.2d at 594-95 (allowing for recovery from the indirect recipient "carries out the purposes of the Bankruptcy Code by avoiding a preferential transfer"); and (3) letters of credit raise specific policy concerns that are not generally applicable elsewhere, *see Air Conditioning*, 845 F.2d at 299 (noting that district court was concerned "to uphold the sanctity of letters of credit"); *Compton*, 831 F.2d at 594-95 (allowing for recovery from the entity for whose benefit the fraudulent transfer was made "preserves the sanctity of letter[s] of credit"). Indeed, the *Compton* court stated the limited nature of its holding in the opinion itself. *See Compton*, 831 F.2d at 595 ("Our holding does not affect the strength of or the proper use of letters of credit. . . .

Only when a creditor receives a secured letter of credit to cover an unsecured antecedent debt will it be subject to a preferential attack under 11 U.S.C. § 547(b)."). Moreover, no court in the 20 years since these decisions were issued has expanded them outside of the context of preferential transfer cases or to transactions other than letters of credit, much less cited them to support anything like the Committee's novel theory.

The facts alleged in the Amended Complaint do not warrant the expansion of the *Air Conditioning* and *Compton* holdings urged by the Committee. First, unlike the debtors in those cases, the Conveying Subsidiaries are not without a claim if they cannot assert a claim against the Senior Transeastern Lenders. If the Conveying Subsidiaries have no interest in the New Loans proceeds (as the relevant cases hold), they can continue to allege claims against the New Lenders to avoid the obligations and liens that they incurred to the New Lenders, which would (if successful) provide them complete relief. Second, the concern in these preference cases – that the debtor is preferring an unsecured creditor over other creditors through a nefarious transaction – is not present here. The transfer of security interests to the New Lenders by the Conveying Subsidiaries was for the purpose of securing a corporate loan, the proceeds of which were used to retire a significant corporate obligation. There is nothing untoward in the transactions alleged in the Amended Complaint, unlike the circumstances in *Air Conditioning* and *Compton*. Finally, the policy concerns raised by the courts about protecting the unique nature of a commercial lending practice (there letters of credit), strongly supports rejecting the Committee's argument. If the Committee is correct that pledges of assets in and of themselves create an interest in the proceeds of the loans secured by the pledge, then the utility of pledges of assets would be fundamentally

altered for all the reasons discussed above. (*See supra* at 6-7.) *Air Conditioning* and *Compton* are wholly inapplicable to this case at bar. The Court should decline the Committee's request to create a new legal doctrine that overhauls decades of law and commercial practice.

**B.    The New Lender Claim and Lien Transfers Were Not Subsequently Transferred to the Senior Transeastern Lenders**

The Committee's second formulation of its alternative theory is that the value of the New Lender Claim and Lien Transfers was transformed into the New Loans cash proceeds and that that value was transferred to the Senior Transeastern Lenders in connection with the Transeastern Settlement, making the Senior Transeastern Lenders liable as subsequent transferees. (Mot. at 20-21.) The Committee asserts that those liens "had a value equal to the Conveying Subsidiaries' obligations to the First and Second Lien Lenders – obligations to repay $500 million in principal and interest on the term loans" and claims that it can elect to recover that value from the Senior Transeastern Lenders. (Opp. at 13, 14.) The Committee cites no authority for this unprecedented equation or for the legal premise upon which it is based. The fallacy of the Committee's subsequent transferee theory is that the initial incurrence of the obligations and transfer of the liens to the New Lenders have not been subsequently transferred to the Senior Transeastern Lenders or anyone else.[9] Rather, the transferred liens are exactly where the Conveying Subsidiaries are alleged to have transferred them: with the New Lenders.

---

[9]    To the extent the Committee seeks to recover the incurrence of the obligations to the New Lenders as part of this articulation of its theory, its argument fails for a more fundamental reason. As a matter of logic alone, it is not possible for an incurred obligation to be subsequently transferred and recovered from anyone. Indeed, Section 550 of the Bankruptcy Code by its terms does not apply to fraudulently incurred obligations, but rather applies only to recovery of fraudulent transfers. A fraudulently incurred obligation

The Committee's analogies demonstrate the flaw in its argument. The Committee references a case where an initial cash transfer transformed, through a series of transactions, into a commercial office condominium development by a mediate transferee, and another where a ranch was transferred, then sold, and the proceeds of the sale were used to acquire Canadian treasury bills. (Opp. at 14.) In each of these cases, the court permitted recoveries of the fraudulent transfer from subsequent transferees because the proceeds of the estates were traceable, through the transformations, and so the transformed property became property of the estates. (*See id.*) Significantly, in each of these instances, the property initially transferred by the debtor was thereafter transferred to another party.

It is at this point that the Committee's argument with respect to the New Lender Claim and Lien Transfers falls apart.   The Committee cites no authority for the extraordinary proposition that incurred obligations, as in the form of the New Lender Claim and Lien Transfers, become, through transformation or otherwise, the cash proceeds of a loan that they secure, permitting the debtor to recover those loan proceeds from the recipient. The same New Lender Claim and Lien Transfers that the Conveying Subsidiaries transferred to the New Lenders continue to be possessed by the New Lenders. Moreover, Section 550 of the Bankruptcy Code provides for recovery only after the plaintiff avoids the initial transfer. To the extent that the Committee is successful in its claims against the New Lenders and avoids the New Lender Claim and Lien Transfers, the Conveying Subsidiaries will no longer have any obligations to the New Lenders and

---

may be avoided under 11 U.S.C. § 548 of the Bankruptcy Code, but there is no basis to pursue recovery from a mediate or subsequent transferee thereof. (*See* Mot. at 21-23.)

will have recovered full value. The nature of the New Lender Claim and Lien Transfers – even if they were transferred – makes impossible a claim for subsequent transferee liability.

## III.    FURTHER AMENDMENT OF THE AMENDED COMPLAINT WOULD BE FUTILE

The Senior Transeastern Lenders established that the Committee should not be permitted to replead its claims against them because amendment would be futile. (*See* Mot. at 23-26.) The Committee suggests that the question of whether amendment would be futile is premature.[10] (*See* Opp. at 15-16.) The question is not premature, however, because courts have denied leave to amend a complaint that has been dismissed where amendment would be futile and any amended complaint would still be subject to dismissal. *See Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1974 (U.S. 2007) (where complaint does not allege enough facts to state a claim to relief that is plausible, as opposed to merely conceivable, court may dismiss a claim without allowing the opportunity to put forward a proposed amendment). (*See also* Mot. at 23 (collecting cases).) Denial of leave to amend here, where the Committee cannot allege facts to support its claims against the Senior Transeastern Lenders, would save time, effort, and resources by avoiding additional motion practice that would yield the same result as this Motion. *See, e.g., Ridge at Red Hawk, LLC v. Schneider,* 493 F.3d 1174, 1177, 1178-79 (10th Cir. 2007) (denying amendment as futile in light of "impossibility of stating a valid

---

[10]    The Committee also asserts that the issue is hypothetical because the Committee has no intention to assert claims on behalf of TOUSA or other TOUSA affiliates that are not Conveying Subsidiaries. (*See* Opp. at 15-16.)

The Committee does not dispute or even address the Senior Transeastern Lenders' right of recoupment, which is an independent basis for concluding that amendment would be futile.

claim on the facts of this case"). The Committee should not be permitted to amend again its claims against the Senior Transeastern Lenders.

## CONCLUSION

For the above-stated reasons, and the reasons discussed in the Motion, the Senior Transeastern Lenders respectfully request that the Court enter an order dismissing with prejudice, under Federal Rule of Civil Procedure 12(b)(6), counts VII through XVIII asserted against them because the Amended Complaint fails to state a claim upon which relief can be granted. The Senior Transeastern Lenders also respectfully request that the Court not allow the Committee to amend counts VII through XVIII because any such amendment would be futile, and that the Court grant the Senior Transeastern Lenders such further and additional relief as the Court deems just and equitable.

## **ATTORNEY CERTIFICATION**

I, Michael I. Goldberg here by certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that the attorneys with Milbank, Tweed, Hadley & McCloy, LLP, appearing pro hac vice in this matter, were admitted pursuant to Court Order dated August 27, 2008 as to Dennis C. O'Donnell (D.E. 46); David R. Eastlake (D.E. 48); Andrew W. Leblanc (D.E. 48); Andrew T. Beirne (D.E. 49); and dated August 28, 2008 as to Dennis F. Dunne (D.E. 53).

Respectfully submitted,

MILBANK, TWEED, HADLEY & McCLOY LLP
Dennis F. Dunne (pro hac vice)
Andrew M. Leblanc (pro hac vice)
Dennis C. O'Donnell (pro hac vice)
Andrew T. Beirne (pro hac vice)
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: 212-530-5000
Facsimile: 212-530-5219

and

AKERMAN SENTERFITT
Las Olas Centre II, Suite 1600
3350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: michael.goldberg@akerman.com

By:  /s/ Michael I. Goldberg
    Michael I. Goldberg, Esq.
    Florida Bar Number 886602

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 25, 2008, I electronically filed the foregoing *SENIOR TRANSEASTERN LENDERS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT* with the Clerk of the Court using CM/ECF. I also certify that notification of the filing of the foregoing document will be served on all counsel of record via CM/ECF and e-mail as indicated on the attached Service List

By: /s/ Michael I. Goldberg
Michael I. Goldberg

Case No. 08-10928-JKO
Adv. Pro No. 08-01435-JKO
Page 1

## SERVICE LIST

Patricia A. Redmond, Esq.
Stearns Weaver Miller Weissler
  Alhadeff & Sitterson, P.A.
150 W. Flagler St., Suite 2500
Miami, FL 33130
*predmond@swmwas.com*

Michael L. Waldman, Esquire
Robbins, Russell, Englert, Orseck,
Untereiner & Sauberg, LLP
1801 K. Street, N.W.
Suite 411-L
Washington, DC 20006
*mwaldman@robbinsrussell.com*

Paul Steven Singerman, Esq.
Berger Singerman, P.A.
200 S. Biscayne Blvd., Suite 1000
Miami, FL 33131
*singerman@bergersingerman.com*

Allan E. Wulbern, Esq.
Stephone D. Busey, Esq.
Smith, Hulsey & Busey
225 Water St., # 1800
Jacksonville, FL 32202
*awulbern@smithhulsey.com*

Amy D. Harris, Esq.
Strichter, Riedel, Blain & Prosser, P.A.
110 E. Madison St., #200
Tampa, FL 33602
*aharris.ecf@srbp.com*

Joseph H. Smolinsky, Esq.
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, New York 10012
*jsmolinsky@chadbourne.com*

Eric Przybylko, Esquire
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, New York 10012
*eprzybylko@chadbourne.com*

Scott L. Baena, Esq.
Matthew I. Kramer, Esq.
Jeffrey I. Snyder, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 S. Biscayne Blvd., #2500
Miami, FL 33131
*sbaena@bilzin.com*

Gregory W. Nye, Esq.
  Bracewell & Giuliani LLP
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, CT 06103
*gregory.nye@bgllp.com*

M. Natasha Labovitz, Esq.
Kirkland & Ellis, LLP
Citigroup Center
153 East 53 Street
New York, New York 10022-4611
*nlabovitz@kirkland.com*

Matt Papez, Esq.
Kirkland & Ellis, LLP
Citigroup Center
153 East 53 Street
New York, New York 10022-4611
*mpapez@kirkland.com*

Ileana A. Cruz, Esquire
White & Chase, LLP
Wachovia Financial Center
200 South Biscayne Blvd.
Suite 4900
Miami, Florida 33131
*icruz@whitecase.com*

Meghan McCurdy, Esquire
David O. Hille, Esquire
White & Case, LLP
1155 Avenue of the Americas
New York, New York 10036
*mmccurdy@whitecase.com*