# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

|  |  |
|---|---|
| In re:<br>TOUSA, INC., *et al.*,<br><br>Debtors. | Chapter 11 Cases<br><br>Case No. 08-10928-JKO<br><br>Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TOUSA, INC., *ET AL.*,<br><br>Plaintiff<br><br>vs.<br><br>CITICORP NORTH AMERICA, INC.; WELLS FARGO BANK, N.A.; BANK OF AMERICA, N.A.; JPMORGAN CHASE BANK, N.A.; MORGAN STANLEY SENIOR FUNDING, INC.; CASTLERIGG MASTER INVESTMENTS, LTD.; CFIP MASTER FUND, LTD.; CITIBANK, N.A.; CGDO, LLC (AS AGENT FOR CHILTON GLOBAL CREDIT OPPORTUNITIES MASTER FUND LP); ESPERANCE C/O SCOTIABANK (IRELAND) LIMITED; REOI CAYMAN LTD.; FIDELITY FIXED INCOME TRUST: FIDELITY STRATEGIC REAL RETURN FUND; THE FOOTHILL GROUP, INC.; FORTRESS CREDIT INVESTMENTS I LTD.; FORTRESS CREDIT INVESTMENTS II LTD.; GOLDMAN SACHS CREDIT PARTNERS L.P.; GRAND CENTRAL ASSET TRUST, GAIA SERIES; GRAND CENTRAL ASSET TRUST, SIL SERIES; HBK MASTER FUND L.P.; HELIOS FUNDING LLC; INVESTMENT CBNA LOAN FUNDING LLC; JP MORGAN WHITEFRIARS INC.; LEHMAN COMMERCIAL PAPER INC.; MARATHON FINANCING I. B.V.; MCDONNELL LOAN OPPORTUNITY LTD.; MERRILL LYNCH PIERCE FENNER & SMITH INC.; MONARCH MASTER FUNDING | Adv. Pro. No. 08-1435-JKO |

LTD; PERRY PRINCIPALS, L.L.C.;
PROMETHEAN I MASTER, LTD.; ROYAL
BANK OF CANADA; SOF INVESTMENTS,
L.P.; TACONIC CAPITAL PARTNERS 1.5
L.P.; TACONIC OPPORTUNITY FUND L.P.;
TENNENBAUM MULTI-STRATEGY
MASTER FUND; TRILOGY PORTFOLIO
COMPANY, LLC; VAN KAMPEN DYNAMIC
CREDIT OPPORTUNITIES FUND; VAN
KAMPEN SENIOR INCOME TRUST; VAN
KAMPEN SENIOR LOAN FUND; WCP REAL
ESTATE STRATEGIES FUND; WESTPORT
CAPITAL PARTNERS LLC; AIG ANNUITY
INSURANCE COMPANY; ALEXANDRA
GLOBAL MASTER FUND, LTD.; AMERICAN
GENERAL LIFE INSURANCE COMPANY;
AMERICAN INTERNATIONAL GROUP,
INC.; AVENUE INVESTMENTS LP;
DEUTSCHE BANK AG NEW YORK
BRANCH; LONGACRE CAPITAL PARTNERS
QP, LP; LONGACRE MASTER FUND LTD;
M.D. SASS RE/ENTERPRISE PORTFOLIO
COMPANY, L.P.; Q FUNDING III, LP;
QUADRANGLE MASTER FUNDING LTD;
STONEHILL INSTITUTIONAL PARTNERS
LP; SUNAMERICA INCOME FUNDS –
SUNAMERICA HIGH YIELD BOND FUND;
SUNAMERICA SERIES TRUST – HIGH
YIELD BOND PORTFOLIO; THE MASTER
TRUST BANK OF JAPAN, LTD.; THE
VARIABLE ANNUITY LIFE INSURANCE
COMPANY; THIRD POINT LOAN LLC;
VALIC COMPANY II HIGH YIELD BOND
FUND; THE CIT GROUP/BUSINESS CREDIT,
INC; DISTRESSED HIGH YIELD TRADING
OPS. FUND LTD; 3V CAPITAL MASTER
FUND LTD.; DEUTSCHE BANK TRUST
COMPANY AMERICAS; SILVER OAK
CAPITAL, LLC; BEAR STEARNS
INVESTMENT PRODUCTS INC.; BLACK
DIAMOND CLO 2005-1; FALL CREEK CLO,
LTD.; EATON VANCE SENIOR DEBT
PORTFOLIO; EATON VANCE SENIOR
INCOME TRUST; EATON VANCE GRAYSON
& CO.; EATON VANCE VT FLOATING-RATE
INCOME FUND; EATON VANCE LIMITED

DURATION INCOME FUND; EATON VANCE
SENIOR FLOATING-RATE TRUST; EATON
VANCE FLOATING-RATE INCOME TRUST;
EATON VANCE CREDIT OPPORTUNITIES
FUND; FARALLON CAPITAL
INSTITUTIONAL PARTNERS, L.P.;
FARALLON CAPITAL INSTITUTIONAL
PARTNERS II, L.P.; TINICUM PARTNERS,
L.P.; FARALLON CAPITAL OFFSHORE
INVESTORS, INC.; FARALLON CAPITAL
OFFSHORE INVESTORS II, L.P.; FARALLON
CAPITAL PARTNERS, L.P.; FARALLON
CAPITAL INSTITUTIONAL PARTNERS III,
L.P.; AURUM CLO 2002-1 LTD.; FLAGSHIP
CLO III; FLAGSHIP CLO IV; FLAGSHIP CLO
V; GRAND CENTRAL ASSET TRUST, CED
SERIES; HARTFORD MUTUAL FUNDS, INC.
ON BEHALF OF THE HARTFORD FLOATING
RATE FUND BY HARTFORD INVESTMENT
MANAGEMENT COMPANY, ITS SUB-
ADVISOR; STEDMAN CBNA LOAN
FUNDING LLC; ATASCOSA INVESTMENTS,
LLC; GLENEAGLES CLO LTD; GRAND
CENTRAL ASSET TRUST, HLD SERIES;
GRAND CENTRAL ASSET TRUST, SOH
SERIES; JASPER CLO, LTD.; LIBERTY CLO,
LTD.; BURNET PARTNERS, LLC; ROCKWALL
CDO, LTD.; HIGHLAND CDO OPPORTUNITY
FUND, LTD.; HIGHLAND FLOATING RATE
LLC; HIGHLAND LEGACY LIMITED; LOAN
FUNDING VII, LLC; HIGHLAND OFFSHORE
PARTNERS, L.P.; HIGHLAND CREDIT
OPPORTUNITIES CDO LTD.; HIGHLAND
FLOATING RATE ADVANTAGE FUND; LL
BLUE MARLIN FUNDING LLC; MERRILL
LYNCH CREDIT PRODUCTS, LLC; OCEAN
BANK; CENTURION CDO 10, LTD.;
CENTURION CDO XI, LTD.; CENTURION
CDO 8, LIMITED; CENTURION CDO 9, LTD.;
CENTURION CDO II, LTD.; CENTURION CDO
VI, LTD.; SEQUILS-CENTURION V, LTD.;
CENTURION CDO VII, LTD.; RIVERSOURCE
FLOATING RATE FUND; AND DOE
SUCCESSOR TRUSTEE.

Defendants.

3

## THIRD AMENDED ADVERSARY COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") of TOUSA, Inc., *et al*. ("Debtors"), by and through its undersigned counsel, on behalf of and as the representative of the bankruptcy estates of the Debtors, based upon information and belief and as a result of its investigation to date, alleges as follows:

## PRELIMINARY STATEMENT

1.      In this adversary proceeding, the Committee seeks (in Counts I–VI) to avoid certain prepetition fraudulent and preferential transfers of more than $500 million that grew out of secured debt obligations incurred by certain Debtors and to recover payments already made on those debt obligations.  On or about July 31, 2007, TOUSA, Inc. ("TOUSA") and certain of its subsidiaries, now among the Debtors, took on $500 million of debt in term loans so that TOUSA could repay a debt for which those subsidiaries were not liable.  Each of those subsidiaries also took on debt pursuant to a revolving credit facility; the proceeds of the loans under the revolving credit facility may have benefited the subsidiary that used the borrowed funds, but did not provide reasonably equivalent value or fair consideration to other subsidiaries that were obligated to pay the debt.  At the time of these transactions, the subsidiaries either already were insolvent or thereby became insolvent.  The Committee also seeks (in Counts VII-XVIII) to recover the proceeds of the term loans or the proceeds of liens granted by Debtors from the recipients of the payments of the proceeds.  Finally, the Committee seeks (in Count XIX) to set aside as a preferential transfer the lien on a tax refund of more than $200 Million, and objects (in Count XX) to certain claims lodged against Debtors.

2.     During the summer of 2005, Debtor TOUSA Homes LP ("Homes LP") and Falcone/Ritchie LLC formed TE/TOUSA LLC (the "Transeastern JV") to acquire substantially all of the homebuilding assets of Transeastern Properties, Inc. (the "Transeastern Acquisition"). TOUSA and Homes LP gave certain guaranties as part of the transaction, and the parties formed several subsidiaries of the Transeastern JV. In order to fund the Transeastern Acquisition, Homes LP, TOUSA, and the Transeastern JV Subsidiaries (as defined below) entered into three credit agreements with the Transeastern Lenders totaling $675 million (the "Transeastern Debt").  TOUSA and Homes LP were the only Debtors that were liable for a portion of the Transeastern Debt.

3.     The Transeastern JV foundered within months.  By November 2006, the Administrative Agent for the Transeastern Lenders began litigation against TOUSA and Homes LP seeking recovery under their guaranties.  After months of negotiations, the Debtors consummated a "global settlement" of the litigation and of the remaining obligations among participants in the Transeastern JV (the "Transeastern Settlement").  As part of the Transeastern Settlement, TOUSA and Homes LP forced certain of their direct and indirect subsidiaries (the "Conveying Subsidiaries"), on or about July 31, 2007, to become co-borrowers and guarantors under certain secured credit facilities (a First Lien Term Loan, a Second Lien Term Loan, and an amended revolving credit facility (defined below as the New Loans)) of approximately $800 million with the New Lenders (as defined below).  TOUSA and Homes LLP used the proceeds of the First Lien Term Loan and the Second Lien Term Loan, among other things, to satisfy the Transeastern Debt – even though the Conveying Subsidiaries were not obligated for the Transeastern Debt.

4.      The Conveying Subsidiaries did not receive reasonably equivalent value (a) from the New Lenders in exchange for incurring secured debt obligations under the Term Loans (the "New Lender Claim and Lien Transfers"), or (b)(i) from CIT and the Transeastern Lenders (defined below) in exchange for the transfer of over $422 million in satisfaction of the Transeastern Debt (the "CIT Transfer"), or (ii) from the Doe Successor Trustee (as defined below) in exchange for incurring obligations on the "New Subordinated Notes,"[1] which were $20 million of new paid-in-kind notes, in the "New Subordinated Notes Transfers." (The CIT Transfer and the New Subordinated Notes Transfers together are the "Transeastern Transfers" and, together with the New Lender Claim and Lien Transfers, are the "Fraudulent Transfers.").

5.      On July 31, 2007, the Conveying Subsidiaries were (i) either insolvent or rendered insolvent by the Fraudulent Transfers, (ii) left with unreasonably small capital, or (iii) incurring debts beyond their ability to pay as the debts matured.  Thus, the Committee seeks to avoid and, as applicable, recover, the foregoing transfers and payments made in connection therewith, on behalf of and for the benefit of the Conveying Subsidiaries' estates, as constructively fraudulent conveyances under applicable bankruptcy and non-bankruptcy law.

6.      In addition, the Committee seeks to avoid as a preferential transfer any security interest allegedly granted by any of the Debtors to the New Lenders in respect of a tax refund in the approximate amount of $210 million (the "Tax Refund") that the Debtors received in or around June 2008.  The Debtors' entitlement to the Tax Refund arose as a result of significant losses incurred during fiscal year 2007, which the Debtors were able to carry back to fiscal years

---

[1] These were $20 million of new 14.75% senior subordinated paid-in-kind notes due July 1, 2015. The New Subordinated Notes were issued pursuant to that certain Indenture, dated as of July 31, 2007, among TOUSA (as issuer), all or substantially all of the Conveying Subsidiaries (as guarantors), and Wells Fargo (as indenture trustee.) Wells Fargo subsequently resigned as indenture trustee and was replaced by HSBC. Upon information and belief, on or about May 13, 2008, HSBC resigned as indenture trustee and has not been replaced.

2005 and 2006.  As a matter of law, (a) the Tax Refund is deemed earned as of the last day of the

fiscal year for which the refund is claimed (in this case, December 31, 2007) and, thus, (b) any

interest that the New Lenders allegedly obtained in the Tax Refund could not have arisen until

December 31, 2007.  As the New Lenders' alleged interest in the Tax Refund (a) arose during

the 90-day period prior to the commencement of the Debtors' chapter 11 cases, (b) was a

transfer on account of an antecedent debt owed to the New Lenders prior to the Petition Date, (c)

was made while the Debtors were insolvent and (d) resulted in the New Lenders receiving more

than they would in a chapter 7 case had the transfer not occurred, the Committee seeks to avoid,

on behalf of and for the benefit of each of the Debtors' estates that has an interest in the Tax

Refund, the New Lenders' alleged lien on the Tax Refund as a preferential transfer under

Bankruptcy Code section 547 (the "Preferential Transfer" and, together with the Fraudulent

Transfers, the "Transfers").

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and

1334(b) because the claims asserted in this adversary proceeding arise in the above-captioned

chapter 11 cases.  This proceeding is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

8.      The Debtors and their non-Debtor affiliates (collectively, the "TOUSA

Companies") design, build, and market detached single-family residences, town homes, and

condominiums, and operate in various metropolitan markets in ten states, located in four major

geographic regions: Florida, the Mid-Atlantic, Texas, and the West.  TOUSA is a publicly traded

company and the TOUSA Companies were collectively the nation's thirteenth largest homebuilder in 2006.  On January 29, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.      Plaintiff Committee was appointed by the Office of the United States Trustee for the Southern District of Florida pursuant to Bankruptcy Code section 1102 on February 13, 2008.  The Committee brings the Fraudulent Transfer claims derivatively on behalf of and for the benefit of the estates of the following Debtors: Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; and TOUSA/West Holdings, Inc. (collectively, the "Conveying Subsidiaries"). The Committee brings the Preferential Transfer claim on behalf of and for the benefit of the estates of each of the Debtors that has an interest in the Tax Refund.

10.    Defendant Citicorp North America, Inc. ("Citicorp"), the administrative agent under the New Revolving Debt and First Lien Term Loan (each, as defined below) and holder of the liens conveyed pursuant thereto, is a corporation organized under the laws of the State of Delaware. Citicorp is an initial transferee of the New Lender Claim and Lien Transfers and the Late 2007 Avoidable Claim and Lien Transfers within the meaning of section 550(a) of the Bankruptcy Code.

11.    Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), the successor administrative agent under the Second Lien Term Loan (as defined below) and holder of the liens conveyed pursuant thereto, is a corporation organized under the laws of the United States of America. Wells Fargo is an initial transferee of the New Lender Claim and Lien Transfers within the meaning of section 550(a) of the Bankruptcy Code.

12.    The original lenders under the New Loans and signatories thereunder, their successors, assigns, and participants, are defendants herein and are identified as follows:

(i)    The First Lien Lenders include Bank of America, N.A.; JPMorgan Chase Bank, N.A.; Morgan Stanley Senior Funding, Inc.; Castlerigg Master Investments, Ltd.; CFIP Master Fund, Ltd.; CGDO, LLC (as agent for Chilton Global Credit Opportunities Master Fund LP); Esperance C/O Scotiabank (Ireland) Limited; Fidelity REOI Cayman Ltd.; Fidelity Fixed Income Trust: Fidelity Strategic Real Return Fund; The Foothill Group, Inc.; Fortress Credit Investments I LTD.; Fortress Credit Investments II LTD.; Goldman Sachs Credit Partners L.P.; Grand Central Asset Trust, Gaia Series; Grand Central Asset Trust, SIL Series; HBK Master Fund L.P.; Helios Funding LLC; Investment CBNA Loan Funding LLC; JP Morgan Whitefriars Inc.; Lehman Commercial Paper Inc.; Marathon

Financing I., B.V.; McDonnell Loan Opportunity LTD.; Merrill Lynch Pierce,

Fenner & Smith Incorporated; Monarch Master Funding Ltd.; Perry Principals,

L.L.C.; Promethean I Master, Ltd.; Royal Bank of Canada; SOF Investments,

L.P.; Taconic Capital Partners 1.5 L.P.; Taconic Opportunity Fund L.P.;

Tennenbaum Multi-Strategy Master Fund; Trilogy Portfolio Company, LLC; Van

Kampen Dynamic Credit Opportunities Fund; Van Kampen Senior Income Trust;

Van Kampen Senior Loan Fund; WCP Real Estate Strategies Fund; and Westport

Capital Partners LLC.

(ii)     The Second Lien Lenders include AIG Annuity Insurance Company; Alexandra

Global Master Fund, Ltd.; American General Life Insurance Company; American

International Group, Inc.; Avenue Investments LP; Citibank, NA; Citicorp North

America, Inc.; Deutsche Bank AG, New York Branch; Goldman Sachs Credit

Partners LP; HBK Master Fund LP; JPMorgan Chase Bank, N.A.; Longacre

Capital Partners QP, LP; Longacre Master Fund LTD; M.D. Sass Re/Enterprise

Portfolio Company, L.P.; Merrill Lynch Pierce Fenner & Smith Inc.; Monarch

Master Funding Ltd; Morgan Stanley Senior Funding, Inc.; Q Funding III, LP;

Quadrangle Master Funding LTD; Stonehill Institutional Partners LP;

SunAmerica Income funds – SunAmerica High Yield Bond Fund; SunAmerica

Series Trust – High Yield Bond Portfolio; The Master Trust Bank of Japan, Ltd.;

The Variable Annuity life Insurance Company; Third Point Loan LLC; Trilogy

Portfolio Company LLC; and VALIC Company II High Yield Bond Fund.

(iii)    The First Lien Lenders and the Second Lien Lenders are, collectively with

Citicorp and Wells Fargo, the "New Lenders".  The New Lenders are initial,

immediate and/or mediate transferees of the New Lender Claim and Lien

Transfers within the meaning of section 550(a) of the Bankruptcy Code.

13.     Defendant Doe New Subordinated Notes Successor Trustee ("<u>Doe Successor</u>

<u>Trustee</u>") is the successor indenture trustee on the New Subordinated Notes. Doe Successor

Trustee is an initial transferee of the New Subordinated Notes Transfers within the meaning of

section 550(a) of the Bankruptcy Code.

14.     The original lenders under the New Subordinated Notes and signatories

thereunder, and their successors, assigns and participants (the <u>New Subordinated Noteholders)</u>

are defendants herein and include Deutsche Bank Trust Company Americas; Highland CDO

Opportunity Fund, Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate

Limited Liability Company; Highland Legacy Limited; Highland Offshore Partners, L.P.; Jasper

CLO, Ltd.; Loan FundingVII LLC; and Quadrangle Master Funding Ltd..  The New

Subordinated Noteholders are immediate and/or mediate transferees of the New Subordinated

Notes Transfers or the entities for whose benefit transfers were made within the meaning of

section 550(a) of the Bankruptcy Code.

15.     Defendant The CIT Group/Business Credit, Inc. ("<u>CIT</u>"), the administrative agent

in connection with the Transeastern Debt on the Transfer Date (as defined below), is a

corporation organized under the laws of the state of New York. CIT is an initial, immediate, or

mediate transferee of the Transeastern Transfers within the meaning of section 550(a) of the

Bankruptcy Code.

16.     The lenders under the Senior Credit Agreement and signatories to the CIT

Settlement Agreement (both defined below), defendants herein, are: 3V Capital Master Fund

Ltd.; Atascosa Investments, LLC; Aurum CLO 2002-1 Ltd.; Bank of America, N.A.; Bear

Stearns Investment Products Inc.; Black Diamond CLO 2005-1; Burnet Partners, LLC; Centurion

CDO 10, Ltd.; Centurion CDO 8, Limited; Centurion CDO 9, Ltd.; Centurion CDO II, Ltd.;

Centurion CDO VI, Ltd.; Centurion CDO VII, Ltd.; Centurion CDO XI, Ltd.; Deutsche Bank

Trust Company Americas; Distressed High Yield Trading Ops. Fund Ltd; Eaton Vance Credit

Opportunities Fund; Eaton Vance Floating-Rate Income Trust; Eaton Vance Grayson & Co.;

Eaton Vance Limited Duration Income Fund; Eaton Vance Senior Debt Portfolio; Eaton Vance

Senior Floating-Rate Trust; Eaton Vance Senior Income Trust; Eaton Vance VT Floating-Rate

Income Fund; Fall Creek CLO, Ltd.; Farallon Capital Institutional Partners II, L.P.; Farallon

Capital Institutional Partners III, L.P.; Farallon Capital Institutional Partners, L.P.; Farallon

Capital Offshore Investors II, L.P.; Farallon Capital Offshore Investors, Inc.; Farallon Capital

Partners, L.P.; Flagship CLO III; Flagship CLO IV; Flagship CLO V; Gleneagles CLO Ltd;

Goldman Sachs Credit Partner, L.P.; Grand Central Asset Trust, CED Series; Grand Central Asset

Trust, HLD Series; Grand Central Asset Trust, SOH Series; Hartford Mutual Funds, Inc. on behalf

of The Hartford Floating Rate Fund by Hartford Investment Management Company, its Sub-

Advisor; Highland CDO Opportunity Fund, Ltd.; Highland Credit Opportunities CDO Ltd.;

Highland Floating Rate Advantage Fund; Highland Floating Rate LLC; Highland Legacy Limited;

Highland Offshore Partners, L.P.; Jasper CLO, Ltd.; JPMorganChase Bank, N.A.; Liberty CLO,

Ltd.; LL Blue Marlin Funding LLC; Loan Funding VII, LLC; Merril Lynch Credit Products, LLC;

Ocean Bank; Quadrangle Master Funding Ltd.; Riversource Floating Rate Fund; Rockwall CDO,

Ltd.; Sequils-Centurion V, Ltd.; Silver Oak Capital, LLC; Stedman CBNA Loan Funding LLC;

The Foothill Group, Inc.; Tinicum Partners, L.P.; Van Kampen Dynamic Credit Opportunities

Fund; Van Kampen Senior Income Trust; and Van Kampen Senior Loan Fund  (collectively, the

"Transeastern Lenders" and, together with CIT, HSBC and Doe Successor Trustee and the New

Subordinated Noteholders, the "Transeastern Transferees").  The Transeastern Lenders are initial, immediate, or mediate transferees of the Transeastern Transfers or the entities for whose benefit transfers were made within the meaning of section 550(a) of the Bankruptcy Code.

17.    All defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure, made applicable by Rule 7020 of the Federal Rules of Bankruptcy Procedure, because the right to relief asserted against all defendants arises out of the same transaction, occurrence, or series of transactions and occurrences, and questions of law and fact common to all defendants and/or certain categories or classes of defendants will arise in this action.

## BACKGROUND

### A.    The Transeastern Acquisition

18.    On June 6, 2005, the Transeastern JV was formed to enter into the Transeastern Acquisition.  Prior to the consummation of the Transeastern Acquisition, Arthur J. Falcone and Edward W. Falcone were the majority owners of Transeastern Properties, Inc.

19.    To fund the Transeastern Acquisition, the Transeastern JV created a series of "tiered" special purpose subsidiaries (the "Transeastern JV Subsidiaries"): a) EHT, the primary operating subsidiary of the Transeastern JV; b) TE/TOUSA Senior, LLC ("TOUSA Senior"), managing member and sole owner of EHT; c) TE/TOUSA Mezzanine LLC ("TOUSA Mezz"), which owned all of the membership interests in TOUSA Senior; and d) TE/TOUSA Mezzanine Two LLC ("TOUSA Mezz II"), which owned all of the membership interests in TOUSA Mezz. The Transeastern JV Subsidiaries entered into credit agreements with separate groups of lenders,

each dated August 1, 2005 (collectively, the "Transeastern Credit Agreements"),[2] totaling $675 million, as follows:

    (i)        a $450,000,000 Credit Agreement (the "Senior Credit Agreement")[3] entered into by EHT with TOUSA Senior, LLC as co-borrower;

    (ii)      a $137,500,000 Senior Mezzanine Credit Agreement (the "Senior Mezzanine Credit Agreement")[4] with TOUSA Mezz as borrower; and

    (iii)     an $87,500,000 Junior Mezzanine Credit Agreement (the "Junior Mezzanine Credit Agreement") with TOUSA Mezz II as borrower.

20.      Thus, (a) EHT and TOUSA Senior were the only primary obligors under the Senior Credit Agreement, (b) TOUSA Mezz was the only primary obligor under the Senior Mezzanine Credit Agreement, and (c) TOUSA Mezz II was the only primary obligor under the Junior Mezzanine Credit Agreement.  In addition, TOUSA and Homes LP (the "TOUSA Guarantors") both executed three unsecured completion guaranties and three unsecured carve-out guaranties (the six guaranties together are the "TOUSA Guaranties") in respect of the Transeastern Credit Agreements.  Upon information and belief, carve-out guaranties were also executed by Falcone/Ritchie LLC and certain of its affiliates.

21.      Although the Debtors' corporate structure includes many entities, only TOUSA and Homes LP had any obligations in connection with the Transeastern Debt.  None of the Conveying Subsidiaries were obligors under the Transeastern Credit Agreements.

---

[2] Deutsche Bank Trust Company Americas ("DB Trust") was the original administrative agent under the Transeastern Credit Agreements, and Deutsche Bank Securities Inc. ("DB Securities") was the sole lead arranger and sole book running manager thereunder. On March 13, 2007, CIT replaced DB Trust and DB Securities as administrative agent, lead arranger, and book running manager for the Transeastern Credit Agreements.

[3] The Senior Credit Agreement was secured by first priority liens on substantially all of the assets of EH/Transeastern, LLC ("EHT") including, without limitation, real estate and options contracts.

[4] The Senior Mezzanine Credit Agreement and the Junior Mezzanine Credit Agreement were secured by liens on ownership interests in certain of the Transeastern JV Subsidiaries.

**B.**      **The Prepetition Transeastern Litigation**

22.      On October 31, 2006, and November 1, 2006, the TOUSA Guarantors received

demand letters from DB Trust requiring payment under the TOUSA Guaranties.  The demand

letters alleged that potential defaults and events of default had occurred under the Transeastern

Credit Agreements triggering the TOUSA Guarantors' obligations. On November 28, 2006, the

TOUSA Guarantors filed a declaratory action in Florida state court against DB Trust seeking a

declaration that the TOUSA Guarantors' obligations under the TOUSA Guaranties had not been

triggered and/or that their exposure under the TOUSA Guaranties differed from what DB Trust

alleged in the demand letters (the "Florida Action").[5] On November 29, 2006, DB Trust filed

suit in New York against the TOUSA Guarantors asserting claims allegedly arising out of DB

Trust's rights under the TOUSA Guaranties (the "New York Action").

23.      DB Trust was the Administrative Agent under the Transeastern Credit

Agreements from the inception of the agreements through March 13, 2007. In addition, DB

Securities acted as financial advisor to certain of the TOUSA Guarantors and Transeastern JV

Subsidiaries in connection with the Transeastern Acquisition, pursuant to a letter agreement (the

"DB Letter Agreement"). On March 26, 2007, DB Securities commenced an action in New York

for claims allegedly arising out of the DB Letter Agreement (the "DB Securities Action" and,

together with the Florida Action and the New York Action, the "Prepetition Transeastern

Litigation").

24.      As the Conveying Subsidiaries were not liable for any of the Transeastern Debt,

they were not parties in the Prepetition Transeastern Litigation.

---

[5] On April 27, 2007, the Florida Action was dismissed without prejudice by stipulation of the parties.

C.    __The Transeastern Settlement__

25.    During the months of May, June, and July 2007, parties to the Prepetition

Transeastern Litigation and others entered into the following agreements in connection with the

Transeastern Settlement:

(i)    a Settlement and Release Agreement dated as of May 30, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, and certain of the Falcone Entities[6] as set forth in Schedule 1 to the agreement (the "Land Bank Settlement Agreement");

(ii)    a Settlement and Release Agreement dated as of July 31, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, CIT, and the lenders under the Senior Credit Agreement (the "CIT Settlement Agreement");

(iii)    a Settlement and Release Agreement, dated as of June 29, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, and the lenders under the Senior Mezzanine Credit Agreement (the "Senior Mezzanine Settlement Agreement"); and

(iv)    a Settlement and Release Agreement, dated as of June 29, 2007 by and between, among others, the TOUSA Guarantors, the Transeastern JV Subsidiaries, and the lenders under the Junior Mezzanine Agreement (the "Junior Mezzanine Settlement Agreement" and, together with the Land Bank Settlement Agreement, the CIT Settlement Agreement, and the Senior Mezzanine Settlement Agreement, the "Transeastern Settlement Agreements").

26.    Pursuant to the Land Bank Settlement Agreement, among other things, the

Falcone Entities obtained releases from any and all claims or issues arising in connection with

the Transeastern JV and the Transeastern Acquisition with the exception of certain retained

obligations set forth in the Land Bank Settlement Agreement. Upon information and belief, the

Land Bank Settlement Agreement also provided for the payment of over $49 million by EHT to

the Falcone Entities in exchange for the takedown of certain properties. Also upon information

and belief, EHT, TOUSA Senior, TOUSA Mezz, and TOUSA Mezz II were merged into

TOUSA Homes Florida, L.P., one of the Debtors, upon consummation of the Transeastern Settlement.

27.     Pursuant to the CIT Settlement Agreement and in accordance with a pay-off letter attached thereto, among other things, EHT and TOUSA Senior agreed to pay $421,522,193.46 to CIT on July 31, 2007, with an additional penalty of approximately $140,000 per day for any late payments.

28.     Pursuant to the Senior Mezzanine Settlement Agreement, among other things, TOUSA agreed to issue and deliver (i) the New Subordinated Notes, and (ii) $117.5 million (at $1,000 per share) of 8% Series A Convertible Pay-in-Kind Preferred Stock in TOUSA to the lenders under the Senior Mezzanine Settlement Agreement in satisfaction and discharge of the debt incurred thereunder.

29.     Pursuant to the Junior Mezzanine Settlement Agreement, among other things, TOUSA agreed to issue and deliver $16.25 million of warrants to acquire shares of TOUSA common stock to the Junior Mezzanine Credit Agreement lenders in satisfaction and discharge of the debt incurred thereunder.

30.     The Transeastern Settlement closed on July 31, 2007 (the "Transfer Date"). The Transeastern Settlement released all claims by the Transeastern Transferrees against the TOUSA Guarantors and the Transeastern JV Subsidiaries arising out of the Transeastern Acquisition and the Transeastern Debt.

D.      **The New Credit Agreements**

---

[6] The "Falcone Entities" consist of Arthur Falcone, Edward Falcone, Falcone/Ritchie LLC, and other affiliated entities.

31.    Having agreed to settle the Transeastern litigation, TOUSA and Homes LP had to obtain the funds necessary to pay for the settlement, which they otherwise lacked.

32.    In order to fund, among other things, the settlement payments to, among others, CIT under the Transeastern Settlement, TOUSA, as borrower, together with Homes LP and the Conveying Subsidiaries, as both borrowers and guarantors, entered into the following secured credit facilities on the Transfer Date:

(i)    Second Amended and Restated Revolving Credit Agreement (the "Amended Revolver Agreement") with Citicorp, as Administrative Agent, and certain of the Lenders Under the Amended Revolver Agreement; (the "Revolving Debt");[7]

(ii)    $200 million first lien term loan facility (the "First Lien Term Credit Agreement") with Citicorp, as Administrative Agent, and certain of the First Lien Term Lenders (the "First Lien Term Loan");[8] and

(iii)    $300 million second lien term loan facility (the "Second Lien Term Credit Agreement," and together with the Amended Revolver Agreement and the First Lien Term Loan Agreement, the "New Credit Agreements") with Citicorp, as Administrative Agent,[9] and certain of the Second Lien Term Lenders (the "Second Lien Term Loan"[10] and, together with the First Lien Term Loan and the Revolving Debt, the "New Debt" or "New Loans").

The New Credit Agreements were executed as part of a single integrated transaction, and all of the Agreements choose the law of the State of New York as the law governing the agreements.

33.    The obligations under the Revolving Debt and First Lien Term Loan (together, the "First Lien Indebtedness") are allegedly secured by first priority liens on, among other things, the property and assets of all of the Debtors, whether real or personal, tangible or intangible, and wherever located (the "Prepetition Collateral"). The obligations under the Second

---

[7] As of the Petition Date, approximately $316.5 million was outstanding under the Amended Revolver Agreement in respect of revolving loans and letters of credit.

[8] As of the Petition Date, approximately $199 million was outstanding under the First Lien Term Loan.

[9] On or about January 28, 2008, Citicorp resigned as administrative agent under the Second Lien Term Loan and was replaced by Wells Fargo.

Lien Term Loan are allegedly secured by a second priority lien on the Prepetition Collateral. An intercreditor agreement, dated as of July 31, 2007, governs the respective rights of the lenders under the First Lien Indebtedness and the lenders under the Second Lien Term Loan.

34.    Prior to the Transeastern Settlement, the existing First Amended and Restated Revolving Credit Agreement (the "January 2007 Revolver"), forbade TOUSA and Homes LP and any of its subsidiaries from creating any lien upon its properties except in limited circumstances inapplicable to the Transeastern Settlement.  When TOUSA and Homes LP entered into loan agreements to fund the Transeastern Settlement, thereby granting liens beyond those permitted by the January 2007 Revolver, the lenders under the January 2007 Revolver as a result no longer had any commitment to make any further loans to TOUSA, Homes LP or any of the Conveying Subsidiaries.  In connection with funding the Transeastern Settlement, the lenders under the January 2007 Revolver exercised their discretion and entered into the Amended Revolver Agreement in order to authorize the First Lien Term Loan and Second Lien Term Loan and to continue to make loans under the revolving facility.  The Amended Revolver Agreement was a new loan commitment, because the lenders under the January 2007 Revolver retained the absolute discretion to refuse to make further loans under that agreement.  Indeed, the parties agreed that the Amended Revolver Agreement expressly "superseded" the January 2007 Revolver.  The Amended Revolver Agreement contained numerous other terms making clear that it was a new loan agreement, including provisions that deemed prior letters of credit to be letters of credit under the Amended Revolver Agreement, provisions granting security interests to the Administrative Agent under the Amended Revolver Agreement, and other provisions

---

[10] As of the Petition Date, approximately $317 million was outstanding under the Second Lien Term Loan.

showing that further borrowings would be regarded as having been created under the Amended Revolver Agreement itself.

E.    **Knowledge of The Transeastern Transferees**

35.    Even though the Conveying Subsidiaries did not receive fair consideration or reasonably equivalent value in connection with the Transeastern Settlement, the New Loans, or the October 25, 2007 Amended Revolver Agreement and the December 14, 2007 Amended Revolver Agreement, the Conveying Subsidiaries were made jointly and severally liable on a secured basis for all amounts owed and subsequently borrowed pursuant to the New Loans (including interest, fees, and other amounts).  All, or substantially all, of the Conveying Subsidiaries were liable before July 31, 2007, on approximately $1.1 billion in debt obligations. Nonetheless, the New Credit Agreements expressly required that proceeds from the New Loans would be used to satisfy the obligations of the TOUSA Guarantors, the Transeastern JV Subsidiaries, and the Falcone Entities under the Transeastern Credit Agreements.  Indeed, the New Loans were conditioned upon finalizing the Transeastern Settlement and extinguishing the Transeastern Debt.[11] On the Transfer Date, no less than $422.8 million of the proceeds from the New Debt plus other consideration was paid to CIT and other parties in satisfaction of the Transeastern Debt.

36.    The Transeastern Transferees (i) knew that the Conveying Subsidiaries were not defendants in the Prepetition Transeastern Litigation, (ii) knew that the Conveying Subsidiaries

---

[11] The conditions to the New Loans included, but were not limited to, "[t]he Settlement Documents . . . [being] in full force and effect", "[t]he refinancing and exchange of Indebtedness under the Transeastern JV Credit Agreements . . . [being] consummated in full to the satisfaction of the Lenders with all Liens in favor of the existing lenders being terminated and discharged", and "the Administrative Agent [of the Transeastern Debt] . . . [receiving] a 'pay-off' letter." First Lien Term Loan at Section 3.1(c)(i) and (iii); Second Lien Term Loan at Section 3.1(c)(i) and (iii). The Amended Revolver Agreement required execution of the First Lien and Second Lien Term Loans. Section 3.1(c)(i) and (iii).

were not obligated on the Transeastern Debt that was released in connection with the Transeastern Settlement, (iii) knew that the Conveying Subsidiaries did not otherwise benefit from the Transeastern Settlement, and (iv) knew that the Conveying Subsidiaries were nevertheless forced to take on crippling obligations in order to fund the Transeastern Settlement. In short, the Transeastern Transferees knew or should have known that the Conveying Subsidiaries did not receive fair consideration or reasonably equivalent value in exchange for incurring the New Debt that was used to fund the Transeastern Settlement.

37.    The Transeastern Settlement was negotiated extensively among sophisticated parties represented by sophisticated counsel, and resulted in certain of the Transeastern Transferees receiving, among other consideration, equity interests in TOUSA and unsecured notes from TOUSA and the Conveying Subsidiaries. On information and belief, the sophisticated Transeastern Transferees and their agents and counsel must have conducted extensive due diligence, including examination of the capital structure of TOUSA and the Conveying Subsidiaries, before agreeing to accept that consideration. Such due diligence would have revealed, among other things, that all or substantially all of the Conveying Subsidiaries already were guarantors of more than $1 billion in unsecured bond obligations, and that the fair value of the assets of each Conveying Subsidiaries was far less than the obligations of those entities, before and certainly after consummation of the Transeastern Settlement. For these reasons and others, the Transeastern Transferees knew, should have known, or upon reasonable inquiry would have learned, that the Conveying Subsidiaries were insolvent at the time of, or became insolvent as a result of, the Transeastern Settlement.

**F.    The Debtors Grant New Liens and Mortgages After July 31, 2007**

38.    The parties to the Amended Revolver Agreement also executed an Amended and Restated Security Agreement dated as of July 31, 2007 (the "Amended Security Agreement").

The Amended Security Agreement stated that it was amending the Original Security Agreement, which it defined as "that certain Security Agreement in favor of Citicorp North America, as Administrative Agent (as amended by Amendment No. 1 to Security Agreement dated as of January 30, 2007)." The Amended Security Agreement stated that the "the Original Security Agreement is being amended and restated to among other things, add additional property of the Grantors as collateral to secure the Obligations and the obligations under the Revolver Guaranty." Grantors under the Amended Security Agreement included the Conveying Subsidiaries.

39.     Under the Amended Security Agreement, the Conveying Subsidiaries granted liens to Citicorp, as agent for the lenders under the Amended Revolver Agreement, in certain real property and certain other assets.

**F.     Further Amendments of the Revolver**

40.     Not long after executing the Amended Revolver Agreement, the Debtors proved unable to comply with its terms and conditions. On information and belief, the Chief Financial Officer of TOUSA refused in September 2007 to certify that TOUSA was solvent. That refusal constituted an Event of Default under the Amended Revolver Agreement and authorized the Lenders Under the Amended Revolver Agreement to cease permitting further draws or Letters of Credit.

41.     Nevertheless, on October 25, 2007, the Lenders Under the Amended Revolver Agreement exercised their discretion and entered into a new revolver agreement (the "October 25, 2007 Amended Revolver Agreement") in order to make additional loans and to excuse TOUSA from having to make any representations about its solvency until December 31, 2007. The October 25, 2007 Amended Revolver Agreement was a new loan commitment because, in light of the Event of Default, the Lenders under the Amended Revolver Agreement retained the

absolute discretion to refuse to make further loans under that agreement.  The Lenders under the Amended Revolver Agreement decided to make a new loan commitment to TOUSA, notwithstanding TOUSA'S inability to comply with the terms of the Amended Revolver Agreement.  TOUSA's Form 10Q for the period ending September 30, 2007, stated that TOUSA had incurred a net loss for the nine months ended September 30, 2007 of $817.7 million and that "there is substantial doubt about our ability to continue as a going concern."

42.     TOUSA's financial condition continued to deteriorate.  On information and belief, an Event of Default occurred under the October 25, 2007 Amended Revolver Agreement. Nevertheless, on December 14, 2007, the lenders under the October 25, 2007 Amended Revolver Agreement exercised their discretion and again decided to make a new loan commitment to TOUSA by amending the October 25, 2007 Amended Revolver Agreement to enter into a new agreement (the "December 14, 2007 Amended Revolver Agreement") in order to make additional loans under a revolving facility. The December 14, 2007 Amended Revolver Agreement was a new loan commitment because the lenders under the October 25, 2007 Amended Revolver Agreement had the absolute discretion to refuse to make further loans under that agreement.  The company reported that the December 14, 2007 Amended Revolver Agreement extended "through February 1, 2008 the waiver of the financial covenants."

43.     Between July 31, 2007 and the petition date, several of the Conveying Subsidiaries were unable to perform under option or land contracts.  TOUSA reported that these failures caused contract counterparties to draw on existing letters of credit. Those draws, TOUSA reported in its September 30, 2007, 10Q, "increased our outstanding borrowings." As each of those cash draws was for the benefit of only one of the subsidiaries, the cash draws did not provide reasonably equivalent value to the other Conveying Subsidiaries.  On information

and belief, some or all of the remaining cash draws between July 31, 2007 and the petition date likewise failed to provide reasonably equivalent value to every one of the Conveying Subsidiaries.

**G.      The Tax Refund**

44.      Upon information and belief, on or about March 14, 2008, the Debtors filed with the Internal Revenue Service a consolidated 2007 federal tax return in which the Debtors claimed the Tax Refund. Upon information and belief, the Debtors received the Tax Refund in or around June 2008. The Debtors' entitlement to the Tax Refund arose as a result of significant losses incurred during fiscal year 2007 resulting from the sale, disposition, and returning of assets to various lenders, which losses the Debtors were able to carry back to fiscal years 2005 and 2006. As a matter of law, the Tax Refund is deemed earned as of the last day of the fiscal year for which the refund is claimed, i.e., December 31, 2007.

**COUNT I**

**FRAUDULENT TRANSFER AGAINST NEW LENDERS (SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)**

45.      The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

46.      None of the Conveying Subsidiaries received reasonably equivalent value in exchange for New Lender Claim and Lien Transfers under the First Lien Term Loan and the Second Lien Term Loan Agreements.  Each of the Conveying Subsidiaries incurred an obligation to repay the First Lien Term Loan and Second Lien Term Loan and transferred an interest in its property on July 31, 2007 when it executed the First Lien and Second Lien Term Loan Agreements.

47.     At the time the New Lender Claim and Lien Transfers were made, each of the Conveying Subsidiaries: (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due; and/or (b) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

48.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

49.     The New Lender Claim and Lien Transfers should be avoided pursuant to sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code section 544(b).

50.     Any payments made in connection with the New Lender Claim and Lien Transfers under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 726.105 and 726.108 of the Florida Statutes and sections 544(b) and 550 of the Bankruptcy Code.

## COUNT II

## FRAUDULENT TRANSFER AGAINST THE NEW LENDERS (SECTIONS 726.106 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

51.     The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

52.     None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the New Lender Claim and Lien Transfers under the First Lien Term Loan and the Second Lien Term Loan Agreements.  Each of the Conveying Subsidiaries incurred an

obligation to repay the First Lien Term Loan and Second Lien Term Loan and transferred an interest in its property on July 31, 2007 when it executed the First Lien and Second Lien Term Loan Agreements.

53.    Each of the Conveying Subsidiaries either already was insolvent at the time of the New Lender Claim and Lien Transfers or became insolvent as a result of the New Lender Claim and Lien Transfers.

54.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

55.    The New Lender Claim and Lien Transfers under the First Lien Term Loan and the Second Lien Term Loan Agreements should be avoided pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code section 544(b).

56.    Any payments made in connection with the New Lender Claim and Lien Transfers under the First Lien Term Loan and the Second Lien Term Loan Agreements (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550.

## COUNT III

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS
### (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW
### AND 11 U.S.C. §§ 544(b) AND 550)

57.    The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

58.     None of the Conveying Subsidiaries received fair consideration in exchange for the New Lender Claim and Lien Transfers.  Each of the Conveying Subsidiaries incurred an obligation to repay the New Loans and transferred an interest in its property on July 31, 2007 when it executed the New Credit Agreements.

59.     Each of the Conveying Subsidiaries either already was insolvent at the time of the New Lender Claim and Lien Transfers or became insolvent as a result of the New Lender Claim and Lien Transfers.

60.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

61.     The New Lender Claim and Lien Transfers should be avoided pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

62.     Any payments made in connection with the New Lender Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

### COUNT IV

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS (SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

63.     The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

27

64.     None of the Conveying Subsidiaries received fair consideration in exchange for the New Lender Claim and Lien Transfers.  Each of the Conveying Subsidiaries incurred an obligation to repay the New Loans and transferred an interest in its property on July 31, 2007 when it executed the New Credit Agreements.

65.     The capital remaining in the hands of each of the Conveying Subsidiaries after the New Lender Claim and Lien Transfers was unreasonably small.

66.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

67.     The New Lender Claim and Lien Transfers should be avoided pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

68.     Any payments made in connection with the New Lender Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

## COUNT V

### FRAUDULENT TRANSFER AGAINST THE NEW LENDERS
### (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

69.     The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

70.     None of the Conveying Subsidiaries received fair consideration in exchange for the New Lender Claim and Lien Transfers.  Each of the Conveying Subsidiaries incurred an obligation to repay the New Loans and transferred an interest in its property on July 31, 2007 when it executed the New Credit Agreements.

71.     At the time of the New Lender Claim and Lien Transfers, each of the Conveying Subsidiaries intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

72.     At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

73.     The New Lender Claim and Lien Transfers should be avoided pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

74.     Any payments made in connection with the New Lender Claim and Lien Transfers (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

### COUNT VI

### FRAUDULENT TRANSFER AGAINST
### THE NEW LENDERS (11 U.S.C. §§ 548, 550)

75.     The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

76.     The New Lender Claim and Lien Transfers were made within two years of the Petition Date.

77.     Each of the Conveying Subsidiaries received less than reasonably equivalent value in exchange for the New Lender Claim and Lien Transfers.  The Conveying Subsidiaries incurred a new obligation upon executing the New Credit Agreements on July 31, 2007.

78.     At the time of the New Lender Claim and Lien Transfers, each of the Conveying Subsidiaries (i) was insolvent or became insolvent as a result of the New Lender Claim and Lien Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining was unreasonably small; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

79.     The New Lender Claim and Lien Transfers, the New Collateral Liens and the Post July 2007 Mortgages should be avoided pursuant to Bankruptcy Code section 548(a)(1)(b).

80.     Any payments made in connection with the New Lender Claim and Lien Transfers, the New Collateral Liens and the Post July 2007 Mortgages (including but not limited to any interest or other payments made by, on account of, or based on the value or assets of each of the Conveying Subsidiaries on the New Debt prior or subsequent to the Petition Date) should be avoided and recovered pursuant to Bankruptcy Code sections 548 and 550.

### COUNT VII

**FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES**
**(SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES AND**
**11 U.S.C. §§ 544(b) AND 550)**

81.     The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

82.    None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

83.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due; and/or (b) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

84.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

85.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

86.    Each of the Conveying Subsidiaries transferred an interest in its property to the First Lien Lenders and the Second Lien Lenders when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

87.    As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the

Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

88.    In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

89.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT VIII

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 726.106 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

90.    The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

91.    None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

92.    Each of the Conveying Subsidiaries either already was insolvent at the time of the Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

93.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

94.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

95.     Each of the Conveying Subsidiaries transferred an interest in its property to the First Lien Lenders and the Second Lien Lenders when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

96.     As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

97.     In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

98.     The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT IX

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

99.     The Committee restates and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

100.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

101.    Each of the Conveying Subsidiaries either already was insolvent at the time of the Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

102.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

103.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

104.    Each of the Conveying Subsidiaries transferred an interest in its property when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

105.    As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

106.    In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

107.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT X

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

108.    The Committee restates and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

109.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

110.    The capital remaining in the hands of each of the Conveying Subsidiaries after the Transeastern Transfers was unreasonably small.

111.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

112.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

113.    Each of the Conveying Subsidiaries transferred an interest in its property when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

114.    As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the

Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

115.    In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

116.    The Transeastern Transfers other than the guarantees on the New Subordinated Notes should be avoided and/or recovered pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XI

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

117.    The Committee restates and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

118.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

119.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

120.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

121.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

122.    Each of the Conveying Subsidiaries transferred an interest in its property when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

123.    As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

124.    In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

125.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XII

### FRAUDULENT TRANSFER AGAINST
### TRANSEASTERN TRANSFEREES (11 U.S.C. §§ 548 AND 550)

126.    The Committee restates and realleges  the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

127.    The Transeastern Transfers were made within two years before the Petition Date.

128.    Each of the Conveying Subsidiaries received less than reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

129.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (i) was insolvent or became insolvent as a result of the New Lender Claim and Lien Transfers and the Transeastern Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with each such Conveying Subsidiary was an unreasonably small; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

130.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

131.    Each of the Conveying Subsidiaries transferred an interest in its property when it executed the New Credit Agreements on July 31, 2007.  The First Lien Lenders and the Second Lien Lenders transferred that interest in property, or the value of that interest in property, to the lenders under the Senior Credit Agreement to satisfy the obligations owed by TOUSA and others (but not by the Conveying Subsidiaries).

132.    As the New Loan Agreements expressly required that the proceeds of the First Lien Term Loan and the Second Lien Term Loan be used to repay the debts owed to the Transeastern Transferees, the Transeastern Transferees are the entities for whose benefit the transfer of funds from the First Lien Term Loan and the Second Lien Term Loan was made.

133.    In addition, the Transeastern Transferees are mediate transferees because they received the CIT Transfer as proceeds of the transfer of property by the Conveying Subsidiaries.

134.    The Transeastern Transfers should be avoided and/or recovered pursuant to Bankruptcy Code sections 548 and 550(a).

## COUNT XIII

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

135.    The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

136.    None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

137.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due; and/or (b) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

138.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

139.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

140.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan.  On information and belief, the Conveying Subsidiaries provided the

39

funds used to repay principal and interest on the First Lien Term Loan.  Funds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

141.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XIV

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 726.106 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

142.    The Committee repeats and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

143.    None of the Conveying Subsidiaries received reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

144.    Each of the Conveying Subsidiaries either already was insolvent at the time of the Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

145.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

146.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

147.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan. On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan. Funds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

148.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XV

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

149.    The Committee restates and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

150.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

151.    Each of the Conveying Subsidiaries either already was insolvent at the time of the Transeastern Transfers or became insolvent as a result of the Transeastern Transfers.

152.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

153.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

154.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan. On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan. Funds drawn under the First Lien Term Loan and the Second Lien Term Loan was property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

155.    The Transeastern Transfers should be avoided and/or recovered pursuant to sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

### COUNT XVI

**FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES
(SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW
AND 11 U.S.C. §§ 544(b) AND 550)**

156.    The Committee restates and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

157.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

158.    The capital remaining in the hands of each of the Conveying Subsidiaries after the Transeastern Transfers was unreasonably small.

159.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

160.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

161.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan.  On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan.  Funds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

162.    The Transeastern Transfers other than the guarantees on the New Subordinated Notes should be avoided and/or recovered pursuant to sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XVII

### FRAUDULENT TRANSFER AGAINST TRANSEASTERN TRANSFEREES (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

163.    The Committee restates and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

164.    None of the Conveying Subsidiaries received fair consideration in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

165.    At the time of the Transeastern Transfers, each of the Conveying Subsidiaries intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

166.    At all times relevant hereto, there were actual creditors of each of the Conveying Subsidiaries holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

167.    At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

168.    The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan.  On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan.  Funds drawn under the First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries

169.     The Transeastern Transfers should be avoided and/or recovered pursuant to sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550(a).

## COUNT XVIII

### FRAUDULENT TRANSFER AGAINST
### TRANSEASTERN TRANSFEREES (11 U.S.C. §§ 548 AND 550)

170.     The Committee restates and realleges the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

171.     The Transeastern Transfers were made within two years before the Petition Date.

172.     Each of the Conveying Subsidiaries received less than reasonably equivalent value in exchange for the Transeastern Transfers, and the Transeastern Transfers diminished the value of each of the Conveying Subsidiaries' estates.

173.     At the time of the Transeastern Transfers, each of the Conveying Subsidiaries (i) was insolvent or became insolvent as a result of the New Lender Claim and Lien Transfers and the Transeastern Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with each such Conveying Subsidiary was an unreasonably small; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

174.     At all times relevant hereto, the Transeastern Transferees had actual or constructive knowledge that the Transeastern Transfers and/or the New Lender Claim and Lien Transfers were fraudulent.

175.     The Conveying Subsidiaries were borrowers under the First Lien Term Loan and the Second Lien Term Loan. On information and belief, the Conveying Subsidiaries provided the funds used to repay principal and interest on the First Lien Term Loan.  Funds drawn under the

First Lien Term Loan and the Second Lien Term Loan were property of each of the Conveying Subsidiaries, and were transferred to the Transeastern Transferees, which were the initial transferees within the meaning of section 550 of the Bankruptcy Code, from the Conveying Subsidiaries.

176.    The Transeastern Transfers should be avoided and/or recovered pursuant to Bankruptcy Code sections 548 and 550(a).

**COUNT XIX**

**AVOIDABLE PREFERENCE**
**AGAINST THE NEW LENDERS (11 U.S.C. §§ 547 AND 550)**

177.    The Committee restates and realleges  the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

178.    The granting of a security interest in the Tax Refund, to the extent valid, was for the benefit of the New Lenders.

179.    The granting of a security interest in the Tax Refund, to the extent valid, was on account of an antecedent debt owed to the New Lenders prior to the Petition Date.

180.    The granting of a security interest in the Tax Refund, to the extent valid, was made to the New Lenders while the Debtors were insolvent.

181.    The granting of a security interest in the Tax Refund, to the extent valid, occurred within 90 days of the Petition Date.

182.    The granting of a security interest in the Tax Refund, to the extent valid, will result in the New Lenders receiving more than they would in a chapter 7 case had the granting of the security interest not occurred.

183.    The granting of the security interest in the Tax Refund to the New Lenders, to the extent valid, should be avoided and/or recovered pursuant to Bankruptcy Code sections 547 and 550.

## COUNT XX

### OBJECTION TO ALLOWANCE OF CLAIM
### (11 U.S.C. §§ 105, 502, 544, 548, 550 AND FRBP 3007, 7001)

184.    The Committee restates and realleges  the allegations contained in paragraphs one through forty-four, which are incorporated by reference as if set forth fully herein.

185.    The New Lenders filed proofs of claims seeking allowance of the full amount of the New Loans (the "Claims").  The Committee hereby objects to the Claims pursuant to section 502 of the Bankruptcy Code on behalf of TOUSA and the Conveying Subsidiaries.

186.    The Conveying Subsidiaries received less than reasonably equivalent value in exchange for incurring the New Loans and pledging the Pre-Petition Collateral, and either were insolvent at the time of the New Lender Claim and Lien Transfers, or were rendered insolvent by those Transfers.  As such, the New Lender Claim and Lien Transfers are avoidable under sections 544 and 548 of the Code, and the Claims of the New Lenders – which are based exclusively on the alleged validity of the New Lender Claim and Lien Transfers – must be disallowed under section 502 of the Code.

187.    In connection with the New Credit Agreements, the Conveying Subsidiaries were required to execute Guaranty agreements each dated July 31, 2007 (the "New Loan Guaranties"). Section 2 of the New Loan Guaranties contains language that purports, under certain circumstances, to limit the Debtors' obligations arising from the Debtors' guaranty of the obligations created in the New Credit Agreements and New Loan Guaranties (the "New Loan Savings Clause"). Section 2 of the Amended Revolver Agreement has a guaranty with an

47

identical putative Savings Clause (the "Revolver Savings Clause" and together with the New

Loan Savings Clauses, the "Guaranty Savings Clauses"). Section 10 of each of the New Credit

Agreements also contains language, albeit different from the Guaranty Savings Clauses, that also

purports, under certain circumstances, to limit the liability and liens attributable to the

Conveying Subsidiaries. ("The Loan Agreement Savings Clauses," and together with the

Guaranty Savings Clauses, the "Savings Clauses.").

188.    The Savings Clauses by their terms purport to reduce the amount of the New

Loan obligations incurred in connection with the New Credit Agreements and in the New Loan

Guaranties below the amount at which the Conveying Subsidiaries would be rendered insolvent.

The New Lenders may argue that the Savings Clauses operate as a defense to the Committee's

avoidance claims. The Committee does not concede that the Savings Clauses are enforceable or

that the clauses actually serve as a defense to an avoidance claim.

189.    Even if the Savings Clauses were to be enforced so as to reduce the Conveying

Subsidiaries' liabilities, the Claims still have to be disallowed in their entirety or reduced under

section 502 of the Bankruptcy Code.

190.    Thus, pursuant to sections 105, 502, 544 and 548 of the Code, and Bankruptcy

Rules 3007 and 7001, the Claims should be disallowed in their entirety or reduced.

## **RESERVATION OF RIGHTS**

191.    The Committee believes that additional claims in favor of one or more of the

Debtors' estates against the Defendants and/or other parties, including, without limitation, the

Falcone Entities, may exist. The Committee reserves any and all rights to bring such claims to

the extent authorized by the Court and/or applicable law.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an

order:

(1)     avoiding the New Lender Claim and Lien Transfers;

(2)     granting recovery of all amounts paid in connection with the New Claim and Lien

        Transfers;

(3)     disallowing or in the alternative reducing the Claims by the New Lenders;

(4)     avoiding and/or requiring return of the Transeastern Transfers;

(5)     avoiding any security interest in the Tax Refund;

(6)     enforcing paragraph 16(d) of the *Stipulated Final Order (i) Authorizing Limited*

        *Use Of Cash Collateral Pursuant To Sections 105, 361 And 363 Of The*

        *Bankruptcy Code, And (ii) Granting Replacement Liens, Adequate Protection*

        *And Super Priority Administrative Expense Priority To Secured Lenders,* [D.E.

        1226 in Ch. 11 No. 08-10928]entered by this court on June 20, 2008, to modify or

        eliminate the Adequate Protection Liens and Adequate Protection Claims as

        defined in that order, and requiring disgorgement from Pre-Petition Secured

        Parties, as that term is defined in that Order, any payments made as Adequate

        Protection under that Order;

(7)     granting such other and further relief, including to the extent warranted, equitable

        subordination, as the Court deems just, proper and equitable, including the fees,

        costs, interest, and expenses of this action.

Dated: February 4, 2009

I hereby certify that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court order dated July 10, 2008 [D.E. 1360, 1362, 1363]

/s/ Lawrence S. Robbins

LAWRENCE S. ROBBINS      *pro hac vice*
(D.C. Bar No. 420260)
ALAN D. STRASSER          *pro hac vice*
(D.C. Bar No. 967885)
MICHAEL L. WALDMAN      *pro hac vice*
(D.C. Bar No. 414646)
**ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP**
1801 K Street N.W., Suite 411-L
Washington, DC  20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
lrobbins@robbinsrussell.com
astrasser@robbinsrussell.com
mwaldman@robbinsrussell.com

*Fraudulent Conveyance Adversary Proceeding Counsel for the Official Committee of Unsecured Creditors of TOUSA, Inc., et al.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that February 4, 2009, I caused a true and correct copy of the Third Amended Adversary Complaint to be served by electronic filing and/or email on:


Paul Steven Singerman, Esq.                    *singerman@bergersingerman.com*
**BERGER SINGERMAN P.A.,** *Local Counsel*
200 S. Biscayne Blvd., Suite 1000
Miami, FL   33131
Telephone:  305.775.9500
Facsimile:  305.714.4340
– and –
Paul M. Basta, Esq.                            *pbasta@kirkland.com*
Richard M. Cieri, Esq.                         *rcieri@kirkland.com*
M. Natasha Labovitz, Esq.                      *nlabovitz@kirkland.com*
**KIRKLAND & ELLIS, LLP**
153 East 53 Street
New York, NY   10022
Telephone:  212.446.4800
Facsimile:  212.446.4900
– and –
Jeffrey S. Powell, Esq.                        *jpowell@kirkland.com*
Matthew E. Papez                               *mpapez@kirkland.com*
Daniel T. Donovan                              *ddonovan@kirkland.com*
**KIRKLAND & ELLIS, LLP**
655 15 Street, NW
Washington DC   20005
Telephone:  202.879.5000
Facsimile:  202.879.5200
            *Counsel for TOUSA, Inc., et al.,* **Debtors / Third Party Defendants**
            - - - - - - - - - - - - - - - - - - - - - - - - -


Patricia A. Redmond, Esq.                      *predmond@swmwas.com*
David C. Pollack, Esq.                          *dpollack@swmwas.com*
**STEARNS WEAVER MILLER WEISSLER  ALHADEFF & SITTERSON, P.A.,** *Local Counsel*
150 W. Flagler Street, Suite 2200
Miami, FL   33130
Telephone:  305.789.3200
Facsimile:  305.789.3395
– and –
Lawrence S. Robbins, Esq.                      *lrobbins@robbinsrussell.com*
Alan D. Strasser, Esq.                         *astrasser@robbinsrussell.com*
Michael L. Waldman, Esq.                       *mwaldman@robbinsrussell.com*
**ROBBINS, RUSSELL, ENGLERT, ORSECK,  UNTEREINER & SAUBER LLP,**
1801 K Street, Suite 411-L                     *Fraudulent Conveyance Adversary Proceeding*
Washington, DC 20006                           *Special Counsel*
Telephone:  202-775-4500
Facsimile:  202.775.4510
– and –
Daniel H. Golden, Esq.                         *dgolden@akingump.com*
Philip C. Dublin, Esq.                         *pdublin@akingump.com*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
590 Madison Avenue
New York, NY 10022
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
   *Counsel for Official Committee of Unsecured Creditors of TOUSA, Inc., et al,* **Plaintiff**
- - - - - - - - - - - - - - - - - - - - - - - -

Allan E Wulbern, Esq.          *awulbern@smithhulsey.com*
Stephen D. Busey, Esq.          *busey@smithhulsey.com*
**SMITH HULSEY & BUSEY**
225 Water Street, Suite 1800
Jacksonville, FL  32202
Telephone:  904.359.7700
Facsimile:  904.359.7708
– and –
Richard Craig Prosser, Esq.        *rproser@srbp.com*
Harley Edward Riedel, Esq.        *hriedel@srbp.com*
Amy D. Harris, Esq.          *aharris.ecf@srbp.com*
Edward Peterson, Esq.         *epeterson@srbp.com*
**STICHTER, RIEDEL, BLAIN & PROSSER, P.A.**
110 East Madison Street, Suite 200
Tampa, FL  33602-4718
Telephone:  813.229.0144
Facsimile:  813.229.1811
– and –
Joseph H. Smolinsky, Esq.       *jsmolinsky@chadbourne.com*
Thomas J. Hall, Esq.         *thall@chadbourne.com*
Seven R. Rivera, Esq.         *sriveera@chadbourne.com*
Thomas J. McCormack, Esq.      *tmccormack@chadbourne.com*
**CHADBOURNE & PARKE LLP**
30 Rockefeller Plaza
New York, NY  10112
Telephone:  212.408.5100
Facsimile:  212.541.5369

  *Counsel for Citicorp North America, Inc., in its capacity as Administrative Agent for the First Lien Revolver and First Lien Term Loan Credit Agreement,* **Defendant**
- - - - - - - - - - - - - - - - - - - - - - - -

Scott L. Baena, Esq.          *sbaena@bilzin.com*
Matthew I. Kramer, Esq.        *mkramer@bilzin.com*
Jeffrey I Snyder, Esq.         *jsnyder@bilzin.com*
**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**, *Local Counsel*
200 S. Biscayne Blvd., Suite 2500
Miami, FL  33131
Telephone:  305.374.7580
Facsimile:  305.374.7593
– and –
David M. Levine, Esq.         *jcs@tewlaw.com*
Lawrence A. Kellogg, Esq.
Jeffrey C. Sneider, Esq.
**TEW CARDENAS LLP**, *Local Counsel*
200 S. Biscayne Blvd., Suite 2500
Miami, FL  33131

Telephone:  305.536.1112
Facsimile:  305.536.1116
– and –
Evan D. Flaschen, Esq.                          *evan.flaschen@bgllp.com*
Gregory W. Nye, Esq.                            *gregory.nye@bgllp.com*
Richard Whiteley, Esq.                          *richard.whiteley@bgllp.com*
Daynor M. Carman, Esq.                          *daynor.carman@bgllp.com*
**BRACEWELL & GIULIANI LLP**
225 Asylum Street, Suite 2600
Hartford, CT   06013
Telephone:  860.947.9000
Facsimile:  860.246.3201
   *Co-Counsel to Wells Fargo, as Successor Administrative Agent under that Certain  Second Lien Term Loan Credit*
      *Agreement, and an Informal Group of Holders of Second Lien Term Loan Lenders*, **Defendants**

- - - - - - - - - - - - - - - - - - - - - - - -


David M. Levine, Esq.                           *dml@tewlaw.com*
Lawrence A. Kellogg, Esq.                       *lak@tewlaw.com*
Jeffrey C. Sneider, Esq.                        *jcs@tewlaw.com*
Robin J. Rubens, Esq.                           *rjr@tewlaw.com*
**TEW CARDENAS LLP**, *Local Counsel*
200 S. Biscayne Blvd., Suite 2500
Miami, FL   33131
Telephone:  305.536.1112
Facsimile:  305.536.1116
– and –
Edward J. Estrada, Esq.                          *eestrada@reedsmith.com*
Jordan W. Siev, Esq.                             *jsiev@reedsmith.com*
John L. Scott, Esq.                              *jscott@reedsmith.com*
**REED SMITH LLP**
599 Lexington Avenue, 22nd Floor
New York, NY   10022
Telephone:  212.541.5400
Facsimile:  212.541.5450
      *Co-Counsel to Morgan Stanley Senior Funding, Inc., a Second Lien Term Loan Lender*, **Defendant**

- - - - - - - - - - - - - - - - - - - - - - - -


Jeffrey C. Schneider, Esq.                      *jcs@tewlaw.com*
**TEW CARDENAS LLP**
Four Seasons Tower, 15th Floor
1441 Brickell Avenue
Miami, FL   33131-3407
Telephone:  305.539.2481 (direct dial)
Facsimile:  305.536.1116
   *Local Counsel to several members of an Informal Group of Holders of Second Lien Term Loan Lenders*, **Defendants**

- - - - - - - - - - - - - - - - - - - - - - - -


John H. Genovese, Esq.                          *jgenovese@gjb.com*
Paul J. Batista, Esq.                           *pbattista@gjb.com*
Heather L. Yonke, Esq.                          *hyonke@gjb.com*
**GENOVESE JOBLOVE & BATTISTA, P.A.** , *Local Counsel*
100 SE 2 Street, 44 Floor
Miami, FL   33131
Telephone:  305.349.2300

Facsimile:  305.349.2310
– and –
David S. Rosner, Esq.                              *drosner@kasowitz.com*
Andrew K. Glenn, Esq.                           *aglenn@kasowitz.com*
Jeffrey R. Gleit, Esq.                              *jgleit@kasowitz.com*
Daniel A. Fliman, Esq.                            *dfliman@kasowitz.com*
John Minsker, Esq.                                 *jminsker@kasowitz.com*
**KASOWITZ,  BENSON, TORRES & FRIEDMAN LLP**
1633 Broadway
New York, NY  10019
Telephone:  212.506.1700
  *Counsel to Aurelius Named-Entities, GSO Named-Entities, and Carlyle Strategic Partners (collectively, the*
*"Noteholders"),* **Defendants**
- - - - - - - - - - - - - - - - - - - - - - - -


Michael I Goldberg, Esq.                        *michael.goldberg@akerman.com*
**AKERMAN SENTERFITT**, *Local Counsel*
350 East Las Olas Blvd., Suite 1600
Fort Lauderdale, FL   33301-2229
Telephone:  954.463.2700
Facsimile:  954.463.2224
– and –
Karen Chang, Esq.                                  *kchang@milbank.com*
Dennis F. Dunne, Esq.                           *ddunne@milbank.com*
Andrew M. LeBlanc, Esq.                       *aleblanc@milbank.com*
Andrew Beirne, Esq.                              *abeirne@milbank.com*
Atara Miller, Esq.                                  *amiller@milbank.com*
Dennis C. O'Donnell, Esq.                      *dodonnell@milbank.com*
David R. Eastlake, Esq.                          *deastlake@milbank.com*
**MILBANK, TWEED, HADLEY & MCCLOY LLP**
1 Chase Manhattan Plaza
New York, NY   10005
Telephone:  212.530.5287
Facsimile:  212.530.5219  or 212.822.5057
  *Counsel for the "Senior Transeastern Lenders,"* **Defendants**
- - - - - - - - - - - - - - - - - - - - - - - -


Ileana A. Cruz,  Esq.                             *icruz@whitecase.com*
**WHITE & CASE LLP**
200 S. Biscayne Blvd., Suite 4900
Miami, FL   33131
Telephone:  305.371.2700
Facsimile:  305.995.5289
– and –
Meghan McCurdy, Esq.                          *mmccurdy@whitecase.com*
David G. Hille,  Esq.                             *dhille@whitecase.com*
**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, NY   10036
Telephone:  212.819.8200
Facsimile:  212.354.8113
  *Counsel for Deutsche Bank Trust Company Americas, Highland Named-Entities, Jasper CLO Ltd., Loan Funding VII*
*LLC, Quadrangle Master Funding Ltd.*
- - - - - - - - - - - - - - - - - - - - - - - -

Jerry M. Markowitz, Esq.
Rachel L. Rubio,  Esq.
**MARKOWITZ, DAVIS, RINGEL & TRUSTY, P.A.**
9130 South Dadeland Boulevard, Suite 1225
Miami, FL  33156-7849
Telephone:  305.670.5000
Facsimile:  305.670.5011
<u>– and –</u>
Joseph T. Baio, Esq.
**WILKIE FARR & GALLAGAR PA**
787 Seventh Avenue
New York, NY   10019-6099
Telephone:  212.728.8521
Facsimile:  212.728.9521

*jmarkowitz@mdrtlaw.com*
*rrubio@mdrtlaw.com*

*jbaio@wilkie.com; sjones@wilkie.com;*
*mabrams@wilkie.com*
*dgibson@wilkie.com*

*Counsel for AlixPartners LLP.*

- - - - - - - - - - - - - - - - - - - - - - - -

Steven Schneiderman, Esq.          *steven.d.schneiderman@usdoj.gov*
**OFFICE OF THE ASSISTANT UNITED STATES TRUSTEE**
51 SW 1 Avenue, Suite 1204
Miami, FL  33130
Telephone:  305.536.7285
Facsimile:  305.536.7360

- - - - - - - - - - - - - - - - - - - - - - - -

<u>/s/ Alan D. Strasser</u>
**ALAN D. STRASSER**
**ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER
& SAUBER LLP**
1801 K Street N.W., Suite 411-L
Washington, DC  20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510