Tagged Opinion

ORDERED in the Southern District of Florida on June 17, 2009



John K. Olson, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:

**TOUSA, INC.**, et al.

    Debtors.

_____/

Case No. 08-10928-BKC-JKO

Chapter 11
Jointly Administered

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TOUSA, INC., et al.**,

    Plaintiff,

v.

**CITICORP NORTH AMERICA, INC., et al.**,

    Defendants.

_____/

Adv. Pro. No.: 08-01435-JKO-A

**ORDER DENYING CREDITOR'S MOTION FOR SUMMARY JUDGMENT TO DISMISS COUNT XIX OF THE THIRD AMENDED ADVERSARY COMPLAINT AND GRANTING PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**THIS MATTER** came before the court for hearing on May 28, 2009, upon Citicorp North America, Inc.'s (the "First Lien Agent"), as Administrative Agent for the First Lien Term Loan,

Motion for Summary Judgment Dismissing Count XIX of the Third Amended Adversary Complaint (the "Motion") [DE 315] and the Official Committee of Unsecured Creditors of TOUSA, Inc., et al.'s (the "Plaintiff") Cross Motion for Summary Judgment (the "Cross Motion") [DE 335]. At the May 28th hearing, the Plaintiff withdrew its request for full summary judgment, thus, I will take the Cross Motion as a motion for partial summary judgment seeking a sole determination as to when the Debtor had "acquired rights in" the federal tax refund such that a "transfer" of such rights to the First Lien Agent occurred within the meaning of 11 U.S.C. § 547(e)(3).

## JURISDICTION AND VENUE

This is an adversary proceeding seeking in part to avoid and recover a preferential transfer pursuant to 11 U.S.C. §§547 and 550. I have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and § 157(b)(2)(F). Venue of this proceeding is properly before the Court pursuant to 28 U.S.C. § 1409.

## FACTS

**1. Procedural history**

On January 29, 2008, TOUSA, Inc., in concert with numerous of its subsidiary entities, (collectively the "Debtor") filed a voluntary petition under chapter 11 of Title 11 of the United States Code. *See* [DE 1] in the main case. The complaint in this adversary case was filed by the Plaintiff on July 14, 2008. *See* [DE 1]. This court has permitted amendment to the initial complaint and the operative document now before me is the Third Amended Complaint (the "Complaint") [DE 243] filed on February 4, 2009. The First Lien Agent filed the Motion on April 16, 2009, to which the Plaintiff filed the Cross Motion on May 1, 2009. The Cross Motion also served as an objection to the Motion. On May 14, 2009, Wells Fargo, N.A. (the "Second Lien Agent"), as successor

-2-

Administrative Agent for the Second Lien Term Loan, filed a joinder to the Motion [DE 345] and a response to the Cross Motion (the "Second Lien Agent's Response") [DE 346]. The First Lien Agent filed, on May 15, 2009, a reply in support of its Motion and response in opposition to the Cross Motion (the "First Lien Agent's Reply") [DE 347]. On May 22, 2009, the Plaintiff filed a reply memorandum in support of its Cross Motion ("Plaintiff's Reply") [DE 352]. Oral arguments on the Motion and Cross Motion were heard on May 28, 2009.

2. **Undisputed facts**

The facts dispositive in resolving count XIX of the Complaint are undisputed. The Debtor had entered into a joint venture with Falcone/Ritchie LLC, which was commonly known as the Transeastern joint venture. Motion at 5; Complaint at 5. Transeastern was formed to acquire substantially all of the assets of the Florida-based homebuilder Transeastern Properties, Inc. *Id.* On December 8, 2006, a lawsuit was filed against certain entities of the Debtor, in which the administrative agent for the lender who financed the Transeastern joint venture sought repayment on such loans. Motion at 7; Complaint at 5.

To resolve the litigation the Debtor entered into a global settlement. *Id.* In order to finance this settlement, the Debtor undertook to encumber certain assets, which included "all General Intangibles," in return for loans, which, in part, were used to satisfy the settlement. *Id.*; *see also, e.g.*, "Exhibit 1" attached to the Motion at § 2(f); "Exhibit A" attached to the Second Lien Agent's Reply to Plaintiff's Opposition to Motion to Dismiss [DE 79]. This transaction occurred on July 31, 2007, and the security interests in favor of the First Lien Agent and the Second Lien Agent were perfected on August 1, 2007. Motion at 7; Complaint at 5; *see also* "Exhibit 2" attached to the Motion. As part of the transaction, the Debtor entered into two term loans totaling $500 million – a First Lien

Term Loan represented by the First Lien Agent and a Second Lien Term Loan represented by the Second Lien Agent. *Id.* These funds were predominately used to satisfy the debt owed to the Transeastern lenders under the terms of the settlement. *Id.* Included in these transactions the Debtor amended a pre-existing revolving credit facility (the "Revolver Loan") in which Citicorp North America, Inc. (the "Revolver Agent") is the Administrative Agent for the Revolver Loan. Complaint at 5; *See also*, "Exhibit 6" attached to the Motion to Dismiss Adversary Proceeding [DE 16].

For the taxable year 2005 the Debtor paid $117 million in federal income taxes, and for taxable year 2006 paid $103 million in federal income taxes. *See* "Exhibit 12" attached to the Motion at 21. There is no dispute that the financial situation of the Debtor dramatically changed in 2007 resulting in a net operating loss (an "NOL") for that year. *See* Motion at 4-5; Cross Motion at 1-2. Based on this NOL, which amounted to $643.3 million, the Debtor filed on March 20, 2008, for a tax refund in which it utilized the Internal Revenue Code carryback provisions to write off the 2007 losses against the 2005 and 2006 tax years. *Id.* This resulted in a $207.3 million federal tax refund (the "Tax Refund") being recovered by the estate on April 23, 2008. *Id.* It is undisputed that the Tax Refund is understood as a "general intangible" pledged as collateral under the loan agreements executed on July 31, 2007. Cross Motion at 2.

## DISCUSSION

### 1. Legal standard for summary judgment

Under Rule 56 of the Federal Rules of Civil Procedure, incorporated into bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper if the pleadings, deposition, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving

party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the Court that there are no genuine issues of material fact that should be decided at trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion and resolve all reasonable doubts in that party's favor. See also *Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988). The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must 'cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness.' The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988)(internal citations omitted). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325.

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 324.; *Poole v. Country Club of*

*Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).[1] By its very terms, the standard for summary judgment provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Id.* at 248.

Situations in which opposing parties are simultaneously moving for summary judgment are particularly challenging inasmuch as "[c]ross-motions for summary judgment can be difficult to resolve because '[i]nferences to which a party is entitled with respect to the opponent's motion may not be granted with respect to its own.'" *Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group, Inc.)*, 350 B.R. 166, 170 (Bankr. D. Del. 2006) (quoting *Interbusiness Bank, N.A. v. First Nat'l Bank*, 318 F.Supp 2d 230, 236 (M.D. Pa. 2004)). As there exists no genuine issue as to the material facts, this matter is ripe for adjudication as a matter of law.

### 2. The preference count

Count XIX of the Complaint seeks to avoid, as a preferential transfer pursuant to section 547 of the Bankruptcy Code, the security interest in the Tax Refund purportedly granted in the First Lien Term Loan, Second Lien Term Loan and Revolver Loan. The burden rests with the Plaintiff in demonstrating that a preference exists in this instance. *See* 11 U.S.C. § 547(g). A preference claim

---

[1] Fifth Circuit Decisions entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

requires a showing that the debtor transferred an interest in property satisfying the following requirements:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
> > (A) on or within 90 days before the date of the filing of the petition; or
> > (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--
> > (A) the case were a case under chapter 7 of this title;
> > (B) the transfer had not been made; and
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b); *see also Midwest Holding #7, LLC v. Anderson (In re Tanner Family, LLC)*, 556 F.3d 1194, 1196 (11th Cir. 2009). Bankruptcy Code section 547(e)(1)(B) defines a transfer of personal property for purposes of identifying an avoidable preference in the following manner: "a transfer of . . . property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." 11 U.S.C. § 547(e)(1)(B). However, a transfer under preference law cannot occur "until the debtor has acquired rights in the property transferred." *See* 11 U.S.C. § 547(e)(3).

Essential in determining whether a preference occurred as alleged under Count XIX of the Complaint is understanding: 1) what is the meaning of section 547(e)(3) and when does the Debtor acquire rights in the Tax Refund for transferring purposes as contemplated by this provision of the Code; and 2) whether such transfer, which I find did occur in the preference period, enabled the lenders to receive more than they would have received otherwise – i.e. an improvement in their position.

When interpreting a statute, a court must begin by examining the language of the statute itself and its analysis ". . . should always turn first to one, cardinal canon before all others. . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); See also *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241-242 (1989); *United States v. Goldenberg*, 168 U.S. 95, 102-103 (1897); *Oneale v. Thornton*, 10 U.S. 53 (1810). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Germain,* 503 U.S. at 254 (citing *Rubin v. United States*, 449 U.S. 424, 430 (1981). However, this will not hold true if the disposition required by the text is "absurd." See *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000); *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). Thus, the court should "not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Kelly v. Robinson*, 479 U.S. 36, 43 (1986) (internal quotations and citations omitted). When ambiguity exists in the drafting of a specific statute, then the court may look beyond the four corners of that section and rely on legislative history, purpose of the statute, and common usage of terms found in the Code for guidance as to the legislature's intent.

### *Congressional intent and 11 U.S.C. § 547(e)(3)*

The parties disagree as what is the meant by "acquired rights in the property." Dispute arises as to whether "rights in" can be read to mean "contingent rights in," or not. At first blush, it would seem that if Congress had intended to admit contingent rights in section 547(e)(3), it would have

included such language in the statute. However, some discrepancy, ambiguity, or confusion may lie in the distinction between having a "right in" a contingent right and the concept of a contingent right as an end in itself. Accordingly, I will explore the legislative history of section 547(e)(3) to shed light on the legislative intent of this provision.

Section 547(e)(3) was enacted specifically to overrule such cases as *DuBay v. Williams*, 417 F.2d 1277 (9th Cir. 1969), and *Grain Merchants of Indiana, Inc. v. Union Bank and Savings Co.*, 408 F.2d 209 (7th Cir. 1969), cert. denied, 396 U.S. 827 (1969). *See, e.g.*, Senate Report No. 95-989, 95th Cong., 2d Sess., S. 2266 (1978) (The Senate Committee on the Judiciary in its section by section analysis of the Bankruptcy Reform Act of 1978 stated that, "this provision, more than any other in the section, overrules *DuBay* and *Grain Merchants*."); *see also*, House Report No. 95-595, 95th Congress, 1st Sess. 374-375 (1977); *Siemers v. AG Servs. of Am., Inc.* (*In re Siemers*), 249 B.R. 205, 208 (Bankr. D. Neb. 2000). In *DuBay*, the United States Court of Appeals for the Ninth Circuit established the principle that a floating lien which attached to receivables collected during the preference period was protected from a preference challenge as the creditor had filed its financing statement long before the preference period. *See DuBay*, 417 F.2d at 1288. Similarly, in *Grain Merchants*, the debtor collected on certain accounts receivable during the preference period and deposited the funds with the bank-creditor. The Seventh Circuit held that the transfer to the bank occurred before the preference period, when the bank's security agreement with the debtor was executed and filed. Section 547(e)(3) was expressly enacted to reverse these results.

### *Improvement in position test*

By enacting Section 547(e)(3), Congress intended to curtail such protections afforded to secured creditors so that "[a] creditor with a security interest in a floating mass, such as inventory

or accounts receivable . . . [would be] subject to preference attack to the extent he improves his position during the 90-day period before bankruptcy." Senate Report No. 95-989, 95th Cong., 2d Sess., S. 2266 (1978); House Report No. 595, 95th Cong., 1st Sess., H.R. 8200 (1977). Congress, in its analysis of this provision, saw it as a two-point test requiring determination of the secured creditor's position 90 days before the petition and on the date of the petition – "If new value was first given after 90 days before the case, the date on which it was first given substitutes for the 90-day point." *Id.* This is commonly known as the "improvement in position" test.

An exception to the improvement in position test necessarily flows from it and was accordingly written into the Bankruptcy Code. *See Galloway v. First Ala. Bank (In re Wesley Indus.)*, 30 F.3d 1438, 1442 (11th Cir. 1994). In *Galloway*, the United States Court of Appeals for the Eleventh Circuit held that "[s]ection 547(c)(5) of the [Bankruptcy Code] . . . carves out an exception for inventory or accounts receivable that protects the transfer of a security interest in after-acquired property, i.e., a "floating lien," provided that the creditor does not improve its position within the vulnerable period prior to bankruptcy." Id. This exception:

> . . . permits a creditor with, say, a "floating lien" on the "receivables" of such a company to maintain that lien as the specific accounts receivable are paid off, and replaced by new ones, without fear that a future bankruptcy trustee will mount a preference attack on new accounts receivable arising during the "preference" period. The exception protects new receivables from preference challenges, however, only insofar as they substitute for old ones. Insofar as the grant of a security interest in the new collateral (receivables or inventory that comes into existence during the preference period) improves the creditor's position (compared to his position at the beginning of the preference period), the grant of security constitutes a preference to the extent of the improvement.

*Id.* (citing *Braunstein v. Karger (In re Melon Produce, Inc.)*, 976 F.2d 71, 75 (1st Cir.1992)). To determine whether a creditor improves its position, the finder of fact must compare the amount of outstanding debt to the value of the collateral securing the debt at the beginning and end of the

appropriate preference period. *Galloway*, 30 F.3d at 1442 (citing *Roemelmeyer v. Walter E. Heller & Co., Southeast, Inc. (In re Lackow Bros., Inc.)*, 752 F.2d 1529, 1531-32 (11th Cir.1985)). At any given moment in the relevant time frame, the difference between the outstanding debt and the value of the collateral constitutes the "deficiency." "There is no 'improvement in position' so long as the deficiency at the beginning of the preference period is equal to or smaller than the deficiency at the end of the preference period." *Galloway*, 30 F.3d at 1442.

### *"Rights in the property transferred" under 11 U.S.C. § 547(e)(3)*

Before conducting an improvement in position analysis in this instance, I must first determine when the transfer of the Tax Refund to the First Lien Agent, the Second Lien Agent and the Revolver Agent occurred as dictated by section 547(e)(3). "Nothing in the legislative history or the statutory language itself, however, implies that the provisions of § 547(e)(3) are limited to transfers involving security interests in after-acquired collateral." *In re Eggleston*, 19 B.R. 280, 284 (Bankr. M.D. Tenn. 1982). Thus, the unambiguous and clear language of this statutory provision requires that the provisions of § 547(e)(3) apply to all transfers which are attacked as preferential, including a blanket lien on intangibles that attaches to a federal tax refund. *Id*. Given Congress' legislative intent, combined with the language provided in the statute, section 547(e)(3) must be read to establish the following principle: For a debtor to acquire a right in the property to be transferred, all of the legal prerequisites giving rise to entitlement, determined by the operative state or federal law governing the creation of such property right, must be met.

To explain the implications of this principle, we can apply it to the very scenario that section 547(e)(3) was drafted to address. A floating lien, created outside the preference period that attaches to all future inventory and accounts receivable, is subject to a preference attack with respect to

specific inventory or accounts receivable if the debtor acquired rights to them during the preference period. Applying this principle, a debtor's rights in specific inventory or accounts receivable arise when all the legal prerequisites are met under applicable law. If this occurs during the preference period, then it may be a preferential transfer. Hypothetically speaking, with respect to inventory, it would seem highly unlikely that a statutory scheme would permit a floating lien to attach to such property until a specific item of inventory has been identified to a contract, or perhaps even until the debtor actually acquires such inventory. In such a situation, it is likely that state law would determine the legal prerequisites to be met before a debtor has acquired rights in the inventory, as it is state law, almost always through the state-adopted version of the Uniform Commercial Code, that speaks to when a security interest attaches to inventory. Thus, a creditor who holds a blanket lien over inventory cannot attach that lien to a specific piece of inventory until the debtor has rights in the property under the applicable law. Likewise, a debtor's right in its receivable most likely does not arise until goods are provided or services are rendered that give rise to the receivable – notionally speaking an apple distributor has not satisfied all the legal prerequisites required to have rights in a receivable owed to her by a grocery store until delivery of the actual apples or some other provision/action as prescribed by the contract and/or applicable law. There is no reason why the same form of analysis does not apply to determine when a debtor has rights in a general intangible: one looks to applicable law or contract provisions to determine when a debtor has rights in the general intangible such that the debtor could transfer those rights to a secured creditor.

This understanding of 547(e)(3)'s "rights in the property" is supported by the case law in this Circuit. The Eleventh Circuit Court of Appeals in *Witko v. Menotte* (*In re Witko*), 374 F.3d 1040 (11th Cir. 2004), undertook to determine at what point in time a legal malpractice claim becomes

the property of a bankruptcy estate. In doing so, the Court recognized that "[u]nder Florida law, a cause of action for legal malpractice has three elements [or prerequisites]: (1) the attorney's employment; (2) the attorney's neglect of reasonable duty; and (3) the attorney's negligence was the proximate cause of loss to the client." *Witko,* 374 F.3d at 1043-1044 (citations omitted). The Court held that the legal malpractice claim, arising under a state divorce action, was not property of the estate because the redressable harm (the loss to the client), the third prerequisite, was not established at the time of the bankruptcy filing. *Id.* Highlighting this point is the fact that Florida law requires "when a malpractice action is predicated on errors or omissions committed in the course of litigation, and that litigation proceeds to judgment, the statute of limitations does not commence to run *until the litigation is concluded by final judgment.*" *Silvestrone v. Edell*, 721 So. 2d 1173, 1175 (Fla. 1998) (emphasis added). Since final adjudication in the underlying state court action giving rise to the malpractice claim occurred post-petition, a redressable harm was not present at the time of filing and thus the malpractice claim was not an asset of the estate. *Witko,* 374 F.3d at 1043-1044.

An earlier Eleventh Circuit case demonstrates a dispositive distinction from the facts in *Witko.* In *Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A. v. Alvarez (In re Alvarez)*, an attorney had mistakenly filed a chapter 7 bankruptcy case instead of the contemplated case under chapter 11. 224 F.3d 1273 (11th Cir. 2000). The Court found that the debtor's "loss of ownership and control of his assets upon the bankruptcy filing constitutes a significant and tangible change which obviously caused harm to him" and, thus, the "redressable harm [under state law] occurred at the moment of [the] bankruptcy filing." *Id.* at 1277-1278. The Eleventh Circuit therefore held that since the redressable harm arose in a legal malpractice action as of the filing of the petition, all the legal prerequisites necessary to sustain such a claim under Florida law had been met, and thus the

malpractice claim was property of the estate.

The Eleventh Circuit cases show that an estate's right to a legal malpractice cause of action under Florida law does not rely on the final result of such a claim. Instead, the right to such a claim is unaffected and uninfluenced by whether such action ends in a favorable result or nets a $0 return. As *Witko* and *Alvarez* demonstrate, the determination as to the moment in which a malpractice claim becomes an asset of a bankruptcy estate under Florida law is entirely independent of whether or not the claim has yet provided a monetary return to the estate. The First Lien Agent seems to conflate the fact that the malpractice claim in *Alvarez* was property of the estate even though recovery under the claim was contingent as supporting the notion that a contingent right should be taken into account for determining when the Debtor acquired rights in the Tax Refund. *See* First Lien Agent's Reply at 12-13. This assertion, however, is misguided as explained above – contingency in, or more appropriately, final adjudication or settlement of, a legal malpractice claim, under Florida law, is not a legal prerequisite for the existence of such a cause of action and the property right to such a claim that flows therein.

The Eleventh Circuit's case of *Grant v. Kaufman, P.A. (In re Hagen)*, 922 F.2d 742 (11th Cir. 1991) provides insight into this distinction. In *Hagen*, the debtor was injured in an automobile accident and subsequently signed a contingent fee agreement with an attorney to sue for damages. These actions occurred prior to the preference period. A settlement was reached during the preference period which resulted in a fee being paid to the attorney. The bankruptcy trustee argued that the fee paid to the attorney was a preferential transfer. The Court of Appeals disagreed and held that the fee payment was not a preferential transfer because, under Florida law, an attorney's charging lien relates back in time to the commencement of the attorney's representation. The Court

further stated that "547(e)(3) pertains to when a transfer is made, not when the creditor attained secured status if the lien has a relation back element" and reversed the bankruptcy court's finding that the transfer occurred during the preference period. *Hagen*, 922 F.2d at 743 & 745-746. Although not fully fleshed out by the Court, this result comports with the analysis above. The debtor acquired rights in the tort claim, i.e. all the prerequisites giving rise to the claim under Florida law had been satisfied prior to entering into the contingent fee agreement with the attorney. Since a charging lien relates back to the execution of the arrangement for legal representation, the transfer under bankruptcy law occurred in this instance outside the preference period.

### *The right to the tax refund under federal law*

While the cases above deal with state law rights, a right to a federal tax return is purely a federal law issue. A taxpayer generates a NOL during a tax year if his deductible business expenses exceed his net income. 26 U.S.C. § 172(c). When this occurs, a taxpayer may apply the loss to the two preceding years to offset past tax liability and, if applicable, receive a refund. *See* 26 U.S.C. § 172(b)(1); *see also* 26 U.S.C. § 6511(d)(2). However, to establish a right to an NOL carryback generally, the Internal Revenue Code provides in relevant part that, "[e]xcept as otherwise provided in this paragraph, a net operating loss for *any taxable year* – (i) shall be a net operating loss carryback to each of the 2 taxable years preceding the taxable year of such loss . . . ." 26 U.S.C. § 172(b)(1). The term "taxable year" is defined as "the taxpayer's annual accounting period, if it is a calendar year or a fiscal year." 26 U.S.C. § 441(b). A "fiscal year" is defined as "a period of 12 months ending on the last day of any month other than December." 26 U.S.C. § 441(e). Since the record demonstrates that the Debtor's taxable year coincides with the calendar year, the Debtor does not operate under a fiscal year and its taxable year ends on December 31.

The clear and unambiguous language in the statute provides that a taxpayer is unauthorized to carryback mid-year or part-year losses – it is solely authorized to carryback losses "for any taxable year." Under these provisions, a net operating loss for any period less than the taxable year is a complete nullity and has no legal significance. *See Brandt v. Fleet Capital Corp. (In re TMCI Elec.)*, 279 B.R. 552, 560 (Bankr. N. D. Cal. 1999) (citing *In re Glenn*, 207 B.R. 418, 420-21 (E.D. Pa. 1997). This makes complete sense as it is the case that:

> In the business world, it is not uncommon for a company's earnings and losses during the course of a year to be erratic. A business can enjoy several profitable months followed by a sudden, sizable loss due to a labor strike, a competitor's entry of a new product into the market, or any other number of reasons.

*TMCI Elec.*, 279 B.R. at 560. Therefore, a mid-year claim to a federal tax refund necessarily entails speculation and forecasting about the course of a debtor's business from the date the supposed mid-year right arises until the end of its tax year, meaning that any interest in a tax refund prior to the end of the tax year necessarily would be uncertain and contingent. Perhaps more to the point, Congress has defined the right to a net operating loss carryback as a function of complete and not partial tax years.

The First Lien Agent appears to be mistakenly merging two rather separate and distinct concepts into one interchangeable right. These two distinct rights are, 1) a property right in another entity's contingent tax attributes, and 2) the right of that entity to claim, and presumably collect on, a federal tax refund.

A contingent interest in an NOL carryback and the corresponding federal tax return is an interest in property. Property is broadly defined by the Bankruptcy Code to include "all legal or equitable interests of the debtor." 11 U.S.C. § 541. The Supreme Court clearly held in *Segal v.*

-16-

*Rochelle*, 382 U.S. 375 (1966), decided under the Bankruptcy Act of 1898, that tax attributes are property of a bankruptcy estate. Subsequent Court of Appeals decisions have confirmed the continuing vitality of this proposition in *Segal* under the Bankruptcy Code. *See United States v. Sims (In re Feiler)*, 218 F.3d 948 (9th Cir. 2000); *see also Barowsky v. Serelson (In re Barowsky)*, 946 F.2d 1516, 1518-19 (10th Cir. 1991).

In *Segal*, the debtors incurred NOLs that gave rise to the right to a tax refund when carried back and applied to past tax years. Later in the same taxable year, the debtors filed for bankruptcy. *Segal*, 382 U.S. at 378. The Court held that the resulting loss carryback refund claim constituted "property" as of the time of the bankruptcy petitions, even though the petitions were filed in the middle of the taxable year, and the debtors did not yet have a right to the tax refunds. The right to a tax refund was considered "property" and "transferable." *Id.* at 384-385. Building upon this quite correct premise, the First Lien Agent correctly points out that, in this case, applicable New York law holds that contingent rights are transferable. *See* The First Lien Agent's Reply at 3-4; *Clowe v. Seavey*, 102 N.E. 521, 522 (N.Y. 1913).

However, *Segal* and New York state law do not stand for the proposition that the Debtor had acquired a right to a federal tax refund mid-year 2007. The right to such a refund is governed by federal law under the Internal Revenue Code and arose for the first time after the conclusion of the Debtor's 2007 tax year pursuant to 11 U.S.C. § 547(e)(3) and 26 U.S.C. §§ 172 & 441(b). Thus, the First Lien Term Loan, Second Lien Term Loan and Revolver Loan's secured interests in the Tax Refund did not attach as a matter of bankruptcy preference law until 12:01 a.m. on January 1, 2008, and those secured interest are accordingly subject to attack as a preferential transfer.

## CONCLUSION

The question as to whether the transfer of the interest of the Tax Refund under the First Lien Term Loan, Second Lien Term Loan and Revolver Loan constitute an avoidable preference requires this court to administer an improvement in position test. As the Plaintiff conceded at the May 28th hearing and the Second Lien Agent raised in its papers, to undertake such an analysis would require this court to make findings of fact which cannot be made on the record before me. *See* Second Lien Agent's Response at 4-8.

For the reasons stated above, it is **ORDERED** that:

1. The First Lien Agent's Motion [DE 315], in which the Second Lien Agent joined, is **DENIED**.

2. The Plaintiff's Cross Motion [DE 335] is **GRANTED** in part. The Court hereby **DETERMINES** that the Debtor acquired rights in the Tax Refund at **12:01 a.m.** on **January 1, 2008**, and the security interest in that Tax Refund held by the First Lien Agent, the Second Lien Agent and the Revolver Agent attached at that time and not before. This determination shall be binding in this Adversary Proceeding and in the Debtor's main case. The Plaintiff's Cross Motion is otherwise **DENIED**.

# # #

Copies furnished to:

Patricia A. Redmond, Esq.
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street
Miami, FL 33130

Attorney Redmond is directed to serve a conformed copy of this order on all interested parties.