## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

|  |  |
|---|---|
| In re:<br>TOUSA, INC., *et al.*,<br><br>        Debtors. | Chapter 11 Cases<br><br>Case No. 08-10928-JKO<br><br>Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF TOUSA, INC., *et al.*,<br><br>        Plaintiff,<br><br>  v.<br><br>CITICORP NORTH AMERICA, INC., *et al.*,<br><br>        Defendants. | Adv. Pro. No. 08-01435 |

## SENIOR TRANSEASTERN LENDERS' POST-TRIAL MEMORANDUM

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................. 1

SUMMARY OF THE ARGUMENT ........................................................ 3

STATEMENT OF FACTS ...................................................................... 7

ARGUMENT ........................................................................................ 7

I.    THE COMMITTEE CANNOT RECOVER FROM THE SENIOR
    TRANSEASTERN LENDERS UNDER SECTION 550 .................... 7

    A.    The Only Recovery for the Fraudulent Transfer of the Liens Is the
        Avoidance of the Liens .................................................................. 8

    B.    The Senior Transeastern Lenders Are Not Entities "For Whose Benefit"
        the Conveying Subsidiaries Granted Liens to the New Lenders .............. 14

        1.    Section 550(a)(1) Liability Does Not Apply to the Senior
            Transeastern Lenders .................................................................. 15

        2.    The Cases Cited By The Committee for the Application of "For
            Whose Benefit" Liability Are Inapposite ...................................... 17

    C.    The Senior Transeastern Lenders Are Not Subsequent Transferees of the
        "Value of the Liens" .................................................................... 18

        1.    The Committee Has No Legal Support for Its Claims Under this
            Theory .................................................................................... 18

        2.    The Senior Transeastern Lenders Proved Their Good Faith Under
            Section 550(b)(1) .................................................................... 19

II.    THE COMMITTEE FAILED TO CARRY ITS BURDEN OF PROOF TO
    SUPPORT ITS "DIRECT TRANSFEREE" CLAIMS IN COUNTS XIII
    THROUGH XVIII .................................................................... 23

    A.    Co-Borrowers Do Not Have a Property Interest in Borrowed Funds by
        Virtue of Their Being Co-Borrowers ............................................ 25

    B.    The Committee Failed To Prove that the Conveying Subsidiaries Had Any
        "Control" Over the Loan Proceeds and Thus Failed to Establish Any
        Property Interest in Them ............................................................ 26

        1.    Binding Authority Requires the Committee To Show that the
            Conveying Subsidiaries Had Control Over the Loan Proceeds To
            Establish a Property Interest ...................................................... 26

        2.    The Conveying Subsidiaries Had No Control Over the Funds Paid
            to the Senior Transeastern Lenders .............................................. 27

    C.    Finding that the Conveying Subsidiaries Had a Property Interest in the
        Loan Proceeds Would Fundamentally Alter the Utility of Subsidiary
        Guaranties ................................................................................ 29

i

III.    THE COMMITTEE HAS FAILED TO PROVE ANY FRAUDULENT
        TRANSFER .................................................................................................. 31

        A.    The Committee Failed To Carry Its Burden to Prove that TOUSA or the
              Conveying Subsidiaries Were Either Insolvent Before or Rendered
              Insolvent As a Result of the July 31 Transactions .................................... 31

              1.    The Committee's Experts' Solvency Analyses Are Unreliable.... 32

        B.    The Committee Failed to Prove that TOUSA or the Conveying
              Subsidiaries Did Not Receive Reasonably Equivalent Value In the July 31
              Transactions ............................................................................................... 57

              1.    TOUSA Received Reasonably Equivalent Value in Direct Benefits
                    From the July 31 Transactions .................................................... 58

              2.    The Conveying Subsidiaries Received Reasonably Equivalent
                    Value ............................................................................................ 59

IV.     THE COMMITTEE FAILED TO PROVE THE QUANTUM OF DAMAGES . 64

        A.    Recovery Under Any Theory Is Not Available to Many TOUSA Entities
              ..................................................................................................................... 65

              1.    TOUSA Homes Florida, LP Has Indemnification Obligations to
                    the Senior Transeastern Lenders, Which Survived the Transeastern
                    Settlement ................................................................................... 66

        B.    Any Damages Are Limited to the Value of Liens Transferred to the New
              Lenders, Which Was $161.3 Million as of July 31, 2007 ........................ 68

CONCLUSION ................................................................................................................ 70

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Agranoff v. Miller,*
   791 A.2d 880 (Del. Ch. 2001) ................................................................ 49

*American Bank of Marion County v. Leasing Serv. Corp.*
   *(In re Air Conditioning, Inc. of Stuart),*
   845 F.2d 293 (11th Cir. 1988) ................................................................ 17

*American Key Corp. v. Cole Nat'l Corp.,*
   762 F.2d 1569 (11th Cir. 1985) ......................................................... 36, 52

*Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc.*
   *(In re Ames Dep't Stores, Inc.),* 161 B.R. 87 (Bankr. S.D.N.Y. 1993) ............. 3

*Bakst v. Sawran (In re Sawran),*
   359 B.R. 348 (Bankr. S.D. Fla. 2007) ...................................................... 8

*Bakst v. Wetzel (In re Kingsley),*
   No. 06-2109-BKC-PGH-A, 2007 WL 1491188
   (Bankr. S.D. Fla. May 17, 2007), *aff'd,* 518 F.3d 874 (11th Cir. 2008) .............. 8, 13

*Begier v. IRS,*
   496 U.S. 53 (1990) ............................................................................... 25

*Bennett & Kahnweiler Assocs. v. Ratner (In re Ratner),*
   132 B.R. 728 (N.D. Ill. 1991) ......................................................... 25, 26

*Bonded Financial Services v. European American Bank*
   *(In re Bonded Financial Services),*
   838 F.2d 890 (7th Cir. 1988) .............................................. 15, 16, 17, 20

*Brandt v. Samuel Son & Co. (In re Longview Aluminum, LLC),*
   Nos. 03 B 12184, 04 A 01051, 04 A 00276, 04 A 00279, 2005 WL 3021173
   (Bankr. N.D. Ill. July 14, 2005), *aff'd sub nom Baldi v. Samuel Son & Co.*
   *(In re McCook Metals, LLC),* No. 05C2990, 2007 WL 4287507
   (N.D. Ill . Dec. 4, 2007), *aff'd,* 548 F. 3d 579 (7th Cir. 2008) ...................... 49

*Cammer v. Bloom,*
   711 F. Supp. 1264 (D.N.J. 1989) ............................................................ 42

*Cede & Co. v. Medpointe Healthcare, Inc.,*
   No. Civ. A. 19354-NC, 2004 WL 2093967 (Del. Ch. Sept. 10, 2004) ............... 49

*Cheney v. Cyberguard Corp.,*
   213 F.R.D. 484 (S.D. Fla. 2003) ............................................................ 42

*Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, et al.),*
   130 F.3d 52 (2d Cir. 1997) .................................................................. 15

*Cox Enters. Inc. v. News-Journal Corp.,*
   469 F. Supp. 2d 1094 (M.D. Fla. 2006) .................................................... 41

*Cuthill v. Greemark, LLC (In re World Vision Entm't)*,
    275 B.R. 641 (Bankr. M.D. Fla. 2002) ............................................................. 19

*Cuthill v. Kime (In re Evergreen Sec., Inc.)*,
    319 B.R. 245 (Bankr. M.D. Fla. 2003) ......................................................... 19, 20

*Danning v. Miller (In re Bullion Reserve)*,
    922 F.2d 544 (9th Cir. 1991) ............................................................................ 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ......................................................................................... 50

*Development Specialists, Inc. v. Hamilton Bank, N.A.*
    *(In re Model Imperial, Inc.)*,
    250 B.R. 776 (Bankr. S.D. Fla. 2000) .............................................................. 19

*Dzikowski v. NASD Regulation, Inc.*,
    247 B.R. 867 (S.D. Fla. 2000) .......................................................................... 26

*EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*,
    380 B.R. 348 (Bankr. D. Del. 2008) ................................................................. 31

*Everson v. United States*,
    108 F.3d 234 (9th Cir. 1997) ............................................................................ 10

*Feltman v. Warmus (In re American Way Serv. Corp.)*,
    229 B.R. 496 (Bankr. S.D. Fla. 1999) ................................................................ 8

*First Software Corp. v. Computer Assocs. Int'l (In re First Software Corp.)*,
    107 B.R. 417 (D. Mass. 1989) .......................................................................... 11

*General Elec. Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.)*,
    185 B.R. 801 (B.A.P. 9th Cir. 1995) ................................................................ 15

*Gennrich v. Montana Sport U.S.A. Ltd. (In re Int'l Ski Serv., Inc.)*,
    119 B.R. 654 (Bankr. W.D. Wis. 1990) ............................................................ 11

*Glanz v. RJF Int'l Corp. (In re Glanz)*,
    205 B.R. 750 (Bankr. D. Md. 1997) ................................................................. 12

*Gold v. Interstate Fin. Corp. (In re Schmiel)*,
    319 B.R. 520 (Bankr. E.D. Mich. 2005) ........................................................... 12

*Gold v. New Century Mortgage Corp. (In re Salinitro)*,
    355 B.R. 15 (Bankr. E.D. Mich. 2006) ............................................................. 13

*Goldberg v. Chong*,
    No. 07-20931-CIV, 2007 WL 2028792 (S.D. Fla. July 11, 2007) ...................... 3

*Golden Maine Acquisitions*,
    221 B.R. 963 (N.D. Ala. 1997) ......................................................................... 41

*Goveart v. Capital Bank (In re Miami Gen. Hosp., Inc.)*,
    124 B.R. 383 (Bankr. S.D. Fla. 1991) .......................................................... 29, 30

*Gray v. Cytokine Pharmasciences, Inc.*,
    No. Civ. A. 17451, 2002 WL 853549 ( Del. Ch. Apr. 25, 2002) ...................... 49

iv

*Griffin v. GK Intelligent Sys., Inc.*,
   196 F.R.D. 298 (S.D. Tex. 2000) ................................................................ 43

*In re Advanced Telecomm. Network, Inc.*,
   490 F.3d 1325 (11th Cir. 2007) ................................................................ 56

*In re Amerifirst Secs. Litig.*,
   139 F.R.D. 423 (S.D. Fla. 1991) ............................................................... 43

*In re Aqua Clear Technologies, Inc.*,
   361 B.R. 567 (Bankr. S.D. Fla. 2007) ...................................................... 63

*In re Coggin*,
   30 F.3d 1443 (11th Cir. 1994) .................................................................. 15

*In re Fabrikant & Sons, Inc.*,
   394 B.R. 721 (Bankr. S.D.N.Y. 2008) ...................................................... 60

*In re Image Worldwide, Ltd.*,
   139 F.3d 574 (7th Cir. 1998) .................................................................... 60

*In re Mirant Corp.*,
   334 B.R. 800 (Bankr. N.D. Tex. 2005) ..................................................... 49

*In re Next Wave Personal Commc'ns, Inc.*,
   235 B.R. 277 (Bankr. S.D.N.Y. 1999) ...................................................... 45

*In re Rodriquez*,
   895 F.2d 725 (11th Cir. 1990) .................................................................. 57

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999) ..................................................................... 44

*In re Transit Group Inc.*,
   332 B.R. 45 (Bank. M.D. Fla. 2005) ........................................................ 41

*In re Xonics Photochemical*,
   841 F.2d 198 (7th Cir. 1988) .................................................................... 57

*IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*,
   373 B.R. 283 (Bankr. S.D.N.Y. 2007) .......................................... 32, 48, 49

*Jones v. Kellman (In re Kellman)*,
   248 B.R. 430 (M.D. Fla. 1999) ................................................................. 24

*Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*,
   374 B.R. 333 (Bankr. S.D. Fla. 2007) ................................................ 26, 27

*Kapila v. WLN Family Ltd. P'Ship (In re Leneve)*,
   341 B.R. 53 (Bankr. S.D. Fla. 2006) .......................................................... 3

*Kelley v. Chevy Chase Bank (In re Smith)*,
   236 B.R. 91 (Bankr. M.D. Ga. 1999) .................................................. 10, 12

*Kelley v. GMAC (In re Farmer)*,
   209 B.R. 1022 (Bankr. M.D. Ga. 1997) (same) .................................. 10, 12

*Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*,
   831 F.2d 586 (5th Cir. 1987) ......................................................................... 17

*Kipperman v. Onex Corp.*,
   Civ. A. No. 1:05-CV-1242-JOF, 2009 WL 2515664
   (N.D. Ga. Aug. 13, 2009) ......................................................................... passim

*Krogman v. Sterritt*, 202 F.R.D.
   467 (N.D. Tex. 2001) ............................................................................... 42, 43

*Krol v. Unglaub (In re Unglaub)*,
   332 B.R. 303 (Bankr. N.D. Ill. 2005) ............................................................ 13

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*,
   78 F.3d 30 (2d Cir. 1996) ........................................................................... 41

*Lindquist v. Household Indus. Fin. Co. (In re Vondall)*,
   352 B.R. 193 (Bankr. D. Minn. 2006) ,
   *aff'd*, 364 B.R. 668 (B.A.P. 8th Cir. 2007) ................................................. 13, 14

*McCarthey v. Financial Freedom Sr. Funding Corp. (In re Early)*,
   Adv. No. 05-10079, 2008 WL 2073917 (May 12, 2008),
   *order amended and supplemented on other grounds*,
   2008 WL 2569408 (Bankr. D.D.C. June 23, 2008) ....................................... 13

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
   945 F.2d 635 (3d Cir. 1991) .................................................................... 31, 58

*Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc.
(In re R.M.L., Inc.)*,
   92 F.3d 139 (3d. Cir. 1999) .................................................................... 58, 60

*Merrill v. Dietz (In re Universal Clearing House Co.)*,
   62 B.R. 118 (D. Utah 1986) ........................................................................ 16

*Moser v. Toyota Motor Credit Corp. (In re Davis)*,
   Adv. No. 08-4042, 2009 WL 1033194 (Bankr. E.D. Tex. Mar. 24, 2009) ................. 12

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,
   813 F.2d 1177 (11th Cir. 1987) ............................................................... 26, 57

*Olson v. Parker (In re Parker)*,
   395 B.R. 12 (Bankr. W.D. Mich. 2008) ......................................................... 12

*Peltz v. Hatten*,
   279 B.R. 710 (D. Del. 2002) ........................................................................ 32

*Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n
(In re Pembroke Dev. Corp.)*,
   124 B.R. 398 (Bankr. S.D. Fla. 1991) .................................................. 30, 31, 58, 60

*Pereira v. Dow Chem. Corp. (In re Trace Holdings, Inc.)*,
   287 B.R. 98 (Bankr. S.D.N.Y. 2002) ............................................................. 25

*Peterson v. Berg (In re Berg)*,
   387 B.R. 524 (Bankr. N.D. Ill. 2008) ............................................................ 12

*Pettigrew v. Graham (In re Graham)*,
  747 F.2d 1383 (11th Cir. 1984) ............................................................... 10

*Phillips v. American Honda Motor Co.*,
  238 Fed. Appx. 537 (11th Cir. 2007) ........................................................ 51

*Reily v. Kapila (In re International Mgmt. Assoc.)*,
  399 F.3d 1288 (11th Cir. 2005) (same) .................................................... 15

*Rink v. Cheminova, Inc.*,
  400 F.3d 1286 (11th Cir. 2005) ................................................................ 54

*Rodriguez v. DaimlerChrysler Fin. Servs. Ams. LLC*
  *(In re Bremer)*,
  408 B.R. 355 (B.A.P. 10th Cir. 2009) ................................................... 9, 11

*Rodriguez v. DaimlerChrysler Financial Services Americas LLC (In re Bremer)*,
  392 B.R. 873 (Bankr. D. Colo. 2008) ............................................. 9, 10, 14

*Rodriguez v. Drive Financial Services LP (In re Trout)*,
  392 B.R. 869 (Bankr. D. Colo. 2008) ............................................. 9, 10, 14

*Roost v. Associates Home Equity Serv. (In re Williams)*,
  234 B.R. 801 (Bankr. D. Or. 1999) .......................................................... 12

*Sanitary Ice Vending Co. v. Harris*
  *(In re Polar Chips Int'l, Inc.)*,
  18 B.R. 480 (Bankr. S.D. Fla. 1982) ........................................................ 20

*Schnittjer v. Linn Area Credit Union (In re Sickels)*,
  392 B.R. 423 (Bankr. N.D. Iowa 2008) .............................................. 8, 9, 13

*Shapiro v. Art Leather, Inc. (In re Connolly N. Am. LLC)*,
  340 B.R. 829 (Bankr. E.D. Mich. 2006) .................................................... 15

*Silverman v. Paul's Landmark, Inc. (In re Nirvana Rests., Inc.)*,
  337 B.R. 495 (Bankr. S.D.N.Y. 2006) ........................................................ 3

*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*,
  295 B.R. 593 (B.A.P. 8th Cir. 2003), *aff'd*, 376 F.3d 819 (8th Cir. 2004) .................. 12

*Suhar v. Burns (In re Burns)*,
  322 F.3d 421 (6th Cir. 2003) ........................................................... 8, 9, 13

*Tele-Fest, Inc. v. VU-TV, Inc.*,
  591 F. Supp. 1368 (D.N.J. 1984) ........................................................ 29, 61

*Tidwell v. Chrysler Credit Corp. (In re Blackburn)*,
  90 B.R. 569 (Bankr. M.D. Ga. 1987) .................................................... 11, 18

*Tolz v. Barnett Bank of S. Fla., N.A. (In re Safe-T-Brake of S. Fla., N.A.)*,
  162 B.R. 359 (Bankr. S.D. Fla. 1993) ....................................................... 26

*Turner v. Phoenix Fin. L.L.C. (In re Imageset)*,
  299 B.R. 709 (Bankr. D. Me. 2003) .......................................................... 16

*U.S. v. Batchelor-Robjohns,*
No. 03-20164-Civ, 2005 WL 1761429 (S.D. Fla. June 3, 2005) ........................... 36, 44

*U.S. v. Sarras,* --- F.3d ----,
No. 08-11757, 2009 WL 2176643 (11th Cir. July 23, 2009) ...................................... 51

*USAA Federal Savings Bank v. Thacker (In re Taylor),*
390 B.R. 654 (B.A.P. 9th Cir. 2008) ................................................................ 10, 11, 60

*Vazquez Laboy v. Doral Mortgage Corp. (In re Vazquez Laboy),*
397 B.R. 627 (Bankr. D.P.R. 2008) ................................................................................ 13

*Williams v. Twin City Co.,*
251 F.2d 678 (9th Cir. 1958) ........................................................................................... 62

*Yoppolo v. Liberty Mortgage (In re Morgan),*
276 B.R. 785 (Bankr. S.D. Ohio 2001) ............................................................................ 9

**Statutes**

11 U.S.C. § 544 .................................................................................................................. 15

11 U.S.C. § 548 ................................................................................................... 15, 31, 58

11 U.S.C. § 550 ............................................................................................................ 3, 4, 8

11 U.S.C. § 551 .................................................................................................................. 12

Florida Statute ¶ 726.105 ................................................................................................... 3

Florida Statute ¶ 726.106 ................................................................................................... 3

Florida Statute ¶ 726.108 ................................................................................................... 3

New York Debtor and Creditor Law ¶ 273 ........................................................................ 3

New York Debtor and Creditor Law ¶ 274 ........................................................................ 3

New York Debtor and Creditor Law ¶ 275 ........................................................................ 3

New York Debtor and Creditor Law ¶ 278 ........................................................................ 3

**Other Authorities**

4 Norton Bankr. L. & Prac. 3d § 70.3 (database updated July 2009) ................................ 9

5 Collier on Bankruptcy ¶ 550.02[4] at 550-17 (15th ed. 1984) (same) ......................... 15

Coquillette, "Guaranty of and Security for the Debt of a Parent Corporation by a
Subsidiary Corporation," 30 Case Western L. Rev. 433, 452 (1980) ........................... 61

Jack F. Williams, "The Fallacies of Contemporary Fraudulent Transfer Models as
Applied to Intercorporate Guaranties: Fraudulent Transfer Law as a Fuzzy System,"
15 Cardozo L. Rev. 1403, 1418 (1994) ........................................................................ 29

Michael F. Maglio, "The Promise, Part II: Corporations, Obligations and Fraudulent
Conveyances," 14 Bus. L. Today 25, 30 (2005) ............................................................. 30

Williams, "Fallacies of Contemporary Fraudulent Transfer Models" 15 Cardozo L. Rev.
at 1404-05 ...................................................................................................................... 30

## PRELIMINARY STATEMENT

In the nascent stage of these proceedings the Committee's counsel admitted that TOUSA, Inc. received reasonably equivalent value when it entered into the Transeastern Settlement.[1]  The Committee therefore has no legal qualm with the payment by TOUSA, Inc. to the Senior Transeastern Lenders[2] of $422.8 million to settle claims that threatened the entire TOUSA enterprise.  Notwithstanding this undisputed fact, the Committee boldly asks this Court to undo the settlement – but with a twist.  Instead of asking the Senior Transeastern Lenders to return the settlement proceeds to the party that paid them, TOUSA, Inc., the Committee asks this Court to give the money to a group of TOUSA subsidiaries that were not parties to the settlement and did not transfer any property to the Senior Transeastern Lenders.  This demand flies in the face of fraudulent transfer law, which seeks to put the debtor back in the position it was in before the transfer occurred.  Indeed, the Committee's counsel recognized the deficiency of any claim

---

[1]  Capitalized terms not defined herein shall have the meaning given in the Third Amended Adversary Complaint (D.E. 243).

[2]  As named in the Third Amended Complaint, the Senior Transeastern Lenders are:  3V Capital Master Fund Ltd.; Atascosa Investments, LLC; Aurum CLO 2002-1 Ltd.; Bank of America, N.A.; Bear Stearns Investment Products Inc.; Burnet Partners, LLC; Centurion CDO 10, Ltd.; Centurion CDO 8, Limited; Centurion CDO 9, Ltd.; Centurion CDO II, Ltd.; Centurion CDO VI, Ltd.; Centurion CDO VII, Ltd.; Centurion CDO XI, Ltd.; Deutsche Bank Trust Company Americas; Distressed High Yield Trading Ops. Fund Ltd.; Eaton Vance Credit Opportunities Fund; Eaton Vance Floating-Rate Income Trust; Eaton Vance Grayson & Co.; Eaton Vance Limited Duration Income Fund; Eaton Vance Senior Debt Portfolio; Eaton Vance Senior Floating-Rate Trust; Eaton Vance Senior Income Trust; Eaton Vance VT Floating-Rate Income Fund; Farallon Capital Institutional Partners II, L.P.; Farallon Capital Institutional Partners III L.P.; Farallon Capital Institutional Partners L.P.; Farallon Capital Offshore Investors II, L.P.; Farallon Capital Offshore Investors, Inc.; Farallon Capital Partners L.P.; Flagship CLO III; Flagship CLO IV; Flagship CLO V; Gleneagles CLO Ltd.; Goldman Sachs Credit Partners, L.P.; Grand Central Asset Trust, CED Series; Grand Central Asset Trust, HLD Series; Grand Central Asset Trust, SOH Series; Hartford Mutual Funds, Inc., on behalf of The Hartford Floating Rate Fund by Hartford Investment Management Company, their Sub-Advisor; Highland CDO Opportunity Fund, Ltd.; Highland Credit Opportunities CDO Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate LLC; Highland Legacy Limited; Highland Offshore Partners, L.P.; JPMorgan Chase Bank, N.A.; Jasper CLO, Ltd.; LL Blue Marlin Funding LLC; Liberty CLO, Ltd.; Loan Funding VII, LLC; Merrill Lynch Credit Products LLC; Monarch Master Funding Ltd (f/k/a Quadrangle Master Funding Ltd.); Ocean Bank; Riversource Floating Rate Fund; Rockwall CDO, Ltd.; Sequils-Centurion V, Ltd.; Silver Oak Capital LLC; Stedman CBNA Loan Funding LLC; The Foothills Group, Inc.; Tinicum Partners, L.P.; Van Kampen Dynamic Credit Opportunities Fund; Van Kampen Senior Income Trust; Van Kampen Senior Loan Fund; and Wells Fargo Bank, N.A.

against the Senior Transeastern Lenders when, in October of 2007, it took the extraordinary step

of writing to the TOUSA board of directors and appearing at a TOUSA board meeting to plead

with the board to begin TOUSA bankruptcy proceedings within the 90-day window for

preference claims.  Akin Gump warned that TOUSA would otherwise "forfeit" a claim against

the Senior Transeastern Lenders and cautioned against "the substantial potential value loss if the

Claim is not preserved."  (Ex. 2218.)  Akin Gump's urgent plea to the TOUSA board, and threats

of fiduciary duty claims against Board members, would not have been necessary if the fraudulent

transfer claim that the Committee now asserts had any merit.  The time has come for the Court to

grant judgment for the Senior Transeastern Lenders on the Committee's meritless claims.

The recognized lack of merit of a viable legal claim against the Senior

Transeastern Lenders explains the unusual posture of the case.  Even after trial, the Committee

has been unable or unwilling to commit to a position on what relief it contends would undo the

alleged fraudulent conveyance and return the Conveying Subsidiaries to their pre-transfer

financial position.  The Senior Transeastern Lenders do not know whether the Committee is

asking the Court to avoid the liens granted by the Conveying Subsidiaries, to order the recovery

of funds from the Senior Transeastern Lenders, or to do both.  Nor do the Senior Transeastern

Lenders know whether the Committee wants the Court to conclude that the proceeds of the New

Loans were the property of the Conveying Subsidiaries, were not their property, or were

somehow both simultaneously.  The Committee's refusal to take a position on these issues is

clear – it wants to keep as many "balls in the air" as possible, as it has told the Court previously.

The time has come for the Court to make these decisions for the Committee, and it is clear that

the Committee is not entitled to any recovery from the Senior Transeastern Lenders as a matter

of fact and law.  Reviewing the record demonstrates that the Committee has failed to meet its

2

burden of proving its claims against the Senior Transeastern Lenders. Even if the Committee

had proved the existence of a fraudulent transfer against the First and Second Lien Term Loan

Lenders (the "New Lenders"), which it has not, the Committee's claims against the Senior

Transeastern Lenders are barred by the overwhelming weight of authority.

## SUMMARY OF THE ARGUMENT

As a threshold matter, the Committee has not met its burden of proving a

fraudulent conveyance. Yet, the Committee nevertheless is proceeding against the Senior

Transeastern Lenders on three theories that each require a fraudulent conveyance: (1) claims

under Section 550(a)(1) as parties "for whose benefit" the Conveying Subsidiaries transferred

liens to the New Lenders; (2) claims under Section 550(a)(2) as subsequent transferees of the

"value of the liens" transferred to the New Lenders; and (3) claims under Section 548 as "direct

transferees" of the proceeds of the First and Second Lien Term Loans ("New Loans").[3]  None of

these claims has any legal or factual merit and each is unprecedented.[4]

*Recovery Under Section 550.*  The Committee cannot recover from the Senior

Transeastern Lenders on any claim under Section 550. The purpose of Section 550 is to return

the debtor to the position it would have been in had the fraudulent transfer not occurred.

---

[3]  The claims asserted under Florida Statutes ¶¶ 726.105, Florida Statutes ¶¶ 726.105(1), 726.106, 726.108, and New York Debtor and Creditor Law ¶¶ 273, 274, 275, 278 are substantially similar to the claims asserted under the Federal Bankruptcy Code. *See, e.g., Goldberg v. Chong*, No. 07-20931-CIV, 2007 WL 2028792, at *4 (S.D. Fla. July 11, 2007) (Florida Statutes and the Bankruptcy Code are analogous "in form and substance"); *Kapila v. WLN Family L.P. (In re Leneve)*, 341 B.R. 53, 56 n.1 (Bankr. S.D. Fla. 2006) (Florida fraudulent transfer provisions are essentially identical to those in the Bankruptcy Code, with the exception of a longer statute of limitations under state law); *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rests., Inc.)*, 337 B.R. 495, 501 (Bankr. S.D.N.Y. 2006) (except for the longer statute of limitations under the state statute, the Bankruptcy Code "closely parallels" New York fraudulent conveyance law); *Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc. (In re Ames Dep't Stores, Inc.)*, 161 B.R. 87, 89 n.1 (Bankr. S.D.N.Y. 1993) ("[t]his Court need not discuss the components of a fraudulent conveyance claim under New York state law, [because] the elements are almost identical to that of 11 U.S.C. § 548(a)(2)").

[4]  The Senior Transeastern Lenders begin by addressing the three unique claims against them.

Accordingly, courts throughout the country have held that when the transfer of a lien is a fraudulent transfer, the avoidance of that lien is the appropriate and complete remedy, and recovery under Section 550 is not available. Simply stated, if you granted a lien on your property, and that lien is avoided as fraudulent, you revert to holding your property free and clear of any lien and have been made whole. Indeed, allowing any recovery under Section 550 would violate the Section 550(d) single-satisfaction rule.

*Claims Under § 550(a)(1): "For Whose Benefit" Theory*. The Committee implausibly contends that the Senior Transeastern Lenders, were the party "for whose benefit" the liens were granted to the New Lenders. This novel construction too must fail. It has no support in fraudulent transfer jurisprudence and is based on a plain misconstruction of the Code. Courts have applied the "for whose benefit" language where a party received a non-monetary benefit as a result of a transfer from the debtor to a third party, such as relief from a debt or obligation, or where a party deliberately structured an otherwise voidable transfer so as to avoid a preference claim. Neither of those scenarios is present here. And no court has ever concluded that a party that received payment in satisfaction of an antecedent debt as the Conveying Subsidiaries did is liable under the "for whose benefit" language solely because the loan financing the payment was secured by liens granted by a subsidiary of the obligor.

*Claims Under § 550(a)(2): "Value of the Liens" Theory*. The Committee's next unprecedented argument is that the Senior Transeastern Lenders received, as subsequent transferees, the "value of the liens" conveyed to the New Lenders. The New Lenders however, never transferred the liens. They exist and are held by the New Lenders. That alone precludes a subsequent transferee claim against the Senior Transeastern Lenders. Additionally, no court has held under Section 550(a) that liens can be transformed into the proceeds of loans they secure.

4

Even if such a claim existed, the Senior Transeastern Lenders established at trial that they received payment of indebtedness owing to them in good faith and without knowledge of the voidability of the transfer, thereby precluding subsequent transferee liability.

**Claims Under § 548: "Direct Transferee" Theory**. The Committee's next theory is weaker still. The Committee's "direct transferee" theory argues that because the Conveying Subsidiaries were co-borrowers on and pledged assets to support the New Loans, the funds borrowed under those loans to repay the Senior Transeastern Lenders, were the property of the Conveying Subsidiaries. The case law and the facts require rejection of this theory.[5] Just as a co-sign on a mortgage has no claim to the funds that a bank provides to a borrower to buy a house, the Conveying Subsidiaries had no claim to the proceeds of the New Loans.

\* \* \*

To recover on any theory, the Committee must prove that there was a fraudulent transfer. Specifically, the Committee bears the burden of proving that the Conveying Subsidiaries were insolvent and that they did not receive reasonably equivalent value. The Committee failed to prove either.

**The Committee Did Not Prove Insolvency**. The Committee has not shown that the Debtors were insolvent at the time of, or were rendered insolvent by, the Transeastern Settlement and the closing of the New Loans (collectively, the "July 31 Transactions"). The Committee's experts' deployed unreliable and unprecedented methodologies and reached conclusions that defy logic. Hindsight bias is evident in their methodologies, assumptions and conclusions. All of the Committee's experts relied on analyses prepared by other Committee

---

[5]     Significantly, facts supporting this theory would preclude claims against the New Lien Term Lenders as they would demonstrate that the Conveying Subsidiaries received cash in exchange for their liens and assumption of debt obligations.

experts, meaning that the house of cards collapses if any one card falls out, as clearly happened at trial. The inventory valuation performed by Charles Hewlett lies at the center of the Committee's experts' opinions, forming the basis of both Kevin Clancy's and William Derrough's solvency opinions. As demonstrated at trial, Mr. Hewlett ignored generally accepted real estate appraisal standards and produced a valuation entirely divorced from fair value. Additionally, neither Amy Benbrook nor Mr. Hewlett understood how to use the TOUSA databases on which they relied and did not appreciate the dynamic nature of the data upon which they relied. This caused material inaccuracies to permeate the Committee's experts' reports and rendered them unreliable.

The facts conclusively demonstrated that the Debtors were solvent both before and after the July 31 Transactions. The July 31 Transactions were exposed to the public markets through SEC filings, bank meetings, ratings agency reviews, and analyst presentations. Citibank conducted extensive internal analyses and, as agent, commissioned substantial diligence, including multiple appraisals, a solvency analysis, and a financial advisor to review the business plan. The entire body of work (using foresight, and without the benefit of hindsight) definitively concluded that TOUSA was solvent on July 31, 2007 and would remain so thereafter. The tangible market support for the transactions – the New Loans were oversubscribed in an already tightening credit market – further supports this conclusion. No rational lender would put $500 million dollars of new money on the line if it believed it was lending into a "textbook fraudulent conveyance," as the Committee has argued.

*The Committee Did Not Prove Lack of Reasonably Equivalent Value.* The evidence demonstrated that TOUSA and the Conveying Subsidiaries received greater value in the July 31 Transactions than they gave up, requiring a finding that there was no fraudulent

6

transfer.  Among other benefits proved at trial, the July 31 Transactions relieved TOUSA of

$625 million in obligations to the Transeastern Lenders, resolved the debilitating effects of the

Transeastern Litigation, and provided TOUSA – and in particular Conveying Subsidiary TOUSA

Homes Florida, LP – with the Transeastern assets free and clear of all liens and claims.  TOUSA

was also able to realize a significant tax asset as a result of the transactions.  The Committee

presented no contrary evidence thereby failing to carry its burden of proof.

>    ***Damages Are Limited.***  Finally, if the Committee is permitted to recover any

damages from the Senior Transeastern Lenders, those damages are limited under Section 550 to

the "value of the liens transferred."  The Senior Transeastern Lenders' expert valued the liens at

less than $161 million (with $161 million reflecting the value of the liens granted by all of the

TOUSA entities, including non-Conveying Subsidiaries and TOUSA Homes Florida, LP, none

of which entities could prevail in a fraudulent transfer claim).  The Committee presented no

alternative valuation.[6]

## STATEMENT OF FACTS

>    The Senior Transeastern Lenders are contemporaneously submitting proposed

findings of fact, which are incorporated herein.

## ARGUMENT

**I.    THE COMMITTEE CANNOT RECOVER FROM THE SENIOR
TRANSEASTERN LENDERS UNDER SECTION 550**

>    In Counts VII through XII of the Complaint, the Committee asserts alternative,

and mutually exclusive, claims against the Senior Transeastern Lenders, under Section 550.

These claims seek to recover from the Senior Transeastern Lenders the value of the property

---

[6]    Even for the Section 548 claims, any recovery by the Committee must be reduced by amounts attributable
to non-Conveying Subsidiaries and TOUSA Homes Florida, LP, a calculation similarly not presented by
the Committee.

transferred in the initial fraudulent transfer of the liens to the New Lenders, alleged to be

avoidable under Section 548 in Counts I through VI.[7]

### A.    The Only Recovery for the Fraudulent Transfer of the Liens Is the Avoidance of the Liens

The purpose of Section 550 is to restore the estate to the condition it would have

been in had the transfer not occurred. *See Bakst v. Wetzel (In re Kingsley)*, 518 F.3d 874, 877

(11th Cir. 2008).[8]  Courts recognize that avoidance and recovery are distinct concepts and that

avoidance does not automatically trigger recovery. *See Suhar v. Burns (In re Burns)*, 322 F.3d

421, 427-28 (6th Cir. 2003).  Indeed, recovery is only available when avoidance alone is

inadequate. *See Bakst v. Sawran (In re Sawran)*, 359 B.R. 348, 351-52 (Bankr. S.D. Fla. 2007);

*Schnittjer v. Linn Area Credit Union (In re Sickels)*, 392 B.R. 423, 426 (Bankr. N.D. Iowa 2008);

*see also Bakst v. Wetzel (In re Kingsley)*, No. 06-2109-BKC-PGH-A, 2007 WL 1491188, at *3

(Bankr. S.D. Fla. May 17, 2007) (holding that avoidance of a transfer is necessary to recover

from a transferee, but avoidance does not automatically translate into recovery), *aff'd*, 518 F.3d

874 (11th Cir. 2008). As the Sixth Circuit explained in *Burns*, "when the avoidance of a transfer

does not fully satisfy the estate, then the trustee may seek to recover the property transferred, but

when the avoidance alone is a sufficient remedy, there is no need for the trustee to seek

recovery" under Section 550(a).  322 F.3d at 427.

The nature of the property interest alleged to have been fraudulently transferred

may also limit the remedies available to a debtor or trustee.  For instance, where the property

---

[7]    Section 550, by its terms, only permits recovery arising from avoidance of a fraudulent transfer of property, not from avoidance of a fraudulently incurred obligation.  As such, the Committee's Section 550 claims cannot seek recovery relating to the allegedly fraudulently incurred repayment or guaranty obligations.

[8]    *See also Kipperman v. Onex Corp.*, Civ. A. No. 1:05-CV-1242-JOF, 2009 WL 2515664, *44 (N.D. Ga. Aug. 13, 2009) (holding that the "purpose of section 550 is to recover from the correct party" to restore the estate to its pre-transfer financial condition); *Feltman v. Warmus (In re American Way Serv. Corp.)*, 229 B.R. 496, 530-31 (Bankr. S.D. Fla. 1999) (citations omitted).

interest transferred was a nonpossessory interest, such as liens granted by the Conveying

Subsidiaries, the only remedy available is avoidance and "no recovery is possible under § 550."

*Yoppolo v. Liberty Mortgage (In re Morgan)*, 276 B.R. 785, 792 (Bankr. S.D. Ohio 2001);

*Sickels*, 392 B.R. at 426-27 (holding that "avoidance of a defective mortgage is an adequate

remedy in and of itself" and "[n]o further recovery is allowed"); *Burns*, 322 F.3d at 428 (same).

Construing Section 550, the court in *Morgan* held that

> the very concept of 'recovery' imparts the notion that a possessory
> interest in property exists; that is, the property to be recovered
> must be tangible property.   The reason for this is self-evident:
> when a nonpossessory interest in property is avoided, there is
> nothing left to recover.

276 B.R. at 792 (footnote omitted); *see also* 4 Norton Bankr. L. & Prac. 3d § 70.3 (database

updated July 2009) ("[a]n example of the avoidance alone being satisfaction is where the trustee

successfully avoids a lien").[9]

In a detailed review of this legal premise, the Tenth Circuit Bankruptcy Appellate

Panel recently affirmed two decisions denying recovery following an avoided mortgage.[10]  *See*

*Rodriguez v. DaimlerChrysler Fin. Servs. Ams. LLC (In re Bremer)*, 408 B.R. 355 (B.A.P. 10th

Cir. 2009).  In those cases, the trustee sought to avoid as preferences the creditors' untimely

perfected liens on the debtors' motor vehicles and to obtain judgments against the creditors to

recover the value of the avoided liens.  *Id.*

---

[9]   The Sixth Circuit in *Burns* reasoned that in general where creditors have possessory interests in debtor's property, the trustee (or debtor) would generally have to pursue recovery of the property because avoidance alone would not bring the property back into the estate's possession.  322 F.3d at 428.  This was presented as a general not absolute rule to accommodate exceptions where avoidance of a lien alone would not return the estate to its pre-transfer condition.  That is not the case here.  *See infra* at 18 n.20.

[10]   *Bremer* consolidated on appeal two bankruptcy court cases, *Rodriguez v. Drive Financial Services LP (In re Trout)*, 392 B.R. 869 (Bankr. D. Colo. 2008) and *Rodriguez v. DaimlerChrysler Financial Services Americas LLC (In re Bremer)*, 392 B.R. 873 (Bankr. D. Colo. 2008).

The bankruptcy court granted the trustee partial summary judgments, avoiding the liens as preferences. *Id.* The bankruptcy court held, however, that the trustee was not entitled to further relief in the form of judgments against the creditors for the value of the avoided liens:

> Where, as here, the Trustee avoids only a non-possessory transfer of a lien interest, the preservation of that lien interest for the benefit of the estate is sufficient to place the estate in exactly the same position it would have been in, but for the granting of the lien.

*Trout*, 392 B.R. at 871; *Bremer*, 392 B.R. at 875. As the court explained, "[a]fter a transfer is avoided, the reference in § 550(a) to allowing the trustee to 'recover. . . the property transferred, or . . . the value of such property . . .' *simply does not fit in circumstances where the avoidance in question is of a lien*." *Trout*, 392 B.R. at 871 (emphasis added); *Bremer*, 392 B.R. at 875.[11]

---

[11]    In reaching its conclusion that avoidance was the only remedy available, the bankruptcy court strongly criticized *USAA Federal Savings Bank v. Thacker (In re Taylor)*, 390 B.R. 654 (B.A.P. 9th Cir. 2008), in which the court allowed the trustee to recover the value of a secured lender's avoided lien instead of avoiding the lien. The court in *Taylor* was concerned that the vehicle that was subject to the lien had declined in value between the date of the transfer and the commencement of the avoidance action. 390 B.R. at 662. It therefore permitted recovery of the value of the car on the date of the transfer but, in so doing, "allowed [the lender] to retain its security interest on the car along with its contract rights against the debtors." *Id.* The bankruptcy court in *Bremer* and *Trout* noted that this resolution both ignores the automatic preservation of the avoided lien for the benefit of the estate under Section 551 and "appears to assume that, had the voidable transfer not been made, the automobile that was the collateral would not have depreciated in value." *Trout*, 392 B.R. at 872 n.3; *Bremer*, 392 B.R. at 876 n.3.

*Taylor* is contrary to the overwhelming weight of authority holding that the only remedy available for the fraudulent or preferential transfer of a lien is avoidance. The Sixth Circuit, Eighth Circuit, Tenth Circuit Bankruptcy Appellate Panel, and courts in the First, Seventh, Ninth, Eleventh, and District of Columbia Circuits have all held that avoidance is the only remedy available where the transfer is of a lien. (*See infra* at 12.) As made clear in numerous cases that refused to permit a trustee to recover the value of a lien, the transfer at issue was a lien, not the subject vehicle itself. *See Farmer*, 209 B.R. at 1024; *Smith*, 236 B.R. at 100.

Moreover, *Taylor* is also distinguishable. The *Taylor* court concluded that avoidance alone, in the particular circumstances of that case, would not have put the estate in its pre-transfer position because the car that was subject to the lien was nearly certain to decline in value before the trustee could sell it free and clear of the lien. The Trustee, therefore, could not have recovered the value of the car on the date transferred, leaving the estate in less than its pre-transfer financial condition. This contrasts significantly with the facts at issue here. The Conveying Subsidiaries had unfettered use of their assets at all times and in fact were expected to sell those assets to realize cash in the ordinary course of business. The collection of assets subject to the liens was constantly changing and fluctuating in value. The Committee put on no evidence of their value at any time, which is fatal to any claim it might make. The assets, to a great extent, real property, which is not a "depreciating asset." *See Pettigrew v. Graham (In re Graham)*, 747 F.2d 1383, 1388 (11th Cir. 1984) (holding that real property "was not a depreciating asset whose value when returned to the trustee would be substantially less than its value at the time of the subject conveyance); *Everson v. United States*, 108 F.3d 234, 236 (9th Cir. 1997) (holding that "land does not generally

The trustee in each proceeding appealed.

The Bankruptcy Appellate Panel affirmed, concluding that "avoiding and preserving the [lienholders'] liens for the benefit of the estates placed these estates in their pre-transfer position." *In re Bremer*, 408 B.R. at 358. The *Bremer* panel distinguished cases where courts permitted the recovery of the value of transferred property (instead of recovery of the property itself) because the property itself was unrecoverable[12] or because defendants possessed and used the property since the transfer,[13] concluding that in those instances, the recovery of the property would not return the estate to its pre-transfer position. *Id.* at 360. The court reasoned that the preservation of the liens under Section 551 "had the same effect as recovering those liens under § 550(a): the estates received the liens. The Trustee was not entitled to any more than the [lienholders] had by virtue of the transfers." *Id.* (denying monetary recovery for decrease in value of vehicles subject to the avoided liens).

Courts throughout the country have reached the same conclusion: when the subject of the fraudulent or preferential transfer action is a lien, avoidance of the lien is a complete remedy. *See, e.g.*, *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 602 n.7

---

depreciate in value").

Finally, despite permitting recovery, the court in *Taylor* was mindful of the limitations on recovery imposed by Section 550. It did not avoid the lien and limited the trustee to recovery of the value of the lien because to do both would have violated Section 550(d). *See Taylor*, 390 B.R. at 665. Lastly, nothing in *Taylor* supports any recovery against the Senior Transeastern Lenders. If applied here, *Taylor* could only support a damages recovery from the holders of the liens transferred, the New Lenders – not the Senior Transeastern Lenders. It provides no support for the Committee's "for whose benefit" or "value of the liens" theories of liability. In short, *Taylor* is both wrongly decided and not applicable here.

[12] *See, e.g.*, *Tidwell v. Chrysler Credit Corp. (In re Blackburn)*, 90 B.R. 569, 573 (Bankr. M.D. Ga. 1987) (permitting recovery of the value of vehicle that was subject to avoided lien where lienholder had repossessed the vehicle before debtor filed for bankruptcy).

[13] *See, e.g.*, *First Software Corp. v. Computer Assocs. Int'l (In re First Software Corp.)*, 107 B.R. 417, 423-24 (D. Mass. 1989) (involving fraudulent transfer of computer software and permitting recovery of value of software which declined in value while used by defendant); *Gennrich v. Montana Sport U.S.A. Ltd. (In re Int'l Ski Serv., Inc.)*, 119 B.R. 654, 658 (Bankr. W.D. Wis. 1990) (reviewing cases concerning appropriate remedy where defendants consumed or used the fraudulently transferred property).

(B.A.P. 8th Cir. 2003) (avoidance of a grant of a security interest is sufficient to recover the transferred property), *aff'd*, 376 F.3d 819 (8th Cir. 2004); *Moser v. Toyota Motor Credit Corp. (In re Davis)*, Adv. No. 08-4042, 2009 WL 1033194, at *7 (Bankr. E.D. Tex. Mar. 24, 2009) (where trustee avoids transfer of nonpossessory lien, which is preserved for the benefit of the estate, trustee cannot "recover" any property or its value); *Olson v. Parker (In re Parker)*, 395 B.R. 12, 23-24 (Bankr. W.D. Mich. 2008) (where transfer was of quitclaim deed, no remedy beyond avoiding quitclaim deed was needed); *Gold v. Interstate Fin. Corp. (In re Schmiel)*, 319 B.R. 520, 530 (Bankr. E.D. Mich. 2005) (citing *Burns* and concluding that because mortgage on property was transferred and not property itself, avoidance of preferential transfer under Section 547 was the only remedy and recovery under Section 550 was not available); *Kelley v. Chevy Chase Bank (In re Smith)*, 236 B.R. 91, 100 (Bankr. M.D. Ga. 1999) (recovery for the preferential transfer of a lien on a vehicle is the avoidance of that lien, not the recovery of the value of the vehicle at the time of the lien transfer); *Roost v. Associates Home Equity Serv. (In re Williams)*, 234 B.R. 801, 805 (Bankr. D. Or. 1999) (where trustee avoids lien and property subject to lien was not transferred to creditor, trustee had no need for "recovery" under Section 550); *Kelley v. GMAC (In re Farmer)*, 209 B.R. 1022, 1024-25 (Bankr. M.D. Ga. 1997) (same); *Glanz v. RJF Int'l Corp. (In re Glanz)*, 205 B.R. 750, 758 (Bankr. D. Md. 1997) (avoidance of lien was "a meaningful event in and of itself" and left "simply nothing to 'recover' under Section 550"); *cf. Peterson v. Berg (In re Berg)*, 387 B.R. 524, 569 (Bankr. N.D. Ill. 2008) ("remedy of avoidance is adequate for a non-possessory mortgage interest by operation of 11 U.S.C. § 551," which automatically preserved avoided lien, thereby benefiting the estate).

In addition to violating the purpose of Section 550, permitting recovery after avoidance of a lien would violate the single-satisfaction limitations of Section 550(d). *See*

*Sickels*, 392 B.R. 423. In *Sickels*, the trustee sought to avoid a mortgage lien and also sought to recover the value of the lien from the mortgage company. The trustee asserted that avoidance of the lien alone would not make the estate whole because the mortgaged property had depreciated. *Id.* at 425.

The *Sickels* court surveyed cases from around the country and concluded that "avoidance of a defective mortgage is an adequate remedy in and of itself" and no other remedy could be awarded. *Id.* at 426 (citing *In re Burns*, 322 F.3d at 427-28).[14] The *Sickels* court held that

> [a]voidance of the lien constitutes a complete recovery for the bankruptcy estate. No further recovery is allowed or necessary to remedy the avoidable transfer or put the estate back into the financial condition Debtors enjoyed prior to the transfer. By avoiding the lien, the bankruptcy estate now holds the property subject only to the first mortgage, just as Debtors did prior to granting the [lienholder] a second mortgage to secure a loan. ***If the Court also awarded Trustee a judgment in the amount of the loan, Trustee would be allowed to collect twice on the avoided mortgage lien. Such a result is precluded by § 550(d).***

*Id.* at 427 (emphasis added); *see also Kingsley*, 2007 WL 1491188 at *3 (holding that recovery under Section 550(a) "is limited to a single satisfaction by Section 550(d)"); *Vazquez Laboy v. Doral Mortgage Corp. (In re Vazquez Laboy)*, 397 B.R. 627, 633 (Bankr. D.P.R. 2008) (citing *Sickels* and concluding that where debtors avoided lien they were not also entitled to recover from creditor value of lien).

---

[14] *See also Lindquist v. Household Indus. Fin. Co. (In re Vondall)*, 352 B.R. 193, 200 (Bankr. D. Minn. 2006) (denying trustee's request for money judgment after mortgage avoided under § 544(a) because avoidance of grant of security interest is sufficient to recover transferred property and requiring creditor to pay trustee the value of the secured claim would be impermissible double recovery), *aff'd*, 364 B.R. 668 (B.A.P. 8th Cir. 2007); *McCarthey v. Financial Freedom Sr. Funding Corp. (In re Early)*, Adv. No. 05-10079, 2008 WL 2073917, at *4 (May 12, 2008) (holding that when a lien is preserved, resort to § 550 for monetary recovery is "generally inappropriate"), *order amended and supplemented on other grounds*, 2008 WL 2569408 (Bankr. D.D.C. June 23, 2008); *Gold v. New Century Mortgage Corp. (In re Salinitro)*, 355 B.R. 15, 19 (Bankr. E.D. Mich. 2006) (holding that after avoidance under § 544, mortgage is preserved for the benefit of the estate and § 550(a) does not apply because there is nothing to recover; *Krol v. Unglaub (In re Unglaub)*, 332 B.R. 303, 323 (Bankr. N.D. Ill. 2005) (concluding that avoidance of mortgage under § 544 makes bankruptcy estate whole).

The bankruptcy court in *Bremer* and *Trout* also focused on the impermissible double-recovery that would result if the trustee could both avoid the liens and recover their value under Section 550. It concluded that reading Section 550(a) "to create in a trustee a further remedy following avoidance of a lien both tortures the plain meaning of the language of § 550(a) and allows a potential windfall to the estate." *Trout*, 392 B.R. at 871-72; *Bremer*, 392 B.R. at 875; *see also Vondall,* 352 B.R. at 200 (holding that, after avoidance of liens, ordering lienholder to pay trustee the value of its secured claim would permit double recovery and "penalize [the lienholder] double the value of its secured interest"). To hold otherwise would be tantamount to giving the estate an insurance policy on the value of its assets and shifting the risk of depreciation, which was clearly born by the estate before the transfer, to the creditors. *See Bremer*, 408 B.R. at 361 (declining to allow recovery for the decline in value of the property subject to the avoided liens because: "The Code . . . does not guarantee that assets recovered will be worth what they were at any relevant valuation date.").

Where, as here, the debtors continued to have access to and use of their assets after granting non-possessory liens to the New Lenders, the avoidance of the liens as fraudulent transfers would restore the debtors to their pre-transfer position. Therefore, even if the Committee had proved that granting the liens was fraudulent, Sections 550(a) and (d) preclude any "recovery" beyond avoidance of the liens. The Committee therefore cannot recover anything from the Senior Transeastern Lenders.

**B.    The Senior Transeastern Lenders Are Not Entities "For Whose Benefit" the Conveying Subsidiaries Granted Liens to the New Lenders**

Even if this Court were to conclude, contrary to the prevailing jurisprudence, that the Committee could recover under Section 11 U.S.C. § 550 from the Senior Transeastern Lenders, the Committee's claims that the Senior Transeastern Lenders are the entities "for whose

14

benefit" the transfers (*i.e.*, the grant of liens by the Conveying Subsidiaries to the New Lenders) were made must fail. Section 550(a) provides that "to the extent that a transfer is avoided" under Section 544 or 548, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property," from "(1) the initial transferee of such transfer or the entity of for whose benefit such transfer was made." No court has ever applied "for whose benefit" liability to allow the recovery of loan proceeds by subsidiaries that granted liens to secure that loan.

1.    **Section 550(a)(1) Liability Does Not Apply to the Senior Transeastern Lenders**

The seminal case interpreting the "for whose benefit" language is the Seventh Circuit's decision in *Bonded Financial Services v. European American Bank (In re Bonded Financial Services)*, 838 F.2d 890, 896 (7th Cir. 1988). The court in *Bonded* noted that Section 550 separates initial transferees and beneficiaries, on the one hand, from "immediate or mediate" transferees, on the other, and reasoned that the categories are mutually exclusive. *Id.* at 895. This is evident from the fact that the Section 550(b)(1) value-and-good-faith defense available to subsequent transferees is not available to entities encompassed within Section 550(a)(1). *See id.* The court reasoned that "[t]he paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor – someone who receives the benefit but not the money."[15] *Id.* at 895; *Reily v. Kapila (In re International Mgmt. Assoc.)*, 399 F.3d 1288, 1292 (11th Cir. 2005) (same). Most

---

[15]    *See also In re Coggin*, 30 F.3d 1443, 1453 (11th Cir. 1994) (the phrase "entity for whose benefit such transfer was made" usually "has been employed when the trustee attempts to recover from a guarantor of an underlying debt"); 5 Collier on Bankruptcy ¶ 550.02[4] at 550-17 (15th ed. 1984) (same); *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, et al.)*, 130 F.3d 52, 57-58 (2d Cir. 1997) (the phrase "entity for whose benefit such transfer was made" usually "references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds"); *General Elec. Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.)*, 185 B.R. 801, 809 (B.A.P. 9th Cir. 1995) ("The party who forces a debtor to make a transfer is almost always 'the entity for whose benefit such transfer was made' and thus is generally always subject to strict liability"); *Shapiro v. Art Leather, Inc. (In re Connolly N. Am. LLC)*, 340 B.R. 829, 836-37 (Bankr. E.D. Mich. 2006) (party whose indemnification obligations were reduced as a result of the transfer at issue was "entity for whose benefit such transfer was made").

importantly for purposes of the Committee's claims, "only a person who receives a benefit *from the initial transfer* is within this [for whose benefit] language."[16]  *Id.* (emphasis added).

       The initial transfer alleged by the Committee in Counts VII through XII is the transfer of liens by the Conveying Subsidiaries to the New Lenders.  The Senior Transeastern Lenders received no automatic benefit when the liens were transferred to the New Lenders and therefore are not entities for whose benefit the transfers were made.  In fact, the Senior Transeastern Lenders only received a benefit from the subsequent transfer by TOUSA of the loan proceeds it later received from the New Lenders.  As a result, the Committee's claims against the Senior Transeastern Lenders as the entities "for whose benefit" the Conveying Subsidiaries granted liens fails.  *See Bonded*, 838 F.2d at 896 (holding that bank that obtained dominion over funds as a result of transfer 10 days after initial transfer could not be "entity for whose benefit of such transfer was made"); *Danning v. Miller (In re Bullion Reserve)*, 922 F.2d 544, 548 (9th Cir. 1991) (following *Bonded* and concluding that entity who later received fraudulently transferred funds was *at most* a subsequent transferee).

       The Committee wholly failed to prove that the Senior Transeastern Lenders could be liable as entities "for whose benefit" the Conveying Subsidiaries transferred liens to the New

---

[16]  The court in *Merrill v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118, 128 n.12 (D. Utah 1986), explained the important reason only parties that benefitted from the initial transfer, not any subsequent transfer, can be considered within the "for whose benefit" language of Section 550(a)(1):

> Inequitable results would follow if one who benefits from a subsequent transfer is classified as a subsection (a)(1) transferee while one who actually receives a subsequent transfer is classified as a subsection (a)(2) transferee.  Under such a classification an entity which actually *received* property from an initial transferee would be entitled to the [value-and-good-faith] protections of Section 550(b) while one who did not actually receive the property but benefitted in some way from the transfer would not be entitled to those same protections.

*Id.* (emphasis in original); *see also Turner v. Phoenix Fin. L.L.C. (In re Imageset)*, 299 B.R. 709, 718 (Bankr. D. Me. 2003) (for purposes of Section 550(a)(1), the "benefit must derive directly from the [initial] transfer, not from the use to which it is put by the transferee").

16

Lenders under any construction of Section 550(a)(1) previously applied by any court. The transfer of the liens by the Conveying Subsidiaries itself had no direct effect on the interests of the Senior Transeastern Lenders. This undisputed fact is fatal to the Committee's claims under Section 550(a)(1). *See Bonded*, 838 F.2d at 896.

### 2. The Cases Cited By The Committee for the Application of "For Whose Benefit" Liability Are Inapposite

The scant authority the Committee has repeatedly cited in support of its "for whose benefit" claims does not sustain its reading of Section 550(a)(1). (*See* Reply in Support of Mot. to Dismiss at (D.E. 180) at 17-18 (citing *American Bank of Marion County v. Leasing Serv. Corp. (In re Air Conditioning, Inc. of Stuart)*, 845 F.2d 293 (11th Cir. 1988) and *Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*, 831 F.2d 586 (5th Cir. 1987)).) In both *Air Conditioning* and *Compton*, the debtors and defendants structured transactions to accomplish by subterfuge what would clearly have been avoidable preferences if transacted directly.[17] The courts therefore overlooked the form and instead considered the substance of the transactions. The courts reasoned that if the creditors' actions were permitted, the purpose of the Bankruptcy Code to avoid preferential transfers would be frustrated. The courts therefore stretched the "for whose benefit" liability of Section 550 to those particular facts. (*See* Reply in Supp. of Mo. to Dismiss (D.E. 189) at 17-18).)[18]

In contrast to *Air Conditioning* and *Compton*, no subterfuge occurred, or is even alleged to have occurred, here. To the contrary, the July 31 Transactions were fully disclosed to

---

[17]    In each case, the debtor effectuated a payment to a creditor on account of an antecedent debt immediately prior to the bankruptcy filing by transferring assets (cash in *Air Conditioning*, 845 F.2d at 295; security interests in *Compton*, 831 F.2d at 589) to a bank. The bank then issued a letter of credit for the benefit of the creditor, which the creditor drew upon on the occurrence of the filing of the bankruptcy petition.

[18]    Neither *Air Conditioning* nor *Compton* stands for the broad, proposition articulated by the Committee (*see* Opposition to Motion to Dismiss (D.E. 168) at 12), that parties may recover under Section 550(a) property in which they did not have an interest.

17

the public markets through press releases and federal regulatory filings. A claim does not exist

against the Senior Transeastern Lenders because the payment to them was a payment by TOUSA

of an antecedent obligation as to which there was no defense and TOUSA did not file for

bankruptcy within the preference period.[19] *Air Conditioning* and *Compton* therefore do not

support the Committee's claims against the Senior Transeastern Lenders.

**C.      The Senior Transeastern Lenders Are Not Subsequent Transferees of
the "Value of the Liens"**

**1.      The Committee Has No Legal Support for Its Claims Under
this Theory**

The Committee's second alternative theory in Counts VII through XII is that the

Senior Transeastern Lenders received the "value of the liens" that the Conveying Subsidiaries

granted to the New Lenders. The Committee contends that the liens were transformed into the

cash proceeds of the New Loans and paid to the Senior Transeastern Lenders. Despite styling

this as a subsequent transferee claim under Section 550(a)(2), and seeking recovery of damages

from the Senior Transeastern Lenders, the Committee presented no evidence that the interest in

property transferred by the Conveying Subsidiaries to the New Lenders (the liens) was ever

transferred to the Senior Transeastern Lenders. Indeed, those liens remain with the New

Lenders, as evidenced by the claims seeking to avoid those liens. (*See* Third Amended

Adversary Complaint (D.E. 243), Counts I–VI.)

The Committee has never cited any support for the transmogrification of liens into

the cash proceeds of the loans they secure.[20] That the New Lenders continue to hold the liens is

---

[19]      The Committee acknowledged the legitimate purpose behind the Transeastern Settlement, and informed the Court that a fraudulent transfer claim by TOUSA, Inc. against the Senior Transeastern Lenders would fail. (*See* May 22, 2008, Hearing Tr. (D.E. 1076) at 155:11-22.)

[20]      The facts here are in contrast to *Blackburn*, 90 B.R. at 573, where the court permitted recovery of the value of the property because the lien no longer existed and the debtor no longer had the property that had been subject to the lien. (*See supra* at 11 n.12.)

a fundamental failing of this theory. The Committee's prior efforts to support it (*see* Opposition to the Motion To Dismiss (D.E. 168) at 13-14) miss the mark. In each case, the initial transferee no longer held the debtor's property, having transferred it to another party and receiving something different in return. (*See* Senior Transeastern Lenders' Reply Mem. in Supp. of Mot. to Dismiss (D.E. 180) at 17-18). The record here is clear, the New Lenders continue to hold the liens.

### 2. The Senior Transeastern Lenders Proved Their Good Faith Under Section 550(b)(1)

Section 550(b)(1), provides, in relevant part, that the trustee may not recover under Section 550(a)(2) from a subsequent transferee "that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." Good faith under Section 550(b)(1) "is judged using an objective standard." *Cuthill v. Greemark, LLC (In re World Vision Entm't)*, 275 B.R. 641, 649 (Bankr. M.D. Fla. 2002) (internal citations omitted); *Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797-98 (Bankr. S.D. Fla. 2000); *Cuthill v. Kime (In re Evergreen Sec., Inc.)*, 319 B.R. 245, 253 (Bankr. M.D. Fla. 2003).

Courts have concluded "that a subsequent transferee does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer or the debtor's insolvency." *Model Imperial*, 250 B.R. at 797-08; *see Evergreen Sec.*, 319 B.R. at 253; *see also World Vision Entm't*, 275 B.R. at 658 ("Courts will determine whether the good faith defense is established by looking at the actions and knowledge, both actual knowledge and imputed knowledge, of the recipient."). Only if the circumstances "would place a reasonable person on inquiry of a debtor's fraudulent purpose, and diligent inquiry would have discovered the fraudulent purpose," then the good-faith standard is not met. *See Evergreen Sec.*, 319 B.R. at

253 (citing *Sanitary Ice Vending Co. v. Harris (In re Polar Chips Int'l, Inc.)*, 18 B.R. 480

(Bankr. S.D. Fla. 1982)); *see also Bonded*, 838 F.2d at 897-98 (reviewing cases and concluding

that a subsequent transferee who lacks information to support an inference of knowledge

suggesting that somewhere in the chain of transfers there was a fraudulent conveyance does not

have a duty to investigate).

a.    **The Senior Transeastern Lenders Proved Their Good
Faith and That They Had No Knowledge of the
Voidability of the Conveying Subsidiaries' Transfer of
Liens**

Five Senior Transeastern Lenders, whose collective involvement with

Transeastern was broadly representative of the group[21] demonstrated that they acted in good faith

and participated in the Transeastern Settlement without knowledge of the voidability of any

transfer.[22]  As they testified, the settlement involved a payment to the Senior Transeastern

Lenders in satisfaction of an antecedent debt and in settlement of the Transeastern Litigation.  It

was financed by a common subsidiary guaranty financing secured by liens on the assets of

TOUSA's subsidiaries.

In demonstrating their good faith, the Senior Transeastern Lenders testified about

the underlying Transeastern Litigation and the extensive negotiations to settle it, including the

settlement discussions between TOUSA and the Mezzanine Transeastern Lenders.  The Senior

Transeastern Lenders knew that any settlement with them was contingent on TOUSA reaching a

global settlement of all Transeastern-related issues and obtaining the necessary financing.  The

---

[21]    The five representatives included lenders on both the public- and private- side; lenders that took an active
role in negotiating the Transeastern Settlement and those that did not; lenders that participated only in the
Senior Transeastern Credit Agreement and those which were also Mezzanine Transeastern Lenders; lenders
that sold their interests before the Transeastern Settlement and those that held through the closing; and
lenders that participated in the New Loans and those that did not.

[22]    For detail concerning the good faith testimony, see the Senior Transeastern Lenders' Proposed Findings of
Fact § XVI.

20

Senior Transeastern Lenders generally understood the structure of the settlement financing and knew that Citibank had committed to underwrite the $500 million New Loans. Nothing about the structure of the financing or Citibank's commitment to underwrite $500 million in loans to TOUSA raised any red flags or concerns that it might be a fraudulent transfer. If anything, Citibank's commitment to fund the New Loans reassured the Senior Transeastern Lenders that the Transeastern Settlement was in TOUSA's best interests.

The Senior Transeastern Lenders' testimony, as supported by the facts in evidence, shows that they negotiated with TOUSA in good faith to settle the Transeastern Litigation. They worked with TOUSA to ensure that Transeastern could continue to operate while negotiations were ongoing and that events would not trigger a bankruptcy filing by either Transeastern or TOUSA, which could have had devastating effects on TOUSA's business and operations.

As investors in Transeastern, the Senior Transeastern Lenders monitored available information concerning TOUSA and Transeastern. In the months before the July 31 Transactions, press reports about TOUSA and the homebuilding industry varied greatly. The Senior Transeastern Lenders regularly monitored reports about Citibank's efforts to syndicate the loans. Through this monitoring, the Senior Transeastern Lenders learned that both of the New Loans were vastly oversubscribed by the marketplace. This, in their view, was a validation by the market of TOUSA's business plan and decision to settle the Transeastern Litigation. It also indicated that the market did not consider that TOUSA was insolvent or that it would be rendered insolvent by the financing. Despite a tightening credit market in July 2007, the New Loans were fully subscribed and closed.

b.      **The Senior Transeastern Lenders Provided Value to
TOUSA, Inc. and the Conveying Subsidiaries**

There can be no question that the Senior Transeastern Lenders took the transfers

for value by, at the very least, releasing the Transeastern indebtedness and their claims regarding

the guaranty obligations.  The Transeastern Settlement eliminated $625 million of Transeastern

Loans, plus interest, and provided the Transeastern assets to TOUSA, specifically to its

subsidiary TOUSA Homes Florida LP.  Each of the Conveying Subsidiaries received some value

from the settlement of the Transeastern Litigation, including, among other things, a significant

tax asset, the resolution of the litigation overhang, avoiding the risk of a default on their

revolving credit facility and more than $1 billion in bond debt, and receiving the transfer of the

Transeastern assets to a Conveying Subsidiary, TOUSA Homes Florida, LP.  (*Id.*)

c.      **Participation in the New Loans Is Not Evidence of a
Lack of Good Faith**

The Committee contends that the participation of certain Senior Transeastern

Lenders in the New Loans is evidence of their lack of good faith because they, in effect,

converted their unsecured TOUSA claims to secured TOUSA loans.  (*See, e.g.*, Committee

Pretrial Mem. (D.E. 500) at 36.)  This assertion is baseless.  First, the Committee misrepresented

to this Court that [seven] Senior Transeastern Lenders improved their position by becoming fully

secured creditors.  Not so.  Four of the purported "cross-over lenders" were participants only in

the TOUSA revolving loan facility, which was not part of the New Loans and was not used to

fund the Transeastern Settlement.  (Ex. 3359.)

One of the other entities referenced by the Committee, Monarch Master Funding

(f/k/a Quadrangle Master Funding) ("Monarch"), received slightly more than $153 million in the

Transeastern Settlement.  Monarch committed only $10 million of new funding to the Second

Lien Term Loan.  (Ex. 3359.)  It is hard to reconcile how this small $10 million new money loan

22

allowed Monarch to "vastly improve" its position. (*See, e.g.*, Committee Pretrial Mem. at 37.)
In total, Senior Transeastern Lenders committed to only $22 million of the $200 million First
Lien Term Loan and to only $10 million of the $300 million Second Lien Term Loan, or only
6.4% of the total $500 million new financing. (Ex. 3359.)

   Moreover, participation in the New Loans in any amount is not evidence of bad
faith, especially in light of the facts and circumstances of these loans. Citibank fully committed
to lend $500 million to TOUSA in May 2007, ten full weeks before the Transeastern Settlement
was consummated. The Citibank commitment was not contingent on its ability to syndicate the
New Loans. It was contractually obligated to fund regardless of whether any Senior
Transeastern Lender was involved in the syndication. Senior Transeastern Lenders that did not
want to participate in the New Loans simply stayed on the sidelines, took their settlement
payment and exited the situation. In fact, this is what most Senior Transeastern Lenders did.[23]

## II. THE COMMITTEE FAILED TO CARRY ITS BURDEN OF PROOF TO SUPPORT ITS "DIRECT TRANSFEREE" CLAIMS IN COUNTS XIII THROUGH XVIII

   The Committee's Section 548 claims against the Senior Transeastern Lenders
contend that the loan proceeds were property of the Conveying Subsidiaries, who then
transferred those loan proceeds to the Senior Transeastern Lenders. On this basis, the Committee
asserts that the Conveying Subsidiaries can avoid the transfer under Section 548 to the Senior
Transeastern Lenders as "direct transferees" and recover the proceeds. To establish that the
Conveying Subsidiaries made a direct transfer to the Senior Transeastern Lenders, the

---

[23] For these reasons, the fact that certain of the Senior Transeastern Lenders participated in the First or Second Lien Term Loans is strongly supportive of their belief that the funding of the Transeastern Settlement was not an avoidable transaction, and is not evidence of bad faith. Likewise, the participation of several Senior Transeastern Lenders in the TOUSA revolver, which provided funding for the operations of TOUSA's homebuilding subsidiaries, strongly supports their view that TOUSA was, at the very least, not insolvent as of July 31, 2007 or rendered insolvent as a result of the July 31 Transactions.

Committee must prove that the Conveying Subsidiaries had a property interest in the proceeds of the New Loans that were transferred by TOUSA to the Senior Transeastern Lenders.

But the Committee conceded in its Opposition to the Motion To Dismiss that this claim is made "in the alternative" to the claims against the New Lenders (*see* Opposition to Motion to Dismiss at 4-5): to prevail on its claims against the New Lenders, the Committee must prove that the Conveying Subsidiaries had no interest in the loan proceeds; while to prevail on its "direct transferee" claim against the Senior Transeastern Lenders, the Committee must prove exactly the opposite. While the Committee pled and tried its claims in the alternative, it cannot have proved both sets of mutually exclusive facts.

Despite having previously conceded that these are alternative theories, the Committee recently and curiously asserted that it is a "false dichotomy." (Trial Tr. at 4148:19-25.) An examination of the arguments, however, shows that the inconsistencies between them are irreconcilable. The loan proceeds cannot both have been the property of the Conveying Subsidiaries and, at the same time, *not* have been the property of the Conveying Subsidiaries. The resolution of the inconsistent factual contentions is critical because if the loan proceeds were the property of the Conveying Subsidiaries, then the Conveying Subsidiaries received reasonably equivalent value from the New Lenders (to wit: the loan proceeds of $500 million) and have no claims against them under Section 548. If, by contrast, the loan proceeds were not the property of the Conveying Subsidiaries, then the Committee has no claims under Section 548 against the Senior Transeastern Lenders because the Conveying Subsidiaries did not transfer an interest in their property to the Senior Transeastern Lenders. *See Jones v. Kellman (In re Kellman)*, 248 B.R. 430, 433 (M.D. Fla. 1999) (noting that "if Debtor had no interest then there could not be a transfer of property that Trustee could avoid under 11 U.S.C. § 548"); *Pereira v. Dow Chem.*

24

*Corp. (In re Trace Holdings, Inc.)*, 287 B.R. 98, 107 (Bankr. S.D.N.Y. 2002) (to recover under Section 548, the trustee must demonstrate that "the debtor transferred an interest in property"); *Begier v. IRS*, 496 U.S. 53, 58 (1990) ("property of the debtor" is "best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings"). The facts adduced at trial, and the Committee's own arguments, make clear that there is no basis to argue that the proceeds of the New Loans were the property of the Conveying Subsidiaries. As such, the Committee cannot prevail on its Section 548 claims against the Senior Transeastern Lenders.

### A.    Co-Borrowers Do Not Have a Property Interest in Borrowed Funds by Virtue of Their Being Co-Borrowers

The Committee bases its claim that the Conveying Subsidiaries had a direct interest in the loan proceeds on the fact that they were "co-borrowers" under the relevant loan documents and because they pledged liens on their assets in connection with the New Loans. The Committee's assertion is flatly contrary to the governing law, logic, and the facts.

In *Bennett & Kahnweiler Assocs. v. Ratner (In re Ratner)*, the court addressed whether a debtor had an interest in loan proceeds just because he was a co-borrower on the loan with his wife. 132 B.R. 728 (N.D. Ill. 1991). The debtor's wife used the loan proceeds to purchase real estate. *Id.* at 733. The debtor did not have control over the loan proceeds and had not used them. The plaintiffs nevertheless argued that the debtor "had an interest in the loan proceeds, which he transferred to his wife so that she could acquire the Mohawk property." *Id.* The court disagreed, concluding that "[t]here is no legal authority to support plaintiffs' position that a debtor who acts as a co-borrower while insolvent has made a transfer under § 727 of the Code, and this court would have to reach too far to make the finding plaintiffs seek." *Id.* at 734.

25

The theory rejected in *Ratner* is the same theory presented by the Committee here, similarly without support. If the debtor in *Ratner,* as a result of his co-borrower status, had obtained a property interest in the loan proceeds, then the use by his wife of that property would have constituted a transfer. But the court concluded that simply being a co-borrower did not effect a transfer by the debtor to anyone, even when his wife, the other co-borrower used the loan proceeds. Likewise, the Conveying Subsidiaries acquired no interest in the proceeds of the New Loans that were transferred to the Senior Transeastern Lenders simply because they were co-borrowers and pledged liens.[24]

### B. The Committee Failed To Prove that the Conveying Subsidiaries Had Any "Control" Over the Loan Proceeds and Thus Failed to Establish Any Property Interest in Them

#### 1. Binding Authority Requires the Committee To Show that the Conveying Subsidiaries Had Control Over the Loan Proceeds To Establish a Property Interest

Whether a debtor-plaintiff in a fraudulent transfer action has an interest in property is determined by whether the debtor had "control" over the property. *Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177, 1181-82 (11th Cir. 1987); *Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.),* 374 B.R. 333, 338 (Bankr. S.D. Fla. 2007). The two elements of "control" for purposes of this analysis are the power to designate the party that will receive the funds and the power actually to disburse the funds at issue to that party. *Tolz v. Barnett Bank of S. Fla., N.A. (In re Safe-T-Brake of S. Fla., N.A.),* 162 B.R. 359, 365 (Bankr. S.D. Fla. 1993); *Bankest Capital,* 374 B.R. at 338-39; *Dzikowski v. NASD Regulation, Inc.,* 247 B.R. 867, 869-70 (S.D. Fla. 2000). "Where the debtor's interests do not provide the

---

[24] If the Court concludes that the Conveying Subsidiaries received any interest in the loan proceeds, it was at most "a bare legal title interest in the property and what [they] transferred had no real economic value." *See Kapila v. Gillion (In re Moodie),* 362 B.R. 554, 562 (S.D. Fla. 2007) (finding no fraudulent transfer because "the transfer of bare legal title for free is not less than reasonably equivalent value").

impetus for the transaction," courts are more likely to find that the debtor did not have an interest in any property transferred. *Bankest Capital*, 374 B.R. at 339.

> ### 2.    The Conveying Subsidiaries Had No Control Over the Funds Paid to the Senior Transeastern Lenders

In its Pretrial Memorandum, the Committee appeared to have abandoned its argument that the Conveying Subsidiaries held a property interest in the proceeds of the New Loans. The Committee asserted that TOUSA, Inc. "compelled substantially all of its subsidiaries to borrow, and grant liens to support, $500 million in additional debt" (Committee Pretrial Memorandum (D.E. 500) at 1) and that the Conveying Subsidiaries "were made to be co-borrowers and guarantors on the $500 million in new debt" (*id.* at 5). Making the point even more clear, the Committee affirmatively argued that the Conveying Subsidiaries "received no direct benefit from obligating their assets" (*id.*), which necessarily means that they did not receive the proceeds of the New Loans.[25]

Although the Committee declined to abandon its "direct transferee" theory in its arguments at trial, it put on no evidence to support this theory. Indeed, the facts strongly support the conclusion that the Conveying Subsidiaries did not control the cash proceeds of the loan. TOUSA witnesses testified that the Conveying Subsidiaries had no independent control or authority over the loan proceeds prior to their being paid to satisfy the Transeastern Settlement. (Trial Tr. (Wagman) at 562:2-6; Trial Tr. (Berkowitz) at 1712:3-7.) Likewise, the Conveying Subsidiaries had no ability to do anything with the loan proceeds other than what was specified in the loan documentation. (Trial Tr. (Berkowitz) at 1646:3-8; Ex. 332 at CNAIT-01135264: Ex.

---

[25]    At the July 6, 2009 hearing on Debtors' motion for summary judgment, the Court noted to counsel for the First Lien Term Loan Lenders that he had a "glass mountain" to climb to establish that the Conveying Subsidiaries received a direct benefit from the loan proceeds. (July 6, 2009 Hearing Tr. (D.E. 536) at 26:20-27:6.) Counsel for the Committee has not defended its "direct transferee" claims, which relies on the same argument that the First Lien Term Loan Lenders were making.

3301 at CNAIT-01143805; Ex. 3358 at CNAIT-00918072.) Citibank, which had committed to underwrite the entire $500 million of the New Loans, confirmed that the Conveying Subsidiaries had no independent authority to use the loan proceeds, that the bank considered it loaning money only to TOUSA, Inc. and that it would not have honored any request by the Conveying Subsidiaries (as co-borrowers) to use the funds. (Trial Tr. (McManus) 3695:19-3696:9, 3696:23-3697:1.) The Conveying Subsidiaries therefore did not have the power to designate who would receive the funds or the power to disburse the funds.

Indeed, this testimony is consistent with the loan documents themselves, which governed the use and control of the funds. Both the First and Second Lien Term Loan Agreements provide, in Section 4.12, "Use of Proceeds," that the proceeds would be used to fund the "Acquisition," which is defined as "the contribution by the Administrative Borrower to the Transeastern JV Entities of an amount necessary to discharge all amounts of outstanding Indebtedness of the Transeastern JV Entities." (Ex. 360 at TOUSA-BR-00074659-60, TOUSA-BR-00074724; Ex. 361 at TOUSA-BR-0075346-47, TOUSA-BR-00075410.) The "Administrative Borrower" is defined in the Preamble as TOUSA, Inc., not any of the Conveying Subsidiaries. (Ex. 360 at TOUSA-BR-00074659; Ex. 361 at TOUSA_BR-00075346.)

Upon closing of the New Loans, the funds flowed pursuant to the structure contemplated by the parties. Citibank directly transferred the proceeds of the New Loans to Universal Land Title ("ULT"), a subsidiary of TOUSA, Inc. and not a Conveying Subsidiary. (Joint Stipulated Facts (D.E. 542) ¶ 43.) The flow of funds documentation identifies "Credit to Technical Olympic USA" (TOUSA, Inc.'s former name) for this transfer. (Ex. 442 at CNAIT-00522151; Trial Tr. (McManus) at 3693:21-3694:15.) ULT then immediately transferred the

28

funds to CIT, the administrative agent for the Senior Transeastern Lenders, for distribution to those lenders. (Ex. 136 at TOUSA-BE-00249961-63.) None of the Conveying Subsidiaries ever controlled the distribution of the funds, nor was there ever a moment when they could have intercepted the loan proceeds and diverted them to an alternative use. The Conveying Subsidiaries therefore cannot assert a Section 548 claim against the Senior Transeastern Lenders.

### C.   Finding that the Conveying Subsidiaries Had a Property Interest in the Loan Proceeds Would Fundamentally Alter the Utility of Subsidiary Guaranties

If the Court concludes that the Committee can prevail on any of the three theories against the Senior Transeastern Lenders, the Court would fundamentally alter the utility of common loan arrangements involving cross- and up-stream guaranties.[26] Cross- and up-stream guaranties are "routine in commercial transactions," particularly where large sums are borrowed by corporate entities. *See* Jack F. Williams, "The Fallacies of Contemporary Fraudulent Transfer Models as Applied to Intercorporate Guaranties: Fraudulent Transfer Law as a Fuzzy System," 15 Cardozo L. Rev. 1403, 1418 (1994). Courts in this district have cautioned against holdings that are "'inhibitory of contemporary financing practices, which recognize that cross-guarantees are often needed because of the unequal abilities of interrelated corporate entities to collateralize loans.'" *Goveart v. Capital Bank (In re Miami Gen. Hosp., Inc.)*, 124 B.R. 383, 393 (Bankr. S.D. Fla. 1991) (quoting *Tele-Fest, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1379 (D.N.J. 1984)).

The New Loans are ordinary subsidiary guaranty financings. If, as the Committee asserts, subsidiaries obtained a property interest in loan proceeds by virtue of being co-borrowers, incurring obligations as guarantors or pledging collateral in support of the loans to the

---

[26] Although the Committee's two Section 550(a) claims are based on facts distinct from the Section 548 "direct transferee" claims, a finding in favor of the Committee on any of the three claims would have the same practical effect insofar as they seek to create new remedies for parties that merely incur obligations.

parent corporation, such financing practices would suddenly become useless, unsettling clear expectations in an already turbulent time.[27]  Rather than providing the additional security to lenders that subsidiary guaranties have always been understood to provide, accepting the Committee's arguments would make such loans riskier for lenders and for third parties that do business with the borrowers.  Indeed, the Committee's rule would have the effect of granting property rights to the pledging subsidiaries that have never previously existed, which rights bring with them the right to seek to recover the proceeds.

Most tellingly, if the law were as the Committee supposes, unrelated third parties would never transact with parties using such financing structures because virtually every such structure, and the use of the proceeds of these structures, would give rise to a claim that it was for less than reasonably equivalent value.  If the Committee were correct that each of those subsidiaries obtained a property interest in the loan proceeds, then any transfer of the loan proceeds by the parent would be contended to be for less than reasonably equivalent value as it relates to the subsidiaries.  But this is not the case.  Rather than analyzing whether such subsidiaries obtained a property interest in loan proceeds, the proper legal analysis is to determine whether the subsidiaries could avoid the obligations incurred in connection with such financing or whether the subsidiaries or the enterprise received reasonably equivalent value in return.  See, e.g., Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.), 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991); Miami Gen. Hosp., 124 B.R. at 394; Williams, "Fallacies of Contemporary Fraudulent Transfer Models," 15 Cardozo L. Rev. at 1404-05.  If the Committee is right that subsidiaries acquire a property interest by virtue of being

---

[27]    See Michael F. Maglio, "The Promise, Part II:  Corporations, Obligations and Fraudulent Conveyances," 14 Bus. L. Today 25, 30 (2005) (explaining that from the standpoint of fraudulent transfer law, whether a subsidiary signs a promissory note or a separate guarantee agreement makes no difference if the subsidiary does not receive the loan proceeds).

Derrough had to develop a novel methodology, not cited in a single valuation treatise or previously considered by any court, and to misapply other commonly accepted methodologies.

As Mr. Derrough acknowledged, "the three most common methodologies" used to perform a Balance Sheet Test are a comparable transaction analysis, a comparable company analysis, and a DCF analysis. (*See* Trial Tr. (Derrough) at 1325:7-14.) *See also Kipperman*, 2009 WL 2515664 at \*16. Concluding that there were insufficient comparables, Mr. Derrough did not perform a comparable transaction analysis. He purported to perform a comparable company analysis and a DCF analysis but his analyses do not reflect an objective application of those methods; rather, they each reflect only his subjective view that TOUSA was trading at a discount to its peers on July 31, 2007. (*See* Trial Tr. (Metrick) at 1988:17-1990:18, 2021:12-2024:22.) Mr. Derrough also performed what he called an "Observable Market Value" or "OMV" analysis. (*See* Ex. 633, ¶¶ 26-27; Trial Tr. (Derrough) at 1325:15-23.) But this analysis is not commonly used, (Trial Tr. (Derrough) at 1329:11–19), and is an unreliable method to determine solvency, (Trial Tr. (Stulz) at 2258:20-2259:5).

### (i)    Mr. Derrough's Comparable Company Analysis

A comparable company analysis is intended to conclude a value for a subject company based on the average value being attributed by the market to a set of similar companies. This is achieved in a three-step process. First, a set of comparable companies is selected. Second, the relevant valuation metrics are chosen and analyzed. And, third, enterprise value of the company is calculated by applying the chosen metrics. Mr. Derrough errs at each step.

### (a)    Mr. Derrough Used His Subjective View of TOUSA's Value to Choose His "Most Comparable" Companies

Because an analyst can use the selection of comparable companies to introduce his biases about value, it is critical that he set out the criteria for determining comparability

from the trading behavior of the comparable companies, so as not to open the analysis to bias. (*See* Trial Tr. (Metrick) at 2001:13-2002:8.) Because Mr. Derrough's analysis was result driven, however, he did not apply the mean or median multiple of either the 13 "Reference Range" or the five "Most Comparable" companies he selected. Instead, he chose to create a multiple range, the low end of which was below the lowest multiple for any of the comparable companies, including his five "most comparable" companies, because he observed that TOUSA was "trading at the low end of its peers as of July 31, 2007." (*See* Trial Tr. (Derrough) at 1345:25-1346:20; Ex. 633 at 16.) Had Mr. Derrough applied the mean or median inventory multiple of either the 13 comparable companies or the five "most comparable" companies, his own analysis would have demonstrated that TOUSA had positive equity value as of July 31, 2007. (*See* Trial Tr. (Metrick) at 2002:24-2004:21; *see also* Ex. 5249, ¶ 28.)

Mr. Derrough also failed to apply his own criteria for choosing a multiple. Mr. Derrough stated that when a metric trades in a tight range it "suggests that the market is placing greater emphasis on that metric as an appropriate one for valuation purposes." (*See* Ex. 633, ¶ 41.) But Mr. Derrough did not use, or even consider using, a total assets multiple, which traded in a tighter range than the Inventory Multiple he used and had been more stable historically. (*See* Trial Tr. (Metrick) at 2004:22-2006:13; Ex. 5248, ¶ 19.) Mr. Derrough asserted that a total assets multiple was inappropriate because it includes intangibles such as goodwill, which have "no real economic value." (Ex. 634, ¶ 21.) This position is contradicted however by his prior testimony in the *Jean Coutu v. Wells Fargo* matter in which he stated that "[i]ntangible assets can include assets such as brands, patents, trademarks, and goodwill, all of which can be extremely beneficial to the creation of future economic benefits and, therefore, be extremely valuable resources for a company." (*See* Trial Tr. (Derrough) 1413:19-1414:20.) Not

surprisingly, applying the mean or median of the assets multiple would yield a positive equity value for TOUSA. (Trial Tr. (Metrick) at 2010:19-2011:21.)

### (ii) Mr. Derrough's Discounted Cash Flow Analysis

A discounted cash flow analysis calculates value by discounting to present value the projected future cash flows of a company through the forecast period and adding the discounted present value of the terminal value. The terminal value is intended to reflect the cash flows generated beyond the forecast period in perpetuity. Both components are critical to a DCF analysis. Mr. Derrough improperly calculated both, rendering his analysis unreliable. *See Kipperman*, 2009 WL 2515664 at *27 (finding plaintiffs' expert's DCF analysis unreliable noting that "[i]t is not enough, however, for an expert to select a well accepted and scientifically valid methodology; he must also apply that methodology correctly to the facts of the case").

### (a) Mr. Derrough's DCF Model Contained Unrealistic Projections

A "DCF analysis is highly sensitive to the quality and appropriateness of the underlying financial projections." (Ex. 633 ¶ 52.) Mr. Derrough began his analysis with the financial projections prepared by TOUSA management and AlixPartners in July 2007 but, based solely on Mr. Hewlett's opinion, concluded that the projections were overly optimistic and, without any independent evaluation, replaced only the average sales prices in the model with numbers provided by Mr. Hewlett. (*Id.* ¶ 61.) Such blind reliance on conclusions of another fails to meet the requirements of Rule 702. *See American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) (noting that "[e]xpert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not"); *U.S. v. Batchelor-Robjohns*, No. 03-20164-Civ, 2005 WL 1761429, at *5 (S.D. Fla. June 3, 2005) (finding experts that relied on someone else's calculations without performing independent calculations

unreliable under Rule 702). Moreover, the resulting financial projections are internally inconsistent and do not reflect a business plan that reasonable management would adopt. (*See* Trial Tr. (Metrick) at 2020:1-2020:20; *see also* Ex. 5249, ¶ 32.)

First, as discussed below, *infra* at 52-53, the projected ASPs provided by Mr. Hewlett were derived from forecast factors on www.economy.com and are of questionable applicability. Second, the modified projections assumed a significant decrease in ASPs without any corresponding decrease in costs (or any modification of costs at all), rendering them internally inconsistent. (*See* Trial Tr. (Metrick) at 2020:21-2021:11; *see also* Ex. 5249, ¶ 33.) It is unlikely that home prices would fall substantially, while the cost components, such as land, material and labor, remain constant. (*See* Trial Tr. (Metrick) 2020:21-2021:11; *see also* Ex. 5249, ¶ 33.) In fact, such an assumption is contrary to the trend that was already evident by July 31, 2007. (Trial Tr. (Samuels) 3464:12-18.) Even if absolute costs were not decreasing, dramatically decreasing ASPs such as those projected in the modified model would force management to change the product mix or base model features offered in an effort to drive down costs and preserve profits. (*Id.*) This flexibility was not accounted for in Mr. Derrough's model, resulting in significantly overstated costs and understated cash flows.[28]

### (b) Mr. Derrough's Terminal Value Is Based On His Subjective Inventory Multiple

A discounted cash flow analysis is intended to be an absolute valuation, independent of the market's perception of value. (Trial Tr. (Metrick) 1994:13-16; Ex. 5429 ¶ 29.) But the terminal value in Mr. Derrough's DCF analysis – which represented 60% of his

---

[28] Mr. Derrough's opinion that TOUSA had unreasonably small capital after the July 31 Transactions is based on the ASP-modified projections, Ex. 633 at ¶ 68, and suffers from the same deficiencies. Moreover, contemporaneous data indicates that the capital markets did not expect TOUSA to file for bankruptcy in the near future. (Ex. 3001 (Stulz Report) ¶¶ 45-62.)

total enterprise value – was driven by the Inventory Multiple he derived in the Comparable Company analysis.[29]  (*See* Trial Tr. (Derrough) 1358:13-22, 1359:15-1360:11.)  This produced another market-based, relative valuation thus defeating the purpose of a DCF analysis.  (*See* Trial Tr. (Metrick) 2024:23-2027:16; Ex. 5429, ¶¶ 29-30.)  It also injected the DCF analysis with the same subjectivity and potential for bias inherent in the Comparable Company analysis.  (*See* Ex. 5249, ¶ 29.)  As Professor Metrick explained, "In the end we're just getting one answer, and that answer is Mr. Derrough's view that the company is worth somewhere near 60 percent [of its inventory], because it drives the discounted cash flow and it drives the comparable companies." (Trial Tr. (Metrick) at 2025:25-2027:16.)

The flaws in the modified projections are manifest in Mr. Derrough's Gordon Growth results and the significant disparity between the results of his DCF analysis and the values he derived in his other analyses.  (*See* Ex. 5249, ¶¶ 42-43.)  Mr. Derrough "crosschecked" his DCF results using the Gordon Growth model and concluded that the implied perpetuity growth rate in his DCF analysis with an Inventory Multiple was 15%.  As Professor Metrick explained, this means that TOUSA, in time, would consume "the entire universe." (Trial Tr. (Metrick) at 2021:12-2024:22.)  Recognizing the absurdity of this result, Mr. Derrough concluded that the Inventory Multiple was too high and should be decreased to imply a more reasonable growth rate, which would further drive down TOUSA's equity value.  (Ex. 633 ¶ 63.) In fact, the unrealistic growth rate was more likely caused by Mr. Derrough's failure to forecast

---

[29]    Mr. Derrough made much of the fact that under his alternative-ASP DCF analysis, TOUSA would only have positive equity using an inventory multiple of 100% and a discount rate of 12%. (Trial Tr. (Derrough) at 1281:12-1283:2; Ex. 634 (Derrough Report) at Ex. 1A.)  But an inventory multiple of 100% is actually less than the historical average for either the five or the 13 comparable companies. (Trial Tr. (Metrick) at 2116:21-2118:17; Ex. 5249 (Metrick Report) at Exhibit 4.)  A chart comparing the historical inventory multiples shows that Mr. Derrough's inventory multiple range (55%-65%) was far below the historical average for the group, and that 60% was the lowest inventory multiple TOUSA ever reached during this time. (Trial Tr. (Metrick) at 2116:21-2118:17; Ex. 5249 (Metrick Report) at Exhibit 4.)

projections to the point of stable growth. (*See* Trial Tr. (Metrick) at 2021:12-2024:22; *see also* Ex. 2340 at 219 ("The appropriate length of the forecast period should be until that variability [in its earnings stream] stops; at the point in time that the company expects normalized or level growth, the terminal value is calculated.").)

### (iii)    Mr. Derrough's OMV Analysis

Mr. Derrough is principally involved in restructuring consulting and neither he nor his firm regularly issues solvency opinions. (*See* Trial Tr. (Derrough) at 1312:13-23.) It is therefore not surprising that the OMV methodology he developed and applied has never before been used to determine solvency. (*See* Trial Tr. (Derrough) at 1337:13-1338:12.)

The OMV method assumes that the sum of the market values of TOUSA's debt and equity equaled the fair value of its assets. (Trial Tr. (Stulz) at 2261:11-24; Ex. 3001 (Stulz Report), ¶ 9, 33.) The assumption is flawed because: (i) numerous factors can create a gap between the market value of a company's securities and the fair value of its assets, particularly when companies are in distress; and (ii) it requires that the market for the company's securities is efficient. (Trial Tr. (Stulz) at 2261:111-2262:7; Ex. 3001 (Stulz Report), ¶ 9, 33-36.)

Professor Rene Stulz, a recognized finance scholar who sits on the editorial boards of over ten academic and practitioner publications, serves on the boards of financial groups and management funds, and has acted as consultant to the IMF, the World Bank, the New York Stock Exchange, and the Federal Reserve Bank of New York, had never before heard of an "Observable Market Value" test for solvency. (*See* Ex. 3001, Expert Report of Rene Stulz, ¶¶ 1-2; Trial Tr. (Stulz) at 2260:3-6.) And neither Professor Stulz nor Mr. Derrough was aware of any financial textbooks or treatises that endorse or even discuss the "OMV" method. (*See* Trial Tr. (Stulz) at 2260:7-11; Trial Tr. (Derrough) 1333:10-20.)

39

(a)    **Mr. Derrough Did Not Consider Factors That May Have Caused Market Value to Differ From Fair Value**

When a company is in distress, the market value of the company's securities often does not reflect the fair value of assets. In his Comparable Company Analysis, Mr. Derrough identified a number of the factors that may have artificially depressed the market value of TOUSA's securities including "high leverage," "quality of management," "concentrated shareholder base," and "concerns surrounding the Transeastern Settlement."[30] (*See* Trial Tr. (Stulz) at 2282:6-2283:4.) Mr. Derrough cited these factors to justify valuing TOUSA at a discount to the set of 13 companies in his Comparable Company analysis, (Ex. 633, ¶ 46), but did not consider them in his OMV analysis. (*See* Trial Tr. (Stulz) at 2283:5-12.)

A gap might also exist between the market value of a company's securities and the fair value of the company's assets if there is uncertainty about the quantity or quality of a company's assets. (*See* Trial Tr. (Stulz) at 2272:12-21; 2272:25-2274:19; Ex. 3001, ¶¶ 36-38.) There is evidence that such a gap may have existed for TOUSA securities. In particular, it is not clear that the market knew the precise amount or value of assets that TOUSA received from its joint ventures, including the value of the Transeastern assets that were being acquired in the July 31 Transactions. (*See* Trial Tr. (Stulz) at 2273:17-2275:8; Trial Tr. (Derrough) at 1333:16-22.)

Finally, the aggregate trading value of the minority shares understates the value of the enterprise because there is inherent value in a control position. (*See* Trial Tr. (Stulz) at 2275:10-2276:5; Ex. 3001, ¶ 37(i).) Mr. Derrough explained that he did not add a control

---

[30]    Mr. Derrough opined, based on the fact that TOUSA's bonds were trading at a significant discount to par, that TOUSA would not be able to satisfy its debts as they came due after the July 31 Transactions. (Ex. 633 (Derrough Report), ¶ 73.) But there is no correlation between debt trading prices and likelihood of bankruptcy. (Ex. 3001 (Stulz Report), ¶ 55-57.) As set forth above, *supra* at 37-38, the ASP-modified DCF model is unreliable and Mr. Derrough's reliance on it is flawed.

premium because "the company is not being sold. We're valuing this company with . . . this
management team . . . not what it might be worth to somebody else if somebody else had the
opportunity to control it." (*See* Trial Tr. (Derrough) at 1224:24-1225:10.) This position is
contrary to the governing law and goes against the very concept of fair value, which considers
how the company would be valued in a sale between a willing buyer and willing seller. (*See*
Trial Tr. (Stulz) at 2276:6-2277:13.) *See, e.g., Cox Enters. Inc. v. News-Journal Corp.*, 469 F.
Supp. 2d 1094, 1107 (M.D. Fla. 2006) ("[t]he better definition of a going concern in my view
assumes that a corporation will be managed in a reasonably prudent manner going forward,
regardless of how poorly it may have been run in the past. This allows for an appraiser to
normalize the financial data of a poorly operated corporation before determining what the
corporation would sell for in an arm's-length transaction."); *In re Transit Group Inc.*, 332 B.R.
45, 55 (Bank. M.D. Fla. 2005) ("[f]air value, in the context of a going concern, is determined by
the fair market price of the debtor's assets that could be obtained if sold in a prudent manner
within a reasonable period of time to pay the debtor's debts") (quoting *Golden Maine
Acquisitions*, 221 B.R. 963, 967 (N.D. Ala. 1997) and citing *Lawson v. Ford Motor Co. (In re
Roblin Indus., Inc.)*, 78 F.3d 30, 35 (2d Cir. 1996)).

(b)    **Mr. Derrough Failed to Show That
       TOUSA's Securities Traded on Efficient
       Markets**

Despite Mr. Derrough's characterization of market efficiency as theory dreamed
up by litigators, market efficiency is a concept that has been studied and written about in the field
of finance since the 1960's. (*See* Trial Tr. (Stulz) at 2263:16-2264:18.) If a market is not
efficient, *i.e.*, it does not reflect all publicly available information about a company, it cannot be
relied on to reflect the fair value of the company's assets. (*See* Trial Tr. (Stulz) at 2262:8-22,
Ex. 3001, ¶ 35.) Where, as here, a theory of liability rests on the principle of market efficiency,

41

it is plaintiff's burden to prove the efficiency of the market for *each* relevant security. *See*

*Cammer v. Bloom*, 711 F. Supp. 1264, 1281 (D.N.J. 1989). (*See also* Trial Tr. (Stulz) at 2263:3-15.)

Courts and economists have noted since at least the 1980s that the following factors should be considered in determining efficiency: (1) trading volume; (2) the number of securities analysts following the company; (3) the number of market makers; (4) whether the company is entitled to file S-3 Registration statements; (5) empirical facts linking unexpected corporate events or financial disclosures and a response in the market; (6) capitalization of the company; (7) the bid-ask spread; and (8) the percentage of stock not held by insiders, i.e. the float. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 497-98 (S.D. Fla. 2003) (citing *Cammer*, 711 F. Supp. at 1281 and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)). (*See* Trial Tr. (Stulz) at 2265:20-2267:19.) Mr. Derrough did nothing to test the efficiency of the market for TOUSA stocks or bonds; instead, he asserted that the markets for TOUSA's securities were efficient because, (1) TOUSA's stock traded on the New York Stock Exchange and (2) a high volume of TOUSA's debt securities were traded.[31] (Ex. 633, ¶ 28.) However, those facts alone fail to establish efficiency. Courts have noted that it would be illogical to apply a conclusion relative to a whole market, such as the NYSE, without considering the characteristics of the individual security. *See Cammer*, 711 F. Supp. at 1281 (noting that "each security has a distinct market"). Moreover, trading volume alone cannot establish efficiency.[32] (*See* Trial Tr. (Stulz) at 2269:8-22; 2271:3-8.)

---

[31]  Mr. Derrough's reference to the change in TOUSA's securities prices on August 6, 2007, Ex. 633 at Ex. 4, is not evidence of a link between disclosure of unexpected events and market activity because the Global Settlement was actually disclosed no later than August 1, 2007 (*See* Trial Tr. (Derrough) at 1415:24-1416:13; 1416:14-1417:7; Ex. 3448).

[32]  Moreover, several of the *Cammer* factors militate against a finding of efficiency here. In particular, no equity analysts were following TOUSA in June or July of 2007. *See Cheney*, 213 F.R.D. at 299, (existence

      **b.**      **Mr. Clancy's Balance Sheet Analysis Is Unreliable**
                   **Because It Improperly Relied on Mr. Hewlett's Flawed**
                   **Inventory Valuation**

The Committee's second expert on solvency, Mr. Clancy, fares no better than Mr. Derrough. Mr. Clancy performed only an "adjusted balance sheet" test – commonly referred to as the Asset Approach to the Balance Sheet Test – and concluded that TOUSA was insolvent both before and after the July 31 Transactions. He also purported to create stand alone adjusted balance sheets for three Conveying Subsidiaries that he opined demonstrate insolvency before or as a result of the July 31 Transactions. Each of his conclusions rested entirely on the inventory valuation conducted by Mr. Hewlett that, as discussed below, bears no relation to the market value of the properties. (*See infra* at 45-48.)

The starting point for Mr. Clancy's analysis was TOUSA's July 31, 2007 balance sheet. He adjusted this balance sheet based on the "fair market value" analysis performed by Mr. Hewlett. Mr. Clancy did not discuss the appropriateness of the valuation methods with Mr. Hewlett and had no opinion about whether the methodologies were appropriate. (Trial Tr. (Clancy) at 960:7-20.) As Mr. Clancy testified, he "did not in any way double-check [Mr. Hewlett's] numbers or methodology." (*Id.* at 960:21-961:5.) Mr. Clancy was told to use Mr. Hewlett's numbers in his solvency analysis and, as he testified, it was "not his job" to assess their reasonableness. (*Id.* at 1045:18-1046:5.) Mr. Clancy's failure to assess the validity of Mr. Hewlett's value conclusions and his decision to accept them with unblinking reliance, despite the fact that, as discussed below, they defy logic, demonstrates that the methodology he used to

---

of two equity analysts does not favor finding of efficiency) (citing *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423 (S.D. Fla. 1991); *Krogman*, 202 F.R.D. at 475; and *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 303 (S.D. Tex. 2000)). TOUSA had a small market capitalization (suggesting problems with efficiency common to smaller firms), and had a large controlling shareholder (making float much smaller). (*See* Trial Tr. (Stulz) at 2267:1-2268:20.) Similarly, trading data for certain of TOUSA's bond was unavailable. (*See* Trial Tr. (Stulz) at 2271:15-2272:1.) Mr. Derrough failed to consider these factors.

formulate his own opinion was flawed. *See Batchelor-Robjohns*, 2005 WL 1761429 at \*5 (citing *In re TMI Litig.*, 193 F.3d 613, 715 (3d Cir. 1999)). Had Mr. Clancy not used Mr. Hewlett's inventory values, his balance sheet analysis would have indicated solvency.

(i)    <strong>Mr. Hewlett's Discounted Cash Flow Analyses<br>Do Not Reflect Market Value</strong>

The foundation of Mr. Clancy's work was Mr. Hewlett's asset valuations. Mr. Hewlett is not a licensed real estate appraiser. (Trial Tr. (Hewlett) at 822:25-823:2.) As a result, instead of using standard real estate appraisal techniques to derive fair value – including a sales comparison approach – Mr. Hewlett performed a Life of Project, discounted cash flow analysis. Mr. Hewlett's analysis assumed that on July 31, 2007, TOUSA would sell off its communities in their current state to another builder or developer with exactly the same characteristics as TOUSA. (*Id.* at 598:20-25; 747:10-18.) This bulk sale methodology amounted to a liquidation analysis. (Trial Tr. (Samuels) at 3441:1-3441:13 ("If we . . . sold it in bulk, there would be no company because there would be no inventory.").) That it represented liquidation values is evident from Mr. Hewlett's conclusion that TOUSA's inventory was worth only $889 million, over $1 billion less than its book value. In a going concern analysis, one has to assume that TOUSA will continue to build out its inventory and sell finished homes to homebuyers and excess tracts of unimproved land to developers, and will continue to purchase more land, all consistent with its business plan and strategy. Otherwise, one shifts the profits from TOUSA to the third-party buyer. (*See* Trial Tr. (Cannon) at 2914:22-2915:10.) A going concern fair valuation conducted in accordance with uniform standards of appraisal practice indicated a fair value of TOUSA's inventory between $1.44 billion and $1.52 billion. (*See* Ex. 643 (Samuels Report) at v; Ex. 611 (Corrected Cannon Report) at 30, 32, 36, 39, 42, 44.)

(a)      **Applying a Sales Comparison Approach**
         **Would Materially Change Mr. Hewlett's**
         **Value Conclusions**

A sales comparison approach is the approach that most accurately captures the

intentions of buyers in the marketplace, inherently reflecting any underlying valuation analyses

they conducted.  (*See* Trial Tr. (Samuels) at 3423:5-3425:18.)  *See also In re Next Wave*

*Personal Commc'ns, Inc.*, 235 B.R. 277, 294 (Bankr. S.D.N.Y. 1999) (overruled on other

grounds) ("the market comparable technique is traditionally accepted as the proper method of

valuing real estate in most cases, using adjustments to reconcile differences between specific

parcels").  By contrast, a DCF analysis requires "many inputs and assumptions" to reflect the

same information and becomes overly speculative, especially when valuing tracts of raw land

which are far from development.  (*See* Trial Tr. (Samuels) at 3445:11-22.)  Therefore,

professional appraisal standards recognize that a DCF analysis should only be applied in

conjunction with valuations derived from some other methodology, particularly when valuing

raw land.  (*Id.* at 3423:5-3425:18; Ex. 643 at 643.)  *See also Next Wave,* 235 B.R. at 295

(recognizing that a DCF analysis "is generally not used as a tool for determining fair market

value, particularly when that determination can be made using either replacement cost or market

comparables").

Mr. Hewlett's DCF analysis fails to appreciate the highest and best use of the

properties valued, including alternative uses and option value.  (*See* Trial Tr. (Samuels) at

3445:23-3452:9; Trial Tr. (Metrick) at 1976:19-1978:2; Ex. 5249, n. 54, ¶ 38.)  For example, Mr.

Hewlett did not consider that as of July 31, 2007, opportunistic buyers with capital were

acquiring land at depressed prices because they knew the values would eventually go back up.

(*See* Trial Tr. (Samuels) at 3445:23-3452:9.)  Nor did Mr. Hewlett consider alternative

financially feasible or legally permissible uses for the land, as required by the applicable

45

appraisal standards. (*See* Trial Tr. (Samuels) at 3445:23-3452:9.) Mr. Hewlett thus mistakenly

concluded that 83% of TOUSA's raw land lots, or 60% of TOUSA communities with raw land

parcels, had zero (or negative) value. (Trial Tr. (Hewlett) at 841:18-25.) This conclusion defies

logic. As Mr. Samuels explained at trial, land has zero value only when external encumbrances,

such as contamination or option contracts, are imposed. (Trial Tr. (Samuels) at 3458:25-

3460:25.) With respect to "raw land itself, there are too many opportunities and too many

alternatives and too many options that people have to generate income and to generate cash from

raw land." (*Id.*; *see* Trial Tr. (Metrick) at 1976:19-1978:2.) Mr. Hewlett himself recognized that

the owner of land for which his analysis showed a negative value would not give the land away,

but would instead wait until market conditions improved and use or sell the land. (*See* Trial Tr.

(Hewlett) at 808:16-809:6.) This is the very essence of the "option value" that his analysis

ignored.

Actual sales being contemplated and negotiated by TOUSA as of July 31, 2007

make plain the flaws in Mr. Hewlett's methodology. For example, as of July 31, 2007, TOUSA

had received three letters of intent to purchase a property at Canyon Crossroads, and TOUSA in

fact sold this property in late 2007 for $12.4 million. (Trial Tr. (Hewlett) 834:7-840:1.) A sales

comparison approach indicated a market value of $14 million for the property. (Ex. 643

(Samuels Report) at 330.) Mr. Hewlett's analysis derived a net present value of *negative* $8.1

million (which he conservatively noted as zero), which was $22 million off the mark. (*See* Trial

Tr. (Samuels) at 3445:23-3452:4.)

As of July 31, 2007, TOUSA was also actively engaged in negotiating the sale of

its Engle Mid-Atlantic and Virginia Divisions. TOUSA sold those assets for $29 million in

October 2007. (*See* Ex. 643 (Samuels Report) at 446.) A sales comparison approach (including

a number of lots with some vertical construction not included in the sale) indicated a market value of approximately $33 million. (*Id.* at 448.) Mr. Hewlett's DCF analysis derived a net present value as of July 31, 2007 of only $17 million (*id.*), which was $16 million off the mark.

Mr. Hewlett's workpapers reflect that he knew that a sales comparison approach would have yielded significantly higher values. A file memo on the Red River property shows that the sales comparison approach indicated a per acre value of $30,000, or $55 million for the whole tract. (Trial Tr. (Hewlett) at 816:13-817:11.) This is similar to the $56.9 million value derived by Mr. Samuels using a sales comparison approach, (Ex. 643 (Samuels Report) at 446), and is consistent with a December 29, 2006 appraised value of $40,000 per acre, (Ex. 5401). Mr. Hewlett however rejected the results of the sales comparison analysis and concluded a value of ***negative $122 million*** based on his DCF analysis. (*See* Motion to Exclude the Reports and Expert Testimony of Charles A. Hewlett (D.E. 392), at Ex. J.) This valuation gap of more than $175 million is stunning.

Mr. Hewlett's failure to apply a sales comparison approach resulted in his undervaluing TOUSA's raw land inventory by more than $120 million, when considering his "conservative" zero value assumption for most raw land. (*See* Trial Tr. (Samuels) at 3445:23-3452:9); Ex. 643 (Samuels Report) at 444.) The failure to consider a sales comparable approach infected Mr. Hewlett's analysis of inventory categories other than raw land. (*See* Trial Tr. (Metrick) at 1967:13-1968:7.)

   (ii) **Applying Market-Derived Inputs Would Materially Change Mr. Hewlett's Value Conclusions**

Mr. Hewlett's analysis assumed that the land would be developed exactly as TOUSA had anticipated and at exactly the same cost, thus reflecting an investment return expected to TOUSA, not a fair value of the assets. (*See* Trial Tr. (Metrick) at 1976:19-1978:2.)

The flaw in this analysis is best illustrated by the discount rates Mr. Hewlett used. Mr. Hewlett calculated his discount rates based on TOUSA's debt rate, derived directly from TOUSA's Revolving Credit facility, and TOUSA's internal debt-to-equity weighting. TOUSA's debt rate was 9.32%, more than 2% higher than the market rates as of July 31, 2007. (*See* Trial Tr. (Samuels) at 3455:18-3458:24; Ex. 643 (Samuels Report) at 440.) TOUSA's debt to equity weighting also ran significantly higher than market. (*Id.*) By using TOUSA's numbers instead of market rates for the discount rate, Mr. Hewlett undervalued TOUSA by more than $50 million. (*See* Ex. 643 (Samuels Report) at 441.) Using costs derived from TOUSA's internal budgets and historical costs, which were dramatically higher than what other developers in the marketplace were incurring, instead of market-derived costs similarly caused Mr. Hewlett to materially undervalue TOUSA's assets. (*See* Trial Tr. (Samuels) 3436:6-3437:9.)

### (iii) Mr. Hewlett's DCF Models Contain Unreliable Cost, Average Sales Price, and Absorption Projections

Mr. Hewlett rejected the contemporaneous financial projections created by TOUSA management in favor of his own projections. In fact, he expressly stated that his projections were "not influenced by what management's projections were or were not at the time." (Trial Tr. (Hewlett) at 764:5-18.) But Mr. Hewlett has no experience operating or even valuing a homebuilder. (*Id.* at 749:10-19.) Moreover, it is well settled that *post facto* projections prepared for purposes of litigation are disfavored compared to managements' contemporaneously prepared projections. *See Iridium*, 373 B.R. at 347 ("Without a firm basis to replace management's cost projections with those developed for litigation, the starting point for a solvency analysis should be management's projections.") (citing *Brandt v. Samuel Son & Co. (In re Longview Aluminum, LLC)*, Nos. 03 B 12184, 04 A 01051, 04 A 00276, 04 A 00279, 2005 WL 3021173, at *9 (Bankr. N.D. Ill. July 14, 2005), *aff'd sub nom Baldi v. Samuel Son & Co.*

*(In re McCook Metals, LLC)*, No. 05C2990, 2007 WL 4287507 (N.D. Ill. Dec. 4, 2007), *aff'd*,

548 F. 3d 579 (7th Cir. 2008).)[33]

(a)    **Mr. Hewlett's Costs Are Unreliable**

As Mr. Hewlett stated, costs are a key driver of a DCF analysis. (*See* Ex. 633 at

17.) The horizontal cost-to-complete data provided by Ms. Benbrook and the vertical cost-to-

complete numbers that Mr. Hewlett derived were taken directly from internal TOUSA EssBase

reports. But, as Ms. Benbrook and Mr. Hewlett admit, the budget information they relied on

from those reports is not static. (Trial Tr. (Benbrook) 4216:24-4217:6; Trial Tr. (Hewlett)

4266:17-4267:2.) Accordingly, the costs that drove Mr. Hewlett's DCF analysis did not reflect

information that was known or knowable as of July 31, 2007.

Expert testimony must be based on reliable principles and methods. *See* Fed. R.

Evid. 702. Ms. Benbrook's and Mr. Hewlett's repeated assertion on rebuttal that the budget

---

[33]   In *Iridium*, a fraudulent transfer action, the court held that the creditors committee failed to prove that the debtors were insolvent. The committee attempted to show insolvency with cash flow projections its expert created in anticipation of litigation, rather than the debtor's pre-petition business plan cash flow projections that were extensively vetted by the debtor's lenders. 373 B.R. at 295-96. The court found that the debtor's projections were "reasonable and prudent," based on "management's input into the creation of the projections," "the deliberative process of development and testing that produced [the] projections," and expert analysis by investment bankers. *Id.* at 347-48. Further, the court stated that where alternative projections "are no better supported by the evidence than are those in the Business Plan," the projections in management's business plan should be used in the DCF. *Id.* at 351 (citing *In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr. N.D. Tex. 2005)).

*See also Cede & Co. v. Medpointe Healthcare, Inc.*, No. Civ. A. 19354-NC, 2004 WL 2093967 (Del. Ch. Sept. 10, 2004). In an appraisal action to determine fair value of stock held by the petitioners as of the date of a merger, the court stated: "[t]his Court has a preference for the use of management forecasts because management is typically deemed most knowledgeable about the Company's prospects." *Id.* at *16 (citing cases). The court noted that "post-hoc litigation driven forecasts have an 'untenably high' probability of containing 'hindsight bias and other cognitive distortions'..." *Id.* (citing *Agranoff v. Miller*, 791 A.2d 880, 892 (Del. Ch. 2001) (refusing to give any weight to expert's DCF analysis based on substantially revised set of management projections that both experts found unreliable, relying instead on the comparable companies methodology)). For that reason, the court stated that it was skeptical of ex post adjustments to management forecasts "or the creation of new projections entirely." *Id.* at n.84 (quoting *Cede & Co. v. JRC Acquisition Corp.*, No. Civ. A. 18648-NC, 2004 WL 286963, *2 (Del. Ch. Feb. 10, 2004)). *See also Gray v. Cytokine Pharmasciences, Inc.*, No. Civ. A. 17451, 2002 WL 853549, *8 ( Del. Ch. Apr. 25, 2002) (disregarding expert's DCF analysis, finding expert's "litigation-driven projections to be unreliable" where expert ignored detailed management projections and created his own).

49

numbers in the TOUSA reports are "reliable," (Trial Tr. (Benbrook) 4165:19-23, 4182:20-25; Trial Tr. (Hewlett) 4272:11-22), is incredible and contrary to the very definition of reliability. It is undisputed that the budget numbers change and cannot be relied upon to determine costs as of July 31, 2007. (Trial Tr. (Devendorf) 1909:2-12.) The "new analysis" done by Ms. Benbrook and Mr. Hewlett during the trial does not alter this conclusion.

First, the "variability analysis" comparing the change between the budgets in the late-2008 reports to the budgets in the July 2009 reports does not indicate how much the budgets changed between July 2007 – the relevant date for purposes of Mr. Hewlett's valuation – and October 2008.[34] (Trial Tr. (Hewlett) 4293:13-18; Trial Tr. (Benbrook) at 4186:17-24.) In fact, the budgets would have changed more before late-2008, when TOUSA was still actively developing properties. (Trial Tr. (Devendorf) 1960:24-1961:2.) Second, the "materiality analysis" purportedly showing that the average costs to complete derived from the non-static budget numbers were not materially different from cost information contained in other TOUSA reports does not render the methodology used reliable.[35] Neither Ms. Benbrook nor Mr. Hewlett

---

[34] Ms. Benbrook's variability analysis contains numerous formula errors and is itself unreliable. (Trial Tr. (Benbrook) at 4246:25-4247:21.) As she testified, there are errors in her workpapers, the right numbers are not reflected in her summary presentation, and she is "not sure" if she would get the same result after correcting her errors. (Trial. Tr. (Benbrook) 4195:13-4198:25.) Moreover, Ms. Benbrook's analysis, even with the numerous errors, notes that the there was a variance of *more than* 5% in 36.4% of communities analyzed between the budget numbers she relied on and the July 2009 budget numbers. (Trial Tr. (Benbrook) 4201:2-5; Ex. 905.)

[35] The analysis also does not demonstrate "the known or potential error rate of the methodology" discussed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Ms. Benbrook and Mr. Hewlett presented net variances to the Court, thereby masking the relevant error rates. (*See, e.g.*, Trial Tr. (Benbrook) 4254:6-16 (acknowledging that there may be huge differences between the budget numbers used and the other data considered depending on the community).) As Mr. Hewlett noted, the budget numbers he relied on had a variance from TOUSA's historical costs of *more than* 10% in 33% of communities analyzed. (Ex. 4221.) Ms. Benbrook's materiality analysis is similarly unavailing. As she testified, determining the potential per lot variance, she had no methodology or process to decide which of the five alternative data points she would compare her budget information to. (Trial Tr. (Benbrook) 4244:17-25.) Moreover, the materiality conclusion she presented was calculated based on the book value of the inventory, which is significantly higher than the values determined by Mr. Hewlett, and thus materially understated the variability. (Trial Tr. (Benbrook) at 4249:2-12.)

modified their original analyses to incorporate the costs derived using one of the alternative methodologies identified. Their analyses relied solely on TOUSA's budget numbers. The continued reliance on non-static budget numbers by Ms. Benbrook, Mr. Hewlett and, by extension, Mr. Clancy is fatal to their opinions. *See U.S. v. Sarras*, --- F.3d ----, No. 08-11757, 2009 WL 2176643, at *14-15 (11th Cir. July 23, 2009) (affirming preclusion of expert testimony based on methodology not proven to be reliable); *Phillips v. American Honda Motor Co.*, 238 Fed. Appx. 537, 540 (11th Cir. 2007) (affirming exclusion of testimony by expert who provided "no reliable link between his data and the facts at issue in the case").

The costs in Mr. Hewlett's DCF analyses are also unreliable because they assume, consistent with Ms. Benbrook's instruction, that costs, including land acquisition costs, material and labor, will remain flat if ASPs are decreasing, despite projecting significantly decreasing housing prices. (Trial Tr. (Samuels) at 3464:19-3464:15.) This assumption is unreasonable and inconsistent with what was being observed in the market as of July 31, 2007. (*Id.*; Ex. 643 at 434.) As Mr. Samuels testified, the *Marshall Valuation Service* available as of July 31, 2007, already showed monthly construction cost trends decreasing between 2% and 8%. (Trial Tr. (Samuels) at 3464:12-18.) A steeper downturn after July 2007 would result in further decreased costs. Accordingly, Mr. Hewlett's DCFs significantly overstate the costs, thereby driving down the value of the property. (*Id.* at 3463:5-3465:8; Ex. 643 at 435.)

          (b)    **Mr. Hewlett's Method for Projecting Average Sales Price is Flawed**

Although Mr. Hewlett attempted to dress up his forecasts with a discussion of economic events surrounding the valuation date, in essence Mr. Hewlett simply took his

forecasts from a website.[36] Specifically, Mr. Hewlett derived future sales prices by applying

forecast factors from the www.economy.com website to July 31, 2007 sales prices. (*See* Trial

Tr. (Hewlett) at 682:22-683:18.) Mr. Hewlett applied the forecast factors without independently

testing their reasonableness and without understanding the methodology or data with which they

are derived. (*See id.* at 768:13-13-775:9); 766:13-17 (no recollection of his views as of July 31,

2007).) In fact, Mr. Hewlett made clear that he does not know the basic statistical concepts

needed to understand or test the modeling used by the www.economy.com economists to create

the forecasts. (*See id.* at 768:17-769:13.) Mr. Hewlett's opinion therefore fails to satisfy Rule

702. *See American Key Corp.*, 762 F.2d at 1580 (11th Cir. 1985); *see also Kipperman*, 2009 WL

2515664 at *28 (excluding expert opinion that relied on industry statistics without a scientific

explanation as to why they were an adequate benchmark for the debtor and without explaining

how they were compiled, whether they were subject to peer review, whether they had a known

error range, or whether they are generally used by financial experts looking at the industry).

   Indeed, Mr. Hewlett did not even test the long-term reliability of the

www.economy.com forecasts by comparing historical forecasts to actual market results. (Trial

Tr. (Hewlett) at 774:4-19.) Significantly, the data from the Case-Shiller and OFHEO Indexes on

which the www.economy.com forecast factors are based relate only to resales of existing homes,

not to new home sales. (*Id.* at 772:21-773:2.) They also include foreclosure data. TOUSA's

business is the construction and sale of new homes. (*Id.*) It is not a reseller. The indexes

therefore cannot properly be used to forecast new home pricing. (*See* Trial Tr. (Cannon) at

2948:5-2949:1.) More fundamentally, the indexes are based on a technical application of a

---

[36] Mr. Hewlett admitted that views of the industry were mixed as of July 31, 2007, *see* Trial Tr. (Hewlett) at 751:17-23, and as Christopher James testified, the steep downturn was not expected or experienced before August 2007, see Trial Tr. (James) at 2135:13-2136:6.

paired-sales methodology, which has significant flaws and does not accurately reflect home

prices in the cities covered. (*See id.* at 2949:2-2955:19.) It is not relied on by appraisers (*id.*),

but was relied on blindly by Mr. Hewlett.

(c)    **Mr. Hewlett's Absorption Assumptions<br>Are Unreasonable**

Mr. Hewlett arbitrarily projected absorption rates – effectively, the rate at which

TOUSA will sell homes – for each TOUSA community he analyzed, again rejecting

management's contemporaneous projections based on their knowledge of the business. For

many communities, Mr. Hewlett projected unreasonably long absorption periods. (Trial Tr.

(Hewlett) at 796:15-797:1 (projecting absorption period of more than five years in ten percent of

communities).) The protracted absorption periods manufactured by Mr. Hewlett are arbitrary,

unrealistic and are inconsistent with homebuilders' behaviors. (Trial Tr. (Cannon) at 3073:7-11.)

Rather than building out a community over decades, homebuilders would modify the product and

staging to reduce the absorption period and related sales and marketing costs.

(iv)    **Mr. Hewlett Inappropriately Valued<br>Communities By Extrapolating Conclusions<br>From Communities Analyzed**

Mr. Hewlett performed a DCF analysis on approximately two thirds of TOUSA's

communities. (Trial Tr. (Samuels) at 3452:10-3455:13.) He valued the remaining communities

by improperly extrapolating the value conclusions for communities he did analyze to

communities he did not analyze by comparing the product mix in the two communities and

writing down the book value of the community not analyzed by the same percentage as the

community analyzed. (*Id.* at 3452:10-3455:13.) But, as Mr. Hewlett admitted, book value has

no relation to fair value. (Trial Tr. (Hewlett) at 812:9-812:24.) Moreover, in considering

whether communities are comparable, Mr. Hewlett did not consider when the underlying land

53

was acquired or whether it had been subject to an impairment write-down since its purchase. Applying this unfounded technique, Mr. Hewlett extrapolated zero and near-zero values to a significant number of properties. (Trial Tr. (Samuels) at 3452:10-3455:13.) In total, Mr. Hewlett attributed zero values to properties with a book value of $215 million and, by extrapolation and without analysis, attributed zero values to another $60 million dollars worth of properties. (*Id.* at 3452:10-3455:13.) Similarly, Mr. Hewlett attributed less than 15% of book value to properties with a total book value of approximately $130 million, and then wrote down another $44 million of book value by extrapolation and without analysis. (*See* Trial Tr. (Samuels) at 3452:10-3455:13.) These valuations are unreliable and fail to satisfy Rule 702. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (affirming exclusion of testimony from expert who extrapolated temperature data from Texas to Georgia and Florida "because storage conditions were supposedly similar and the sites were all in the same basic latitudinal range" and expressing that "[t]ransposition of data based on such conjecture and rough approximation lacks the 'intellectual rigor' required by *Daubert*").

### (v) Mr. Clancy's Conveying Subsidiary Balance Sheets Are Unreliable

A central feature of Mr. Clancy's work is the creation of brand new financial reports for two Conveying Subsidiaries, Tousa Homes, Inc. ("THI") and Newmark Homes, Inc. ("Newmark") and post-transaction balance sheets he created for THI, Newmark and TOUSA Homes Florida, LP. TOUSA reported its financial information on a consolidated basis, and never created or maintained financial reports for these entities in the course of its business. Mr. Clancy used as his foundation the consolidated and consolidating legal entity trial balance as of July 31, 2007 (the "Trial Balance") that TOUSA prepared in connection with this litigation. (Trial Tr. (Clancy) at 996:10-14; 998:7-13.)

54

Mr. Clancy did not perform an ability to pay debts test on a legal entity basis, in part because there are only projections available on a consolidated basis. (*Id.* at 1025:25-1026:5.) TOUSA did not prepare forecasts on a legal entity basis, so performing an ability to pay debts test on a legal entity basis "would have relied upon a lot of subjectivity, recreating something or creating that for the first time after the fact." (*Id.* at 1026:11-1027:5.) Mr. Clancy similarly did not perform a DCF analysis for the individual TOUSA entities because there are no cash flow statements available. (*Id.* at 1136:1-13.)

Because TOUSA did not keep its books and records on a legal entity basis, Mr. Clancy was forced to make two significant assumptions to try to create balance sheets. First, he assumed that the bond debt outstanding should be allocated, after exhausting TOUSA, Inc.'s resources, based upon the respective net worth of the subsidiaries (the "Bond Allocation Method") and second, he assumed that all intercompany transactions should be treated as equity investments. Neither if these assumptions is reasonable.[37]

Mr. Clancy's *post facto* creation of legal entity balance sheets was an inherently speculative and unreliable exercise. The very people responsible for maintaining TOUSA's financial reporting system and producing audited statements overwhelmingly testified that credible financial statements cannot be created for TOUSA's individual legal entities. (Ex. 5254 (Lee Report) at 20; Trial Tr. (Wagman) at 493:16 – 494:13; Trial Tr. (Berkowitz) at 1725:14-17; Trial Tr. (McManus) at 3614:6-10; Wagman Depo. at 128:20-129:03; Trial Tr. (Devendorf) at 1877:15-1877:18; Correa Depo at 159:3-159:14; Devendorf Depo. at 89:21-92:18; McAden

---

[37] Mr. Clancy's arbitrary decision to treat intercompany transactions as equity investments ignores the fact that "Intercompany Obligations" were pledged as collateral to the Revolving Credit Lenders prior to the issuance of the New Loan. (Ex. 3062, § 3.1(b)(i).) Mr. Clancy provided no accounting principle that allowed him to disregard the legal character and nature of the Intercompany Obligations, which are contractual liabilities, and treat them as equity.

Depo. at 157:12-159:8.) If TOUSA's financial managers, together with the human resources of a large accounting team and detailed accounting databases, were not capable of creating these reports, it stretches the bounds of reason to believe that Mr. Clancy, with his small team of associates and no in-depth knowledge of TOUSA's accounting systems, could create credible and reliable financial statements in a matter of months.

(a)    **Mr. Clancy's Bond Allocation Methodology Fails To Account For the Contingent Nature of the Subsidiaries' Liability on the Bond Debt**

TOUSA, Inc. is the only direct obligor on the unsecured bond debt. (Ex. 630 at 17.) The Conveying Subsidiaries are merely guarantors, promising to repay the debt in the event of a default by TOUSA, Inc. (*Id.*) The Conveying Subsidiaries' potential exposure is further reduced under the bond indentures to their pro rata share based on "the proportion that the net worth of the Company or the relevant Subsidiary Guarantor represents relative to the aggregate net worth of the Company and all of the Subsidiary Guarantors combined." (*Id.*)

The bond debt was recorded entirely on TOUSA, Inc.'s books. (Trial Tr. (Clancy) 1121:24-1122:4.) To allocate the bond debt to the Conveying Subsidiaries, Mr. Clancy developed a two-step allocation methodology in which he first determined the amount of bond debt to be allocated to the subsidiaries using a dividend analysis and then allocated that debt based on net worth. (*Id.* at 1120:13-18.) This methodology is contrary to established legal principles. In assessing solvency, contingent liabilities – such as the Conveying Subsidiaries' guaranties on the bond debt – must be fair valued by discounting the total potential exposure by the likelihood that the contingency will become real. *See In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325 (11th Cir. 2007) ("A contingent liability is not certain – and often is highly unlikely – ever to become an actual liability. To value the contingent liability it is necessary to

56

discount it . . . .") (quoting *In re Xonics Photochemical*, 841 F.2d 198, 200 (7th Cir. 1988)).  Mr. Clancy undertook no such analysis.  (Trial Tr. (Clancy) 1128:18-1130:19.)  Instead, he improperly allocated the maximum potential exposure to each Conveying Subsidiary, significantly overstating their liabilities.  This overstatement had a material impact on his analysis because, even accepting Mr. Hewlett's adjusted inventory values, no Conveying Subsidiary was insolvent by more than the allocated value of the bond debt.  (*Id.* at 1124:10-24.)

(b)    **Mr. Clancy's Treatment of the Intercompany Accounts Fails To Account For the Significant Assets and Liabilities on the Legal Entity Balance Sheets**

TOUSA has never indicated that the intercompany accounts represent equity investments in the subsidiaries – as opposed to liabilities – and the current Plan, as described in the Disclosure Statement of Wind Down Version, provides for treatment of the intercompany claims in the event that such claims become Allowed.  (*See* Ex. 630 at 17, n. 8 and Ex. 631 at 13, n. 10.)  Yet, in his legal entity analysis, Mr. Clancy eliminated the Intercompany Notes and the intercompany balances entirely, concluding that they constitute an equity investment.  This conclusion is contradicted by the evidence.

**B.    The Committee Failed to Prove that TOUSA or the Conveying Subsidiaries Did Not Receive Reasonably Equivalent Value In the July 31 Transactions**

The Committee has the burden of proving each element of a fraudulent transfer claim by a preponderance of the evidence, including that the debtor did not receive reasonably equivalent value in exchange for the property transferred and obligations incurred.  *See Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593-94 (11th Cir. 1990) (citing *In re Rodriquez*, 895 F.2d 725, 726 n.1 (11th Cir. 1990) ("The trustee bears the burden of showing that a transfer was not for reasonably equivalent value.")); *In re Pembroke Dev. Corp.,*

57

124 B.R. 398, 400 (Bankr. S.D. Fla. 1991). The Committee purports to carry its burden with a single assertion by Mr. Derrough that "[t]he Conveying Subsidiaries were relieved of no direct obligations in connection with the Transeastern Settlement and as a result, received no direct benefit. It seems the Conveying Subsidiaries themselves did not receive reasonably equivalent value, if any value at all." (Ex. 633 at 5. *See also* Trial Tr. (Derrough) 1363:7-23.) This is clearly insufficient.

### 1.    TOUSA Received Reasonably Equivalent Value in Direct Benefits From the July 31 Transactions

It is undisputed that TOUSA received substantial direct benefits in the July 31 Transactions. TOUSA was relieved of its obligations on the Transeastern debt, for which it had recorded a contingent liability of $386 million, acquired the Transeastern assets, and received valuable tax assets as a result of the transaction. (*See* Ex. 5254 (Lee Report) at 35-38; Ex. 631 (Clancy Rebuttal Report) at 5.) In addition to the direct benefits, TOUSA received significant indirect benefits including the avoidance of a free-fall bankruptcy, which provided TOUSA with continued access to its revolving credit facility and improved conditions with vendors and employees. (Ex. 5254 (Lee Report) at 30, 38; Ex. 3000 (Lenhart Report) at 142-43, 151.) The Committee adduces no contrary evidence and indeed, the balance sheets presented by Mr. Clancy establish the opposite.[38] *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) ("when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received").

---

[38] Notably, Mr. Clancy offered no opinion on the nature or value of benefits received and his balance sheets cannot be relied upon as evidence that any entity received less than reasonably equivalent value. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 151 (3d Cir. 1999) (noting that "[t]hat should dispel any suggestion that *Metro Communications* stands for the proposition that a debtor must receive a direct, tangible economic benefit in order to receive "value" for purposes of § 548(a)(2) of the Code").

According to Mr. Clancy, before the July 31 Transactions, TOUSA had a net equity value of negative $541 million. (*See* Ex. 631 at 11.) After the transactions, Mr. Clancy opined that TOUSA's net equity value was negative $662 million. The $121 million decrease in equity value after the transactions correlates directly to Mr. Clancy's $122 million write-down of the value of the Transeastern assets based on Mr. Hewlett's valuation. But, as Mr. Clancy knows, the Transeastern assets were recorded on TOUSA's books at fair value, as required by acquisition accounting. (*See* Trial Tr. (Clancy) at 1135:5-20. *See also* Ex. 480 at EY-TOUSA-002204 (noting that Ernst & Young was comfortable with value attributed to the assets).) Mr. Hewlett's conclusion that the Transeastern assets were worth $28 million bears no relation to the fair value. (*See* Ex. 643 (Samuels Report) at v (valuing TE assets at $145.5 million); Ex. 611 (Cannon Report) at 30, 32, 36, 39, 44 (valuing TE assets at $172.3 million).)

Recognizing that TOUSA received reasonably equivalent value, the Committee attempts artificially to deconstruct the consolidated enterprise, and bring an action on behalf of the unsecured creditors of TOUSA debtors other than TOUSA, Inc. and TOUSA Homes, LP ("TOUSA Homes"), arguing that the individual "Conveying Subsidiaries" did not receive reasonably equivalent value. The Committee fails to carry its burden on this theory as well.

2.    **The Conveying Subsidiaries Received Reasonably Equivalent Value**

a.    **TOUSA Homes Florida, LP Received Reasonably Equivalent Value in Direct Benefits From the July 31 Transactions**

The assets acquired in the July 31 Transactions were recorded on the books of TOUSA Homes Florida, LP. (*See* Ex. 630 (Clancy Report) at 7.) Even accepting Mr. Hewlett's valuation, which understated the value of the Transeastern assets by $120 million, TOUSA Homes Florida, LP received $26 million in direct benefits as a result of the July 31 Transactions.

(*Id.* at 25.) The Committee does not assert that these benefits were not reasonably equivalent in value to any property transferred or obligation incurred. Indeed, prior to the July 31 Transactions, TOUSA Homes Florida, LP had no assets. (Ex. 48 at 4.)

**b.     TOUSA Homes Inc. and Newmark Homes Received Reasonably Equivalent Indirect Benefits**

A debtor need not "receive a direct, tangible economic benefit in order to receive value." *See In re R.M.L.*, 92 F.3d at 151. "[T]ransfers to third parties, particularly affiliates, are supported by fair consideration when the debtor benefits indirectly." *In re Fabrikant & Sons, Inc.*, 394 B.R. 721, 738 (Bankr. S.D.N.Y. 2008) (citing *In re Image Worldwide, Ltd.*, 139 F.3d 574, 578-79 (7th Cir. 1998)). *See also In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990) (stating that the Bankruptcy Code "does not authorize voiding a transfer which 'confers an economic benefit upon the debtor,' either directly or indirectly"); *In re Taylor*, 386 B.R. 361, 370 (Bankr. S.D. Fla. 2008) ("The benefit received need not be entirely 'direct'; a transaction can have indirect benefits.").

TOUSA, Inc. and the Conveying Subsidiaries operated as a single business enterprise, benefiting significantly from centralized operations. (*See* Ex. 639 (Lee Report) at 9-22.) Because TOUSA, Inc. and the Conveying Subsidiaries "share an identity of interests" – and a centralized cash management system – what benefits one entity will benefit the other, and reasonably equivalent value may be found in the direct consideration received by TOUSA, Inc. *See In re Pembroke Dev. Corp.*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991); *In re Royal Crown Bottlers of N.Am.*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982). *See also In re Miami Gen. Hosp., Inc.*, 124 B.R. 383, 387 (Bankr. S.D. Fla. 1991) (repayment by debtor of an affiliate's debts was not a fraudulent transfer, finding sufficient indirect benefit based on the "symbiotic" relationship among the affiliates); *Telefest Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1378 (D.N.J. 1984)

(debtor's guaranty of a parent's loan not a fraudulent transfer because the loan was intended to benefit the debtor subsidiary based on the "close and intertwined relationship" between parent and debtor).[39]

Prior to July 31, 2007, the Conveying Subsidiaries were heavily reliant on the revolving credit agreement's letter of credit feature which was used almost exclusively to secure bonding obligations. (Trial Tr. (Berkowitz) at 1628:11-1630:13.) Failure to resolve the Transeastern Litigation would have created a default under the revolver and blocked the Conveying Subsidiaries' access to the letters of credit and operating cash. The resolution of the Transeastern Litigation not only maintained access to the revolver, but it increased access to cash under the revolving credit facility as a result of the acquisition of the Transeastern assets, which were valued at approximately $150 million. (*See* Ex. 639 (lee Report) at 38.) *See also In re Fabrikant*, 394 B.R. at 738 (citing *Image Worldwide*, 139 F.3d at 578-79) ("indirect benefits may include synergy, increased access to capital, safeguarding a source of supply and protecting customer relationships"). The Conveying Subsidiaries' need for financing was real and concrete.[40]

---

[39] The court in *Telefest* applied the "identity of interests" principle in holding that a subsidiary received indirect benefits from guarantying new and old loans to its parent and affiliates. 591 F. Supp. at 1381. The court determined that the loan was intended to benefit the subsidiary, based on evidence showing a "close and intertwined relationship" among the parent and subsidiaries. *Id.* at 1378. The court noted that a loan allowing the parent's expansion would "most probably provide an additional and secure market" to the subsidiary. *Id.* at 1379. The *Telefest* court found that fair consideration was given, citing commentary identifying sources of fair consideration as indirect benefits, rights of subrogation, and rights of contribution against subsidiaries. *Id.* at 1380 (citing Coquillette, "Guaranty of and Security for the Debt of a Parent Corporation by a Subsidiary Corporation," 30 Case Western L. Rev. 433, 452 (1980)).

[40] The Trial Balance relied on by Mr. Clancy shows a negative cash balance of $3 million and $10.8 million respectively for Newmark and THI. (Ex. 48 at 8.) In recognition of the critical nature of the Conveying Subsidiaries' liquidity needs, Mr. Derrough and others testified that the Conveying Subsidiaries could have obtained stand-alone financing. The consent and agreement of numerous parties with disparate and divergent interests would have been required. (Trial Tr. (Berkowitz) at 1723:15-1724:4; 1724:14-21.) The Committee's position that the Conveying Subsidiaries could easily obtain independent financing must be carefully scrutinized in light of Mr. Clancy's testimony that TOUSA and the Conveying Subsidiaries were insolvent immediately before the Transeastern Settlement by half a billion dollars.

The Conveying Subsidiaries also benefited from the realization of tax assets worth at least $145 million. (*See* Ex. 639 (Lee Report) at 39-40.) *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995). The avoidance of a TOUSA bankruptcy is also a highly relevant and legally cognizable benefit.[41] *See Williams v. Twin City Co.*, 251 F.2d 678, 681 (9th Cir. 1958) (finding the avoidance of bankruptcy, or delaying a bankruptcy, may constitute an indirect benefit); *see also Geron v. Palladin Overseas Fund, Ltd.* (*In re AppliedTheory Corp.*), 330 B.R. 362, 364 (S.D.N.Y. 2005) (holding that avoiding bankruptcy, even if "ultimately proved to be short-lived," provides reasonably equivalent value).

Mr. Derrough's assertion that a bankruptcy for TOUSA, Inc. would not necessarily have resulted in the bankruptcy of the Conveying Subsidiaries, Ex. 634 at ¶¶ 24-32, ignores the fact that the Conveying Subsidiaries were co-borrowers on the $800 million revolver facility, which held as collateral a secured claim on all of their assets. (Trial Tr. (Berkowitz) at 1724:8-13.) The Conveying Subsidiaries were also guarantors on over $1 billion of bond debt before the July 31 Transactions. (*Id.* at 1678:3-1679:3.) In a TOUSA-only bankruptcy the assets of the Conveying Subsidiaries would have been immediately vulnerable to seizure from secured lenders. (*Id.*) The bonds guarantied by the Conveying Subsidiaries would have accelerated and they would have been subject to calls on a billion dollars worth of guaranties. (*Id.*) It is implausible to assume the Conveying Subsidiaries would avert their own bankruptcy when their entire asset base was at the mercy of their creditors.

---

[41] The Senior Transeastern Lenders are cognizant of the Court's question presented to counsel at the July 6, 2009 hearing inquiring as to whether it was worse to suffer a bond default in mid-2007 vs. late-2007 or early 2008. (*See* July 6, 2009 Hearing Tr. (D.E. 536) at 28.) The Senior Transeastern Lenders respectfully suggest that this issue was fully considered by the TOUSA Board of Directors at the time. The Board, in a valid exercise of its business judgment, determined that taking action in July 2007 to avoid a default and the concomitant damages was in the best interests of TOUSA. (*See* Ex. 187 at Lehman 060920; Ex. 255 at 5.)

Accepting as true however that the Conveying Subsidiaries could have avoided bankruptcy highlights another significant benefit received by the Conveying Subsidiaries. A bankruptcy filing by Tousa, Inc. would have forced a disentangling of the intercompany obligations and repayment of those obligations by the Conveying Subsidiaries to TOUSA, Inc.[42] This was of significant value to THI and Newmark, the main homebuilding operations, which had outstanding net intercompany payables of $796 million and $175 million, respectively. (See Ex. 48 at 12.)

In addition to the tangible benefits, the Conveying Subsidiaries also benefited from the elimination of the negative effects of the Transeastern litigation – on vendors, customers and employees – and the avoidance of the effects of a free-fall bankruptcy filing by TOUSA, Inc., including maintaining the beneficial synergies. *See Mellon* Bank, 945 F.2d at 646-47 (corporate synergies identified as indirect benefit); *Williams v. Twin City Co.*, 251 F.2d 678, 681 (9th Cir. 1958) (avoidance of bankruptcy identified as indirect benefit).

The Committee has not proved that the indirect benefits identified lack value, and has therefore failed to carry its burden.[43] *See Mellon Bank*, 945 F.2d at 648 (the Committee failed to satisfy its burden where the Committee acted on the "blind assumption" that the indirect benefits of the leveraged buy-out had no value); *In re McDonald*, 265 B.R. 632, 636 (Bankr. M.D. Fla. 2001) (plaintiff failed to bring forward evidence sufficient to prove by a

---

[42]    As noted above, the Intercompany Obligations were pledged as collateral under the revolving credit facility. (Ex. 3062, § 3.1(b)(i).)

[43]    Although this Court has held that a burden of production may shift to the defendant to show that the debtor received a benefit from the transfer, *see, e.g., In re Aqua Clear Technologies, Inc.*, 361 B.R. 567, 582 (Bankr. S.D. Fla. 2007), that case is inapposite in that it deals with a circumstance in which the plaintiff demonstrated actual fraud in connection with $8,732.19 in avoidable transfers. To the extent the Court concludes that it is in fact applicable, we respectfully submit that *In re Aqua Clear* was wrongly decided and urge the Court to reconsider its decision. In any event, the defendants have satisfied the burden of production identified in *In re Aqua Clear* and the Committee has failed to prove that the benefits identified do not constitute reasonably equivalent value.

preponderance of the evidence that the debtor did not receive reasonably equivalent value); *In re Actrade Fin. Techs., LTD.*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005) (denying summary judgment, but stating that the plaintiff "cannot prevail on its 'simplistic formulation that [the debtor] received nothing'"); *In re R.M.L, Inc.*, 195 B.R. 602, 620 (M.D. Pa. 1996) (dismissing argument that the burden shifted to defendant under *In re Minnesota Utility Contracting, Inc.*, 110 B.R. 414, 419 (D. Minn. 1990), and holding that the Committee failed to meet its burden where it showed no particularized evidence of lack of reasonably equivalent value and where the Committee's "blind assumption" that the debtor received no value was rebutted by testimony the Committee).

## IV.    THE COMMITTEE FAILED TO PROVE THE QUANTUM OF DAMAGES

If the Committee could prevail on any of its claims against the Senior Transeastern Lenders, the Court would have to determine the quantum of damages to award. To the extent that the Committee has given any indication of what it claims is the value of those liens, it appears to suggest that the liens are valued at the face value of the New Loans, so that the measure of damages against the Senior Transeastern Lenders is equal to the amount of the transfer they received from TOUSA (through ULT). (*See* Committee's Opp. to Mot. to Dismiss (D.E. 16) at 13.) But, as a threshold matter, the Committee cannot recover from the Senior Transeastern Lenders more than the Senior Transeastern Lenders received, i.e., $422.8 million. The damages available to the Committee also must, under any theory, be reduced by the value attributable to the non-plaintiff TOUSA entities and by the value attributable to the Conveying Subsidiaries that have failed to prove a fraudulent transfer. Furthermore, damages on the Committee's "for whose benefit" or subsequent transferee claims are limited to the value of the liens transferred by the prevailing Conveying Subsidiaries to the New Lenders, less any

recoupment, and subject to Section 550(d)'s proscription of any double satisfaction. *See* 11 U.S.C. § 550.

The Committee has offered no proof of the quantum of damages it claims from the Senior Transeastern Lenders and in particular has offered no evidence of the value, as of July 31, 2007, of the liens transferred to the New Lenders.

A. **Recovery Under Any Theory Is Not Available to Many TOUSA Entities**

Damages must be reduced by the value attributable to the non-plaintiff TOUSA entities, including TOUSA, Inc. and TOUSA Homes LP, under any theory advanced against the Senior Transeastern Lenders. The damages must further be reduced by the value attributable to the Conveying Subsidiaries other than Newmark and THI because the Committee failed to prove that any one of them owned property, transferred property, was insolvent, or received less than reasonably equivalent value in the July 31 Transactions. Mr. Clancy is the only Committee expert who purports to opine on the solvency of the individual subsidiaries. But Mr. Clancy only presents balance sheets for Newmark, THI, and TOUSA Homes Florida, LP, grouping the remaining Conveying Subsidiaries with TOUSA, Inc, a non-plaintiff entity that indisputably received reasonably equivalent value in the July 31 Transactions. As set forth above (*supra* at 59), TOUSA Homes Florida, LP also received reasonably equivalent value in the July 31 Transactions in the form of the Transeastern assets. Any recovery must therefore be further reduced by TOUSA Homes Florida, LP's allocable share of the alleged fraudulent transfer. According to Mr. Clancy's analysis, the total value of New Loans allocable to Newmark and THI is $376 million, (Ex. 630 (Clancy Report) at 12), only a portion of which would be recoverable against the Senior Transeastern Lenders.

1.    **TOUSA Homes Florida, LP Has Indemnification Obligations to the Senior Transeastern Lenders, Which Survived the Transeastern Settlement**

Any recovery must be further limited by the Senior Transeastern Lenders' recoupment rights, as asserted in their Sixteenth Affirmative Defense (*see* Answer (D.E. 259) at 32), and supported by the record.

Recoupment is "the right of a defendant, in the same action, to cut down the plaintiff's demand either because the plaintiff has not complied with some cross obligation of the contract on which he sues or because he has violated some duty which the law imposes on him in the making or performance of that contract." *In re Bill Heard Enters., Inc.*, 400 B.R. 813, 820 (Bankr. N.D. Ala. 2009) (internal quotations omitted). Because recoupment is defensive in nature, permitting a determination of the "just and proper liability on the main issue," *see Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993) (internal quotations omitted), if the Committee recovers any of the cash proceeds of the New Loans, the Court must decide recoupment issues before entering a damages award.

TOUSA, Inc., EH/Transeastern, LLC ("EH/Transeastern"), and TE/TOUSA Senior, LLC ("TOUSA Senior") were the "Borrower Parties" on the $450,000,000 Senior Credit Agreement dated as of August 1, 2005. EHT and TOUSA Senior were "Borrowers," and TOUSA, Inc. and TOUSA Homes were guarantors with respect to the Senior Credit Agreement.

Under Section 9.14 of the Senior Credit Agreement, each of the Borrower Parties agreed to indemnify and hold the Senior Transeastern Lenders harmless:

> from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, charges, expenses and disbursements (including reasonable attorney's fees and expenses) of any kind or nature whatsoever which may at any time (including at any time following repayment of the Loan and the termination, resignation or replacement of the Administrative Agent or replacement of any Lender) be imposed on, incurred by

66

or asserted against any such Person in any way relating to or arising out of this [Senior Credit] Agreement or any document contemplated by or referred to herein, or the transactions contemplated hereby, or any action taken or omitted by any such Person under or in connection with any of the foregoing, including with respect to any investigation, litigation or proceeding (including any insolvency proceeding or appellate proceeding) related to or arising out of this [Senior Credit] Agreement or the Loan or the use of the proceeds therefore, whether or not any Indemnified Person is a party thereto.

In connection with the Transeastern Settlement, and in particular with the settlement of the Senior Credit Agreement, the Senior Transeastern Lenders, TOUSA, Inc., EH/Transeastern, TOUSA Senior, TOUSA Homes, TE/TOUSA Mezzanine Two, LLC ("TOUSA Mezz II"), and TE/TOUSA Mezzanine, LLC ("TOUSA Mezz"), as well as other parties, entered into the Mutual Release and Consent Agreement dated as of July 31, 2007.

Section 3 of the Mutual Release and Consent Agreement specifically provides that the releases granted to TOUSA, Inc., EH/Transeastern, TOUSA Senior, TOUSA Homes, TE/TOUSA, TOUSA Mezz II, and TOUSA Mezz do not apply to legal claims by the lenders on the Senior Credit Agreement that arise under Section 9.14 of that agreement, among others. These specific exceptions to the releases in the Mutual Release and Consent Agreement are defined as the "Surviving Obligations."

As described above, EH/Transeastern, TOUSA Senior, TOUSA Mezz II, and TOUSA Mezz were merged into TOUSA Homes Florida, LP, one of the Conveying Subsidiaries (on whose behalf the Committee brought these proceedings), upon consummation of the Transeastern Settlement. The Surviving Obligations of EH/Transeastern, TOUSA Senior, TOUSA Mezz II, and TOUSA Mezz in connection with the Senior Credit Agreement and the Mutual Release and Consent Agreement therefore remain with TOUSA Homes Florida, LP.

There can be no question that the 12 counts of fraudulent transfer claims that the Committee brought on behalf of the Conveying Subsidiaries against the Senior Transeastern Lenders arise out of a transaction that relates to or arises out of the Senior Credit Agreement. The Committee brought claims against the Senior Transeastern Lenders precisely *because* they were the lenders of record on the Senior Credit Agreement at the time of the Transeastern Settlement. Under Section 9.14 of the Senior Credit Agreement, the Senior Transeastern Lenders have a right of recoupment, on an equal basis, against TOUSA, Inc., TOUSA Homes, EH/Transeastern, TOUSA Senior, TOUSA Mezz II, TOUSA Mezz, and TOUSA Homes Florida, LP for the full amount of any recovery against them in these proceedings, plus attorneys' fees and costs.

Accordingly, in the event of a judgment against the Senior Transeastern Lenders, at least one of the Conveying Subsidiaries – TOUSA Homes Florida, LP – would be obligated to indemnify them. Under the facts presented at trial, and the construction of the applicable provisions of the Senior Credit Agreement and the Transeastern Settlement, recoupment would significantly reduce any damages that could be recovered from the Senior Transeastern Lenders.

**B.    Any Damages Are Limited to the Value of Liens Transferred to the New Lenders, Which Was $161.3 Million as of July 31, 2007**

The Committee's claims in Counts VII through XII are premised on the Conveying Subsidiaries' transfer of liens and incurrence of repayment and guaranty obligations to the New Lenders. Section 550, which governs the "for whose benefit" and "value of the liens" claims asserted against the Senior Transeastern Lenders limits recovery to the property transferred, or, if the court so orders, the value of the property transferred. Therefore, the maximum amount of damages that can be recovered from the Senior Transeastern Lenders is the value of the liens pledged to the New Lenders.

Liens are a security interest in the Conveying Subsidiaries' property that can only be exercised if TOUSA and the co-obligors and guarantors default under the New Loans. (Ex. 360 at TOUSA-BR-00074759-61; Ex. 361 at TOUSA-BR-00075443-46.) As such, the Senior Transeastern Lenders' expert Charles Stryker established that the liens must be analyzed as contingent liabilities. (Trial Tr. (Stryker) at 3316:3-18.) Courts analyzing the value of contingent liabilities, such as guaranties securing loan agreements, regularly determine the value of the contingent liability by multiplying the face value of the liability by the probability that the contingency will come to pass (the likelihood that the guarantor will be called on to pay). *See, e.g.*, *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 594 (11th Cir. 1990) ("It is well established [] that a contingent liability cannot be valued at its potential face amount; rather, 'it is necessary to discount it by the probability that the contingency will occur and the liability become real.'") (citing *Xonics Photochemical*, 841 F.2d at 200).

Mr. Stryker analyzed the probability that TOUSA would default on the New Loans and testified that, based on the Standard & Poor's ratings and the Cumulative Average Default Rates by Rating Modifier historical study, the fair value as of July 31, 2007 of the liens granted by the Conveying Subsidiaries totaled $161.3 million. (Trial Tr. (Stryker) at 3316:21-3318:18.) This value includes the value of all of the liens granted by all of the TOUSA entities, including non-Conveying Subsidiaries and TOUSA Homes Florida, LP, which entities cannot recover in a fraudulent transfer claim. (*Id.* 3318:22-3319:16.) The Committee offered no contrary evidence, so Mr. Stryker's testimony is unrebutted. If the Committee were to prevail on its claims under Section 550(a), the most it could recover is less than $161.3 million, reduced further by the Senior Transeastern Lenders' recoupment defenses, as described below.

## CONCLUSION

For the reasons stated above, the Senior Transeastern Lenders are not liable as a matter of law on the claims asserted against them.[44] The legal defenses to the claims asserted against the Senior Transeastern Lenders, present insurmountable barriers to the Committee's claims under any of its three alternative theories. Moreover, the facts adduced at trial clearly show that none of the Committee's claims against the Senior Transeastern Lenders has support in the record. Judgment should be entered in favor of the Senior Transeastern Lenders.

---

[44] This memorandum is filed on behalf of the Senior Transeastern Lenders syndicate defendants. With respect to several syndicate members that are named in connection with their participation in the syndicates sued in these proceedings, reference is also made to the post-trial submissions submitted on behalf of such syndicates. To the extent that any of the other post-trial submissions may vary as to certain legal or factual arguments due to varying positions among the syndicates taken as a whole, those syndicate members will be deemed not to take a position on any such legal or factual arguments.

## ATTORNEY CERTIFICATION

I, Michael I. Goldberg here by certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that the attorneys with Milbank, Tweed, Hadley & McCloy, LLP, appearing pro hac vice in this matter, were admitted pursuant to Court Order dated August 27, 2008 as to Andrew M. Leblanc (D.E. 48) and Andrew T. Beirne (D.E. 49); dated August 28, 2008 as to Dennis F. Dunne (D.E. 53); dated September 22, 2008 as to Atara Miller (D.E. 90); and dated March 20, 2009 as to Alan Stone (D.E. 305).

Respectfully submitted,

MILBANK, TWEED, HADLEY & McCLOY LLP
Dennis F. Dunne (*pro hac vice*)
Andrew M. Leblanc (*pro hac vice*)
Alan Stone (*pro hac vice*)
Andrew T. Beirne (*pro hac vice*)
Atara Miller (*pro hac vice*)
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: 212-530-5000
Facsimile: 212-530-5219

and

AKERMAN SENTERFITT
Las Olas Centre II, Suite 1600
3350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: michael.goldberg@akerman.com


By:＿ /s/ Michael I. Goldberg＿＿＿＿＿＿＿＿
　　　Michael I. Goldberg, Esq.
　　　Florida Bar Number 886602

71

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 4, 2009, I electronically filed the foregoing *Senior Transeastern Lenders' Post-Trial Memorandum* with the Clerk of the Court using CM/ECF.  I also certify that notification of the filing of the foregoing document will be served on all counsel of record via CM/ECF  and e-mail as indicated on the attached Service List

By:  /s/ Michael I. Goldberg
Michael I. Goldberg

Case No. 08-10928-JKO
Adv. Pro No. 08-01435-JKO

## SERVICE LIST

Patricia A. Redmond, Esq.
Stearns Weaver Miller Weissler
  Alhadeff & Sitterson, P.A.
150 W. Flagler St., Suite 2500
Miami, FL 33130
*predmond@swmwas.com*

Michael L. Waldman, Esquire
Robbins, Russell, Englert, Orseck,
Untereiner & Sauberg, LLP
1801 K. Street, N.W.
Suite 411-L
Washington, DC 20006
*mwaldman@robbinsrussell.com*

Paul Steven Singerman, Esq.
Berger Singerman, P.A.
200 S. Biscayne Blvd., Suite 1000
Miami, FL 33131
*singerman@bergersingerman.com*

Allan E. Wulbern, Esq.
Stephone D. Busey, Esq.
Smith, Hulsey & Busey
225 Water St., # 1800
Jacksonville, FL 32202
*awulbern@smithhulsey.com*

Amy D. Harris, Esq.
Strichter, Riedel, Blain & Prosser, P.A.
110 E. Madison St., #200
Tampa, FL 33602
*aharris.ecf@srbp.com*

Joseph H. Smolinsky, Esq.
Eric Przybylko, Esquire
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, New York 10012
*jsmolinsky@chadbourne.com*
*eprzybylko@chadbourne.com*

Scott L. Baena, Esq.
Matthew I. Kramer, Esq.
Jeffrey I. Snyder, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 S. Biscayne Blvd., #2500
Miami, FL 33131
*sbaena@bilzin.com*

Gregory W. Nye, Esq.
 Bracewell & Giuliani LLP
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, CT 06103
*gregory.nye@bgllp.com*

M. Natasha Labovitz, Esq.
Kirkland & Ellis, LLP
Citigroup Center
153 East 53 Street
New York, New York 10022-4611
*nlabovitz@kirkland.com*

Matt Papez, Esq.
Kirkland & Ellis, LLP
Citigroup Center
153 East 53 Street
New York, New York 10022-4611
*mpapez@kirkland.com*

Ileana A. Cruz, Esquire
White & Chase, LLP
Wachovia Financial Center
200 South Biscayne Blvd.
Suite 4900
Miami, Florida 33131
*icruz@whitecase.com*

Meghan McCurdy, Esquire
David O. Hille, Esquire
White & Case, LLP
1155 Avenue of the Americas
New York, New York 10036
*mmccurdy@whitecase.com*