**Tagged Opinion**



## ORDERED in the Southern District of Florida on October 30, 2009.

**John K. Olson, Judge**
**United States Bankruptcy Court**

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>TOUSA, INC., *ET AL.*,<br><br>　　　　　　　　Debtors.<br><br>OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF TOUSA, INC., *ET AL.*,<br><br>　　　　　　　　Plaintiffs,<br><br>vs.<br><br>CITICORP NORTH AMERICA, INC., *ET AL.*,<br><br>　　　　　　　　Defendants. | Chapter 11 Cases<br><br>Case No. 08-10928-JKO<br><br>Jointly Administered<br><br>**Adv. Pro. No. 08-1435-JKO** |

### AMENDED[1] FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

[1] This amends and replaces Docket No. 658 signed October 13, 2009.

In this adversary proceeding, the Creditors' Committee seeks to avoid (as fraudulent transfers) and to recover some $500 million in liens granted by certain of the Debtors (the "Conveying Subsidiaries") less than 6 months before their bankruptcy filings in January 2008 and at a time when the Committee contends that the Conveying Subsidiaries were insolvent. The Committee also seeks to recover some $420 million paid in cash to prior lenders to other Debtors whose loans were paid out as part of the same transaction in which the challenged liens were granted. Finally, the Committee seeks to avoid as preferential the grant of a security interest in a $207 million tax refund which was perfected less than 90 days before the Debtors' petitions were filed. Because I conclude that the Conveying Subsidiaries (a) did not receive reasonably equivalent value in exchange for the liens granted, (b) were insolvent both before and after the transaction, and (c) were left with unreasonably small capital with which to operate their businesses as a result of the transaction, the liens will be avoided and the value of the property conveyed will be recovered with interest for the benefit of the respective Debtors' estates. Because I conclude that the security interest in the tax refund claim was perfected within the preference period and at a time when the Debtors were insolvent, and that recognition of the security interest would enable the lenders to receive more than they would receive in a Chapter 7 liquidation, the security interest in the tax refund will be avoided and those portions of it which were paid out to the lenders as part of a cash collateral stipulation will be ordered disgorged.

This case was tried in 13 trial days in July and August 2009. The stakes are enormous: the Debtors, who are a roll-up of homebuilders, are grossly insolvent and are in a phased wind-down of their operations, heading to a liquidating Chapter 11 plan. The plaintiff Committee, which was authorized to bring this avoidance action on behalf of the Debtors' estates, represents the interests

2

of unsecured creditors, primarily bondholders owed a principal amount slightly over $1 billion. Aligned as defendants in the fraudulent transfer claims are the holders of a first lien term loan (in the original amount of roughly $200 million), the holders of a second lien term loan (in the original amount of roughly $300 million), and the lenders who were paid some $420 million in the financing transaction which forms the basis for the lawsuit. The defendants in the preference claim include the first and second lien term lenders.[2] The parties were all represented by extremely able lawyers; no expense was spared in trial preparation and presentation and no avenue of legal argument was left unexplored.

This case arises from the decision of TOUSA, Inc. ("TOUSA") to borrow, and to cause many of its subsidiaries (the "Conveying Subsidiaries") to borrow, $500 million on July 31, 2007, and to secure that debt by granting to the lenders liens on substantially all of their assets. The proceeds of the loans were used to settle litigation against TOUSA and one of its subsidiaries, TOUSA Homes LP ("Homes LP"), that arose from the default on debt incurred to finance the Transeastern Joint Venture, a disastrous business venture that TOUSA undertook in 2005. The Conveying Subsidiaries, which were not defendants in the litigation and were not liable to the entities that financed the Transeastern Joint Venture (the "Transeastern Lenders") nonetheless incurred liabilities and granted liens to secure the resolution of their parent's liabilities. TOUSA and the Conveying Subsidiaries filed their chapter 11 petitions on January 29, 2008. In this adversary proceeding, the

---

[2]     As used herein, "First Lien Lenders" (whether or not capitalized) refers to the lenders under the First Lien Term Loan. Although the Committee previously included fraudulent conveyance and preference claims against the first lien Revolver in this proceeding, such claims are not presently before me. To the extent any First Lien Lender sued herein is also a lender under the first lien Revolver, references to such lenders herein are not intended to address their role or rights as Revolver lenders.

As used herein, "First Lien Creditors" (whether or not capitalized) refers to the Revolver lenders and the First Lien Lenders.

Official Committee of Unsecured Creditors of TOUSA, Inc. ("the Committee") seeks to avoid obligations and transfers pursuant to 11 U.S.C. §§ 544(b), 548, and 550, and comparable state law provisions.  The Committee also seeks, pursuant to 11 U.S.C. § 547, to avoid liens on a federal income tax refund for tax years 2005 and 2006 arising from losses suffered by TOUSA and its subsidiaries in tax year 2007.

### I.    TOUSA, the Transeastern Joint Venture, and the July 31, 2007 transaction

TOUSA and its subsidiaries design, build, and market detached single-family residences, town homes, and condominiums.

TOUSA made its initial public offering of common stock in March 1998 under the name Newmark Homes Corp.  In 1995, it had acquired The Adler Companies, Inc., which had operated in southern Florida since 1990.  In December 1999, Technical Olympic USA, Inc. acquired 80% of Newmark Home Corp.'s common stock.  In November 2000, Technical Olympic USA, Inc. purchased Engle Holdings, Inc., a Florida-based publicly traded homebuilding company. In June 2002, Engle Holdings Corp. merged into Newmark Homes Corp, and the company changed its name to Technical Olympic USA, Inc.  In 2007, the company officially changed its name to TOUSA, Inc.

TOUSA grew rapidly through a series of acquisitions.  In October 2002, TOUSA acquired the net assets of DS Ware Homes LLC, a homebuilder operating in Jacksonville, Florida.  In November 2002, TOUSA acquired the net assets of Masonry Homes, Inc., a homebuilder operating in the northwestern suburbs of Baltimore, Maryland and southern Pennsylvania.  In February 2003, TOUSA acquired Trophy Homes, Inc., a homebuilder operating in the Las Vegas area, and James Construction Company, a homebuilder operating in the greater Denver area. During 2004, TOUSA acquired certain assets of Gilligan Homes, a homebuilder with operations in Maryland,

4

Pennsylvania, and Delaware.  TOUSA's homes are marketed under various brand names, including Engle Homes, Newmark Homes, Fedrick Harris Estate Homes, Marksman Homes, D.S. Ware Homes, Masonry Homes, Trophy Homes, James Company, and Gilligan Homes.

To facilitate its rapid growth, TOUSA took on more than $1 billion of unsecured bond indebtedness.  TOUSA, Inc. was the obligor on the bond debt, and the Conveying Subsidiaries were jointly and severally liable as guarantors.  The holders of these bonds were senior in right to payment from the assets of all of the Conveying Subsidiaries.  As of July 31, 2007, the total amount of principal outstanding on the bonds was approximately $1.061 billion.

In June 2005, Homes LP, a wholly-owned subsidiary of TOUSA, and Falcone/Ritchie LLC ("Falcone") formed TE/TOUSA LLC (the "Transeastern Joint Venture") to acquire certain homebuilding assets owned by Transeastern Properties, Inc. in Florida.  Homes LP and Falcone each held a 50% voting interest in the joint venture, and Homes LP was its managing member.

The Transeastern Joint Venture was funded with $675 million of third-party debt capacity (of which $560 million was drawn as of July 31, 2007), a $20 million subordinated loan from Homes LP and $165 million of equity, of which Homes LP contributed $90 million in cash and Falcone contributed $75 million in property.  None of the Conveying Subsidiaries was an obligor or guarantor on this third party debt.

As a condition precedent to the Transeastern credit agreements, TOUSA and Homes LP executed three unsecured completion guaranties and three unsecured carve-out guaranties (the "Transeastern Guaranties").  None of the Conveying Subsidiaries was a guarantor on the Transeastern Guaranties.

5

The housing downturn soon threatened the viability of the Transeastern Joint Venture. On September 27, 2006, TOUSA announced that the Transeastern Joint Venture's "revised sales and delivery projections are not adequate to support the existing capital structure." Ex. 5004 at 5. Two days later, the Transeastern Joint Venture and the Transeastern Lenders entered into the "Consent and Agreement," whereby the parties agreed that a potential default or an event of default, as defined in the Transeastern credit agreements, had occurred. Citicorp North America, Inc. ("Citi"), the administrative agent for TOUSA's revolving loan facility ("the Revolver"), in turn notified TOUSA that the potential default constituted a material adverse change under the Revolver, and insisted that TOUSA secure the Revolver by having its subsidiaries grant liens on their assets.

On October 4, 2006, the Transeastern Joint Venture received a letter from certain affiliates of Falcone giving notice of defaults on four existing option agreements for failure by the Transeastern Joint Venture to make required payments of approximately $29 million. On October 30, 2006, the Transeastern Joint Venture received a default notice from Kendall Land Development, LLC ("Kendall"), a land bank.

Deutsche Bank Trust Company Americas ("DB Trust") (the Administrative Agent for the Transeastern Lenders) sent letters dated October 31, 2006, and November 1, 2006, to TOUSA and Homes LP demanding payment under the Transeastern Guaranties. The demand letters alleged that potential defaults and events of default had occurred under the Transeastern credit agreements, triggering the guarantors' obligations. DB Trust asserted that TOUSA's and Homes LP's guaranty obligations equaled or exceeded all of the outstanding obligations under the Transeastern credit agreements and that TOUSA and Homes LP were also liable for default interest, costs, and expenses. TOUSA's 8-K, filed November 7, 2006, acknowledged receipt of the demand letters from DB Trust

6

and reported that DB Trust contended that TOUSA was liable under the Transeastern Guaranties.

TOUSA disclosed in its Form 10-Q dated November 14, 2006 that the Transeastern Joint Venture's management had concluded that the Transeastern Joint Venture would not have the ability to continue as a going concern under its current debt structure.  TOUSA also announced that it would write off $143.6 million of its investment in the Transeastern Joint Venture.

On November 28, 2006, TOUSA and Homes LP filed a declaratory action in Florida state court against DB Trust seeking a declaration that their obligations under the Transeastern credit agreements had not been triggered and/or that their exposure under the Transeastern Guaranties differed from what DB Trust alleged in its demand letters.  On December 4, 2006, DB Trust filed a lawsuit seeking repayment of the Transeastern loans and "damages for the various breaches by TOUSA and TOUSA Homes of the Carve-Out Guaranties and the Completion Guaranties." TOUSA filed an 8-K announcing the lawsuits and asserted that the lawsuits were "without merit." Ex. 5010 at 5.

TOUSA executed settlements with the Transeastern Lenders and Falcone on July 31, 2007. The settlement included the payment of more than $421 million to the Senior Transeastern Lenders.

To finance the settlements, TOUSA and the Conveying Subsidiaries took on new debt.  They borrowed $200 million pursuant to a $200 million first lien term loan facility with Citi as Administrative Agent and $300 million pursuant to a $300 million second lien term loan facility with Citi as Administrative Agent.  Citi subsequently resigned as administrative agent under the Second Lien Term Loan and was replaced by Wells Fargo Bank.  The First Lien and Second Lien Term Loan Credit Agreements stated that the funds must be used, among other things, to pay the Transeastern Lenders.  TOUSA also amended its revolving credit agreement and entered into the

Second Amended and Restated Revolving Credit Agreement (Ex. 362), with Citi as Administrative Agent. The July 31, 2007 credit agreements were executed as part of a single integrated transaction ("the July 31 Transaction").[3]

In connection with the July 31 Transaction, TOUSA and the Conveying Subsidiaries also executed, among other documents, Pledge and Security Agreements for the First Lien Term Credit Agreement and Second Lien Term Credit Agreement, and an Amended and Restated Pledge and Security Agreement for the Amended Revolver Agreement. The Amended Security Agreement for the First Lien Term Loan and the Amended and Restated Pledge and Security Agreement for the Amended Revolver Agreement state that they secure obligations under the Revolving Debt and First Lien Term Loan by granting first priority liens on, among other things, the property and assets of all of the Debtors, whether real or personal, tangible or intangible, and wherever located. The Amended Security Agreement for the Second Lien Term Loan states that it secures obligations under the Second Lien Term Loan by granting a second priority lien on the same property and assets. An Intercreditor Agreement, dated as of July 31, 2007 governs the respective rights of the lenders under the First Lien and Second Lien Term Loans.

---

[3]  In the transaction, Citi withheld $14,838,514.58 from the loan proceeds as fees for financing, loan syndication and restructuring; $3,742,701.02 for legal, advisory and other professional fees; and $5,000,000.00 as an Original Issue Discount, for a total of $23,581,215.60. Citi also wired $476,418,784.40 to CIT, as agent for the Transeastern Lenders. CIT received $21,973,803.50 from TOUSA in addition to the loan proceeds. CIT distributed $421,015,089.15 to the Senior Transeastern Lenders for principal, interest, and fees under the Senior Credit and Revolver Agreements with the Transeastern JV; $5,368,739.93 to counsel and financial advisors to the Senior Transeastern Lenders; $2,748.21 in fees to Deutsche Bank; $8,861,198.15 to Deutsche Bank for fees regarding letters of credit; $250,000 as a "breakage fee" to CIT as agent for the Senior Transeastern Lenders; $57,338,172.18 to Falcone entities for satisfaction of claims, release of certain Land Bank obligations, and resolution of issues regarding property taxes; and $5,809,389.49 to Universal Land Title for title insurance.

II. **CONTEMPORANEOUS EVIDENCE SUGGESTS THAT THE CONVEYING SUBSIDIARIES WERE INSOLVENT AT THE TIME OF THE JULY 31 TRANSACTION, AND THAT THE TRANSACTION (A) RENDERED THEM EVEN LESS SOLVENT, (B) LEFT THEM WITH UNREASONABLY SMALL CAPITAL, AND (C) LEFT THEM UNABLE TO PAY THEIR DEBTS AS THEY MATURED**

A. **The events leading to the July 31 transaction demonstrate that the Conveying Subsidiaries were insolvent both before and after the transaction**

1. **The severe downturn in the housing market and TOUSA's homebuilding business**

The effects of the housing downturn were not confined to the Transeastern Joint Venture; the homebuilding business of TOUSA and its subsidiaries also collapsed. As early as February 2006, TOUSA's CEO, Antonio ("Tony") Mon, informed TOUSA's Board that "the housing industry is beginning to show signs of a slowdown." Ex. 2016 at 2. At TOUSA's May 2006 board meeting, Mon told the Board that "the housing industry is definitely in a slowdown" and that he believed "this slowdown is not a short term event, rather this is something that could take up to 2 years to work through." He said that "2007 and 2008 could be significantly weaker than previously anticipated" and that lower sales and lower margins were expected to continue "for the foreseeable future." Ex. 2022 at 2.

At TOUSA's June 2006 board meeting, Mon told the Board that TOUSA's third quarter results would likely show a significant decrease from the prior year. He reported that the Phoenix region had experienced a decrease in orders, in traffic, and in gross margins, and he expected to see significant decreases in backlogs and increased cancellations. The market in the Florida region had "dramatically decreased." Two other homebuilders, Lennar and Horton, had decided to "sell at any price," and the market was now a "buyer's market." Ex. 2023 at 2-3.

9

At TOUSA's October 2006 board meeting, Mon discussed with the Board "the difficult market conditions existing in a majority of the markets in which the Company operates, focusing particularly on the Florida market." He reported "concerns about operating results for the balance of 2006 and 2007." Ex. 2029 at 1-2.

At the November 17, 2006 board meeting, the TOUSA Board was given a "detailed report" on the Florida region, including a review of each distinct Florida market. The Board was told that "the market continues to decline;" that resale inventories remained "at an all time high;" that "spec units have flooded the market;" that "traffic is down 28% over last year;" and that the traffic the company was seeing was "less qualified." Ex. 2035 at 2.

In January 2007, John Kraynick, Executive Vice President for the Florida region of TOUSA Homes, Inc., sent Mon an email attaching a Credit Suisse First Boston research report on the Florida housing market, which predicted "a long road toward recovery in Florida." The CSFB report described "major headwinds to the Florida housing market" that "will continue to present significant challenges." Ex. 2046 at 1-3. At the February 16, 2007 board meeting, Mon "pointed to the challenges of the housing industry across almost all of the markets in which the Company is currently operating" and "expressed his belief that the markets were likely to remain difficult for the balance of 2007. He noted that the total supply of homes on the market . . . was at a 40 year high as of the end of 2006." This fact, combined with a loss of affordability, "has resulted in a conclusion that the recovery is likely not to be rapid." Ex. 2052 at 3.

On February 19, 2007, Kraynick sent an email to David Cobb, the president of the Orlando division, urging that "we must figure out a way to make sales. . . . I feel that we reached the point for radical solutions." Cobb responded that the southwest Florida market "has yet to hit bottom and

from what I've seen so far this season we are nowhere near it.  This market is going to take years to recover."  Ex. 2054 at 1-2.

In a March 2007 "Special Comment," Moody's stated that its outlook on the homebuilding industry, which had been "cautiously negative" in the summer of 2006, was "more assertively negative" from the fall of 2006 to the present.  It noted that TOUSA's rating had been downgraded twice, to B2, and predicted that if the 2007 market "turn[s] into a rout . . . the pace of negative rating actions would accelerate."  Ex. 2057 at 2.  A Credit Suisse report issued on March 12, 2007 forecasted a 20% drop in new home sales in 2007 and a decline of 35% - 45% in housing starts through 2007 and into 2008.  A press report on the same date, circulated among Citi's TOUSA team, noted that issues affecting subprime mortgage lenders weakened TOUSA's bonds, which dropped as much as 3 points during the trading day. Also on March 12, Business Week published an interview with Yale's Robert Shiller, who predicted that home prices would decline 10-30 percent over the next five years, and further stated that homebuilders had been disguising falling prices by including incentives at no cost to the buyer.

Other industry experts also noted the serious downward trends in the homebuilding sector. Two leading monthly real estate newsletters, U.S. Building Market Intelligence (USBMI) and the Key Indicator Alert (KIA), each rated the New Home Sales market as a D+ in Spring 2007, highlighting the significant drops in new home sales, dangerously high inventories, and continued poor affordability.

Mon acknowledged that as of April 15, 2007, "[d]eliveries, margins, foreclosures, short sales. . . . [c]ancellations, everything was getting negative."  "It was very obvious everywhere." Mon Tr. 134:21-135:4.  "One has to look far back to 1989-1992 to find anything even remotely

similar to what we are now experiencing."  Ex. 243.  On April 25, 2007, Mon wrote an email acknowledging that the markets were going down faster than the company had expected.  The email noted that the chief economist of the National Association of Home Builders was now predicting that the market would not recover until 2011; that existing home sales were much lower than expected and had experienced the largest drop in 18 years; and that consumer confidence fell to its lowest level in 8 months.

Investors recognized that TOUSA faced increasingly long odds.  TOUSA's stock price fell from a high of $23 during 2006 to below $4 by April 2007.  Its bonds traded at discounts of 30% and 40% to face value in May 2007.  One securities analyst wrote in April that for TOUSA, "things just seem to go from bad to worse".  Ex. 2078 (capitalization altered).  When TOUSA's corporate credit rating was lowered after the proposed July 31 Transaction was presented to ratings agencies, one of Citi's lead bankers on the deal, Svetoslav Nikov, declared, "The ship is sinking."  See Nikov Dep. 77:11-78:22; 79:3-11; 81:4-20; Ex. 336.  In an email in March, after examining financial models for TOUSA, Nikov wrote, "I don't think the downside model should be shown to anyone outside of here.  It's too scary."  Nikov Dep. 60:21-61:3; Ex. 334.

But even as market conditions and TOUSA's own financial condition deteriorated in the first quarter of 2007, TOUSA continued to prepare to take on the $500 million in new secured debt.

TOUSA's management realized that the company was already dangerously over-leveraged and in need of an infusion of capital.  On February 16, 2007, David Kaplan, one of Mon's senior financial advisors, sent an email to Mon and Wagman, with the heading "VERY IMPORTANT." The email noted that "there are all kinds of costs/liabilities, old and new, coming at us from Transeastern.  And there are impairments and cash flow issues – of which I am not informed –

12

arising in Colorado and in the mid-Atlantic region." Kaplan stated, "Cash will be everything is [sic] 2007 and 2008." "I would recommend, strongly, that you prepare the owners for the possible/likely need for an equity infusion – perhaps $150 [million], perhaps more." Ex. 2053 at 1. Kaplan sent another email to Mon and Wagman on February 18, 2007, urging a focus on "TOUSA's first, highest, and, to me, almost its only priority – the need to keep all of the cash it gets when it sells homes, reinvesting only in what beings [sic] in more cash, fast. So that we have water as we traverse the 2007 Valley of (Possible) Death." Ex. 2055 at 4.

Lehman Brothers prepared a bankruptcy waterfall analysis for TOUSA in February 2007, and Kaplan suggested in early 2007 that the company needed a Chief Restructuring Officer. Two versions of a memorandum introducing Larry Young, an advisor to TOUSA from AlixPartners LLP ("Alix"), as Chief Restructuring Officer were drafted. On April 15, 2007, Young wrote to Wagman, "[W]hy rush to restructure in a down market with a bad set of terms just to file in 3 months. If we need to file due to the lenders/shareholder issues, then lets do it now and save ourselves about $50 million in transaction cost!" Ex. 246; Wagman Tr. 457:20-24. Wagman agreed. Wagman Tr. 458:15-17.

Mon recognized that the increased debt resulting from the settlement could severely constrain the company. As notes on a draft Board presentation stated, "we must build in the capacity in this model so that when the market does turn, we have access to capital to build/sell product. If we can't do this, we are toast." Ex. 419 at 3.

However, TOUSA's management was faced with ownership (the Stengos family in Greece, often referred to as "The Greeks," which owned about two-thirds of TOUSA's issued and outstanding shares) that opposed dilution of its controlling position. On February 21, 2007, Mon

13

wrote to Mark Shapiro at Lehman Bros. concerning a presentation Shapiro had made to TOUSA about financing a Transeastern settlement: "The [G]reeks got a little spooked by the increasing dilution in the slide presented at the meeting." Ex. 2433.

On March 1, 2007, Mon sent an email to the Stengos family, asking their opinions on a draft memo for the Board. The draft memo noted the "likelihood that any Transeastern solution will make us overleveraged in the short term" and "[t]he potential that the current housing recession lasts longer or becomes deeper than previously anticipated." The draft memo proposed that, after the Transeastern settlement, TOUSA "re-balance its capital structure within the 45% to 55% debt to cap range as quickly as possible." Konstantinos Stengos[4] directed Mon not to send the memo to Board members.

Later, recognizing the company's desperate need for an infusion of equity, Mon spoke with several potential investors. But he was "working under some real limitations because of the controlling shareholder views" that opposed any dilution in their ownership of the company. Mon Tr. 140:11-22; Ex. 243. The majority owners directed Mon to terminate discussions with potential investors until the Transeastern settlement and new financing closed. Wagman also recognized the company's precarious financial condition and pushed to reduce the debt to be incurred in the Transeastern Settlement, "[m]uch to the disappointment of the Stengos family." Wagman Tr. 466:2-21; Ex. 2114. Wagman believed that the Stengos family's opposition to diluting their equity interest prevented the company from maintaining necessary flexibility. Wagman Tr. 456:7-16. Paul Berkowitz, TOUSA's Chief of Staff and its former outside counsel, agreed that the controlling Greek shareholders "were very interested in maintaining their equity position" and that the company was

---

[4] The Stengos *paterfamilias.*

laboring under constraints because of the Greeks' desire to maintain control.  Berkowitz Tr. 1829:17-23.

The Stengos family's resistance to equity dilution forced TOUSA to take on excessive debt – a point management made clear to the owners.[5]  On April 26, 2007, Mon sent Sam Bakhshandehpour, a financial advisor to the Stengos family, a PowerPoint presentation that included slides on the prospective Transeastern settlement and Citi financing.  The slides noted that the settlement would over-leverage TOUSA, which would have a 70/30 debt to equity ratio post-settlement; that post-settlement TOUSA would have limited access to capital markets, joint venture partners, or land bankers to grow its business; and that there were significant risks to TOUSA's ability to de-leverage, among which were further deterioration in the housing market, falling land and home values, and further weakening in credit markets.

TOUSA's prospects continued to decline precipitously in the second quarter of 2007.  A Kaplan email to Mon on May 1, 2007 noted that margins, cash flows, earnings, and asset values were all very low, and would stay low for an unknown period of time; that appraisals would be low, so financing will be expensive and at low loan-to-cost ratios; and that a step down in the market was certainly possible.  Kaplan concluded that "although we can agree to pay Creditors in full and with interest if payments are postponed, we cannot afford to pay them cash up front;" . . .  "Today, what is possible is not what looked possible a few months ago.  And everyone knows this." Ex. 497; Mon Tr. 177:3-178:4; 180:22-25.

In a May 25, 2007 email to himself, Wagman stated that TOUSA "*will* fail" to satisfy covenants in its bond indentures "into late 2008 or 2009.  Not even close."  Ex. 2113 at 1-2

---

[5]   In taking this position, the Stengos family was, of course, betting with the creditors' money.

15

(emphasis added).  He noted the view of the rating agencies that the homebuilding industry was "grim and getting grimmer," with downward pressure on prices and margins.  He wrote,

> As CFO, and in light of all of this market uncertainty, I have absolutely no desire to fly this plane too close to the ground, achieve some from [sic] of consensual settlement today and crash within the upcoming year.  That would be a clusterfuck.

*Id*.

On May 29, 2007, Mon and other TOUSA executives received a report that S&P had downgraded, from stable to negative, the bond ratings on major homebuilders Centex, D.R. Horton, and Pulte, all of which were close to violating financial covenants in their bond indentures.  On June 6, 2007, Mon and others executives received a report that the National Association of Realtors was predicting that prices of new homes would fall 2.3 percent, and prices of existing homes would fall 1.3 percent.  Mon forwarded the report to the Board, noting "FYI, this represents [ ] the first time in 40 years that the US median home prices have declined."  Ex. 2416.

In a June 14, 2007 email to the Board, Mon stated that the company had not anticipated the degree to which problems in the subprime mortgage segments were spreading across the prime and ALT-A mortgage markets, leading to tighter underwriting of residential mortgage loan applications, mortgage lenders' pulling commitments to homebuyers, and increased interest rates.  These developments, Mon observed, "could have a cascading effect down the line."  Ex. 2125.  Mon summed up for the Board: "[T]his housing correction is far from over."  Ex. 2125.

In June, two Bear Stearns hedge funds that were heavily invested in the subprime mortgage market collapsed, harming an already weak credit market further.

At the June 20, 2007 Board meeting, at which the Board approved the July 31 Transaction, Mon informed the Board that the U.S. housing market was at the lowest point since 1991.  Lehman

Bros. made a presentation to the Board that concluded that the Transeastern settlement, funded with the $500 million to be borrowed in the July 31 Transaction, was "the best alternative . . . to maximize value for shareholders." Ex. 187 at 27. Lehman's waterfall analysis concluded that all equity would be wiped out in a TOUSA bankruptcy. *Id.* at 36. Lehman expressly declined to opine whether the settlement was the best alternative for TOUSA's creditors and expressly stated that it was not offering an opinion on the fairness of the settlement. A PowerPoint presentation to the Board described the economic reality facing the company. The "selling season and housing recovery [are] not what we hoped when we prepared the budget." Ex. 2128 at 3. TOUSA was liquidating assets at the bottom of the market; pursuing a "[v]alue-destructive" strategy through the Transeastern settlement; had limited access to capital markets; had undertaken financing on a "very short leash;" and had "[l]ittle room for errors" because the company was "[f]ly[ing] low to the ground." Ex. 423 at 29; Ex. 2128.

Just two days later, Mon sent Bakhshandehpour, the Stengos family advisor, a memo entitled "Strategic Alternatives." In a bullet-point summary at the outset captioned "The TE settlement leaves TOUSA in a very difficult position," Mon observed that, as a result of the Transeastern settlement, TOUSA would be "[o]ver-leveraged," "[w]ithout access to the capital markets," in the midst of a "serious housing correction," at the "wrong time" to be "[f]orced to reduce assets," "[i]n need of a significant equity infusion," and "[u]nable to survive should housing conditions degrade further or the housing correction lengthen appreciably." Ex. 496 at 2. Mon's memorandum foresaw that a "[s]tay the [c]ourse" strategy – even when coupled with the company's de-leveraging plan – would, among other things, leave TOUSA unable to service its $1 billion of bond debt, at a "competitive disadvantage," with "[c]apital [c]onstraints" that would allow "[b]arely enough

17

'oxygen' to survive," with "[l]ittle room for error [and] increased risk of crashing and burning," "[l]imited ability to re-invest in the business," and "[a]lways on the brink of default." The "[e]nd [r]esult" of the strategy, Mon acknowledged, would be "[i]ncreased risk of failure and inability to withstand worsening business conditions." A list of the pros and cons of the strategy identified only one "pro" – "[p]reserves the entity and the existing, but diluted, ownership structure" – but seven "cons," the first of which was "[l]iquidation or bankruptcy risk." Ex. 496 at 2-4. Significantly, Mon reached these dire conclusions *before* the June 20 Board meeting; he exchanged a substantially identical version of the memo with Tommy McAden, then an executive vice president of TOUSA and President of the Transeastern Joint Venture, as early as June 17, 2007. A more complete and prescient prediction (that the effect of the Transeastern transaction would be to leave TOUSA with unreasonably small capital) would be hard to imagine. I note particularly that Mons' predictions were made in mid-June 2007. As found below, both the general business conditions in which TOUSA operated and its specific situation worsened significantly in the intervening six weeks leading up to the July 31st closing.

Mon did not send any version of his Strategic Alternatives analysis to Alix, nor did he share it with Wagman, his CFO, or with Citi, the administrative agent for the new financing. Berkowitz testified, "I would rather the memo not have been sent." Berkowitz Tr. 1836:9-10. And when McAden saw this email from Mon, he wondered why the company was engaging in the July 31 Transaction at all.

On June 27, 2007, Mon advised the Board that in a June 26 investor call, Lennar, a national home builder based in Miami, reported a "very ugly quarter" with "more ugliness to come" as

"housing markets . . . continued to deteriorate." Ex. 2132. Mon testified that "throughout the summer we continued to see a downward slope in the housing market." Mon Tr. 225:17-226:10.

On July 9, 2007, Mon sent the Board copies of articles from Barron's and the Wall Street Journal that Mon summarized as "un-relenting negative news on housing." Barron's foresaw that home sale volumes would decline another 20% to 25%. The Wall Street Journal reported that declining home prices would increase homebuilders' impairments and decrease their book values "for the foreseeable future." Stating the obvious, Mon told the Board that this "is news we could do without." Ex. 2142.

By late July 2007, McAden described the Florida homebuilding market as having gone from the "hottest market" to being "at the bottom." McAden Dep. 99:10-24. Even so, he believed that the worst was yet to come for Southwest Florida. On July 17, 2007, Hunter Blankenbaker, TOUSA's head of investor relations, sent Mon and other TOUSA executives an email headed "Pulte – Not so good news," attaching a report about Pulte Homes' preliminary results for the second quarter. Blankenbaker wrote, "[m]ost concerning was the $740-$770 million of land related charges[] that is about 11% (pre-tax) of their book and 100% of our book." Ex. 2425.

TOUSA's own performance continued to plummet. Its sales in the first quarter of 2007 plunged more than 16% from the comparable quarter the previous year, its backlog fell more than 20%, and its profit margin fell. The crash continued in the second quarter. On July 12, 2007, TOUSA's 8-K reported that deliveries and sales dropped 15%, profit margins tumbled, backlog fell 29% year over year, and the cancellation rate rose to 33%. TOUSA's internal financial reporting showed similar declines year over year.

Numerous analysts, ratings agencies and market participants recognized that TOUSA was deeply troubled. On May 16, Debtwire reported that TOUSA bondholders had warned that the company would be entering the "zone of insolvency" if it took on the new financing to settle with the Transeastern Lenders, and that "[s]ome holders of Technical Olympic's secured debt, and a portion of other Transeastern mezz lenders, believe that the proposed settlement could force the company into an eventual bankruptcy." Ex. 2107. In July 2007, ratings agencies Moody's and Standard & Poor's both downgraded their ratings of TOUSA bonds in contemplation of the July 31 Transaction, concluding that TOUSA was "not likely" to be able to meet its financial obligations. Ex. 2145; Ex. 2146; Ex. 2332. By the time of the July 31 Transaction, TOUSA's unsecured bonds were selling at a dramatic discount, some as low as $0.45 on the dollar.

>   **2.      Prior to the July 31 transaction, Citi harbored significant doubts about TOUSA's solvency, but – motivated by the prospect of substantial fee income – pressed forward nonetheless**

Citi saw the proposed new financing as a highly attractive opportunity for fees. In a March 23, 2007 email, Citi employees discussed their strategy of structuring the deal so that, even in a worst-case scenario, Citi would lose less than its fees. Citi ultimately collected approximately $15 million in fees for the transaction, including funds paid to its advisors by TOUSA. Citi was keenly aware of its ultimate goal. In early March 2007, when TOUSA requested an amendment of the Revolver to relax the interest coverage ratio and avoid a going concern opinion from its auditors, Citi assented to modifying the covenants because "[a] going concern [opinion] would not be particularly helpful in putting in place the $1.2B financing we're working on, as you know, and for which we are slated to earn roughly $8mm in fees." Ex. 2062.

Citi was also well aware of the negative effect its financing would have on TOUSA's bondholders. In a February 8, 2007 email chain among Citi bankers, one noted that TOUSA's bonds "will get a whole lot less attractive when our deal is announced." Ex. 338.

Members of Citi's real estate risk group raised doubts about whether Citi should enter into the July 31 Transaction. In addition, Bank of the West, a member of the Revolver syndicate, informed Citi of its extreme displeasure at the notion that the Revolver lenders would become *pari passu* with $200 million of new secured debt, and that TOUSA was borrowing hundreds of millions of dollars to repay an unsecured debt to settle a lawsuit that would result, at worst, in an unsecured judgment.

Prior to the July 31 Transaction, Citi had reclassified TOUSA's loans to "2" – a "defined problem." David Mode, one of the Citi bankers on the deal, recognized that in April-July of 2007, "there was deterioration in the market and deliveries were down." Mode Dep. 69:10-21. And Citi's bankers on the July 31 Transaction reacted with shock when they learned, on July 12, 2007, that S&P had lowered TOUSA's rating from B to CCC+ that day. Ex. 2146; Ex. 337. "That is whack," said one. Ex. 337.

Citi nevertheless pressed on with the transaction. Its due diligence, however, failed to uncover the privately-held views of TOUSA's senior management, which were considerably more pessimistic than TOUSA's projections used to support the July 31 Transaction. For example, Citi never discovered the Strategic Alternatives memo in which Mon observed – prior to the June 20th board meeting – that the July 31 Transaction would leave TOUSA "[o]ver-leveraged" and at risk of "crashing and burning" even if it could successfully execute its de-leveraging plan. Ex. 496 at 2-3.

21

### 3. The syndication process for the new loans reflected the dramatic deterioration in TOUSA's business

Because of the plummeting housing sector and the market's perceptions of TOUSA's credit risks, the syndication market for the new loans became "[m]ore challenging" in July, and the cost of the loans to TOUSA increased. Wagman Tr. 426:14-427:11. At least as early as July 24, lenders were dropping out of the deal. Nikov emailed colleagues at Citi that they were losing syndicate participants, and "[t]hings were looking ugly out there." Ex. 349. Marni McManus, the Citi engagement leader, described leaving "panicky" messages about the deal as the market got worse. Ex. 350; Nikov Dep. 210:16-19; 211:6-10. In a July 24 email to Wagman, Devendorf, and Berkowitz, McManus urged TOUSA to resolve the remaining open items quickly, because "the [market] has completely dried up," and "[t]he market is going from horrendous to worse." Ex. 2153 at 1-2.

In the end, there was nearly a 50 percent attrition in prospective lenders for the First Lien Term Loan in the four days immediately before July 31, reducing the level of commitments by almost half. In order to keep a sufficient number of lenders in the deal – and avoid having to underwrite the rest of TOUSA's debt – Citi had to provide significant pricing incentives, thus raising TOUSA's borrowing costs.

The final group of lenders included some firms that were lenders on the Transeastern debt that the new loans paid off. These former Transeastern lenders were able to leverage themselves from an unsecured loan to the Transeastern Joint Venture into secured loans to TOUSA and all of the Conveying Subsidiaries. Compare Ex. A to CIT stipulation, Adv. Pro. DE 383 (list of Senior

22

Transeastern Lenders receiving payments) with Ex. 3359 (list of lenders to First Lien Term Loan and the Second Lien Term Loan at initial syndication).[6]

The Citi bankers on the deal should not have been surprised by these market challenges had they been paying attention. In that connection, I note that the lead Citi banker, Marni McManus, testified that it was not until Sunday, August 5, 2007 – as a result of a call at her beach house from a Citi colleague – that she first came to believe that the housing market downturn would be particularly severe. In that call, a Citi trader advised her that American Home Mortgage, a prominent mortgage lender, would soon be filing for bankruptcy. But publicly available information showed that American Home Mortgage's problems began well before July 31, 2007. In late June, American Home Mortgage had already withdrawn its earnings guidance for the second quarter, causing a twelve percent drop in its stock price on that day alone. American Home Mortgage announced on July 27 that it would face significant margin calls, and trading of its stock was suspended on July 30. At the same time, Countrywide Financial, another large mortgage lender, announced that defaults on its mortgages – including those to prime borrowers – were rising quickly. American Home Mortgage's stock price fell from $21.43 per share on June 27, 2007, to $1.04 per share on July 31. And, in fact, in American Home Mortgage's first day bankruptcy filings, filed on August 6, 2007, its CEO noted that the issues that led to American Home Mortgage's bankruptcy had developed for several weeks prior to its filing. These issues had affected American Home Mortgage, Countrywide Financial, and other mortgage lenders for a significant time prior to July 31, 2007. From this, I conclude that, if the news of American Home Mortgage's problems as of

---

[6] In addition, many of the Senior Transeastern Lenders bought parts of the TOUSA Term Loans shortly after the syndication, including Goldman Sachs, Deutsche Bank, and Grand Central Asset Trust.

August 5 did affect McManus's views of the housing market, it was not because of a sudden change in market conditions, but rather because, as McManus conceded, she simply did not follow American Home Mortgage and other mortgage lenders in her normal course of business. How it is possible that the lead Citi lender to TOUSA did not consider knowledge of the residential mortgage industry to be important for any analysis of homebuilder prospects is inexplicable and, in any event, was never explained at trial.

Ultimately, the key Citi employees who shepherded the July 31 Transaction through its closing had more than sufficient knowledge to understand TOUSA's precarious situation. As McManus stated: "I didn't remember exactly what caused the whole house of cards to start coming down." McManus Tr. 3791:7-9.

### 4.     TOUSA's CEO and top advisors had outsized personal incentives to consummate the transaction

TOUSA's CEO had a strong personal incentive to ensure that the July 31 Transaction was consummated. As TOUSA reported in its July 24, 2007 Report on Form 8-K, half of Mon's 2007 target incentive bonus of $4.5 million was contingent on, among other things, the successful completion of the July 31 Transaction.

Mon also brought in third party advisors whose compensation was contingent on providing opinions that facilitated the closing. Under Lehman Bros.'s original fee arrangement, $3.5 million of Lehman's compensation was contingent on completion of the Transeastern settlement. Later, when it became clear that Lehman would not be participating in the financing of that settlement, the fee arrangement was modified to add a $2.9 million financing advisory fee, which was also contingent on completion of the settlement.

Likewise, as I set out at greater length in Section IV below, AlixPartners, too, was retained to provide a solvency opinion pursuant to a contingent fee arrangement. TOUSA agreed to pay Alix $2 million if Alix opined that TOUSA was solvent. If Alix failed to offer an opinion of solvency, TOUSA would pay only Alix's time charges and reimburse its costs. These time-based fees and costs were less than half of the $2 million incentive fee paid to Alix.

### B.    Contemporaneous evidence demonstrates that the Conveying Subsidiaries were left with unreasonably small capital

On June 22, 2007, Mon wrote that the Transeastern settlement would leave TOUSA "in a very difficult position." The company would be "[o]ver-leveraged," "[w]ithout access to the capital markets," "[i]n need of a significant equity infusion," and "[u]nable to survive should housing conditions degrade further or the housing correction lengthen appreciably." Among the listed problems were an "unsustainable and dangerous" level of debt and "major operational constraints." A "[s]tay the [c]ourse" strategy – even when coupled with TOUSA's de-leveraging plan – would, among other things, leave the company "[b]arely enough 'oxygen' to survive," "[l]ittle room for error; increased risk of crashing and burning," "[l]imited ability to re-invest in the business," and "[a]lways on the brink of default." The end result of the strategy would be "[i]ncreased risk of failure and inability to withstand worsening business conditions." A list of the pros and cons of the strategy identified only one "pro" – "[p]reserves the entity and the existing, but diluted, ownership structure." It identified seven "cons," the first of which was "[l]iquidation or bankruptcy risk." Ex. 496 at 2-6.

Mon believed that the covenants proposed by Citi "will surely limit our ability to grow the business in the future." But he concluded that "we do not have a lot of choice in this." Ex. 2439.

Mon also recognized that the increased debt resulting from the settlement could severely constrain the company.  As notes on a draft Board presentation stated, "[W]e must build in the capacity in this model so that when market does turn, we have access to capital to build/sell product. If we can't do this, we are toast."  Ex. 419 at 3.  Mon was right, and TOUSA was toast.

On March 1, 2007, Mon emailed Konstantinos Stengos, Andreas Stengos, George Stengos, and Marianna Stengos to request their opinions on a draft memo for the Board.  The draft memo noted the "likelihood that any Transeastern solution will make us overleveraged in the short term" and "[t]he potential that the current housing recession lasts longer or becomes deeper than previously anticipated."  The draft memo proposed that TOUSA "re-balance its capital structure within the 45% to 55% debt to cap range as quickly as possible."  Ex. 2059.

All of this is consistent with the story told by the contemporaneous, objective indicators of capital adequacy:  In the wake of the July 31 Transaction, TOUSA and its subsidiaries were saddled with a debt to total capitalization ratio of 71.3% – much higher than the ratios of comparable homebuilders.  See Section III.B.2, below.  As TOUSA documented at the time, the transaction "[l]imited [TOUSA's] ability to re-invest in the business," saddled it with an "[i]nability to enter into new joint ventures," and imposed "[t]ight control on land acquisitions."  As a result, TOUSA recognized it would be "[u]nable to participate in [an] eventual upturn" in the real estate market. Ex. 496 at 2-3.

Because the parent company was left with unreasonably small capital to operate its business, the Conveying Subsidiaries also were left with unreasonably small capital.  What is more, because of the Conveying Subsidiaries' grants of liens to First and Second Lien Term Lenders, they were left with no unencumbered assets with which to procure capital independent of TOUSA.

C.    Contemporaneous evidence demonstrates that the Conveying Subsidiaries were unable to pay their debts as they came due

As early as March 2007, TOUSA was told by its auditors that it could receive a going concern opinion because of its inability to satisfy the covenants on its revolver loan. To avoid that opinion, Citi agreed to modify the covenants.[7]

In a May 26, 2007 e-mail, Wagman stated that he had "pushed damn hard for no debt in the settlement." Having been unsuccessful in that effort, he observed that under even a moderate downside scenario, TOUSA would violate its bond covenants in 2008 and 2009. And "in light of all [the] market uncertainty" – including "downward pressure on prices" and "a ton of pressure" on margins – he worried that such a downside scenario would indeed come to pass. In the colorful language quoted above, Wagman expressed the view that the payoff of the Transeastern debt would leave TOUSA flying too close to the ground, with a likelihood of crashing within the next year. The crash actually came in less than six months.

Kaplan warned Mon that the company "cannot incur a great deal of debt or accept covenants whose terms and conditions might not be met by our uncertain, projected earnings where the risk is all on the downside." Realizing that this was precisely what the company intended to do to finance the Transeastern settlement, he specifically advised Mon that "we cannot afford to borrow to pay [the Transeastern creditors] cash up front." Ex. 497 at 2-3.

The bond market reached the same conclusion about TOUSA's creditworthiness. TOUSA's bonds were trading at a severe discount to face value at the time of the July 31 Transaction, selling for prices as low as 48 cents on the dollar. Those discounts revealed the market's perception of

---

[7]  As noted above, Citi's motivations were not eleemosynary.

TOUSA's financial distress:  TOUSA's bonds carried very low credit ratings, and particularly noted its senior subordinated debt was "likely in, or very near, default" as of July 2007.  Ex. 2145; Ex. 2146; Ex. 2332.

None of these post-July 31 Transaction developments should have been the least bit surprising to TOUSA.  In a letter to the TOUSA Board prior to the July 31 Transaction, counsel for one of the bondholders urged TOUSA not to go forward with the ill-advised new loans:

> Cap Re also suspects that substantial additional asset impairment write downs are imminent and will be announced soon after the Refinancing is complete.  The Company's asset write downs to date have been substantially lower than those taken at the Transeastern JV – a comparable business – and less than one would expect in light of the Company's drastically declining orders and other deteriorating business metrics. Most disturbingly, the terms of the Company's new debt and preferred stock suggest a company which is unable to pay its debts as they come due.  The Company had to dramatically increase pricing at the senior secured credit facility at the last minute to consummate the Refinancing. . . .  In sum, the Company cannot service its debt and has chosen to mortgage its future. . . .

Ex. 2158 at 3.

### D.    TOUSA was insolvent both before and after the Transaction

Immediately after completion of the July 31 Transaction, TOUSA's financial condition quickly became even more attenuated.  By August 8, Wagman found that the TOUSA financing model was wrong, putting the company at risk of covenant violations.  By the end of September, Wagman decided that he could not issue a solvency representation, as required by the credit agreement, and that TOUSA was already in violation of several covenants under the new credit agreement.

On October 25, 2007, TOUSA and Citi amended the Amended Revolver Agreement and the First Lien Loan Term Credit Agreement, waiving the requirement that TOUSA provide a solvency representation to borrow under the Revolver.

Representatives from an ad hoc committee of bondholders urged the company to file for bankruptcy in October to preserve a potential preference claim involving the Term Loans.[8]  The effort culminated in a letter to TOUSA's Board on October 26, 2007 and a presentation to the Board days later.

In its Form 10-Q for the period ending September 30, 2007, filed on November 14, 2007, TOUSA reported inventory impairments and abandonment costs of more than $500 million for the third quarter, a net year-to-date loss for 2007 of $817 million, and that "there was substantial doubt about our ability to continue as a going concern."  Ex. 3281.

On December 14, 2007, TOUSA and Citi amended the Amended Revolver Agreement and the First Lien Term Credit Agreement to further extend the waivers contained in the October 25 amendments.

On January 2 and January 15, 2008, TOUSA filed 8-Ks disclosing that it had failed to make required semi-annual interest payments due on its bonds.  On January 28, 2008, TOUSA and most of its subsidiaries – including all of the Conveying Subsidiaries – filed petitions for relief under the Bankruptcy Code.

---

[8]  In a preference claim under 11 U.S.C. § 547, the debtor is presumed insolvent during the 90 days before its petition date.  There is no presumption of insolvency in a fraudulent transfer claim.  Thus, the burden of proof shifts under the two claims: in a preference claim, the defendant must prove solvency; in a fraudulent transfer claim, the plaintiff must prove insolvency.  The Plaintiff did so here, but just, and at enormous expense.  Had the TOUSA Debtors filed their petitions within 90 days of July 31, 2007, the preference case would have been nigh-unto a laydown.

III.   **THE EXPERT TESTIMONY SUGGESTS THAT EACH OF THE CONVEYING SUBSIDIARIES WAS INSOLVENT BOTH BEFORE AND AFTER THE JULY 31 TRANSACTION**

     **A.**     **The Conveying Subsidiaries were insolvent before the Transaction**

          **1.**     **The fair value of the Conveying Subsidiaries' liabilities exceeded the fair value of their assets before the Transaction**

The Committee sought to prove the insolvency of the Conveying Subsidiaries just before the July 31, 2007 transaction through the testimony of Kevin P. Clancy. Clancy is qualified in the fields of financial restructuring and accounting services. He is a partner in the business investigation services group at the national accounting and consulting firm of J.H. Cohn, LLP, and has extensive experience providing advice and litigation-related services in the bankruptcy context, including expert testimony. He is a Certified Public Accountant, a Certified Insolvency and Restructuring Advisor, and a member of the American Bankruptcy Institute. He has been involved with the TOUSA bankruptcy case since March 2008 and has had numerous interactions with TOUSA personnel and TOUSA's accounting systems.

Clancy presented adjusted balance sheets reflecting the net worth, on a fair value basis, of the three most significant TOUSA entities – the parent company, TOUSA, Inc., and the two Conveying Subsidiaries that held nearly all of the consolidated enterprise's assets, TOUSA Homes, Inc. and Newmark Homes, L.P. – just before the transaction on July 31, 2007. His starting point for these balance sheets was a trial balance, compiled by the Debtors using the same data they used to operate their business, containing accounting data for the various TOUSA legal entities as of July 31.

Clancy adjusted various line items on the trial balance, both up and down, to reflect the fair value of the relevant entities' assets and liabilities. His most significant adjustments were as follows: First, he adjusted the book value of the TOUSA entities' homebuilding inventory assets to reflect the fair market value of those assets as provided by the Committee's real estate expert, Charles Hewlett. Second, because he analyzed each entity individually – and ultimately determined each entity individually to be insolvent and therefore without value as an investment – he eliminated certain line items that reflected one entity's ownership of another. The Defendants' expert Stryker performed the same adjustment. Third, because the parent and the Conveying Subsidiaries each were obligated on TOUSA's bond and revolver debt, he allocated the liability for those debts among the various entities according to the amount of the burden they would be expected to shoulder. Because the bond indentures expressly provide a right of contribution in proportion to various entities' relative net worth, Clancy allocated the bond liability in proportion to net worth; because the revolver debt was secured by various entities' assets, he allocated the revolver liability in proportion to asset value. These allocations were rational and reasonable, and were substantially identical to Stryker's allocation for revolver debt. Fourth, he eliminated line items relating to written intercompany notes that formalized certain financial obligations from one Conveying Subsidiary to another, because including these notes would serve only to shift assets (and a proportionate share of the shared liabilities just described) among various Conveying Subsidiaries without having any bottom-line effect on the Conveying Subsidiaries' solvency. I found Clancy to be credible and his methodology reasonable and rational.

31

Clancy's adjusted pre-transaction balance sheets for TOUSA Inc., TOUSA Homes, Inc., and Newmark Homes L.P. are shown below:[9]

| Tousa, Inc. | | | | | | |
|---|---|---|---|---|---|---|
| | 7/31/07 Balance | | Adjustments | | Adjusted Balance | |
| **Assets** | | | | | | |
| Cash | $ | 25 | | | $ | 25 |
| Fixed Assets | | 5 | | - | | 5 |
| Inventory | | 14 | | (6) **(a)** | | 8 |
| Other Assets | | 55 | | (25) **(b)** | | 30 |
| Tax Assets | | 244 | | | | 244 |
| Financial Service Assets | | 45 | | (45) **(c)** | | - |
| Total | $ | 388 | $ | (76) | $ | 312 |
| | | | | | | |
| **Liabilities** | | | | | | |
| AP | | 50 | | - | | 50 |
| Customer Deposits | | - | | - | | - |
| Accrued TE | | 386 | | | | 386 |
| Bonds | | 1,061 | | (876) **(e)** | | 185 |
| Revolver | | 144 | | (94) **(d)** | | 50 |
| Financial Service Liabilities | | 23 | | (23) **(c)** | | - |
| Total | $ | 1,664 | $ | (992) | $ | 672 |
| **Net Equity** | $ | (1,276) | $ | 916 | $ | (360) |

---

[9] These tables contain various footnote references that correspond to explanations in Clancy's reports of the various adjustments he made to reflect the fair value of TOUSA's assets and liabilities. These findings discuss only the most significant of those adjustments; Clancy's reports and testimony provide a full explanation of the remainder.

| THI | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Balance | | Adjustments | | | Adj. Balance | |
| **Assets** | | | | | | | |
| Cash | $ | (11) | $ | 11 | (a) | $ | - |
| Fixed Assets | | 15 | | - | | | 15 |
| Inventory | | 1,670 | | (1,119) | (b) | | 551 |
| Other Assets | | 80 | | - | | | 80 |
| Investment in Subs | | 213 | | (211) | (c) | | 2 |
| Investment in JV (and JV AR) | | 168 | | (89) | (d) | | 79 |
| Goodwill | | 51 | | (51) | (e) | | - |
| Financial Service Assets | | - | | 45 | (f) | | 45 |
| Total | $ | 2,186 | $ | (1,414) | | $ | 772 |
| | | | | | | | |
| **Liabilities** | | | | | | | |
| AP | $ | 138 | $ | (24) | (j) | $ | 114 |
| Customer Deposits | | 41 | | - | | | 41 |
| Obligations for Inv. Not Owned | | 227 | | (227) | (b) | | - |
| I/C Notes | | 676 | | (676) | (g) | | - |
| Bonds | | - | | 595 | (i) | | 595 |
| Revolver | | - | | 122 | (h) | | 122 |
| Financial Service Liabilities | | - | | 23 | (f) | | 23 |
| Total | $ | 1,082 | $ | (188) | | $ | 894 |
| | | | | | | | |
| **Net Equity** | $ | 1,104 | $ | (1,226) | | $ | (122) |

| Newmark LP | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Balance | | Adjustments | | | Adjusted Balance | |
| **Assets** | | | | | | | |
| Cash | $ | (3) | $ | 3 | (a) | $ | - |
| Fixed Assets | | 9 | | - | | | 9 |
| Inventory | | 284 | | 19 | (b) | | 303 |
| Other Assets | | 5 | | - | | | 5 |
| Investment in JV (and JV AR) | | 7 | | - | | | 7 |
| Goodwill | | 12 | | (12) | (c) | | - |
| Total | $ | 314 | $ | 10 | | $ | 324 |
| | | | | | | | |
| **Liabilities** | | | | | | | |
| AP | $ | 37 | $ | - | | $ | 37 |
| Customer Deposits | | 12 | | - | | | 12 |
| I/C Notes | | 54 | | (54) | (d) | | - |
| Bonds | | - | | 281 | (e) | | 281 |
| Revolver | | - | | 52 | (f) | | 52 |
| New Debt (1st and 2nd) | | - | | | | | - |
| New Debt (PIK Notes) | | - | | | | | - |
| Total | $ | 103 | $ | 279 | | $ | 382 |
| | | | | | | | |
| **Net Equity** | $ | 211 | $ | (269) | | $ | (58) |

Ex. 2411.

These adjusted balance sheets demonstrate that each of the TOUSA entities Clancy analyzed was insolvent prior to the transaction: TOUSA, Inc.'s liabilities exceeded the fair value of its assets by $360 million; TOUSA Homes, Inc.'s liabilities exceeded the fair value of its assets by $122 million; and Newmark Homes L.P.'s liabilities exceeded the fair value of its assets by $58 million. Clancy's methodology and conclusions are credible and reliable. Indeed, they are substantially supported by the testimony of John Salomon, an accountant designated as an expert witness by the Senior Transeastern Lenders but ultimately not called at trial. Salomon testified at his deposition that, if Hewlett's valuation of the real-estate assets is correct, he has no disagreement with Clancy's insolvency conclusions.

Defendants did not mount substantial objections to most of Clancy's analysis; their experts trained their most significant criticisms on his treatment of certain "intercompany balances" (amounts owing from one TOUSA entity to another, which are distinct from the "intercompany notes" discussed above) and his write-down of inventory assets based on the input of Hewlett. Neither criticism undermines Clancy's methodology or conclusions.

### 2. Clancy's treatment of intercompany balances as equity was credible and reliable

Defendants objected to Clancy's treatment of TOUSA's so-called "intercompany balances." When one TOUSA entity had given money to another, Clancy treated that amount as an equity investment, and he therefore did not include it as an asset or a liability on either entity's adjusted balance sheet. Clancy therefore did not include in his adjusted balance sheets a negative $798 million net intercompany balance for TOUSA Homes, Inc. and a negative $174 million net intercompany balance for Newmark Homes L.P., which reflected that those companies had received

substantially more from other TOUSA entities than those entities had received from them. According to Defendants' expert William Lenhart, however, this was a mistake and the intercompany balances should have been listed on the balance sheet as assets or (in the cases of TOUSA Homes, Inc. and Newmark Homes L.P.) liabilities.

Clancy presented credible and reliable reasons for treating these balances as equity. He testified that TOUSA had never itself classified these balances as assets or liabilities; that the trial balance recorded them as equity; and that TOUSA had also consistently treated them as equity in the relevant sections of its SEC filings. In any event, the dispute about intercompany balances has no impact on Clancy's insolvency conclusions. Because both of the relevant Conveying Subsidiaries – TOUSA, Homes, Inc. and Newmark Homes, L.P. – had received substantially more money from other TOUSA entities than they had provided, a balance sheet that included their intercompany balances as liabilities would have shown them to be even more deeply insolvent than Clancy's balance sheets reflect.

### 3. Hewlett's fair-value adjustments to TOUSA's homebuilding inventory were credible and reliable

Committee expert Charles Hewlett performed an analysis of the fair value of the homebuilding inventory assets owned by TOUSA and its significant Conveying Subsidiaries as of July 31, 2007. Hewlett provided his valuation conclusions to Clancy. The values provided by Hewlett are reliable, but his decision not to ascribe value to certain assets (including one asset sold post-Transaction for a substantial price) rendered his aggregate conclusions subject to vigorous challenge at trial.

Hewlett is a Managing Director with RCLCO, a reputable real estate advisory firm, and has more than 25 years of experience in the real estate industry.  He is a frequent speaker, moderator and panelist at various real estate industry events, and a guest lecturer and faculty member at various graduate business and real estate school programs.  During his career, Hewlett has provided valuation services, market analyses, and feasibility studies to various clients, including large residential homebuilders and developers, on hundreds of occasions.

As discussed in more detail below, Hewlett's methodology was, for the most part, the application of a discounted cash flow analysis to the various residential communities.  This methodology is fundamentally appropriate as a means of assessing what a purchaser of any of the communities would pay, analyzed[10] by subtracting development and carrying costs from prospective net sale prices.  The methodology invites attack when the cost to complete exceeds prospective revenues: in those cases, Hewlett ascribed zero value to the project (a proper conclusion when examining discounted cash flow) but ascribed nothing to "option value," or what a purchaser would pay to buy and hold the land for future development.

Hewlett concluded that, as of July 31, 2007, (a) homebuilding inventory assets owned by TOUSA Homes, Inc., had a fair value of approximately $771.5 million; (b) homebuilding inventory assets owned by Newmark Homes, L.P., had a fair value of approximately $303.2 million; (c) homebuilding inventory assets owned by TOUSA Homes Florida, L.P., after the July 31 Transaction had a fair value of approximately $28.2 million; (d) homebuilding inventory assets owned by a joint venture (owned by TOUSA Homes, Inc.) known as Engle/Sunbelt, LLC, had a fair value of approximately $14.4 million; and (e) homebuilding inventory assets owned by TOUSA Mid-Atlantic

---

[10]  Hewlett's methodology was more nuanced than my summary description in this paragraph.

Investment, LLC, had a fair value of approximately $8 million.  Hewlett's analysis demonstrated that the fair value of Newmark Homes, L.P.'s homebuilding assets was greater than their book value on July 31, 2007, while the fair value of the homebuilding assets held by the other four legal entities listed above was substantially less than their respective book values.

Hewlett's valuation was based on a detailed, community-level analysis of the real estate assets held by TOUSA and the Conveying Subsidiaries as of July 31, 2007.  He used a "bottoms-up approach, looking at a life of project analysis for each individual community and rolling up those individual community-level analyses into divisions and then legal entities."  Hewlett Tr. 598:2-6. That approach was a reliable way to value the real estate assets held by TOUSA and the Conveying Subsidiaries, including the undeveloped land parcels (discussed in more detail in section III.A.3.d, below).  In conducting his valuation, Hewlett considered the collection of assets within a given community, and determined how the composition of those assets (*i.e.*, unsold complete homes, unsold under construction, finished lots, etc.) would affect when they would be sold to individual homebuyers.

Hewlett determined the fair market value of the homebuilding assets as of July 31, 2007, by assessing the price that a hypothetical willing buyer would have paid a hypothetical willing seller for the assets on or about that date, assuming no undue pressure on either party, and with a reasonable period of time to consummate a transaction.  The valuation standard used by Hewlett was consistent with a going concern value, not a liquidation value.

Based upon the portfolio of real estate assets at issue, Hewlett concluded that, under the circumstances, the most likely hypothetical willing buyer would be another developer or homebuilder that would purchase communities or groups of assets from TOUSA or the Conveying

Subsidiaries. That conclusion is reasonable given the nature of TOUSA's business, the volume of real estate assets TOUSA and the Conveying Subsidiaries owned as of July 31, 2007, and the fact that many of the properties were in a largely undeveloped or semi-developed state.

Hewlett's valuation conclusions are well-supported; they are the product of a careful and systematic approach to each community analyzed. As Hewlett explained, his analysis consisted of six steps.

First, for each community, Hewlett determined the market-driven average sales price ("ASP") and sales pace (*i.e.*, the rate at which homes would sell) as of July 31, 2007, using TOUSA's own historical data, as well as data from comparable non-TOUSA communities and market data. For communities that had historical sales information, Hewlett considered the sales and closing figures for (i) four months, (ii) year-to-date, and (iii) 12 months, immediately before July 31, 2007. Using that information, Hewlett analyzed trends relating to sales, pricing, cancellation rates, gross margins, and the various components of ASPs. He also collected and analyzed sales data for other TOUSA and non-TOUSA comparables in each market, particularly in instances where the TOUSA community itself had no historical sales.

Second, based on numerous sources of information available on July 31, 2007, Hewlett forecasted future ASPs and sales pace. To do that, he undertook a comprehensive examination of the housing market, based upon contemporaneous industry data, reports by industry experts and economists, news articles, financial reports of other builders, metropolitan area forecasts, and TOUSA's own results and internal documents. Hewlett also analyzed housing affordability, as well as the relationship between for-sale and rental housing costs as of July 31, 2007. Hewlett's analysis

38

of the housing market as of July 31, 2007 and his conclusions regarding future ASPs and sales pace are discussed in more detail in section III.A.3.a, below.

Third, Hewlett performed community-level discounted cash flow ("DCF") analyses. He projected revenues from the sale of finished homes in each community over the life of the project, and subtracted from those projected revenues the costs associated with holding the land, building and developing the lots, and marketing and selling the finished homes. This process involved calculating the revenues based on the project-level ASPs and sales pace, and subtracting the labor, material and other construction costs as well as the costs associated with marketing, sales and closings, such as commissions, advertising, and real estate taxes. The various cost inputs used by Hewlett in his community-level DCFs are discussed in section III.A.3.b, below.

Fourth, Hewlett assessed the value, if any, of land option rights owned by TOUSA and the Conveying Subsidiaries as of July 31, 2007. He concluded that the majority of the options – mostly those located in markets that had experienced declines – had no value. In those cases, Hewlett assumed – as did the Senior Transeastern Lenders' real estate expert Michael Samuels – that the prudent business decision would have been for TOUSA to decline to exercise the options. In instances where the optioned lots had value, Hewlett added their value to the community.[11]

Fifth, after determining the revenue and cost inputs, Hewlett applied a set of discount rates to the computed future cash flows to derive each community's net present value. Hewlett used discount rates that were tailored to the particular geographic market and the risks associated with different types of real estate assets. The discount rates were within the range used by market

---

[11] Senior Transeastern expert Samuels used a similar approach to value optioned lots. Curiously, 1st Lien Lender expert Cannon did not ascribe any value to land under option.

participants on July 31, 2007, and averaged 20% overall.  Hewlett's discount rates are discussed in greater detail in section III.A.3.c, below.

Sixth, Hewlett took his community-level, discounted cash flow results and aggregated them in their respective divisions and legal entities.  In total, Hewlett performed community-level analyses for 298 communities, which represented 83% of the book value of the significant divisions. As to the remaining communities, Hewlett extrapolated from his findings for the 298 communities, taking into account the development stage, community size and other characteristics of the remaining communities.  For purposes of his extrapolation, Hewlett categorized the remaining communities based on their similarities to the communities analyzed and assigned them a percentage of their book value that corresponded to what he had found for analyzed communities in the same division.

Overall, I find that Hewlett's valuation approach is reasonable and methodologically sound. The subsections that follow include additional detail regarding various components of Hewlett's valuation analysis as well as an explanation of why the criticisms and alternative approaches offered by Defendants' experts – primarily real estate experts Michael Cannon (for the First and Second Lien Lenders) and Michael Samuels (for the Senior Transeastern Lenders) – are less convincing. In particular, the subsections included below discuss (a) Hewlett's forecasts of future ASPs and sales pace; (b) the cost projections he used; (c) his discount rate analysis; (d) his approach to undeveloped land; (e) his qualifications; and (f) his proposed valuation findings.

         **a.**      **Hewlett's forecasts of future ASPs and sales pace were reliable and based on a realistic and supported view of the likely trajectory of the housing market after July 31, 2007**

The second step of Hewlett's six-step analysis involved projecting future ASPs and sales pace for each community. Before making those projections, Hewlett conducted a review of information regarding the state of the housing market as of July 31, 2007, using only information that was available on or before that date. Based on his review, Hewlett concluded that the housing market downturn, which was already in full swing by July 31, 2007, was likely to continue and worsen in certain markets. Those conclusions are well supported by the weight of the evidence available as of July 31, 2007. Certain of the contrary conclusions offered by Defendants' real estate were less credible.

         **(i)**      **Hewlett made reasonable conclusions regarding future ASPs and sales pace based on a thorough and competent analysis of market information**

Various indices and other housing data available by the spring of 2007 demonstrated a markedly downward trend, and by the second quarter of 2007, sentiment and press about the housing market had turned decidedly more negative. Even most economists who believed that the worst of the housing slump had passed by July 31, 2007 still predicted that future housing prices would decline and that the downturn would be prolonged. Predictions regarding the amount of future declines in home prices varied, with some commentators predicting national declines in the 20-30% range and others, such as Moody's Economy.com, predicting declines of 5-7% through 2009.

Contemporaneous information from a variety of sources showed that the national housing market and many of the geographic markets where TOUSA's assets were located were in a serious

41

decline that appeared likely to continue.  The following were among the indicators that Hewlett
considered:

•    U.S. Census Bureau data showed a precipitous decline in the volume of new home sales and
     the number of permits secured for new housing starts beginning in late 2005/early 2006 and
     continuing through July 31, 2007.

•    Data from the well-regarded Standard & Poor's/Case Shiller Index regarding home price
     changes in certain metropolitan areas showed that (a) existing home prices had been trending
     downward on average in twenty major metropolitan areas for ten months in a row prior to
     July 31, 2007, and (b) certain TOUSA markets that had experienced astronomical price
     inflation beginning in 2002 were seeing price declines in 2006 and 2007.

•    The NAHB/Wells Fargo Housing Market Index of Builder Confidence showed that (a)
     homebuilders' confidence in the housing market began to drop precipitously in 2005 and (b)
     the downward trend continued in the months leading up to July 31, 2007, reflecting, among
     other things, builders' awareness of the subprime mortgage crisis and their disappointment
     in the spring 2007 selling season.

•    The Housing Opportunity Index of Housing Affordability published by the National
     Association of Home Builders (NAHB) and Wells Fargo showed a "dramatic decrease in the
     affordability of housing markets across the country."

The contemporaneous third-party data upon which Hewlett relied[12] was consistent with
Hewlett's analysis of the affordability of for-sale housing, which demonstrated that housing prices
were seriously out of equilibrium with income and rental rates.  In addition, it was apparent that the
downward trends in sales volume and home prices that were shown in the third-party data were
affecting TOUSA as well by July 31, 2007.  In most TOUSA markets, sales were down in 2007
compared to 2006, and prices were falling.  TOUSA's own internal documents also show that senior

---

[12]  It is difficult not to be struck by the fact that the data relied upon and the methodologies used by the various experts,
each respectively claimed as the most reliable, neatly matched the results which are most favorable to the party which
had hired the expert.  I found most of the experts to be credible; Defendants' expert Lenhart was a notable exception.
Conclusions flow from what are fundamentally credibility determinations, and those in turn flow from a combination
of the comparative quality of the lawyering and the persuasiveness of the witnesses.  I note these discomfiting facts in
the discussion of Hewlett's analysis not to take particular aim at him or to cast doubt upon my conclusions but simply
to note how remarkable the disparities in perception and presentation can be.

executives at the Company were increasingly pessimistic about housing sales and prices in the second half of 2007 and beyond.

After considering information from a variety of sources, Hewlett concluded that forecasts of home price changes at the metropolitan area level prepared in or about July 2007 by Moody's Economy.com comported with his view of where home prices were likely to go after July 31, 2007. Overall, Moody's predicted a relatively modest 5-7% decline in home prices between 2007 and 2009, although it predicted more dramatic price declines in certain geographic markets and price increases in others. According to Moody's, home prices would increase by 2010 in the vast majority of metropolitan areas where TOUSA communities were located. The Moody's forecasts that Hewlett relied on were available prior to July 31, 2007 and therefore were not influenced by events that occurred after that date.

Moody's Economy.com is a reputable source of information regarding the housing market and its forecasts are based on the S&P/Case Shiller and OFHEO indices. Price changes to these indices apply to new home sales as well as existing home sales, as those two types of home sales generally have tracked together.[13]

Hewlett's views about the likely trajectory of the housing market informed his community-level sales pace (absorption) assumptions as well. In general, Hewlett assumed that TOUSA communities would be expected to continue to achieve the sales pace they had experienced

---

[13]   Defendants' expert Cannon attacked the reliability of Moody's forecasts on the grounds that they rely in part on the Case Shiller Index ("CSI"). I find his criticisms of the CSI to be unpersuasive. The critics cited by Cannon are CSI competitors who have a financial incentive to impugn the CSI. Cannon's additional criticism – that the CSI is not relevant to new home sales – is similarly unpersuasive. Cannon himself conceded that the existing home market is closely related to the new home market and that the new home market simply lags behind what occurs in the existing home market. In fact, TOUSA's own real estate consultant believed that the CSI "underestimate[d] the magnitude of a downturn," especially for new home sales. Ex. 2436 at 1.

in the four months leading up to July 31, 2007, until such time as a community's sales prices began to increase (based on the Moody's Economy.com metropolitan level forecasts). When a community's sales prices were predicted to increase (indicating a recovery), Hewlett assumed that the sales pace would accelerate simultaneously. When it was available, Hewlett focused on the sales activity over the four months prior to July 31, 2007 because he determined that the activity during that period provided the best information for calculating the absorption rate of a community during the months ahead.

In determining the expected sales pace for each community, Hewlett considered the community's own sales history to be the best source of information if an active sales history existed. As a supplement to that information, Hewlett examined information from other TOUSA and non-TOUSA communities as comparables.

I find that Hewlett's ASP and absorption forecasts were reasonable and reliable. In particular, I find that Hewlett's reliance on the Moody's forecasts to predict changes in future ASPs and absorption, as reflected in his community-level cash flow analyses, was reasonable.

> ### (ii)    The ASP and sales pace assumptions used by Cannon and Samuels are unreliable and contrary to the weight of the evidence

Defendants' experts, Cannon and Samuels, criticized Hewlett's reliance on the Moody's forecasts and offered their own forecasts for future ASPs and absorption trends. As discussed below, their criticisms and forecasts are for the most part less reliable and credible.

### (a)    Cannon's ASP and sales pace assumptions

As part of his valuation, Cannon forecasted that ASPs would be flat – neither increasing nor decreasing – for six years and that absorption would decrease by 25% for two years and then return to its pre-downturn sales pace.   There are a number of serious problems with Cannon's assumptions.

First, he adopted his flat-ASPs-for-six-years rule for all communities throughout TOUSA, regardless of their location.   But Cannon conceded that, like politics,[14] all real estate is local. National trends have limited utility in forecasting what will happen in specific submarkets and local communities.   Historical experience has shown that different metropolitan areas recover from housing downturns at different rates depending on a host of factors relating to the local economy, supply and demand, and the degree of correction needed in that particular housing market. Hewlett's analysis – in contrast to Cannon's – accounts for expected differences in ASPs in different geographic markets in 2007, 2008, 2009 and thereafter.   Using the Moody's forecasts, Hewlett assumed price changes that were "very specific and very sensitive to the geographic market" instead of adopting a "one size fits all approach" like the one used by Defendants' real estate experts.

Second, despite the abundance of evidence indicating that the relevant housing markets were in decline well before and leading up to July 31, 2007, Cannon forecasted no further decline in ASPs.  In light of the numerous indicators cited by Hewlett, all showing a declining housing market (see section III.A.3.a(i), above); contemporaneous TOUSA documents acknowledging that further deterioration was likely (see section II.A.1, above); as well as Cannon's own admission that the housing market was declining as of July 31, 2007, it was unreasonable not to project a decrease in ASPs for some appreciable period of time after July 31, 2007.

---

[14]   Speaker of the House Thomas P. "Tip" O'Neill.

Cannon's explanations for his failure to project lower ASPs are not credible. As an initial matter, Cannon's assertion that homebuilders were not lowering their actual prices (and were, instead, increasing option incentives) was contradicted by the public statements and statistics of other homebuilders and the data in Cannon's own report.[15]   In addition, Cannon's assumption that ASPs would remain flat was predicated, at least in part, on his belief that ASPs have "nothing . . . to do with market value." Cannon Tr. 3160:1.  That view is at odds with all of the other testimony in the case, including that of Defendants' other real estate expert Samuels, who used ASPs in his analysis and could not understand Cannon's assertion that ASPs are irrelevant to market value.  In fact, TOUSA management, Hewlett, and Samuels all recognized that incentives offered to homebuyers by homebuilders must be factored into the sales price when looking at the value of the asset to a homebuilder.  Thus, contrary to Cannon's assertion, ASP – which includes incentives – is the proper metric to consider.  In light of Cannon's concession that homebuilders were addressing the problems in the housing market by offering substantially greater incentives to generate sales, his failure to use ASPs appears to be a way to avoid lowering future sales prices in his valuation analysis.  Although Cannon's motivations in that regard are unclear, his methodology appears result-driven.

Third, Cannon provided little support for his assumption that, as of July 31, 2007, sales pace (absorption) should have been expected to be depressed for only two years.  While he contended that the typical housing downturn lasts only 2 or 3 years and therefore TOUSA's home sales should have been expected to recover in that time frame, Cannon's own chart of historical housing downturns

---

[15]  In that regard, Cannon's report and testimony contained numerous misleading excerpts and mischaracterizations of industry reports as well as a misleading description of a 2008 presentation by Hewlett.

shows a number that lasted for four to six years. Given the many indications as of July 31, 2007 that the present downturn would be serious and prolonged, Cannon's anticipation of a "normal" housing recovery is unfounded.[16]

Fourth, Cannon made unreliable assumptions when assessing the sales pace for a given community. In determining the absorption rates for each of his communities, he used a divisional rate of sales, not the sales history in the community at hand. Ex. 652 (Cannon Report) at 23-24. Although Cannon professed to consider carefully a range of factors, his workpapers show that he in fact engaged in a purely mathematical exercise at the division level to come up with the absorption rates that he applied.[17] Moreover, Cannon's divisional "aggregate" was not even a simple average but was weighted to increase the absorption rate significantly.[18] Cannon's use of divisional absorption information resulted in inflated absorption assumptions and overstated values.

Fifth, Cannon's absorption analysis is flawed because he did not appropriately consider a community as a whole when valuing the properties within a community. By assessing each asset group in isolation, Cannon arrived at inflated absorption rates because he ignored the fact that there are other categories of assets that have to be sold. For example, a rational homebuilder would not begin vertical construction on finished lots in a community with a large supply of unsold completed

---

[16] In fact, Mon and TOUSA management believed that the closest analogy was the housing downturn of the late 1980's and early 1990's. That housing downturn lasted more than five years and required more than 15 years before the pre-downturn level of housing starts was reached. In addition, as Mon acknowledged, there were many indications that this housing downturn would be quite severe, and possibly unprecedented. *See*, *e.g.*, Ex. 2416 (indicating that U.S. median home prices had fallen in the first half of 2007 for the first time in 40 years).

[17] Cannon's reliance on the divisional average can be discerned by comparing the division averages found in his Report (Ex. 652 (Cannon Report) at Vol. II, 11-28) with the number of finished lots absorbed each year (Ex. 643 (Samuels Report) at 566-718). *See also* Hewlett 718:25-720:6.

[18] Cannon's use of a weighted rather than simple average in his divisional absorption rate can be discerned by comparing his "aggregate" absorption rate with an average of all of the communities listed in the "number of units absorbed per month." Ex. 652 (Cannon Report) at Vol. II, 11-28.

homes that would take years to sell. As Hewlett cogently explained, it was an error for Defendants' real estate experts to have finished lots absorbed beginning in year one if the community had existing inventory that would first have to be sold off. Although at trial Cannon claimed to have considered the interplay of various types of assets within a community, his absorption assumptions do not bear that out. For all of the foregoing reasons, I find that Cannon's analysis of future ASPs and sales pace was flawed and unreliable.

### (b)    Samuels' ASP and sales pace assumptions

For his valuation, Samuels made the following forecast regarding ASPs: (1) ASPs would be flat for three years; (2) all incentives would end at the beginning of the fourth year (causing ASPs to increase); and (3) ASPs would rise three percent in the fifth year and thereafter. Samuels' forecast for future ASPs, therefore, suffers from many of the same defects as Cannon's: his forecast was the same for all of TOUSA, with no attempt to differentiate among geographic areas; it predicted no decline in ASPs after July 31, 2007, despite overwhelming evidence that housing markets around the country were declining, especially in TOUSA's key geographic regions; and it assumed that ASPs would rebound more quickly than could reasonably have been expected based on evidence available as of July 31, 2007. Those assumptions are not credible.

The rebound in ASPs that Samuels forecasted in year four is especially unrealistic. It defies logic to think that homebuilders simply would cease to offer incentives in all markets at a set point in time. Not surprisingly, Samuels never quantified the impact of that forecast and conceded that his forecast had the effect of increasing ASPs in year four by more than 18%. I find that such a large percentage increase in one year is not a credible assumption. A typical annual increase in ASPs is in the low single digits; Samuels' forecast included a 3% increase in year five, and even TOUSA

management's own unduly optimistic forecasts projected annual increases only in the 1% to 3% range. I similarly cannot credit the explanation that Samuels offered at trial – that he believed that incentives would actually be removed gradually beginning at an earlier date but that he simply reflected it all in year four – since that approach would be the equivalent of forecasting steep annual ASP increases beginning in year one, when all of the data and evidence showed a declining housing market.

Samuels also failed to conduct any absorption analysis whatsoever on the vast majority of the assets, because he did not consider it relevant to his "retail approach" to valuation. Thus, for all assets except land under development, Samuels did not consider whether the pace of home sales would be rising or falling in a geographic region or a specific community. The fact that the rate of home sales in TOUSA communities was not important to Samuels' valuation of the vast majority of the real estate properties is telling and undermines the reliability of his analysis. In the limited instances where Samuels did consider sales pace (*i.e.*, when valuing land under development), he failed to use realistic assumptions or to consider the interplay of the other types of assets that existed within the community. For all of the foregoing reasons, I find that Samuels' analysis of future ASPs and sales pace, to the extent he performed any, was flawed and unreliable.

### (iii) James' testimony does not cast doubt upon Hewlett's ASP and sales pace assumptions

Defendants also offered an economist, Christopher James, to opine that Hewlett was unduly pessimistic in his projections. According to James, the national economy, and thus the housing market, sustained unexpectedly sharp declines beginning in August 2007 for reasons that TOUSA management could not reasonably have foreseen. James demonstrated that the national economy did, indeed, suffer significant deterioration from and after August 2007, and that these shocks

reverberated in the national housing market. The undisputed fact that the national housing market went to hell in a handcart beginning in August 2007 does not mean that TOUSA's markets and business were not already there at July 31, 2007.

James' testimony does not demonstrate that Hewlett's forecasts were materially mistaken. First and foremost, James focused entirely on the *national* economy and the *national* housing market. He offered no opinion on the conditions of the particular geographic markets in which TOUSA and the Conveying Subsidiaries did business. As James acknowledged, TOUSA did a significant percentage of its business in regions, like Florida, that were adversely affected *before* the declines in other parts of the country.

Second, although James focused on the ways in which a deteriorating *economy* caused deterioration in the *housing market*, causation, as he recognized, also moved in the opposite direction: A substantial downturn in the housing market (especially in TOUSA's markets) caused deterioration in the national economy. Much, though certainly not all, of the decline in the national economy from and after August 2007 was the byproduct of housing market deterioration that was sustained in the spring and summer of 2007.

Finally, James' own data confirm that a highly pessimistic view of TOUSA's housing market was well warranted as of July 31, 2007. For example, although James noted a sharp increase in foreclosures, including for prime mortgages, beginning in late July 2007, he agreed that foreclosures were generally preceded by events of default.[19] It follows that defaults and delinquencies in mortgages must have been spiking in the spring and early summer of 2007. Similarly, whereas James noted a substantial drop in the issuance of commercial paper beginning in August 2007, he

---

[19] How could it be otherwise?

agreed that at least one reason for that could be a spike in the *preceding* months in defaults in the asset class backing the commercial paper. And although James opined that "U.S. corporate bond spreads experienced sharp increases starting in August 2007" – from which James inferred that private borrowing costs were increasing due to marketwide risk – the chart on which he relied in fact shows a much sharper increase in *July* 2007. James' effort to explain this apparent contradiction was unpersuasive.

Taken as a whole, the evidence persuades me that Hewlett's assumptions, which were based on the Moody's forecasts, were a reasonable estimate of future home price changes and absorption rates in the various geographic markets where TOUSA and the Conveying Subsidiaries operated. I would note, although it did not affect Hewlett's analysis (or my findings), that home prices have in fact fallen far more than Moody's or Hewlett predicted as of July 31, 2007, and that Hewlett's fair value conclusions undoubtedly would have been lower had he anticipated or taken into account the post-July 31, 2007 events noted by James.

### b.    The cost inputs used in Hewlett's DCFs were reasonable predictions of future costs

The third step of Hewlett's six-step analysis involved projecting expected future revenues and costs at the community level. As explained above, Hewlett derived the revenue inputs from his projections of ASPs and sales pace. Hewlett's community models also incorporated detailed information regarding future (*i.e.*, post-July 31) costs, including assumptions regarding what it would cost to develop, build out, market and sell the homebuilding assets owned by TOUSA and the Conveying Subsidiaries as of July 31, 2007. Hewlett based his cost inputs on TOUSA's historical and projected costs for developing and building the same or similar types of houses.

51

Hewlett obtained some of the cost inputs directly from various TOUSA data sources. Many others were provided by Committee expert Amy Benbrook.

Benbrook is a partner with J.H. Cohn, LLP. She has twenty years of experience in the real estate development and construction accounting fields. Benbrook has performed work for many residential home builders, including numerous assignments estimating costs associated with developing and building residential developments.

Using cost information provided by TOUSA was the best way to estimate what it would cost to develop and build out lots and houses in communities owned by TOUSA and the Conveying Subsidiaries as of July 31, 2007. By relying on TOUSA's historical cost information and its projections regarding what it expected to spend on future development, Hewlett was able to use community-specific cost inputs, which factor in differences in costs incurred (and expected to be incurred) for different projects and different geographic areas, and which are more accurate than national industry averages.

Hewlett's discounted cash flow analyses accounted for horizontal costs, *i.e.*, the costs associated with developing land into building-ready pads and constructing community amenities, and vertical costs, *i.e.*, the costs associated with constructing, finishing and selling houses built on those pads.

For the vast majority of projects that were expected to have additional horizontal costs after July 31, 2007, Benbrook estimated the cost to complete the horizontal development. Benbrook derived the horizontal cost-to-complete estimates from various sources, including information obtained from TOUSA's HSP accounting system,[20] and she cross-checked the numbers she used

---

[20] See discussion of HSP-related issues below in this section.

with information from several other contemporaneous sources.  In cases where the HSP budgets appeared to be missing or incomplete, Benbrook relied on cost-to-complete information from non-HSP sources.[21]

For vertical construction costs, Hewlett's DCF analyses incorporated inputs from two sources.  First, for houses that were under construction on July 31, 2007 (backlog and speculative homes), Hewlett derived the cost-to-complete vertical construction from house-specific budgets that were in the HSP system. Hewlett used those budgets because they were in line with actual historical costs incurred to build similar homes in the same or neighboring communities.  Second, for houses that had not been started on July 31, 2007 – that is, for future vertical construction – Benbrook provided estimated future construction costs associated with building out and selling an average home in each community, including material and labor costs, option costs, and indirect construction costs.  Benbrook derived her future vertical construction cost inputs from multiple sources, including recent actual historical cost information, TOUSA impairment models, and in some cases divisional averages, and she cross-checked them.  Benbrook also provided inputs for soft costs, such as commissions, marketing and advertising costs, and closing costs, and Hewlett incorporated those costs in his DCF models for each home in his community-level analyses.

Finally, in addition to providing community-specific cost inputs, Benbrook advised Hewlett to make the following two assumptions regarding the trajectory of future construction costs: (1) construction costs would remain flat during a housing downturn; and (2) costs would begin to increase when the housing market recovered, but in no case would construction costs escalate by

---

[21]  For a small number of communities, Hewlett obtained horizontal cost information directly from documents produced by the Debtors.

more than five percent per year.[22]  The assumptions provided by Benbrook are reasonable and consistent with historical experience.  Data from previous downturns (cited in Samuels' expert report for the Defendants) show that while the *rate of increase* in construction costs slowed during previous housing downturns and the first part of 2007, the overall costs continued to go up.  Recent data from the current housing downturn provided by Samuels also indicate that building material costs continued to rise, which further demonstrates that Benbrook's cost assumptions were conservative.

The cost estimates and assumptions used by Hewlett, whether derived from HSP reports or other sources, represent reasonable predictions of the costs associated with building out the communities that were owned by TOUSA and the Conveying Subsidiaries as of July 31, 2007.  I find that Hewlett's use of detailed cost inputs based on TOUSA information from the same or similar communities was the most reliable method of predicting future construction expenses.

Defendants offered numerous criticisms of the cost inputs used by Hewlett.  First, they attacked the reliability of the underlying HSP data used by Benbrook and Hewlett.  Second, they contended that it was inappropriate for Hewlett to deduct costs such as commissions, closing costs, and marketing costs.  And third, they argued that it was wrong for Hewlett to hold construction costs constant during the time period that he forecast declining ASPs.  None of these criticisms convinces me that Hewlett's analysis is unreliable.

At the time of her initial direct testimony and cross-examination, Benbrook testified that the information contained in the HSP system was "static;" that is, she believed that her review of Land

---

[22]  Some of the costs in Benbrook's analysis (roughly 13 %) were tied to ASPs and would decrease (and not simply remain flat) with any market decline.

Development Cost Code reports from the HSP system run in October 2008 "as of" July 31, 2007 would accurately reflect the information which was in the system as of July 31, 2007. But the HSP system did not work that way. Changes in TOUSA budget information made subsequent to July 31, 2007 would, in fact, be carried back and appear in runs made "as of" July 31st.

During the course of the trial, Defendants elicited testimony establishing that budget information contained in certain reports from the Debtors' HSP system was "non-static" when run "as of" July 31, 2007. That is to say, if the database were queried at different times for budget data as it existed on July 31, 2007, the resulting outputs sometimes differed. Although this fact calls into some question the accuracy of the information upon which Benbrook (and therefore Hewlett) relied is establishing costs, I am satisfied after carefully considering the attacks made on Benbrook's cost information that the non-static nature of the reports did not make a material difference to Hewlett's bottom-line conclusion regarding the value of the real-estate assets owned by TOUSA and the Conveying Subsidiaries. While the Defendants' efforts to discredit Benbrook's cost information succeeded in establishing an error in her premise that information in the Land Development Cost Code reports was static, it did not succeed in establishing that post-July 31, 2007 changes to the data base made any material difference to the ultimate values derived.

Benbrook used TOUSA's Land Development Cost Code reports – which she obtained from the Debtors' HSP system – to compute the horizontal land-development costs for 115 of the 292 communities she analyzed. To assess the reliability of those reports, she compared the numbers she derived from those reports to the cost numbers she would otherwise have derived from five other static sources: two sets of historical data detailing the horizontal costs for houses that had closed in the same community in the months before July 31, 2007; projections prepared by the Debtors for

55

purposes of impairment analyses; a land acquisition model prepared by the Debtors in December 2006; and a borrowing base document prepared by the Debtors on or around July 31, 2007. The aggregate difference between the data from the non-static Land Development Cost Code reports and the data from these alternative sources would, at most, have changed Hewlett's valuation of the real-estate assets by $5.1 million – approximately a 0.4% difference, which is an amount Hewlett appropriately characterized as *de minimis*. Benbrook additionally investigated the degree to which the budget information in the Land Development Cost Code reports actually had changed over time, by comparing the budget data in the reports she had run in October 2008 with the budget data in a fresh set of reports she ran in July 2009, after the "non-static" issue had come to light. Although Defendants suggested that the aggregate difference between the horizontal costs derived from the two sets of reports could be as much as $1.7 million, that is an insignificant amount of variability when compared to a total cost figure of approximately $628 million. Nor did the cost inputs particular to either TOUSA Homes, Inc. (0%) or Newmark Homes L.P. (0.7%) change to any significant degree. For all of the above reasons, I conclude that Benbrook's horizontal cost estimates were reliable, as were the Land Development Cost Code reports she used to calculate them.

Hewlett provided similar testimony regarding the reliability of TOUSA's Job Cost Detail reports, which he used to compute remaining vertical home-construction costs for backlog and speculative homes in inventory as of July 31, 2007. He compared the cost data in those reports to two alternative (static) sources of cost data: a historical record of the vertical costs of homes that closed in the relevant community in the months leading up to July 31, 2007; and the July 31, 2007 borrowing base document that Defendants' real-estate expert Samuels used for his vertical cost

56

inputs.  The first comparison showed an aggregate difference of 3.6% ($16.3 million compared to a total cost figure of $456 million for the communities for which comparable data existed), which Hewlett reasonably deemed to be "fairly minimal."  The second comparison showed an aggregate difference of only 0.2% ($1.4 million compared to a total cost figure of $575 million for the communities for which comparable data existed), which Hewlett reasonably deemed *de minimis*.  Hewlett also analyzed how much the Job Cost Detail reports in fact changed over time, and determined that they changed by only 0.7% between the time he originally compiled them and the time of trial.  Nor was there significant localized variability: roughly 85% of the reports changed by less than 3%, and the differences for the reports relating to communities owned by TOUSA Homes, Inc. and Newmark Homes L.P. were only 0.2% and 1.7%, respectively.  For all of these reasons, I conclude that the vertical construction cost estimates Hewlett derived from the Job Cost Detail reports were reliable.

Moreover, the HSP reports used by Benbrook and Hewlett are consistent with (in the case of Samuels) or superior to (in the case of Cannon) the cost data used by Defendants' experts in their analyses.  Samuels, like Hewlett, believed that TOUSA's own reports were the best available means of calculating the percentage of completion in horizontal development.  For his projected costs of vertical development, Samuels primarily used TOUSA's borrowing base budgets, which varied overall by only approximately 0.2% from the HSP budgets used by Hewlett.  Thus, Samuels – like Hewlett – used TOUSA's own projected costs-to-complete, many of which were originally derived from the HSP system.

As for Cannon, he made no effort to calculate the cost to complete the horizontal development at specific communities, instead relying on general assumptions, ratios and "rules of

thumb." Thus, for all TOUSA properties he simply adopted an industry "60/40 rule" that 40% of the value of the finished lot is attributable to the raw land. He then assumed that all sites were 50% developed rather than trying to determine how much horizontal development was still required in each community as of July 31, 2007. Both Samuels and Hewlett rejected this "valuation by assumption" approach and instead estimated horizontal costs to complete on a community-by-community basis based on the information in the TOUSA accounting system. Simply assuming that all communities were 50% developed is bound to be inaccurate: "some of [the TOUSA properties] might be at 85 percent developed" and "[s]ome of them might be at 20 percent developed." Samuels Tr. 3534:16-3535:4. Even if the HSP budgets used by Hewlett changed a relatively small amount over time, Hewlett's more detailed, site-specific analysis is plainly superior to and more reliable than the gross assumptions relied on by Cannon.

Defendants' second cost-related criticism was that Hewlett erred by factoring in commissions, marketing and advertising costs, and closing costs in his DCFs. Defendants' experts contended that no deductions were needed for those costs because the relevant measure of "fair value" is the retail value of the home (*i.e.*, the amount paid by the ultimate purchaser of a finished home) which does not include deductions for those costs. Defendants' experts' criticism is unfounded and their "retail" valuation approach is inappropriate.

As discussed above, for purposes of his fair valuation of the inventory, Hewlett determined that another homebuilder or developer would be the most likely purchaser of TOUSA communities or groups of assets. In deciding how much another homebuilder or developer would pay, Hewlett assessed the risks and costs associated with monetizing the homebuilding assets, just as the potential purchaser would. Accordingly, as part of his community-level DCF analyses, Hewlett deducted the

58

costs that would be associated with maintaining, marketing and selling the completed homes, including commissions, marketing and advertising costs, closing costs, and holding costs, because those costs would be considered by a purchaser in deciding what it would pay for the assets.

Cannon and Samuels, in contrast, did not include the costs associated with the future sale and closing of homes in performing their valuations of many categories of real estate assets.[23]  The "retail values" they used made no deductions at all for costs such as commissions, marketing and advertising costs, closing costs, and holding costs.  Even if one were to assume as they did that a "fair valuation" could be based on TOUSA and the Conveying Subsidiaries building out and selling each backlog home, speculative home, and finished lot to an individual homebuyer at a retail price in the months or years after July 31, 2007, it is unrealistic to ignore the costs that TOUSA and the Conveying Subsidiaries would incur for maintaining, selling and closing on these homes.  TOUSA and the Conveying Subsidiaries would need to deduct those costs – all of which would be necessary to generate income from these properties – in determining their fair value.  Thus, I find that, regardless of whether the hypothetical willing buyer is a homebuilder, developer or a collection of individual homebuyers who purchase from TOUSA, Hewlett was correct to take into account in his fair value analyses the costs associated with maintaining, selling and closing on these real estate assets.  I further find that, by failing to take those costs into account, Defendants' experts overvalued the real estate assets by tens of millions of dollars.

Defendants' final criticism of Hewlett's cost information was their attack on his (and Benbrook's) assumption that construction costs would remain flat during a housing downturn.

---

[23]   Neither Cannon nor Samuels accounted for those costs in connection with their valuations of the backlog and speculative homes, and Samuels also did not factor in the costs for finished lots.

Samuels (along with Professor Metrick) criticized that assumption, arguing that construction costs should go down if housing sales fall. While understandable as theory, Defendants' criticism is unsubstantiated by the facts.[24] Data from past housing downturns, as well as data regarding the current downturn, confirm that building material costs generally continue to rise (albeit at a much slower rate than during housing market upswings) and generally do not decrease. Benbrook's assumption regarding construction cost changes is reasonable, conservative, and consistent with historical experience.

        c.      **Hewlett's discount rates were reasonable and consistent with prevailing market rates**

In the fifth step of his six-step analysis, Hewlett applied a set of discount rates to the community-level cash flows he computed to arrive at each community's net present value. The discount rates that he developed and used were specific to each community and they took into account the geographic market and the risks associated with different types of real estate assets. The average discount rate used by Hewlett was approximately 20%. The rates used by Hewlett were within the range used by actual market participants on July 31, 2007 and were consistent with Hewlett's experience in the real estate industry. Cannon and Samuels criticized Hewlett's discount rates for being too high and argued that the rates they used – 11.5% and 10.63%, respectively – were more reasonable. Defendants' experts' rates are unreasonably low and are inconsistent with contemporaneous industry surveys. Indeed, the RealtyRates.com Developer Survey for Second Quarter 2007 shows average discount rates for site-built residential properties of 25.14% ("actual rates") and 23.97% ("pro-forma rates"). The Korpacz survey for the second quarter of 2007 shows

---

[24] "Facts are stubborn things." Alaine-René Lesage, *Gil Blas,* Book X, ch. 1 (1735).

a range of discount rates of 10% to 25%, with a national average of 17.72%. Other industry analysts also reported that typical discount rates are 20% to 25% for finished lots and 15% to 20% for vertical construction. The evidence demonstrates that Hewlett's discount rates are reliable and consistent with what market participants were using on or about July 31, 2007, while the rates used by Cannon and Samuels are unreasonably low.

Hewlett's discount rates are reliable for the additional reason that they varied based on the characteristics of each community. Unlike Hewlett, both Cannon and Samuels used a single, flat discount rate for all of the assets that they valued. By using a one-size-fits-all approach, Cannon and Samuels failed to take account of differences in geographic markets and the risks associated with different assets. Thus, even though Cannon acknowledged that the "present value rate" should "var[y] with the size, complexity, market potential, overall quality, appeal, estimated absorption, and pricing of the product,"[25] Ex. 652 (Cannon Report) at Addenda 43, neither Cannon nor Samuels used discount rates that took those differences into account.

Cannon and Samuels made an additional error in conducting their "present value" analyses: they failed to discount certain categories of assets at all. For those assets, Defendants' experts simply assumed that discounting to present value was unnecessary.[26] That approach ignores certain holding costs as well as the time value of money, which is implicated by the fact that it would take months or years for homes under construction and finished lots to be completed, sold and transferred to retail purchasers. In contrast, Hewlett considered when homes would likely be sold, and

---

[25] Samuels agreed with Cannon that risk profiles vary in different geographic markets and stages of completion.

[26] Samuels did not perform a present value discount on any of the TOUSA real estate assets except for his Land Under Development category, *see* Samuels Tr. 3482:6-3483:24; Ex. 617 (Hewlett Rebuttal Report) at 5, while Cannon performed a present value discount only on a small portion of the properties in his Finished Lot and Land Under Development categories. *See* Cannon Tr. 3126:5-16; 3127:20-25; 3129:3-13; Ex. 617 (Hewlett Rebuttal Report) at 5.

61

discounted their value to account for the time required to complete their sale.  By failing to apply a present value discount to whole categories of assets, Defendants' experts greatly overestimated the value of those assets.

I find that Hewlett's discount rates are reasonable and reliable.  I also find that the present value analyses conducted by Cannon and Samuels were deficient because they used unreasonably low discount rates and failed to discount certain types of assets at all.

### d.    Hewlett's valuation of the undeveloped land was problematic

As he did with the other categories of inventory assets, Hewlett valued the undeveloped land owned by TOUSA and the Conveying Subsidiaries by conducting community-level DCF analyses. Hewlett considered using a different approach – known as the sales comparison approach – but he ultimately concluded that approach was unreliable because purchase activity for large parcels of undeveloped land in the relevant markets was not sufficiently active in the months leading up to July 31, 2007 and there was a dearth of truly comparable transactions.  Under the circumstances that existed on or about July 31, 2007, it was reasonable for Hewlett to use the DCF approach instead of the sales comparison approach to arrive at a fair market value.[27]  In fact, market participants such as homebuilders and developers generally rely on that approach to value raw land.

In conducting his DCF analyses for the undeveloped land parcels, Hewlett assumed that the undeveloped land would be used for residential development.  Although there was some suggestion from Defendants' experts at trial that the land could be used for other purposes (actually suggesting, with an apparent straight face, use as an amusement park, an illegal alien holding facility, or a sports

---

[27]   Defendants' experts acknowledged that it is not uncommon to discover that a sales comparison approach is inappropriate for want of a sufficient number of truly comparable transactions in the marketplace.

stadium,[28] Metrick Tr. 1976:19-1977:4), TOUSA's own contemplated use – and the use contemplated by all three real estate experts – was for development into residential communities. Hewlett Tr. 806:8-12; Ex. 616 (Hewlett Report) at 41-43; Ex. 643 (Samuels Report) at 283-284; Ex. 652 (Cannon Report) at 5. Thus, there is no real, non-frivolous dispute that the highest and best use for the undeveloped land was residential construction. In such circumstances, it was reasonable and valid for Hewlett to value the undeveloped land assets by performing a cash flow analysis that contemplated the hypothetical build-out of parcels using assumptions based on TOUSA's own information and his expertise.

In light of the evidence regarding the market for raw land transactions on or about July 31, 2007, and the uncontroversial assumption that the land would be used for residential development, I find that Hewlett's valuation of the raw land using the DCF approach was appropriate and reliable.

Hewlett's valuation methodology is not called into question by the fact that his analysis yielded zero values for some (approximately 18%) of the communities. Hewlett's conclusion that certain communities had no value as of July 31, 2007 was a reflection of various factors, including the length of time before sufficient demand would support the construction of homes at a reasonable profit and the substantial holding costs and obligations that TOUSA and the Conveying Subsidiaries would incur in the meantime. That finding is consistent with market conditions and experience, but only to a limited extent. It is consistent with the testimony of Mon, who stated that if the cost to develop a piece of undeveloped land exceeded the expected return, the company could "decide to write it down to zero" and sit on it. Mon Tr. 341:24-342:7. Put another way, a zero value reflects

---

[28]  I admire thinking outside the box, but suggesting a sports stadium be built in the Arizona desert between the Phoenix and Tucson metro areas – while fun in an academic brainstorming session – is beyond silly when proposed at trial.

the absence of an active market for that property, and it reflects the likelihood that an owner would not be able to sell the property at that time.

Defendants' expert Samuels also criticized Hewlett's undeveloped land valuations because a single parcel which Hewlett valued at zero sold after July 31, 2007 for a substantial sum.  If this were a broader issue, I would be more concerned about the methodology, or at least its application; it is troublesome when "worthless" property sells for a lot of money.  But I ultimately find this cherry picking of post-July 31, 2007 events is unpersuasive.  Samuels did not do a systematic study of TOUSA's raw land sales after July 31, 2007, nor did he mention the fact that TOUSA sold a parcel post-July 31, 2007 for several million dollars *less* than the value attributed to it by Hewlett. Samuels himself also concluded that several hundred properties in five communities (from his Land Under Development and Finished Lots categories) had zero value. Samuels' critical reference to a single post-July 31, 2007 sale also failed to take into account TOUSA's continuing, unsuccessful efforts to sell many of its raw land parcels, despite its strong incentive under the deleveraging strategy and bankruptcy to execute such land sales. Samuels also did not consider whether TOUSA had abandoned a number of properties since July 31, 2007.  Furthermore, in his selective use of post-July 31, 2007 data, Samuels never took into consideration the fact that TOUSA currently forecasts the sale of its largest raw land parcel – known as "Red River" – at a time and for an amount that is far closer to Hewlett's valuation than that of Defendants' experts.

In sum, I find Defendants' experts' criticisms of Hewlett's valuation of the undeveloped land parcels to be unpersuasive.

In contrast to Hewlett's valuation of the undeveloped land, the valuations performed by Defendants' real estate experts are less reliable.  In particular, it was unreasonable for Defendants'

real estate experts to rely on the sales comparison method to value TOUSA's undeveloped land, because their use of that method was predicated on the faulty assumptions that there was an active market for raw land as of July 31, 2007, and that there were sufficient comparable transactions.  In fact, at that time, homebuilders and developers had little interest in purchasing new raw land parcels, as most were more interested in reducing their undeveloped land inventory in the face of declining demand for homes and riskier market conditions. Consequently, in attempting to come up, for example, with a set of comparable sales for six raw land parcels in the Las Vegas area as of July 31, 2007, Samuels was able to identify only a single sale in the Las Vegas area during the first seven months of 2007.

Defendants' experts were forced in many instances to fall back on sales from 2006 and earlier in their search for "comparable" transactions, but this was inappropriate given the decreases in home prices and the resulting dramatic decline in land values that had occurred in the interim.[29]  Given that raw land prices are extremely sensitive to changes in home prices and often drop precipitously in comparison, it was unreliable for Defendants' experts to use sales from earlier years. The sea change in the raw-land market in the time period leading up to July 31, 2007, with 60 to 80% declines in value in those rare instances where sales did occur, rendered inadequate the minuscule "timing adjustments" made by Defendants' experts and made the 2005 and 2006 sales transactions not sufficiently comparable for purposes of a sales comparison approach.  The "adjustments" which were made have a decided air of being result-oriented.

---

[29]  TOUSA executives were aware of this reality.  One member of Management commented on the lack of land sales in 2007, Ex. 2436, and another noted that "in markets where they have seen a 15-20% decline in net home prices (reflecting full impact of incentives and discounts), the value of finished lots has declined 30-40%, and the value of raw land has fallen 60-80%." Ex. 2432.

The huge Red River parcel in Arizona is a prime example of Defendants' experts' use of inappropriate sales comparables. Virtually all of the supposedly comparable transactions Samuels and Cannon used to come up with a value for the Red River parcel were not in fact comparable.

Samuels listed eight assertedly comparable transactions. Yet half of the sales took place in 2006 and thus were not at all comparable because of the critical impact of the decline in home prices. In addition, one of the 2007 transactions Samuels considered comparable actually was negotiated in 2005 as part of an ongoing master planned community development. Seven of the eight transactions involved sales of parcels of 1,300 lots or fewer, with four of the transactions for parcels of fewer than 1,000 lots. The Red River site involved more than 6,300 lots and thus was five or six times the size of the supposedly comparable sales. The locations of several of the eight comparables also were far removed from the Red River site, oftentimes with much more desirable access to commuting routes, services and amenities.

Cannon's sales comparables for Red River suffer from the same deficiencies, with some located in different counties, different metropolitan areas, or 80 miles away. Moreover, based on his workpapers, Cannon apparently adopted wholesale the raw land valuations generated earlier by Crown Appraisers, even though Crown appeared to make no adjustments for the earlier time periods or other differences between the supposedly comparable transactions. One of Cannon's assertedly comparable sales – and one included in the Crown Appraisal – was a parcel of land adjacent to the Biosphere science experiment, which the developer hoped to use as a lure for a unique resort, hotel, retail mixed use development and which bore no discernable similarity to the Red River parcel.

In light of the evidence regarding the condition of the market for undeveloped land transactions on or about July 31, 2007, and the problems with Defendants' experts' use of the sales

comparison approach, I find that the valuations of the undeveloped land parcels performed by Cannon and Samuels were unreliable.

### e. Hewlett is a qualified real estate expert whose opinions were credible

As discussed above, Hewlett is an experienced real estate professional who is well qualified to serve as an expert witness on real estate valuation issues. Nonetheless, Defendants moved to exclude Hewlett as an expert witness under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny, arguing that he is unqualified because he is not a licensed appraiser and his opinions are unreliable. Cannon in particular appeared to hold as Received Truth the view that only a licensed appraiser was qualified to offer any views on the value of real estate.

I find that Hewlett is qualified to offer expert witness testimony in this case and, for the reasons discussed above, the opinions he expressed are reliable. In my evaluation of the evidence and credibility of the witnesses, I find that it is inconsequential that Hewlett is not a licensed appraiser and that he can offer opinions regarding the value of real estate assets in this forum.

### f. Real estate valuation findings

Based on the totality of the evidence, I find Hewlett to be credible and his methodology to be reliable. I therefore accept his conclusions concerning the value of the homebuilding inventory assets owned by TOUSA Homes, Inc., Newmark Homes, L.P., TOUSA Homes Florida, L.P., Engle/Sunbelt, LLC, and TOUSA Mid-Atlantic Investment, LLC. As explained above, I do not find the valuations provided by Cannon or Samuels to be credible or reliable.

Furthermore, even were I to conclude that Hewlett's valuation conclusions are somewhat too low and that certain assets owned by TOUSA and the Conveying Subsidiaries may have been worth

more on July 31, 2007 than the value he assigned, it would not change my conclusion that the principal Conveying Subsidiaries – TOUSA Homes, Inc. and Newmark – were insolvent both pre-transaction and post-transaction.  As set forth in Clancy's adjusted pre-transaction balance sheets, TOUSA Homes, Inc. and Newmark were insolvent by $122 million and $58 million, respectively, prior to the July 31, 2007 transaction. See section III.A.1, above.  Clancy's post-July 31, 2007 transaction balance sheets show that TOUSA Homes, Inc. and Newmark were insolvent by $395 million and $206 million, respectively. See section III.B.1, below.  Thus, even if Hewlett's valuations were understated by 10%, TOUSA Homes, Inc. and Newmark would still be insolvent both pre-transaction and post-transaction.  My review of the totality of the evidence leads me to find that any understatement by Hewlett of the valuation of the TOUSA Homes, Inc. and Newmark real estate assets was considerably less than the amount by which these Conveying Subsidiaries were insolvent both pre-transaction and post-transaction.[30]

### B.    The Conveying Subsidiaries were insolvent after the transaction

#### 1.    The fair value of the Conveying Subsidiaries' liabilities exceeded the fair value of their assets after the Transaction

In addition to providing fair-value-adjusted balance sheets for several TOUSA entities reflecting their financial situation just *before* the July 31 Transaction, Clancy also provided fair-value-adjusted balance sheets for TOUSA, Inc., TOUSA Homes, Inc., Newmark Homes, L.P., and TOUSA Homes Florida, L.P. reflecting their financial situation just *after* the Transaction.  The major adjustments between the pre-transaction balance sheets and the post-transaction balance

---

[30]  TOUSA Homes Florida, L.P., would also still be insolvent after the transaction even if Hewlett's valuation of the Transeastern assets were understated by 10 percent.

sheets are (1) the allocation of the new debts taken on in the Transaction – the $500 million in new secured loans and $20 million in PIK notes – proportionately among the entities by assets and net worth, respectively; and (2) the placement of the Transeastern assets, as valued by Hewlett, on the balance sheet of TOUSA Homes Florida L.P. (which also assumed its portion of the Conveying Subsidiaries' shared debt burdens).

Clancy's post-transaction balance sheets are summarized in the following table:

| | Tousa, Inc. | Newmark | THI | Tousa FLA | Total |
|---|---|---|---|---|---|
| Total Assets at Fair Market Value | $ 328 | $ 324 | $ 772 | $ 29 | $ 1,453 |
| Less secured financing liabilities | | | (18) | | (18) |
| Assets Available for Joint Secured Debt | 328 | 324 | 754 | 29 | 1,435 |
| % of Available Assets | 23% | 23% | 53% | 2% | 100% |
| Allocated Revolver | $ (51) | $ (51) | $ (118) | $ (5) | $ (224) |
| Allocated New Debt | $ (114) | (113) | (263) | (10) | (500) |
| Available for Unsecured Creditors | $ 163 | $ 161 | $ 374 | $ 14 | $ 711 |
| Tousa, Inc. Assets Available for Bond | (152) | | | | (152) |
| Tousa, Inc. Assets Available for PIK | (3) | | | | (3) |
| Other Unsecured Debt | | | | | |
| AP | (50) | (37) | (114) | (30) | (231) |
| Customer Deposits | - | (12) | (41) | (2) | (55) |
| Financing Liabilities | - | | (5) | | (5) |
| Net Equity Before Debt* | $ (43) | $ 112 | $ 214 | $ (18) | $ 265 |
| % of Net Equity | N/A | 34% | 66% | N/A | 100% |
| Allocated Remaining PIK Note | | (6) | (11) | | (17) |
| Allocated Remaining Bond Debt | | (312) | (597) | | (909) |
| Equity | $ (43) | $ (206) | $ (395) | $ (18) | $ (661) |

* Net Equity Before Debt for Tousa, Inc. reflects Tousa, Inc.'s allocated Bond Debt and PIK Note Debt.

Ex. 2411.

As this table shows, Clancy concluded that, immediately after the transaction, TOUSA Inc.'s liabilities exceeded the fair value of its assets by $43 million; TOUSA Homes, Inc.'s liabilities exceeded the fair value of its assets by $395 million; Newmark Homes, L.P.'s liabilities exceeded

the fair value of its assets by $206 million; and TOUSA Homes Florida L.P.'s liabilities exceeded the fair value of its assets by $18 million.

Clancy's analysis demonstrates that the Conveying Subsidiaries, which were already insolvent before the transaction, were rendered even more deeply insolvent by the transaction. Because Clancy used essentially the same methodology for his post-transaction balance sheets as for his pre-transaction balance sheets, they are reliable and credible for similar reasons. And, again, Defendants' expert John Salomon largely validates Clancy's conclusions.

> ### a. Consolidated TOUSA's debts exceeded its total enterprise value after the Transaction, which further supports the conclusion that the Conveying Subsidiaries all were insolvent

The results of Clancy's post-Transaction adjusted balance-sheet analysis were further confirmed by the similar results reached by another of the Committee's experts, William Derrough. Derrough performed three separate balance-sheet analyses of the Conveying Subsidiaries and concluded in each that their liabilities exceeded their assets following the Transaction.

Derrough is well qualified in the fields of business valuation, capital markets, and restructuring. He is a Managing Director and the co-head of the Recapitalization and Restructuring Group at the investment banking firm Moelis & Company, LLC. He is a fellow of the American College of Bankruptcy and a member of the Board of Directors of the International Insolvency Institute. He has advised on or executed more than 100 transactions over a wide range of industries. In the majority of these engagements, he has completed detailed financial analyses, including valuation, debt capacity, feasibility, and solvency analyses. He possesses extensive experience in the homebuilding industry in particular.

70

Derrough applied the balance sheet test by computing a "Total Enterprise Value" ("TEV") for the consolidated TOUSA enterprise and subtracting the net value of TOUSA's debt. TEV is a commonly used concept in determining the going-concern value of a business. As such, it represents a proxy for the fair value of the enterprise's assets. If the enterprise's TEV is less than its net debt (its outstanding indebtedness minus its cash on hand), then its liabilities exceed the fair value of its assets and it is insolvent. Not only Derrough, but also Defendants' experts Lenhart and Stryker use a TEV method for determining solvency.

Although Derrough's application of the balance sheet test directly examines only the solvency of the consolidated TOUSA enterprise as a whole, the insolvency of the consolidated TOUSA enterprise *after* the July 31 Transaction necessarily means that the individual Conveying Subsidiaries all were insolvent. That is because, following the Transaction, the Conveying Subsidiaries each were jointly and severally liable on TOUSA's $1,724 million of outstanding funded indebtedness: $1,061 million in bond debt, $200 million of First Lien Term Loan debt, $300 million of Second Lien Term Loan debt, $144 million of revolver debt, and $20 million of PIK note debt. If the consolidated TOUSA enterprise as a whole lacked sufficient assets to repay this debt, it follows that there would have been no way for any individual Conveying Subsidiary to satisfy its joint and several obligations on the debt.

### (i)    After the Transaction, Consolidated TOUSA's debt exceeded the market's valuation of its assets

The first method Derrough used to compute the TEV of the consolidated TOUSA enterprise was the Observable Market Value method. The Observable Market Value method calculates a public company's TEV on a certain date by adding the market value of the company's publicly

traded debt and equity securities on that date and subtracting its cash.  The sum of the market values of a company's debt and equity is the textbook definition of enterprise value.  Indeed, it is so defined in a recent book published by one of Defendant's own experts, Yale professor Andrew Metrick, who also provided testimony to similar effect.   And it is commonly accepted among valuation professionals.  As Derrough explained, the market price of the equity plus the market price of the debt is what it would cost investors to purchase claims on all of a company's assets.  Derrough's Observable Market Value approach is a reliable and credible test for determining the solvency of the consolidated TOUSA enterprise (and therefore, post-transaction, of the Conveying Subsidiaries).

Derrough calculated the sum of the market values of all of the consolidated TOUSA enterprise's outstanding equity and debt instruments on July 31, 2007 to be $1,503.5 million. Subtracting the face value of the debt and adding back cash (which could be used to pay off that debt) resulted in a net equity figure of negative $189.4 million.  The fact that the Observable Market Value of the consolidated TOUSA enterprise on July 31, 2007 was smaller than the face amount of the debt it would be obligated to pay shows that it – and, by extension, each of the Conveying Subsidiaries – was insolvent on that date.  Furthermore, similar calculations using the market prices of TOUSA's securities on July 25, 2007 and August 6, 2007 (the first full trading day following an 8-K filed by TOUSA announcing the closing of the transaction) yielded results of negative $89.3 million and negative $333.5 million net equity respectively, reinforcing the conclusion of insolvency.   One of Defendants' experts, René Stulz, contended that, as a general matter, an Observable Market Value approach might conceivably be inaccurate.  His criticisms, however, are almost entirely theoretical, and there is no evidence that they actually undermine the applicability and reliability of Derrough's Observable Market Value calculations here.

First, Stulz pointed out that the Observable Market Approach does not work well in circumstances where the market for a company's securities is not sufficiently efficient. He did not, however, offer any opinion that the markets for TOUSA's securities were inefficient. And there is no reason to believe that Derrough's analysis suffers any inefficiency-related inaccuracies. Derrough testified to a number of factors showing that the market for TOUSA's equity securities (which were listed on the New York Stock Exchange) and debt securities were efficient: they were actively traded, they were followed by market analysts, and the SEC permitted TOUSA to file an S-3 short-form registration.

Second, Stulz suggested that the prices for debt instruments might be depressed for reasons other than the creditworthiness of the company that backs them, thereby skewing any Observable Market Value calculation. However, there is no evidence that the trading prices for TOUSA's bonds on July 31, 2007 – lower than 50 cents on the dollar for some of TOUSA's subordinated notes – resulted from any factors other than the market's perception of the depressed fair value of TOUSA's assets. Stulz himself performed no quantitative analysis of how much effect, if any, such factors had on the price of TOUSA's bonds. He furthermore conceded that a chart attached to Derrough's expert report – showing that the Credit Suisse High Yield Bond Index was trading at or near par (*i.e.*, 100 cents on the dollar), while TOUSA's bonds traded at much lower prices – would, if correct, strongly support the view that the deflated prices for TOUSA's bonds reflected concerns about TOUSA in particular, and not high-yield bonds more generally. And he also conceded that creditworthiness concerns explained at least some (if not all) of the difference in prices between TOUSA's senior notes (which would be paid off first in the event of bankruptcy) and otherwise comparable subordinated notes (which would be paid off only after the senior notes).

Third, Stulz suggested that Derrough should have used a higher value for TOUSA's stock, adding a "control premium" to account for the fact that a purchaser would pay more for majority control of a company.  There is no reason why Derrough should have added a control premium.  As he testified, doing so would be "inappropriate" here because "[w]e're valuing this company with . . . these assets, this capital structure, this balance sheet, this management team, this business plan; not what it might be worth to somebody else if somebody else had the opportunity to control it." Derrough Tr. 1225:3-16.  There is no evidence in the record that any outside purchaser was willing to pay any such premium for control of TOUSA, and consequently there is no factual basis for applying an increase to the observable traded value of TOUSA's stock based on what such a hypothetical buyer might pay.  And in any event, even if a control premium were applicable here, Stulz provides no measure of what it should be.  There is thus no evidentiary grounding for the implausible notion that the stock, which had market value of $170.5 million, should have been valued nearly $190 million higher, as would have been necessary for TOUSA to be solvent under the Observable Market Method on July 31, 2007.

Fourth, Stulz suggested that TOUSA's positive market cap (the total value of outstanding public and private shares) – which was $170.5 million according to Derrough – cuts against Derrough's opinion that TOUSA was insolvent.  But as Derrough explained, TOUSA's equity market cap may simply reflect "option value" created by investors who think there is little to lose (because the stock price is low) and much to gain (if, against all expectations, the stock price skyrockets), rather than any actual present-day value.  At trial, Stulz himself disavowed any opinion as to whether TOUSA's positive market cap actually proved that it was solvent. In any event, it is readily observable in the marketplace that the stock of even notoriously bankrupt companies trades

at a positive price even after it is clear that the stock interests will be wiped out in the bankruptcy process. Economic rationality appears to play little role in such matters.

> (ii)     **After the Transaction, Consolidated TOUSA's debt exceeded the value of its assets under a comparable companies analysis**

The second method Derrough used to compute the TEV of the consolidated TOUSA enterprise was the Comparable Companies method. In this method, the practitioner (1) identifies a set of companies similar to the one being valued and calculates the TEV for each of these comparable companies using the Observable Market Value method; (2) derives an appropriate "valuation" metric – a statistic that, for each of the comparable companies, bears a meaningful and reasonably consistent relationship to its TEV; and (3) uses that valuation metric to compute the TEV for the company under consideration. There is no dispute that this is a widely accepted, and commonly used, valuation methodology.

In the first step, Derrough identified five homebuilders – Standard Pacific Corp.; Hovnanian Enterprises Inc.; M/I Homes, Inc.; Meritage Homes Corp.; and Beazer Homes USA Inc. – as TOUSA's most comparable peers based on their operating profile. In the next step, he focused upon the book value of a company's homebuilding inventory as the most appropriate valuation metric. He did so because inventory is the largest and most valuable item on a homebuilder's balance sheet; because his experience in the homebuilding industry had taught him that this was the metric investors typically looked at; because other analysts focused on this or similar metrics; and because each of the comparable companies had reasonably similar ratios between their TEVs and the book value of their inventory, suggesting that book value of inventory is a meaningful determinant of value to investors in homebuilding companies. In the third step, based on the ratio between TEV

and book value of inventory for the comparable companies, and TOUSA's condition relative to these other companies, Derrough concluded that the best estimate for TOUSA's TEV under this valuation method would lie between 55% and 65% of the book value of its inventory. Using that "inventory multiple," Derrough calculated TOUSA's TEV to be between $1,336 million and $1,579 million. Subtracting TOUSA's net debt yielded a net equity value of negative $357 million to negative $114 million, again demonstrating insolvency of the consolidated TOUSA enterprise and each of the Conveying Subsidiaries.

Derrough's comparable companies analysis is both reliable and credible. Two of Defendants' experts – William Lenhart and Andrew Metrick – criticize Derrough's application of this technique, but their criticisms are largely contradictory and ultimately unpersuasive.

First, both Lenhart and Metrick attacked Derrough's use of an "inventory multiple" to derive TOUSA's TEV. They did so from opposite directions: Lenhart criticized him for looking at a balance-sheet item such as inventory, rather than an income-based item like the EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) multiple that Lenhart and Alix (see Section IV, below) used in their valuations of TOUSA. Metrick, on the other hand, criticized Derrough for looking at only *one* item on TOUSA's balance sheet, rather than looking at *all* of the assets on TOUSA's balance sheet. Neither criticism undermines Derrough's use of the inventory multiple. Metrick persuasively explained why Lenhart's (and Alix's; see Section IV.F., below) focus on EBITDA is inappropriate, because the ratio of EBITDA to TEV varies too widely across the range of comparable companies, suggesting that market participants do not consider it a stable valuation metric. Lenhart's criticisms are furthermore fatally undermined by his lack of understanding of how Derrough's comparable companies analysis – wherein he derived an inventory multiple for TOUSA

from the comparable-company set and used it to determine TOUSA's TEV – worked.[31]  As for Metrick's own focus on total assets, he conceded that his main critique of Derrough's alternative focus on inventory was that (in Metrick's view) Derrough did not adequately explain himself in his report.  However, as described above, Derrough persuasively explained at trial why he used an inventory multiple, and Metrick conceded that he does not have sufficient experience with homebuilders to contest Derrough's industry-specific reasoning.  Furthermore, Derrough's reliance on an inventory multiple gains additional support from other valuation professionals' use of that same metric when looking at TOUSA.

Second, Metrick criticized Derrough for using a 55%-65% range for his inventory multiple, as distinct from using the median or mean of the TEV/inventory ratios of the five comparable companies, which would have been slightly higher.   But Derrough amply supported his methodology.  He discussed no fewer than eight reasons – TOUSA's historical trading levels, high leverage, lack of geographic diversity, perceived low-quality assets, perceived low-quality management, perceived under-impairment of assets, overhang of concentrated shareholder base, and concerns about the transaction – why TOUSA should be valued at a discount to its peers. Furthermore, in contrast to Metrick's academic judgment that valuation practitioners should not depart from the median or the mean of the comparable-company set's valuation ratios, testimony from Defendants' expert Stryker confirmed that such departures are standard practice in circumstances where there are reasons to believe a company to be worse off than its peers.

---

[31]  Lenhart was – by a wide margin – the least in command of the facts and the least credible expert who testified at trial.

       (iii)      **After the Transaction, Consolidated TOUSA's debt exceeded the valuation of its assets under a discounted cash flow analysis**

The third method Derrough used to compute the TEV of the consolidated TOUSA enterprise was the Discounted Cash Flow ("DCF") method.  A company is valued by adding (1) the company's projected cash flows for the next several years (discounted to present value) to (2) a "terminal value" representing the future worth of the company at the end of the projection period (also discounted to present value).  To perform his DCF analysis here, Derrough started with a model created by TOUSA itself in combination with Alix.  Because both he and Hewlett viewed the ASP projections in that model as unreasonably high, Derrough replaced the ASP assumptions with alternative forecasts (made from the perspective of July 31, 2007) supplied by Hewlett.  Based on my review of his reports and testimony as well as the other evidence in the case, I find the assumptions and alternative forecasts supplied by Hewlett to be reliable and well-supported.

For the first part of the DCF (the cash-flow projections), Derrough used the modified model to generate projections of TOUSA's cash flows from 2007 to 2012, which he then discounted to present value.  For the second part of the DCF (the terminal value), Derrough used his modified model to predict the book value of TOUSA's inventory at the end of 2012, to which he then applied an inventory multiple of 60% (the middle of the range he derived in his comparable companies analysis) to arrive at TOUSA's valuation at the end of the projection period, which he also discounted to present value.  He added the discounted cash flows and discounted terminal value together to get a total TEV of $1.1 billion.  Subtracting TOUSA's net debt, Derrough arrived at a net equity value of negative $585 million.  This again confirmed that TOUSA was insolvent after July 31, 2007 – as, by extension, were each of the Conveying Subsidiaries. Derrough furthermore

provided a sensitivity chart showing how that net equity conclusion would change if his assumptions were altered; according to that chart, TOUSA would have a positive net equity only under a vastly more optimistic set of assumptions that Derrough deemed implausible.

Derrough's DCF analysis is a credible and reliable indicator of the insolvency of TOUSA and the Conveying Subsidiaries. Metrick criticized Derrough's DCF analysis on two primary grounds, but neither undermines the analysis. First, Metrick criticized Derrough for failing to lower the model's projections for TOUSA's homebuilding costs when he substituted in the lower ASPs provided by Hewlett. But Metrick's assumption that costs must fall when ASPs fall is purely theoretical, and is contradicted by the unrebutted empirical evidence presented in the testimony and report of the Committee's cost expert, Amy Benbrook. Second, Metrick criticized Derrough for calculating his terminal value using an inventory multiple, rather than an alternative approach that tries to model the growth of the company in perpetuity. As the deposition testimony of another of Defendants' experts makes clear, however, the use of a valuation multiple in these circumstances is not uncommon. Indeed, Alix followed a valuation-multiple approach too, although as explained by both Metrick and Derrough, the EBITDA multiple Alix used was inappropriate. In any event, Derrough cross-checked his results using the perpetuity growth method advocated by Metrick and saw no reason to conclude that his multiple-based approach had undervalued the collective TOUSA enterprise.

### 2. The Conveying Subsidiaries had unreasonably small capital after the Transaction

In addition to concluding that the consolidated TOUSA enterprise was insolvent after the transaction under various applications of the balance-sheet test, Derrough also determined that the

consolidated TOUSA enterprise had unreasonably small capital as of July 31, 2007. Derrough observed that the transaction left TOUSA with a very high debt-to-capitalization ratio of 71.3%, higher than any of the comparable homebuilders. Both Derrough and TOUSA's own management recognized that this left TOUSA with little maneuvering room in a tightening marketplace, unable to take advantage of opportunities that might otherwise be available. In addition, Derrough – with input from Hewlett – opined that TOUSA's plan to survive its troubles depended on unreasonable assumptions about ASPs and the company's ability to generate cash through hypothesized bulk land sales.

Derrough's methodology and conclusions on this issue are credible and reliable. And because of the consolidated enterprise's shared cash structure, the lack of adequate capital on a consolidated basis necessarily shows that the individual Conveying Subsidiaries had unreasonably small capital as well.

### 3.    The Conveying Subsidiaries were unable to pay their debts as they came due after the Transaction

Finally, Derrough concluded that the consolidated TOUSA enterprise would not be able to meet its debts as they came due after the transaction. That conclusion was informed by a number of factors. TOUSA's bonds were trading at very low levels (below 50 cents for some of the subordinated bonds), well below comparable bonds from other issuers, demonstrating that the market did not expect that bond debt to be paid off in full. Derrough's modified model, using Hewlett's projected ASPs, predicted that TOUSA would fail one of the covenant conditions on its secured debt within six months of the transaction. Even under the more optimistic ASP projections

used by Alix, TOUSA still would have failed covenants.  As Derrough explained from his own experience, covenant violations could have potentially disastrous results for TOUSA.

Derrough's methodology and conclusions on this issue are credible and reliable.  Indeed, his conclusions mirror the contemporaneous conclusions of two ratings agencies, Moody's and Standard & Poor's (S&P), each of which independently advised the market that TOUSA was unlikely to meet its debt obligations.  On July 11, 2007, Moody's downgraded TOUSA's subordinated bonds to a rating of Ca based on the "serious challenges" it foresaw for TOUSA. Ex. 2145 at 1-2.  According to Moody's, "[o]bligations rated Ca are highly speculative and are likely in, or very near, default." Ex. 2332 at 1.  Similarly, on July 12, 2007, S&P lowered its rating of TOUSA's subordinated bonds to CCC-.  Ex. 2146 at 4.  According to S&P, "[i]n the event of adverse business, financial or economic conditions" – which were certainly in the offing for TOUSA – an "obligor is not likely to have the capacity to meet its financial commitment on [an] obligation" with such a rating.  Ex. 2329 at 4.

Because the Conveying Subsidiaries each were jointly and severally liable for all of the collective enterprise's bond debt, the conclusion that the collective TOUSA enterprise could not pay its debts as they came due necessarily demonstrates that the Conveying Subsidiaries were individually unable to pay their debts as they came due.

### C.      Defendants' experts' claims of solvency are unpersuasive

In response to the Committee's experts, Defendants presented two experts – Charles Stryker and William Lenhart – who opined on solvency.  For the reasons stated below, I decline to accept their solvency-related conclusions.

81

1.    **Charles Stryker's report and testimony do not show that the Conveying Subsidiaries were solvent**

Stryker's opinion on solvency is limited to the presentation of adjusted balance sheets for the consolidated TOUSA enterprise both before and after the transaction.  Those balance sheets are not persuasive evidence of the Conveying Subsidiaries' solvency.  To begin with, Stryker relies on a homebuilding inventory valuation provided to him by Samuels.  For all of the reasons set forth above in sections III.A.3.a(ii), (b)–(d), I do not find Samuels' valuation of the homebuilding inventory assets to be credible or reliable.  Had Stryker used the valuations of Hewlett – which I do credit – he too would have found that the consolidated TOUSA enterprise was insolvent both before and after the transaction.  Stryker opined that the TOUSA enterprise was solvent by approximately $145 million before the transaction. That is considerably less than the $277 million difference between the inventory valuation he used ($1.360 billion) and the comparable inventory valuation provided by Hewlett ($1.083 billion).  (Hewlett valuations of $772 million for TOUSA Homes, Inc., $303 million for Newmark Homes, L.P., and $8 million for TOUSA Mid-Atlantic Investment, LLC). Likewise, Stryker's post-transaction solvency cushion of $283 million was considerably less than the approximately $400 million difference in post-transaction inventory valuations.

Stryker included on his adjusted balance sheet a $228 million line item labeled "Goodwill and other intangible assets" that does not properly belong there. $63 million of that line item consists of the book value of TOUSA's goodwill, which both Clancy and Lenhart properly wrote off in order not to overstate the fair value of TOUSA's assets.  A going-concern fair valuation of  TOUSA's homebuilding assets is likely to include at least some, and in some cases all, of the intangible value recorded on the balance sheet as goodwill, because (as Clancy and Lenhart agreed) the selling prices of TOUSA's homes will incorporate that goodwill.  To add the entire value of TOUSA's booked

goodwill on top of that going-concern asset valuation – as Stryker did – creates the risk, if not the certainty, of double-counting.

The rest of Stryker's $228 million figure – which consists of additional value Stryker assigned to TOUSA's trademarks ($162 million) and workforce ($5 million) – is also unsupported. Neither Lenhart nor Clancy included additional value for these items, and Stryker admitted at trial that the value (if any) attributable to TOUSA's trademarks and workforce might already have been part of the $63 million in goodwill that TOUSA had recorded on its books. Furthermore, Stryker's valuation of the trademarks includes a number of assumptions – including the trademarks' value in the marketplace, the appropriate royalty rate to apply to them, and the rate at which TOUSA's business would grow in the future – that lack empirical and theoretical footing. If one were simply to remove the $161 million of trademark value from Stryker's balance sheet, the balance sheet would show the consolidated TOUSA enterprise to be *insolvent* by approximately $16 million just before the transaction on July 31, 2007.

### 2. William Lenhart's testimony and report do not show that the Conveying Subsidiaries were solvent

Lenhart opined that, because TOUSA operated as a so-called "common enterprise," the solvency of TOUSA and the Conveying Subsidiaries must be evaluated on a consolidated basis. Applying both a "balance sheet" and "income" methodology, Lenhart concluded that TOUSA was solvent both before and after the July 31 Transaction. Lenhart further opined that, if one were forced to examine the Conveying Subsidiaries as separate legal entities, he would still find each to be solvent both before and after the July 31 Transaction. For the reasons that follow, I find that Lenhart's opinions lack sufficient credibility and, in any event, are unpersuasive.

### a.    Lenhart was not a credible witness

Having heard his testimony and observed his demeanor, I find that Lenhart is not a credibile expert witness in this case.  I say that for several reasons.

First, Lenhart's pretrial disclosures and conduct call his credibility at trial into question.  Although Lenhart professed in his report that no court had ever found his methodology to be unreliable, that assertion was simply not true.  As the evidence showed, Chief Bankruptcy Judge Gerling in the *Matco Electronics* case expressly found that Lenhart's methodology – contained in sworn affidavits submitted in support of a summary judgment motion – was insufficiently reliable, and the court therefore denied summary judgment.  *See In re Matco Electronics Group, Inc.*, No. 02-60835, Mem. Decision, Findings of Fact, Conclusions of Law & Order at 26, (Bankr. N.D. N.Y. Dec. 19, 2005).

More troubling, Lenhart testified regarding solvency in the *Cablevision Electronics Investments* case.  Trial Tr. vol. I, 24, Nov. 29, 2007, *Official Comm. of Unsecured Creditors of TW, Inc. v. Cablevision Sys. Corp.* (*In re TW, Inc.*), Ch. 11 Case No. 03-10785, Adv. No. 05-50585 (Bankr. D. Del. dismissed Apr. 15, 2009).  In the course of being qualified as a solvency expert, Lenhart testified under oath that he had never served as an expert in a case "in which the court did not ultimately adopt [his] insolvency-related conclusions." *Id.*  There were, however, at least two such cases on the books at the time of this 2007 sworn testimony.  The first was Chief Judge Gerling's decision in *Matco Electronics*.  The second was United States District Judge Sweet's decision in *Pereira v. Cogan*, 294 B.R. 449 (S.D. N.Y. 2003), *rev'd on other grounds*, *Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005).  Although Lenhart sought to distance himself from *Pereira* – noting that the case was later reversed on appeal (on other grounds, as it turns out) – I find that a

plain reading of the decision shows that here, too, a court declined to "ultimately adopt" Lenhart's "insolvency-related conclusions."  As Lenhart acknowledged, he prepared with trial counsel before testifying in this case, and thus knew that this "ultimately adopt" question was coming.  Indeed, Lenhart indicated that he and Defendants' trial counsel expressly selected the word "ultimately" in the question in order to exclude (putatively) the *Pereira* case from the compass of his answer. Dissembling from a putative expert is extraordinarily troublesome.

Lenhart's labored effort at trial to account for these pretrial derelictions only heightened my concerns about his credibility.  But most troubling of all was Lenhart's flat contradiction at trial of a crucial portion of his sworn deposition.  As I explain more fully elsewhere in these findings and conclusions, Lenhart based his opinion that TOUSA was reasonably capitalized in part on his conclusion that TOUSA had a "reasonable plan to de-lever its balance sheet."  Not surprisingly, Lenhart was asked at trial how he could square that conclusion with Mon's "Strategic Alternatives" memo (Ex. 496) in which Mon cast considerable doubt on the efficacy of the de-leveraging plan in late June 2007, two days after the TOUSA Board had already approved the July 31 Transaction.  But whereas at his deposition Lenhart had sworn that he had, in fact, "obviously" taken Exhibit 496 "into consideration," at trial he conceded that he was not sure that he had even *seen* a copy of Exhibit 496 prior to the issuance of his report.  Such a fundamental contradiction about a crucial document in the case served to erode further Lenhart's overall credibility.

### b.    Lenhart's "common enterprise" approach

I reject as unpersuasive Lenhart's opinion that the solvency analysis in this case must be examined on a "common enterprise" basis.  First and foremost, this issue presents a question of law: Section 548 is framed in terms of "debtors," and each of the Conveying Subsidiaries manifestly is a "debtor."  I address this in more detail in the Conclusions of Law.

Beyond that, Lenhart's "common enterprise" analysis lacks any roots in statutory law and he furnished no standard by which to tell when a complex corporate organization should or should not be considered a "common enterprise."  Most, if not all, of the factors Lenhart cited are, by his own admission, common to many public companies.  Finally, I note that in the *Cablevision Electronics Investments* case, Lenhart opined that, unless the doctrine of substantive consolidation applies (and neither Lenhart nor I find it applicable in this case at this juncture), he has "always" analyzed the solvency of a subsidiary-debtor "on a stand-alone basis." When asked why this case is different from all his other cases, Lenhart's distinctions were entirely unpersuasive.  I was left with the distinct impression that Lenhart's testimony on this and many other points was simply unbelievable and that, for the right price,[32] Lenhart would opine as desired on anything.

In any event, the evidence clearly shows that TOUSA could – and did – rely on the separateness of individual legal entities when it served its best interests.  Testimony from many TOUSA employees confirmed that TOUSA routinely recognized the distinctions among its individual subsidiaries.  For example, TOUSA filed state and local tax returns on behalf of many of its subsidiaries, as part of a planning process intended to decrease its overall tax burden.  The

---

[32]  At trial, Lenhart testified that his firm BDO Seidman had already billed its client $6 million and estimated additional billings of $500,000 before this case was completed.

filing of these tax returns required TOUSA to determine financial information for individual subsidiaries on a state by state basis. Berkowitz testified that he believed the information contained in these tax returns accurately stated the relevant financial information for individual subsidiaries and that state tax returns were commonly prepared for a number of the Conveying Subsidiaries.

Steven Sisson, TOUSA's former Tax Director, was responsible for the preparation of state tax returns. As part of that preparation, he inspected data from TOUSA's consolidated accounting system and engaged in a "mapping" process to arrive at results for individual subsidiaries. When asked about the accuracy of that process, Sisson described it as "[v]ery accurate," and testified that the process was "fairly simple in that the divisions operated within particular states. And by being able to map to that particular state I was able to determine what legal entity it was." Sisson Dep. 20:1-21:13.

Angela Valdes, TOUSA's Chief Accounting Officer, testified that she assisted in the preparation of documentation that divided TOUSA's assets and liabilities by legal entity; a "lot of divisions," she testified, mapped "cleanly" to a particular legal entity. Valdes Dep. 1/14/09 17:9-18:8. The "trial balance" she helped to create used data from TOUSA's accounting system, which was then mapped to individual legal entities. Ex. 48; Valdes Dep. 1/14/09 178:3-181:11. The templates, once created, allowed the company to create analyses of individual entities' financial situations on different dates, including July 31, 2007. Valdes Dep 1/14/09 16:19-22.

Berkowitz's testimony illustrates several instances in which TOUSA relied on the separateness of the Conveying Subsidiaries. Notably, this includes a document, prepared by Berkowitz, that contains the "Closing Steps" for the Transeastern Settlement. This "Closing Steps" document, which Berkowitz agreed detailed a "lengthy" series of steps, was motivated in part by

a desire to maintain losses associated with the Transeastern Settlement as ordinary.  Doing so required that the partnership interests in the Transeastern Joint Venture never be held by the same entity – otherwise, TOUSA's advisors believed, the losses would be characterized as capital losses, and the company would be unable to offset ordinary profits using those losses.  As Berkowitz testified, a significant percentage of the entities involved in the "Closing Steps" memorandum were Conveying Subsidiaries.

The relationship between TOUSA, Inc. and the Conveying Subsidiaries was similar to the typical relationship between corporate parents and subsidiaries. TOUSA maintained "process memos" to track intercompany transactions, such as the cost of employees that were formally employed by TOUSA Associates Services Company, but whose work benefitted other entities.  As Shapiro described it, "TOUSA was a normal corporate structure."  Shapiro Dep. 201:23-24.

From this I conclude that the Conveying Subsidiaries are properly viewed as distinct, individual entities.  While TOUSA may have, at times, consolidated some of its record-keeping for the sake of administrative simplicity, its management certainly recognized and relied upon the legal separateness of the entities when they saw some benefit from doing so.  The information that TOUSA maintained is sufficient to permit an accurate determination of the insolvency of individual subsidiaries.   I therefore decline to adopt Lenhart's "common enterprise" methodology for evaluating the solvency of the Conveying Subsidiaries in this case.

### c.    Lenhart's "balance sheet" analysis

To perform his balance sheet solvency analysis, Lenhart began with essentially the same legal entity balance sheet that Clancy used in his analysis for the Plaintiff.  He then used Cannon's numbers for the major categories of homebuilding inventory, (including unimproved land, land

under development, finished lots, unsold homes under construction, and completed unsold homes).

As Lenhart acknowledged, the inventory asset account was highly material to his fair value balance

sheet, and thus if Cannon's methodology and numbers were flawed, so too would Lenhart's analysis.

Because I reject Cannon's inventory valuations for the reasons discussed in section

III.A.3.a(ii), (b)-(d), above, I reject Lenhart's balance sheet solvency analysis both for TOUSA

consolidated, as well as for his "legal entity" analysis. Because I have credited Hewlett's fair

valuation of TOUSA's inventory, I note that Lenhart himself agrees that, with those substantial

adjustments, TOUSA consolidated would be insolvent.

### d.    Lenhart's "income" analysis

Lenhart alternatively used an "income" approach – essentially a Discounted Cash Flow – in

evaluating TOUSA's solvency. Lenhart used two different models for his DCF: a base case model

developed by TOUSA management for Alix ("Management Base Case" or "Base Case") and a

Modified Downside Scenario that he and his colleagues at BDO Seidman developed. He also used

an EBITDA multiple for the terminal year of the DCF model. I am not persuaded by either of

Lenhart's DCF models.

The Management Base Case suffers from a variety of flaws that I address below in more

detail in section IV dealing with the Alix solvency opinion. The Base Case model substantially

ignored "bottoms-up" input; it failed to revisit or revise year-over-year percentage-increase

assumptions in ASP or deliveries even as market realities were deteriorating between April and July

2007; and, as Hewlett demonstrated, it made wildly over-optimistic assumptions about the future

– assumptions that TOUSA management itself disbelieved even as it was transmitting the model

to Alix and Citi.  Lenhart's DCF models both rely heavily on the Management Base Case and accordingly are just as flawed as the underlying data.

The Modified Downside Scenario also suffers from independent flaws.  For one thing, although it purports to be a "downside" model, several of its key assumptions are the same as or, in the case of future ASP's, actually more optimistic than the Management Base Case.  For another, Lenhart never considered testing assumptions that, if valid, would have resulted in negative equity.  In light of all the evidence in the case – including Hewlett's realistic projections of future ASP's and sales volumes which I have found to be credible and persuasive – I reject as unpersuasive both models that underlie Lenhart's income approach to solvency.

### D.    The conclusions reached by Plaintiff's experts are internally consistent and consistent with the weight of the non-expert evidence

I find that each of the analyses provided by Plaintiff's experts is reliable and credible if considered in isolation; the analyses derive even greater force when considered in light of all of the other evidence.  Unlike the analyses provided by Defendants' experts, which are frequently at odds with one another and with the non-expert evidence, the analyses of the Plaintiff's experts are consistent with one another and with the non-expert testimony concerning TOUSA's insolvency at the time of the July 31 Transaction.

Hewlett's projection that the housing market would continue to decline in many of TOUSA's key markets is supported by the contemporaneous opinions of TOUSA management.  In early May of 2007, TOUSA informed its lenders that it believed the national housing market might not recover until 2011.  On June 14, Mon sent an email to the Board of Directors alerting them that, in his opinion, problems in the subprime mortgage market were beginning to spread to the Alt-A and prime

mortgage markets, indicating that the housing correction was "far from over."  Mon 184:8-185:7; 186:4-7; 186:19-187:3; 188:18-189:2; Ex. 2125.

The memorandum sent by Mon to Bakhshandehpour and McAden on June 22, 2007, just two days after the Board voted to approve the Global Settlement, further shows that Mon fully expected that the market would continue to deteriorate; as Mon acknowledged in the memo, the settlement left TOUSA in a position where it would be unable to withstand "worsening business conditions." Ex. 496 at 3.  Mon privately said to the Board that the downward trajectory in the results of Lennar, a key competitor, would mirror TOUSA's.  Into early July, Mon continued to inform the Board of the "un-relenting negative" news in the housing market.  Ex. 2142.

Finally, the presentation given by Mon in Porto Carras, Greece to the Stengos family on August 4, 2007 – and prepared prior to July 31, 2007 – shows that Mon believed the market was still declining.  In that presentation, Mon noted, among other things, that:  conditions in the market were getting worse; the "urgency to buy" was "gone"; and that "home price declines" were "continuing." Ex. 260 at 3.

The evidence, therefore, clearly shows that Hewlett's projections about the trajectory of sales prices and deliveries are consistent with – and, in some cases, more optimistic than – the contemporaneous opinions of TOUSA's top management.  The price projections for local markets used by Hewlett show price recovery in each local market by 2011 at the latest, with the majority showing price increases by 2010, and some markets showing price increases from 2007 onward. He also projected that deliveries would remain flat in individual markets until prices began to recover, at which point deliveries would increase.  These assumptions are more optimistic than

TOUSA's actual results, which were showing decreases in both ASP and deliveries throughout 2007.

The proof at trial also confirms Derrough's testimony that, given his knowledge of the homebuilding industry, the ASP projections used in TOUSA's forecasting model were overly optimistic. Key TOUSA management personnel believed that the true state of the housing market was significantly worse than what TOUSA included as assumptions in its projections. Therefore, it was reasonable for Plaintiff's experts to revise those projections downward so they more accurately reflected TOUSA management's actual views.

Management's actual views about the state of the business also support the conclusions of Plaintiff's experts that TOUSA would not be able to pay its debts as they came due and had insufficient capital to operate. Even at the June 20, 2007 Board of Directors meeting which approved the Global Settlement, a presentation given to the Board noted that the settlement constituted a "[v]alue-destructive strategy," that the new financing would put the company on a "very short leash," and that it would be left with "[l]ittle room for errors." Ex. 423 at 29; Mon Tr. 196:2-198:7. As the housing market continued to deteriorate through the remainder of June and July, that margin shrunk below zero. At the Porto Carras presentation, Mon noted that TOUSA would have to shift from being a "growth machine" to a "'niche' builder." Ex. 260 at 14. In the frank assessment of TOUSA's CEO, a primary effect of the Global Settlement would be to cause TOUSA to not have enough capital to maintain its business plans.

Mon laid out in detail, in his June 22 memorandum to Bakhshandehpour, his precise concerns that TOUSA would not be able to function with the limitations imposed upon it by the Transeastern settlement. The memorandum contained Mon's conclusion that the Transeastern

settlement left TOUSA "[u]nable to participate in the eventual upturn," and "[w]ithout access to the capital markets." He thought that TOUSA, post-settlement, would be "[u]nable to survive should housing condition s [sic] degrade further or the housing correction lengthens appreciably." The company's de-leveraging plan would put TOUSA "at a major competitive disadvantage." The "[e]nd [r]esult" would be an "[i]ncreased risk of failure," and a major "[c]on" for the settlement was "[l]iquidation or bankruptcy risk." Ex. 496 at 2-3. Mon's opinion on the settlement at the time – although apparently disclosed only to McAden and the majority shareholders of TOUSA, and not to TOUSA's CFO, Chief of Staff, or outside advisors – was that TOUSA would be left with inadequate capital to sustain its business, and would likely be unable to pay its debts as they came due. Derrough's conclusions that TOUSA was insolvent, both on a consolidated basis and as to each individual subsidiary, are therefore amply supported by the evidence, and in fact match the contemporaneous evidence significantly more accurately than do the analyses of Defendants' experts.

In stark contrast, the Defendants' experts expressly contradicted and undermined one another with respect to the central issues of fact in the case – most notably, whether the Conveying Subsidiaries were insolvent, or rendered insolvent, on July 31, 2007. For example:

- Stulz, the First Lien Lenders' finance expert, disputed the validity of the Observable Market Value method of determining a company's Total Enterprise Value ("TEV"). Stulz Tr. 2261:19-24. As Plaintiff's expert, Derrough, explained, this theory holds that a company's TEV is equivalent to the market value of all of its outstanding securities, including its equity and debt. Derrough Tr. 1198:2-23. Metrick – the Senior Transeastern Lenders' finance expert, who authored a treatise on valuation issues – disagreed with Stulz, and agreed with Derrough. Though Defendants took pains to keep Metrick's views on this issue out of evidence, Metrick Tr. 2053:11-20, he testified that the market value of a company's outstanding securities is the textbook definition of Total Enterprise Value – as his own textbook makes clear . Metrick Tr. 2053:22-2055:15.

- The Defendants' experts also disagreed about Derrough's application of the Comparable Companies method to determine TOUSA's TEV.  Whereas Metrick insisted that the subject company always must be valued based upon the average of the "valuation multiples" for the members of the peer group (even if the subject company is demonstrably inferior to all the rest), Metrick Tr. 2077:22-2079:3, Stryker – who, like Metrick, was a valuation expert for the Senior Transeastern Lenders – disagreed with Metrick, and agreed with Derrough that a discount from the average is appropriate when "the company is so inferior that it would warrant that."  Stryker Dep. 167:23-24.

- The Defendants' experts likewise disagreed profoundly as to how TOUSA should be valued under the Discounted Cash Flow method.  Lenhart – the First Lien Lenders' valuation expert – used an EBITDA multiple to calculate TOUSA's terminal value.  See Ex. 3000 (Lenhart Report) at 111.  Metrick, however, was emphatic that it is  improper to rely upon an EBITDA multiple to value TOUSA. Metrick Tr. 2083:18-2084:23.  Indeed, Metrick insisted that it is substandard practice to use *any* multiple to derive the terminal value.  Metrick Tr. 2110:5-2112:23.

- The Defendants' experts also disputed one another's application of the  "balance sheet" test of solvency.  Stryker added a $228 million line item to the TOUSA balance sheet that he called "intangible assets," consisting not only of the goodwill that appeared on the company's books, but also the purported value of TOUSA's trademarks and its assembled workforce. See Ex. 5403 (Limited Stryker Report) at Rev. Ex. 5.  But Lenhart added no such intangible value, and in fact decided to write off the $62.7 million of goodwill on TOUSA's books because at least part of it "may have been indirectly appraised . . . within the value of the TOUSA Group's inventory."  Ex. 3000 (Lenhart Report) at 99.  As Stryker frankly conceded, if even a portion of the "intangible assets" are removed from the balance sheet he constructed, TOUSA was insolvent on July 31, 2007.  Stryker Tr. 3341:25-3342:6.

Parsing through the valuation testimony in this case has been difficult, primarily because each of the experts could latch on to various data which support the conclusions they reach.[33]  Some doubt was cast on each of the experts by the skilled cross-examinations by the very able lawyers who tried the case.  While I am satisfied on balance that the Conveying Subsidiaries were insolvent both before and after the Transaction, the parties could point to lots of expert testimony which could support the opposite conclusion.  But on the question of whether the Conveying Subsidiaries were left with unreasonably small capital, no plausible conclusion could be reached on the evidence

---

[33]  I felt at times as if I were listening to the fable of the blind men describing an elephant.

presented other than those entities were left with no financial maneuvering room, no assets upon which they could borrow, and no way out of a hopeless financial squeeze which TOUSA's management recognized months, weeks, and days before the closing on July 31, 2007. Mon's predictions in June 2007, before the Transaction was approved by TOUSA's board, were entirely correct. The intransigent position taken by the controlling shareholders – whose refusal to accept dilution ultimately meant that they owned a bigger share of a worthless company – probably guaranteed that result.[34] It is, however, clear that the Conveying Subsidiaries were left after the Transaction with unreasonably small capital.

## IV.    THE ALIX SOLVENCY OPINION IS NOT PERSUASIVE

As TOUSA's financial condition deteriorated in the spring of 2007, its bondholders sounded an alarm. On April 18, 2007, counsel for Capital Research and Management Company ("Cap Re"), a major investor in TOUSA bonds, delivered a letter to TOUSA's Board highly critical of the proposed Transeastern settlement. The letter observed that the settlement would swap an unsecured liability of parent corporation TOUSA for the secured liability of TOUSA and its subsidiaries; noted that the settlement might put TOUSA into the "zone of insolvency" and the financing might be a "fraudulent transfer;" and warned that the proposed refinancing could "destroy the financial flexibility the Company will require to survive if the current housing slump becomes a protracted one. . . .  [T]he Company is simply exchanging one group of aggrieved creditors for another, and imperiling its long run survival prospects in the process." The Cap Re letter was thereafter shown to the Board of Directors. Ex. 239; Mon Tr. 161:4-162:10.

---

[34]    Whether management was appropriately candid with its board, and whether the board exercised due care, are questions which go well beyond the scope of what I am called upon to decide.

TOUSA immediately sent the Cap Re letter to Citi which, in response, demanded on April 27, 2007 that TOUSA provide a solvency opinion as a condition of closing the July 31 Transaction. Wagman acknowledged that Citi's request was precipitated by the Cap Re letter.[35]

### A.    The circumstances under which the Alix Opinion was created cast doubt on its credibility

TOUSA turned to Alix for the solvency opinion.  Significantly, Alix was not asked to examine the solvency of individual subsidiaries and did not do so.  Rather, Alix opined on the solvency of TOUSA only on a consolidated basis.[36]  The Alix opinion is unpersuasive for several reasons – first, because of the circumstances of its creation.

Citi's Commitment Letter required a solvency opinion from a "nationally recognized, independent financial advisory firm that has substantial experience in providing solvency opinions in connection with transactions similar to the Transactions contemplated hereby."  Ex. 237 at 2; Ex. 359 at 29; Wagman Tr. 379:6-381:14.  But Alix had not provided a solvency opinion for a homebuilder since some time before 2005.  Yet, despite Alix's apparent lack of experience, TOUSA did not consider any firm other than Alix.

The Alix solvency opinion was a contingent fee arrangement:  TOUSA agreed to pay $2 million if Alix ultimately opined that TOUSA would be solvent immediately following the July 31

---

[35]  Also in the wake of the Cap Re letter, on May 8, 2007, the TOUSA Board approved indemnity agreements for TOUSA officers "to the fullest extent permitted by law in the event the officer is, or is threatened to be made, a party to or participant in any threatened, pending, or completed action, suit or proceeding by reason of the fact that the officer is or was serving as one of the Company's officers." Ex. 2112 at Item 1.01; Mon Tr. 182:17-21; Ex. 225.

[36]  That is scarcely surprising, as TOUSA management never considered whether any individual subsidiary was solvent or insolvent at the time of the July 31 Transaction or whether any individual subsidiary would be rendered insolvent by the Transaction. Citi also failed to consider whether individual subsidiaries (as opposed to consolidated TOUSA) were solvent.

Transaction; but if Alix could not so opine, TOUSA would pay Alix only its time charges and reimburse its costs.  These ultimately amounted to less than half of the $2 million fee which was paid.  Wagman described the $2 million fee as "a very large fee."  Wagman Tr. 391:22-24.  Mon described it as "egregious." Mon Tr. 56:19-21.  By contrast, Imperial Capital had told Citi that it could provide a solvency opinion for about $500,000.  Alix's lead partner on the solvency opinion engagement, Bruce Den Uyl, described the $2 million as a "premium" based on the riskiness of the assignment.  Den Uyl Dep. 75:17-24.

Alix reached its bottom line opinion in remarkable speed.  Alix's retention was finalized on June 15, 2007.  By the time of TOUSA's Board meeting on June 20, 2007, Alix had already indicated that it expected to deliver a favorable opinion.  Indeed, in providing counsel to the TOUSA Board at the June 20 meeting, Lehman Bros. assumed that TOUSA would be solvent based on the fact that TOUSA had "received a solvency opinion from AlixPartners" – even though the Alix opinion supposedly would not be completed for more than a month thereafter.  On June 22, 2007, in response to Nikov's request to read Alix's solvency opinion, Wagman emailed "Alix Partners Final Solvency Opinion" to him.  By June 27, 2007, a draft solvency opinion was in circulation.

### B.     The Alix Opinion relied on projections provided entirely by TOUSA management, not from a "bottoms up" analysis of TOUSA's business

According to one of the lead Citi bankers on the deal, the solvency opinion condition required an "independent" firm because Citi did not want TOUSA to be able to influence the conclusion of the firm rendering the solvency opinion.  But in rendering its opinion, Alix in fact relied heavily (if not exclusively) on the assumptions and projections provided by TOUSA for the five year period from 2007 to 2012.  What is more, Alix made clear in its engagement letter that it

97

would "not take any action to verify the accuracy or completeness" of the information on which its opinion would be based.  Ex. 240 at 3.  And Alix personnel involved in the opinion confirmed that they did not do so.

For example, Robert Bruce Den Uyl, the lead partner for Alix on the engagement, testified that his firm's opinion was based heavily on management's forecasts.  His colleagues who were deposed made the same point.  Alix did not even ask TOUSA management how good the company's projections had been in the past and Alix never conducted any review of how accurate management's projections had been in the past.  Alix's failure to make any such inquiry is especially problematic because TOUSA's projections did not come from a "bottoms up" analysis of TOUSA's business (even though George Yeonas, TOUSA's current COO, has described a bottoms up method as "the best way to analyze project oriented companies."  Yeonas Dep. 31:18-32:3).

Wagman confirmed that it was TOUSA management who selected the assumptions used in the models that were provided to Alix.  Wagman relied on Mon's view about the assumptions that should be given to Alix.  For his part, Mon assumed, but had no direct knowledge, that the final financial projections provided to Alix were based on input from the divisions.  Mon's assumption was not correct.  In January 2007, TOUSA's regional EVPs and CFOs provided projections to TOUSA's management, but in the ensuing six months, TOUSA did not seek input from its field operations on its long term projections, and its regional managers did not review the projections provided to Alix.  In particular, the projections of average sales price and gross margin used in the models did not come from TOUSA's field operations. Jared Yerian of Alix testified that no one on the solvency team told him that he or she had spoken with a TOUSA division president.  I conclude

that Alix made no inquiry whatever of TOUSA's operational-level management and that the information given to Alix by TOUSA's senior management was hopelessly outdated.

David Cobb, president of TOUSA's critically important Orlando division, was not aware in 2007 that the company was preparing five-year projections to use in undertaking a new debt obligation. He could not recall any discussions with TOUSA's corporate managers about a five-year forecast even though Cobb and other division presidents evaluated their markets on a community-by-community level, looked at similar projects in the same area, generated their own projected average sales prices and margins, took into account local costs, and revised forecasts on a *monthly* basis based on actual sales and costs. Cobb could not recall any specific instances in which TOUSA management came back to his division to discuss revised forecasts. And he could not recall anyone from the regional or corporate level contacting him between May and July 2007 to get his views on the local housing market.

Cheryl Kypreos, president of the Las Vegas division, offered similar testimony in her deposition. She was never consulted about the number of deliveries she expected her division to have in 2009, 2010, 2011, or 2012. Nor was she asked about the likely average selling price in 2012. No one from TOUSA headquarters contacted her in the spring or summer of 2007 to discuss the housing market in Las Vegas. She was not even aware that TOUSA was preparing projections in connection with the new loan agreements. Other TOUSA executives overseeing local homebuilding operations gave similar testimony.

Mon agreed that without input from the divisions, financial projections could produce "bogus" numbers. Mon Tr. 121:20-23. That risk was realized. For example, David Cobb testified that if he had seen a three to five-year projection showing average sales prices going up by a

significant amount, he would have considered that unusual. He would not have made such a forecast at the division level. And yet that was the information on which Alix relied in preparing its solvency opinion.

### C. TOUSA did not revise the assumptions it provided to Alix even though it knew that the market was continuing to decline

The base case, *i.e.*, the "most likely" scenario that TOUSA provided to Alix, relied on critical assumptions concerning the ASPs and deliveries over the five year period from 2007-2012. But the projections that TOUSA gave to Alix, which provided the foundation for Alix's July 31, 2007 opinion, were in important respects substantially the same as the projections that TOUSA had developed as early as April 2007. Despite dramatic deterioration in the market and in TOUSA's business between April and July 31, TOUSA never altered its year-over-year growth assumptions – even though TOUSA management privately acknowledged that those assumptions were outdated and overly optimistic.

In a May 1, 2007 presentation to the Steering Committee of the revolver lenders, TOUSA quoted from a model it had developed in April. The April model projected that deliveries for TOUSA's core business would increase by 5% each year from 2008 through 2012, while ASPs would increase 2% annually.

Despite the "un-relenting bad news" from April through the end of July, TOUSA management never changed the crucial year-over-year growth projections for deliveries and ASPs. Both the June 2007 base case model, as well as the final base case model delivered to Alix on July 27, 2007, used the same year-over-year projections of ASPs and deliveries that had been developed in April. The April projections were grossly optimistic when made; TOUSA management's failure

to update the projections in light of TOUSA's rapidly collapsing businesses during the second quarter of 2007 is inexplicable except as a result of gross negligence or as part of a willful decision to do nothing to upset the Transaction.  TOUSA's lenders' failure to challenge the continuing validity of the April projections was the result of either gross negligence or a willful decision – motivated by a desire to generate fee income – to turn a blind eye toward the obvious reality that TOUSA was in a death spiral.

### D.    To make matters worse, TOUSA did not even provide Alix with its honest assessment of its prospects

By the time Alix's opinion was issued, Mon no longer believed (if he ever did) the assumptions TOUSA had given to Alix.  On August 4, 2007, Mon traveled to Porto Carras, Greece to visit Konstantinos Stengos, chairman of TOUSA's Board of Directors and the largest shareholder of TOUSA's parent company.  At that meeting, Mon presented his actual views of the state of the homebuilding industry.  What he described to Stengos as the "best case" – sales recovering in "mid/late 2008" and deliveries recovering in "early/late 2009" – is itself more pessimistic than the "base case" (*i.e.*, likeliest) model that the company had provided to Alix only eight days earlier.  Mon even described a scenario in which deliveries would not recover until mid to late 2010.  A draft of the Porto Carras presentation, reflecting the same critical assumptions, was prepared at least a week *before* the Alix solvency opinion was finished.  But Mon sent Alix neither the Porto Carras presentation nor the facts contained in it.[37]

---

[37]  Mon also acknowledged that the projections TOUSA had given to Alix were highly uncertain.  Although the Alix model relied heavily on the projections of deliveries and ASP for 2012, Mon was confident of the deliveries projection only within a range of "plus or minus 20 percent" and of the ASP projection only within a range of plus or minus 10-15 percent.  Mon Tr. 130:3-10.

Mon also failed to disclose to Alix – or even to Wagman – his June 22 "Strategic Alternatives" memo or the facts and opinions contained in it.  Had he done so, Alix would have learned that TOUSA's CEO believed that the July 31 Transaction would leave the company "[o]ver-leveraged," "[u]nable to survive should housing conditions degrade further or the housing correction lengthen appreciably," with "[b]arely enough 'oxygen' to survive," and at risk of "crashing and burning."  Ex. 496 at 2-3.  That is to say, left with an unreasonably small capital.

### E.    Alix did not sufficiently "stress test" the models

TOUSA's "downside cases" were, by the company's admission, used merely for covenant negotiation purposes; nobody involved in the analysis undertook the downside testing necessary to determine the allowable margin of error in TOUSA's projections.

Just as Alix relied on TOUSA's outdated assumptions for its base case model, Alix also used TOUSA's assumptions for the "downside" models. To develop a downside model based on lower EBITDA, Alix adopted the assumption of a 30% reduction in EBITDA that was provided by TOUSA management.  But TOUSA never gave Alix a model projecting a 30% reduction in EBITDA in any of the "out years" of 2009-2012.  TOUSA never provided Alix with a model projecting a reduction in deliveries of more than 10%.  And TOUSA did not provide a model that assumed lower average sales prices *and* lower deliveries, even though TOUSA had experienced exactly that in its own operations.

TOUSA designed its downside to include little real stress.  Alix's methodology gave the company's results in the "out years" (2009-2012), and particularly the 2012 results, an outsized impact on the results of Alix's DCF analysis.  Yet Alix did not analyze the impact of any changes in the ASPs in 2012 on its solvency analysis, and TOUSA chose downside cases that did not have

any appreciable impact on 2012 results.  For example, the ASP – a key driver for a homebuilder – was never lowered for 2012 in the downside cases provided by TOUSA.  However, the Committee's real estate expert, Charles Hewlett, reasonably concluded that the 2012 projected ASPs should have been approximately 12% lower, and should have been lower in prior years, as well.  Alix never examined – in part because TOUSA never gave it – any model that assumed a simultaneous reduction in deliveries and ASP.

Because Alix blindly relied upon TOUSA's unsupportable financial projections, Alix's opinion that TOUSA was solvent as of July 31, 2007 is not credible.  Even minor reductions in the ASP assumptions in Alix's discounted cash flow analysis would have resulted in a finding of insolvency.  If the unrealistic ASPs in TOUSA's projections were reduced by merely 4.8% in each of projected periods, it would have led to a finding of insolvency.  Similarly, if the *only* change to the projections were to reduce the ASP assumption in the final year of the projections by 8%, it also would have led to a finding of insolvency.

### F.    Alix's use of an EBITDA multiple further skewed its results

As previously discussed (see section III.B.1.a(ii) and (iii)), I find Alix's solvency opinion to be unreliable for the additional reason that, as ***both sides'*** experts agreed at trial, Alix's methodologies for determining solvency were seriously flawed.  That is, even if Alix had incorporated realistic projections of future performance into its analysis (it did not), Alix's solvency opinion still provides no basis for concluding that TOUSA was solvent on July 31.  Among other failings, I find that Alix inappropriately used an EBITDA multiple in valuing the company.  See section III.B.1.a(ii), above.

Recognizing the deficiencies in the Alix analysis, none of the Defendants' experts has adopted or endorsed the Alix opinion; to the contrary, the Senior Transeastern Lenders' valuation expert, Professor Andrew Metrick, expressly disputes the validity of the principal elements of the Alix analysis.  It remains quite unclear as to what value TOUSA received from Alix in exchange for the $2 million Alix was paid for its opinion.

## V.    THE CONVEYING SUBSIDIARIES DID NOT RECEIVE REASONABLY EQUIVALENT VALUE IN EXCHANGE FOR THE OBLIGATIONS AND TRANSFERS

### A.    The expert testimony and other evidence presented by the Committee proves that the Conveying Subsidiaries did not receive reasonably equivalent value

The Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the obligations they incurred and transfers they made in the July 31 Transaction.  In the Transaction, each Conveying Subsidiary incurred joint and several liability for the entire amount owed under the First and Second Lien Term Loans.  For purposes of solvency analysis, Kevin Clancy, the Committee's accounting expert, recognized that these liabilities were contingent (in the sense that the obligations of any single subsidiary would be reduced to the extent that another subsidiary paid part of this obligation) and allocated the total obligations among the TOUSA entities.  He attributed a total of $403 million of new obligations to the Conveying Subsidiaries.  He then used the same apportionment methodology to analyze the amount of the obligations for which each Conveying Subsidiary would need to receive reasonably equivalent value.  Clancy concluded that, as a result of the July 31 Transaction, TOUSA Homes, Inc. incurred obligations of $274 million; Newmark Homes, LP incurred obligations of $119 million; and TOUSA Homes Florida, LP incurred

obligations of $10 million.  I have already found Clancy's apportionment methodology credible and reliable in the context of his solvency analysis and I find it similarly credible and reliable here.

The July 31 Transaction did not provide the Conveying Subsidiaries with reasonably equivalent value in return for what they gave up.  To the extent they received any value at all, it was minimal and did not come anywhere near the $403 million of obligations they incurred collectively, or the obligations that each incurred individually.

### 1.    The Conveying Subsidiaries received no direct benefits in the July 31 Transaction

The Conveying Subsidiaries did not receive any direct benefits in exchange for the value they gave up in the July 31 Transaction.  The Conveying Subsidiaries received none of the proceeds of the loans they became obligated to repay.  The money was transferred by the lenders to Universal Land Title, Inc. (which is a TOUSA subsidiary, but not one of the Conveying Subsidiaries) which disbursed the funds to the various parties to the settlement.  This disposition of the loan proceeds was required by the terms of the loan agreements to complete the settlement.  Of the proceeds of the new debt, more than $421 million was paid to the Transeastern Lenders to settle claims and lawsuits brought by the Transeastern Lenders against TOUSA, Inc. and TOUSA Homes, LP, *but not against the Conveying Subsidiaries*.  Over $49 million of proceeds from the new loans was paid to the Falcone entities, TOUSA's partner in the Transeastern joint venture, for rights to certain properties and the release of claims that did not involve the Conveying Subsidiaries.

The Conveying Subsidiaries received no value in the form of debt relief.  It is undisputed that the Conveying Subsidiaries did not obtain the satisfaction of their own debts in the July 31 Transaction; rather, they satisfied an obligation of TOUSA, Inc. and Homes, LP.

The Conveying Subsidiaries received no net value from the acquisition of homebuilding inventory.  The only Conveying Subsidiary to receive any homebuilding inventory at all in the July 31 Transaction was TOUSA Homes Florida, LP, which ultimately received control of the troubled Transeastern communities.  Hewlett estimated the value of those properties to be approximately $28 million, an estimate I find reasonable for the same reason I find Hewlett's approach to be credible and reliable as a general matter.  Along with that $28 million in assets, however, came $32 million in liabilities in accounts payable and customer deposits.  Because TOUSA Homes Florida LP received liabilities greater than the value of the assets it received, it received a negative net value from the transaction, even before accounting for the $10 million in obligations to pay the First and Second Lien debt that was attributed to TOUSA Homes Florida LP.

The Conveying Subsidiaries received no value from the July 31 Transaction in the form of tax benefits.  Defendants have suggested that the July 31 Transaction allowed TOUSA to take losses on the Transeastern venture that could be used to generate (1) a refund for federal taxes paid in 2005 and 2006 and (2) an offset against federal taxes on profits made in future years.  For multiple independent reasons, I conclude that no such tax benefits accrued to the Conveying Subsidiaries.  First, Clancy testified that, because the parent company TOUSA, Inc. filed federal taxes on a consolidated basis on behalf of all the TOUSA entities, any federal tax benefits would go to TOUSA, Inc., rather than to the Conveying Subsidiaries.  Second, TOUSA's tax consultant, James Werle, testified at his deposition that all of the "substantial" loss-generating events that ostensibly arose out of the July 31 Transaction – *viz*, abandonments of Transeastern properties and its trademark – "would have happened with or without" the settlement.  Werle Dep. 167:5-22; *see also*

106

*id.* at 21:19-23:3 (all of Transeastern's 2007 losses passed through to TOUSA even before the July 31 Transaction); Christie Dep. 224:14-225:23 (supporting testimony from TOUSA's tax auditor).

> ### 2.    The Conveying Subsidiaries received, at most, minimal indirect benefits in the July 31 Transaction

The Conveying Subsidiaries did not receive any substantial indirect benefits in exchange for the value they gave up in the July 31 Transaction.

> #### a.    Settlement of the Transeastern litigation did not improve the day-to-day business operations of the Conveying Subsidiaries

Defendants have suggested that the Transeastern litigation had negative effects on the day-to-day business operations of the Conveying Subsidiaries, and that the July 31 Transaction conferred an indirect benefit on the Conveying Subsidiaries by eliminating those effects. I find no evidence of such effects, and I therefore find that the July 31 Transaction did not confer an indirect benefit on the Conveying Subsidiaries by eliminating them.

TOUSA's management made no quantitative determination of what impact, if any, the pendency of the Transeastern litigation was having on the Conveying Subsidiaries' business. Nor did the TOUSA Board make any effort to quantify any of the benefits of settling the Transeastern litigation. When asked how much time was spent at the June 20, 2007 Board of Directors meeting (at which the settlement was approved) discussing the benefit to the subsidiaries, Wagman answered, "If not zero, close to zero."

Employees outside of TOUSA's headquarters supervising the day-to-day operations were largely oblivious to the Transeastern litigation. Carl Mulac, president of the Arizona division in 2007, could not think of any specific problems that the Transeastern litigation had caused for his

local business, and the issue did not consume a significant amount of time of the people at the divisional level. The president of TOUSA's Las Vegas division, Cheryl Kypreos, was not aware of the Transeastern litigation in the January to July 2007 time frame. Cobb, whose Orlando division included properties sold under the Transeastern name, testified that the litigation had little effect on his division outside of the Transeastern communities themselves.

Defendants have suggested that the Conveying Subsidiaries may have benefitted by avoiding damage to the TOUSA brand. But the Conveying Subsidiaries did not use TOUSA as a brand for marketing homes; outside of the financial markets, there was no "TOUSA brand."

### b. The Conveying Subsidiaries did not receive any indirect benefit from forestalling TOUSA, Inc.'s bankruptcy

Defendants have also suggested that the transaction indirectly benefitted the Conveying Subsidiaries by keeping the parent out of bankruptcy. The parent's bankruptcy, they claim, would have pushed the Conveying Subsidiaries into bankruptcy and would also have eliminated the parent's ability to provide a variety of services to the Conveying Subsidiaries. For the reasons stated below, I find that the Conveying Subsidiaries received no indirect benefits of these sorts.

As a threshold matter, the evidence shows that the July 31 Transaction did not in fact prevent the bankruptcy of the parent company, TOUSA, Inc. There is no reason to believe that the replacement of a contingent litigation liability with a massive amount of secured debt rendered TOUSA *better* able to weather the extreme downturn in the housing market. The Committee's finance expert, William Derrough, confirmed that there is "no evidence . . . that doing that deal prevented a TOUSA bankruptcy." Derrough Tr. 1300:16-18. Because the July 31 Transaction did not prevent TOUSA, Inc.'s bankruptcy – at most it delayed the inevitable – it could not have given

rise to any purported benefits to the Conveying Subsidiaries predicated on the avoidance of such a bankruptcy.

But even assuming the Transaction did prevent (or at least postpone) a TOUSA, Inc. bankruptcy, it still conferred no substantial benefits on the Conveying Subsidiaries because the Conveying Subsidiaries would not have been seriously harmed by such an earlier bankruptcy.

To begin with, an earlier TOUSA, Inc. bankruptcy would not necessarily have caused the Conveying Subsidiaries to declare bankruptcy. Defendants point out that a TOUSA, Inc. bankruptcy would have constituted an event of default on TOUSA's bonds, thereby allowing the bondholders to demand immediate payment on the bonds from the Conveying Subsidiaries. But Derrough testified, based on his experience with similar situations, that the Conveying Subsidiaries could have come to an accord with the bondholders, possibly by obtaining their own financing to refinance the bonds, which would have allowed them to continue as going concerns despite the default. Hewlett confirmed, based on his particular experience with the real-estate industry, that the Conveying Subsidiaries – which held some 95% of TOUSA's assets – could have obtained their own financing even if the parent were in bankruptcy.

Nor would a TOUSA, Inc. bankruptcy have adversely affected the parent's ability to provide corporate services, such as use of its cash management system and group purchasing arrangements, to the Conveying Subsidiaries. TOUSA, Inc. could have continued to provide those services even in bankruptcy, as demonstrated by the fact that it has in fact done so since filing for bankruptcy in January 2008. If TOUSA, Inc. were unable to provide some service for some reason, the Conveying Subsidiaries could have outsourced it to some other entity or performed it in-house.

In any event, the corporate services provide by TOUSA to its subsidiaries, while necessary to be provided by some means, were not themselves critical to the subsidiaries' success. TOUSA's homebuilding business was created largely through the roll-up of other homebuilding companies which had successfully operated as independent entities which marketed under their own brand names, operated with independently-obtained financing, and maintained their own cash management, accounting, and purchasing systems. Many of the acquired companies, including Engle Homes and the Newmark companies, maintained standalone accounting systems for some time after their acquisition by TOUSA. Separate divisions also had their own IT departments.

Although transfer to independent management would have taken some transition time, the Conveying Subsidiaries could have operated independently. TOUSA has moved personnel from the field to headquarters and vice versa. But it neither considered doing so nor investigated how long and expensive it would be to establish the subsidiaries as stand-alone businesses. Nor did TOUSA investigate how long it would take to prepare individual financial statements for the subsidiaries or ask whether any financial institutions would be willing to lend to individual subsidiaries. "[I]t just wasn't part of the thinking." Berkowitz Tr. 1824:9-1826:8. McAden acknowledged that there were successful smaller builders that had all the things TOUSA supplied to its divisions: their own financing, HR department, and insurance.

Finally, even assuming that *all* of the TOUSA entities would have spiraled immediately into bankruptcy without the July 31 Transaction, the Transaction was *still* the more harmful option. As Derrough explained, encumbering the Conveying Subsidiaries' assets with massive secured debt was in fact much *worse* for TOUSA, from a bankruptcy perspective, than an immediate bankruptcy would have been. That is because the power wielded in bankruptcy by secured creditors "impedes

the flexibility of a debtor's operations in bankruptcy" and places substantial burdens on all parties involved in the proceedings.  Derrough Tr. 1304:4-13.

### c.    The Conveying Subsidiaries did not receive any substantial benefits relating to the Revolving Credit Agreement

Defendants also have suggested that the July 31 Transaction conferred on the Conveying Subsidiaries certain indirect benefits relating to TOUSA's revolving credit facility.  I conclude that they received no substantial benefit related to the Revolver.

First, Defendants suggest that the July 31 Transaction benefitted the Conveying Subsidiaries because an adverse judgment in the Transeastern litigation would have caused a default on the Revolver.  But even assuming that such an adverse judgment was likely, I see no reason to believe that the Conveying Subsidiaries could not have dealt with a possible Revolver default by transitioning to an alternative source of financing.  I have already concluded that the Conveying Subsidiaries could have obtained independent financing and even if there were a bankruptcy, DIP financing would likely have been available.  Although such refinancing might have resulted in some fees, those fees would have been minimal in relation to the size of the new obligations that the Conveying Subsidiaries incurred in the July 31 Transaction (and very likely no more onerous than the fees paid in connection with the July 31 Transaction).

Second, Defendants have suggested that the July 31 Transaction benefitted the Conveying Subsidiaries by adding the Transeastern assets to the borrowing base for the Revolver, thereby increasing the amount of money that the Conveying Subsidiaries and other TOUSA entities could borrow.  But there is no evidence that the Conveying Subsidiaries' cash requirements exceeded the capacity of the pre-transaction borrowing base.

111

**B.      Defendants failed to present any persuasive evidence that the Conveying Subsidiaries received substantial value in the July 31 Transaction**

Defendants have failed to show, either through fact witnesses, documents, or expert testimony, that the Conveying Subsidiaries received reasonably equivalent value – or, indeed, any substantial value – in the July 31 Transaction.

**1.      TOUSA itself never considered whether the Conveying Subsidiaries would benefit from the July 31 Transaction**

TOUSA itself never even considered whether the Conveying Subsidiaries would benefit from the July 31 Transaction. Although Berkowitz signed a consent for TOUSA Homes, Inc. to enter into the July 31 Transaction, he did not analyze whether the July 31 Transaction was in the best interests of TOUSA Homes, Inc. or any other subsidiary. He likewise did not quantify the benefit of the transaction to any subsidiary, or speak with other TOUSA officers about whether the transaction was in the best interests of individual subsidiaries.

When TOUSA's Board approved the transaction, there was no consideration of whether the transaction was good for the individual subsidiaries, and no effort was made to identify, let alone quantify, the benefits, if any, to the subsidiaries.[38]

Wagman made no effort to determine the value to individual subsidiaries of the cash management system, group purchasing arrangements, or other indirect benefits. He knew of no such effort by anyone else, and the subject was not considered by the Board when it approved the July 31 Transaction. No one at the company considered whether individual subsidiaries could have

---

[38]  For its part, Citi never tried to determine the value of benefits to any of the individual entities. Nikov Dep. 298:8-299:25.

obtained financing on their own. Wagman made no effort to quantify the benefits flowing to individual subsidiaries from the disposition of the Transeastern assets.

TOUSA's former treasurer, Russell Devendorf, suggested in response to questioning from Defendants at trial that he might ascribe about 95% of the benefits of the July 31 Transaction to TOUSA Homes, Inc. and Newmark Homes L.P., because they collectively owned about 95% of the entire enterprise's homebuilding assets. But for several independent reasons, I give very little, if any, weight to this testimony. First, Devendorf professed to have no such opinion when he was questioned at the deposition, arriving at this view only in time for trial. Devendorf's about-face on this and other issues between his deposition and trial – during which time he was named as a defendant in a directors and officers suit relating to the July 31 Transaction – undermines his credibility.[39] Second, such a *post hoc* allocation opinion generally falls within the domain of an expert witness, rather than a pure fact witness like Devendorf. Third, it is difficult to credit Devendorf's abstract opinion on how benefits should be allocated when he offered no well-developed view regarding what those benefits are. His testimony did not quantify the amount of total benefits from the settlement, much less identify each benefit and estimate how much it was worth. Accordingly, he could not and did not explain why it would make sense to apportion each and every purported benefit of the settlement (including, say, debt-relief benefits) by assets rather than by some other method (most importantly, based on which entity was liable for the debt). Finally, it just does not make logical sense under any rational analysis that the Conveying Subsidiaries – which were not obligated on the Transeastern debt and whose assets were previously unencumbered – received 95% of the benefit of the July 31 Transaction when they got none of the

---

[39] After observing his candor and demeanor, I found Devendorf not to be a credible witness.

proceeds from that Transaction.  To the extent that Devendorf actually believed his testimony on that score, I don't believe him and reject the testimony as absurd.

> **2.  Defendants' experts failed to show that the Conveying Subsidiaries received substantial value in the July 31 Transaction**

Two of Defendants' experts – William Lenhart and M. Mark Lee – presented testimony related to the issue of reasonably equivalent value.  For the reasons stated below, their testimony does not alter my finding that the Conveying Subsidiaries did not receive reasonably equivalent value in the July 31 Transaction.

> **a.  William Lenhart**

For the reasons given earlier, I have discounted Lenhart's testimony on credibility grounds. In any event, his testimony regarding reasonably equivalent value was unpersuasive.

First and foremost, Lenhart – consistent with his overall view of TOUSA – devoted almost all of his analysis to the question whether *consolidated* TOUSA received reasonably equivalent value.  For example, in summarizing his opinion on this issue in a chart in his report, Lenhart stated that the figures show the "low and high ranges of tangible value the TOUSA Group received" (Ex 3000 at 148).  By "TOUSA Group," Lenhart was referring to the consolidated entity as a whole.  I have found and concluded that the "common enterprise" approach is foreclosed by the plain language of the statute and thus reject the bulk of Lenhart's analysis of reasonably equivalent value as inapposite.

Beyond that, Lenhart provided no basis for deciding what portions, if any, of the benefits received by consolidated TOUSA are allocable to the Conveying Subsidiaries.  As he repeatedly conceded in portions of his deposition later admitted as evidence by stipulation, Lenhart made no

attempt prior to trial to allocate the benefits to particular Conveying Subsidiaries. That holds true both as to the "direct" benefits summarized on page 149 of Lenhart's report, as well as to the purported "indirect" benefits listed at pages 150-151 of the report. Ex.3000.

### b.    M. Mark Lee

Lee likewise provided testimony only about the benefits received by TOUSA as a whole rather than by the individual Conveying Subsidiaries. He attempted to quantify three categories of benefits: settlement of the Transeastern litigation, income tax benefits, and the acquisition of Transeastern assets. For the reasons I have already discussed, these did not constitute value to the Conveying Subsidiaries. What is more, Lee affirmatively disavowed holding any expert opinion as to whether the July 31 Transaction was necessary in order for TOUSA to obtain the tax benefits he attempted to quantify.

Lee also provided some opinions regarding certain benefits he did not quantify. His opinions on those issues were far from conclusive and do not alter my findings regarding the absence of reasonably equivalent value. First, he testified that the Conveying Subsidiaries "could" have defaulted on their bonds if there were an adverse judgment against TOUSA, Inc. in the Transeastern litigation; he did not have an opinion, however, as to whether or not that actually would have happened. See Lee Tr. 2887:13-2888:24. Second, he said in his report that the Transeastern litigation "could" have adversely affected the Conveying Subsidiaries' business; again, however, he reached no firm conclusion on whether that would have actually happened. See Ex. 639 (Corrected Lee Report) at 38.

## VI.    THE FIRST AND SECOND LIEN LENDERS, AND THE SENIOR TRANSEASTERN LENDERS, DID NOT ACT IN GOOD FAITH AND WERE GROSSLY NEGLIGENT

A reasonable assessment of TOUSA's finances prior to the July 31 Transaction would have shown that the Conveying Subsidiaries were already insolvent and were going to be left with unreasonably small capital if the Transaction went through. Furthermore, ample public information about the dire financial state of TOUSA in the weeks before the July 31 Transaction required the First and Second Lien Lenders, and the Senior Transeastern Lenders, to investigate TOUSA's finances or proceed with the July 31 Transaction at their peril.

Representatives of several of the Senior Transeastern Lenders testified that they entered into the July 31 Transaction in good faith and without knowledge of the avoidability of the transaction. In particular, Robert Burns (Monarch Alternative Capital), John Morgan (Highland Capital), Ralph Hinckley (Eaton Vance) and Jaime Lifton (JPMorgan Chase) testified and offered supporting affidavits, and the Court admitted without objection the affidavit of Ashraf Jilani (Centurion-Riversource).[40] The Court heard no evidence from the other Senior Transeastern Lenders in support of the good faith defense.[41]

---

[40]    As Jilani appeared in court and was ready to submit to cross-examination, the Committee did not object to the admission of his affidavit. The Court sustained the Committee's objection to the admission of affidavits from other representatives of the Senior Transeastern Lenders who did not appear in court and were not otherwise subject to cross-examination.

[41]    The other Senior Transeastern Lenders are: 3V Capital Master Fund Ltd.; Atascosa Investments, LLC; Aurum CLO 2002-1 Ltd.; Bank of America, N.A.; Bear Stearns Investment Products Inc.; Black Diamond CLO 2005-1; Burnet Partners, LLC; Centurion CDO 10, Ltd.; Centurion CDO 8, Limited; Centurion CDO 9, Ltd.; Centurion CDO II, Ltd.; Centurion CDO VI, Ltd.; Centurion CDO VII, Ltd.; Centurion CDO XI, Ltd.; Deutsche Bank Trust Company Americas; Distressed High Yield Trading Ops. Fund Ltd; Eaton Vance Credit Opportunities Fund; Eaton Vance Floating-Rate Income Trust; Eaton Vance Grayson & Co.; Eaton Vance Limited Duration Income Fund; Eaton Vance Senior Debt Portfolio; Eaton Vance Senior Floating-Rate Trust; Eaton Vance Senior Income Trust; Eaton Vance VT Floating-Rate Income Fund; Farallon Capital Institutional Partners II, L.P.; Farallon Capital Institutional Partners III, L.P.; Farallon Capital Institutional Partners, L.P.; Farallon Capital Offshore Investors II, L.P.; Farallon Capital Offshore Investors, Inc.; Farallon Capital Partners, L.P.; Flagship CLO III; Flagship CLO IV; Flagship CLO V; Gleneagles CLO Ltd; Goldman Sachs Credit Partners, L.P.; Grand Central Asset Trust, CED Series; Grand Central Asset Trust, HLD Series; Grand

116

Notwithstanding the testimony of these witnesses, there was overwhelming evidence that TOUSA was financially distressed beginning in 2006 and that its financial problems rapidly worsened in the first seven months of 2007.  TOUSA reported a loss of $80 million in the third quarter of 2006 alone[42] and wrote off of its entire investment in the Transeastern Joint Venture in its 10-Q filed November 14, 2006. In the fourth quarter of 2006, TOUSA lost $243 million, as its sales and deliveries fell dramatically while cancellations rose.  DB Trust, acting on behalf of all the Senior Transeastern Lenders, noted on January 8, 2007 that TOUSA's "current wherewithal" constrained the position it could take on settling the Transeastern dispute. Ex. 443 at 2.  S&P listed TOUSA as the "weakest" publicly-traded homebuilder in a March 1, 2007 report.  Burns Tr. 4000:24-4001:21.  Moody's put TOUSA on Credit Watch with a negative outlook and downgraded TOUSA on April 2, 2007.  Burns Tr. 4015:5-4016:7.  A securities analyst noted that, for TOUSA, "Things Just Seem to Go from Bad to Worse."  Ex. 2078.

TOUSA's plummeting bond and stock prices mirrored its financial woes. Capstone, the financial advisor to the Senior Transeastern Lenders, reported that TOUSA's stock price fell 55% in the first nine months of 2006 – more than any other homebuilder's.  It continued to fall in 2007:

---

Central Asset Trust, SOH Series; Hartford Mutual Funds, Inc., on behalf of The Hartford Floating Rate Fund by Hartford Investment Management Company, their Sub- Advisor; Highland CDO Opportunity Fund, Ltd.; Highland Credit Opportunities CDO Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate LLC; Highland Legacy Limited; Highland Offshore Partners, L.P.; Jasper CLO, Ltd.; JPMorganChase Bank, N.A.; Liberty CLO, Ltd.; LL Blue Marlin Funding LLC; Loan Funding VII, LLC; Merrill Lynch Credit Products, LLC; Ocean Bank; The Quadrangle Master Funding Ltd.; Riversource Floating Rate Fund; Rockwall CDO, Ltd.; Sequils-Centurion V, Ltd.; Silver Oak Capital, LLC; Stedman CBNA Loan Funding LLC; The Foothills Group, Inc.; Tinicum Partners, L.P.; Van Kampen Dynamic Credit Opportunities Fund; Van Kampen Senior Income Trust; Van Kampen Senior Loan Fund; and Wells Fargo Bank, N.A.  Stip. at Ex. B.

[42]  The 10-Q stated that "For the three months ended September 30, 2006, we had a net loss of $80.0 million as compared to net income of $70.3 million for the three months ended September 30, 2005, a decrease of 214%."  Ex. 2034 at 32.

it closed at $9.11 on March 1, 2007 and $3.82 on April 2, 2007.[43]  TOUSA bond prices fell throughout the year.

On April 18, 2007, Cap Re sent a letter to TOUSA warning that the transaction could push the company into the "zone of insolvency." Ex. 239.  That letter was passed on to Milbank, counsel to the Senior Transeastern Lenders, and was also received by Monarch, one of the Transeastern Lenders.  *Debtwire* reported on May 16, 2007 that existing bondholders of TOUSA had warned that the company would be entering the "zone of insolvency" if it took on the new financing to pay off the Transeastern lenders. The *Debtwire* report added that "[s]ome holders of Technical Olympic's secured debt, and a portion of other Transeastern mezz lenders, believe that the proposed settlement could force the company into an eventual bankruptcy."  Ex. 2107; Berkowitz Tr. 1832:3-1833:20. The Cap Re letter also warned that the proposed refinancing "may well be a fraudulent transfer by the Company and/or one or more of the subsidiary guarantors." Ex. 239 at 3.

The bad news continued. TOUSA's 10-Q for the first quarter of 2007, filed May 10, 2007, reported that TOUSA had lost $66 million in the first quarter; its deliveries, sales and revenues fell. It warned for the first time that "the lenders to the joint venture could cause their respective joint venture borrower to file for bankruptcy at any time."  Ex. 2102 at 44.

TOUSA announced by 8-K dated May 15, 2007 that Citi would require TOUSA to obtain a solvency opinion in connection with the financing. Ex. 5015 at 2.  An equity analyst at Deutsche Bank issued a report on May 29, 2007 confirming the obvious conclusion: "our residual equity value

---

[43]    Historical  prices  for  TOUSA  common  stock  are  available  at http://finance.yahoo.com/q/hp?s=TOUSQ.PK&a=02&b=1&c=2007&d=03&e=2&f=2007&g=d.

analysis continues to suggest little in equity value once Transeastern is consolidated" with TOUSA. Ex. 2344 at 1.

On July 11, 2007, Moody's Investors Service downgraded the credit rating of TOUSA and its debt securities to "reflect the serious challenges that TOA will face with the increased debt leverage in a difficult industry environment." Ex. 2145 at 2. Moody's emphasized there was a "very small margin of error in order for the company to succeed in its proposed plan." Ex. 2145 at 2. It assigned TOUSA's senior subordinated bonds a Ca rating, indicating that those securities were "likely in, or very near, default." Ex. 2332; Berkowitz Tr. 1833:22-1834:13. Monarch's Burns circulated by email a news report about the downgrade the same day it was made public.

The next day, S&P downgraded the credit rating of TOUSA to CCC+, warning that "challenging homebuilder conditions will make it difficult for TOUSA to execute its debt restructuring plans." S&P gave all of TOUSA's bonds, as well as its second lien debt, a CCC- rating, indicating that TOUSA was "not likely" to be able to meet any of these commitments if matters did not improve, and predicted that holders of second-lien debt would recover only 0-10% of the principal in the event of a default. Ex. 2146. S&P added that "[a]n obligation rated 'CCC' is currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment." Ex. 2329 at 4.

TOUSA added to the grim news by announcing its second quarter results in a press release dated July 12, 2007, which revealed that TOUSA sales, deliveries, and backlog had fallen and its cancellations had increased.[44]

---

[44]  TOUSA's financial distress was sufficiently plain that TriPacific Capital Partners demanded conditions on its participation in a transaction with TOUSA, citing "the many issues surrounding the instability of the market and the company's viability." Devendorf Tr. 1925:19-1926:21.

TOUSA's steady fall provided ample reason for any lender to acknowledge, as Burns testified, that TOUSA was "in a difficult position" even before the release of the second quarter results. Burns Tr. 4035:15:16.   TOUSA was projecting losses throughout 2007 as well. Burns acknowledged that a Moody's downgrade would be cause for "concern about TOUSA's continued financial health" (Burns Tr. 4020:19-23), but he did nothing to investigate the issues raised by the Moody's downgrade and he was unaware whether anyone else did so.   He also was unable to identify anything that he – or anyone else – did to investigate the issues raised by the S&P downgrade.   Every Senior Transeastern Lender had ample reason to suspect that TOUSA had been skirting the edge of insolvency for months.

Each of the Senior Transeastern Lenders also had ample reason to believe that the new financing could be an avoidable transfer for the Conveying Subsidiaries. Only TOUSA and TOUSA Homes LP were obligated on the Transeastern debt, and only TOUSA and TOUSA Homes LP were parties to the litigation that DB Trust had filed on behalf of the Senior Transeastern Lenders. Although none of the Conveying Subsidiaries was obligated on the debt or at risk as parties to the litigation, each was proffered as a guarantor on the new financing.   As early as April, Burns had heard that, under the new financing, "the structure was that the conveying subs which were not guarantors of the Transeastern debt and not parties to the Transeastern litigation were going to become guarantors of the new financing."   Burns Tr. 4031:12-19.

TOUSA announced in its 8-K filed on May 15 that the Conveying Subsidiaries would provide liens to support the new financing.   As Burns put it, "TOUSA disclosed that each of the Term Loans would be guarantied by substantially all of TOUSA's domestic subsidiaries and that the obligation on the First Lien Term Loan and the Second Lien Term Loan would be secured by

substantially all of the assets of TOUSA and its subsidiaries." Ex. 5404 (Burns Aff.) at ¶ 29.  See also Ex. 5405 (Morgan Aff.) at ¶ 15; Ex. 5408 (Jilani Aff.) at ¶ 11; Ex. 5407 (Lifton Aff.) at ¶ 13. In short, every Senior Transeastern Lender knew or should have known that the Conveying Subsidiaries were granting liens to secure a loan that would be used to repay a debt for which the Conveying Subsidiaries were not liable and to settle litigation to which the Conveying Subsidiaries were not parties.

Several of the Senior Transeastern Lenders rested their good faith defense in part on the due diligence they believed had been conducted by Citi or the involvement of third-party professionals in the transaction.  No representative of the Senior Transeastern Lenders – other than Burns (see below) – suggested that his organization performed its own due diligence. Morgan Tr. 4087:19-21 (Highland did not perform its own solvency analysis); Hinckley Tr. 4103:20-25 (Eaton Vance was not involved in any of the solvency analyses).  Neither Jilani nor Lifton described any due diligence performed by his organization on the solvency or financial condition of TOUSA.  Instead, each believed that Citi "was in a position to perform substantial and thorough diligence concerning the new lending facility" (Ex. 5407 (Lifton Aff.) at ¶ 16; Ex. 5408 (Jilani Aff.)at ¶ 13; Ex. 5406 (Hinckley Aff.) at ¶ 13), or that Citi had "conducted extensive due diligence." Ex. 5405 (Morgan Aff.).  Each also knew that Citi or TOUSA had retained third-party professionals to assist in some way. (Ex. 5405 (Morgan Aff.) at ¶ 6; Ex. 5407 (Lifton Aff.) at ¶ 7; Ex. 5408 (Jilani Aff.) at ¶ 7; Ex. 5406 (Hinckley Aff.) at ¶ 6); Burns Tr. 3909:22-3913:4.

Nevertheless, none of the Senior Transeastern Lender witnesses – except for Burns – could point to anything that any of the third-party advisors ever said or did that could possibly overcome the foregoing concerns about TOUSA's financial health. Morgan acknowledged the assistance of

Blackstone as a financial advisor, but only for assessing the value of the consideration provided to the mezzanine lenders as part of the Transeastern settlement. Morgan's affidavit and testimony describe no other contact with any financial advisor, much less with one that conveyed any information about TOUSA. Jilani noted only that Lehman had been retained to advise TOUSA; he conceded that his firm "did not take an active role in interacting with TOUSA or its advisers." Ex. 5408 (Jilani Aff.) at ¶ 7. Lifton admitted that he "did not have any contact with TOUSA or its advisors." Ex. 5407 (Lifton Aff.) at ¶ 7.

Burns, by contrast, testified that he had extensive contact with TOUSA and its outside advisors. Burns's testimony describes in some detail the due diligence that Monarch undertook before buying the Transeastern debt – which included sending an analyst to make physical inspection of the subdivisions where Transeastern had assets – but no similar inquiries or work were undertaken to analyze the financial solvency of TOUSA. Compare Burns Tr. 3881:19-21 ("We sent one of our analysts down here to walk through a few of the [Transeastern] subdivisions") with Burns Tr. 3914:6-7 (for TOUSA, Monarch "looked at the information that was provided to us."). Beyond that, Burns could say only that "[o]ur advisors interfaced with [TOUSA's] advisors." Burns Tr. 4061:20-21. Burns relied on outside advisers principally because, in his view, they were "among the elite in the financial advisory field." Burns Tr. 3910:2-4. But Burns did not identify any information he received from these advisors that would sufficiently allay concern about TOUSA's solvency.

The Senior Transeastern Lenders witnesses also suggested that their good faith was shown by the demand for the loans in the marketplace. But the loans were secured by substantially all the assets of the Conveying Subsidiaries, as the Senior Transeastern Lenders knew or should have

known from public information. Ex. 5015 (TOUSA 8-K filed May 15, 2007). Demand for these loans said little about the solvency of TOUSA, as secured creditors would get first crack at TOUSA's assets. Indeed, at least six of the Transeastern Lenders – including Monarch, Merrill Lynch, The Foothills Group, Inc. and the three Van Kampen Funds – received full repayment of their Transeastern loans *and* became fully secured creditors in the syndication of the First Lien Term or Second Lien Term Loans. Compare Ex. A to CIT stipulation, Adv. Pro. DE 383 (list of Senior Transeastern Lenders receiving payments) with Ex. 3359 (list of lenders to First Lien Term Loan and the Second Lien Term Loan at initial syndication).[45] When asked "Was there any quid pro quo such that we'll settle with you on Transeastern as long as your lenders buy back into the term loan?" Wagman testified, "You know, it sounds familiar." Wagman Tr. 531:16-19. Berkowitz was also asked if he had heard discussion of a quid pro quo with the Transeastern Lenders. He answered, "I remember it vaguely. . . . I know that there were lenders in one part of the deal that were trying to get in the other part." Berkowitz Tr. 1702:18-25.

Although there may have been initial demand for participation in the loans, that demand fell sharply in a few weeks. Citi was able to syndicate the two term loans only by reducing the price below par and increasing the yield. Ex. 177; Burns Tr. 4056:2-15 (yield on First Lien Term Loan increased from Libor plus 350 to Libor plus 400; yield on Second Lien Term Loan increased from Libor plus 650 to Libor plus 725). Demand for the loans reflected favorable terms rather than any view about TOUSA's solvency.

---

[45] Many of the Senior Transeastern Lenders bought parts of the TOUSA Term Loans shortly after the syndication, including Goldman Sachs, Deutsche Bank, and Grand Central Asset Trust.

Virtually all of the information that was available to the Senior Transeastern Lenders was available to the First and Second Lien Lenders, and their agent, Citi, as well.  Indeed, Citi had, if anything, even more notice of TOUSA's precarious position and greater opportunity to conduct due diligence.  *See* Section II.A.2., above.  Nonetheless, Citi proceeded with the transaction, which generated very substantial fee income for Citi.

Taken as a whole, the evidence shows that the First and Second Lien Lenders and the Senior Transeastern Lenders knew or should have known on the basis of publicly available information that TOUSA and the Conveying Subsidiaries were insolvent on July 31, 2007 or were precariously close to insolvency and manifestly were to be left with inadequate capital.  It was also clear from publicly available information that the Conveying Subsidiaries would be forced to incur obligations and grant liens so that TOUSA could obtain financing for the settlement and that the Conveying Subsidiaries were not liable on the Transeastern debt or guaranties and were not defendants in the Transeastern litigation.  Despite this information, the First and Second Lien Lenders and the Senior Transeastern Lenders proceeded with the transaction without careful inquiry into TOUSA's solvency or the potential avoidability of the July 31 Transaction.

## VII.   THE VALUE OF THE LIENS WAS EQUAL TO THE OBLIGATIONS UNDER THE TERM LOANS

For reasons explained in the conclusions of law, the value of the liens was equal to the lesser of the amount of the obligations secured by the liens or the value of the collateral.  Plaintiff has proved that the value of the Conveying Subsidiaries' collateral on July 31, 2007 greatly exceeded the obligations they incurred in the transaction.  Therefore, as a matter of law, the value of the liens at the time of transfer was the amount of those obligations.

124

Based on the testimony of their expert, Stryker, the Senior Transeastern Lenders contend that the liens granted in the July 31 Transaction had a value of only $161 million. Stryker purported to value those liens by estimating the probability that there would be a default on the debt they secured (which would result in the liens being called upon) and to multiply that probability by the size of the debt ($500 million). I reject that valuation because it conflicts with the legal principles that govern the determination of the value of liens.

Even if I were to accept Stryker's general approach to valuation of the liens, his methods for determining value, and his application of those methods, have other flaws that preclude acceptance of his opinion. To begin with, Stryker fails to account for the full value of the liens. Stryker conceded that his method assigns no value to the critical role the liens played in allowing TOUSA to obtain the new financing, namely, that TOUSA's ability to borrow the full $500 million was entirely contingent on the Conveying Subsidiaries granting liens on all their property. Stryker also conceded that his method assigns no value to the future borrowing ability that the Conveying Subsidiaries sacrificed by pledging all of their assets to the First and Second Lien Term Loan Lenders.

Stryker's valuation method was not merely conceptually inappropriate; he also failed to apply it properly. To compute the probability that TOUSA would default on the debt, Stryker relied on a chart from Standard & Poor's that he understood to list the historical rate of defaults on debts with similar credit ratings. However, he realized on cross-examination that this chart did not in fact list the rate of defaults on *debts* with certain credit ratings, as he had thought, but rather the rate of default by *companies* with certain credit ratings. Because Stryker used the wrong chart and conflated defaults by companies with defaults on particular borrowings, I cannot accept his

calculations.  Moreover, whatever the data might suggest about general historical default rates, my conclusion in this case that the Debtors were insolvent at the time of the transfer means that there was an extremely high probability that the liens would be called upon.  For that reason, as well as the reasons stated above, I reject Stryker's valuation of the liens.

## VIII.  THE TAX REFUND

TOUSA, on a consolidated basis, suffered a net operating loss in the tax year ending December 31, 2007.  Because of the net operating loss, TOUSA was able to claim a federal tax refund for taxes paid for tax years 2005 and 2006.  TOUSA received that refund, of approximately $207.3 million, in April 2008.  Unless avoided, the liens granted in the July 31 Transaction provide the First and Second Lien Lenders, and the Revolver Lenders, a security interest in this refund.

The "Liquidation Analysis" submitted by the Debtors in connection with the November 12, 2008 Draft Disclosure Statement [DE 2139 in the Debtors' main bankruptcy case] estimated the likely proceeds of a Chapter 7 liquidation of TOUSA.  The analysis provided estimates for high, midpoint, and low recoveries.  The net proceeds (after accounting for administrative claims and wind-down costs) of a high recovery were estimated to be $348,967,000; net proceeds of a midpoint recovery were estimated to be $258,143,000; net proceeds of a low recovery were estimated to be $167,320,000.  No party disputed this analysis when it was filed.

If the transfer of the liens on the tax refund had not occurred – *i.e.*, if the liens did not attach to the $207.3 million of the Debtors' property constituted by the tax refund – the Liquidation Analysis shows that the Debtors' estates would have post-liquidation assets of approximately $141 million under the high recovery estimate (*i.e.*, $348,967,000 less $207,300,000), $51 million under the midpoint recovery estimate ($258,143,000 less $207,300,000), and $0 under the low recovery

estimate ($167,320,000 less $207,300,000), to distribute to the First Lien creditors, which were owed $325,740,000[46] at the time the Liquidation Analysis was prepared.  In other words, if the First Lien creditors had not obtained liens on the tax refund, they would have nearly $326 million in secured claims, but the estate would have only $141 million to which their liens could attach – assuming the *highest* of the three estimates of net recovery offered in the Liquidation Analysis. Because the First Lien Creditors were undersecured, the liens on the tax refund, if not avoided, would enable them to recover more than they would receive in a case under chapter 7 of this title, if the transfer had not been made, and the First Lien Creditors had received payment to the extent provided by the Bankruptcy Code.  Because the First Lien creditors were undersecured, the Second Lien creditors were also undersecured, by definition and by contract.

Citi contends that the schedules filed by the Debtors at the outset of the bankruptcy case indicate that the First Lien Lenders were oversecured on the petition date.  Pre-Trial Brief of the First Lien Term Loan Agent at 37-40 (Adv. Pro. DE 496).  However, those filings do not purport to state how much creditors would receive in a Chapter 7 proceeding, and clearly overstate the likely value that could be realized from a disposition of TOUSA's assets.

First, the schedules reflect the estimated book value of the assets, not the market value at the time the schedules were filed.  *See*, *e.g.*, Ex. 3192 at 3 ("It would be prohibitively expensive and unduly burdensome to obtain current market valuations for all of the Debtor's property interests. Accordingly, unless otherwise indicated, the Debtor's Schedules reflect net book values as of January 28, 2008, unless indicated otherwise.").  Second, the reported book values "do not reflect

---

[46]  Both the net proceeds of liquidation and the First Lien debt indicated in the Liquidation Analysis are net of amounts that had been authorized to be paid to the First Lien creditors under the Cash Collateral Order.

certain impairments or other charges for any period after September 30, 2008." See, *e.g.*, Ex. 3192 at 7. As other evidence has indicated, market values continued to decline starkly after September 30, 2007. Third, any "market valuation," in addition to being *lower* than the book value reported in the schedules, by definition will be *greater* than the value that could be realized under a forced liquidation pursuant to Chapter 7.

Because the Debtors' schedules do not purport to estimate, and because they clearly overstate, the value of the assets that could be recovered by the estates in a Chapter 7 proceeding, those schedules provide an unreliable answer to the question whether the First and Second Lien Creditors were oversecured or undersecured, *i.e.*, whether liens on the tax refund would improve the position of the First and Second Lien Creditors. By contrast, the Liquidation Analysis on which Plaintiff relies was prepared to address precisely the value of the assets that could be recovered by the estates in a Chapter 7 proceeding. For that reason, the Liquidation Analysis provides a more reliable estimate of that value than do the schedules on which Defendants rely.

Based upon the Liquidation Analysis, I find that the First and Second Lien Creditors would receive more in a Chapter 7 proceeding if their liens on the tax refund are not avoided than they would receive if the liens on the tax refund had not been granted. I find that to be the case whether the liquidation value of TOUSA's assets is estimated at the time of the petition or at the time the Liquidation Analysis was prepared.

## CONCLUSIONS OF LAW

### I.    JURISDICTION AND VENUE

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b), as this is a civil proceeding arising in or related to a case under the Bankruptcy Code. This Court also has

jurisdiction under 28 U.S.C. § 1334(e), as this adversary proceeding involves property of the Debtors' estates.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this proceeding is properly before the Court pursuant to 28 U.S.C. § 1409.

## II.    THE OBLIGATIONS INCURRED AND LIENS GRANTED TO THE FIRST AND SECOND LIEN LENDERS WERE FRAUDULENT TRANSFERS AND THE SENIOR TRANSEASTERN LENDERS WERE ENTITIES FOR WHOSE BENEFIT THE TRANSFERS WERE MADE

Plaintiff seeks to avoid obligations and transfers under 11 U.S.C. § 544(b)(1) (invoking Florida and New York law) and 11 U.S.C. § 548(a)(1)(B).[47]  Section 548(a)(1)(B) permits the avoidance of any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred within 2 years before the date of filing of the petition, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer or obligation and (A) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation, (B) was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining with the debtor was an unreasonably small capital; or (C) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.  11 U.S.C. § 548(a)(1)(B).

In the July 31 Transaction, each of the Conveying Subsidiaries incurred obligations to repay the First and Second Lien Term Loans and granted liens on their property to the First and Second

---

[47] Specifically, Plaintiff asserts claims under Sections 726.105, 726.106, and 726.108 of the Florida Statutes and under Sections 273, 274, 275, and 278 of the New York Debtor and Creditor Law.  In the particular facts of this case, there are no material differences between the legal standards that govern Plaintiff's claims under Section 548 of the Bankruptcy Code and the legal standards that govern its claims under Florida and New York law, as incorporated by Section 544 of the Bankruptcy Code.  Accordingly, my analysis of issues under Section 548 applies also to Plaintiff's claims under state statutes.

Lien Lenders to secure those obligations.  Each lien on the property of a Conveying Subsidiary constitutes a "transfer . . . of an interest of the debtor in property" and each obligation incurred by a Conveying Subsidiary constitutes an "obligation . . . incurred by the debtor" within the meaning of Section 548.  The transfers were made and the obligations were incurred within two years before the date of the petition.

## A.    Insolvency

Each of the Conveying Subsidiaries was insolvent before the July 31 Transaction and each was rendered more deeply insolvent by the Transaction.

### 1.    The balance sheet test

The "balance sheet" test of insolvency (11 U.S.C. § 548(a)(1)(B)(ii)(I)) requires proof that the sum of the debts of a Conveying Subsidiary is greater than the fair value of that subsidiary's property.  11 U.S.C. § 101(32)(B).  Fair valuation, in the context of a going concern, "contemplate[s] an estimate of proceeds realizable within a reasonable time frame through either collection or sale at regular market value."  *Pembroke Dev. Corp. v. A.P.L. Window* (*In re Pembroke Dev. Corp.*), 122 B.R. 610, 611 (Bankr. S.D. Fla. 1991) (citing *In re Continental Country Club, Inc.*, 108 B.R. 327, 331 (Bankr. M.D. Fla. 1989)).  *See also Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 35 (2d Cir. 1996) ("Fair value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts."); *Orix Credit Alliance, Inc. v. Harvey* (*In re Lamar Haddox Contractor, Inc.*), 40 F.3d 118, 121 (5th Cir. 1994) (stating that the "fair value" of property is determined by "estimating what the debtor's assets would realize if sold in a prudent

manner in current market conditions."). "Fair valuation for our purposes here is indistinguishable from fair market value. It is the estimate of what can be realized out of the assets within a reasonable time either through collection or sale at the regular market value, conceiving the latter as the amount which could be obtained for the property in question within such period by a capable and diligent business man from an interested buyer who is willing to purchase under the ordinary selling conditions." *Murphy v. Valencia* (*In re Duque Rodriguez*), 75 B.R. 829, 831 (Bankr. S.D. Fla. 1987) (internal citations and quotation marks omitted). Thus, fair market value is the price that a hypothetical, fully informed willing buyer would have paid a willing seller on the valuation date, assuming a reasonable time to sell the property and no undue pressure on either party.

Because "a fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time," the valuation "should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts." *Travelers Int'l AG v. Trans World Airlines, Inc.* (*In re Trans World Airlines, Inc.*), 134 F.3d 188, 194-195 (3d Cir. 1998).

In reaching conclusions on "fair valuation," I am permitted to adopt the asset values of one party or the other, or to choose another valuation figure after weighing all of the evidence. *See*, *e.g.*, *In re Roblin Indus. Inc.*, 78 F.3d at 35.

The Committee has proven insolvency under the balance sheet test through two well-accepted methods of valuation. First, the Committee's real estate expert, Charles Hewlett, determined the fair value of the Conveying Subsidiaries' homebuilding assets as of July 31, 2007. Kevin Clancy, the Committee's accounting expert, incorporated those values to construct balance sheets for each Conveying Subsidiary. The results show that each Conveying Subsidiary's debts exceeded the fair value of its assets on July 31, 2007, both before and after the July 31 Transaction.

131

Second, the Committee's expert on business valuation, William Derrough, determined TOUSA's "total enterprise value" and compared that value with the company's debts. That analysis demonstrated that TOUSA was insolvent on a consolidated basis and that each of the Conveying Subsidiaries was insolvent as well. Derrough's analysis demonstrated insolvency under each of three different methods of determining Total Enterprise Value – the analysis of "Observable Market Value," the analysis of "comparable companies," and a discounted cash flow analysis. For reasons explained in detail in my findings of fact, I find the analyses of Hewlett, Clancy, and Derrough to provide persuasive and reliable evidence of insolvency and reject as less persuasive the analyses of Defendants' experts.

Defendants filed a motion before trial to exclude the expert testimony of Charles Hewlett regarding the valuation of the Debtors' real-estate assets as unreliable under *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993). With regard to Hewlett's qualifications, I conclude that he is qualified to serve as an expert witness under Federal Rule of Evidence 702 and Federal Rule of Bankruptcy Procedure 9017, and I further conclude that there is no legal requirement applicable in this forum that requires a real estate valuation expert to be a licensed appraiser. For substantially the reasons stated in Plaintiff's opposition to the motion, as well as the detailed findings I have made above regarding the reliability of Hewlett's methodology, I deny the motion.

Defendants have criticized Hewlett's valuation methodology because, instead of merely estimating the aggregate retail sales prices of individual homes and properties, Hewlett looked at groups of assets and discounted those values to account for marketing costs, the present value of sales that will occur in the future, and other factors. As a factual matter, I have found that Hewlett's

132

methodology was a reasonable and appropriate approach to determining value.  I also conclude, as a matter of law, that Hewlett's methodology was appropriate.

"To decide whether a firm is insolvent within the meaning of § 548(a)(2)(B)(I), a court should ask:  What would *a* buyer be willing to pay for the debtor's *entire package* of assets and liabilities.  If the price is positive, the firm is solvent; if negative, insolvent." *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992) (emphases added); see also *Sherman v. FSC Realty LLC* (*In re Brentwood Lexford Partners, LLC*), 292 B.R. 255, 268-269 (Bankr. N.D. TX. 2003) (stating that assets may be valued individually or packaged in groups based on business considerations).

Hewlett appropriately conducted a valuation of each Conveying Subsidiary's assets as a going concern that would be sold to a buyer of a *business* or a portion of a business, rather than the value of individual assets that would be sold at retail through a potentially lengthy wind-down process.  The price that a potential buyer of a homebuilding business would pay would reflect not only the retail price at which the buyer could ultimately sell its individual assets, but a discount to reflect the costs that would be incurred to make those sales and the present value of income that would be earned only in the future.  *See*, *e.g.*, *In re Taxman Clothing Co., Inc.*, 905 F.2d 166 (7th Cir. 1990) ("going concern" valuation of retailer should reduce retail prices of inventory by the retailer's mark-up, which covers retailer's cost of sales); *Syracuse Eng'g Co. v. Haight*, 110 F.2d 468 (2d Cir. 1940) (buyer would necessarily consider future costs when calculating how much to pay for debtor's asset); *Emerald Hills Country Club, Inc. v. Hollywood, Inc.* (*In re Emerald Hills Country Club*), 32 B.R. 408, 415 (Bankr. S.D. Fla. 1983) (using present value of condominium/apartment units for fair valuation because the discounted price accounted for market

absorption over a two year period and the reality that the assets could not be sold immediately); *cf.*

*Samson v. Alton Banking & Trust Co.* (*In re Ebbler Furniture & Appliances, Inc.*), 804 F.2d 87, 92

(7th Cir. 1986) (Easterbrook, J., concurring) (the wholesale cost of inventory "is . . . the appropriate

standard as a rule" because a buyer in the same business or industry as the debtor "would still incur

all the costs of retailing the goods, costs that would have to be subtracted from the retail price to

determine the 'value' of the inventory").  The "fair valuation" standard does *not* "require the taking

into account of the sum which could be realized only through retail sale of certain articles 'in the

slow process of trade,' or through collection from debtors without property 'by patient and persistent

effort.'"  1 COLLIER BANKRUPTCY MANUAL ¶ 101.32[4] (3d ed. 1997).  I conclude that Hewlett used

a reasonable and appropriate methodology to determine a "fair valuation" of the Conveying

Subsidiaries' assets.

Defendants also filed a *Daubert* motion before trial to exclude the expert testimony of

William Derrough regarding the valuation of TOUSA and the Conveying Subsidiaries under the

Observable Market Value method.  For substantially the reasons stated in Plaintiff's opposition to

the motion, as well as the detailed findings I have made above regarding the reliability of that

valuation method, I deny the motion.  I furthermore note that an additional criticism of that method

raised by Defendants at trial regarding Derrough's decision not to apply a "control premium" to the

market value of TOUSA's stock is not only factually baseless for reasons I have already stated but

is also legally groundless.  *See* section III.B.1.a(i).  The premium a hypothetical investor might

theoretically pay to purchase a controlling share of TOUSA's stock is irrelevant to computing asset

values under Section 548.  *Heilig-Meyers Co. v. Wachovia Bank, N.A.* (*In re Heilig-Meyers Co.*),

319 B.R. 447, 462 (Bankr. E.D. Va. 2004).

Defendants have also argued that it is inappropriate or impossible to determine the solvency of individual Conveying Subsidiaries because TOUSA and its subsidiaries collectively operated as a "common enterprise." They argue that this common enterprise should be examined on a consolidated basis. The statute, however, requires consideration of whether "the debtor" was insolvent and, because each of the Conveying Subsidiaries is a separate and distinct "debtor," each must be considered separately.

Two legal doctrines sometimes permit a court to treat otherwise distinct and independent entities as a single, consolidated debtor: the equitable doctrine of substantive consolidation and the "alter ego" doctrine (sometimes referred to as "veil piercing"). However, strict requirements limit the use of these doctrines to disregard corporate form. As Judge Posner has explained:

> When a parent causes one of its subsidiaries to guarantee another's (or the parent's own) debts, there is an obvious danger . . . that creditors of the guarantor . . . will find themselves, without warning, dealing with a suddenly less solvent . . . debtor. The effect of the guarantee . . . is similar to that of a rule of law that treats the assets of affiliated corporations as a common pool available to the creditors of each affiliate. Such rules have sometimes been advocated, but the law has refused to adopt them, for just the reason stated; they make it harder for creditors of an affiliated corporation to assess their debtor's creditworthiness. If such rules were in force, "a sign of weakness in any member of a family of corporations would lead creditors to descend on each member, strong or weak, to claim their pound of flesh."

*In re Xonics Photochemical, Inc.*, 841 F.2d 198, 201 (7th Cir. 1988) (quoting *In re Auto-Train Corp., Inc.*, 810 F.2d 270, 277 (D.C. Cir. 1987); see also *Tryit Enters. v. Gen. Elec. Capital Corp.* (*In re Tryit Enters.*), 121 B.R. 217, 223 (Bankr. S.D. Tex. 1990) ("Since the assets of affiliated corporations are not generally treated as a common pool available to the creditors of each affiliate, unusual circumstances must be present to so treat them.").

135

Perhaps recognizing that the requirements for substantive consolidation or veil piercing cannot be satisfied, Defendants have expressly represented that they are not invoking either doctrine in this adversary proceeding.

In light of the statutory requirement to focus on "the debtor" and Defendants' express waivers of any claims of substantive consolidation, alter ego, and veil piercing,[48] Defendants' argument that the solvency of TOUSA and its subsidiaries should be assessed on a consolidated basis, because the TOUSA entities collectively were a "common enterprise," must be rejected as a matter of law.  Defendants' argument, if accepted, would apply the doctrines of substantive consolidation and veil piercing in substance even though the recognized prerequisites for invoking those doctrines are not present and despite Defendants' express waiver of any argument that those doctrines would be appropriate in this adversary proceeding.  Accordingly, the relevant question for solvency analysis is whether each of the Conveying Subsidiaries, individually, was insolvent.

Apart from being wrong as a matter of law, Defendants' "common enterprise" claim is refuted by the evidence.  For one thing, the relationship of TOUSA, Inc. (the parent) to the Conveying Subsidiaries is no different in kind from the business relationships among parents and subsidiaries in countless other companies.  What is more, Plaintiff established that TOUSA was fully able to separate the assets and liabilities of each Conveying Subsidiary when it was in the company's interest to do so.

---

[48]  Defendants have reserved the right to assert such claims in connection with confirmation of reorganization plan(s) for the Debtors.  Such reservation has no effect upon the fraudulent transfer analysis here.

### 2.    Unreasonably small capital

The Committee also proved beyond peradventure that each of the Conveying Subsidiaries was left after the Transaction with unreasonably small capital within the meaning of 11 U.S.C. § 548(a)(1)(B)(ii)(II).    That standard asks whether a company has sufficient capital to support operations in the event that performance is below expectations.

"[A]n 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable solvency." *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).  "Because [a debtor's cash flow] projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses. . . .  However, reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error." *Id.* at 1073 (internal citations omitted).  "[U]nreasonably small capital denotes a financial condition short of equitable insolvency."  *Id.* at 1075.  "'[U]nreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually.'"  *Official Comm. of Unsecured Creditors of Toy King Distributors, Inc. v. Liberty Savings Bank* (*In re Toy King Distributors, Inc.*), 256 B.R. 1, 142 (Bankr. M.D. Fla. 2000).

The Committee's evidence of balance sheet insolvency is also proof that the Conveying Subsidiaries had unreasonably small capital. In addition, the contemporaneous documents and the testimony of TOUSA's CEO, Tony Mon; his senior financial advisor, David Kaplan; and TOUSA's CFO, Steve Wagman all indicate that the company (including each of the Conveying Subsidiaries) was overleveraged at the time of the July 31 Transaction and faced considerable risk of failure as a result of the transaction.

### 3.    Inability to pay debts as they matured

The Committee also proved that the July 31 Transaction left the Conveying Subsidiaries unable to pay their debts as they matured within the meaning of 11 U.S.C. § 548(a)(1)(B)(ii)(III).

"The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured. While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured. . . ." *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defs.* (*In re WRT Energy Corp.*), 282 B.R. 343, 415 (Bankr. W.D. La. 2001) (internal citations omitted) (quoted in *EBC I, Inc. v. Am. Online, Inc.* (*In re EBC I, Inc.*), 380 B.R. 348, 359 (Bankr. D. Del. 2008)).

Plaintiff proved this "inability to pay debts" through the testimony and contemporaneous documents of Mon, Kaplan, and Wagman, among others; through the analyses provided by Hewlett and Derrough; through evidence of the market pricing of TOUSA's debt; and, of course, through TOUSA's actual inability to meet its financial obligations shortly after the July 31 Transaction.

### 4.    The savings clauses

Defendants have argued that the "savings clauses" in Section 10.20(d) of the term loans reduce the obligations incurred and liens granted by the Conveying Subsidiaries to the extent necessary to prevent their insolvency.[49]  That defense is unpersuasive for multiple reasons.

The savings clauses purport to amend liabilities and liens to make them "enforceable to the maximum extent" permitted by law.  However, because the Conveying Subsidiaries were insolvent even before the July 31 Transaction and received no value from that transaction, the liabilities and liens cannot be enforced *at all*.  *Any* liability imposed on a Conveying Subsidiary, and any lien securing that liability, would be avoidable under Section 548.  In this circumstance, the savings clauses have no effect at all.

If the Conveying Subsidiaries became insolvent only after the July 31 Transaction, the savings clauses are unenforceable under 11 U.S.C. § 541(c)(1)(B), which provides that an interest of the debtor in property becomes property of the estate, notwithstanding any "provision in an agreement" that is "conditioned on the insolvency or financial condition of the debtor" that "effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property."  The savings clauses are "provision[s] in an agreement."  They are "conditioned on the insolvency or financial condition of the debtor."  And they "effect a forfeiture, modification, or termination of the debtor's interest in property."  In particular, the savings clauses, if given the effect

---

[49]  Section 10.20(d) of both the First Lien Term Loan and the Second Lien Term Loan states:  "Each Borrower agrees if such Borrower's joint and several liability hereunder, or if any Liens securing such joint and several liability, would, but for the application of this sentence, be unenforceable under applicable law, such joint and several liability and each such Lien shall be valid and enforceable to the maximum extent that would not cause such joint and several liability or such Lien to be unenforceable under applicable law, and such joint and several liability and such Lien shall be deemed to have been automatically amended accordingly at all relevant times."

claimed by Defendants, would defeat the debtors' cause of action for a fraudulent transfer, and a cause of action is unquestionably property of the debtor. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983) (Section 541(a)(1) "'includes all kinds of property, including tangible or intangible property [and] causes of action.'" (quoting S. Rep. No. 95-989 at 82 (1978))).

The savings clauses are unenforceable for the additional reason that efforts to contract around the core provisions of the Bankruptcy Code are invalid.[50] Section 548 was meant to ensure that those who saddle insolvent businesses with new obligations or liens must provide reasonably equivalent value in return, or face the avoidance of the transaction. That purpose is evident not only from § 548(a)(1)(B)(I), which provides for the avoidance of transfers by insolvent firms that receive less than reasonably equivalent value, but also from § 548(c), which permits a transferee or obligee that takes for value and in good faith to retain any interest transferred, but only "to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." The savings clauses, if enforced, would nullify the protection provided by § 548(a)(1)(B) and the limits that § 548(c) places on the ability of transferees to retain property. The savings clauses come into play if and only if the transaction would otherwise be avoided, *i.e.*, if the transferee has not provided reasonably equivalent value to an otherwise-insolvent debtor. If given effect, the only purpose served by the savings clauses is to ensure that the transferee can preserve its claim to every last penny of the debtor's remaining assets without providing reasonably equivalent value. The savings

---

[50] *See*, *e.g.*, *Glenn v. Sutton* (*In re Sutton*), 324 B.R. 624, 627 (Bankr. W.D. Ky. 2005) ("The Debtor cannot contract the prohibition on ipso facto clauses away, nor can a Creditor enforce such a provision even if the Debtor agrees to it. Therefore, despite the Creditor's attempt to contract around the jurisdiction of the Bankruptcy Court, this Court has jurisdiction over the dischargeability of the debt owed to the Creditor by the Debtor."); *In re SemCrude*, L.P., 399 B.R. 388, 389 (Bankr. D. Del. 2009) ("By allowing parties to contract around the mutuality requirement of section 553, one creditor or a handful of creditors could unfairly obtain payment from a debtor at the expense of the debtor's other creditors, thereby upsetting the priority scheme of the Code and reducing the amount available for distribution to all creditors.").

clauses are a frontal assault on the protections that section 548 provides to other creditors.  They are, in short, entirely too cute to be enforced.[51]

The savings clauses in the term loans are also unenforceable as a matter of contract law under the facts of this case.  Because of the existence of multiple savings clauses, each of which purports to reduce obligations after accounting for all other obligations, it is utterly impossible to determine the obligations that result from the operation of any particular savings clause. Specifically, whether liabilities must be reduced pursuant to the savings clause in the First Lien Term Loan, and if so, by how much, can be determined only after a determination of liabilities under the Second Lien Term Loan.  But liabilities under the Second Lien Term Loan are also subject to a savings clause; pursuant to that savings clause, liabilities under the Second Lien Term Loan can be determined only after a determination of liabilities under the First Lien Term Loan.   In mathematical terms, the value of $A$ can be determined only after knowing the value of $B$; but the value of $B$ can be determined only after knowing the value of $A$.  The savings clauses create a circular problem that has no answer.[52]  It is turtles all the way down.[53]  Because of the interaction between the two savings clauses, liabilities under the term loans are *inherently* indeterminate.

---

[51]  There is something inherently distasteful about really clever lawyers overreaching.  Some problems cannot be drafted around.  The fact that this sort of drafting was felt necessary by Citi ought to have given it pause that maybe this deal was not possible.  In any event, Citi and the rest of the Defendants assumed the risk that the Transaction would be regarded by a reviewing court as a fraudulent transfer.

[52]  One could perhaps solve the problem using multivariable calculus if the equations were to be solved simultaneously. The problem from a mathematical standpoint is that each savings clause is to be implemented only after all other liabilities are determined.  Because of the circularity of that requirement, the dog must continue to chase its tail forever.

[53]  "[A]n Eastern guru affirms that the earth is supported on the back of a tiger.  When asked what supports the tiger, he says it stands upon an elephant; and when asked what supports the elephant he says it is a giant turtle.  When asked, finally, what supports the giant turtle, he is briefly taken aback, but quickly replies 'Ah, after that it is turtles all the way down.'"  *Rapanos v. United States*, 547 U.S. 715, 754 n.14 (2006).

As a matter of contract law, an inherently indefinite contract term is unenforceable. "[A] court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to." *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991); *see also*, *e.g.*, *Bus. Sys. Eng'g, Inc. v. IBM Corp.*, 547 F.3d 882, 890 (7th Cir. 2008) ("The terms of a contract are reasonably certain only if 'they provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33(2))); *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992) (contract "must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." (internal quotation omitted)); *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966) ("[T]o be enforceable, a contract must be sufficiently certain to enable the court to determine the legal obligations of the parties thereto."). Here, the savings clauses create contracts "as indefinite, and the meaning thereof as impossible of ascertainment by construction, as would be the quotient of a specified number divided by an indefinite divisor." *Van Slyke v. Broadway Ins. Co.*, 47 P. 689, 690 (Cal. 1897). As a matter of contract law, the necessary conclusion is that the savings clauses are unenforceable. "[I]f the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *Candid Productions, Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333-34 (S.D.N.Y. 1982).

Finally, the savings clauses have no effect because the parties to the term loans did not take the steps required by the loan agreements to give effect to any modification of the Conveying Subsidiaries' obligations and liens. Section 10.1 of the term loans provides that no amendment "shall in any event be effective" unless, among other things, that amendment is "in writing and

signed by the Requisite Lenders." This signed writing is specifically and explicitly required for any amendment that would "reduce the principal amount of any Term loan" or that would "release any Borrower from its payment obligation." In this case, there has been no written amendment signed by the lenders, so no amendment of the liens and liabilities of the Conveying Subsidiaries pursuant to the savings clauses has been effected.

### B. Reasonably equivalent value

#### 1. The governing legal standards

The Committee proved that none of the Conveying Subsidiaries received reasonably equivalent value in exchange for the obligations and transfers. "The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997) (internal citation omitted). "By its terms and application, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange." *Advanced Telecommunication Network, Inc. v. Allen* (*In re Advanced Telecommunication Network, Inc.*), 490 F.3d 1325, 1336 (11th Cir. 2007).

There are two types of benefits to be considered in analyzing reasonably equivalent value: benefits that the debtor receives directly ("direct benefits") and those it receives indirectly ("indirect benefits"). "As a general rule, an insolvent debtor receives less than a reasonably equivalent value where it transfers its property in exchange for consideration which passes to a third party. In such cases, it ordinarily receives little or no value." *Hall v. Arthur Young & Co.* (*In re Computer Universe, Inc.*), 58 B.R. 28, 30 (Bankr. M.D. Fla. 1986).

To make out the elements of a fraudulent conveyance claim, a plaintiff must prove that a debtor did not receive direct benefits reasonably equivalent to the value which it gave up. If the plaintiff meets that burden, the burden is then on defendants to produce (if they can) evidence that the debtors indirectly received sufficient, concrete value. *See Welt v. Jacobsen* (*In re Aqua Clear Technologies, Inc.*), 361 B.R. 567, 582 (Bankr. S.D. Fla. 2007) ("[o]nce the Trustee has made his *prima facie* case that a transfer constitutes a fraudulent transfer . . . the burden of producing evidence shifts to the transferee to demonstrate that the Debtor received a benefit or that there was some legitimate purpose for the transfer."). The burden on Defendants includes a requirement to show that the "indirect benefits" were tangible and concrete, and to quantify their value with reasonable precision. *See, e.g., Pummill v. Greensfelder, Hemker & Gale* (*In re Richards & Conover Steel Co.*), 267 B.R. 602, 614 (8th Cir. B.A.P. 2001) ("party claiming to have delivered value must quantify it.").[54]

As discussed above in my findings of fact, each of the Conveying Subsidiaries incurred joint and several liability to repay the First and Second Lien Term Loans. If those obligations are apportioned among the TOUSA entities, approximately $403 million in new obligations may be attributed to the Conveying Subsidiaries. *See* section III.B.1, above. Also for reasons discussed in my findings of fact, the Conveying Subsidiaries received, at most, minimal value in the July 31

---

[54] *See, e.g., Clark v. Security Pacific Business Credit, Inc.* (*In re Wes Dor*), 996 F.2d 237, 243 (10th Cir. 1993) (noting that defendant "fails to point to any evidence quantifying the amount of such [indirect] benefits"); *Leonard v. Mountainwest Fin. Corp.* (*In re Whaley*), 229 B.R. 767, 775 (Bankr. D. Minn. 1999) (where immediate benefit from transfer goes to third party, burden shifts to transferee to show debtor received indirect benefit that was "both tangible and of concrete economic value"); *Leonard v. First Commercial Mortgage Co.* (*In re Circuit Alliance, Inc.*), 228 B.R. 225, 231 (Bankr. D. Minn. 1998) (when trustee establishes transfer was made on account of third party's debt or obligation, burden shifts to defendant to demonstrate debtor received benefit that was "tangible, of concrete economic value, and reasonably equivalent to what the debtor gave up."); *Leonard v. Norman Vinitsky Residuary Trust* (*In re Jolly's Inc.*), 188 B.R. 832, 843 (Bankr. D. Minn. 1995) (once proven that consideration for transfer went directly to third party, defendant seeking shelter of "indirect benefit" defense bears intermediate burden of production as to the concreteness of the indirect benefit, and its reasonable equivalence in value).

Transaction.  I would reach the same conclusion even if the burden of producing evidence with respect to indirect benefits lay with the Plaintiff rather than with Defendants.

### 2.    The Conveying Subsidiaries did not receive direct benefits in the July 31 Transaction

For the reasons stated above in my findings of fact, the Conveying Subsidiaries received no direct benefits in the July 31 Transaction.  See section V.A.1, above.

Defendants contend that various other benefits, aside from the ones I discuss above, should be considered direct.  These putative direct benefits include, for example, (1) the Conveying Subsidiaries' avoidance of default on their guaranties of the bond indebtedness; (2) their avoidance of default under the Revolver; (3) obtaining a larger credit limit under the Revolver, by reason of an increase in the Borrowing Base; (4) realization of a tax refund; and (5) additional future tax benefits.

The Defendants' characterization of these as "direct" benefits is incorrect.  None of the purported benefits was provided by the Defendants, themselves; none was specifically contemplated by the terms of the transactional documents; and none was provided directly to the Conveying Subsidiaries.  Instead, each of these benefits, if received at all by the Conveying Subsidiaries, was received only indirectly.  But even if Defendants were correct, it would not alter my factual conclusion that the Conveying Subsidiaries did not receive reasonably equivalent value in the July 31 Transaction.

### 3.    Indirect benefits

Defendants have failed to carry their burden of producing evidence of indirect benefits that were tangible and concrete, and of quantifying the value of those benefits with reasonable precision.

Not a single expert or fact witness for Defendants has even attempted to quantify the value of the indirect benefits they claim were received by the Conveying Subsidiaries. For that reason, alone, it would be appropriate to rule in favor of Plaintiff on the issue of reasonably equivalent value.

However, regardless of where the burdens of production or proof lie, Plaintiff has demonstrated that the Conveying Subsidiaries did not receive reasonably equivalent value, whether directly or indirectly. That is true both for the reasons set forth in my findings of fact and for the additional independent legal reasons set forth below.

The language of section 548 is clear that "the debtor" must receive reasonably equivalent "value" "in exchange for" the transfer or obligation. 11 U.S.C. § 548(a)(1)(B)(I) (trustee may avoid transfer or obligation "if *the debtor . . . received* less than a reasonably equivalent *value in exchange for* such transfer or obligation" (emphasis added)). That language means that an indirect benefit is cognizable only if three requirements are satisfied. First, the benefit must be received, even if indirectly, by "the debtor," *i.e.*, by an individual Conveying Subsidiary. A benefit received by some other entity does not automatically become a benefit received by *the debtor* merely because both entities are engaged in a common business enterprise. Rather, the touchstone of a cognizable indirect benefit is whether "'the debtor's net worth has been preserved' and the interests of the creditors will not have been injured by the transfer." *General Electric Credit Corp. v. Murphy* (*In re Rodriguez*), 895 F.2d 725, 727 (11th Cir. 1990) (quoting *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991). Moreover, it is irrelevant, in this context, whether TOUSA hoped, or even expected, that the July 31 Transaction would serve the best interests of the company's subsidiaries. The relevant inquiry under Section 548 is whether the Conveying Subsidiaries *actually received*

146

reasonably equivalent value, not whether TOUSA (or the Defendants) hoped or expected that they would receive value.

Second, any purported "indirect benefits" defense must also be limited to cognizable "value." Section 548 does not refer to "benefits," whether direct or indirect. It requires reasonably equivalent "value" and includes a precise definition of "value" that encompasses *only* "property" and "satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. §§ 548(a)(1)(B)(i), (d)(2)(A). Since this case does not concern the satisfaction of the debt of any Conveying Subsidiary, "property" received by a Conveying Subsidiary is the only value that is relevant here.

Third, property must have been received by a Conveying Subsidiary "in exchange for" the transfer or obligation. Any "property" that a Conveying Subsidiary would have enjoyed regardless of the July 31 Transaction cannot be regarded as property received "in exchange for" the transfer or obligation.

In light of the legal principles set forth above, various of the purported indirect benefits championed by Defendants are legally irrelevant.

The statute entirely refutes Defendants' attempt to lump all of the TOUSA entities together for purposes of determining reasonably equivalent value. Section 548 makes clear that reasonably equivalent value must be received by the "debtor" itself – that is, by the same "debtor" that incurred the relevant obligation or made the relevant transfer. Thus, for example, the litigation-settlement value received by TOUSA, Inc. has no relevance to whether or not the Conveying Subsidiaries participated in a fraudulent conveyance.

Defendants assert that the bankruptcy of TOUSA, Inc. would have deprived the Conveying Subsidiaries of a variety of services provided by TOUSA's corporate offices, such as access to a centralized cash management system, purchasing, payroll and benefits administration.  However, many of these business "synergies" do not constitute "value" under section 548 because they are not "property."[55]  Moreover, these benefits were not received by the Conveying Subsidiaries "in exchange for" the obligations and transfers.  The Conveying Subsidiaries enjoyed all of these benefits long before the July 31 Transaction and there is no evidence that they would have lost these benefits in the event of a TOUSA bankruptcy.  Here, there is no need to speculate about what *might* have happened in this regard; TOUSA *did* file for bankruptcy, and the Conveying Subsidiaries in fact continued to receive the benefit of these corporate services after it did so.

To the extent that Defendants' claims of indirect benefits rest on the avoidance of default and bankruptcy by the Conveying Subsidiaries, those claims are equally flawed.  "Avoiding default" is not "property" and therefore is not cognizable as "value" under the statute.

The same is true of the purported indirect benefits of eliminating the adverse business overhang of the Transeastern litigation.  The Conveying Subsidiaries have no "property" right in the elimination of such overhang, and it therefore cannot constitute "value."

Based on the foregoing analysis, the indirect benefits asserted by Defendants cannot be credited.  It is doubtful that any of the claimed benefits constitutes (1) property (2) received by the

---

[55]  As a matter of natural usage, legal usage, and bankruptcy-law usage, the Conveying Subsidiaries could not receive "property" unless they obtained some kind of enforceable entitlement to some tangible or intangible article. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 1818 (1986) (defining "property" in its broadest sense as "something . . . in which or to which a person has a right protected by law") (emphasis added); 11 U.S.C. § 541(a)(1) (defining "[p]roperty of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case") (emphasis added); *see also Bracewell v. Kelley* (*In re Bracewell*), 454 F.3d 1234, 1239 (11th Cir. 2006) (debtor's "hope to an entitlement" not a property interest until it is legally cognizable.)

debtor (3) in exchange for the obligation or transfer.  Moreover, not a single expert or fact witness for Defendants has even attempted to quantify the value of the indirect benefits they claim were received by the Conveying Subsidiaries.  It is clear, moreover, that the purported benefits, even if legally cognizable, and whether considered individually or as a whole, have value (if any) that falls well short of "reasonably equivalent" value.  Accordingly, Defendants "indirect benefits" defense must fail.  Plaintiff has proved that the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the obligations and liens.

### C.    The First and Second Lien Lenders did not take for value and in good faith and are not entitled to preserve liens and obligations under section 548(c)

Under 11 U.S.C. § 548(c), a transferee or obligee "that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."  To preserve liens and claims under this provision, the First and Second Lien Lenders must prove that they acted in good faith and "gave value to the debtor."

"[A] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency."  *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1355 (8th Cir. 1991).  The Court may look at the actions of a reasonably prudent person in the transferee's position.  *Jobin v. Ripley* (*In re M&L Bus. Machine Co.*), 198 B.R. 800, *aff'd* 84 F.3d 1330 (10th Cir. 1996).  This test is applied by looking at the objective facts, *i.e.*, what the transferee should have known, *Development Specialists, Inc. v. Hamilton Bank, N.A.* (*In re Model Imperial, Inc.*), 250 B.R. 776 (Bankr. S.D. Fla. 2000).  "Courts have generally held that it is not necessary to show that the transferee had actual fraudulent intent, though fraudulent intent on the

part of the transferee would clearly establish the lack of good faith." *Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 230 B.R. 546, 591-592 (Bankr. W.D. Tenn. 1999).

The evidence demonstrates that the First and Second Lien Lenders, and their agent, Citi, had far more than sufficient notice of TOUSA's insolvency, based on objective, publicly available information.[56]  Moreover, emails and testimony from key Citi personnel involved in the transaction make clear that Citi had actual knowledge of facts indicating that TOUSA likely was insolvent and that the Conveying Subsidiaries would not receive reasonably equivalent value in the July 31 Transaction.  Despite this notice, Citi undertook no investigation at all of the solvency of any Conveying Subsidiary or the value that any Conveying Subsidiary would receive in the transaction. Citi's investigation of the solvency of TOUSA on a consolidated basis was woefully lacking.  For that reason, the Court concludes that the First and Second Lien Lenders and Citi did not take "in good faith" within the meaning of Section 548(c).

The evidence also demonstrates that the First and Second Lien Lenders did not "take for value" and did not "g[i]ve value to the debtor," *i.e.*, to the Conveying Subsidiaries.  For this additional reason, the First and Second Lien Lenders do not satisfy the requirements of § 548(c) wholly apart from their failure to act in good faith.

---

[56]  In response to bondholders' warnings of the potential for a fraudulent transfer claim if the Transaction were consummated, Citi demanded that the Debtors obtain a solvency opinion.  For the reasons discussed above, that opinion was based upon outdated information, undertaken with shoddy analysis, and provides no defense to the fraudulent transfer claim.  Like the ineffective savings clauses, the "solution" attempted to be engineered through the Alix solvency opinion reflects excessive cleverness rather than a hard-headed, honest analysis of the economic reality of the Transaction.

**D.    The Senior Transeastern Lenders are entities for whose benefit the transfer was made**

Section 550 of the Bankruptcy Code provides remedies for fraudulent transfers.  Pursuant to § 550(a)(1), the trustee may recover "the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made."  However, a plaintiff is entitled to only a single satisfaction under this provision of the statute.  11 U.S.C. § 550(d).

The Senior Transeastern Lenders were "entities for whose benefit" the transfer of liens to the First and Second Lien Lenders was made.  The plain meaning of the statutory language encompasses the Senior Transeastern Lenders.  The new loans, and the liens securing those loans, were undertaken for the express purpose of resolving the claims of the Transeastern Lenders against TOUSA, Inc. and Homes LP.  Execution of the settlement with the Transeastern Lenders was expressly required by the loan agreements, and all parties to the July 31 Transaction understood that the Senior Transeastern Lenders would immediately receive more than $421 million of the loan proceeds.  The Senior Transeastern Lenders directly received the benefit of the Transaction and the Transaction was undertaken with the unambiguous intent that they would do so.

The facts of this case also fall squarely within the Eleventh Circuit's holding in *American Bank of Marin County v. Leasing Service Corp.* (*In re Air Conditioning, Inc. of Stuart*), 845 F.2d 293 (11th Cir. 1988).  In *Air Conditioning*, a creditor was paid with funds provided by a bank in exchange for a security interest in the debtor's property.  The Eleventh Circuit held that the creditor was an entity for whose benefit the transfer of the security interest to the bank was made.

151

The Senior Transeastern Lenders have argued that it would be improper to construe the statute in a manner that would subject them (as beneficiaries of an unlawful transfer) to a potential recovery because the statute's "good faith" defense under Section 550(b) cannot be asserted to bar recoveries from beneficiaries under Section 550(a)(1). However, it is clear from the statutory language that Congress did not intend for this good faith defense to be available when recovery is sought from beneficiaries under subsection (a)(1). In this case, moreover, the Senior Transeastern Lenders are unable to satisfy the requirements for invoking that defense.

Accordingly, Plaintiff has established that it may recover from the Senior Transeastern Lenders the value of the liens granted to the First and Second Lien Lenders. The value that is recoverable is the value at the time of the transfer, *i.e.*, the value on July 31, 2007. *Bakst v. Sawran* (*In re Sawran*), 359 B.R. 348, 351 (Bankr. S.D. Fla. 2007); *Dibraccio v. Raybin* (*In re J.R. Royce, Inc.*), No. 91-24413-BKC-PGH, 1999 WL 33596531 (Bankr. S.D. Fla. 1999); *Murdock v. Plymouth Enter., Inc.* (*In re Curtina Intern., Inc.*), 23 B.R. 969, 979 (Bankr. S.D. N.Y. 1982).

### E.      The Senior Transeastern Lenders are not entitled to recoupment

The Senior Transeastern Lenders assert a right of recoupment as an affirmative defense under Section 9.14 of the Senior Credit Agreement dated August 1, 2005. That provision provides, among other things, that the borrowers will indemnify the lenders for liabilities relating to or arising out of the Senior Credit Agreement. EH/Transeastern LLC; TE/TOUSA Senior, LLC; TE/TOUSA Mezzanine Two, LLC; and TE/TOUSA Mezzanine LLC were parties to the Senior Credit Agreement. In a series of transactions that occurred after the First and Second Lien Term Loans were granted, and after the Senior Transeastern Lenders were paid, these four TOUSA/Transeastern entities were merged into TOUSA Homes Florida LP. TOUSA Homes Florida LP is one of the

Conveying Subsidiaries.  TOUSA, Inc. and TOUSA Homes LP were also parties to the Senior Credit Agreement.

Recoupment is "'[t]he right of a defendant, in the same action, to cut down the plaintiff's demand either because the plaintiff has not complied with some cross obligation of the contract on which he sues or because he has violated some duty which the law imposes on him in the making or performance of that contract.'"  *In re Bill Heard Enters., Inc.*, 400 B.R. at 820  (quoting *Smith v. American Fin. Sys., Inc.* (*In re Smith*), 737 F.2d 1549, 1553 n.7 (11th Cir. 1984)).

There is no conceivable recoupment defense against any of the Conveying Subsidiaries other than TOUSA Homes Florida LP.  None of the remaining Conveying Subsidiaries was a signatory to the Senior Credit Agreement and none has any obligation to indemnify the Senior Transeastern Lenders under that agreement.  There is no basis for permitting recoupment to reduce the recovery to which those Conveying Subsidiaries are entitled because those entities had and have no obligations or duties to the Senior Transeastern Lenders.

Recoupment is also unavailable against TOUSA Homes Florida LP.  Recoupment may be asserted only if "the debtor's claim and the creditor's claim arose from the same transaction."  *In re Bill Heard Enters., Inc.*, 400 B.R. 813, 821 (Bankr. N.D. Ala. 2009).  It is intended to produce a judgment that "does justice in view of the one transaction as a whole."  *United Structures of America, Inc. v. G.R.G. Engineering, S.E.*, 9 F.3d 996, 999 (1st Cir. 1993) (quoting *Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296, 299 (1946)).

The claim for recoupment against TOUSA Homes Florida LP does not satisfy the "same transaction" requirement.  TOUSA Homes Florida LP is entitled to recovery based on the payment of funds to the Senior Transeastern Lenders on July 31, 2007.  When that payment was made,

TOUSA Homes Florida LP had not yet merged with any of the entities that signed the Senior Credit Agreement and did not have any contractual obligations or duties with respect to the Senior Transeastern Lenders.  Conversely, those TOUSA entities which had signed the Senior Credit Agreement did not and do not claim that their property was transferred in violation of Section 548. To the extent (if any) that TOUSA Homes Florida LP currently has any contractual obligations arising from the Senior Credit Agreement, it has such obligation only as a successor to EH/Transeastern LLC; TE/TOUSA Senior, LLC; TE/TOUSA Mezzanine Two, LLC; and TE/TOUSA Mezzanine LLC.  But TOUSA Homes Florida LP's claim for recovery does not rest on its status as a successor to those entities; that claim arose even before it became a successor to them and would exist if it *never* became a successor to them.  The recoupment claim therefore does not seek justice by viewing "one transaction as a whole."  Instead, it seeks to reduce Plaintiff's recovery because of a purported contractual obligation that the Plaintiff plainly did not have when the actionable events occurred.

     The recoupment defense also fails because the indemnification requirements in the Senior Credit Agreement do not extend to liabilities "resulting solely from the gross negligence or willful misconduct" of the indemnified party.  The evidence in this case shows that TOUSA's precarious financial condition was clearly evident in the weeks leading to the July 31 Transaction.  It was equally clear that the transaction would cause the Conveying Subsidiaries to incur obligations and encumber their assets to fund the settlement, and that those subsidiaries were not liable for the debts and guaranties to the Senior Transeastern Lenders.  Under these circumstances, the Senior Transeastern Lenders were grossly negligent, at the least, in proceeding with the transaction.

III.    **THE PAYMENT TO THE SENIOR TRANSEASTERN LENDERS WAS A FRAUDULENT TRANSFER**

The evidence also demonstrates that the payment to the Senior Transeastern Lenders is avoidable pursuant to Section 548.

A.    **The payment to the Senior Transeastern Lenders was a transfer of an interest of the Debtors in property**

Section 548 permits the avoidance of certain transfers of "an interest of the debtor in property" if, among other things, the debtor "voluntarily or involuntarily" received less than reasonably equivalent value in exchange for the transfer.  11 U.S.C. § 548(a)(1).  Property of the debtor is "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."  *Begier v. IRS*, 496 U.S. 53, 58 (1990).  Under 11 U.S.C. § 541(a)(1), the property of the estate includes (with exceptions not relevant here) "*all* legal or equitable interests of the debtor in property."  (Emphasis added.)

There can be no serious doubt that if the Conveying Subsidiaries had retained the borrowed funds, rather than transferring those funds to the Senior Transeastern Lenders, those funds would have been included within the debtors' estates when the petition was filed, thereby ensuring that those funds, along with other property of the debtors, would be available to creditors.  *See Manchester v. First Bank & Trust Co.* (*In re Moses*), 256 B.R. 641, 645 (B.A.P. 10th Cir. 2000) (holding that, by virtue of being a borrower, "the debtor had a legal and an equitable interest in the Trust Loan proceeds, and the Transfer to the Bank diminished the debtor's estate.  On the debtor's petition date, the Trust Loan proceeds were no longer available to pay unsecured creditors.").  "In the bankruptcy setting, courts have held that transfers by a debtor of borrowed funds constitute transfers of the debtor's property."  *In re Smith*, 966 F.2d 1527, 1533 (7th Cir. 1992).  These cases

155

reflect the principle that when funds are loaned to a borrower, they become the property of the borrower (who incurs a contractual obligation to repay the loan).

If funds are lent to co-borrowers (rather than to a single borrower), each of the co-borrowers has a property interest in the funds. As the Supreme Court explained in an analogous context, "if the conclusion were otherwise, the . . . property would belong to no one." *United States v. Craft*, 535 U.S. 274, 285 (2002). That conclusion would shield the borrowed funds from creditors even if all of the co-borrowers filed a bankruptcy petition. *See id.* ("This result not only seems absurd, but would also allow [co-owners] to shield their property."). Not surprisingly, although the issue has been considered infrequently, courts that have confronted the question have held that borrowed funds are the property of the co-borrowers. *Bash v. Sun Trust Banks, Inc.* (*In re Ohio Bus. Machines, Inc.*), 356 B.R. 786 (table), 2007 WL 177941 (B.A.P. 6th Cir. 2007) (unpublished opinion) (property of a subsidiary corporation included funds that were co-borrowed by a parent corporation and its subsidiary, and used to pay parent's debt); *Anzalone v. Dulgerian* (*In re Dulgerian*), 388 B.R. 142, 151 (Bankr. E.D. Pa. 2008) (co-borrowed funds are property of co-borrower).

In arguing to the contrary, the Senior Transeastern Lenders rely on a single district court decision, *Bennett & Kahnweiler Assocs. v. Ratner* (*In re Ratner*), 132 B.R. 728 (N.D. Ill. 1991). They contend that this case "addressed whether a debtor had an interest in loan proceeds because he was a co-borrower on a loan with his wife." Senior Transeastern Lenders' Motion To Dismiss First Amended Adversary Complaint And Memorandum Of Law In Support Of Motion at 13 (Ad*v*. Pro. DE 151). But that was not the issue decided in *Ratner*. As the opinion states in three separate places, the case addresses an entirely different question: whether a debtor who acted as a

156

co-borrower *made a transfer* to his co-borrower. *Ratner*, 132 B.R. at 733-34 ("Plaintiffs argue that a debtor who acts as a co-borrower while insolvent has made a transfer." "The question of whether Ratner's act amounted to a transfer is a question of law." "There is no legal authority to support plaintiffs' position that a debtor who acts as a co-borrower while insolvent has made a transfer."). That question is entirely irrelevant here. The Committee has not argued that the act of borrowing constituted a transfer of the Conveying Subsidiaries' property, let alone that it constituted a transfer *to a co-borrower*. The transfer at issue is the payment of funds to the Senior Transeastern Lenders.

Relying on *Nordberg v. Sanchez* (*In re Chase & Sanborn Corp.*), 813 F.2d 1177 (11th Cir. 1987), the Senior Transeastern Lenders have argued that the Conveying Subsidiaries had no property interest in the loan proceeds because they did not "control" the property. *Sanchez* is inapposite. In *Sanchez*, the owner of the debtor corporation borrowed funds through a personal loan, deposited those funds in a specially-opened corporate account, withdrew the funds almost immediately thereafter, and then used the funds for personal purposes. There was no indication that the corporation held legal or equitable title to the funds; the corporation's fleeting possession of the property was the only basis for suggesting that the corporation might have an interest in the property. The Eleventh Circuit held that this possession was not enough to create a property interest, and the corporation's lack of "control" over the property was one of the factors supporting that conclusion.

From that narrow holding, the Senior Transeastern Lenders attempt to infer a broad principle that "control" is an essential element of any property interest. That inference is clearly wrong. There are many examples of interests in property that do not encompass control of the disposition of the property. A tenant by the entirety holds property even if he cannot unilaterally alienate the

157

property; similarly, the beneficiary of a trust holds a property interest in the trust even if he cannot control the disposition of the trust's property. *See United States v. Craft, supra*, 535 U.S. at 284 (referring to these and other examples and citing cases). Indeed, the broad "control" test urged by the Senior Transeastern Lenders would negate the paradigmatic example of a fraudulent transfer, in which the owner of an insolvent corporation transfers corporate funds to a personal account for his personal use. In that situation, the owner, rather than the corporation, may exercise *de facto* control over the disbursement of the corporate funds to his own account, but no one would suggest that the owner's control negates the corporation's legal and equitable interest in the funds.[57]

A "control" requirement is also belied by the statutory definition of "transfer." That term is defined broadly to include "each mode, *direct or indirect*, absolute or conditional, *voluntary or involuntary*, of disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D) (emphasis added). Similarly, the statutory definition of fraudulent transfer makes clear that a fraudulent transfer may occur whether the debtor acts "voluntarily or involuntarily." 11 U.S.C. § 548(a)(1) (emphasis added). These definitions leave no doubt that a debtor may own property even if the debtor has no power to prevent some other party from transferring the property.

Finally, there is no inconsistency in the Committee's claim that the Conveying Subsidiaries had a property interest in the proceeds of the term loans and the Committee's simultaneous claim that the Conveying Subsidiaries did not receive reasonably equivalent value from the First and

---

[57] Nor does the "earmarking" doctrine control here. Under that doctrine, which has been applied in cases addressing preferences, some cases have held that if a new lender loans funds that are earmarked for the payment of debt owed to an existing creditor, the payment is not a preferential transfer of the debtor's property. But that doctrine is invoked when the transaction, viewed in its entirety, merely replaces one creditor with another, and does not diminish the value of the estate. See *Tolz v. Barnett Bank of S. Fla.* (*In re Safe-T-Brake of S. Fla., Inc.*), 162 B.R. 359, 363-366 (Bankr. S.D. Fla. 1993); *McCuskey v. National Bank of Waterloo* (*In re Bohlen Enterprises, Ltd.*), 859 F.2d 561, 566 (8th Cir. 1988). That is not the situation here. The estates of the Conveying Subsidiaries were diminished by the payments to the Senior Transeastern Lenders, because the Conveying Subsidiaries – which were not liable for any debt to them – received no value from the release of the Senior Transeastern Lenders' claims against others.

Second Lien Lenders.  The Conveying Subsidiaries had a property interest in the loan proceeds, for reasons previously explained, but the *value* of that property interest to the Conveying Subsidiaries was minimal because they had been forced to enter into a contractual commitment that the borrowed funds would be paid to others, principally the Senior Transeastern Lenders.

Based on these principles, I conclude that the payment to the Senior Transeastern Lenders was a transfer of an interest of the debtor in property within the meaning of Section 548(a).

### B.    The Conveying Subsidiaries were insolvent and did not receive reasonably equivalent value

For reasons previously explained, I have concluded that the Conveying Subsidiaries were insolvent on the date of the transfer, had unreasonably small capital, and would incur debts beyond their ability to pay, within the meaning of 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III).

The Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the transfer.  The Senior Transeastern Lenders released claims against TOUSA and Homes LP, but had no claims against the Conveying Subsidiaries.  In exchange for the payment to the Senior Transeastern Lenders, the Conveying Subsidiaries did not directly receive either "property" or the "satisfaction or securing of a present or antecedent debt *of the debtor*."  11 U.S.C. § 548(d)(2)(A) (emphasis added).  Because Plaintiff demonstrated the absence of any direct benefits to the Conveying Subsidiaries, the Senior Transeastern Lenders had the burden of producing evidence that the Conveying Subsidiaries received "indirect" benefits that were tangible and concrete, and to quantify their value with reasonable precision.  The Senior Transeastern Lenders failed to produce such evidence.  However, regardless of which party had the burden of producing evidence of indirect benefits, the evidence taken as a whole clearly established that there were no significant indirect

159

benefits, for reasons previously explained.  The Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the transfer to the Senior Transeastern Lenders.

### C.     The Conveying Subsidiaries are entitled to recover the payments to the Senior Transeastern Lenders

If a transfer is avoided pursuant to Section 548, Section 550(a)(1) permits the recovery of the transferred property from the initial transferee.  Pursuant to this provision, the Conveying Subsidiaries are entitled to recover payments made to the Senior Transeastern Lenders.

The Senior Transeastern Lenders advance good faith defenses to the Committee's claims under Section 548 and its effort to recover from the Senior Transeastern Lenders under Section 550.  Both defenses require the Senior Transeastern Lenders to prove that they took in good faith, but there are differences in the statutory requirements.

Under 11 U.S.C. § 550(b), the Senior Transeastern Lenders must prove three elements: that they took for value, in good faith and without knowledge of the avoidability of the transfer avoided.[58]  Here, the Senior Transeastern Lenders fail on all three elements.

"A transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency."  *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1991).  The Court may look at the actions of a reasonably prudent person in the transferee's position.  *In re M&L Bus. Machine Co.*, 198 B.R. 800 (D. Colo.), *aff'd* 84 F.3d 1330 (10th Cir. 1996).  This test is applied by looking at the objective facts, *i.e.*, what the transferee should have known, *In re Model Imperial, Inc.*, 250 B.R. 776 (Bankr. S.D. Fla. 2000).  "Courts have generally held that it is

---

[58]  The statute provides that the trustee may not recover against "a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1).

not necessary to show that the transferee had actual fraudulent intent, though fraudulent intent on the part of the transferee would clearly establish the lack of good faith." *In re Cannon*, 230 B.R. 546, 592 (Bankr. W.D. Tenn. 1999).

As explained in detail in Section IV of the findings of fact, the Senior Transeastern Lenders had ample reason to believe that the Conveying Subsidiaries were insolvent and would not receive reasonably equivalent value in the July 31 Transaction. The homebuilding industry suffered growing losses throughout the United States in 2006 and those woes increased in 2007. TOUSA, which S&P called the weakest of the publicly-traded homebuilders, suffered these troubles more acutely than other homebuilders. It lost almost a quarter-billion dollars in the fourth quarter of 2006 alone, and continued to lose money through the first two quarters of 2007. TOUSA's sales and deliveries fell and its cancellations rose. Its backlog, which measured its future sales, also declined sharply. It became the most highly-leveraged company in the industry, and objective outside observers expressed considerable skepticism that it would survive the July 31 Transaction.

Although several witnesses for the Senior Transeastern Lenders state that their good faith is evidenced by hard-fought negotiations with TOUSA,[59] there is no evidence to support this basis for a good faith defense. In fact, the negotiations were brief and concluded in substance in a few days with TOUSA's complete and total capitulation. By letter dated January 8, 2007, DB Trust wrote to TOUSA's financial advisor urging that TOUSA support a settlement that gave "each of the Lenders . . . a significant opportunity to satisfy its claims in full." Stip. ¶ 33; Ex. 443 at 2. Eleven days later, TOUSA made an initial proposal "that the senior lenders would be paid in full with interest" (Burns Tr. 3995:11-14) which was, as Robert Burns (from Monarch Alternative Capital,

---

[59] Ex. 5404 (Burns Aff.) at ¶ 15; Ex. 5407 (Lifton Aff.) at ¶ 19.

a Transeastern Lender) testified, "as good as you can do." Burns Tr. 3996:8-21.[60]  Negotiations

between TOUSA and the Senior Transeastern Lenders were brief and concluded in substance by

early January 2007,[61] although the final settlement agreement was dated July 31, 2007.  Ex. 5076.

These brief and non-contentious negotiations provide no support for the proposition that the Senior

Transeastern Lenders acted in good faith within the meaning of § 550(b).

Although the Senior Transeastern Lenders may have provided value to TOUSA and Homes

LP, they provided none to the Conveying Subsidiaries, which were not borrowers or guarantors

under the loans to the Transeastern Joint Venture. Furthermore, none of the Conveying Subsidiaries

was a party to the litigation that DB Trust had brought against the Transeastern Joint Venture,

TOUSA, and Homes LP.  Accordingly, the satisfaction of the Transeastern debt, the elimination of

the guaranties, and the settlement of the Transeastern litigation provided no value to the Conveying

Subsidiaries.  The Senior Transeastern Lenders do not satisfy the requirements of Section 550(b).

Under 11 U.S.C. § 548(c), a transferee "that takes for value and in good faith has a lien on

or may retain any interest transferred or may enforce any obligation incurred, as the case may be,

to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer

or obligation."  Under this statute, the Senior Transeastern Lenders must establish both their good

faith and that they "gave value to the debtor" if they wish to retain the property transferred to them.

---

[60] Steve Wagman, TOUSA's CFO, testified that the settlement with the Senior Transeastern Lenders "was already baked at the time I started . . . right in the beginning, January 10th or so."  Wagman Tr. 504:19-20.

[61] By contrast, there were "difficult and hard-fought negotiations between the mezzanine lenders and Transeastern" that extended "over [ ] some months" (Morgan Tr. 4092:1-6), which reached impasse at one point and prompted the Transeastern Joint Venture to prepare to file for bankruptcy.  Burns Tr. 3997:3-10.

This defense is also unavailable to the Senior Transeastern Lenders.  For the reasons stated above, they did not act in good faith within the meaning of Section 548(c).  Nor did they give value to the Conveying Subsidiaries, for the reasons previously explained.

The Senior Transeastern Lenders are likewise not entitled to recoupment based on the indemnification provisions in the Senior Credit Agreement, for reasons previously explained.

Two parties to the Senior Credit Agreement, Eaton Vance and Riversource-Centurion, transferred their interests in the agreement to Deutsche Bank before July 31, 2007.  However, the requisite paperwork was not completed before the July 31 payment. Eaton Vance therefore received a payment of $14.9 million and Riversource received a payment of $23.1 million.  Both transferred their payments to Deutsche Bank.  Deutsche Bank thus became a mediate transferee under 11 U.S.C. § 550(b) of those payments.  As Deutsche Bank has offered no evidence to support any good faith defense, those payments are directly recoverable from Deutsche Bank.

## IV.   THE LIENS ON TOUSA'S TAX REFUND ARE PREFERENTIAL TRANSFERS

The Committee also seeks to avoid liens on a $207.3 million tax refund as unlawful preferences under 11 U.S.C. § 547(b).  Unlike the claims under Sections 544 and 548, which are asserted on behalf of the Conveying Subsidiaries only, the claim under Section 547 is asserted on behalf of all of the Debtors, including TOUSA, Inc. and Homes LP, as well as the Conveying Subsidiaries.  The Committee's claim under Section 547 seeks to avoid liens on the tax refund held by the First and Second Lien Lenders.

To avoid the liens pursuant to section 547, Plaintiff must prove the "transfer of an interest of the debtor in property (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent;

163

(4) made . . . on or within 90 days before the petition; . . . (5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b). For purpose of section 547, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f).

As part of the July 31 Transaction, the Debtors granted liens on "general intangibles" to the First and Second Lien Lenders. Similar liens were granted to the Revolver Lenders to secure loans under the Second Amended Revolver Agreement executed on the same date. The Debtors' general intangibles were previously unencumbered. For purposes of section 547, "a transfer is not made until the debtor has acquired rights in the property transferred." 11 U.S.C. § 547(e)(3). The date on which the Debtors "acquired rights in" the federal income tax refund was January 1, 2008, immediately following completion of the 2007 tax year. Prior to that date, the Debtors had no right under federal income tax law to claim the refund. Order Denying Creditor's Motion for Summary Judgment to Dismiss Count XIX of the Third Amended Complaint and Granting Plaintiff's Cross-Motion for Partial Summary Judgment at 17 [Adv. Pro. DE 379], 406 B.R. 421, 432.

Because the debtors first acquired rights in the refund on January 1, 2008, that is the date of the transfer of the liens on that refund. Thus, the transfer occurred within the 90 day preference period specified in 11 U.S.C. § 547(b)(4)(A), at a time when the Debtors were presumed to have been insolvent pursuant to 11 U.S.C. § 547(f). Defendants have not offered any evidence to rebut the presumption of insolvency on that date.

The transfer was made to or for the benefit of creditors, *i.e.*, the First and Second Lien Lenders, within the meaning of section 547(b)(1).

The transfer was made for or on account of antecedent debt to those lenders, *i.e.*, the First and Second Lien Term Loans, within the meaning of section 547(b)(2).

Plaintiff has also carried its burden of proving the final element of the preference claim, *i.e.*, that the transfer of the liens would enable the transferees to obtain more than they could obtain in a Chapter 7 case.

The "Liquidation Analysis" submitted by the Debtors in connection with the November 12, 2008 Draft Disclosure Statement [DE 2139] estimated the likely proceeds of a Chapter 7 liquidation of TOUSA. The analysis provided estimates for high, midpoint, and low recoveries. The net proceeds (after accounting for administrative claims and wind down costs) of a high recovery were estimated to be $348,967,000; net proceeds of a midpoint recovery were estimated to be $258,143,000; net proceeds of a low recovery were estimated to be $167,320,000. No party disputed this analysis when it was filed.

Assuming, as the calculation in Section 547(b)(5) requires, that "the transfer had not been made" – *i.e.*, that the liens do not attach to the $207.3 million of the Debtors' property constituted by the tax refund – the Debtors' estates would have post-liquidation assets of approximately $141 million under the high recovery estimate (*i.e.*, $348,967,000 less $207,300,000), $51 million under the midpoint recovery estimate ($258,143,000 less $207,300,000), and $0 under the low recovery estimate ($167,320,000 less $207,300,000), to distribute to the First Lien creditors, who were owed

$325,740,000[62] at the time the Liquidation Analysis was prepared.  In other words, if the First Lien creditors had not obtained liens on the tax refund, they would have nearly $326 million in secured claims, but the estate would have only $141 million to which their liens could attach – assuming the *highest* of the three estimates of net recovery offered in the Liquidation Analysis.  This analysis makes clear that the liens on the tax refund, if not avoided, would enable the First Lien creditors to recover more than they would receive if "(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."  11 U.S.C. § 547(b)(5).  Because the First Lien creditors were undersecured, the Second Lien creditors were also undersecured, by definition.

Citi, as Administrative Agent for the First Lien lenders, contends that the analysis required under Section 547(b)(5) must be performed as of the date of the Debtors' petition and that the Court may rely on the financial filings by the Debtors at the outset of the bankruptcy case to find that the First Lien Lenders were oversecured on that date.  Pre-Trial Brief of the First Lien Term Loan Agent at 37-40 [Adv. Pro. DE 496].

Citi is incorrect that the value of the debtors' assets on the petition date is necessarily determinative.  Section 547(b)(5) requires a determination of what a creditor "would receive" in a Chapter 7 proceeding.  What a creditor "would receive" will depend on the amount recovered through an orderly liquidation of an estate's assets.  Liquidation cannot occur instantaneously on the date the petition is filed, and nothing in the language of subsection (b)(5) suggests, much less requires, that the Court adopt such an unrealistic assumption to determine what a creditor "would

---

[62]  Both the net proceeds of liquidation and the First Lien debt indicated in the Liquidation Analysis are net of amounts that had been authorized to be paid to the First Lien creditors under the Cash Collateral Order.

receive." That conclusion is reinforced by the fact that when Congress wanted to require the use of a specific date in other parts of section 547, it chose clear and precise language to do so. See, *e.g.*, § 547(b)(4) (specifying preference periods); § 547(c)(3)(B) (concerning date of perfection of security interest); § 547(c)(5)(A) (defining relevant preference periods); § 547(e)(2) (defining date of transfer). The failure to prescribe a specific date in § 547(b)(5) suggests that Congress did not intend to require an inflexible use of values on the petition date to determine whether a transfer would result in a preference.

In any event, the Liquidation Analysis on which Plaintiff relies provides a more accurate estimate of the value of Debtors' assets on the petition date than do the schedules cited by Defendants. The Debtors' initial schedules of assets and liabilities do not purport to show the amount the estates could recover in the event of a Chapter 7 liquidation. Rather, the schedules reflect the book value of the assets at the time the schedules were filed.[63] *See*, *e.g.*, Ex. 3192 at 3 ("It would be prohibitively expensive and unduly burdensome to obtain current market valuations for all of the Debtor's property interests. Accordingly, unless otherwise indicated, the Debtor's Schedules reflect net book values as of January 28, 2008, unless indicated otherwise."). The schedules overstate the value of debtors' assets on January 28, 2008 in at least two respects. First, the debtors stated that the book values reported in the schedules "do not reflect certain impairments or other charges for any period after September 30, 2008." *See*, *e.g.*, Ex. 3192 at 7. Second, in addition to the schedules' statements that the reported book values are greater than "market

---

[63] For the Debtors' schedules to reflect book value is consistent with my experience in 30 years of bankruptcy practice. For a debtor's schedules to reflect actual fair market value of any property other than cash and marketable securities is as rare as a unicorn.

valuations," it is also clear that a "market valuation," by definition, will be greater than the value that could be realized under a forced liquidation pursuant to Chapter 7.

Because the debtors' schedules do not purport to estimate, and because they clearly overstate, the amount that could be obtained by the estates in a Chapter 7 proceeding, those schedules provide an unreliable answer to the question posed by Section 547(b)(5). By contrast, the Liquidation Analysis on which Plaintiff relies was prepared to address precisely the question that is relevant under Section 547(b)(5), namely, how much would the Debtors' estates recover if this were a Chapter 7 case. For that reason, the Liquidation Analysis provides a more reliable estimate of the answer to that question than do the schedules on which Citi would have me rely.

Section 547(c) provides statutory defenses to the avoidance of certain transfers that may not be avoided even if the requirements of section 547(b) have been proved by the plaintiff. The party opposing avoidance bears the burden of proof to establish nonavoidability under subsection (c). 11 U.S.C. § 547(g). Defendants have not carried their burden of demonstrating that the transfer of liens on the tax refund falls within any of the categories of transfers that are permissible pursuant to subsection (c).

The defense created under § 547(c)(1) is not applicable because it applies only if, among other things, the transfer was a "substantially contemporaneous" exchange for new value. Here, the loans that constitute the new value were not substantially contemporaneous with the transfer of the liens, which occurred on January 1, 2008. Several circuits have adopted a bright-line rule that the transfer and the exchange for new value must occur within ten days to be substantially contemporaneous; the Eleventh Circuit has adopted a more flexible standard. *Gordon v. Novastar Mortgage, Inc.* (*In re Hedrick*), 524 F.3d 1175 (11th Cir. 2008). In this case, however, 153 days

168

elapsed between July 31, 2007 and the transfer on January 1, 2008. This gap greatly exceeds the longest delays that have been found to be substantially contemporaneous. *See, e.g., Pine Top Ins. Co. v. Bank of Am. National Trust & Savings Association (In re Pine Top Ins. Co.)*, 969 F.2d 321 (7th Cir. 1992) (two to three weeks); *General Motors Acceptance Corp. v. Martella (In re Martella)*, 22 B.R. 649, 653 (Bankr. D. Colo. 1982) (45 days); *Barr v. Reneau (In re Lyon)*, 35 B.R. 759 (Bankr. D. Kan. 1982) (20 days). And many cases have held that gaps far shorter than the gap in this case are not substantially contemporaneous. *See, e.g., Sheehan v. Valley National Bank (In re Shreves)*, 272 B.R. 614, 621 (Bankr. N.D. W.Va. 2001) (four month gap not "substantially contemporaneous"); *Viera v. Ana National Bank (In re Messamore)*, 250 B.R. 913 (Bankr. S.D. Ill. 2000) (67 days); *Ray v. Security Mutual Finance Corp. (In re Arnett)*, 731 F.2d 358, 364 (6th Cir. 1984) (33 days); *Allison v. First National Bank & Trust Co. (In re Damon)*, 34 B.R. 626 (Bankr. D. Kan. 1983) (25 days); *Brown Family Farms, Inc. v. Brown (In re Brown Family Farms, Inc.)*, 80 B.R. 404 (Bankr. N.D. Ohio) (more than a month is too long). Subsection (c)(1) does not apply because the transfer and the exchange of new value were not "substantially contemporaneous."

The defense provided by § 547(c)(2) is not applicable because it applies only if, among other things, the transfer was "made in the ordinary course of business or financial affairs of the debtor and the transferee." The purpose of this exception is "to leave undisturbed normal financial relations." *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir. 1986) (internal quotation omitted). The ordinary course exception "provides a safe haven for a creditor who continues to conduct normal business on normal terms." *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 367 (5th Cir. 2002). *See also Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d 775, 790 (9th Cir. 2007)

169

("the creditor must show a baseline of past practices between itself and the debtor"). In general, debts incurred on an emergency basis while the debtor was in financial distress are not in the ordinary course. *Caillouet v. First Bank & Trust* (*In re Entringer Bakeries, Inc.*), 368 B.R. 520, 532 (E.D. La. 2007). Similarly, restructuring a debt to impose stricter credit limits is an indication that debt was not incurred in the ordinary course. *See*, *e.g.*, *Hechinger Inv. Co. of Del., Inc. v. Universal Forest Products, Inc.* (*In re Hechinger Inv. Co. of Del., Inc.*), 489 F.3d 568, 578 (3d Cir. 2007) ("In essence, a month before the beginning of the preference period, UFP tightened its credit terms, imposed a credit limit, required Hechinger to make payments by wire transfer in large, lump-sum amounts, and required Hechinger to send remittance advices after making payment on invoices. This was not the ordinary course of dealing between the parties."); *J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir. 1989) (deal that imposed new terms and constraints as a direct result of creditor's knowledge of debtor's deteriorating financial condition not in ordinary course). The transfers here were not "in the ordinary course."

The defense provided by § 547(c)(3) is not applicable because it applies only if, among other things, the transfer creates a security interest in property acquired by the debtor using new value "given to enable the debtor to acquire such property; . . . and in fact used by the debtor to acquire such property." 11 U.S.C. § 547(c)(3)(A)(iii)-(iv). The new value here was not given or used to enable the Debtors to acquire "such property," *i.e.*, the tax refund. As previously explained in the findings of fact, the new loans were not necessary to enable TOUSA to obtain the tax refund.

The Committee has demonstrated that the requirements for avoiding the liens on the tax refund pursuant to section 547(b) have been met. Defendants have failed to demonstrate that the requirements for nonavoidability set forth in §§ 547(c)(1)-(3) are present.

## V.    REMEDIES

I have concluded that (1) the obligations incurred by the Conveying Subsidiaries to the First and Second Lien Lenders, and the liens transferred to secure those obligations, may be avoided pursuant to Sections 544 and 548; (2) the Senior Transeastern Lenders are entities for whose benefit the transfer was made; and (3) the transfer of more than $421 million to the Senior Transeastern Lenders may also be avoided pursuant to Sections 544 and 548.  Section 550(a) permits recovery for the benefit of the estate of "the property transferred, or, if the court so orders, the value of such property, from the initial transferee of such transfer or the entity for whose benefit such transfer was made."  Under Section 550, as previously explained, a successful plaintiff may recover the value of the property *at the time of the transfer*.

"Bankruptcy courts have consistently held that 11 U.S.C. § 550 'is designed to restore the estate to the financial condition that would have existed had the transfer never occurred'" and that the bankruptcy courts have broad equitable powers to accomplish that end.  *Bakst v. Wetzel* (*In re Kingsley*), 518 F.3d 874, 877 (11th Cir. 2008) (quoting *In re Sawran*, 359 B.R. 348, 354 (Bankr. S.D. Fla. 2007); *Feltman v. Warmus* (*In re Am. Way Serv. Corp.*), 229 B.R. 496, 530-31 (Bankr. S.D. Fla. 1999) (purpose of Section 550 is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.").

Merely avoiding the obligations and liens associated with the First and Second Lien Term Loans will not restore the Conveying Subsidiaries to the financial condition that would have existed had the transfer never occurred.  A complete remedy must also account for the costs imposed on the Conveying Subsidiaries as a direct result of the transfers.  These costs include the various fees

171

associated with the transaction itself, as well as the cost of pursuing this litigation in order to avoid the unlawful transaction.

Section 550 "provides the basis for an award of attorneys' fees and costs" to the trustee for avoiding a fraudulent transfer. *Shimer v. Fugazy* (*In re Fugazy Express, Inc.*), 159 B.R. 432, 437 (Bankr. S.D. N.Y. 1993), *citing* 4 L. King, COLLIER ON BANKRUPTCY, ¶ 550.02 at 550-9 (15th ed. 1990) (discussing § 550, noting that "[a]s under prior law the bankruptcy court should exercise its equitable powers to award the trustee interest and costs when appropriate"); *cf. In re Ace Fruit & Produce Co.*, 49 F. Supp. 986, 990 (S.D.N.Y. 1943); *contra*, *Brown v. Phillips* (*In re Philllips*), 379 B.R. 765, 789 (Bankr. N.D. Ill. 2007) (no authority to award attorneys' fees).

The Committee asks me to rely in part upon Florida Statute § 57.105 for the award of attorneys' fees. Section 57.105 provides that "If a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract." *See In re Full Gospel Assembly of Delray Beach*, 371 B.R. 559 (Bankr. S.D. Fla. 2007). The First Lien Term Loan and the Second Lien Term Loan Agreements contain provisions that allow attorneys' fees to the lenders for reimbursement of fees and expenses related to the "interpretation" of the Agreement or "enforcement of any Obligation or enforcement of any Loan Document. . . ." Ex. 360, Section 10.3(a); Ex. 361, Section 10.3( a). Under § 57.105, then, the Committee – which stands in the shoes of the Debtors – seeks to recover attorneys' fees for prevailing in this action in which the Term Lenders sought to enforce the Term Loan Agreements.

172

The Term Loan Agreements purport by their terms to be governed by New York law.  New York does bear a rational relationship to this transaction.  Thus the issue of whether I may apply § 57.105 turns on whether that Florida statute is procedural in nature, in which case I may; or substantive in nature, in which case I may not.

At first blush, Fla. Stat. § 57.105 would appear to be procedural.  It is located within Florida Statutes in Title VI, *Civil Practice & Procedure* (Ch. 45-89), Chapter 57 *Court Costs*.  The title of § 57.105 is "Attorney's fee; sanctions for raising unsupported claims or defenses; service of motions; damages for delay of litigation."  When enacting § 57.105, the Florida Legislature stated:

> It is the intent of this act and the Legislature to accord the utmost comity and respect to the constitutional prerogatives of Florida's judiciary, and nothing in this act should be construed as any effort to impinge upon those prerogatives. To that end, should any court of competent jurisdiction enter a final judgment concluding or declaring that any provision of this act improperly encroaches upon the authority of the Florida Supreme Court to determine the rules of practice and procedure in Florida courts, the Legislature hereby declares its intent that *any such provision be construed as a request for rule change* pursuant to s. 2, Art. 5 of the State Constitution and not as a mandatory legislative directive.

Laws 1999, c. 99-225, § 34 (emphasis added).

Thus, both the legislative enactment and its placement within Florida Statutes would ordinarily cause one to conclude that § 57.105 is procedural.  The Florida Supreme Court has ruled otherwise: "The supreme court has held that 'rights to attorney's fees granted by statute are substantive rather than procedural.'" *Walker v. Cash Register Auto Ins. of Leon County, Inc.*, 946 So. 2d 66, 71 (Fla. App. 1 Dist. 2006) (citing *Moser v. Barron Chase Securities, Inc.*, 783 So. 2d 231, 236 (Fla. 2001); *Timmons v. Combs*, 608 So. 2d 1, 2-3 (Fla. 1992) ("it is clear that the

circumstances under which a party is entitled to costs and attorney's fees is substantive"); *Leapai v. Milton*, 595 So. 2d 12 (Fla. 1992)).

The Florida Supreme Court's determination that statutory rights to attorneys' fees are substantive precludes me from relying on § 57.105 in awarding attorneys' fees to the Committee here. "A state court's characterization of an issue as substantive rather than procedural for choice-of-law purposes is binding on a federal court." *Shaps v. Provident Life & Accident Insurance Co.*, 244 F.3d 876, 883 (11th Cir. 2001). The Eleventh Circuit specifically ruled in *Shaps*:

> The Florida Supreme Court has held that under *lex loci contractus* the law of the jurisdiction where the contract was executed governs substantive issues regarding the contract, such as the interpretation of its terms. *See Lumbermens Mut. Cas. Co. v. August*, 530 So. 2d 293, 295 (Fla. 1988). Shaps maintains that the Florida Supreme Court must thereby have intended procedural issues to be governed by Florida law regardless of the effect of *lex loci contractus*. That is the approach taken by the Florida Supreme Court in related contexts. *See, e.g., Colhoun v. Greyhound Lines, Inc.*, 265 So. 2d 18, 20 (Fla. 1972) (Florida law, as law of the forum, applied to procedural matters notwithstanding applicability of foreign law to substantive matters under lex loci delicti ). As a general rule, for conflicts purposes a state will view procedural issues as subject to its own laws. *See Maryland Cas. Co. v. Williams*, 377 F. 2d 389, 393 n.1 (5th Cir. 1967) ("As a general rule, states will adhere to the law of a foreign state which is substantive, but will apply its own law on matters of procedure.").

*Shaps*, 244 F.3d at 882. Accordingly, I do not rely on Fla. Stat. § 57.105 but instead rely entirely upon the provisions of the Bankruptcy Code cited above in awarding attorneys' fees and costs to the Committee.

The Conveying Subsidiaries are also entitled to recover the diminution in value of the liens that has occurred since the transfer. As explained by the court in *Warmus*, 229 B.R. at 532:

> [I]f the court awards a money judgment, but the property has appreciated, the judgment will not restore the estate to the condition

174

that it would have been in but for the transfer: the transferee will retain the appreciated value. This is contrary to section 550(e), which specifies the narrow circumstances in which the transferee is entitled to share in the appreciated value. On the other hand, if the court limits the Trustees to recovery of the property itself, and if the property has declined in value, the estate will have lost the opportunity to dispose of the property prior to its depreciation.

The value of the liens has declined substantially since July 31, 2007, albeit by an amount that cannot yet be determined with precision. The value of a lien equals the lesser of the value of the collateral to which it attaches (the upper bound of what the lienholder can seize) and the amount of the debt it secures (the upper bound of what the lienholder can keep). *See*, *e.g.*, *Morris v. Vulcan Chem. Credit Union* (*In re Rubia*), 257 B.R. 324, 328 (B.A.P. 10th Cir. 2001) ("The value of the Trustee's lien position is measured by the value of the [collateral], but it is limited by the amount of the debtor's debt to [the creditor] on the petition date."); *see also Morris v. St. John Nat'l Bank* (*In re Haberman*), 516 F.3d 1207, 1211 (10th Cir. 2008) ("[H]ad the [debtors] defaulted on their loan prior to bankruptcy, the only property the [creditor] could've claimed (assuming a perfected security interest) was the [collateral], and then only up to the value of the loan."); *USAA Fed. Sav. Bank v. Thacker* (*In re Taylor*), 390 B.R. 654, 657, 664 n.13 (B.A.P. 9th Cir. 2008) (valuing lien as the amount of the obligation secured at the time of the challenged transfer).

At the time the liens were granted, they were worth the amount of the Conveying Subsidiaries' obligations to the First and Second Lien Lenders, because the value of the Conveying Subsidiaries' property (the collateral) was considerably greater than those obligations (while at the same time worth less than the total amount of the Conveying Subsidiaries' total debt). Now, however, the Conveying Subsidiaries' property is worth a great deal less than the debt, and the liens

are consequently worth a great deal less as well.  The Conveying Subsidiaries are entitled to recover that loss in value in addition to their other costs.

Because both the First and Second Lien Lenders and the Senior Transeastern Lenders are initial transferees (and the Senior Transeastern Lenders are beneficiaries) of an avoidable transfer, Section 550 would permit recovery from either set of Defendants, sufficient to restore the Conveying Subsidiaries to their pre-transaction financial condition.  However, a complete recovery from only one set of Defendants (whether the First and Second Lien Lenders, or the Senior Transeastern Lenders) would mean that the other set of Defendants would retain the benefits obtained in the avoided transfer.  In effect, one set of Defendants would obtain a windfall, at the expense of the other set of Defendants.  A more equitable solution would require each set of Defendants to relinquish some of the benefits obtained from the unlawful transfer so that the Defendants, collectively, will share the obligation of restoring the Conveying Subsidiaries to their pre-transfer financial position.  "But the value of the transferred property should be restored to the estate, even if composite elements of that value must come from more than one transferee." *Burtrum v. Laughlin* (*In re McLaughlin*), 18 B.R. 778, 781 (Bankr. W.D. Mo. 1982).

In the specific circumstances of this case involving inter-related multiparty transactions, unwinding the July 31 Transaction, to the extent possible, would provide a practicable and equitable remedy.

As a result of the transaction, the First and Second Lien Lenders loaned $500 million; more than $421 million went to the Senior Transeastern Lenders.  In return for the loans, the First and Second Lien Lenders obtained claims for repayment against the Conveying Subsidiaries, and liens to secure those claims.  To unwind the transaction as to the First and Second Lien Lenders requires

176

the return to them of funds paid to the Senior Transeastern Lenders (in the manner and in the amounts described below), and the relinquishment of the claims and liens against the Conveying Subsidiaries (but not the claims and liens against TOUSA, Inc. and Homes LP).

As a result of the transaction, the Senior Transeastern Lenders received more than $421 million in cash, and released their claims against TOUSA, Inc. and Homes LP. To unwind the transaction as to the Senior Transeastern Lenders requires disgorgement of that portion of the payment they received in the transaction attributable to the Conveying Subsidiaries and the restoration of their unsecured claims against TOUSA, Inc. and Homes LP, which were released as a result of the transaction. As found above, $403 million of the value of the assets subjected to the liens granted in the Transaction is attributable to the Conveying Subsidiaries. *See* Section III.B.1 above. I will therefore order the disgorgement of $403 million in principal amount of the total funds paid to the Senior Transeastern Lenders.

The Senior Transeastern Lenders must pay prejudgment interest on the full amount of that disgorgement. Under New York law, which provides the basis for Plaintiffs' successful claims under § 544, prejudgment interest is mandatory where, as here, there is a "sum awarded . . . because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." N.Y. C.P.L.R. 5001(a). The default amount of that interest is 9% per year, running from the time at which the cause of action accrued. See N.Y. C.P.L.R. 5001(b), 5004. I see no reason not to follow those statutory guidelines, and I therefore order the Senior Transeastern Lenders to pay simple interest at that rate from July 31, 2007, the date of the fraudulent transfer, to the date on which judgment is entered. *See*, *e.g.*, *Geltzer v. Artists Marketing Corp.* (*In re Cassandra Group*), 338 B.R. 583, 599-600 (Bankr. S.D. N.Y. 2006).

I would order the Senior Transeastern Lenders to pay that amount even in the absence of a New York law claim.  Federal law permits a court in a fraudulent transfer case to award prejudgment interest to compensate the debtor "for the use of funds that were rightfully his."  *IBT International Inc. v. Northen* (*In re International Administrative Services, Inc.*), 408 F.3d 689, 710 (11th Cir. 2005); *Warmus*, 229 B.R. at 538.  I find New York law persuasive in determining the proper amount of such compensation here, and would exercise my federal-law discretion in accordance with the guidelines it sets forth.

The Conveying Subsidiaries incurred obligations to repay the First and Second Lien Lenders and granted liens to secure those obligations.  To unwind the transaction as to the Conveying Subsidiaries, those claims and liens must be avoided.  In addition, to ensure that the Conveying Subsidiaries are made whole, they are entitled to recover the costs described above, including the difference between the value of the liens at the time of the transaction (*i.e.*, the amount of the loan obligations) and the value of those liens today (*i.e.*, the current fair market value of the Conveying Subsidiaries' property).

To provide this compensation to the Conveying Subsidiaries, the funds relinquished by the Senior Transeastern Lenders shall be placed in a segregated account (the "Disgorgement Account") to be established by the Debtors from which appropriate compensation to the Conveying Subsidiaries will be paid pursuant to separate order of this Court.  After all requisite payments to the Conveying Subsidiaries have been accomplished, the remainder of the funds shall be distributed to the First and Second Lien Lenders in accordance with the First and Second Lien Term Loan Agreements.  Absent agreement among the parties as to the appropriate amounts to disburse to the Conveying Subsidiaries, further proceedings will be conducted to determine those amounts.

Part of the remedy ordered here involves the reimbursement by Defendants of fees and expenses paid to Plaintiff's counsel, financial advisors, and experts in connection with this Adversary Proceeding.  Precise calculation of those amounts is not possible at this time because the attorneys, financial advisors, and experts have not submitted final bills for the fees and expenses incurred thus far in the litigation. The Conveying Subsidiaries and TOUSA, Inc. shall recover fees and expenses for the Adversary Proceeding from the Defendants.  Calculation of those amounts requires that the professionals representing those entities segregate the fees and expenses for the Adversary Proceeding from those attributable to the main bankruptcy case.  I also order the disgorgement of all fees paid by the Debtors for professionals advising the First Lien Term Loan and the Second Lien Term Loan Lenders and will require disgorgement of all such fees.  Accordingly, each professional firm that has been compensated for services or reimbursed for expenses pursuant to the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals or the Cash Collateral Orders (as defined below) shall submit to the Court on or before October 23, 2009, in the same manner provided for in such orders, a calculation of the total amount of fees and expenses to the date of this order.

The attorneys and other advisors to the Committee and the Debtors shall segregate those fees and expenses attributable only to the Adversary Proceeding from all other fees.

The attorneys and other advisors to the First Lien Term Loan and the Second Lien Term Loan Lenders shall report all fees and expenses that have been paid by the Debtors without segregating fees and expenses related to the Adversary Proceeding from other fees and expenses, except that all fees and expenses incurred on behalf of the Revolver Lenders shall be stated separately by attorneys and advisors for the First Lien Term Lenders.

179

Based upon the foregoing, it is **ORDERED:**

1.      Pursuant to 11 U.S.C. §§ 544 and 548 and under applicable New York and Florida fraudulent transfer law, (a) all obligations of the Conveying Subsidiaries to the First and Second Lien Lenders arising from the July 31 Transaction; (b) all claims of the First and Second Lien Lenders asserted or assertable against the Conveying Subsidiaries, and (c) all liens granted by the Conveying Subsidiaries to secure such obligations and claims, are hereby **AVOIDED** and all such claims are **DISALLOWED.**

2.      Pursuant to 11 U.S.C. § 550 and under applicable New York and Florida fraudulent transfer law, the First and Second Lien Lenders shall **DISGORGE** to the Conveying Subsidiaries' estates any and all principal, interest, costs, expenses and other fees or amounts paid to, for the benefit of, or on behalf of, the First and Second Lien Lenders or in respect of the First and Second Lien Lenders' asserted claims or obligations against the Conveying Subsidiaries' estates (collectively, the "Disgorged Payments").  All Disgorged Payments shall be wired into the Disgorgement Account on or before **November 9, 2009**.  For the avoidance of doubt, the Disgorged Payments shall include, but not be limited to, any and all (a) fees and expenses paid to, for the benefit of, or on behalf of, the First and Second Lien Lenders' respective counsel and advisors, pursuant to the First and Second Lien Term Loan Agreements, and (b) payments to, for the benefit of, or on behalf of, the First and Second Lien Lenders pursuant to the Interim DIP Order, the First Cash Collateral Order, the Second Interim Cash Collateral Order, the Final Second Cash Collateral Order, the Third Cash Collateral Order (each as defined in the Fourth Cash Collateral Order (as defined below)), and the Fourth Interim Order (i) Authorizing Limited Use of Cash Collateral Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code, (ii) Granting Replacement Liens,

Adequate Protection and Super Priority Administrative Expense Priority to Secured Lenders (the "Fourth Cash Collateral Order") and together with the Interim DIP Order, the First Cash Collateral Order, the Second Interim Cash Collateral Order, the Final Second Cash Collateral Order, the Third Cash Collateral Order (the "Cash Collateral Orders").

3.      Pursuant to 11 U.S.C. § 550 and under applicable New York and Florida fraudulent transfer law, the Senior Transeastern Lenders shall **DISGORGE** to the Conveying Subsidiaries' estates $403 million in principal amount (the "Senior Transeastern Disgorged Funds") by or on behalf of the Senior Transeastern Lenders, plus prejudgment interest, with such amounts to be wired into the Disgorgement Account on or before **November 9, 2009**. The Senior Transeastern Lenders also shall disgorge prejudgment interest on the Senior Transeastern Disgorged Funds at the rate of the 9% per year, simple interest, for the period between July 31, 2007 and October 13, 2009.

4.      Pursuant to 11 U.S.C. § 550 and under applicable New York and Florida fraudulent transfer law, upon a further determination by the Court of the diminution in value of the Conveying Subsidiaries' property between July 31, 2007 and October 13, 2009, the Senior Transeastern Disgorged Funds shall be distributed first to the Conveying Subsidiaries on account of (a) transaction costs incurred in connection with the consummation of the July 31 Transaction; (b) the costs incurred by the Debtors and the Committee in connection with prosecuting this adversary proceeding, including fees and expenses paid to attorneys, advisors, and experts; and (c) the diminution in the value of the liens between July 31, 2007 and October 13, 2009; with any remaining funds to be distributed to the First and Second Lien Lenders.

5.      For the purposes of permitting estimation of the diminution in value of the liens between July 31, 2007 and October 13, 2009, the Court **DIRECTS** the Debtors to produce, on or

181

before **November 12, 2009**, an accounting of the value of the remaining assets of the Conveying Subsidiaries that were subject to the avoided liens.

6. The Senior Transeastern Lenders may file a proof of claim against TOUSA Inc. and TOUSA Homes L.P.; *provided, however*, that such proof of claim must be filed on or before **November 13, 2009** and, if timely filed, such claim shall be allowed or disallowed in connection with the Debtors' ongoing Chapter 11 cases. Copies of each such proof of claim shall be simultaneously served on counsel for the Debtors and counsel for the Committee.

7. Pursuant to 11 U.S.C. § 547(b), all liens granted to the First and Second Lien Lenders by the Conveying Subsidiaries, TOUSA Inc. and TOUSA Homes LP on the federal tax refund of $207.3 million are hereby **AVOIDED.** All funds paid to the First Lien Lenders from such tax refund shall be **DISGORGED** to the Debtors, together with interest at the rate of 9% per year, simple interest, for the period between the date of payment and October 13, 2009.

8. Defendants' *Daubert* motions seeking to exclude the testimony of Charles Hewlett and William Derrough are **DENIED.**

9. The Court will conduct a status conference in this adversary proceeding on **Monday, November 9, 2009, at 1:30 a.m.** in Courtroom 301, United States Courthouse, 299 East Broward Boulevard, Fort Lauderdale, Florida 33301.

10. A separate final judgment will be entered in conformity with Federal Rule of Bankruptcy Procedure 7054.

###